UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHEET METAL WORKERS LOCAL #218(S) ) PENSION FUND, 2855 Via Verde, Springfield, IL 62703<br><br>Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC.,<br><br>        Plaintiff,<br><br>  vs.<br><br>RODERICK M. HILLS, FERNANDO AGUIRRE, MORTEN ARNTZEN, ROBERT W. FISHER, STEVEN P. STANBROOK, CARL H. LINDNER, KEITH E. LINDNER, WILLIAM W. VERITY, JEFFREY D. BENJAMIN, ROBERT W. OLSON, STEVEN G. WARSHAW, JEFFERY M. ZALLA, JAMES B. RILEY, WARREN J. LIGAN, ROBERT F. KISTINGER, OLIVER W. WADDELL, WILLIAM A. TSACALIS and JOHN W. BRAUKMAN III,<br><br>        Defendants,<br><br>  -and-<br><br>CHIQUITA BRANDS INTERNATIONAL, INC., a New Jersey corporation,<br><br>      Nominal Defendant. | Case No.<br><br>DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY,
CORPORATE WASTE, AND *ULTRA VIRES* CONDUCT

## OVERVIEW

1.      This is a stockholder derivative action on behalf of Chiquita Brands International, Inc. ("Chiquita" or the "Company") against certain of its officers and directors for intentional, reckless or negligent breaches of their fiduciary duties and corporate waste. The wrongful conduct involves illegal, improper or *ultra vires* conduct, including causing Chiquita to violate the laws of the United States and Colombia and international business conduct codes. This conduct includes paying, or permitting to be paid, improper and/or illegal bribes and other payments to known terrorist organizations such as United Self-Defense Forces of Colombia (the "AUC"), The Revolutionary Armed Forces of Colombia ("FARC"), and the National Liberation Army ("ELN") and illegally providing or facilitating the provision of weapons to the AUC. Chiquita's outside auditor and Robert W. Olson, the Company's in-house General Counsel, acquiesced in the making and concealment of the improper or illegal payments and their mischaracterization in Chiquita's books and records. As a result of this illegal conduct, Chiquita was forced to plead guilty to federal felony charges, pay a large fine, be placed on corporate criminal probation, be sued civilly by the victims of the AUC, and to suffer losses due to the destruction of Chiquita's business operations in Colombia – once its largest source of bananas and profits.

2.      Chiquita is a publicly owned company operating throughout the world, including, until recently, Colombia, where its Banadex subsidiary produced bananas in the Urabá and Santa Marta regions. Chiquita is the world's second largest banana producer. Defendants have misrepresented to shareholders that under their stewardship Chiquita was an ethical, law-abiding corporation that was improving its operations due to the skills of its top managers. As a result, these top managers and directors benefited from their lucrative Chiquita positions.

3.      Chiquita is the successor to the United Fruit Company, which had a long history of illegal conduct. In Central and South America it cooperated with authoritarian governments to suppress and kill its employees during labor protests and pay bribes, the exposure of which led to the suicide of the Company's Chairman and CEO and the enactment of the U.S. Foreign Corrupt Practices Act.

- 1 -

United Fruit's control over Central American governments gave rise to the term "banana republic." As a result of this past, it was important that the insider fiduciaries operate Chiquita in a lawful and ethical manner. Defendants told the shareholders Chiquita's prior behavior

> clearly would not live up to the Core Values we hold today or to the expectations of our stakeholders. Today, we are a different Company. But we acknowledge our complex past as a way to begin an honest dialogue about our present and our future. It is humbling to consider the impacts – both positive and negative – that a corporation can have. At the same time, it is uplifting to note the distance a company can travel.

4.      The true facts were much different than these corporate fiduciaries represented to Chiquita's shareholders. In fact, Chiquita's officers and directors were encouraging and/or permitting Chiquita's executives to resort to improper and/or illegal *ultra vires* activities to boost Chiquita's reported results, including bribes and other improper payments to retain the ability to operate in Colombia. This was done to make their stewardship of Chiquita appear more successful and provide the executives with large salaries and bonus compensation.

5.      From 1997 through 2004, Defendants caused Chiquita to make over 100 bribery payments to the AUC, totaling over $1.7 million, and other bribery payments to the FARC and ELN, which payments were actively concealed from the shareholders and government officials in the U.S. and Colombia. They caused these payments to be falsely accounted for in Chiquita's financial records and statements as "security payments." Because of the illegal conduct of the Defendants, following a March 2007 indictment, Chiquita was forced to plead guilty to a criminal violation of the U.S. Global Terrorism Sanctions Act and pay a $25 million non-tax-deductible fine – the largest criminal penalty ever imposed under that Act. Chiquita also was sentenced to five years criminal probation during which the Company has to meet stringent conditions or face revocation of its probation and additional criminal sanctions. Chiquita has to pay the fine over five years with interest, thus materially increasing the actual amount to be paid and the damage to the Company.

6.      The AUC was designated a "Foreign Terrorist Organization" by the U.S. Department of State. With 15,000 to 20,000 armed troops, the AUC has used kidnapping, torture, rape, murder,

extortion and drug trafficking among its techniques. Paramilitary killings rose dramatically while the sustaining payments from Chiquita continued. One of many massacres committed by the AUC took place in 2001, while the AUC was receiving funds from Chiquita. One morning, the AUC paramilitaries entered the rural town of Chengue and killed 24 men by smashing their skulls. Over 4,000 people were killed in the Uraba banana-growing region of Columbia during the period Chiquita funded the AUC. Chiquita's money helped the AUC buy weapons and ammunition to carry out its terrorist operations.

7.     Chiquita's insiders used the AUC against its own rebellious employees and those who urged them to improve their working conditions. In Antioquia, Chiquita's business boomed as the AUC took over banana-growing lands and was blamed for killing human rights workers and trade unionists. In one year, the AUC was accused of 16 massacres, 362 assassinations and 180 kidnappings, all financed in part by Chiquita. Chiquita has been sued on behalf of many Colombians killed by the terrorists, seeking millions of dollars in damages from Chiquita. Chiquita's executives also facilitated the shipment of 3,000 Israeli rifles and millions of rounds of ammunition to the paramilitaries in 2001. The weapons were brought through the port facility operated by Banadex and stored on the Company's docks before being distributed to the paramilitaries. Colombia's attorney general has opened an investigation into this and requested information from the U.S. Department of Justice ("DOJ"). Colombia may seek the extradition of eight Chiquita officials on charges the Company used one of its ships to smuggle weapons to the paramilitary group.

8.     These payments were known to Chiquita's top corporate officers and directors, Chiquita's in-house General Counsel, and Chiquita's outside auditors and lawyers, who all were aware the payments were being falsely accounted for in Chiquita's records to conceal the truth. Defendants engaged in this wrongful *ultra vires* behavior because Chiquita's Colombian banana-producing operations were highly profitable and these officers and directors were motivated to convince Chiquita's shareholders their management and stewardship of Chiquita was successful. The AUC was

killing thousands of pro-labor advocates in Colombia, which Defendants knew would help them pressure workers in the Company's Colombian operations to accept lower wages and less desirable working conditions. In addition, by continuing the profitable Colombian banana operations via the improper payments and other activities, Defendants inflated their compensation, thus personally profiting from their breaches of duty, which damaged the Company.

9.    The bribery payments to the AUC were made for over seven years, continuing after the payments were disclosed to the DOJ and even after Chiquita publicly disclosed them in mid-2004. Defendants falsely indicated to the DOJ and shareholders that the payments had stopped. Defendants also permitted these bribery payments to continue even after they received specific advice from Chiquita's outside counsel that the payments were illegal and had to stop and that "Chiquita should leave Columbia."

10.    These illegal and/or improper actions had the desired effect, *i.e.*, increasing Chiquita's apparent success and operating profits in the short term. The Defendants' improper and/or unlawful actions have had a damaging impact on Chiquita and its shareholders.

11.    Despite knowledge of the bribery payments and knowledge or reckless disregard of the arms shipments, Chiquita's directors permitted such conduct, including the falsification of Chiquita's books and records in violation of the Securities Exchange Act of 1934 ("1934 Act") to conceal the payments. They did this even though Chiquita was the subject of a Securities and Exchange Commission ("SEC") Consent Decree entered in October 2001. That Decree arose out of improper payments by Chiquita's Banadex subsidiary in Colombia and the falsification of Chiquita's books and records in violation of the 1934 Act to conceal payments, and required Chiquita to "cease and desist" from such falsification. The directors failed to remedy the wrongful conduct even after it became known to the DOJ. Defendants' false statements and reckless or intentional misconduct have already cost Chiquita millions of dollars in wasted compensation for the Defendants, fines and expenses, and expose it to hundreds of millions of dollars in civil suit damages and costs, while damaging Chiquita's

corporate reputation. Chiquita's stock has fallen from over $30 per share to as low as $12.50 per share, costing shareholders over $750 million in lost market capitalization.

12.    When the DOJ discovered Defendants were continuing to make the illegal payments, it threatened Chiquita and Defendants with criminal prosecution. Defendants continued to act in their own self-interest at the expense of Chiquita by causing Chiquita to plead guilty and pay a large fine in return for the government's promise not to prosecute the executives involved – even though the government's Sentencing Memorandum specifically identified 10 present and former Chiquita officers as being actively involved in the illegal payments. On September 17, 2007, the federal court's order made clear Chiquita's senior officers and directors had offered Chiquita's guilty plea so they would be spared personally. By sparing the executives criminal exposure and by paying them large severance payments or allowing them continued lucrative employment in exchange for their silence, all the then-current directors of Chiquita further breached their fiduciary duties to Chiquita.

13.    By 2002, Chiquita's insiders knew they would have to sell off Chiquita's Colombian banana operations due to the illegal and improper conduct they had caused or permitted there. They knew this sale would deprive Chiquita of millions of dollars in revenues from what had been one of its most profitable operations. To try to make up for these lost revenues and profits, in 2003, the Defendants hastily and without adequate due diligence acquired a German fruit distribution business known as Atlanta A.G. ("Atlanta") for an excessive price. As a result, almost $43 million in goodwill went onto Chiquita's balance sheet. Defendants presented Atlanta as a favorable acquisition that would increase revenues by over $1 billion a year. In truth, the Atlanta acquisition badly damaged the Company. Almost immediately upon the acquisition of Atlanta, because of severe problems in its business, Chiquita began to write off the value of Atlanta, which ultimately wiped out 100% of the goodwill recorded for the Atlanta acquisition in less than three years.

14.    In 2004, due to the problems in its Colombian operations from the improper activities there, and hoping to reduce the likelihood of extradition of Chiquita insiders to Colombia for their

criminal conduct, Defendants sold Chiquita's Colombian banana-producing operations in a "fire sale." This deprived Chiquita of a major source of bananas necessary to conduct its business, requiring Chiquita to secure another source at premium, unprofitable, prices. The "fire sale" produced a $9 million loss when the cost of the long-term banana purchase contract is factored in.

15.     The current directors will not objectively consider, bring, or vigorously prosecute claims against themselves or the officers who were actively involved in the misconduct. Because the current Board is disabled from protecting or enforcing the Company's rights, Sheet Metal Workers Local #218(S) Pension Fund, an institutional shareholder of Chiquita, brings these claims in the place of the Chiquita Board of Directors to protect the Company and restore shareholder value.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiff and Defendants are citizens of, and domiciled in, different states. All of Plaintiff's trustees are residents and citizens of Illinois and none reside in or are citizens of the same states as Defendants. This action does not seek to confer jurisdiction that the court would otherwise lack.

17.     Chiquita does substantial business in Washington, D.C., including directing significant marketing toward, making substantial sales in, and relying heavily upon sales revenue derived from the District of Columbia. Defendant Hills, who was the "financial expert" of the Audit Committee and a key defendant, resides in and is a citizen of the District of Columbia. A substantial part of the wrongdoing occurred in and/or had an effect in Washington, D.C. The DOJ and SEC have investigated Chiquita here in Washington, D.C. for important aspects of the conduct complained of herein. The Company is subject to a Consent Decree in this district in *Securities & Exchange Commission v. Chiquita Brands Int'l, Inc.*, No. 01-CV-2079 (D.D.C. *judgment entered* Oct. 25, 2001), and the Company's compliance with that decree is relevant to this action. The Company recently settled the DOJ enforcement action brought in this district in *United States v. Chiquita Brands Int'l, Inc.*, No. 07-

CV-0055 (D.D.C. *judgment entered* Sept. 24, 2007), which is highly relevant to the underlying claims in this action. The allegations in this case are substantially related to the claims being prosecuted in *Jane/John Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 07-CV-01048 (D.D.C. *filed* June 7, 2007), where the Company faces significant liability for injuries perpetrated by the AUC in Columbia.

## PARTIES

18.     Plaintiff Sheet Metal Workers Local #218(S) Pension Fund was at relevant times a shareholder of Chiquita. Plaintiff currently owns approximately 3,400 shares of Chiquita common stock. Plaintiff brings this action derivatively for the benefit of Chiquita. Plaintiff will fairly and adequately represent the interests of Chiquita and its shareholders in enforcing the rights of Chiquita.

19.     Nominal defendant Chiquita Brands International, Inc. ("Chiquita") is a New Jersey corporation headquartered in Ohio. Chiquita engages in the growing, distribution and sale of bananas. Chiquita is the world's second largest banana producer, with annual revenues of approximately $4.5 billion and about 25,000 employees. Through the late 1990s, Chiquita was the world's largest banana producer, controlling one-third of the world's banana trade. By late 2001, Chiquita entered into a reorganization proceeding from which it emerged in the Spring of 2002. The pre-reorganization equity holders of Chiquita continued to be such after the reorganization. The reorganization plan explicitly preserved Chiquita's pre-reorganization causes of action as to all persons and entities not released via the plan. The wrongful conduct alleged herein began before the bankruptcy, continued during the proceeding while concealed from the bankruptcy court, and continued after the reorganization. No Defendant herein was released by the reorganization plan. In October 2001, the SEC issued a cease-and-desist order against Chiquita, in which the SEC found Chiquita violated the books and records and internal accounting controls provisions of the 1934 Act in connection with a payment to foreign customs officials by a wholly-owned foreign subsidiary of Chiquita. *SEC v. Chiquita Brands International, Inc.*, Civ. Action No. 01-CV-2079 (D.D.C. *judgment entered* Oct. 25, 2001). Chiquita consented to the entry of an order that requires Chiquita to cease and desist from violating those

- 7 -

provisions. The SEC also filed a settled complaint in federal court seeking entry of a consent order requiring Chiquita to pay a $100,000 civil penalty. Chiquita settled the action without admitting or denying the Commission's allegations. The order found Chiquita violated the books and records and internal control provisions as a result of the conduct of its Colombian subsidiary, Banadex. According to the order, employees of Banadex authorized the payment of the equivalent of $30,000 to local customs officials to secure renewal of a license at Banadex's Turbo, Colombia port facility. The subsidiary's books and records incorrectly identified the two installment payments, made in 1996 and 1997. The SEC concluded Banadex employees made inaccurate entries in the records of the transaction and in Banadex's general ledger to conceal the payment to customs officials. These inaccurate entries constituted a violation by Chiquita of §13(b)(2)(A) by failing to maintain books and records which accurately reflected Banadex's transactions and dispositions of assets. The SEC further found that Chiquita violated §13(b)(2)(B) by failing to maintain a system of internal accounting controls to ensure that Banadex's books and records accurately and fairly reflected the disposition of Banadex's assets. Accordingly, the SEC, pursuant to §21C of the 1934 Act, required that Chiquita cease and desist from committing or causing any violation, and committing or causing any future violation, of §§13(b)(2)(A) and 13(b)(2)(B) of the 1934 Act.

20.    Defendant Fernando Aguirre ("Aguirre") has served as Chairman of Chiquita since May 2004 and as Chief Executive Officer ("CEO") and President since January 2004. Aguirre received a compensation package for fiscal 2006 valued at over $3 million. On April 15, 2007, after the Company entered into the plea agreement and suffered the Colombia and Atlanta losses, Aguirre's employment agreement was renewed and his base salary increased more than 13% to $900,000 per year with a target bonus of 130% of that annual base salary. Aguirre also received a restricted stock award worth $1.2 million and an additional restricted stock grant with a targeted value of $1.6 million, despite his complicity in the wrongdoing alleged herein. His long-term incentive payment for the 2007-2009 performance period was set at $1.6 million. Aguirre resides in and is a citizen of Ohio.

21.    Defendant Morten Arntzen ("Arntzen") has served as a director of Chiquita since 2002. Arntzen received $111,000 in directors' fees in fiscal 2006. Despite the Board's complicity in the wrongdoing, the Board increased the cash component of their pay by more than 60%, from $30,000 to $50,000 per year, and increased the stock component of their compensation by 100%, from an annual grant worth $25,000 to an annual grant worth $50,000, resulting in a combined directors' fee of $130,000 per year. Arntzen served with Defendant Hills on the Audit Committee that approved the payments to the AUC, the fraudulent accounting for those payments in Chiquita's books and records and the concealment of those payments in Chiquita's reports filed with the SEC. *The Wall Street Journal* reported in August 2007 that Arntzen said "the AUC payments weren't secretive; they were disclosed to Ernst & Young and to company directors on the audit committee." Arntzen told *The Wall Street Journal*: "When I joined the board, I knew the company was making payments to paramilitary groups in Colombia." Arntzen resides in and is a citizen of Connecticut.

22.    Defendant Robert W. Fisher ("Fisher") has served as a director of Chiquita since 2002 and as Acting Chief Operating Officer from March to August of 2002. He received over $101,000 in directors' fees in fiscal 2006. Due to the increases in directors' fees, Fisher now receives an annual fee of $130,000 per annum and other perquisites. Fisher resides in and is a citizen of California.

23.    Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of Chiquita since 2002 and as a member of the Audit Committee between 2003 and 2005. Stanbrook received a directors fee of over $111,000 for fiscal 2006 and now receives a directors' fee of $130,000 per annum and other perks. Stanbrook resides in and is a citizen of Wisconsin.

24.    Defendant Carl H. Lindner ("C. Lindner") served as Chairman and CEO of Chiquita from 1984 until May 22, 2002 and August 13, 2001, respectively, having originally joined the Board in 1976. Through his insurance company, American Financial Group ("AFG"), Lindner controlled nearly 40% of Chiquita's stock until after AFG's bankruptcy in 2003, when his equity interest was reduced to less than 10%. C. Lindner resides in and is a citizen of Ohio.

- 9 -

25.     Defendant Keith E. Lindner ("K. Lindner"), C. Lindner's son, served as Vice Chairman of Chiquita from 1997 until 2001. He served as Chiquita's President and Chief Operating Officer from 1989 to 1997 and in various executive capacities since 1984. K. Lindner was also Co-President and a director of AFG and AFC. K. Lindner resides in and is a citizen of Ohio and Florida.

26.     Defendant Roderick M. Hills ("Hills") served as a director of Chiquita from March 2002 until he resigned in May 2007 and a member of the Audit Committee. Hills learned about the payments to the AUC in April 2002, a month after he joined the Board. According to notes later produced by the Company's outside counsel, in reaction to counsel's warnings that the payments had to stop, Hills' urged continuation of the payments, stating "just let them sue us, come after us." Even after the DOJ learned of the payments and told Hills the payments were illegal, Hills refused to curtail them and permitted approximately $145,000 to be paid. On December 22, 2003, Hills emailed fellow directors: "we appear to [be] committing a felony." Hills resides in and is a citizen of Washington, D.C.

27.     Defendant Robert W. Olson ("Olson") served as Senior Vice President and General Counsel of Chiquita from before 1997 until he retired in August 2006. Olson approved the illegal payments and helped devise the scheme to conceal and falsely account for them. He provided legal counsel and advice to many of the Defendants and Chiquita throughout this period and approved many false and misleading statements to shareholders. When Kirkland & Ellis told Chiquita it "should STOP PAYMENTS IMMEDIATELY," Olson (and Hills) argued against doing so and was involved in continuing to conceal the payments from the DOJ. Even when the DOJ told Olson on April 23, 2003 the payments were illegal, he and Hills caused or permitted Chiquita to make more payments of over $145,000 through February 2004. Olson resides in and is a citizen of Ohio.

28.     Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of Chiquita from March 2002 until 2007. Benjamin was a member of Chiquita's Audit Committee during his Board membership. Benjamin resides in and is a citizen of New York.

29.    Defendant William W. Verity ("Verity") served as a director of Chiquita from 1994 until March 2002.  Verity served on the Board's Compensation and Audit Committees from 1998-2002. Verity resides in and is a citizen of South Carolina.

30.    Defendant Steven G. Warshaw ("Warshaw") served as a director of Chiquita from 1997 until March 2002.  Warshaw also served as Chiquita's President and Chief Operating Officer from 1997-2001, as Chief Financial Officer from 1994-1998 and as Executive Vice President and Chief Administrative Officer from 1990-1997, having served in various executive capacities at Chiquita since 1986 when the Lindners took control.  Warshaw is a resident and citizen of Ohio.

31.    Defendant Jeffery M. Zalla ("Zalla") has served as Senior Vice President and Chief Financial Officer since May 2005.  From April to June, 2005, he served as Vice President, Finance for Chiquita Fresh Group-North America.  He served as Vice President, Treasurer, and Corporate Responsibility Officer from April 2003 to April 2005, Corporate Responsibility Officer and Vice President, Corporate Communications from September 2001 to April 2003 and Vice President and Corporate Responsibility Officer from October 2000 to September 2001.  Zalla is a resident and citizen of Kentucky.

32.    Defendant James B. Riley ("Riley") served as Senior Vice President and Chief Financial Officer of Chiquita from 2001 until August 2004.  Riley is a resident and citizen of Ohio.

33.    Defendant Warren J. Ligan ("Ligan") served as Chief Financial Officer of Chiquita from 1998 until 2000, having previously served in various executive capacities since 1993.  Ligan is a resident and citizen of California.

34.    Defendant Robert F. Kistinger ("Kistinger") has served as President and Chief Operating Officer of the Company's Chiquita Fresh Group since March 2000, having previously served as President and Chief Operating Officer of the Company's Chiquita Banana Group from 1997 until 2000, as Senior Executive Vice President of the Chiquita Banana Group from 1994 to 1997, as President of

Chiquita Banana Group-North America from 1996 to 1997, and in various other executive capacities since 1980. Kistinger is a resident and citizen of Ohio

35.     Defendant Oliver W. Waddell ("Waddell") served as a director of Chiquita from 1994 to March 2002 and served on the Audit and Compensation Committees. Waddell is a resident and citizen of Ohio.

36.     Defendant William A. Tsacalis ("Tsacalis") was Vice President, Controller and Chief Accounting Officer of Chiquita and currently serves at Vice President, Finance and Treasurer. Tsacalis is a resident and citizen of Ohio.

37.     Defendant John W. Braukman III ("Braukman") is Senior Vice President of New Business Development and served as Senior Vice President and Chief Financial Officer of Chiquita until June 2005 when he was replaced by Zalla. Braukman is a resident and citizen of Connecticut.

## DEFENDANTS' FIDUCIARY DUTIES

38.     By reason of their positions as officers and directors of Chiquita and because of their ability to control corporate affairs of Chiquita, Defendants owed Chiquita and its shareholders fiduciary obligations of care, candor, compliance, trust, and loyalty, and were required to manage Chiquita in a fair, just, honest and equitable manner and to act in furtherance of the best interests of Chiquita and its shareholders and not in furtherance of their personal interest or benefit.

39.     Each director and officer of the Company owes to Chiquita the fiduciary duty to comply with the laws of the United States and the other countries Chiquita does business in and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. Each owes an obligation of good faith and fair dealing. As officers and directors of a publicly held company, Defendants had a duty to disseminate accurate and truthful information about the Company and an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections and to not advance their own personal or financial interests over and at the expense of the Company's public shareholders.

40.     Defendants, because of their positions of control and authority as directors or officers of Chiquita, were able to and did control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their positions with Chiquita, each Defendant had access to all non-public information about the financial condition, operations and future business prospects of Chiquita, including, without limitation, the illegal and improper activities in which the Defendants caused Chiquita to engage.

41.     To discharge their duties, the officers and directors of Chiquita were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Chiquita.

42.     During all relevant times, each Defendant occupied positions with Chiquita that made him privy to confidential and proprietary information concerning Chiquita. Because of these positions and such access, each Defendant knew the true facts specified herein had not been disclosed to and were concealed from Chiquita's shareholders. Defendants, as fiduciaries entrusted with non-public information, were obligated to disclose material information regarding Chiquita and to take any and all actions necessary to ensure the officers and directors of Chiquita did not abuse their positions of trust, loyalty and fidelity in a manner that caused the Company to violate the law.

### FACTUAL ALLEGATIONS

43.     In an effort to present themselves as competent, honest stewards and managers of Chiquita, Defendants repeatedly misrepresented they were overseeing and managing Chiquita in a lawful and ethical manner and Chiquita had internal accounting and other controls to assure its accounting was proper and it was in compliance with anti-corruption and anti-bribery laws. Defendants also misrepresented Chiquita had effective training programs for its executives and managers in this regard. Defendants have caused Chiquita to engage in a pattern and practice of making illegal and improper bribery payments and engaging in other illegal activities in Colombia and making false and misleading statements to conceal them, violating U.S. and foreign law. Defendants also repeatedly

misled Chiquita's shareholders to entrench and enrich themselves by boosting Chiquita's apparent short-term results and paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage Chiquita.

44.     For many years in their Annual Reports and other communications with shareholders, Chiquita's directors stressed their successful management and oversight of Chiquita, its ethical behavior and compliance with laws. These representations were false and misleading and made with reckless disregard for the truth by the directors. The Annual Reports were false and misleading for failing to disclose the existence and nature of the Colombian payments, the falsification of financial statements, the circumvention of or material weakness in Chiquita's accounting controls, Chiquita's other improper activities in Colombia, the fact that Chiquita's funds were being used to support terrorism, the Defendants' *ultra vires* conduct, and the primary reason for Chiquita's apparent progress was the improper and *ultra vires* conduct.

45.     The statements in Chiquita's Annual Reports specified below were known by Defendants to be false when those statements were made. To justify continuation of their lucrative positions, Defendants wanted to make it appear Chiquita was succeeding and in an ethical, lawful manner. The repeated positive and reassuring statements about Chiquita's controls and procedures to comply with laws, rules and conventions, Chiquita's actual compliance with them, and Chiquita's dedication to high ethical standards were false. In fact, Chiquita's top officers and directors were permitting circumvention of those procedures and controls by permitting the payment of bribes and illegal arms shipments. Chiquita's financial statements also were false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make provision for the monetary fines, penalties and damages that would inevitably result from those payments.

46.     In Chiquita's 1997 Annual Report to Shareholders, the "Executive Message" signed by C. Lindner, K. Lindner and Warshaw, stated: "We continue to make measurable progress toward objectives which further the realization of Chiquita's earnings capacity." Elsewhere, the Report stated:

- 14 -

"Chiquita's corporate values balance good citizenship and social responsibility with profitable business growth. . . . The Company has a strong commitment to ethical, social . . . standards . . . . Consumers worldwide are concerned about . . . social issues. They expect companies to fulfill their responsibilities of global citizenship. . . . Chiquita welcomes the interest in ethical standards and pledges to continue improving . . . social conditions where the Company operates."

47.     The 1997 Annual Report contained the following:

**Statement of Management Responsibility**

The financial information presented in this Annual Report is the responsibility of Chiquita Brands International, Inc. management, which believes that it presents fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The Company's system of internal accounting controls, which is supported by formal financial and administrative policies, is designed to provide reasonable assurance that the financial records are reliable for preparation of financial statements and that assets are safeguarded against losses from unauthorized use or disposition. Management reviews, modifies and improves these systems and controls as changes occur in business conditions and operations. The Company's worldwide internal audit function reviews the adequacy and effectiveness of controls and compliance with policies.

The Audit Committee of the Board of Directors reviews the Company's financial statements, accounting policies and internal controls. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors to discuss these matters.

48.     Chiquita's 1998 Annual Report stated:

Chiquita is a responsible corporate citizen to a broad community of our customers, consumers, employees and neighbors.

49.     The "Executive Message" in the 1998 Annual Report signed by C. Lindner, K. Lindner and Warshaw stated: "Chiquita Brand International's 1998 operating results reflect continued progress . . . ."

50.     Chiquita's 1998 and 1999 Annual Reports contained the same "Statement of Management Responsibility" as in its 1997 Annual Report, which statements were false and misleading for the same reasons.

51.     Chiquita's 2000 Annual Report to Shareholders contained the same "Statement of

Management Responsibility" as in its 1997 Annual Report, which statements were false and misleading

for the same reasons.

52.     During 2000, Chiquita published a "Corporate Responsibility Report." It stated in a

letter signed by Warshaw:

**A New Spirit of Openness:  Letter from Steve Warshaw**

>       To some, this Report may seem like it was along time coming.

>       The Chiquita of today emerged, over the course of 100 years, from companies
> holding various names, including the United Fruit Company and United Brands. . . .

>       But along the way, the United Fruit Company became known as "the octopus,"
> an organization reputed to have such broad reach and influence that it could hold sway
> over governments and the lives of its employees.  This reputation was born of many
> things, including allegations of the Company's participation in labor rights suppression
> in Colombia in 1928 and involvement in a government overthrow in Guatemala in 1954,
> as well as its involvement in a bribery scandal in Honduras in 1975.  And in the years
> since, some would argue that the Company has been closed and defensive in addressing
> concerns about its standards and practices.  In the eyes of many, all of this casts a
> shadow, even today, over the Company.

>       Times have changed.  And so has our Company.

>       Our stakeholders expect more of us.  We expect more of ourselves.  Our
> understanding of our role in society, and what it means to be a responsible corporate
> citizen, is quite different than it was not long ago.

>       Three years ago, in the wake of particularly damaging media coverage, we
> embarked on a disciplined path toward Corporate Responsibility. . . . This was not to be
> a public relations exercise, but a management discipline – a way to align ourselves
> around a set of Core Values, to build a sense of common purpose across our different
> units, and to get the best out of our people. . . . We have learned that building trust
> demands a new spirit of openness and honesty within the Company, and that earning the
> trust of our many stakeholders is vital to our success. . . . Of course there is compelling
> moral value to this work.  But it also makes smart business sense. . . .

53.     Elsewhere the 2000 Corporate Responsibility Report stated:

>       **Our Core Values and Code of Conduct** – These standards are the cornerstones
> of our commitment to Corporate Responsibility.  Our Core Values guide our strategic
> business decisions and help us balance the needs of our stakeholders, and our Code of
> Conduct translates these Values into everyday behaviors. . . .

***INTEGRITY***

We live by our Core Values

We communicate in an open, honest and straightforward manner

We conduct business ethically and lawfully

54.     In the 2000 Corporate Responsibility Report, Defendants told the shareholders they had

a series of controls, committees and procedures that ensured compliance with these core values:

**Creating Governance:  Support and Accountability**

Governance Structure

Chiquita's commitment to Corporate Responsibility begins at the top of the organization and is supported by a governance structure designed to provide guidance, resources, and accountability for the responsible conduct of employees in their everyday jobs.

Audit Committee

In 2000, we expanded the role of the Audit Committee of the Company's Board of Directors to include oversight of whether the Company has the right people, policies and programs in place to properly manage Corporate Responsibility.  The Audit Committee has three members, all of whom are outside directors.  The Company's Corporate Responsibility Officer has open access to Audit Committee members and reports to them periodically as part of regularly scheduled Committee meetings.

Senior Management Group for Corporate Responsibility

The effective achievement of our standards is the responsibility of our senior management.  Twelve top operating and administrative managers of our worldwide businesses have been meeting about every two months since October 1998 specifically to discuss our Corporate Responsibility strategy and performance.  These senior managers are responsible for providing vision and effective leadership for Corporate Responsibility, modeling our Core Values in their personal behavior, and holding the organization accountable for achieving credible progress toward our objectives.

Corporate Responsibility Officer

In May 2000, Chiquita appointed a full-time Vice President and Corporate Responsibility Officer. The role of the Corporate Responsibility Officer is to oversee the design, implementation, management, and improvement of Corporate Responsibility practices throughout the Company.  He is also responsible for the development of measurement, verification, accountability, communication, and reporting systems.  He serves as an internal resource for best practices in Corporate Responsibility, communicates with stakeholders about the Company's performance, and tracks emerging issues of importance to the Company and its stakeholders.  He reports to the President and Chief Executive Officer.

Jeff Zalla is a ten-year Chiquita employee and has led our Corporate Responsibility Steering Committee since its inception in 1998.

Corporate Responsibility Steering Committee

The Senior Management group is currently supported by a Corporate Responsibility Steering Committee, which includes the Corporate Responsibility Officer, the Vice President of Human Resources, five directors and managers from representative Chiquita business units, and one rotating member of Senior Management. This group has met monthly since October 1998 and has contributed enormously to the design and implementation of our Corporate Responsibility efforts. The Steering Committee has worked to ensure that our strategies and objectives are appropriate and that our tools for assessment and planning are effective for all business units. It has also engaged other corporate functions such as Legal, Human Resources and our environmental group in efforts to integrate Corporate Responsibility into our everyday management practices. . . .

Our Code of Conduct

Our Code of Conduct translates our Core Values into everyday behaviors. For decades, Chiquita has had a Code of Conduct that dealt with ethical and legal behavior and compliance with Company policies. . . . Our Code of Conduct now embodies standards in the areas of food safety, labor standards, employee health and safety, community involvement, environmental protection, ethical behavior, and legal compliance.

55.    Chiquita's 2001 Annual Report stated:

We made considerable progress on corporate responsibility, breaking new ground with our first Corporate Responsibility Report (www.chiquita.com), which earned praise for its honesty, transparency and measurement against rigorous third-party environmental and social standards. As a Company, we will continue to be guided by Chiquita's Core Values of integrity, respect, opportunity and responsibility in our dealings with shareholders, employees, customers, suppliers and the communities in which we do business.

For 2001, Chiquita reported $155 million earnings . . . (EBITDA) . . . [and] an improvement of 7% over the previous year. . . .

We are confident that . . . our industry-leading production capabilities in Latin America, and the Chiquita brand, which is among the best-known and most respected brands in the world, provide us a strong platform for growth.

56.    Chiquita's 2001 Annual Report contained the same "Statement of Management Responsibility" as in the 1997 Annual Report, which statements were false and misleading for the same reasons. Chiquita's 2001 Corporate Responsibility Report contained similar statements as in the 2000 Corporate Responsibility Report, which were false and misleading for the same reasons.

57.    Chiquita's 2002 Annual Report stated:

**Here's what we're doing to improve corporate responsibility**.  In 2002, Chiquita again demonstrated its commitment to high . . . social standards. . . .  Our corporate responsibility reports also continue to earn recognition for their honesty, transparency and clear performance measurement.  Our first report was ranked best in the world among food companies by SustainAbility and the United Nations Environmental Program, and our second report shared the first-ever award for outstanding sustainability reporting from a coalition of more than 80 environmental and investment groups.  I encourage you to review our corporate responsibility reports at www.chiquita.com.

We are committed to managing Chiquita to the highest standards of integrity and propriety in all our affairs, from our farms to our boardroom.  Our achievements are a great source of price among our employees.

We have confidence in Chiquita's turnaround.

58.    Elsewhere the 2002 Annual Report stated:

**Why Are You Continuing to Invest in Corporate Responsibility?**

[I]n 1998, Chiquita took on corporate responsibility as a major priority following years of criticism from nongovernmental organizations and the media.  Management decided to turn around the company's reputation. . . .  In delivering on our corporate responsibility goals, we have gone from being a target of criticism to a focal point of praise.  We could not buy that kind of turnaround in corporate reputation.  We can only earn it, by committing to high standards and living up to them. . . .  [W]e continue to invest in corporate responsibility because it is the right thing to do. . . .

Integrity

- We live by our Core Values.

- We communicate in an open, honest and straightforward manner.

- We conduct business ethically and lawfully.

59.    Chiquita's 2002 Annual Report contained the same "Statement of Management

Responsibility" as in the 1997 Annual Report, which was false and misleading for the same reasons.

60.    Chiquita's 2003 Annual Report stated:

We also accomplished new milestones in corporate responsibility . . . .  2003 was an excellent year for Chiquita . . . .  The turnaround of Chiquita is well underway. . . .  Approximately 80 percent of the $1 billion increase in 2003 revenue from 2002 was due to our acquisition in March of Atlanta AG, a German fresh produce distributor.  Operating income for 2003 rose to $140 million . . . .  We are very pleased with Chiquita's achievements in 2003 . . . .

- 19 -

61.     Elsewhere, the 2003 Annual Report stated in a Q/A session:

A.      As I explained earlier, I believe in decisions made on the basis of values
and principles.  I am impressed by Chiquita's Core Values and the company's
accomplishments in corporate responsibility.  Chiquita's high standards of . . . social
performance enhance the company's reputation and ultimately its brand.  There are a
growing number of investors who seek companies with track records in corporate
responsibility.  Chiquita should benefit from this trend.  I will continue to support our
corporate responsibility program, because it is the right thing to do and it is good for
Chiquita and our stakeholders.

62.     Elsewhere, the 2003 Annual Report stated:

OUR   COMMITMENT   TO   ACHIEVE   HIGH   STANDARDS   OF
ENVIRONMENTAL, SOCIAL AND ETHICAL PERFORMANCE IS ROOTED IN
OUR   CORE   VALUES  –  INTEGRITY,   RESPECT,   OPPORTUNITY   AND
RESPONSIBILITY – WHICH, ALONG WITH OUR CODE OF CONDUCT, GUIDE
OUR LONG-TERM STRATEGIES AND EVERYDAY ACTIONS.

63.     Chiquita's 2003 Annual Report contained the same "Statement of Management

Responsibility" as in the 1997 Annual Report, which was false and misleading for the same reasons.

64.     Chiquita's 2003 Annual Report also stated:

The Company has international operations in many foreign countries, including
those in Central and South America. . . .  The Company must continually evaluate the
risks in these countries, including Colombia, where an unstable environment has made it
increasingly difficult to do business.  The Company's activities are subject to risks
inherent in operating in these countries, including government regulation, currency
restrictions and other restraints, burdensome taxes, risks of expropriation, threats to
employees, political instability and terrorist activities, including extortion, and risks of
action by U.S. and foreign governmental entities in relation to the Company.  Should
such circumstances occur, the Company might need to curtail, cease or alter its activities
in a particular region or country.  Chiquita's ability to deal with these issues may be
affected by applicable U.S. laws.  The Company is currently dealing with one such
issue, which it has brought to the attention of the appropriate U.S. authorities who are
reviewing the matter.  Management currently believes that the matter can be resolved in
a manner that is not material to the Company, although there can be no assurance in this
regard.

No disclosure was made of the bribery payments or arms-provisions relating to the AUC or Chiquita's

other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and

Colombia and the viability and value of Chiquita's Colombian operations.

65.     On May 10, 2004, Defendants caused Chiquita to issue a release stating:

DEPARTMENT OF JUSTICE INVESTIGATION

In April 2003, the company's management and audit committee, in consultation with the board of directors, voluntarily disclosed to the U.S. Department of Justice that the company's banana producing subsidiary in Colombia has been forced to make "protection" payments to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The company's sole reason for submitting to these payment demands has been to protect its employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Justice Department was made because the company's management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the Justice Department's guidance. Following the voluntary disclosure, the Justice Department undertook an investigation. The company has cooperated with that investigation.

Recently, the Department advised that, as part of the investigation, it will be evaluating the role and conduct of the company and some of its officers. The company cannot predict the outcome of the investigation or its possible effect on the company or its Colombian subsidiary.

66.    Chiquita's 2004 Annual Report discussed the now-disclosed Colombia payments and the

DOJ investigation, stating:

### FACING A NEW CHALLENGE IN COLOMBIA

In May 2004, Chiquita announced that the company's management and audit committee, in consultation with the board of directors, had voluntarily disclosed to the U.S. Department of Justice more than a year earlier that the company's banana producing subsidiary in Colombia had been forced to make protection payments to certain groups in that country. The company's sole reason for submitting to these payment demands was to protect employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Department of Justice was made because management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the department's guidance. Following the voluntary disclosure, the Department of Justice undertook an investigation, with which the company has cooperated. To date, this investigation has not concluded and the company cannot predict its outcome. Chiquita sold its Colombian banana-producing and port operations to a local producer and exporter of bananas in June 2004. . . .

The Company is currently dealing with one such issue involving protection payments that its Colombian banana producing subsidiary (sold in June 2004) had been forced to make to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The Company's management and its audit committee, in consultation with the board of directors, voluntarily disclosed this

- 21 -

issue to the U.S. Department of Justice in April 2003 and requested its guidance. In late March 2004, the Department of Justice advised that, as part of its investigation, it would be evaluating the role and conduct of the Company and some of its officers in the matter. The Company intends to continue its cooperation with this investigation, but it cannot predict the outcome or any possible adverse effect on the Company, which could include the imposition of fines.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations. The stated "sole" reason for the payments was false; they were made because the AUC helped Defendants control labor conditions in Colombia, continue the Company's large profits from its Columbian operations (its most profitable operations), and boost their bonuses. Chiquita earned nearly $50 million in profit from its Columbian operations between September 10, 2001, when the AUC was designated a terrorist group, and February 2004.

67. Chiquita's 2004 Annual Report contained the following "Statement of Management Responsibility," signed by Aguirre, Braukman and Tsacalis:

The financial statements and related financial information presented in the Annual Report are the responsibility of Chiquita Brands International Inc. management, which believes that they present fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The Company's management is responsible for establishing and maintaining adequate internal controls. The Company has a system of formal accounting controls, which includes internal control over financial reporting and is supported by internal financial and administrative policies. This system is designed to provide reasonable assurance that the Company's financial records can be relied on for preparation of its financial statements and that its assets are safeguarded against loss from unauthorized use or disposition.

The Company also has a system of disclosure controls and procedures designed to ensure that material information relating to the Company and its consolidated subsidiaries is made known to the Company representatives who prepare and are responsible for the Company's financial statements and periodic reports filed with the Securities and Exchange Commission ("SEC"). The effectiveness of these disclosure controls and procedures is reviewed quarterly by management, including the Company's Chief Executive Officer and Chief Financial Officer. Management modifies and improves these disclosure controls and procedures as a result of the quarterly reviews or as changes occur in business conditions, operations or reporting requirements.

The Company's worldwide internal audit function, which reports to the Audit Committee, reviews the adequacy and effectiveness of controls and compliance with the Company's policies.

The Audit Committee of the Board of Directors consists solely of directors who are considered independent under applicable New York Stock Exchange rules. One member of the Audit Committee, Roderick M. Hills, has been determined by the Board of Directors to be an "audit committee financial expert" as defined by SEC rules The Audit Committee reviews the Company's financial statements and periodic reports filed with the SEC, as well as the Company's internal control over financial reporting including its accounting policies. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors, both together and separately, to discuss these matters.

The Audit Committee engages Ernst & Young, an independent registered accounting firm, to audit the Company's financial statements and its internal control over financial reporting and express opinions thereon. The scope of the audits is set by Ernst & Young, following review and discussion with the Audit Committee. Ernst & Young has full and free access to all Company records and personnel in conducting its audits. Representatives of Ernst & Young meet regularly with the Audit Committee, with and without members of management present, to discuss their audit work and any other matters they believe should be brought to the attention of the Committee. Ernst & Young has issued an opinion on the Company's financial statements. . . . Ernst & Young has also issued an audit report on management's assessment of the Company's internal control over financial reporting. . . .

MANAGEMENT'S ASSESSMENT OF THE COMPANY'S
INTERNAL CONTROL OVER FINANCIAL REPORTING

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on management's assessment, management believes that, as of December 31, 2004, the Company's internal control over financial reporting was effective based on the criteria in Internal Control-Integrated Framework.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

68.    Chiquita's 2005 Annual Report contained the same "Statement of Management Responsibility" (signed by Aguirre and Zalla in the 2005 Report) as in the 2004 Annual Report, except that the section entitled "Management's Assessment of the Company's Internal Control Over Financial Reporting was revised as follows:

- 23 -

The company's management assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2005. Based on management's assessment, management believes that, as of December 31, 2005, the company's internal control over financial reporting was effective based on the criteria in *Internal Control-Integrated Framework*, as set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In addition, a new paragraph was added in the 2005 Report:

Chiquita has published its Core Values and Code of Conduct which establish the company's high standards for corporate responsibility. The company maintains a hotline, administered by an independent company, that employees can use to confidentially and anonymously communicate suspected violations of the company's Core Values or Code of Conduct, including concerns regarding accounting, internal accounting control or auditing matters. All reported accounting, internal accounting control or auditing matters are forwarded directly to the Chairman of the Audit Committee of the Board of Directors.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

69.    Chiquita's 2005 Annual Report discussed Colombia and the DOJ investigation, repeating, almost verbatim, the Company's May 10, 2004 release. The discussion in the 2005 Report added:

In September-October 2005, the company was advised that the investigation is continuing and that the conduct of the company and some of its officers and directors remains within the scope of the investigation. The company intends to continue its cooperation with this investigation, but it cannot predict its outcome or any possible adverse effect on the company (including the materiality thereof), which could include the imposition of fines and/or penalties.

70.    Chiquita's 2005 Annual Report contained a "Corporate Responsibility" section:

Our Core Values – Integrity, Respect, Opportunity and Responsibility – guide our daily decisions, and our Code of Conduct clearly defines our standards for corporate responsibility. In addition to strict legal compliance, we define corporate responsibility to include social responsibilities, such as respect for the environment and the communities where we do business, the health and safety of our workers, labor rights and food safety. We see a clear link between our Core Values and our company's vision, mission and sustainable growth strategy.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

71.     Chiquita's 1997-2005 financial statements distributed to the shareholders were false and misleading in failing to disclose Defendants' improper, wasteful and *ultra vires* payments (and the continuation thereof after the DOJ found out about them), as well as the contingent liabilities those payments exposed Chiquita to, including large criminal or civil penalties and the diminution of value of Chiquita's Colombian operations.

72.     From 1997 through February 2004, Chiquita made improper or illegal and *ultra vires* payments to a terrorist organization in Colombia, the AUC. The AUC was formed around April 1997 to organize loosely affiliated paramilitary groups that emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. Defendants caused or permitted Chiquita to make payments to the AUC nearly every month from 1997 through February 2004, making over 100 payments totaling over $1.7 million. Defendants caused Chiquita to pay Colombian terrorist organizations for approximately 15 years, which payments were *ultra vires*, improper or illegal.

73.     Defendants caused or permitted Chiquita to improperly record these payments in its corporate books and records as "security payments," payments for "security," or "security services" to conceal the true nature of the payments. Neither Chiquita nor Banadex ever received any security services or security equipment for the payments. From the outset, Chiquita and Banadex officers recognized these payments were illicit and improper, which is why they falsely accounted for them.

74.     Chiquita's payments to the AUC were reviewed and approved by high-ranking officers and directors. They knew the Company was paying the AUC and the AUC was a violent, paramilitary organization. In-house counsel for Chiquita conducted a review of the payments in August 2000 and prepared a memorandum detailing that review. The memorandum recognized that the party being paid was a front for the AUC and described the AUC as a "widely-known, illegal vigilante organization."

75.    The in-house attorney presented the results of his review to the Audit Committee in September 2000. There was no instruction to stop the payments or to report the payments to U.S. or Colombian authorities. Notwithstanding the knowledge of senior officers and directors that the Company was making regular payments to the AUC, Chiquita continued to make the payments.

76.    On September 10, 2001, the AUC was designated as a Foreign Terrorist Organization by the U.S. Department of State, making Chiquita's payments to the AUC illegal under the material support statute, 18 U.S.C. §2339B. On October 31, 2001, the AUC was designated as a Specially-Designated Global Terrorist by the U.S. Department of the Treasury, making the payments illegal under the International Emergency Economic Powers Act, 50 U.S.C. §1705(b), and the underlying Global Terrorism Sanctions Regulations, 31 C.F.R. §594.204.

77.    After at least 2000, Chiquita's payments to the AUC were reported to the Audit Committee, the agent of the full Board, on a quarterly basis. Chiquita recorded them in its books and records as "security payments" or payments for "security services" after it was known to senior officers and directors that no security services were being provided to Chiquita or Banadex and the party being paid was a front for the AUC. In late March 2002, senior officers of Chiquita established new procedures for paying the AUC in Santa Marta directly in cash and keeping a private ledger of these cash payments. The procedures involved paying a senior officer of Banadex additional "income" from the Banadex general manager's fund. That money, in turn, was provided to an employee of Banadex, who delivered the cash directly to the AUC in Santa Marta. The senior Banadex officer reported this additional "income" on his Colombian tax return, and Banadex increased the payments to him to cover this additional personal tax liability. On April 23, 2002, these new procedures were reviewed at a meeting of the Audit Committee in Chiquita's Cincinnati headquarters. Chiquita's books and records never reflected that the ultimate and intended recipient of the payments was the AUC.

78.    Defendants caused Chiquita to continue to pay the AUC even after the payments were brought to the attention of its senior executives and Board members during a Board meeting held in

- 26 -

September 2000. Chiquita continued to pay the AUC after the U.S. designated the AUC as a FTO on

September 10, 2001 and a Specially-Designated Global Terrorist on October 30, 2001. Chiquita

continued to pay the AUC after gaining knowledge of the AUC's designation as an FTO. Defendants

caused Chiquita to continue to pay the AUC after outside counsel repeatedly advised them, beginning

in late February 2003, to stop the payments and leave Columbia. They caused Chiquita to continue to

pay the AUC after DOJ officials told them on April 24, 2003 that the payments were illegal and could

not continue. They caused Chiquita to continue to pay the AUC after outside counsel advised them on

September 8, 2003 that the DOJ had given no assurances the Company would not be prosecuted for

making the payments. They caused Chiquita to continue to pay the AUC after one of its directors

acknowledged in an internal email on December 22, 2003 that "we appear [to] be committing a

felony."

79.     Outside counsel's advice to Defendants was memorialized in contemporaneous

memoranda and notes. Among other things, outside counsel advised Defendants:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: 'CANNOT MAKE THE PAYMENT'"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out
  through repetition. Buz [business] decision to stay in harm's way. Chiquita
  should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given
  the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

80.     In April 2003, according to outside counsel's notes concerning a conversation about the payments to the AUC, a senior officer of Chiquita said as to the DOJ: "His and [a director's] opinion is just let them sue us, come after us. This is also [a senior officer's] opinion." Four days later, Chiquita senior officers instructed their subordinates to "continue making payments" to the AUC.

81.     In April 2003, the DOJ learned of the payments to the AUC. DOJ officials told Defendants that Chiquita's payments to the AUC were illegal and could not continue. The DOJ also cautioned them, as Chiquita's outside counsel had warned them earlier, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." Chiquita's outside counsel later stated in writing that the DOJ never gave Chiquita any assurance that the Company would not be prosecuted for making the payments.

82.     In May 2003, a Chiquita employee was instructed to "continue making payments" to the AUC. Chiquita thereafter continued its payments to the AUC. In a memorandum dated September 8, 2003, outside counsel noted that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

83.     Senior officers and directors of Chiquita were aware the Company was continuing to pay a designated FTO and the Company was subject to criminal prosecution for its conduct. On December 22, 2003, a director of Chiquita sent an email to other directors regarding the Company's ongoing payments to the AUC, in which he said, among other things, "we appear to [be] committing a felony." A week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that "Chiquita is knowingly violating the law."

84.     When the DOJ learned of the continuing payments, it threatened Defendants and Chiquita with criminal prosecution. To protect themselves from possible criminal prosecution, on March 19, 2007, Defendants caused Chiquita to sign a written plea agreement with the United States in which Chiquita was required to admit its guilt. The plea agreement provides for a criminal fine of

- 28 -

$25 million and corporate probation of five years. The plea agreement provided that Chiquita may pay the fine in five annual installments. Chiquita was required to post the first payment of $5 million upon entry of judgment. Chiquita is required to pay an additional $5 million, plus post-judgment interest, each year for the subsequent four years. DOJ stated: "Defendant Chiquita has pled guilty to a very serious charge. In support of its guilty plea, the Company has admitted the truth of the facts sets [sic] forth in the Factual Proffer." It emphasized that "Chiquita . . . admitted as part of its guilty plea that it continued to engage in the same criminal conduct after its voluntary disclosure." DOJ's Sentencing Memorandum states: "It was particularly important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager."

85.    When the DOJ threatened the Defendants and Chiquita with criminal prosecution, the Defendants abused their continuing control of Chiquita by causing it to plead guilty and pay a huge fine in return for a promise from the government not to prosecute the Chiquita executives involved in the illegal conduct, thus damaging the Company to protect themselves. In order to assure that the DOJ did not prosecute any of the Chiquita directors criminally, the directors have continued to employ key wrongdoers in important corporate positions, have paid off other employees with generous severance packages and "confidentiality" agreements and promises not to pursue them civilly for their involvement in the activities which resulted in the criminal plea of Chiquita.

86.    The plea agreement provided for a five-year term of corporate probation. In addition to the general conditions of probation, the agreement provides the following additional conditions: (1) Chiquita must pay the sums set forth in the agreement; (2) Chiquita "shall implement and maintain an effective compliance and ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States Sentencing Guidelines, including, but not limited to, (a) maintaining a permanent compliance and ethics office and a permanent educational and training program relating to federal laws governing payments to, transactions involving, and other dealings with individuals, entities, or countries designated by the United States as Foreign Terrorist Organizations, Specially-Designated Global

- 29 -

Terrorists, Specially-Designated Narcotics Traffickers, and/or Countries Supporting International

Terrorism, and/or any other such federally-designated individuals, entities, or countries, (b) ensuring

that a specific individual remains assigned with overall responsibility for the compliance and ethics

program, and (c) ensuring that that specific individual reports directly to the Chief Executive Officer

and to the Board of Directors of Chiquita . . . , no less frequently than on an annual basis on the

effectiveness of the compliance and ethics program; and (3) pursuant to 18 U.S.C. § 3563(a)(l),

[Chiquita] shall not commit any federal, state or local crimes during the term of probation."

  87. On March 19, 2007, DOJ issued a release entitled "Chiquita Brands International Pleads

Guilty to Making Payments to a Designated Terrorist Organization, Agrees to Pay $25 Million Fine":

> Under the terms of the plea agreement, Chiquita's sentence will include a $25 million
> criminal fine, the requirement to implement and maintain an effective compliance and
> ethics program, and five years' probation. . . . The plea agreement arises from payments
> that Chiquita had made for years to the violent, right-wing terrorist organization United
> Self-Defense Forces of Colombia [AUC] . . . . Funding a terrorist organization can
> never be treated as a cost of doing business," stated U.S. Attorney Taylor. "American
> businesses must take note that payments to terrorists are of a whole different category.
> They are crimes. . . .

### CHIQUITA'S PAYMENTS TO THE AUC

> [T]he investigation leading to this prosecution developed evidence that for over
> six years – from sometime in 1997 through Feb. 4, 2004 – Chiquita paid money to the
> AUC in two regions of the Republic of Colombia . . . . In total, Chiquita made over 100
> payments to the AUC amounting to over $1.7 million. . . . Chiquita's payments to the
> AUC were reviewed and approved by senior executives of the corporation, including
> high-ranking officers, directors and employees.

>  For several years Chiquita paid the AUC by check through various
> intermediaries. Chiquita recorded these payments in its corporate books and records as
> "security payments" or payments for "security" or "security services." Chiquita never
> received any actual security services in exchange for the payments.

>  Beginning in June 2002, Chiquita began paying the AUC in Santa Marta directly
> and in cash according to new procedures established by senior executives of Chiquita.
> The newly-implemented procedures concealed the fact that Chiquita was making direct
> cash payments to the AUC. A senior Chiquita officer had described these new
> procedures to Chiquita's Audit Committee on April 23, 2002. . . .

Beginning on Feb. 21, 2003, outside counsel emphatically advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Outside counsel advised Chiquita:

"Must stop payments."

"Bottom Line: CANNOT MAKE THE PAYMENT"

"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"

"General Rule: Cannot do indirectly what you cannot do directly"

Concluded with: "CANNOT MAKE THE PAYMENT"

"You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

"[T]he company should not make the payment." . . . .

Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004. From April 24, 2003 (the date of Chiquita's initial disclosure to the Justice Department) through February 4, 2004, Chiquita made 20 payments to the AUC totaling over $300,000.

88.    Mario Iguarán, Colombia's Attorney General, has said he will seek extradition of eight Chiquita officials connected to the case. He also is seeking information about charges that in 2001 a ship unloaded some 3,400 AK-47 rifles and 4 million rounds of ammunition in a Banadex-controlled dock in Colombia destined for the AUC. These charges were detailed in a 2003 report of the Organization of American States. "This was a criminal relationship," said Iguarán in a report published in the Washington Post. "Money and arms and, in exchange, the bloody pacification of Urabá."

89.    Roscoe Howard Jr., former U.S. Attorney for Washington D.C., who helped lead the Chiquita prosecution before he left his position in 2004, stated: "I regarded this as a murder investigation" from the start.   He also stated: "Even though Chiquita didn't murder anyone, that's what the money was used for – to buy weapons."

90. In 2004, due to the problems created in its Colombia operations due to the illegal activities the Defendants had caused Chiquita to engage in there, and hoping to avoid extradition of Chiquita insiders to Colombia for their criminal conduct, the Defendants caused Chiquita to sell Chiquita's Colombian banana-producing operations. Due to these circumstances, this was a "fire sale," even though those Colombian operations had been Chiquita's most profitable operations. Chiquita earned some $50 million in profits from its Colombian banana-producing operations from September 10, 2001 through January 2004. The forced sale of the Colombian operations deprived Chiquita of a huge source of supply of bananas necessary to conduct its business – requiring that Chiquita, while selling the Colombian banana operations also secured a supply of bananas by purchasing them from another source at premium, unprofitable, prices. The sale of this valuable asset produced a $9 million loss when the long-term banana purchase contract is factored in.

91. While Chiquita's Colombian banana operation had been a very profitable part of Chiquita's business, the Defendants' illegal and improper acts largely destroyed the value of the asset. The Defendants had to sell that operation at a large loss. The Company reported:

> In June 2004, the Company sold its banana-producing and port operations in Colombia . . . . In connection with the sale, Chiquita entered into eight-year agreements to purchase bananas . . . from affiliates of the buyer . . . at above-market prices. This resulted in a liability of $33 million at the sale date, which represents the estimated net present value of the above-market premium to be paid for the purchase of bananas over the term of the contract. . . . The Company recognized a before-tax loss of $9 million and an after-tax loss of $4 million on the transaction . . . .

92. By 2002, Chiquita's insiders knew that they would have to cause Chiquita to sell off its Colombian banana operations due to the longstanding illegal conduct they had caused or permitted there, in part to try to avoid the extradition of several Chiquita insiders to Colombia for their criminal conduct. This sale – which they knew would take place under distress circumstances – deprived Chiquita of millions of dollars in revenues from what had been its most profitable operations, which reflected badly on Defendants' management and stewardship of Chiquita. Thus, to try to make up for the lost revenues and profits Chiquita would soon suffer, the Defendants in haste, and without adequate

research, investigation, evaluation or due diligence, acquired a German fruit distribution business,

known as Atlanta A.G., at an excessive price. Because of the excessive price the Defendants caused

Chiquita to pay for Atlanta, almost $43 million dollars in goodwill went onto Chiquita's balance sheet.

According to Chiquita's 2002 Annual Report:

> By exchanging loans for Atlanta's underlying equity interests, we were able to acquire ownership in a virtually cashless transaction that closed in March 2003. To boost Atlanta's profitability and maximize the value of our investment, we hired as president Peter Jung, who brings extensive restructuring, food industry and consumer products expertise. We have already begun streamlining Atlanta's distribution network, selling certain assets and reducing its debt. The acquisition of Atlanta increased Chiquita's debt by approximately $65 million and will increase our consolidated revenues on an annualized basis by almost $1.1 billion.

93.    According to Defendants, the Atlanta acquisition was a substantial success. Chiquita's

2003 Annual Report stated:

> The improvement in 2003 operating income was due to Chiquita's success in cost-cutting, the benefit of a stronger euro, asset sales, increased banana and other fresh fruit sales, and improvements at Atlanta. The progress on our commitments was significant. . . . We acquired Atlanta, exited its underperforming businesses and cut its costs. In fact, we're ahead of schedule on improving Atlanta's profitability.

94.    According to Defendants, the success of Atlanta continued in 2004. According to

Chiquita's 2004 Annual Report:

> Financial highlights for 2004 include the following

> - Net sales for 2004 were $3.1 billion compared to $2.6 billion for 2003. Approximately 60% of the increase was due to the acquisition of Atlanta AG ("Atlanta"), a German distributor of fresh fruits and vegetables, which was completed in March 2003.

95.    Chiquita's 2003 Annual Report stated:

> Critical Accounting Policies and Estimates

> The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements. The additional discussion below addresses major judgments used in

> - reviewing the carrying values of intangibles . . . .

> Review of Carrying Values of Intangibles . . . .

Goodwill – Substantially all of the Company's $43 million of goodwill relates to its acquisition of Atlanta during 2003. . . . [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

96.    Chiquita's 2004 Annual Report stated:

Critical Accounting Policies and Estimates

The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements. The additional discussion below addresses major judgments used in

•    reviewing the carrying values of intangibles . . . .

Goodwill

Substantially all of the Company's $46 million of goodwill relates to its acquisition of Atlanta during 2003. . . . [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

97.    In truth, the Atlanta acquisition was a failure, badly damaging the Company. Almost immediately upon the acquisition of Atlanta, because of problems in its business, Chiquita began to write off the value (goodwill) of Atlanta, and by 2006, those charge-offs and write-downs wiped out all of the goodwill recorded in connection with the Atlanta acquisition in less than three years.

## FUTILITY OF DEMAND ALLEGATIONS

98.    Plaintiff brings this action derivatively in the right and for the benefit of Chiquita to redress injuries suffered and to be suffered by Chiquita as a result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by Defendants. Chiquita is named as a nominal party solely in a derivative capacity.

99.    In bringing this action, plaintiff has satisfied all statutory procedural requirements. Plaintiff has standing to bring this action as it is a shareholder of Chiquita and was such at all relevant times. Plaintiff will fairly and adequately represent Chiquita's interests in enforcing its rights. Plaintiff is not using this action to gain any personal advantage, nor does Plaintiff have any agenda other than to correct the wrong that has been done to the Company. To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

100.    Defendants all were directors and/or senior ranking officers of Chiquita, acquiesced in and/or were complicit in making the protection payments to the AUC between 1998 and 2004. They, as well as the non-party outside directors, cannot and would not conduct a meaningful investigation and/or prosecution of Defendants for their misconduct, as to do so would undermine their own credibility, require them to take inconsistent positions with those they have taken, and/or expose themselves and their colleagues to significant criminal and/or civil exposure, both here and in Colombia:

(a)    *Aguirre.* In a written statement issued in March 2007, immediately following Chiquita's entry into the plea agreement, Aguirre stated publicly that the Company viewed the plea agreement "as a reasoned solution to the dilemma the company faced several years ago." The Company "voluntarily disclosed the payments to the Justice Department in 2003," he stated, adding the payments were made "to protect the lives of its employees." "The payments made by the company were always motivated by our good faith concern for the safety of our employees," Aguirre told the *Chicago Tribune* on March 22, 2007. Aguirre made these statements knowing the so-called "good faith" payments had continued for more than a year after the Company secretly "disclosed" the relationship to the Justice Department in 2003, at a time that Chiquita's outside lawyers were insisting the Company terminate the arrangement. Chiquita made at least 19 more payments after the DOJ told the Company that "payments to the AUC were illegal and could not continue." A decision to prosecute those responsible at the Company would be inconsistent with and contradictory to Aguirre's actions and statements during his tenure as President, CEO and Chairman of Chiquita since 2004, where he has maintained the payments were proper and has taken no action to remove the executives and/or directors who oversaw and acquiesced in their payment. Aguirre remains in his dominant and controlling position, despite having lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, failing to fire or discipline the responsible Chiquita officers, and permitting and participating in causing Chiquita to plead guilty to protect the other Defendants and in causing the fire sale of the Colombian operations.

(b)    *Arntzen and Stanbrook.* Arntzen served with Hills on Chiquita's Audit Committee between 2002 and 2007 and Stanbrook served with Hills on the Audit Committee between 2003 and 2005. The Audit Committee was aware of the nature of the protection payments throughout this period. The Audit Committee also knew Chiquita's outside lawyers deemed the payments illegal and wanted them stopped. The Audit Committee acquiesced in the payments to terrorists, the false accounting for the payments and the decision not to properly report the payments to the SEC between 2002 and 2004. Arntzen publicly stated "When I joined the board, I knew the company was making payments to paramilitary groups in Colombia." Arntzen told *The Wall Street Journal* in August 2007, five months after Chiquita's plea agreement was entered and less than one month before the DOJ announced it had decided not to prosecute individual Chiquita executives: "If you didn't do it, your people were going to get killed." In an interview with *TradeWinds* in March 2007, Arntzen stated: (i) the Chiquita Board and management "handled the Colombian disclosures properly," (ii) he and fellow Board members had "turned ourselves in to the Justice Department" and "gave them all the evidence they needed to convict us," (iii) the "directors did what we were supposed to do," and (iv) "You don't always know who you're paying or which side they're on. All you know is that the people are scary and they're armed to the teeth and that if you don't pay them, your people are going to die." As members of the Audit Committee, Arntzen and Stanbrook were charged with selecting and assessing the performance of Chiquita's outside auditors and approving their fees and independence; assessing and approving the annual Company audit results; establishing and enforcing Chiquita's financial and accounting policies and financial statements; reviewing the adequacy and effectiveness of Chiquita's internal accounting controls and the internal audit function; overseeing the Company's legal and Company policy compliance; considering requests for waivers from the Code of Conduct for executive officers and directors (any such waivers being subject to Board approval); and, in connection with all of the foregoing, meeting with the independent auditors, internal auditors and Chiquita's financial management. As such, these Audit Committee Defendants had direct oversight and participation in the

decision to falsely account for the terrorist payments and to misreport them to the SEC. These Audit Committee Defendants also repeatedly facilitated the Company's non-compliance with laws, regulations and Company policies by refusing to exercise their authority under the Audit Committee charter to remove the offending officers and directors. A decision to prosecute those responsible at the Company would be inconsistent with Arntzen's and Stanbrooks' actions and statements throughout this period, where they have maintained the payments were proper and have taken no action to remove the executives and/or directors who oversaw and acquiesced in them.

(c)     *Fisher*. On April 3, 2003, Hills and Olson reported the history of the AUC payments to the full Chiquita Board, of which current Chiquita directors Fisher and non-parties Durk I. Jager and Jaime Serra were then members. Thereafter, Chiquita continued making payments to the AUC, including ten additional payments that were made between May and September totaling about $134,000, after the DOJ told Hills and Olson the payments were illegal on August 23, 2003. On December 22, 2003, Hills emailed fellow directors concerning the DOJ's concerns that the Company was not being as cooperative as he felt it should be, telling them: "We cannot delegate this issue to management . . . . We appear to [be] committing a felony." Nonetheless, the payments continued, with the Board's knowledge, through February 2004. Even as Chiquita began turning over documents relating to the payments to the Justice Department, it kept making payments. Shortly after 8 a.m. on March 24, 2004, agents of the Federal Bureau of Investigation with subpoenas paid a surprise visit to Chiquita's Cincinnati headquarters. Later that day, FBI agents in Fort Lauderdale, Florida, entered a Company Board meeting and delivered subpoenas. Despite the fact that the Company was forced to pay a $25 million fine, is a felon, is serving five years probation and is exposed to hundreds of millions of dollars in potential liability in the civil suits, none of the implicated executives have been discharged and no recovery has been sought from any of the implicated Chiquita executives or directors.

(d)     *Stanbrook and Fisher*. As members of the Chiquita Compensation Committee, Defendants Stanbrook and Fisher and non-party directors Clare M. Hasler and Jaime Serra are charged

with: (i) evaluating the performance, and reviewing and approving all compensation, of Chiquita's executive officers; (ii) making recommendations to the Board with respect to incentive compensation and equity-based plans; (iii) overseeing the Company's leadership and organization development, including succession planning; and (iv) administering Chiquita's Stock and Incentive Plan. Contrary to their responsibilities, these directors increased executive pay following the Company's March 2007 plea agreement, despite Chiquita's losses and exposure to criminal and civil liability. Despite the fact that Chiquita suffered a poor 2006 and its stock price dropped 25%, the Compensation Committee raised Aguirre's cash salary to $900,000 a year, a 13% increase, and granted him a new award of $1.2 million in restricted stock, an LTIP award opportunity for the 2007-2009 performance period of $1.6 million, and an additional restricted stock grant with a targeted value of $1.6 million. Despite Chiquita's loss of the banana business due to misconduct by its executives and Aguirre's and others' refusal to hold them accountable, Chiquita's Compensation Committee justified this compensation increase by stating Aguirre was "helping to transform it from a seller of commodity bananas to a more diversified – and more profitable – seller of fruit-based products." They also almost doubled their own annual directors' fees. By this decision, shareholders are being penalized twice: as the firm's equity owners, they pay the ultimate price for the misconduct, and they also must pay bonuses on top of high salaries to deal with the aftermath. Additionally, on August 3, 2006, the Compensation Committee accepted Olson's resignation and entered into an agreement with him providing for one year's annual base salary and target bonus, aggregating $622,500, paid between March 1, 2007 and August 24, 2007; $138,333 representing the pro rata portion of his 2006 target bonus; $7,434 in company-paid COBRA health insurance premiums through August 2007; $10,000 in reimbursement of legal fees related to the agreement; the acceleration of the vesting of 59,639 shares of restricted stock previously issued to him; and payment of up to 12 months of office space and services for Olson and maintenance of existing director and officer liability insurance covering him. In exchange, Olson entered into a "retirement" agreement containing a confidentiality agreement of unlimited duration.

- 38 -

(e)    Non-party director Serra could not independently and disinterestedly consider a pre-suit demand to bring the claims alleged herein as Serra's livelihood and career prospects would be compromised if he actively investigated or made the decision to prosecute these claims. Serra is a Mexican economist and a foreign trade specialist with vast ties to the Latin America fruit and vegetable trade import/export business. Serra is Chairman of SAI Consulting and Principal of NAFTA Fund. His professional practice includes the design of investment strategies in Mexico for foreign companies and advice to Mexican companies interested in becoming regional players in North America.

(f)    Non-party director Howard W. Barker, Jr. could not independently and disinterestedly consider a pre-suit demand to bring the claims alleged herein, as Barker is beholden to the other Board members who appointed him. Barker has never been elected by the Chiquita shareholders. He was selected by Aguirre and the other Board members only after they were comfortable he would not take any action adverse to them. Moreover, Barker has attempted to market himself as a consultant and expert based on his former status as a major partner at KPMG, and diligently investigating and prosecuting the claims alleged herein would threaten those interests.

101.    The Chiquita Board cannot exercise independent objective judgment in deciding whether to bring this action or vigorously prosecute it. Therefore, Plaintiff's demand upon it to take the action requested herein is excused. Chiquita's Board and its management also are antagonistic to this lawsuit:

(a)    The allegations herein detail a widespread and continuous pattern and practice of misconduct spanning more than six years. Each Defendant had the ability to cause Chiquita to disclose the existence of the illegal protection payment scheme during that six-year period and failed to do so.

(b)    The misconduct alleged herein created a substantial fear of personal criminal or civil liability for several current members of Chiquita's Board in light of the successful DOJ prosecution resulting in a $25 million fine and the pending civil suits. As a result, the Chiquita Board is incapable of exercising valid business judgment, as investigation and/or prosecution of these claims would expose, or increase the exposure of, each Board member to criminal and/or civil liability.

- 39 -

(c)    The misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure. It had to be the result of a deliberate Board policy or willful or reckless disregard with respect to the illegal or improper payments. According to the government's Sentencing Memorandum, Chiquita's top officers and directors knew that for over six years – from sometime in 1997 through February 4, 2004 – Chiquita, through its wholly-owned Colombian subsidiary, Banadex, paid money to the AUC, a violent terrorist organization in the Republic of Colombia. According to DOJ's Sentencing Memorandum:

A.    **The Gravity of the Core Conduct**

This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years – from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.

Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquila's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.

The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.

B.    **Defendant Chiquita's Motivations**

Defendant Chiquita's motivations for paying the AUC are irrelevant to the illegality of its conduct or to the harm that the Company's conduct has caused to victims of AUC violence. As one federal appeals court has noted, "Terrorist organizations use funds for illegal activities regardless of the intent of the donor[.]" *Boim v. Quranic Literacy Inst. & Holy Land Found, for Relief and Dev.*, 291 F.3d 1000, 1027 (7lh Cir. 2002) (discussing breadth of criminal liability under the material support statute, 18 U.S.C. § 2339B). Nevertheless, defendant Chiquita's motivations for paying the AUC are relevant to an understanding of the felony charge against the Company.

Preliminarily, it is important to note what defendant Chiquita is not accused of. Defendant Chiquita is not accused of supporting the goals or ideologies of the terrorist organizations that the Company funded. The record reflects that defendant Chiquita did not seek out the AUC to start making these payments. Rather, the AUC, through its leader Carlos Castaño, instructed that defendant Chiquita's subsidiary would have to

start making the payments once the AUC moved into the Company's banana-producing region.

Defendant Chiquita, however, did not make one or two payments while deciding on a course of action to take in the face of the AUC's demand (and implied threat) in 1997. Defendant Chiquita decided to accede to the AUC's demand and make routine payments for fully six years. Although defendant Chiquita would later claim that it was the victim of AUC extortion, the Company did not report the "extortion" to any United States or Colombian authorities for several years.

Defendant Chiquita, as a large multinational corporation, had choices to make about where in the world to operate and under what conditions. The Company chose to enter and exit markets and to buy and sell farms based on its business judgment. Defendant Chiquita chose to remain in Colombia and make payments to the AUC that it deemed necessary to operate in the Urabá and Santa Marta regions of Colombia.

Defendant Chiquita's reason for being in Colombia was, of course, to produce bananas profitably. And there is no question that defendant Chiquita profited from its Colombian operations during the period that the Company paid the AUC. According to defendant Chiquita's records, from September 10, 2001 (the date of the AUC's designation as a Foreign Terrorist Organization), through January 2004, the Company earned approximately $49.4 million in profits from its Colombian banana-producing operations. Indeed, by 2003 the Company's Colombian operations were its most profitable.

Whatever motivated defendant Chiquita at the start, the Company made a business decision to remain in Colombia and pay the AUC for over six years. Officers of defendant Chiquita and Banadex referred to the payments as an unsavory "cost of doing business" at their inception in 1997. When the internal investigation into the payments was presented to the Board in September 2000, the Board treated them as a routine business matter – a tolerable expense to be kept low. When the AUC in Santa Marta demanded direct, cash payments in 2002, senior officers of defendant Chiquita obliged. These senior executives also came up with a procedure to record these monthly payments in the Company's books and records that failed to reflect the ultimate and intended recipient of the payments.

By late February 2003, when defendant Chiquita's outside counsel advised the Company to stop the payments immediately in light of the AUC's designation as an FTO and the attendant risk of criminal liability, the payments had already been reviewed and approved at the highest levels of the Company for years. The fact of the AUC demand in 1997 and any perceived risk to the Company's employees from doing business in Colombia were not new topics. The payments had been discussed repeatedly in defendant Chiquita's Cincinnati headquarters. The Company had long since made the business judgment to remain in Colombia, to keep paying the AUC, to record the payments in the Company's books and records without identifying the AUC, and not to report the payments to the pertinent United States and Colombian authorities.

The new information in late February 2003 was not the claimed extortion, but rather outside counsel's advice about the risk of criminal liability to the Company for making the payments. Defendant Chiquita chose to reject that advice and to continue to

- 41 -

pay the AUC. The Company chose to continue the payments even after being advised by the Department of Justice that the payments were illegal and could not continue.

Defendant Chiquita has claimed that it made the payments to protect its employees. Undoubtedly some officers, directors, and employees of defendant Chiquita with knowledge of the payments firmly believed (and still believe) that the Company's sole motivation for making the payments was to protect its Colombian employees. As mentioned, the Company's motivation is legally irrelevant and of no comfort to the victims of the AUC's violence. But even this purported rationale for the payments begs serious questions. If defendant Chiquita was solely motivated to protect its Colombian employees from the AUC,

•       How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

•       How did the payments protect the communities in which those employees lived?

•       How did the payments protect the families, friends, and associates of the Company's employees?

•       What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

•       Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

•       Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

•       Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?

## C.    Defendant Chiquita's Alternatives

The Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law. Defendant Chiquita is a sophisticated multinational corporation with access to the highest quality business and legal advice. There were a number of points at which the Company could have conformed its conduct to the requirements of the law. US failure to do so until late in the evolution of this matter is one of the reasons that the Company appears before the Court having pled guilty to a very serious criminal charge.

Defendant Chiquita was not without any alternative to paying the AUC. While there may have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option that the Company could have considered when faced with the AUC's demand in 1997. As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments. The officer stated, "[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia." In late February and March 2003, defendant

Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia. When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia. Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." Indeed, within one month of joining defendant Chiquita as its new CEO, Fernando Aguirre told senior officers that "if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

Defendant Chiquita may well have had other alternatives – other than the course that it pursued. In the end, the issue is not what defendant Chiquita could have done, but rather what it chose to do– and that was to continue paying terrorists for over six years.

102.    The Chiquita Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the government should not have prosecuted Chiquita. According to Chiquita's response to the government's Sentencing Memorandum:

When Chiquita learned in 2003 (and not earlier as the government implies) that the U.S. government had designated the AUC as a foreign terrorist organization, thereby making the payments illegal under U.S. law, Chiquita voluntarily disclosed its intolerable dilemma to the Department of Justice and sought its guidance – guidance that, despite the government's acknowledgement of the "complicated" nature of the life-and-death situation facing Chiquita, was never provided. For the government now to attempt to hide behind the simplistic position that "[t]he Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law" (Sentencing Mem. at 16) is a hollow, post hoc rationalization that ignores reality. That is especially true in an area that the government has itself indicated is vital to the country's interest – national security. The government's position that companies like Chiquita should comply with the law without the government's input or help does much to undermine the government's goal of encouraging self-reporting and full cooperation. . . . Chiquita agrees that the government faced a very substantial risk of losing this case if it had proceeded to trial. Indeed, it is Chiquita's position that, in light of the Company's voluntary disclosure of the payments and its complete cooperation with the government's subsequent investigation, the government should have foregone prosecution in this matter altogether.

103.    A majority of the current Board members are conflicted as well as potentially personally liable and as such have not complied and cannot comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Chiquita, as this would require them to sue themselves, several of Chiquita's current executives and several former Board members and executives (who they have

improperly caused Chiquita to release or agree to indemnify) who would provide inculpatory testimony as to the current Board's involvement, knowledge and malfeasance if they were sued. To protect themselves, the directors negotiated a plea deal costing the Company millions while letting the responsible executives off the hook, but have allowed several executives to stay in their lucrative positions even though they engaged in criminal conduct that damaged the Company. For example:

(a)    Aguirre, the Chairman and CEO, who lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, has failed to fire or discipline the officers responsible for the bribery payments. He permitted and participated in causing Chiquita to plead guilty to protect the other Defendants. He caused the fire sale of the Colombian operations. Yet, he remains in his dominant and controlling position.

(b)    The current directors will not pursue legal action against the officers and directors involved in the wrongdoing as this will create further evidence of those officers' and directors' active illegal conduct in violation of Colombian law, increasing the likelihood of their extradition to Colombia. Extradition would put tremendous pressure on the Chiquita officers and directors to implicate the current directors, and further expose and detail their complicity in the criminal conduct.

(c)    The current directors will not objectively consider, bring, or vigorously prosecute claims against the directors and officers of Chiquita who were actively involved in the criminal misconduct because they have continued to permit the employment of several of them in fiduciary positions at the Company, and chose to release others with lucrative severance payments rather than demand contribution from them for their transgressions against Chiquita. Each of these decisions would be called into question, and evidence of their conduct revealed, if the current directors investigated the allegations herein.

104.    A majority of the current Board approved the Atlanta acquisition and the Colombia disposition, which damaged the Company. A majority of the current Board increased their own

compensation and that of the officers still at the Company involved in the wrongdoing, notwithstanding their responsibility for this wrongdoing.

105. Prosecution of the allegations contained herein in light of the Chiquita Board's prior claims of innocence would undermine each Board member's defense and increase each Board member's exposure to potential civil and/or criminal liability.

106. The members of Chiquita's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their colleagues in the top ranks of the corporation for the violations of law complained of herein.

107. The members of Chiquita's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

108. Chiquita's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds. Due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies contain provisions which eliminate coverage for any action brought directly by Chiquita against these Defendants, known as the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Chiquita, there would be no directors' and officers' insurance protection and thus, this is a further reason why the directors will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

## FIRST CAUSE OF ACTION

### (Derivative Claim for Breach of Fiduciary Duties)

109.    Plaintiff hereby incorporates the preceding paragraphs.

110.    Defendants are fiduciaries of Chiquita and its shareholders and owe them the duty to conduct the Company business loyally, faithfully, diligently and prudently.  This cause of action is asserted based upon Defendants' acts in violation of law, which constitute breaches of fiduciary duty.

111.    Defendants, in their roles as executives and/or directors of the Company, made false and misleading statements in Annual Reports and participated in the wrongful acts alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of herein.  The bribery payments were *ultra vires* and a waste of corporate assets even if they were not illegal under U.S. or other law when made.

112.    Defendants are responsible for the gross mismanagement of Chiquita and for abdicating their corporate responsibilities in at least the following ways:

(a)    They caused Chiquita to engage in *ultra vires* acts and to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

(b)    They violated their duties of compliance by causing Chiquita to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties by engaging in *ultra vires* and illegal conduct.

(c)    They violated their duty of candor by lying to Chiquita's public shareholders.

(d)    They violated an SEC consent decree, causing Chiquita to commit criminal acts.

(e)    They abused their control of Chiquita for their own personal gain, aggrandizement and protection.

(f)    They exposed the Company and its shareholders to substantial fines, penalties, expenses and liabilities.

(g)    They subjected Chiquita to adverse publicity and loss of goodwill.

113.    As a result of Defendants' wrongful conduct, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, Chiquita has suffered damage.

114.    Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

115.    Defendants abused the control vested in them by their high-level Company positions.

116.    By reason of the foregoing, Defendants have breached their fiduciary obligations of care, candor, compliance and control to Chiquita and its shareholders.

117.    Chiquita and its shareholders have been injured by reason of Defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and a representative of Chiquita, seeks damages and other relief for the Company.

## SECOND CAUSE OF ACTION

### (Derivative Claim for Waste of Corporate Assets)

118.    Plaintiff hereby incorporates the preceding paragraphs.

119.    As a direct result of the wrongdoing alleged herein, Defendants have wrongfully caused Chiquita to waste billions of dollars of corporate assets and have subjected the Company to additional liability of millions of dollars, to the detriment of the Company.

120.    Defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

121.    As a direct and proximate result of Defendants' waste of corporate assets as alleged herein, Chiquita has sustained damages.

## THIRD CAUSE OF ACTION

### (Derivative Claim for Conspiracy and Aiding and Abetting Breaches of Fiduciary Duties)

122.    Plaintiff hereby incorporates the preceding paragraphs.

- 47 -

123.    By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, Defendants have encouraged, facilitated and advanced their breaches of fiduciary duties and waste of corporate assets.  In so doing, Defendants have each aided and abetted, conspired and schemed with the other Defendants to breach their fiduciary duties, waste Chiquita's corporate assets and engage in the *ultra vires* and illegal conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion to ensure Defendants do not participate therein or benefit thereby.

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon.

C.    Directing Chiquita to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' Articles and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    an amendment to the Company's Articles limiting the number of executive directors on the Chiquita Board to one;

(ii)    a proposal to strengthen the Chiquita Board's supervision of operations and develop and implement procedures for greater shareholder input into Board policies and guidelines;

(iii) establishing an effective anti-bribery or corruption exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

(iv) a provision to permit the shareholders of Chiquita to nominate at least three candidates for election to the Chiquita Board;

(v) appropriately test and strengthen the internal audit and control functions;

(vi) reform executive compensation;

(vii) require full compliance with Sarbanes-Oxley; and

(viii) permit shareholders to question all executive directors of Chiquita at the Annual Meeting of Shareholders and establish a more transparent process for receiving and evaluating shareholder proposals.

D.   Voiding all indemnity agreements with, and recapturing all severance or departure payments to, any officer or director found to have been actively involved in the wrongdoing.

E.   Terminating the employment of Zalla and Kistinger and any other current member of Chiquita's management found to have been actively involved in the wrongdoing.

F.   Recapturing all directors' fees and other compensation or reimbursement paid to any of the Chiquita directors named as Defendants.

G.   Discharging Ernst & Young as Chiquita's accountants.

H.   Awarding punitive damages.

I.   Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

J.   Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.

DATED: October 31, 2007

JONATHAN W. CUNEO (939389)
MICHAEL G. LENETT (425592)
CUNEO GILBERT & LaDUCA LLP

_Jonathan W. Cuneo_

JONATHAN W. CUNEO

507 C. Street, N.E.
Washington, D.C. 20002
Telephone: 202/789-3960
202/789-1813 (fax)

WILLIAM K. CAVANAGH
CAVANAGH & O'HARA
407 East Adams Street
Springfield, Illinois 62701
Telephone: 217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff

## VERIFICATION

I, Jonathan W. Cuneo, hereby declare and verify, under penalty of perjury, as follows:

1.      I am a partner of the law firm of Cuneo Gilbert & LaDuca LLP, counsel for Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground verify that the foregoing Complaint is true and correct.

2.      I make this Verification because Plaintiff is absent from the District of Columbia where I maintain my office.

Executed this _31st_ day of October, 2007, at Washington, D.C.

_____
JONATHAN W. CUNEO

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Sheet Metal Workers Local #218(S) Pension Fund, 2855 Via Verde Springfield, IL 62703 | Roderick M. Hills, et al. See attached for additional defendants |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) __Sangamon__ | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) ——— NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Cuneo Gilbert & LaDuca, LLP 507 C Street, NE Washington, DC 20002 202/ 789-3960 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊙ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Shareholder derivative suit alleging breach of fiduciary duty, waste of corporate assets and conspiracy and aiding and abetting.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint    JURY DEMAND:    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  10/31/07    SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

CIVIL ACTION SHEET ATTACHMENT
ADDITIONAL DEFENDANTS

Fernando Aguirre
Morten Arntzen
Robert W. Fisher
Steven P. Stanbrook
Carl H. Lindner
Keith E. Lindner
Robert W. Olson
Jeffrey D. Benjamin
William W. Verity
Steven G. Warshaw
Jeffery M. Zalla
James B. Riley
Warren J. Ligan
Robert F. Kistinger
Oliver W. Waddell
William A. Tsacalis
John W. Braukman III

and

Chiquita Brands International, Inc.
Nominal Defendant