UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHEET METAL WORKERS LOCAL #218(S) PENSION FUND, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RODERICK M. HILLS, et al., <br><br> Defendants, <br><br> – and – <br><br> CHIQUITA BRANDS INTERNATIONAL, INC., a New Jersey corporation, <br><br> Nominal Defendant. | Civil No. 1:07-cv-01957-PLF |

[Caption continued on following page.]

MOTION TO CONSOLIDATE RELATED SHAREHOLDER DERIVATIVE
ACTIONS AND ESTABLISH A LEADERSHIP STRUCTURE

HAWAII ANNUITY TRUST FUND FOR       )    Civil Action No. 1:08-cv-00081-PLF
OPERATING ENGINEERS, Derivatively on  )
Behalf of CHIQUITA BRANDS            )
INTERNATIONAL, INC.,                 )
                                     )
                    Plaintiff,       )
                                     )
        vs.                          )
                                     )
RODERICK M. HILLS, et al.,           )
                                     )
                    Defendants,      )
                                     )
        – and –                      )
                                     )
CHIQUITA BRANDS INTERNATIONAL,       )
INC., a New Jersey corporation,      )
                                     )
                    Nominal Defendant. )
                                     )
_____ )

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    FACTUAL AND PROCEDURAL HISTORY .....................................................5

III.   ARGUMENT .......................................................................................................13

       A.     The Related Shareholder Derivative Actions Should Be Consolidated................13

       B.     The Annuity Trust Fund Is the Most Adequate Lead Derivative Plaintiff ............15

       C.     Coughlin Stoia Is Uniquely Qualified to Serve as Lead Derivative Counsel ........17

IV.    CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

**Page**

## CASES

*Dollens v. Zionts*,
No. 01 C 5931, 2001 U.S. Dist. LEXIS 19966
(N.D. Ill., Dec. 4, 2001) ............................................................................14

*Ernst & Young, LLP v. Tucker ex rel. HealthSouth Corp.*,
940 So. 2d 269 (Ala. 2006) .......................................................................11

*Horn v. Raines*,
227 F.R.D. 1 (D.D.C. 2005)................................................................. *passim*

*Ikerd v. Lapworth*,
435 F.2d 197 (7th Cir. 1970) ....................................................................14

*In re Conseco, Inc. Sec. Litig.*,
120 F. Supp. 2d 729 (S.D. Ind. 2000) .......................................................16

*In re Enron Corp., Sec. Litig.*,
206 F.R.D. 427 (S.D. Tex. 2002)..........................................................17, 18

*In re Salomon Inc. S'holders Derivative Litig.*,
68 F.3d 554 (2d Cir. 1995).......................................................................19

*In re Storage Tech. Corp. Sec. Litig.*,
No. 92-B-750 (D. Colo. 1993) ..................................................................19

*In re XM Satellite Radio Holdings Sec. Litig.*,
237 F.R.D. 13 (D.D.C. 2006)....................................................................18

*Johnson v. Celotex Corp.*,
899 F.2d 1281 (2d Cir. 1990)....................................................................14

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)..................................................................................14

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998)....................................................................................12

*MacAlister v. Guterma*,
263 F.2d 65 (2d Cir. 1958)........................................................................14

*Millman v. Brinkley*,
No. 1:03-cv-3831-WSD, 2004 U.S. Dist. LEXIS 20113
(N.D. Ga. Oct. 1, 2004)........................................................................14, 16

**Page**

*Unite Nat'l Ret. Fund v. Watts*,
   No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246
   (D.N.J. Oct. 28, 2005).......................................................................................................19

## STATUTES, RULES AND REGULATIONS

28 U.S.C.
   §1407...................................................................................................................................12

Federal Rules of Civil Procedure
   Rule 23.1............................................................................................................................15
   Rule 42........................................................................................................................12, 13
   Rule 42(a)..........................................................................................................................14

## LEGISLATIVE HISTORY

S. Rep. No. 104-98..................................................................................................................15

## SECONDARY AUTHORITIES

3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §9.35 (4th ed. 2002)...............18

## I.     INTRODUCTION

Plaintiff, the Hawaii Annuity Trust Fund for Operating Engineers (the "Annuity Trust Fund"), a long-term institutional shareholder of Chiquita Brands International, Inc. ("Chiquita" or the "Company"), brings this motion to consolidate all shareholder derivative actions pending in or later transferred to this District which arise out of the same or similar conduct alleged in this action and to establish a leadership structure to direct the prosecution of the Consolidated Action, including appointing the Annuity Trust Fund as Lead Derivative Plaintiff and approving its selection of Lead Derivative Counsel.

The Annuity Trust Fund originally brought this shareholder derivative action in Chiquita's home state of New Jersey on October 30, 2007 against the entire Chiquita Board of Directors (the "Board") and several of Chiquita's other present and former officers and directors (collectively, the "Chiquita Defendants") for intentional, reckless and/or negligent breaches of their fiduciary duties of care, control, compliance and candor, and/or aiding and abetting such breaches of fiduciary duty, involving illegal, improper and/or *ultra vires* conduct, including causing Chiquita to violate the laws of the United States, Colombia and international business conduct codes, and against Chiquita's longtime outside auditor, Ernst & Young LLP ("E&Y") for aiding and abetting the Chiquita defendants' wrongful conduct and for professional malpractice.  The alleged conduct included paying, or permitting to be paid, improper and/or illegal bribes – payments to a known right-wing/fascist terrorist organization known as United Self-Defense Forces of Colombia (the "Autodefensas Unidas de Colombia" (the "AUC")), and to left-wing terrorist organizations known as The Revolutionary Armed Forces of Colombia (the "FARC") and the National Liberation Army ("ELN") – and illegally providing or facilitating the provision of arms and other weapons to the AUC.  It was also alleged this conduct was facilitated by E&Y and Robert W. Olson, the Company's long-time in-house General Counsel, who acquiesced in the making or concealment of the improper

or illegal payments and the mischaracterization of them in Chiquita's accounting books and financial records, and by E&Y's repeated certifications of Chiquita's false and misleading financial statements distributed to its shareholders, while misrepresenting that they had been properly audited – all without requiring disclosure of the illegal acts, thus furthering the false and misleading statements and breaches of fiduciary duty of the Chiquita executives. As a result of this improper and illegal – indeed, criminal – misconduct, in March 2007 Chiquita was forced to plead guilty to a federal felony count of making illegal payments to a designated terrorist organization, with Chiquita agreeing – subject to court approval of the plea agreement – to pay a $25 million fine and be placed on felony corporate probation for five years. The Company has also been sued in four federal civil mass tort actions by the victims of the AUC's murderous rampage in Colombia – ***collectively seeking nearly $8 billion in damages*** – and suffered huge losses due to the destruction of Chiquita's business operations in Colombia – once its largest source of bananas and profits.

Following the September 17, 2007 acceptance of the terms of Chiquita's guilty plea in this District, the Annuity Trust Fund filed suit against Chiquita's executives and E&Y in New Jersey state court. Immediately after filing its action, the Annuity Trust Fund effected service on Chiquita and E&Y and propounded discovery. Meanwhile, three additional shareholder derivative actions were filed on behalf of Chiquita in federal court in Ohio, the District of Columbia and New Jersey, all of which arise largely out of the same course of conduct pled in the Annuity Trust Fund's New Jersey state derivative action. Chiquita tried but failed to have all of the federal civil mass tort cases not pending in this District transferred to this District, where the first of those actions was commenced. The Company then sought intra-district coordination of all pretrial proceedings through the Multi District Litigation ("MDL") Panel of the four federal civil mass tort actions and all of the federal derivative actions. The MDL motion will be heard January 30, 2008. Citing the pendency of the MDL transfer motion and the risk of inconsistent rulings in the shareholder

derivative actions pending in both federal and state venues, in early December 2007, Chiquita also moved to stay the Annuity Trust Fund's New Jersey state derivative proceedings pending resolution of the federal derivative actions. The Annuity Trust Fund strenuously objected on the basis that the New Jersey state court proceedings were the only proceedings capable of obtaining complete relief for the Company. Chiquita equally strenuously argued all derivative actions against the Chiquita executives needed to be litigated in a single forum – and through their MDL motion, Chiquita selected this forum.

Attempting to reach a compromise between the Annuity Trust Fund's right to prosecute these shareholder derivative claims and the Chiquita defendants' claim of hardship in being required to defend breach of fiduciary duty claims simultaneously in several courts, while recognizing that the claims against E&Y cannot be prosecuted in federal court without destroying its diversity jurisdiction, on January 7, 2008 the New Jersey Superior Court entered an order dismissing (without prejudice) – rather than staying – the claims against all defendants except E&Y and suggested that the Annuity Trust Fund join the federal derivative actions in order to prosecute its claims against the current and former Chiquita executives. Consequently, the derivative claims against E&Y remain pending in New Jersey (currently stayed pending mediation and arbitration) and on January 15, 2008, the Annuity Trust Fund filed its own shareholder derivative complaint in this District against the Chiquita executives. Plaintiff requested that its derivative action be related to the derivative action previously filed in this Court by the Sheet Metal Workers Local #218(S) Pension Fund on October 31, 2007. By this motion Plaintiff seeks consolidation of these two derivative actions and any derivative actions arising out of the same conduct later filed in or transferred to this District.

None of the parties in these related derivative actions should object to consolidation. Consolidation increases judicial economy and reduces the risk of inconsistent rulings. Moreover, as the MDL transfer motion, even if granted, will simply transfer the other federal shareholder

derivative actions to this District for coordinated pretrial proceedings, but will require their remand to the originating jurisdictions for trial, barring the judicial relief sought herein, there remains a significant risk of inconsistent rulings and litigation strategies if all of the federal derivative actions are not consolidated for all purposes.

For the same reasons, it is appropriate to appoint the Annuity Trust Fund as Lead Derivative Plaintiff in the Consolidated Action and to approve its selection of Coughlin Stoia as Lead Derivative Counsel. Courts in this District recognize that particularly in shareholder derivative litigation, "a leadership structure is necessary to provide for an orderly litigation." *Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005). The New Jersey state court's January 7th ruling *per force* requires that the shareholder derivative claims against the Chiquita executive defendants and E&Y proceed simultaneously in separate derivative cases – despite involving identical subject matter. In fact, the aiding and abetting of the individual defendants' breach of fiduciary duty claims being pursued against E&Y in New Jersey may require that court to make determinations concerning the scope of the Chiquita executives' fiduciary duties and the extent to which those duties may have been violated. Barring the judicial intervention sought herein, including the appointment of the Annuity Trust Fund as Lead Derivative Plaintiff and approval of its selection of Lead Derivative Counsel, there remains a serious risk that the plaintiffs in the separate derivative actions pending in state and federal court could adopt inconsistent litigating postures, exponentially decreasing judicial economy, risking prejudice to Chiquita's interests, and increasing the risk of inconsistent rulings. Conversely, the Annuity Trust Fund, a long-term institutional Chiquita investor, has demonstrated through its course of conduct that it has the ability, resources and determination to vigorously prosecute both actions to promote and protect Chiquita's claims and assets.

For these and the additional reasons detailed here, plaintiff respectfully requests that the Court: (i) consolidate the shareholder derivative actions now pending in or later filed in or

transferred to this District that arise out of the same or substantially similar conduct; (ii) appoint the Annuity Trust Fund Lead Derivative Plaintiff; and (iii) approve the Annuity Trust Fund's selection of Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") as Lead Derivative Counsel.

## II.    FACTUAL AND PROCEDURAL HISTORY

The Annuity Trust Fund is a $124+ million defined contribution plan which manages the retirement savings and benefits of over 4,000 participants and beneficiaries who work in Hawaii and are members of the International Union of Operating Engineers Local 3.[1]  As a long-term Chiquita investor, the Annuity Trust Fund has a vested interest in protecting and preserving the Company's assets and promoting good corporate governance.  *Id.*

With revenues of approximately $4.5 billion, Chiquita was the world's single largest banana producer throughout the late 1990s and the largest employer in Latin America for many years.[2]  In fact, while operating for many years as the United Fruit Company ("United Fruit"), the Company exerted so much economic and political influence that many of the Latin American countries it operated in were characterized as "banana republics."  *Id.*  And indeed, United Fruit had a long, dark history of improper and illegal conduct in those countries.  ¶¶3, 25(b).  The Company cooperated with authoritarian governments to suppress – even kill – its employees during labor protests, paid bribes (which, when exposed, led to the suicide of its CEO and the enactment of the U.S. Foreign Corrupt Practices Act), led a coup against an unfriendly government, was implicated in illegally using child labor and in serious environmental abuses and also violated the U.S. antitrust laws.  *Id.*

---

[1]     *See* Declaration of Mary K. Blasy in Support of Motion to Consolidate Related Shareholder Derivative Actions and Establish a Leadership Structure ("Blasy Decl."), ¶3.

[2]     *See* the Annuity Trust Fund's Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste, Abuse of Control and *Ultra Vires* Conduct and Demand for Jury Trial on All Issues So Triable (the "Complaint") filed herein on January 15, 2008, ¶25.  Unless otherwise indicated, all "¶_" references herein are to this Complaint.

Chiquita executives now admit that "its predecessor companies . . . made a number of mistakes," but continued claiming that it was "a different Company" right up until its recent felony criminal plea. *Id*.

Chiquita's power and influence in Latin America did not go unchallenged. In response to dissident groups that rose up against Chiquita, in 1989 the Company began making payments to left-wing terrorist organizations FARC and ELN. ¶¶5, 25. Then, in 1997 Chiquita began making payments to the AUC, a right-wing paramilitary organization that is a brutally violent group that killed, kidnapped, raped, tortured, and caused the disappearance of thousands of Colombian citizens, trade unionists, and human rights activists. ¶¶1, 7. The AUC, often characterized as a "death squad," has been described in *Forbes* as "responsible for some of the worst massacres in Colombia's civil conflict and for a sizable percentage of the country's cocaine exports." ¶6. In fact, over the past six years, with 15,000 to 20,000 armed troops, the AUC has assassinated more than 800 union officials and organizers in Columbia – and more than 4,000 since 1986. ¶¶6-7. During one year alone, the AUC was accused of carrying out 16 massacres, 362 assassinations and 180 kidnappings, all of these crimes financed in part by the payments defendants caused Chiquita to pay the AUC. ¶8. In addition to the illegal payments, Chiquita's executives also facilitated the shipment of 3,000 rifles and millions of rounds of ammunition to the AUC, which were brought into Colombia through Chiquita's Colombian subsidiary, Banadex S.A.'s port facility and stored on Chiquita's docks before being distributed to the death squads; certain weapons were even allegedly smuggled to the AUC on Chiquita's own ships. *Id.*

The Chiquita executive defendants, including former General Counsel Robert Olson, along with Chiquita's longtime outside auditors, E&Y, knew the AUC was a terrorist group. In February 2003, Olson assigned an in-house attorney to investigate the payments, and he concluded that the AUC was "a widely known, illegal vigilante organization." ¶¶39, 103. In fact, Olson and the in-

house attorney had told the Chiquita Board's Audit Committee all the way back in the fall of 2000 that Chiquita was making payments to the AUC and that the AUC was a terrorist organization. *Id*. Despite Olson's February 2003 report, the Chiquita Board decided to continue the payments which in 2001 had been deemed explicitly illegal by the U.S. State Department. ¶104.

On September 10, 2001, the U.S. Department of State designated the AUC as a specially designated foreign terrorist organization (which contains mostly Middle East-based groups like Al Qaeda and Hamas), meaning that U.S. companies could not legally do business with them. ¶¶59, 105. Nonetheless, defendants continued causing Chiquita to make the illegal payments such that between 1997 and 2004, defendants caused Chiquita to make over 100 bribery payments to the AUC in Colombia, totaling over $1.7 million, on top of other bribery payments to the FARC and ELN, which payments were actively concealed by them from the owners of Chiquita, *i.e.*, its shareholders, and from government officials in the U.S. and Colombia. ¶¶5, 106-112.

Evidence later developed by the U.S. Department of Justice ("DOJ") demonstrates the illegality of the payments being made to the AUC over this seven-year period was known to the top Chiquita officers and Board of Directors, to E&Y, and to Chiquita's in-house General Counsel and outside lawyers who all were aware the payments were being made illegally and falsely misreported in Chiquita's financial records to conceal the illegality. ¶¶9-10, 106-112. The Chiquita Defendants engaged in this wrongful *ultra vires* behavior because Chiquita's Colombian banana-producing operations were extremely profitable and these corporate officers and directors were desperate to convince Chiquita's shareholders (and investors) that their management and stewardship of Chiquita was successful and they were making progress toward sustained profitable growth. ¶¶9, 11. In addition, by funding the AUC to kill thousands of pro-labor social activists and labor advocates in Colombia, Chiquita could coerce its Columbian workers to accept lower wages and less desirable working conditions. ¶9. By continuing the profitable Colombian banana operations via the

improper payments and other activities, the Chiquita Defendants inflated their compensation in the form of salaries, bonuses and perks, thus personally profiting from their breaches of duty, which damaged the Company. ¶¶9, 11.

Following an intense, multi-year investigation and prosecution by the DOJ, on March 19, 2007, Chiquita appeared before the Honorable Royce C. Lamberth in this District and pled guilty to the crime of engaging in transactions with a specially-designated global terrorist. *See* Blasy Decl., Ex. K. Under the terms of the negotiated plea agreement, Chiquita agreed to pay a $25 million criminal fine – the largest penalty ever imposed under the U.S. Global Terrorism Sanctions Act, agreed to implement and maintain an effective compliance and ethics program, and agreed to five years' felony probation. *Id*. While Chiquita paid a multi-million dollar fine as a result of the egregious illegal conduct of its senior officers and directors, ***and is now a convicted felon serving felony corporate probation***, the Chiquita Board used its power and influence over Chiquita to spare themselves and their cronies from criminal prosecution and from the financial ruin they visited upon Chiquita. ¶17. ***Not a single Chiquita executive was prosecuted***.

Moreover, Chiquita has been sued civilly in four separate cases in four federal district courts by the families of the hundreds of victims of the AUC's murderous rampage in Colombia, with these plaintiffs collectively seeking ***nearly $8 billion in damages*** from Chiquita.[3] ¶15, 123-124 and Blasy

---

[3]    On June 7, 2007, the first complaint, a class action, was commenced in the District of Columbia entitled *Jane/John Does 1/144 (as Legal Heirs) Columbia, South America v. Chiquita Brands Int'l, Inc. and David Does 1-10*, No. 07-cv-01048, which is essentially a class-wide wrongful death action brought under the ATA, Torture Victim Protection Act ("TVPA") and state tort law by the "legal heirs to Peter Does 1-144, all of whom were murdered by terrorist groups receiving material support from [Chiquita]." *See* Blasy Decl., Ex. A at 1. Thereafter, on June 13, 2007, *Carrizosa, et al. v. Chiquita Brands Int'l, Inc., et al.*, No. 07-60821-CIV, was commenced in the Southern District of Florida, seeking damages under the ATA and Florida state law against Chiquita and subsidiary Chiquita Fresh North America LLC on behalf of the heirs of 20 Columbians killed by terrorists allegedly funded by Chiquita. *See* Blasy Decl., Ex. B at 1. On July 19, 2007, *John Does 1-7 v. Chiquita Brands Int'l, Inc., et al.*, No. 07-3406 (JAG), was commenced in the District of New

Decl., ¶4 and Ex. L. Chiquita has also suffered millions of dollars in economic harm due to the destruction of Chiquita's business operations in Colombia – once its largest source of bananas and profits – and immeasurable damage to its already fragile reputation. ¶¶18-19, 125-132.

Accordingly, following Chiquita's September 17, 2007 sentencing hearing, where the sentence previously outlined in the March 2007 plea agreement was accepted by the court, the Annuity Trust Fund directed its lawyers to file a shareholder derivative action for breach of fiduciary duty against the Company's entire Board of Directors, several other current and former Chiquita executives, and for aiding and abetting those breaches and professional malpractice against the Company's long-time outside auditors, E&Y, in New Jersey state court. *See* Blasy Decl., ¶5 and Ex. F. That complaint was filed on October 30, 2007 in state court in New Jersey (the state of Chiquita's incorporation) and specifically detailed the false and misleading claims of ethical and honest behavior and good corporate citizenship defendants caused Chiquita to make to its shareholders over the years to make it appear Chiquita was profiting as a result of their stellar

---

Jersey against Chiquita, "Moe" Corporations 1-10 and Moes 11-25 seeking a class-wide recovery under New Jersey state law, the ATA and the federal RICO statute alleging a range of torts including extrajudicial killing, torture, terrorism, war crimes, material support to terrorist organizations, cruel, inhuman or degrading treatment, violation of the rights to life, liberty and security of person and peaceful assembly and association, consistent pattern of gross violations of human rights, wrongful death, assault & battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence/negligent hiring/negligence per se, and loss of consortium. *See* Blasy Decl., Ex. C at 1. Finally, on November 14, 2007, *Juan/Juana Does 1-377 v. Chiquita Brands Int'l, Inc., Individuals A-J, Moe Corporations 1-5 and Moes 6-25*, No. 07 cv 103000 (HB), was commenced in the Southern District of New York seeking over $7.8 billion in damages from Chiquita "for terrorism, war crimes, crimes against humanity, extrajudicial killing, torture and wrongful death of plaintiffs' decedents and/or individual living plaintiff(s) committed by [Chiquita], its officers, directors, agents, servants and employees, acting in concert with, aiding, abetting, facilitating, soliciting, directing, orchestrating and conspiring with Colombian paramilitaries and their collaborators in those atrocities, in violation of the Law of Nations, the laws of the United States of America and of individual states, including but not limited to the State of Ohio, and the laws of the Republic of Colombia." *See* Blasy Decl., Ex. D at 1. These actions are referred to herein collectively as the ATA actions and they seek recovery on behalf of Columbians and their heirs for injuries they suffered in Columbia.

management – and not by causing Chiquita to engage in an illegal enterprise – in order to justify their own lucrative salaries and perks.  ¶¶2-4, 9-12, 68-98, and 136(a).  Chiquita has been organized under the laws of New Jersey since the 1800s and all of the derivative claims arise under New Jersey state law.  ¶25.

Immediately prior to the filing of the Annuity Trust Fund's action in New Jersey state court, another shareholder derivative action was filed in federal court in Ohio where Chiquita is headquartered.  *See* Blasy Decl., ¶6.  After the Annuity Trust Fund's action was filed in New Jersey state court, two additional shareholder derivative actions were filed in federal courts, one here in the District of Columbia and the other in the District of New Jersey.  *Id.*  None of the complaints filed in the other federal derivative actions contain nearly the same level of detailed allegations as the Annuity Trust Fund's detailed complaint, none of them names E&Y as a defendant (because they cannot without destroying diversity jurisdiction) and, inexplicably, they all appear to abandon Chiquita's valuable claims against a substantial number of culpable defendants named in the Annuity Trust Fund's action.  *See* Blasy Decl., ¶9.

On November 26, 2007, Chiquita filed a motion before the Judicial Panel on Multidistrict Litigation (the "MDL Panel") to transfer all of the ATA cases pending against Chiquita in jurisdictions other than the District of Columbia, ***and all the federal derivative actions,*** to this District for coordinated pretrial proceedings (the "MDL Motion"), demonstrating the Company's willingness and desire to litigate in this District.  *See* Blasy Decl., ¶4(e) and Ex. E.  Chiquita's MDL Motion is now fully-briefed and will be argued in Arizona on January 30, 2008.  *Id.*

On December 5, 2007, Chiquita moved to stay the Annuity Trust Fund's New Jersey state court action arguing that for comity reasons, the New Jersey state action should be stayed until the federal derivative actions are resolved, based solely on the fact that the Ohio federal derivative action was filed two weeks prior to the New Jersey state derivative action.  *See* Blasy Decl., ¶7.

E&Y also moved to stay the claims against it pending mediation and then arbitration.  *Id*.  The Annuity Trust Fund strenuously objected to Chiquita's comity stay motion on the basis that New Jersey was the correct forum for these shareholder derivative claims, all of which arise under New Jersey state law, that the New Jersey court was actually the first to obtain jurisdiction over the defendants, and that for a variety of reasons, including but not limited to the inclusion of E&Y as a defendant in the New Jersey state derivative action, the New Jersey state proceedings were better situated to obtain complete relief for Chiquita, the real party-in-interest in these actions.  *Id*.  The Annuity Trust Fund also opposed E&Y's stay motion arguing it was entitled to test the *bona fides* of the arbitration agreement Chiquita's faithless fiduciaries had caused it to enter into with Chiquita before being compelled to mediate.  *Id*.  Attempting to reach a compromise between the Annuity Trust Fund's right to prosecute these shareholder derivative claims and the Chiquita defendants' claim of hardship in being required to defend breach of fiduciary duty claims simultaneously in several courts, while recognizing that the claims against E&Y cannot be prosecuted in federal court without destroying its diversity jurisdiction, on January 7, 2008 the New Jersey Superior Court entered an order dismissing (without prejudice) – rather than staying – the claims against all defendants except E&Y[4] and recommending the Annuity Trust Fund join the federal derivative actions:

> The plaintiff, **by joining the Ohio action**, will have a fair opportunity to present its claims against the directors and officers.

> \*        \*        \*

---

[4]      The state court also ruled that the mediation/arbitration provisions in E&Y's engagement agreement with Chiquita governed, and stayed plaintiff's claims on behalf of Chiquita against E&Y pending efforts to mediate/arbitrate.  *Id*. at 5-6.  However, the New Jersey state court retains jurisdiction to (a) enforce the arbitration award; (b) rule on the fairness of any settlement; (c) enforce any settlement agreement; and (d) award attorneys' fees should plaintiff obtain a recovery for Chiquita in connection with the arbitration.  *See, e.g., Ernst & Young, LLP v. Tucker ex rel. HealthSouth Corp.*, 940 So. 2d 269, 287-88 (Ala. 2006).

In this case, in the federal forum, the parties will likely receive a full adjudication of the merits of all claims against the directors and officers. There is therefore no reason for this Court to continue to administer the case as to these parties. ***In the unlikely event that the parties are not able to receive a full adjudication in the federal case, there will be no prejudice to their re-filing at a later date***.

*See* Blasy Decl., ¶7 and Ex. J at 2-5 (emphasis added). [5]

Accordingly, the Annuity Trust Fund will continue to pursue Chiquita's claims against E&Y for aiding and abetting the breaches of fiduciary duties by Chiquita's current and former executives and for professional malpractice in New Jersey state court (following mediation and arbitration proceedings), while simultaneously prosecuting in this Consolidated Action Chiquita's claims against the current and former Chiquita officers and directors originally named in the New Jersey state court action. *See* Blasy Decl., ¶8. Other than removing the counts alleged against E&Y, the Complaint the Annuity Trust Fund filed in this Court on January 15, 2008 mirrors its New Jersey state court complaint. *Id.*

Defendants do not dispute that the Annuity Trust Fund's derivative claims are substantially similar to the Sheet Metal Workers' derivative claims. In fact, counsel for Chiquita strenuously argued the cases were substantially similar in order to obtain the stay they sought in New Jersey state court. There, defendants adamantly maintained that it was unfair to force them to respond to these claims in multiple actions and that it presented a risk of inconsistent rulings. *See* Blasy Decl., ¶7. However, without the relief sought herein, even if Chiquita's MDL Motion is granted, the federal derivative actions and the ATA cases will simply be ***coordinated for pretrial purposes*** under 28 U.S.C. §1407, but the derivative actions will not be ***consolidated for all purposes*** under Fed. R. Civ. P. 42, requiring that each derivative action be remanded to its jurisdiction of origin at the conclusion of the pretrial proceedings. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S.

_____

[5]    Although Judge Contillo made reference to the "Ohio action," the defendants by this time had commenced proceedings before the MDL Panel to transfer the Ohio action to this District.

26, 40-41 (1998). Specifically, with regard to the federal derivative actions, such a result would be absurd and do nothing to prevent the multiplicity of actions or the risk of inconsistent rulings the Chiquita defendants sought to prevent with their motion to stay the Annuity Trust Fund's New Jersey state court proceedings. Moreover, the contemplated MDL coordination does not provide for a leadership structure that ensures that these important breach of fiduciary duty claims being prosecuted *on behalf of Chiquita* against its current and former executives will be vigorously prosecuted independently from the claims being prosecuted in the ATA cases *against Chiquita*. Absent this Court's intervention, there will simply be no means of ensuring that Chiquita's interests are protected *vis-a-vis* the hundreds of tort claimants and their almost $8 billion in unliquidated claims pending against Chiquita.

As such, plaintiff respectfully requests that the Court consolidate the two federal derivative actions pending before it and order that any shareholder derivative actions arising out of the same course of conduct later filed in or transferred to this District be consolidated. Plaintiff also requests that a leadership structure be established that ensures that this important action is prosecuted by a single lead plaintiff with a single lead counsel accountable to the Court and empowered to coordinate the efforts of plaintiffs' counsel to avoid duplication of effort, increase judicial economy and permit Chiquita's shareholders to speak with a unified voice.

## III. ARGUMENT

### A. The Related Shareholder Derivative Actions Should Be Consolidated

Presently pending in this District are two related shareholder derivative actions brought on behalf of Chiquita, the real-party-in-interest. Both actions allege that various Chiquita directors and officers engaged in an illegal bribe payment scheme resulting in substantial harm to Chiquita and its shareholder owners. The marked similarity between the two actions – coupled with the advances in judicial economy which will result from consolidation of these two very similar actions – supports the consolidation of these actions pursuant to Federal Rule of Civil Procedure 42. Any

- 13 -

inconsistencies between the two complaints on file may later be cured through the filing of a consolidated complaint.

The power to order consolidation prior to trial falls within the broad inherent authority of every court "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Horn*, 227 F.R.D. at 2 (noting that Fed. R. Civ. P. 42(a) "gives the Court broad discretionary authority to consolidate cases"). Fed. R. Civ. P. 42(a) provides that:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such proceedings therein as may tend to avoid unnecessary costs or delay.

*See also Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990) ("Rule 42(a) of the Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when there are common questions of law or fact to avoid unnecessary costs or delay."); *Ikerd v. Lapworth*, 435 F.2d 197, 204 (7th Cir. 1970) (same). Further, a court has discretion to consolidate related cases, which involve common questions of fact and law under Fed. R. Civ. P. 42(a), to "alleviate 'needless duplication of time, effort, and expense on the part of the parties and the Court.'" *Horn*, 227 F.R.D. at 2 (quoting *Millman v. Brinkley*, No. 1:03-cv-3831-WSD, 2004 U.S. Dist. LEXIS 20113, at *6 (N.D. Ga. Oct. 1, 2004)).

Specifically, in the shareholder derivative context, "consolidation is appropriate where 'the cost of defending . . . multiple actions may well do serious harm to the very corporation in whose interest they are supposedly brought.'" *Horn*, 227 F.R.D. at 2 (quoting *MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958)). ***When consolidation is appropriate – as it is here – "the Court has the discretion to order the consolidation of subsequently-filed or transferred cases that allege similar facts as those alleged in the current shareholder derivative suits*."** *Id.* (citing *Dollens v. Zionts*, No. 01 C 5931, 2001 U.S. Dist. LEXIS 19966 (N.D. Ill., Dec. 4, 2001)) (emphasis added).

Here, the Sheet Metal Workers' and the Annuity Trust Fund's derivative actions both arise out of the same operative facts and raise similar legal issues; namely, whether various Chiquita officers and directors caused the Company to pay a series of illegal bribe payments to the AUC and whether that resulted in millions of dollars in damage to the Company and, ultimately, to its shareholder owners. Thus, consolidation of these actions will promote judicial economy by avoiding the unnecessary duplicative efforts that are sure to entail if these actions proceed separately. As defendants' prior course of conduct in filing the MDL Motion and the Sheet Metal Workers' prior course of conduct in joining the MDL Motion demonstrate, none of the parties to these proceedings should oppose consolidation of the federal derivative actions. *See* Blasy Decl., ¶4(e). Thus, the shareholder derivative actions pending in (or later filed in or transferred to) this District should be immediately consolidated.

**B.     The Annuity Trust Fund Is the Most Adequate Lead Derivative Plaintiff**

The Annuity Trust Fund moves to be appointed Lead Derivative Plaintiff in the Consolidated Action. As set forth in detail below, the Annuity Trust Fund, as a long-term institutional shareholder of Chiquita, is the most adequate Lead Derivative Plaintiff.

Courts in the District of Columbia recognize that in shareholder actions, "Congress has demonstrated its preference for appointing institutional plaintiffs as lead plaintiffs . . . because 'an institutional investor acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interests of the class with the long-term interests of the company and its public investors.'" *Horn*, 227 F.R.D. at 3 (quoting S. Rep. No. 104-98 at 690). Specifically in the context of shareholder derivative litigation, such an appointment "requires a lead plaintiff to 'fairly and adequately represent the interest of the shareholders . . . in enforcing the right of the corporation or association.'" *Id.* (quoting Fed. R. Civ. P. 23.1).

In selecting a lead derivative plaintiff, "[t]he Court considers, among other things, the following factors to determine which plaintiff would best represent the interests of the shareholders: (1) whether the plaintiff held shares during the relevant time period; (2) whether the plaintiff is represented by capable counsel; and (3) whether the plaintiff is subject to unique defenses that would make appointment problematic." *Id.* (citing *Millman*, 2004 U.S. Dist. LEXIS 20113, at *3). Examination of each of these factors militates strongly in favor of appointing the Annuity Trust Fund as Lead Derivative Plaintiff in the Consolidated Action. First, The Annuity Trust Fund is a long-term institutional shareholder of Chiquita and "held shares during the relevant time period." *Horn*, 227 F.R.D. at 3; *see also* Blasy Decl., ¶3. Second, and as will be discussed more fully below, the Annuity Trust Fund has retained capable counsel – the law firm of Coughlin Stoia – which has extensive experience in shareholder derivative litigation and has obtained significant benefits for plaintiffs in derivative actions. *Id.*

Third, not only is the Annuity Trust Fund free from "unique defenses that would make appointment problematic," it is the plaintiff most capable of "'step[ping] forward to represent [shareholders] and exercise effective management and supervision of the . . . lawyers'" and the litigation. *In re Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729, 732 (S.D. Ind. 2000). As the record shows, the Annuity Trust Fund was the first plaintiff to file a shareholder derivative action in the Superior Court of New Jersey, Chiquita's state of incorporation since its creation in 1899, and the *only* plaintiff to bring the valuable claims against E&Y. The Annuity Trust Fund is moving forward with those claims on Chiquita's behalf in New Jersey. The Annuity Trust Fund's complaints before this Court and the New Jersey state court are indisputably the most detailed on file. Blasy Decl., ¶9. The Annuity Trust Fund also promptly commenced discovery in the New Jersey action, propounding requests for production of documents to nominal defendant Chiquita and to E&Y. When Judge Contillo dismissed the Annuity Trust Fund's claims against the Chiquita executives in New Jersey

state court and recommended that plaintiff join the federal action, the Annuity Trust Fund promptly re-filed those claims in the District of Columbia. It is beyond dispute that the Annuity Trust Fund has vigorously prosecuted this action from the outset and continues to act to protect and preserve Chiquita's assets. Moreover, as an institutional investor overseen by experienced fiduciaries with significant current holdings of Chiquita, the Annuity Trust Fund has a vested interest in these claims brought on behalf of Chiquita that it is capable of effectively prosecuting.

In light of the Annuity Trust Fund's status as a long-term investor in Chiquita, coupled with its quality pleadings and vigorous prosecution discussed above, the Annuity Trust Fund is the most adequate Lead Derivative Plaintiff. The Annuity Trust Fund has established its willingness, capability, and adequacy to represent the interests of Chiquita and its shareholders in this derivative action and should be appointed Lead DerivativePlaintiff.

### C.   Coughlin Stoia Is Uniquely Qualified to Serve as Lead Derivative Counsel

The Annuity Trust Fund's selected counsel, Coughlin Stoia, is uniquely well-equipped to serve as Lead Derivative Counsel. Coughlin Stoia is a 190-lawyer law firm with offices in San Diego, San Francisco, Los Angeles, New York, Boca Raton, Washington, D.C. and Philadelphia. *See* Blasy Decl., ¶2 and Ex. M. Coughlin Stoia is actively engaged in complex litigation around the country, emphasizing securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions. *Id*. Coughlin Stoia's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys who have successfully prosecuted thousands of shareholder lawsuits. Coughlin Stoia attorneys have been responsible for recoveries of more than $45 billion. *Id*. For this reason, when faced with multiple lead plaintiff motions in the largest, most complex shareholder action in U.S. history, Judge Melinda Harmon appointed Coughlin Stoia as sole Lead Derivative Counsel to coordinate the efforts of other counsel and direct the prosecution of the *Enron* case, concluding:

> [T]he Court has found that the submissions of [Coughlin Stoia] stand out in the breadth and depth of its research and insight. . . . [T]he Court has reviewed in careful detail the submissions of [Coughlin Stoia] regarding its competency to serve as Lead Counsel and finds it fully capable of representing Lead Plaintiff and the class.

*In re Enron Corp., Sec. Litig.*, 206 F.R.D. 427, 458 (S.D. Tex. 2002). Coughlin Stoia is a "law firm with exceptional resources and capability to prosecute this action." *Id.* at 454.

In selecting lead derivative counsel, the "principle that guides the Court's decision is which counsel will best serve the interest of the plaintiffs." *Horn*, 227 F.R.D. at 3. "In making this determination, courts consider, among other things, 'experience and prior success record, the number, size, and extent of involvement of represented litigations, the advanced stage of proceedings in a particular suit, and the nature of the causes of action alleged.'" *Id.* (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §9.35 at 388 (4th ed. 2002)). "In addition, courts have considered the quality of the pleadings, the economic interest of the plaintiffs, and the vigor with which the plaintiffs have prosecuted their lawsuits." *Id.* As to the first *Horn* factor, as Judge Huvelle recently recognized when appointing Coughlin Stoia Lead Derivative Counsel in another shareholder action pending in this District,

> The PSLRA "evidences a strong presumption in favor of approving a properly-appointed lead plaintiff's decisions as to counsel selection and counsel retention." *Cendant*, 264 F.3d at 276. The Union Pension Group has selected the firm of [Coughlin Stoia] to serve as its counsel. ***That firm has extensive experience litigating securities class actions and has been appointed lead counsel in cases such as Enron Corp. Sec. Litig., supra. Given the lack of dispute regarding its experience and qualifications, the Court will appoint plaintiffs' choice as lead counsel***.

*In re XM Satellite Radio Holdings Sec. Litig.*, 237 F.R.D. 13, 21 (D.D.C. 2006) (emphasis added). In the specific genre of shareholder derivative litigation, Judge Richard Leon's 2005 appointment of Coughlin Stoia lead derivative counsel in the *Fannie Mae Derivative Litigation* expressly recognizes the firm's ability and resources to benefit plaintiffs in significant shareholder derivative litigation:

> The Court finds that . . . The [Coughlin Stoia] Firm [has] experienced counsel that have had success with this type of litigation. The firm[] ha[s] represented vigorously institutional plaintiffs, with significant financial interests in the outcome of the

> litigation, and have prosecuted the litigation with well-plead and thorough pleadings. The combined experience of these [lawyers] will provide the plaintiffs with counsel that will effectively represent their interests.

*Horn*, 227 F.R.D. at 3-4.

In fact, Coughlin Stoia possesses special, broad, and capable experience in shareholder derivative litigation as its partners have represented shareholders in class and derivative actions for decades and the firm has been on the forefront of litigation resulting in the development of cutting edge corporate governance and therapeutics.  *See* Blasy Decl., ¶2.  The firm has by far the largest litigation support staff of any plaintiffs' securities firm in the Country, consisting of forensic accountants, investigators, financial analysts, paralegals and document clerks.  *Id.*  Coughlin Stoia has recovered hundreds of millions of dollars in derivative litigation arising out of illegal corporate activities.  *Id.*  For instance, the firm was responsible for recovering $40 million in *In re Salomon Inc. S'holders Derivative Litig.*, 68 F.3d 554 (2d Cir. 1995), and also achieved an outstanding recovery of $55 million in *In re Storage Tech. Corp. Sec. Litig.*, No. 92-B-750 (D. Colo. 1993).  The Firm was also responsible for Royal Dutch Petroleum's (Shell's) adoption, implementation, and maintenance of a series of corporate governance changes, including shareholder participation in Board of Director elections, a new "best practices" standard protocol, and imposition of an independent Chairman.  *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005).  In the recently settled derivative action on behalf of Electronic Data Systems Corporation, No. 6:04-cv-0464-LED (E.D. Tex. *filed* 2004), where EDS's senior executives improperly applied percentage-of-completion accounting to inflate EDS's financial results, Coughlin Stoia obtained significant limits on the number of non-independent directors, increased director education, orientation, and responsibilities.[6]  Furthermore, Coughlin Stoia has

---

[6]    The hearing on final approval of the settlement by the Court is scheduled for January 30, 2008.

taken a lead role in investigating and prosecuting scores of shareholder derivative actions around the country arising out of the wave of revelations of option backdating that swept the U.S. corporate scene in 2006.  Coughlin Stoia's lawyers are presently prosecuting the enormous and high-profile *UnitedHealth Group* securities class action in Minnesota, where the California Public Employees' Retirement System is the court-appointed sole lead plaintiff. Coughlin Stoia's lawyers are also serving as Lead Derivative Counsel in several large derivative actions such as *The Home Depot, Inc.*, *Vitesse Semiconductor*, *Family Dollar Stores, Inc.* and *KLA-Tencor Corp*.

Not only are Coughlin Stoia's experience and resources essentially unrivaled, its appointment here will allow for a litigation quarterback who is responsible to the Court and to the Lead Derivative Plaintiff and who will be able to coordinate the various counsel whose substantial experience in representing plaintiffs in shareholder matters can be utilized and drawn upon in an effective and efficient manner.  In particular, Coughlin Stoia is concurrently prosecuting Chiquita's claims against E&Y on behalf of the Annuity Trust Fund in the New Jersey state derivative action. Appointing Coughlin Stoia Lead Derivative Counsel in this action will avoid not only the risk of inconsistent rulings in the state and federal actions, but will preclude the arguably more detrimental risk that derivative plaintiffs will take inconsistent positions in these actions that could irreparably damage Chiquita's litigating posture.

As to the rest of the *Horn* factors addressing the "'stage of the proceedings in [this] suit'" and "'nature of the causes of action alleged'" (*Horn*, 227 F.R.D. at 3), the record reflects that immediately upon entry of Chiquita's plea agreement, the Annuity Trust Fund directed its lawyers to undertake a thorough investigation of the available information concerning Chiquita's misconduct in connection with the systematic and continuous illegal payments to the AUC, including a detailed background investigation of each member of its Board to determine the culpability of each and whether demand upon each to bring the causes of action alleged in its shareholder derivative action

would in fact have been futile. Coughlin Stoia also concluded the necessary legal research to address other potential defenses. Based on these findings, the Annuity Trust Fund directed Coughlin Stoia to file a detailed shareholder derivative complaint in New Jersey addressing in detail the misconduct of the officers and the Board, how its members breached their duties as directors and why demand upon the Board to seek redress prior to filing would have been futile. The Annuity Trust Fund's complaint, consisting of 83 pages and 164 paragraphs, is well-researched, comprehensive, and most poised to secure maximum recovery for Chiquita. The Annuity Trust Fund is the only plaintiff to name E&Y as a defendant and seek recovery to Chiquita for E&Y's professional negligence, accounting malpractice, and aiding and abetting the Chiquita Individual Defendants' misconduct. The Annuity Trust Fund will continue simultaneously prosecuting the Consolidated Action *and* Chiquita's claims against E&Y in New Jersey state court.

Coughlin Stoia's diligent investigation and the subsequent thoroughness of its pleadings in this case, and in the New Jersey state derivative action where it is proceeding with mediation/arbitration of Chiquita's claims against E&Y, coupled with its history of conscientious prosecution, more than justify the Annuity Trust Fund's decision to select Coughlin Stoia, as the firm is uniquely qualified to coordinate the efforts of counsel in this case by serving as Lead Derivative Counsel and guiding this complex action to the best possible result for Chiquita and its shareholders.

## IV.    CONCLUSION

For the above stated reasons, the Hawaii Annuity Trust Fund for Operating Engineers respectfully requests the Court to consolidate the shareholder derivative actions and to appoint it as Lead Derivative Plaintiff and approve its selection of Coughlin Stoia as Lead Derivative Counsel.

DATED:  January 25, 2008                Respectfully submitted,

                                        LAW OFFICES OF ROGER M. ADELMAN
                                        ROGER M. ADELMAN (DC Bar # 056358)


                                              s/ ROGER M. ADELMAN
                                        ————————————————————————————
                                               ROGER M. ADELMAN

                                        1100 Connecticut Ave., NW, Suite 730
                                        Washington, DC  20036
                                        Telephone:  202/822-0600
                                        202/822-6722 (fax)

                                        COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        PATRICK J. COUGHLIN
                                        ARTHUR C. LEAHY
                                        AMBER L. ECK
                                        MARY K. BLASY
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        Attorneys for Plaintiff

S:\CasesSD\Chiquita Derivative\MOT00048455.doc

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 25, 2008.

s/ ROGER M. ADELMAN
ROGER M. ADELMAN

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

E-mail:  radelman@erols.com

# Mailing Information for a Case 1:08-cv-00081-PLF

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

CHIQUITA DERIVATIVE
Service List - 1/22/2008    (07-0235)
Page 1 of  1

**Counsel For Defendant(s)**

Robert S. Litt
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, DC  20004-1206
    202/942-5000
    202/942-5999 (Fax)


Eric H. Holder, Jr.
Jenny R. Mosier
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
    202/662-6000
    202/662-6291 (Fax)


Robert M. Stern
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC  20006-4001
    202/383-5300
    202/383-5414 (Fax)


Michael  Connolly
Thelen Reid Brown Raysman & Steiner LLP
200 Campus Drive, Suite 210
Florham Park, NJ  07932
    973/660-4400
    973/660-4401 (Fax)


Jonathan M. Sperling
Jessica A. Clarke
Covington & Burling LLP
620 Eighth Avenue
New York, NY  10018
    212/841-1000
    212/841-1010 (Fax)


Jeffrey B. Maletta
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC  20006
    202/778-9000
    202/778-9100 (Fax)


Sean  Mack
Pashman Stein
21 Main Street, First Floor
Court Plaza South
Hackensack, NJ  07601
    201/488-8200
    201/488-5556 (Fax)


Eli R. Mattioli
Thelen Reid Brown Raysman & Steiner LLP
875 Third Avenue, 10th Floor
New York, NY  10022
    212/603-6748
    212/603-2001 (Fax)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHEET METAL WORKERS LOCAL #218(S) PENSION FUND, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC., | ) ) ) ) | Civil No. 1:07-cv-01957-PLF |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| RODERICK M. HILLS, et al., | ) ) ) | |
| Defendants, | ) ) ) | |
| – and – | ) ) | |
| CHIQUITA BRANDS INTERNATIONAL, INC., a New Jersey corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) ) | |

[Caption continued on following page.]

[PROPOSED] PRE-TRIAL ORDER NO. 1 CONSOLIDATING RELATED DERIVATIVE
ACTIONS, APPOINTING LEAD DERIVATIVE PLAINTIFF AND APPROVING
ITS SELECTION OF LEAD DERIVATIVE COUNSEL

HAWAII ANNUITY TRUST FUND FOR          )     Civil Action No. 1:08-cv-00081-PLF
OPERATING ENGINEERS, Derivatively on   )
Behalf of CHIQUITA BRANDS              )
INTERNATIONAL, INC.,                   )
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )
                                       )
RODERICK M. HILLS, et al.,             )
                                       )
                    Defendants,        )
                                       )
          – and –                      )
                                       )
CHIQUITA BRANDS INTERNATIONAL,         )
INC., a New Jersey corporation,        )
                                       )
          Nominal Defendant.           )
                                       )
_____      )

Having considered the Hawaii Annuity Trust Fund for Operating Engineers' ("Annuity Trust Fund") Motion to Consolidate Related Shareholder Derivative Actions and Establish a Leadership Structure and good cause appearing, the Court ORDERS as follows:

1.       Pursuant to Fed. R. Civ. P. 42, *Sheet Metal Workers Local #218(S) Pension Fund v. Hills, et al.*, No. 1:07-cv-01957 and *Hawaii Annuity Trust Fund for Operating Engineers*, No. 1:08-cv-00081, and all other shareholder derivative actions commenced on behalf of Chiquita Brands International, Inc. ("Chiquita") that relate to the same subject matter and are subsequently filed in or transferred to this District are hereby consolidated for all purposes into a single action (the "Consolidated Action").

2.       The Consolidated Action shall be maintained in one Master File under Master Docket No. 1:07-cv-01957.  The Clerk shall file all pleadings in the Master File and note such filings on the Master Docket.

3.       An original of this Order shall be filed by the Clerk in the Master File.

4.       The Clerk shall mail a copy of this Order to counsel of record in the Consolidated Action.

5.       Every pleading subsequently filed in the Consolidated Action after entry of this Order shall have the following caption:

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE CHIQUITA DERIVATIVE LITIGATION | ) ) ) | Master File No. 1:07-cv-01957-PLF |
| | ) | (Consolidated Derivative Action) |
| | ) | |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |

6.  This Court requests the assistance of counsel in calling to the attention of the Clerk of this Court, the filing or transfer of any case that might properly be consolidated as part of the Consolidated Action.

7.  When a case that arises out of the same subject matter of the Consolidated Action is hereinafter filed in this Court or transferred from another Court, the Clerk of this Court shall:

    (a)  File a copy of this Order in the separate file for such action;

    (b)  Mail a copy of this Order to the attorneys for the plaintiff(s) in the newly-filed or transferred case and to any new defendant(s) in the newly-filed or transferred case; and

    (c)  Make the appropriate entry in the Master Docket for the Consolidated Action.

8.  Each new case that arises out of the subject matter of the Consolidated Action which is filed in this Court or transferred to this Court, shall be consolidated with the Consolidated Action and this Order shall apply thereto, unless a party objects to consolidation, as provided for herein, or any provision of this Order, within 10 days after the date upon which a copy of this Order is served on counsel for such party, by filing an application for relief and this Court deems it appropriate to grant such application.  Nothing in the foregoing shall be construed as a waiver of the defendants' right to object to consolidation of any subsequently filed or transferred related action.

9.  The Hawaii Annuity Trust Fund for Operating Engineers ("Annuity Trust Fund") is appointed Lead Derivative Plaintiff of the Consolidated Action.

10.  The Annuity Trust Fund's selection of Coughlin Stoia Geller Rudman & Robbins LLP as Lead Derivative Counsel for plaintiffs in the Consolidated Action is approved.  Plaintiffs' Lead Derivative Counsel shall have the authority to speak for plaintiffs in matters regarding pre-trial procedure, trial and settlement negotiations and shall make all work assignments in such manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.

11.    Plaintiffs' Lead Derivative Counsel shall be responsible for coordinating all activities and appearances on behalf of plaintiffs and for the dissemination of notices and orders of the Court. No motion, request for discovery, or other pre-trial or trial proceedings shall be initiated or filed by any plaintiffs except through plaintiffs' Lead Derivative Counsel.

12.    Plaintiffs' Lead Derivative Counsel also shall be available and responsible for communications to and from the Court, including distributing orders and other directions from the Court to counsel. Plaintiffs' Lead Derivative Counsel shall be responsible for creating and maintaining a master service list of all parties and their respective counsel.

13.    Defendants' counsel may rely upon all agreements made with plaintiffs' Lead Derivative Counsel, or other duly authorized representative of plaintiffs' Lead Derivative Counsel, and such agreements shall be binding on plaintiffs.

14.    Lead Derivative Plaintiff shall have the later of 30 days from the entry of this Order or entry of order resolving the motion currently pending before the Multi District Litigation Panel (to transfer other related federal tort and derivative actions to this District) to file and serve a Consolidated Complaint which will supersede all existing complaints. Defendants need not respond to any of the pre-existing complaints. Service, pursuant to Rule 4 of the Federal Rules of Civil Procedure, of any of the pre-existing complaints on any of the defendants, or their counsel, shall constitute sufficient service on that defendant. Service of the case shall be effected with respect to any defendant named in any of the consolidated actions by serving the Consolidated Complaint on that defendant's counsel.

15.    Each defendant shall answer or otherwise respond to the Consolidated Complaint no later than 30 days from the date of service of the Consolidated Complaint. In the event that defendants file and serve any motion directed at the Consolidated Complaint, Lead Derivative Plaintiff shall file and serve its opposition within 30 days after the service of defendants' motion. If

defendants file and serve a reply, they will do so within 15 days after service of Lead Plaintiff's

opposition.  Counsel will confer with the Court to select a hearing date.

       IT IS SO ORDERED.

DATED:  _____     _____
                                          THE HONORABLE PAUL FREIDMAN
                                          UNITED STATES DISTRICT JUDGE


Submitted by:

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)


          s/ ROGER M. ADELMAN
_____
          ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
ARTHUR C. LEAHY
AMBER L. ECK
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff Hawaii Annuity Trust
Fund for Operating Engineers

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 25, 2008.

s/ ROGER M. ADELMAN
ROGER M. ADELMAN

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

E-mail:  radelman@erols.com

# Mailing Information for a Case 1:08-cv-00081-PLF

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

CHIQUITA DERIVATIVE
Service List - 1/22/2008    (07-0235)
Page 1 of  1

**Counsel For Defendant(s)**

Robert S. Litt
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, DC  20004-1206
   202/942-5000
   202/942-5999 (Fax)


Eric H. Holder, Jr.
Jenny R. Mosier
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
   202/662-6000
   202/662-6291 (Fax)


Robert M. Stern
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC  20006-4001
   202/383-5300
   202/383-5414 (Fax)


Michael  Connolly
Thelen Reid Brown Raysman & Steiner LLP
200 Campus Drive, Suite 210
Florham Park, NJ  07932
   973/660-4400
   973/660-4401 (Fax)


Jonathan M. Sperling
Jessica A. Clarke
Covington & Burling LLP
620 Eighth Avenue
New York, NY  10018
   212/841-1000
   212/841-1010 (Fax)


Jeffrey B. Maletta
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC  20006
   202/778-9000
   202/778-9100 (Fax)


Sean  Mack
Pashman Stein
21 Main Street, First Floor
Court Plaza South
Hackensack, NJ  07601
   201/488-8200
   201/488-5556 (Fax)


Eli R. Mattioli
Thelen Reid Brown Raysman & Steiner LLP
875 Third Avenue, 10th Floor
New York, NY  10022
   212/603-6748
   212/603-2001 (Fax)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHEET METAL WORKERS LOCAL #218(S) PENSION FUND, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC.,<br><br>                 Plaintiff,<br><br>   vs.<br><br>RODERICK M. HILLS, et al.,<br><br>               Defendants,<br><br>   – and –<br><br>CHIQUITA BRANDS INTERNATIONAL, INC., a New Jersey corporation,<br><br>          Nominal Defendant. | Civil No. 1:07-cv-01957-PLF |

[Caption continued on following page.]

DECLARATION OF MARY K. BLASY IN SUPPORT OF MOTION
TO CONSOLIDATE RELATED SHAREHOLDER DERIVATIVE ACTIONS
AND ESTABLISH A LEADERSHIP STRUCTURE

HAWAII ANNUITY TRUST FUND FOR
OPERATING ENGINEERS, Derivatively on
Behalf of CHIQUITA BRANDS
INTERNATIONAL, INC.,

                            Plaintiff,

     vs.

RODERICK M. HILLS, et al.,

                            Defendants,

     – and –

CHIQUITA BRANDS INTERNATIONAL,
INC., a New Jersey corporation,

                   Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:08-cv-00081-PLF

I, MARY K. BLASY, of full age, hereby declare as follows:

1.      I am an attorney at law of the State of California and am admitted *pro hac vice* in these proceedings. I am associated with the law firm of Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"), attorneys for plaintiff Hawaii Annuity Trust Fund for Operating Engineers (the "Annuity Trust Fund"). I am fully familiar with the facts set forth herein and, unless otherwise indicated, make this Affidavit based on personal knowledge.

2.      I submit this Affidavit in support of plaintiff's Motion to Consolidate Related Shareholder Derivative Actions and Establish a Leadership Structure. Coughlin Stoia is a 190-lawyer law firm with offices in San Diego, San Francisco, Los Angeles, New York, Boca Raton, Washington, D.C. and Philadelphia. Coughlin Stoia is actively engaged in complex litigation around the country, emphasizing securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions. Coughlin Stoia's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys who have successfully prosecuted thousands of shareholder lawsuits. As a result, Coughlin Stoia attorneys have been responsible for recoveries of more than $45 billion. Coughlin Stoia possesses special, broad, and capable experience in shareholder derivative litigation and its partners have represented shareholders in class and derivative actions for decades and the firm has been on the forefront of litigation resulting in the development of cutting edge corporate governance and therapeutics. The firm has by far the largest litigation support staff of any plaintiffs' securities firm in the Country, consisting of forensic accountants, investigators, financial analysts, paralegals and document clerks. Coughlin Stoia has recovered hundreds of millions of dollars in derivative litigation arising out of illegal corporate activities. Coughlin Stoia's firm resume is attached hereto marked Exhibit M.

3.      Based on information and belief, the Annuity Trust Fund is a $124+ million defined contribution plan which manages the retirement savings and benefits of over 4,000 participants and

beneficiaries who work in Hawaii and are members of the International Union of Operating Engineers Local 3. The Annuity Trust Fund is a long-term investor in Chiquita and continues to hold common stock in Chiquita.

4.      I have reviewed the electronic dockets of the following federal civil actions pending against Chiquita Brands International, Inc. ("Chiquita") and attest to the following:

(a)     On June 7, 2007, a class action was commenced in the District of Columbia entitled *Jane/John Does 1/144 (as Legal Heirs) Columbia, South America v. Chiquita Brands Int'l, Inc. and David Does 1-10*, No. 07-cv-01048. A copy of the complaint filed in that action is attached hereto as Exhibit A.

(b)     On June 13, 2007, *Carrizosa, et al. v. Chiquita Brands Int'l, Inc., et al.*, No. 07-60821-CIV, was commenced in the Southern District of Florida. A copy of that complaint is attached hereto as Exhibit B.

(c)     On July 19, 2007, *John Does 1-7 v. Chiquita Brands Int'l, Inc., et al.*, No. 07-3406 (JAG), was commenced in the District of New Jersey. A copy of the complaint filed in that action is attached hereto as Exhibit C.

(d)     On November 14, 2007, *Juan/Juana Does 1-377 v. Chiquita Brands Int'l, Inc., Individuals A-J, Moe Corporations 1-5 and Moes 6-25*, No. 07 cv 103000 (HB), was commenced in the Southern District of New York. A copy of the complaint filed in that action is attached hereto as Exhibit D.

(e)     On November 26, 2007, Chiquita filed a motion before the Judicial Panel on Multidistrict Litigation (the "MDL Panel") to transfer all four of the Alien Tort Claim Act ("ATA") cases described above in ¶4(b)-(d) to this District for coordinated pretrial proceedings with the ATA action described in ¶4(a), which was the first ATA action filed (the "MDL Motion"). A copy of the

MDL Motion is attached hereto as Exhibit E. The MDL Motion is fully-briefed and will be argued in Arizona on January 30, 2008.

      5.      On October 30, 2007, the Annuity Trust Fund filed a Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste, Abuse of Control and *Ultra Vires* Conduct and Demand for Jury Trial on All Issues So Triable in the Superior Court of New Jersey, Chancery Division, Bergen County. As Chiquita is, and has been since the 1800s, a New Jersey corporation, those claims arise under New Jersey state law. The action named as defendants and asserted claims against Chiquita's entire Board of Directors and other culpable current and former Chiquita directors and officers for breaching their fiduciary duties to Chiquita and against Ernst & Young LLP ("E&Y"), Chiquita's outside auditor of many years, for aiding and abetting those breaches of fiduciary duties and for professional malpractice. A copy of that complaint is attached hereto as Exhibit F.

      6.      Three other shareholder derivative actions which arise from the same course of misconduct alleged in the Annuity Trust Fund's New Jersey state action – and the instant action – were also filed in federal court. On October 12, 2007, *City of Philadelphia Pub. Employees Ret. Sys. v. Aguirre, et al.*, No. 1:07cv851, was filed in the Southern District of Ohio. A copy of the complaint filed in that action is attached hereto as Exhibit G. On October 30, 2007, *Sheet Metal Workers Local #218(S) Pension Fund v. Chiquita Brands Int'l, Inc.*, No. 07-cv-01957, was filed in the District of Columbia. A copy of the complaint filed in that action is attached hereto as Exhibit H. On December 17, 2007, *Taylor v. Aguirre*, *et al.*, No. 07-cv-06002, was filed in the District of New Jersey. A copy of the complaint filed in that action is attached hereto as Exhibit I. The MDL Motion referenced above in ¶4 also encompasses the federal derivative actions and seeks the transfer of the Ohio and New Jersey federal derivative actions to this District for coordinated pretrial proceedings with the federal D.C. derivative action and the four ATA cases. The Annuity Trust

Fund and plaintiff in the federal D.C. derivative action both filed notices supporting the MDL Motion.

7.      On December 5, 2007, Chiquita moved to stay the Annuity Trust Fund's New Jersey state court action arguing that for comity reasons, the New Jersey state derivative action should be stayed in favor of the resolution of the MDL Motion and the federal derivative actions.  The other defendants joined in that motion.  E&Y also moved to stay the claims against it pending mediation and then arbitration.  Defendants based their comity stay motion on the fact that the federal Ohio derivative action was filed two weeks prior to the New Jersey state derivative action and their argument that they should not be forced to respond to the same claims in multiple actions.  The Annuity Trust Fund strenuously objected to the comity stay motion on the bases that New Jersey was the correct forum for these shareholder derivative claims, all of which arise under New Jersey state law, that the New Jersey court was actually the first to obtain jurisdiction over the defendants, and that for a variety of reasons, including but not limited to the inclusion of E&Y as a defendant in the New Jersey state derivative action, the New Jersey state proceedings were better situated to obtain complete relief for Chiquita, the real party-in-interest in these actions.  The Annuity Trust Fund opposed E&Y's stay motion arguing plaintiff was entitled to test the *bona fides* of the arbitration agreement Chiquita's faithless fiduciaries had caused it to enter into with Chiquita before being compelled to mediate.  *Id.*  Attempting to reach a compromise between the Annuity Trust Fund's right to prosecute these shareholder derivative claims and the Chiquita defendants' claim of hardship in being forced to defend breach of fiduciary duty claims simultaneously in several courts, while recognizing that the claims against E&Y cannot be prosecuted in federal court because as a citizen of all 50 states, E&Y would destroy federal diversity jurisdiction, on January 7, 2008 Judge Robert P. Contillo of the New Jersey Superior Court entered an order dismissing rather than staying the Annuity Trust Fund's claims against all defendants except E&Y and directing the Annuity Trust

Fund to join the federal derivative actions.[1]  Judge Contillo's January 7th decision (revised on January 9th to correct a typographical error) is attached hereto as Exhibit J.  Specifically, the letter order directs at pages 3-5 that:

> The plaintiff, **by joining the Ohio action**, will have a fair opportunity to present its claims against the directors and officers.
>
> *     *     *
>
> In this case, in the federal forum, the parties will likely receive a full adjudication of the merits of all claims against the directors and officers.  There is therefore no reason for this Court to continue to administer the case as to these parties.  **In the unlikely event that the parties are not able to receive a full adjudication in the federal case, there will be no prejudice to their re-filing at a later date**.

(Emphasis added.)

8.     Accordingly, the Annuity Trust Fund's claims against E&Y for aiding and abetting the breaches of fiduciary duties by Chiquita's current and former executives and its professional malpractice claims are continuing to be pursued in New Jersey (including mediation and arbitration proceedings) and on January 15, 2008, the Annuity Trust Fund commenced this federal derivative action, which names as defendants all of the current and former Chiquita officers and directors originally named in – but dismissed from – the New Jersey state court action.  In fact, other than removing the counts alleged against E&Y, the Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste, Abuse of Control and *Ultra Vires* Conduct filed herein essentially mirrors the complaint pending in New Jersey state court.

---

[1]     The state court also ruled that the mediation/arbitration provisions in E&Y's engagement agreement with Chiquita governed, and stayed plaintiff's claims on behalf of Chiquita against E&Y pending efforts to mediate/arbitrate.  *Id*. at 5-6.  However, the New Jersey state court retains jurisdiction to (a) enforce the arbitration award; (b) rule on the fairness of any settlement; (c) enforce any settlement agreement; and (d) award attorneys fees should plaintiff obtain a recovery for Chiquita in connection with the arbitration.  *See, e.g., Ernst & Young, LLP v. Tucker ex rel. HealthSouth Corp.*, 940 So. 2d 269, 287-88 (Ala. 2006).

9.     While all four of the shareholder derivative actions currently pending in federal court arise largely out of the same underlying illegal misconduct, the Annuity Trust Fund's complaint includes more detailed allegations and names between ten and seventeen additional culpable defendants that are not named in any of the other federal derivative actions.  For instance, ¶¶20-21, 27-54 and 133-151 include detailed demand futility and party-specific allegations not articulated in the other federal derivative actions.  Similarly, the detailed allegations concerning Chiquita's background contained in ¶25(b)-(h) are not articulated in any of the other federal derivative actions. Paragraphs 57-62 detail important allegations concerning the Terrorism Act none of the other federal derivative actions raise.  The recitation of defendants' fiduciary duties described in ¶66 are missing from the other federal derivative actions.  The detailed disclosure allegations in ¶¶68-98 are not articulated at all in the Ohio and New Jersey federal derivative actions.  Much of the detail appearing in ¶¶99-132 concerning Chiquita's illegal payments to the AUC, the DOJ's investigation and the civil suits lodged against Chiquita is abbreviated in the federal District of Columbia derivative action and simply overlooked by the plaintiffs in the federal Ohio and New Jersey derivative actions.

10.    Attached hereto as Exhibit K is a copy of the U.S. Department of Justice's March 19, 2007 press release obtained from that agency's website on September 18, 2007 <www.usdoj.gov>.

11.    Attached hereto as Exhibit L is a November 15, 2007 *New York Times* article entitled "Victims of Columbian Conflict Sue Chiquita Brands," obtained from that newspaper's website on December 12, 2007 <www.nytimes.com>.

12.    Counsel for plaintiff has discussed this motion with counsel for Plaintiff Sheet Metal Workers #218(S) Pension Fund and Nominal Defendant Chiquita in a good faith effort to determine whether there is any opposition to the relief sought to narrow the areas of disagreement.  Counsel for Sheet Metal Workers #218(S) Pension Fund does not oppose the motion.  Counsel for Chiquita (speaking for Chiquita and the Individual Defendants) agreed to accept service of the Complaint

filed by the Annuity Trust Fund and the Annuity Trust Fund granted defendants an extension to respond to the Complaint; however, counsel for the Annuity Trust Fund was advised defendants would not stipulate to consolidation, appointment of Lead Derivative Plaintiff or approval of Lead Derivative Plaintiff's selection of Lead Derivative Counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 25th day of January, 2008, at San Diego, California.

s/ MARY K. BLASY<br>MARY K. BLASY

S:\CasesSD\Chiquita Derivative\AFF00048456.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 25, 2008.

                      s/ ROGER M. ADELMAN
                      ROGER M. ADELMAN

                      LAW OFFICES OF ROGER M. ADELMAN
                      ROGER M. ADELMAN (DC Bar # 056358)
                      1100 Connecticut Ave., NW, Suite 730
                      Washington, DC  20036
                      Telephone:  202/822-0600
                      202/822-6722 (fax)

                      E-mail:  radelman@erols.com

# Mailing Information for a Case 1:08-cv-00081-PLF

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

CHIQUITA DERIVATIVE

Service List - 1/22/2008    (07-0235)

Page 1 of  1

**Counsel For Defendant(s)**

Robert S. Litt
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, DC  20004-1206
  202/942-5000
  202/942-5999 (Fax)


Eric H. Holder, Jr.
Jenny R. Mosier
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
  202/662-6000
  202/662-6291 (Fax)


Robert M. Stern
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC  20006-4001
  202/383-5300
  202/383-5414 (Fax)


Michael  Connolly
Thelen Reid Brown Raysman & Steiner LLP
200 Campus Drive, Suite 210
Florham Park, NJ  07932
  973/660-4400
  973/660-4401 (Fax)


Jonathan M. Sperling
Jessica A. Clarke
Covington & Burling LLP
620 Eighth Avenue
New York, NY  10018
  212/841-1000
  212/841-1010 (Fax)


Jeffrey B. Maletta
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC  20006
  202/778-9000
  202/778-9100 (Fax)


Sean  Mack
Pashman Stein
21 Main Street, First Floor
Court Plaza South
Hackensack, NJ  07601
  201/488-8200
  201/488-5556 (Fax)


Eli R. Mattioli
Thelen Reid Brown Raysman & Steiner LLP
875 Third Avenue, 10th Floor
New York, NY  10022
  212/603-6748
  212/603-2001 (Fax)

EXHIBIT A

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE / JOHN DOES 1-144 (as Legal Heirs) Colombia, South America   Plaintiffs,  v.  CHIQUITA BRANDS INTERNATIONAL, INC. 250 East Fifth Street Cincinnati, Ohio 45202  and DAVID DOES 1-10   Defendants. | Case No.:  CIVIL JURY TRIAL DEMANDED |

**COMPLAINT**

**I. NATURE OF THE ACTION**

1.      Plaintiffs Jane and John Does 1-144 (hereinafter Plaintiffs) are the legal heirs to Peter Does 1-144, all of whom were murdered by terrorist groups receiving material support from Defendants.  Plaintiffs bring this action against Defendants Chiquita Brands International, Inc. (hereinafter "Chiquita") and David Does 1-10 (collectively referred to as "Defendants") for equitable relief and damages. At some of the times relevant herein, Chiquita's wholly-owned subsidiary, C. I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as "Banadex"), was acting on behalf of Chiquita.

2.      This case involves the systematic intimidation and murder of individuals living in the banana growing regions near the Gulf of Uraba and the city of Santa Marta in Colombia, South America, at the hands of paramilitaries and other terrorist groups working as agents of Defendants.  This case is brought under the Alien Tort Claims Act

(ATCA), Torture Victim Protection Act (TVPA) and state tort law, and seeks to remedy and prevent the violent persecution of persons living in the banana growing regions of Colombia. The Defendants were knowingly engaged in an ongoing campaign of terror against these individuals.

3.    With respect to their business operations in Colombia, the Defendants have hired, armed, contracted with, or otherwise directed terrorist paramilitary security forces, for the most part members of the Autodefensas Unidas de Colombia (United Self-Defense Forces of Colombia, a right wing paramilitary organizations, hereinafter "A.U.C."), that utilized extreme violence and murdered, tortured unlawfully detained or otherwise silenced individuals believed to be interfering with Defendants' business operations in Colombia, or who had the misfortune of residing in the path of Defendants' paramilitary agents. These include persons suspected of sympathizing with leftist guerrillas active in the region, members of the Union Patriotica and Colombian Communist Party, union leaders, and others voicing opposition to the paramilitaries' strict control over these regions. These murders were extrajudicial killings in violation of the ATCA, the TVPA, international human rights law, and the common tort law of the District of Colombia. In some cases, Defendants also made payments to the Fuerzas Armadas Revolucionaries de Colombia (Revolutionary Armed Forces of Colombia, hereinafter "F.A.R.C."), the leftist group that has also been designated a terrorist organization by the Bush Administration.

4.    Plaintiffs do not have access to an independent or functioning legal system within Colombia to raise their complaints. Any effort by Plaintiffs to seek legal redress would be futile because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk from retaliation. This

2

has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International. *See, e.g.,* The Ties that Bind: Colombia and Military-Paramilitary Links, Human Rights Watch (February, 2000).

5.    Further, various non-governmental organizations in Colombia, such as Justicia y Paz, have sought the assistance and protection of the Colombian government. No action was taken, and these complaints were futile because of the lack of an independent or functioning legal system within Colombia. The justice system in Colombia has utterly failed to bring the perpetrators of violence to justice under the laws of Colombia. Finally, even if there were remedies available to Plaintiffs in Colombia, such remedies are inadequate and would not afford the complete relief available to Plaintiffs by this Complaint. Defendants, because they do business in Colombia, are well aware of these conditions, and know that Plaintiffs do not have the option of seeking justice in Colombia for human rights violations. The fact that terrorist paramilitary groups operate openly and are financed by companies such as Chiquita indicates the level of impunity still existing in Colombia.

## II.  JURISDICTION AND VENUE

6.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, based on the ATCA and the TVPA, 28 U.S.C. §1350, for the alleged violations of international human rights law. Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

7.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. 1332 (a)(2). All Plaintiffs are citizens and domiciles of Colombia, and the Defendants are all United States domiciles with their principal place of business and/or residence also in the United

3

States. The amount in dispute between each Plaintiff and each defendant exceeds $75,000.

8.      Defendant Chiquita Brands, International is a New Jersey Corporation with its principal place of business in Ohio. Defendants have a nation-wide business, with distribution networks all over the country. Defendants conduct significant business within the District of Colombia, and is currently facing criminal charges in the District of Colombia for the same conduct at issue in this case.

9.      Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c).

### III. PARTIES

#### Plaintiffs

10.     There are a total of 144 Jane (or John) Doe Plaintiffs in this case. They are the legal heirs of 173 Peter (or Pam) Does who were murdered by terrorist organizations receiving support from Chiquita and/or Banadex. The Peter Does are given numbers corresponding to the numbers used for their heirs. Where a Jane Doe is heir to more than one Peter Doe, the additional Peter Does are given letter designations (such as Peter Doe 6-a), so that the numbers still correspond to the numbers used for their heirs.

11.     On 2/10/1997, Peter Doe 1 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 1, who was the son of Peter Doe 1, is the legal heir to Peter Doe 1 and resides in the municipio of Apartado in Antioquia, Colombia.

12.     In 1997, Peter Doe 2 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 2, who was the son of Peter Doe 2, is the

legal heir to Peter Doe 2 and resides in the municipio of Apartado in Antioquia, Colombia.

13.    On 6/7/1997, Pam Doe 3 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff John Doe 3, who was the father of Pam Doe 3, is the legal heir to Pam Doe 3 and resides in the municipio of Apartado in Antioquia, Colombia.

14.    On 12/12/1997, Pam Doe 4 was disappeared by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 4, who was the daughter of Pam Doe 4, is the legal heir to Pam Doe 4 and resides in the municipio of Apartado in Antioquia, Colombia.

15.    On 12/12/1997, Peter Doe 5 was disappeared by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff John Doe 5, who was the father of Peter Doe 5, is the legal heir to Peter Doe 5 and resides in the municipio of Apartado in Antioquia, Colombia.

16.    On 7/25/2003, Peter Doe 6 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 6, who was the mother of Peter Doe 6, is the legal heir to Peter Doe 6 and resides in the municipio of Apartado in Antioquia, Colombia.

17.    On 7/25/2003, Peter Doe 6-a was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 6, who was the mother of Peter Doe 6-a, is the legal heir to Peter Doe 6-a and resides in the municipio of Apartado in Antioquia, Colombia.

18.     On 8/17/1997, Peter Doe 7 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 7, who was the wife of Peter Doe 7, is the legal heir to Peter Doe 7 and resides in the municipio of Apartado in Antioquia, Colombia.

19.     On 2/14/1993, Peter Doe 7-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 7, who was the mother of Peter Doe 7-a, is the legal heir to Peter Doe 7-a and resides in the municipio of Apartado in Antioquia, Colombia.

20.     On 6/19/1997, Peter Doe 8 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 8, who was the wife of Peter Doe 8, is the legal heir to Peter Doe 8 and resides in the municipio of Apartado in Antioquia, Colombia.

21.     On 7/21/2002, Peter Doe 9 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 9, who was the sister of Peter Doe 9, is the legal heir to Peter Doe 9 and resides in the municipio of Apartado in Antioquia, Colombia.

22.     On 3/30/2002, Pam Doe 10 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 10, who was the mother of Pam Doe 10, is the legal heir to Pam Doe 10 and resides in the municipio of Apartado in Antioquia, Colombia.

23.     On 8/20/1997, Peter Doe 11 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 11, who was the mother of Peter Doe 11, is

the legal heir to Peter Doe 11 and resides in the municipio of Apartado in Antioquia, Colombia.

24.    In 2000, Peter Doe 11-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 11, who was the mother of Peter Doe 11-a, is the legal heir to Peter Doe 11-a and resides in the municipio of Apartado in Antioquia, Colombia.

25.    In 2004, Peter Doe 11-b was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 11, who was the mother of Peter Doe 11-b, is the legal heir to Peter Doe 11-b and resides in the municipio of Apartado in Antioquia, Colombia.

26.    On 12/14/1999, Peter Doe 12 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 12, who was the wife of Peter Doe 12, is the legal heir to Peter Doe 12 and resides in the municipio of Apartado in Antioquia, Colombia.

27.    On 5/24/1975, Pam Doe 13 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 13, who was the mother of Pam Doe 13, is the legal heir to Pam Doe 13 and resides in the municipio of Apartado in Antioquia, Colombia.

28.    On 4/24/1978, Pam Doe 13-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 13, who was the mother of Pam Doe 13-a, is the legal heir to Pam Doe 13-a and resides in the municipio of Apartado in Antioquia, Colombia.

29.     On 1/1/1989, Peter Doe 13-b was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 13, who was the mother of Peter Doe 13-b, is the legal heir to Peter Doe 13-b and resides in the municipio of Apartado in Antioquia, Colombia.

30.     On 7/10/2000, Peter Doe 14 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 14, who was the mother of Peter Doe 14, is the legal heir to Peter Doe 14 and resides in the municipio of Apartado in Antioquia, Colombia.

31.     On 11/9/2003, Peter Doe 14-a was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 14, who was the wife of Peter Doe 14-a, is the legal heir to Peter Doe 14-a and resides in the municipio of Apartado in Antioquia, Colombia.

32.     On 7/20/1997, Peter Doe 15 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 15, who was the wife of Peter Doe 15, is the legal heir to Peter Doe 15 and resides in the municipio of Apartado in Antioquia, Colombia.

33.     On 5/3/2002, Peter Doe 15-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 15, who was the mother of Peter Doe 15-a, is the legal heir to Peter Doe 15-a and resides in the municipio of Apartado in Antioquia, Colombia.

34.     On 5/3/2002, Peter Doe 15-b was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 15, who was the mother of Peter Doe

15-b, is the legal heir to Peter Doe 15-b and resides in the municipio of Apartado in Antioquia, Colombia.

35.    On 9/5/2000, Peter Doe 16 was disappeared by paramilitaries, who received support from Chiquita and/or Banadex. Plaintiff Jane Doe 16, who was the wife of Peter Doe 16, is the legal heir to Peter Doe 16 and resides in the municipio of Apartado in Antioquia, Colombia.

36.    On 10/5/2004, Pam Doe 16-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 16, who was the mother of Pam Doe 16-a, is the legal heir to Pam Doe 16-a and resides in the municipio of Apartado in Antioquia, Colombia.

37.    On 1/16/1997, Peter Doe 17 was killed by paramilitaries, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 17, who was the sister of Peter Doe 17, is the legal heir to Peter Doe 17 and resides in the municipio of Apartado in Antioquia, Colombia.

38.    On 7/10/1997, Peter Doe 18 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 18, who was the wife of Peter Doe 18, is the legal heir to Peter Doe 18 and resides in the municipio of Apartado in Antioquia, Colombia.

39.    On 4/20/2002, Peter Doe 19 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 19, who was the father of Peter Doe 19, is the legal heir to Peter Doe 19 and resides in the municipio of Apartado in Antioquia, Colombia.

40.    On 7/22/1997, Peter Doe 20 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 20, who was the mother of Peter Doe 20, is the legal heir to Peter Doe 20 and resides in the municipio of Apartado in Antioquia, Colombia.

41.    On 6/26/2001, Peter Doe 21 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 21, who was the wife of Peter Doe 21, is the legal heir to Peter Doe 21 and resides in the municipio of Apartado in Antioquia, Colombia.

42.    On 5/28/1997, Peter Doe 22 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 22, who was the wife of Peter Doe 22, is the legal heir to Peter Doe 22 and resides in the municipio of Apartado in Antioquia, Colombia.

43.    On 6/11/1999, Peter Doe 23 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 23, who was the mother of Peter Doe 23, is the legal heir to Peter Doe 23 and resides in the municipio of Apartado in Antioquia, Colombia.

44.    On 11/8/1997, Peter Doe 24 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 24, who was the wife of Peter Doe 24, is the legal heir to Peter Doe 24 and resides in the municipio of Apartado in Antioquia, Colombia.

45.    On 4/13/1997, Peter Doe 25 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 25, who was the mother of Peter Doe 25, is

the legal heir to Peter Doe 25 and resides in the municipio of Apartado in Antioquia, Colombia.

46.     On 1/22/2003, Peter Doe 26 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 26, who was the mother of Peter Doe 26,  is the legal heir to Peter Doe 26 and resides in the municipio of Apartado in Antioquia, Colombia.

47.     On 10/1/1996, Peter Doe 27 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 27, who was the mother of Peter Doe 27,  is the legal heir to Peter Doe 27 and resides in the municipio of Apartado in Antioquia, Colombia.

48.     On 10/19/1997, Peter Doe 28 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 28, who was the wife of Peter Doe 28, is the legal heir to Peter Doe 28 and resides in the municipio of Apartado in Antioquia, Colombia.

49.     On 5/31/1997, Peter Doe 29 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 29, who was the wife of Peter Doe 29,  is the legal heir to Peter Doe 29 and resides in the municipio of Apartado in Antioquia, Colombia.

50.     On 1/7/2000, Pam Doe 30 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 30, who was the daughter of Pam Doe 30, is the legal heir to Pam Doe 30 and resides in the municipio of Apartado in Antioquia, Colombia.

51.     On 10/12/1996, Peter Doe 31 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 31, who was the wife of Peter Doe 31, is the legal heir to Peter Doe 31 and resides in the municipio of Apartado in Antioquia, Colombia.

52.     On 9/14/1995, Peter Doe 32 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 32, who was the wife of Peter Doe 32, is the legal heir to Peter Doe 32 and resides in the municipio of Apartado in Antioquia, Colombia.

53.     On 10/2/2003, Peter Doe 33 was killed by paramilitaries, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 33, who was the wife of Peter Doe 33, is the legal heir to Peter Doe 33 and resides in the municipio of Apartado in Antioquia, Colombia.

54.     On 9/5/2004, Peter Doe 34 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 34, who was the wife of Peter Doe 34,  is the legal heir to Peter Doe 34 and resides in the municipio of Apartado in Antioquia, Colombia.

55.     On 3/4/2004, Peter Doe 35 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 35, who was the wife of Peter Doe 35,  is the legal heir to Peter Doe 35 and resides in the municipio of Apartado in Antioquia, Colombia.

56.     On 5/10/2001, Peter Doe 36 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 36, who was the wife of Peter Doe 36,  is

the legal heir to Peter Doe 36 and resides in the municipio of Apartado in Antioquia, Colombia.

57.    On 12/9/1993, Peter Doe 37 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 37, who was the wife of Peter Doe 37, is the legal heir to Peter Doe 37 and resides in the municipio of Apartado in Antioquia, Colombia.

58.    On 3/4/2002, Peter Doe 38 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 38, who was the wife of Peter Doe 38, is the legal heir to Peter Doe 38 and resides in the municipio of Apartado in Antioquia, Colombia.

59.    On 4/9/1997, Peter Doe 39 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 39, who was the wife of Peter Doe 39, is the legal heir to Peter Doe 39 and resides in the municipio of Apartado in Antioquia, Colombia.

60.    On 6/28/2001, Peter Doe 40 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 40, who was the mother of Peter Doe 40, is the legal heir to Peter Doe 40 and resides in the municipio of Apartado in Antioquia, Colombia.

61.    On 7/16/2002, Peter Doe 41 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 41, who was the wife of Peter Doe 41, is the legal heir to Peter Doe 41 and resides in the municipio of Apartado in Antioquia, Colombia.

62.    On 4/15/1997, Peter Doe 42 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 42, who was the wife of Peter Doe 42, is the legal heir to Peter Doe 42 and resides in the municipio of Apartado in Antioquia, Colombia.

63.    On 3/25/1999, Peter Doe 43 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 43, who was the mother of Peter Doe 43, is the legal heir to Peter Doe 43 and resides in the municipio of Apartado in Antioquia, Colombia.

64.    On 4/27/1999, Peter Doe 43-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 43, who was the mother of Peter Doe 43-a, is the legal heir to Peter Doe 43-a and resides in the municipio of Apartado in Antioquia, Colombia.

65.    On 4/4/1998, Peter Doe 44 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 44, who was the wife of Peter Doe 44, is the legal heir to Peter Doe 44 and resides in the municipio of Apartado in Antioquia, Colombia.

66.    On 2/23/2002, Peter Doe 45 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 45, who was the wife of Peter Doe 45, is the legal heir to Peter Doe 45 and resides in the municipio of Apartado in Antioquia, Colombia.

67.    On 2/5/1993, Peter Doe 46 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 46, who was the wife of Peter Doe 46, is

the legal heir to Peter Doe 46 and resides in the municipio of Apartado in Antioquia, Colombia.

68.    On 12/22/1998, Peter Doe 46-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 46, who was the sister of Peter Doe 46-a, is the legal heir to Peter Doe 46-a and resides in the municipio of Apartado in Antioquia, Colombia.

69.    On 12/4/1997, Peter Doe 47 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 47, who was the wife of Peter Doe 47, is the legal heir to Peter Doe 47 and resides in the municipio of Apartado in Antioquia, Colombia.

70.    On 8/29/1997, Peter Doe 48 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 48, who was the wife of Peter Doe 48, is the legal heir to Peter Doe 48 and resides in the municipio of Apartado in Antioquia, Colombia.

71.    On 6/6/1997, Peter Doe 49 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 49, who was the wife of Peter Doe 49, is the legal heir to Peter Doe 49 and resides in the municipio of Apartado in Antioquia, Colombia.

72.    On 3/10/2000, Peter Doe 50 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 50, who was the wife of Peter Doe 50, is the legal heir to Peter Doe 50 and resides in the municipio of Apartado in Antioquia, Colombia.

73.    On 7/15/1997, Peter Doe 51 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 51, who was the wife of Peter Doe 51, is the legal heir to Peter Doe 51 and resides in the municipio of Apartado in Antioquia, Colombia.

74.    On 8/20/2000, Peter Doe 52 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 52, who was the wife of Peter Doe 52, is the legal heir to Peter Doe 52 and resides in the municipio of Apartado in Antioquia, Colombia.

75.    On 10/28/2002, Peter Doe 53 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 53, who was the wife of Peter Doe 53, is the legal heir to Peter Doe 53 and resides in the municipio of Apartado in Antioquia, Colombia.

76.    On 11/14/2000, Peter Doe 54 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 54, who was the wife of Peter Doe 54, is the legal heir to Peter Doe 54 and resides in the municipio of Apartado in Antioquia, Colombia.

77.    On 11/27/1997, Peter Doe 55 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 55, who was the wife of Peter Doe 55, is the legal heir to Peter Doe 55 and resides in the municipio of Apartado in Antioquia, Colombia.

78.    On 6/14/2000, Peter Doe 56 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 56, who was the wife of Peter Doe 56, is

the legal heir to Peter Doe 56 and resides in the municipio of Apartado in Antioquia, Colombia.

79.    On 2/22/1996, Peter Doe 57 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 57, who was the wife of Peter Doe 57,  is the legal heir to Peter Doe 57 and resides in the municipio of Apartado in Antioquia, Colombia.

80.    In 1987, Peter Doe 58 was killed by the FARC, which received support from Chiquita and/or Banadex.  Plaintiff John Doe 58, who was the brother of Peter Doe 58,  is the legal heir to Peter Doe 58 and resides in the municipio of Chigorodo in Antioquia, Colombia.

81.    In 1993, Pam Doe 58-a was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff John Doe 58, who was the brother of Pam Doe 58-a, is the legal heir to Pam Doe 58-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

82.    On 3/7/1997, Peter Doe 59 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 59, who was the wife of Peter Doe 59,  is the legal heir to Peter Doe 59 and resides in the municipio of Chigorodo in Antioquia, Colombia.

83.    On 5/28/1997, Peter Doe 60 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 60, who was the wife of Peter Doe 60,  is the legal heir to Peter Doe 60 and resides in the municipio of Chigorodo in Antioquia, Colombia.

84.    On 10/20/2000, Pam Doe 61 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 61, who was the wife of Pam Doe 61, is the legal heir to Pam Doe 61 and resides in the municipio of Chigorodo in Antioquia, Colombia.

85.    On 1/27/1991, Peter Doe 62 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 62, who was the son of Peter Doe 62, is the legal heir to Peter Doe 62 and resides in the municipio of Chigorodo in Antioquia, Colombia.

86.    On 3/2/2001, Peter Doe 63 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 63, who was the wife of Peter Doe 63, is the legal heir to Peter Doe 63 and resides in the municipio of Chigorodo in Antioquia, Colombia.

87.    On 5/6/2001, Peter Doe 64 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 64, who was the wife of Peter Doe 64, is the legal heir to Peter Doe 64 and resides in the municipio of Chigorodo in Antioquia, Colombia.

88.    On 7/8/2000, Peter Doe 64-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 64, who was the mother of Peter Doe 64-a, is the legal heir to Peter Doe 64-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

89.    On 7/29/1997, Peter Doe 65 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 65, who was the wife of Peter Doe 65, is

the legal heir to Peter Doe 65 and resides in the municipio of Chigorodo in Antioquia, Colombia.

90.     On 11/23/1999, Peter Doe 66 was killed by paramilitaries, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 66, who was the mother of Peter Doe 66, is the legal heir to Peter Doe 66 and resides in the municipio of Chigorodo in Antioquia, Colombia.

91.     On 7/22/2002, Peter Doe 67 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 67, who was the wife of Peter Doe 67, is the legal heir to Peter Doe 67 and resides in the municipio of Chigorodo in Antioquia, Colombia.

92.     On 4/12/2002, Peter Doe 68 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 68, who was the wife of Peter Doe 68, is the legal heir to Peter Doe 68 and resides in the municipio of Chigorodo in Antioquia, Colombia.

93.     On 2/22/2001, Peter Doe 69 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 69, who was the wife of Peter Doe 69, is the legal heir to Peter Doe 69 and resides in the municipio of Chigorodo in Antioquia, Colombia.

94.     On 11/28/2003, Peter Doe 70 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 70, who was the daughter of Peter Doe 70, is the legal heir to Peter Doe 70 and resides in the municipio of Chigorodo in Antioquia, Colombia.

95.     On 9/18/2001, Peter Doe 71 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 71, who was the daughter of Peter Doe 71, is the legal heir to Peter Doe 71 and resides in the municipio of Chigorodo in Antioquia, Colombia.

96.     On 1/28/1993, Peter Doe 72 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 72, who was the wife of Peter Doe 72, is the legal heir to Peter Doe 72 and resides in the municipio of Chigorodo in Antioquia, Colombia.

97.     In 1994, Peter Doe 73 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 73, who was the wife of Peter Doe 73, is the legal heir to Peter Doe 73 and resides in the municipio of Chigorodo in Antioquia, Colombia.

98.     On 3/10/1994, Peter Doe 74 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 74, who was the wife of Peter Doe 74, is the legal heir to Peter Doe 74 and resides in the municipio of Chigorodo in Antioquia, Colombia.

99.     In 1992, Peter Doe 75 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 75, who was the wife of Peter Doe 75, is the legal heir to Peter Doe 75 and resides in the municipio of Chigorodo in Antioquia, Colombia.

100.    In 1991, Pam Doe 75-a was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 75, who was the mother of Pam Doe 75-a,

is the legal heir to Pam Doe 75-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

101.     On 7/23/1997, Peter Doe 76 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 76, who was the wife of Peter Doe 76, is the legal heir to Peter Doe 76 and resides in the municipio of Chigorodo in Antioquia, Colombia.

102.     On 8/7/1998, Peter Doe 77 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 77, who was the mother of Peter Doe 77, is the legal heir to Peter Doe 77 and resides in the municipio of Chigorodo in Antioquia, Colombia.

103.     On 10/23/1999, Peter Doe 78 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 78, who was the wife of Peter Doe 78, is the legal heir to Peter Doe 78 and resides in the municipio of Chigorodo in Antioquia, Colombia.

104.     On 1/29/1993, Peter Doe 79 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 79, who was the wife of Peter Doe 79, is the legal heir to Peter Doe 79 and resides in the municipio of Chigorodo in Antioquia, Colombia.

105.     In 1990, Peter Doe 80 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 80, who was the wife of Peter Doe 80, is the legal heir to Peter Doe 80 and resides in the municipio of Chigorodo in Antioquia, Colombia.

106.    In 1990, Peter Doe 80-a was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 80, who was the mother of Peter Doe 80-a, is the legal heir to Peter Doe 80-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

107.    In 1992, Peter Doe 80-b was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 80, who was the mother of Peter Doe 80-b, is the legal heir to Peter Doe 80-b and resides in the municipio of Chigorodo in Antioquia, Colombia.

108.    On 8/3/1995, Peter Doe 81 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 81, who was the wife of Peter Doe 81, is the legal heir to Peter Doe 81 and resides in the municipio of Chigorodo in Antioquia, Colombia.

109.    In 1994, Peter Doe 82 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 82, who was the sister of Peter Doe 82, is the legal heir to Peter Doe 82 and resides in the municipio of Chigorodo in Antioquia, Colombia.

110.    On 4/4/1997, Peter Doe 83 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 83, who was the wife of Peter Doe 83, is the legal heir to Peter Doe 83 and resides in the municipio of Chigorodo in Antioquia, Colombia.

111.    In 1999, Peter Doe 84 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 84, who was the wife of Peter Doe 84, is

the legal heir to Peter Doe 84 and resides in the municipio of Chigorodo in Antioquia, Colombia.

112.     In 1991, Peter Doe 85 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 85, who was the wife of Peter Doe 85, is the legal heir to Peter Doe 85 and resides in the municipio of Chigorodo in Antioquia, Colombia.

113.     On 7/23/1996, Peter Doe 86 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 86, who was the wife of Peter Doe 86, is the legal heir to Peter Doe 86 and resides in the municipio of Chigorodo in Antioquia, Colombia.

114.     On 10/24/1990, Peter Doe 87 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 87, who was the wife of Peter Doe 87, is the legal heir to Peter Doe 87 and resides in the municipio of Chigorodo in Antioquia, Colombia.

115.     On 5/20/1991, Peter Doe 88 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 88, who was the brother of Peter Doe 88, is the legal heir to Peter Doe 88 and resides in the municipio of Chigorodo in Antioquia, Colombia.

116.     On 7/10/1989, Peter Doe 88-a was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 88, who was the brother of Peter Doe 88-a, is the legal heir to Peter Doe 88-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

117.    In 1992, Peter Doe 89 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 89, who was the mother of Peter Doe 89, is the legal heir to Peter Doe 89 and resides in the municipio of Chigorodo in Antioquia, Colombia.

118.    In 1992, Peter Doe 89-a was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 89, who was the mother of Peter Doe 89-a, is the legal heir to Peter Doe 89-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

119.    In 1989, Peter Doe 89-b was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 89, who was the mother of Peter Doe 89-b, is the legal heir to Peter Doe 89-b and resides in the municipio of Chigorodo in Antioquia, Colombia.

120.    On 3/7/1997, Peter Doe 90 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 90, who was the wife of Peter Doe 90, is the legal heir to Peter Doe 90 and resides in the municipio of Chigorodo in Antioquia, Colombia.

121.    In 2002, Peter Doe 91 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 91, who was the wife of Peter Doe 91, is the legal heir to Peter Doe 91 and resides in the municipio of Chigorodo in Antioquia, Colombia.

122.    On 4/6/1995, Peter Doe 92 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 92, who was the wife of Peter Doe 92, is

the legal heir to Peter Doe 92 and resides in the municipio of Chigorodo in Antioquia, Colombia.

123.    On 2/11/2001, Peter Doe 93 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 93, who was the wife of Peter Doe 93,  is the legal heir to Peter Doe 93 and resides in the municipio of Chigorodo in Antioquia, Colombia.

124.    On 4/20/1993, Peter Doe 94 was killed by the FARC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 94, who was the wife of Peter Doe 94, is the legal heir to Peter Doe 94 and resides in the municipio of Chigorodo in Antioquia, Colombia.

125.    On 12/10/1997, Peter Doe 95 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 95, who was the wife of Peter Doe 95, is the legal heir to Peter Doe 95 and resides in the municipio of Chigorodo in Antioquia, Colombia.

126.    On 7/22/1995, Peter Doe 96 was killed by the FARC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 96, who was the wife of Peter Doe 96, is the legal heir to Peter Doe 96 and resides in the municipio of Chigorodo in Antioquia, Colombia.

127.    On 7/23/2000, Peter Doe 97 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff Jane Doe 97, who was the mother of Peter Doe 97,  is the legal heir to Peter Doe 97 and resides in the municipio of Chigorodo in Antioquia, Colombia.

128. In 1995, Peter Doe 98 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 98, who was the wife of Peter Doe 98, is the legal heir to Peter Doe 98 and resides in the municipio of Chigorodo in Antioquia, Colombia.

129. In 1997, Peter Doe 98-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 98, who was the mother of Peter Doe 98-a, is the legal heir to Peter Doe 98-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

130. In 1991, Peter Doe 98-b was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 98, who was the mother of Peter Doe 98-b, is the legal heir to Peter Doe 98-b and resides in the municipio of Chigorodo in Antioquia, Colombia.

131. On 8/11/1998, Peter Doe 99 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 99, who was the wife of Peter Doe 99, is the legal heir to Peter Doe 99 and resides in the municipio of Chigorodo in Antioquia, Colombia.

132. On 7/10/1997, Peter Doe 100 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 100, who was the wife of Peter Doe 100, is the legal heir to Peter Doe 100 and resides in the municipio of Chigorodo in Antioquia, Colombia.

133. On 9/24/1999, Peter Doe 101 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 101, who was the wife of Peter Doe

101, is the legal heir to Peter Doe 101 and resides in the municipio of Chigorodo in Antioquia, Colombia.

134.    On 8/27/1990, Peter Doe 102 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 102, who was the mother of Peter Doe 102, is the legal heir to Peter Doe 102 and resides in the municipio of Chigorodo in Antioquia, Colombia.

135.    On 2/11/1993, Peter Doe 103 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 103, who was the mother of Peter Doe 103, is the legal heir to Peter Doe 103 and resides in the municipio of Chigorodo in Antioquia, Colombia.

136.    On 6/2/1995, Peter Doe 104 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 104, who was the mother of Peter Doe 104, is the legal heir to Peter Doe 104 and resides in the municipio of Chigorodo in Antioquia, Colombia.

137.    On 9/18/1999, Peter Doe 105 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 105, who was the wife of Peter Doe 105, is the legal heir to Peter Doe 105 and resides in the municipio of Chigorodo in Antioquia, Colombia.

138.    On 7/10/1996, Peter Doe 106 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 106, who was the wife of Peter Doe 106, is the legal heir to Peter Doe 106 and resides in the municipio of Chigorodo in Antioquia, Colombia.

139.    In 1992, Peter Doe 107 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 107, who was the mother of Peter Doe 107, is the legal heir to Peter Doe 107 and resides in the municipio of Chigorodo in Antioquia, Colombia.

140.    In 1989, Peter Doe 108 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 108, who was the mother of Peter Doe 108, is the legal heir to Peter Doe 108 and resides in the municipio of Chigorodo in Antioquia, Colombia.

141.    In 1991, Peter Doe 108-a was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 108, who was the mother of Peter Doe 108-a, is the legal heir to Peter Doe 108-a and resides in the municipio of Chigorodo in Antioquia, Colombia.

142.    On 5/20/1998, Peter Doe 109 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 109, who was the wife of Peter Doe 109, is the legal heir to Peter Doe 109 and resides in the municipio of Chigorodo in Antioquia, Colombia.

143.    On 11/14/2000, Peter Doe 110 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 110, who was the wife of Peter Doe 110, is the legal heir to Peter Doe 110 and resides in the municipio of Turbo in Antioquia, Colombia.

144.    On 7/16/1997, Peter Doe 111 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 111, who was the daughter of Peter

Doe 111, is the legal heir to Peter Doe 111 and resides in the municipio of Turbo in Antioquia, Colombia.

145.    On 6/28/1995, Peter Doe 112 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 112, who was the brother of Peter Doe 112, is the legal heir to Peter Doe 112 and resides in the municipio of Turbo in Antioquia, Colombia.

146.    On 2/6/2002, Peter Doe 113 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 113, who was the wife of Peter Doe 113, is the legal heir to Peter Doe 113 and resides in the municipio of Turbo in Antioquia, Colombia.

147.    On 9/24/1996, Peter Doe 114 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 114, who was the wife of Peter Doe 114, is the legal heir to Peter Doe 114 and resides in the municipio of Turbo in Antioquia, Colombia.

148.    On 12/10/1995, Peter Doe 115 was disappeared by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 115, who was the wife of Peter Doe 115, is the legal heir to Peter Doe 115 and resides in the municipio of Turbo in Antioquia, Colombia.

149.    In 2002, Peter Doe 116 was killed by paramilitaries, who received support from Chiquita and/or Banadex. Plaintiff Jane Doe 116, who was the mother of Peter Doe 116, is the legal heir to Peter Doe 116 and resides in the municipio of Turbo in Antioquia, Colombia.

150.    In 2002, Peter Doe 116-a was killed by paramilitaries, who received support from Chiquita and/or Banadex. Plaintiff Jane Doe 116, who was the mother of Peter Doe 116-a, is the legal heir to Peter Doe 116-a and resides in the municipio of Turbo in Antioquia, Colombia.

151.    On 8/7/1993, Peter Doe 117 was killed by paramilitaries, who received support from Chiquita and/or Banadex. Plaintiff Jane Doe 117, who was the daughter of Peter Doe 117, is the legal heir to Peter Doe 117 and resides in the municipio of Turbo in Antioquia, Colombia.

152.    On 1/11/2001, Peter Doe 118 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 118, who was the wife of Peter Doe 118, is the legal heir to Peter Doe 118 and resides in the municipio of Turbo in Antioquia, Colombia.

153.    On 11/4/2003, Peter Doe 119 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 119, who was the wife of Peter Doe 119, is the legal heir to Peter Doe 119 and resides in the municipio of Turbo in Antioquia, Colombia.

154.    On 4/28/2002, Peter Doe 120 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 120, who was the daughter of Peter Doe 120, is the legal heir to Peter Doe 120 and resides in the municipio of Turbo in Antioquia, Colombia.

155.    On 8/1/1994, Peter Doe 121 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 121, who was the wife of Peter Doe

121, is the legal heir to Peter Doe 121 and resides in the municipio of Turbo in Antioquia, Colombia.

156.    On 10/3/2000, Peter Doe 122 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 122, who was the wife of Peter Doe 122, is the legal heir to Peter Doe 122 and resides in the municipio of Turbo in Antioquia, Colombia.

157.    On 1/8/1987, Peter Doe 123 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 123, who was the son of Peter Doe 123, is the legal heir to Peter Doe 123 and resides in the municipio of Turbo in Antioquia, Colombia.

158.    On 2/27/1997, Peter Doe 124 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 124, who was the mother of Peter Doe 124, is the legal heir to Peter Doe 124 and resides in the municipio of Turbo in Antioquia, Colombia.

159.    On 2/28/1997, Pam Doe 124-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 124, who was the mother of Pam Doe 124-a, is the legal heir to Pam Doe 124-a and resides in the municipio of Turbo in Antioquia, Colombia.

160.    In 1993, Peter Doe 125 was disappeared by the FARC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 125, who was the son of Peter Doe 125, is the legal heir to Peter Doe 125 and resides in the municipio of Turbo in Antioquia, Colombia.

161.   On 11/6/2002, Peter Doe 126 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 126, who was the daughter of Peter Doe 126, is the legal heir to Peter Doe 126 and resides in the municipio of Turbo in Antioquia, Colombia.

162.   On 3/30/1996, Peter Doe 127 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 127, who was the wife of Peter Doe 127, is the legal heir to Peter Doe 127 and resides in the municipio of Turbo in Antioquia, Colombia.

163.   On 11/23/1997, Peter Doe 128 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 128, who was the wife of Peter Doe 128, is the legal heir to Peter Doe 128 and resides in the municipio of Turbo in Antioquia, Colombia.

164.   On 11/23/1997, Peter Doe 128-a was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 128, who was the sister of Peter Doe 128-a, is the legal heir to Peter Doe 128-a and resides in the municipio of Turbo in Antioquia, Colombia.

165.   On 5/26/1994, Peter Doe 128-b was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 128, who was the sister of Peter Doe 128-b, is the legal heir to Peter Doe 128-b and resides in the municipio of Turbo in Antioquia, Colombia.

166.   On 12/9/1992, Peter Doe 129 was killed by the FARC, who received support from Chiquita and/or Banadex. Plaintiff Jane Doe 129, who was the daughter of Peter Doe

129, is the legal heir to Peter Doe 129 and resides in the municipio of Turbo in Antioquia, Colombia.

167.    In October 1997, Peter Doe 130 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 130, who was the mother of Peter Doe 130, is the legal heir to Peter Doe 130 and resides in the municipio of Turbo in Antioquia, Colombia.

168.    On 6/28/2004, Peter Doe 131 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 131, who was the mother of Peter Doe 131, is the legal heir to Peter Doe 131 and resides in the municipio of Turbo in Antioquia, Colombia.

169.    On 3/15/1992, Peter Doe 132 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 132, who was the sister of Peter Doe 132, is the legal heir to Peter Doe 132 and resides in the municipio of Turbo in Antioquia, Colombia.

170.    On 9/18/1995, Peter Doe 133 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 133, who was the wife of Peter Doe 133, is the legal heir to Peter Doe 133 and resides in the municipio of Turbo in Antioquia, Colombia.

171.    On 8/2/1998, Peter Doe 134 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 134, who was the wife of Peter Doe 134, is the legal heir to Peter Doe 134 and resides in the municipio of Turbo in Antioquia, Colombia.

172.    On 8/2/1987, Peter Doe 135 was killed by paramilitaries, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 135, who was the wife of Peter Doe 135, is the legal heir to Peter Doe 135 and resides in the municipio of Turbo in Antioquia, Colombia.

173.    On 1/25/1997, Peter Doe 136 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 136, who was the wife of Peter Doe 136, is the legal heir to Peter Doe 136 and resides in the municipio of Turbo in Antioquia, Colombia.

174.    On 12/31/1997, Peter Doe 137 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 137, who was the daughter of Peter Doe 137, is the legal heir to Peter Doe 137 and resides in the municipio of Turbo in Antioquia, Colombia.

175.    On 5/23/1997, Peter Doe 138 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 138, who was the wife of Peter Doe 138, is the legal heir to Peter Doe 138 and resides in the municipio of Turbo in Antioquia, Colombia.

176.    On 3/18/2003, Peter Doe 139 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 139, who was the wife of Peter Doe 139, is the legal heir to Peter Doe 139 and resides in the municipio of Turbo in Antioquia, Colombia.

177.    On 12/1/1997, Peter Doe 140 was killed by the FARC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 140, who was the wife of Peter Doe

140, is the legal heir to Peter Doe 140 and resides in the municipio of Turbo in Antioquia, Colombia.

178.    On 6/9/1997, Peter Doe 141 was disappeared by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 141, who was the wife of Peter Doe 141, is the legal heir to Peter Doe 141 and resides in the municipio of Turbo in Antioquia, Colombia.

179.    On 8/14/2000, Pam Doe 142 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 142, who was the mother of Pam Doe 142, is the legal heir to Pam Doe 142 and resides in the municipio of Turbo in Antioquia, Colombia.

180.    In 1996, Peter Doe 143 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 143, who was the father of Peter Doe 143, is the legal heir to Peter Doe 143 and resides in the municipio of Medellin in Antioquia, Colombia.

181.    In 1995, Peter Doe 143-a was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 143, who was the father of Peter Doe 143-a, is the legal heir to Peter Doe 143-a and resides in the municipio of Medellin in Antioquia, Colombia.

182.    In 1999, Peter Doe 143-b was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff John Doe 143, who was the father of Peter Doe 143-b, is the legal heir to Peter Doe 143-b and resides in the municipio of Medellin in Antioquia, Colombia.

183.    On 6/22/2003, Peter Doe 144 was killed by the AUC, which received support from Chiquita and/or Banadex. Plaintiff Jane Doe 144, who was the mother of Peter Doe 144, is the legal heir to Peter Doe 144 and resides in the municipio of Medellin in Antioquia, Colombia.

### Defendants

184.    Defendant Chiquita is a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio. Defendant Chiquita engages in the business of producing, marketing, and distributing bananas and other fresh produce. Defendant Chiquita is one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America, including within the District of Colombia. Defendant Chiquita reported over $2.6 billion in revenue for calendar year 2003.

185.    Banadex was defendant Chiquita's wholly-owned subsidiary and alter ego in the Republic of Colombia. Banadex produced bananas in the Urabá (Antioquia department) and Santa Marta (Magdalena department) regions of Colombia. By 2003, Banadex was defendant Chiquita's most profitable banana-producing operation in the world. In June of 2004, defendant Chiquita sold Banadex, in response to irrefutable evidence that it had been making payments, on behalf of Chiquita, to terrorist groups in Colombia.

186.    Although it no longer has a Colombian subsidiary, Chiquita remains one of the largest buyers of bananas in Colombia, purchasing bananas from Colombian companies at sea in the Gulf of Uraba and elsewhere. Chiquita, and its predecessor the United Fruit Company, has had a presence in Colombia for more than one hundred years.

187.   David Doe 1 was a high-ranking officer of Defendant Chiquita, described as "Individual A" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

188.   David Doe 2 was a member of the board of directors of Defendant Chiquita, described as "Individual B" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

189.   David Doe 3 was a high-ranking officer of Defendant Chiquita, described as "Individual C" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

190.   David Doe 4 was a high-ranking officer of Defendant Chiquita, described as "Individual D" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

200.   David Doe 5 was a high-ranking officer of Defendant Chiquita, described as "Individual E" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

201.   David Doe 6 was a high-ranking officer of Banadex, described as "Individual F" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

202.   David Doe 7 was an employee of Banadex, described as "Individual G" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

37

203.    David Doe 8 was an employee of Defendant Chiquita, described as "Individual H" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

204.    David Doe 9 was an employee of Defendant Chiquita, described as "Individual I" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

205.    David Doe 10 was a high-ranking officer of Defendant Chiquita, described as "Individual J" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

## IV. BACKGROUND FACTS CONCERNING VIOLENCE IN THE BANANA GROWING REGIONS OF COLOMBIA.

### The Conflict in Uraba

206.    The main banana-producing region in Colombia, and the center of Defendant Chiquita's business activities, is on the eastern side of the Gulf of Uraba, on the north coast of Colombia near the border with Panama. This region consists of four municipios (administrative regions akin to counties in the U.S.): Apartado, Turbo, Carepa, and Chigorodo. (hereinafter referred to simply as "Uraba") The four muncipios are located in the department of Antioquia (an administrative region of Colombia akin to a U.S. state).

207.    Uraba has long been a hotbed of discontent and armed conflict. Beginning in the mid-1980s, an armed left-wing guerrilla organization called the F.A.R.C. took military control of the Uraba region. At the same time, the Union Patriotica (Patriotic Union, hereinafter "U.P."), a political party formed by demobilized F.A.R.C. guerrillas, won

38

elections throughout Uraba, taking control of key politial offices. The Partido Comunista de Colombia (Communist Party of Colombia, hereinafter "P.C.C.") also had a strong presence in the region.

208.    In addition, another left-wing guerrilla group called the Ejercito Popular de Liberacion (Popular Army of Liberation, hereinafter "EPL") were rivals of the F.A.R.C. and fought against the F.A.R.C. for control. After years of unsuccessfully battling the F.A.R.C. for control, in the early 1990s, the EPL allied with right-wing militias from the neighboring department of Cordoba, which came to Uraba to fight their common enemy, the F.A.R.C..

209.    From about 1994 through 1996, the A.U.C. drove the F.A.R.C. out of Uraba, killing thousands of people suspected of supporting the F.A.R.C. guerrillas, or their legal political party, the U.P. From 1997 to today, the A.U.C. maintained a reign of terror in Uraba, killing anyone suspected of sympathizing with the F.A.R.C. The inhabitants of Uraba have organized various political projects to demonstrate their neutrality (such as the "peace communities"), but are still caught in the crossfire. During the week that the Plaintiffs signed retainer agreements for this case, a man was assassinated near San Jose de Apartado, and his murder was apparently not investigated.

210.    According to statistics provided by the Colombian National Police, between 1997 and 2004, over 2700 people were murdered in the four municipalities of Apartado, Chigorodo, Carepa and Turbo. This figure does not include murders in the department of Magdelena, where Chiquita also had growing operations. The vast majority of these murders were committed by the A.U.C.

211.   Chiquita's business boomed as the A.U.C. took over banana-growing lands and murdered thousands of people, including human rights workers, trade unionists, and members of the U.P.

212.   Tens of thousands of people have been displaced from their homes in Uraba by this conflict.  Many of them live in "invasions" - slums constructed on public lands on the outskirts of Medellin, Cartagena, and elsewhere.  The slum neighborhood of Policarpa in Apartado, where many of the Plaintiffs live, is another example of an invasion.  These neighborhoods do not generally have water, sanitation, or electricity, and are located in areas where there are no employment opportunities.  The displaced people choose to live there because they feel safer than if they lived in rural areas where they could be hunted down and killed by the A.U.C.

213.   Also in the late 1990s, the A.U.C. took control of the Sintrainagro banana workers union, and drove the competing Fensuago union from the region.  The Fensuagro workers were suspected of having sympathy for the F.A.R.C. guerrillas. Today, the main union for the people supplying bananas to Defendant Chiquita is controlled by the A.U.C. through demobilized A.U.C. fighters in leadership roles in the Sintrainagro union.

214.   Chiquita also grew and bought bananas in five municipios in the department of Magdelena: Cordoba, Río Frio, Orihueca, Sevilla, Aracataca.  These municipios are near to the city of Santa Marta, where Defendant Chiquita also made payments to the A.U.C. A similar level of violence has occurred in this region.

### The A.U.C.

215.   The A.U.C. is a violent, right-wing, paramilitary organization operating in the Republic of Colombia,  The A.U.C. was formed on or about April 1997 to organize

40

loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerrillas fighting the Colombian government. The A.U.C.'s activities include assassinating union leaders and suspected guerrilla supporters, drug trafficking, kidnapping, and indiscriminate murdering of civilians.

216.    Since September 10, 2001, the A.U.C. has been designated as a Foreign Terrorist Organization ("FTO") by the Secretary of State of the United States, making it a federal crime for any United States person to knowingly provide material support and resources, including currency and monetary instruments, to the A.U.C.  On October 31, 2001, the Secretary of State of the United States designated the A.U.C. as a Specially-Designated Global Terrorist ("SDGT"), making it a crime for any United States person to willfully engage in transactions with the A.U.C. without having first obtained a license or other authorization from the Office of Foreign Assets Control of the US Department of the Treasury.

217.    From 1997 to 2004, the A.U.C. murdered at least 10,000 people in Colombia, burying many of the bodies in mass graves.

218.    The U.S. State Department reported in 2003 that about 4,000 union members have been slain in Colombia in the past 20 years.  The vast majority of these murders were committed by right wing paramilitary forces, including the A.U.C.

### Chiquita's Dealings with the A.U.C.

219.    From at least 1997 through February 4, 2004, Defendant Chiquita, through Banadex, paid money to the A.U.C. in the two regions of Colombia where it had banana-growing operations: Uraba and Santa Marta.  Defendant Chiquita paid the A.U.C.,

directly or indirectly, nearly every month. From about 1997 through on or about February 4, 2004, defendant Chiquita made over 100 payments to the A.U.C. totaling over $1.7 million.

220.    The amount of money paid to the A.U.C. was different every month. According to the testimony of A.U.C. commander Salvatore Mancuso in his criminal trial, the A.U.C. was paid a commission based on the number of boxes of bananas shipped by Defendant Chiquita each month. The A.U.C. was paid to ensure that Chiquita's business ran smoothly.

221.    Chiquita's payments were made either through the Papagayo Association, a paramilitary group licensed by the Colombian government, and then transferred to the A.U.C., or directly to Carlos Castaño, the leader and founder of the A.U.C.

222.    Carlos Castaño and other A.U.C. leaders co-mingled this money with other funds used to finance the A.U.C.'s activities throughout Colombia. The money provided by Chiquita financed the A.U.C. from its very first days in operation, making Chiquita one of the financial founders of the A.U.C.

223.    Chiquita's payments to the A.U.C. were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees, described herein as David Does 1-10. Chiquita recorded these payments in its corporate books and records as "security payments."

224.    According to the Colombian chief federal prosecutor's office, in November of 2001, a Banadex ship was used to smuggle more than 3,000 AK-47 assault rifles and more than 2.5 million bullets intended for the A.U.C. This shipment is also described in a 2003 report by the Organization of American States.

42

225.    Giovanny Hurtado Torres, Banadex's legal representative, is one of four people convicted in Colombia over the arms-smuggling scheme.

226.    Chiquita made these payments and shipped these weapons to the A.U.C. with knowledge of the A.U.C.'s activities, and against the advice of its own legal counsel. According to notes taken by Chiquita's counsel, on or about April 4, 2003, David Doe 3 said "His and [David Doe 2's] opinion is just let them sue us, come after us. This is also [David Doe 1's] opinion."

227.    Prior to the creation of the A.U.C. in 1997, Chiquita had paid money to other terrorist organizations operating in Colombia, which also murdered thousands of people.

## VI.  DEFENDANTS' VIOLATIONS OF LAW

228.    Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

(a)    Alien Tort Claims Act, 28 U.S.C. § 1350;

(b)    Torture Victim Protection Act, 28 U.S.C. § 1350;

(c)    Common law of the United States of America;

(d)    United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e)    Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f)    International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g)    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h)    Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i)    Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j)    International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize;

(k)    Article 3 of the Geneva Conventions; and

(l)    Statutes and common law of the District of Columbia, including but not limited to, wrongful death, negligence, and recklessness.

## VII.  CAUSES OF ACTION

229.    Defendants had effective control of the areas where they grew bananas in the regions near the Gulf of Uraba and the city of Santa Marta. Defendants have pled guilty in the pending criminal case, 07-CR-0555 (RCL), of providing material assistance to terrorist groups operating in and around their banana plantations in Colombia. This assistance included cash payments and arms. Defendants accordingly were aiding and abetting all acts of violence committed with the material support provided by Defendants to the terrorist groups they supported.

230.    In committing the tortious conduct alleged herein, the terrorist groups accepting material assistance from Defendants were acting under the supervision of Defendants

44

and/or as Defendants' agents, and/or were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence or subsequent ratification of Defendants.

231.    Defendants had reason to know and/or did know the nature and scope of the tortious conduct alleged herein, as well as tortious conduct carried out through the use of and benefit from the funding, equipment and other resources provided by Defendants. With this knowledge or probable knowledge, Defendants provided and continue to provide this funding, equipment and other resources to the terrorist groups responsible for the damages alleged herein.

232.    The tortious conduct alleged herein carried out by the terrorist groups receiving material assistance from Defendants was reasonably foreseeable.  Defendants failed to exercise due care in preventing this tortious conduct. Defendants and/or their predecessors acquiesced to tortious conduct, as alleged herein, carried out by the terrorist groups receiving material support from Defendants.

233.    With respect to all of the causes of action described below, the harm to Plaintiffs was caused by the commissions or omissions of Defendants, including Defendants' provision of material support to terrorist groups.

## First Cause of Action

**The Alien Tort Claims Act, 28 U.S.C. § 1350 for Extrajudicial Killing on Behalf of All Plaintiffs Against All Defendants.**

234.    Plaintiffs incorporate by reference paragraphs 1 through 233 of this Complaint as is set forth herein.

235.     Defendants Chiquita and David Does 1-10 engaged in acts omissions of intentionally and tortiously causing their agents to murder Peter Does 1-144. Specifically, as is alleged above, the Defendant companies' employees and/or agents engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, murdered Peter Does 1-144. Further, through their agents, Defendants knowingly aided and abetted the paramilitary forces that murdered Peter Does 1-144 by providing financial support, arms, and other substantial assistance that contributed to the ability of paramilitary forces to murder Peter Does 1-144. Defendants were aware of the relationship between Chiquita Brands, International, Banadex and the A.U.C. and other terrorist organizations, and the threats posed by them. However, while having the requisite control to do so, Defendants failed to do anything to cease this relationship or to otherwise protect the lives of Peter Does 1-144. Defendants realized substantial benefits from the murders of Peter Does 1-144, including the elimination of suspected guerrilla sympathizers, communists, and union leaders. These acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra. The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security forces are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph

46

228, supra. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein. Finally, as the murders were committed in the course of a civil conflict, and the victims were innocent civilians, these were also war crimes.

236.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra, resulted in the deaths of Peter Does 1-144. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial. They further seek equitable relief to prevent further human rights violations.

### Second Cause of Action

#### The Torture Victim Protection Act, 28 U.S.C. § 1350 For Extrajudicial Killing on Behalf of All Plaintiffs Against All Defendants.

237.    Plaintiffs incorporate by reference paragraphs 1 through 236 of this Complaint as is set forth herein.

238.    Defendants Chiquita and David Does 1-10 and engaged in acts and omissions of intentionally and tortiously causing their employees and/or agents to murder Peter Does

47

1-144. Specifically, as is alleged above, the Defendants' employees and/or agents engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, murdered Peter Does 1-144 in violation of the TVPA. Further, through their employees and/or agents, the Defendants knowingly aided and abetted the paramilitary forces that murdered Peter Does 1-144 by providing financial support, arms, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Peter Does 1-144. Defendants were aware of the relationship between Chiquita Brands, International, its subsidiary Banadex and the paramilitaries and the threats posed by the paramilitaries to the people of the banana growing regions in Uraba and Santa Marta, including Peter Does 1-144. However, while having the requisite control to do so, they recklessly failed to do anything to cease this relationship or to otherwise protect the lives of Peter Does 1-144. Defendants realized substantial benefits from the murders of Peter Does 1-144, including the elimination of suspected guerrilla sympathizers, communists, and union leaders. These acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra. The acts described herein are actionable under the TVPA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security force are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph

48

228, supra.  Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

239.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra, resulted in the deaths of Peter Does 1-144.  Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 228, supra. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial. They further seek equitable relief to prevent further human rights violations.

## Third Cause of Action

**Wrongful Death, on Behalf of All Plaintiffs Against All Defendants.**

240.    Plaintiffs incorporate by reference paragraphs 1 through 239 of this Complaint as is set forth herein.

241.    Defendants Chiquita and David Does 1-10 committed, or acted in concert to commit, or Defendants' employees or agents, committed acts that constitute wrongful death under the laws of the District of Colombia, the laws of the United States and the

laws of Colombia, and that caused the deaths of Peter Does 1-144.  Defendants Chiquita Brands, International and David Does 1-10 were aware of the relationship between the Chiquita Brands, International and the paramilitaries and the threats posed by the paramilitaries to the people of the Uraba and Santa Marta regions of Colombia, including, Peter Does 1-144.   However, while having the requisite control to do so, they recklessly failed to do anything to cease this relationship or to otherwise protect the lives of Peter Does 1-144. Plaintiffs are the heirs at law herein. Plaintiffs seek damages herein for pecuniary loss resulting from loss of society, comfort, attention, services and support.

242.    Defendants' actions and omissions were a direct and substantial cause of the deaths of Peter Does 1-144.  Defendants failed to use due care to protect them from injury and harm, thereby proximately causing their wrongful deaths.    Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

### Fourth Cause of Action

### Negligence, on Behalf of
### All Plaintiffs Against All Defendants.

243.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

244.    Defendants had a duty of reasonable care towards Plaintiffs to ensure that neither they nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, injury or death, as described herein.  Defendants failed to use due care to protect the Plaintiffs from foreseeable injury, harm, and death.

245.    Defendants had a duty to Plaintiffs to take ordinary care to ensure that the terrorist groups supported by Defendants were not unfit, incompetent or otherwise dangerous to Plaintiffs.

246.    At all relevant times, Defendants and/or their agents, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

247.    Defendants and/or their agents breached the duty of care that they owed Plaintiffs. In engaging in the conduct alleged herein, including the provision of material support to terrorist groups, Defendants and/or their agents have not acted as ordinarily prudent and careful persons would act in similar circumstances.

248.    Defendants and/or their agents' breached of the duty of care that they owed Plaintiffs is the proximate cause of Plaintiffs' damages, as alleged herein.

### Fifth Cause of Action

### Negligent Hiring, on Behalf of
### All Plaintiffs Against All Defendants.

249.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

250.    Defendants and/or their agents selected, hired, retained and/or contracted with terrorist groups operating in and around their banana-growing areas in Colombia.

251.    Defendants had a duty to Plaintiffs to take reasonable care to ensure that these terrorist groups were not unfit, incompetent or otherwise dangerous to Plaintiffs.

252.    Despite actual or constructive knowledge of the violent characteristics of these groups, Defendants hired, retained, and/or contracted with terrorist groups operating in

and around their banana-growing areas in Colombia. At the time that Defendants selected, hired, retained and/or contracted with these terrorist groups, and at all other relevant times, Defendants knew or reasonably should have known that these terrorist groups were unfit, incompetent, and/or dangerous, and that, as a result, would intentionally and/or negligently violate, did violate and would continue to harm Plaintiffs, as alleged herein.

253.    Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting for the security personnel whom Defendants and/or their agents retained to perform this work.  Defendants breached their duty to Plaintiffs, who suffered harm and injury, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

254.    As a direct and proximate result of those violations, Plaintiffs would and did suffer injuries as further alleged herein.

255.    As a direct and proximate result of Defendants' negligent selection, hiring, retention and/or contracting with terrorist groups,  Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

256.    Defendants' conduct constitutes negligent hiring and is actionable under the laws of the District of Columbia.

### Sixth Cause of Action

**Negligent Supervision, on Behalf of
All Plaintiffs Against All Defendants.**

257.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

258.    When engaging in the wrongful conduct alleged herein, the terrorist groups receiving material assistance from Defendants were acting as agents of Defendants.

259.    Defendants had a duty to Plaintiffs to take reasonable care to ensure that the terrorist groups Defendants provided material support to were not unfit, incompetent or otherwise dangerous to Plaintiffs.

260.    By providing material support to terrorist groups, Defendants exercised control over the operative details of the actions taken by these groups, including control over the resources, property, funding and/or equipment used to injure and harm Plaintiffs.

261.    Defendants also had the authority to supervise, prohibit, control, and/or regulate the terrorist groups receiving material support from them so as to prevent these acts and omissions from occurring.  Defendants also had the ability to suspend material support to the terrorist groups until such time as the tortious conduct alleged herein were stopped and/or prevented.

262.    Defendants knew, or reasonably should have known, that the terrorist groups they were providing material support to would create a risk of harm and actually harm or otherwise violate Plaintiffs' rights, and that, as a direct and proximate result of those violations, Plaintiffs would suffer injuries as alleged herein.

263.    Defendants knew, or reasonably should have known, that unless they intervened to protect Plaintiffs and properly supervise, prohibit, control and/or regulate the conduct described herein, the terrorists receiving material support from Defendants would perceive their acts and omissions as being ratified and condoned.

264.    Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate the terrorist groups they were supporting.  Defendants breached their duty to

Plaintiffs, who suffered harm and injury, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

265.    As a direct and proximate result of Defendants' negligent supervision of the terrorist groups they supported, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

266.    Defendants' conduct constitutes negligent supervision and is actionable under the laws of the District of Columbia.

### Seventh Cause of Action

### Intentional Infliction of Emotional Distress, on Behalf of All Plaintiffs Against All Defendants.

267.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

268.    Defendants and/or their agents intentionally committed outrageous and extreme acts, as alleged herein, including the murder, assault, and battery of Plaintiffs immediate family members, carried out by the terrorist groups receiving material support from Defendants.  These acts, which are without privilege, were intended to cause and did cause Plaintiffs to suffer severe emotional distress.

269.    In the alternative, Defendants engaged in outrageous and extreme acts with reckless disregard for the probability of causing Plaintiffs severe emotional distress and did in fact cause Plaintiffs to suffer severe emotional distress.

270.    Defendants' outrageous and extreme conduct constitutes the intentional and/or reckless infliction of emotional distress and is actionable under the laws of the District of Columbia.

### Eighth Cause of Action

**Battery, on Behalf of
All Plaintiffs Against All Defendants.**

271.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

272.    Defendants and/or their agents committed intentional knowing, and/or reckless acts which resulted in harmful or offensive contact with the bodies of Plaintiffs.

273.    Plaintiffs did not consent to the contact. Defendants acted with the intent to cause injury and actually did cause injury, damage, loss and harm to Plaintiffs as alleged herein.

274.    The acts described herein constitute battery, actionable under the laws of the laws of the District of Columbia.

### Ninth Cause of Action

**Assault, on Behalf of
All Plaintiffs Against All Defendants.**

275.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

276.    Defendants and/or their agents intentionally, knowingly and/or recklessly committed or attempted and/or threatened to commit wrongful acts intending to cause harmful or offensive contact with Plaintiffs.   Defendants and/or their agents caused Plaintiffs to imminently fear and/or apprehend such harmful, offensive and/or unlawful contact.  Defendants acted with the intent to threaten and harm and did actually threaten and harm Plaintiffs.

277.    Defendants' commissions and omissions, as alleged herein, demonstrated that Defendants had an imminent ability and intent to subject Plaintiffs to an intentional, offensive and harmful contact. Defendants knew or should have known that Plaintiffs would regard such intentional and harmful contact as offensive.

278.    Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to Plaintiffs. The acts described herein constitute assault, actionable under the laws of the District of Columbia.

## VIII. DEMAND FOR JURY TRIAL

279.    Plaintiffs demand a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)    enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)    declare that Defendants have violated Plaintiffs' human rights and the laws of the District of Columbia and the United States, as set forth herein;

(c)    award Plaintiffs compensatory and punitive damages;

(d)    grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other inhabitants of the Uraba and Santa Marta regions of Colombia;

(e)    award Plaintiffs the costs of suit including reasonable attorneys' fees;

(f)    award Plaintiffs such other and further relief as the Court deems just under the circumstances.

56

Respectfully submitted this seventh day of June, 2007,

Terry Collingsworth
International Rights Advocates
D.C. Bar 471830
2001 S Street NW #420
Washington, D.C. 20002
202-347-4100 ext 104
tc@iradvocates.org

Paul Wolf
D.C. Bar 480285
PO Box 11244
Washington, D.C. 20008-1244
Tel. (202) 674-9653
paulwolf@icdc.com

EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### CASE NO.

## 07-60821

CIV-ALTONAGA

MAGISTRATE JUDGE
TURNOFF

ANTONIO GONZALEZ CARRIZOSA, JULIA
ESTER DURANGO HIGITA, LILIANA MARIA
CARDONA, MARIA PATRICIA RODRIGUEZ, ANA
FRANCISCA PALACIOS MORENO, LUZ MARLENI
DURANGO DAVID, ROSA ZUNIGA IBARGEN, LUIS
AMPARO COGOLLO OSORIO, CELIA MODESTA
NARVAEZ DE MADRID, EDITH MONTIEL
BALLESTEROS, MARIA DE LA CRUZ
VARELAS LOPEZ, ANA DOLIS ALCARAZ, SILVIA
LUZ ACEVEDO DE BUILES,  JUAN PABLO OROZCO BUILES,
MARIA CAMILA OROZCO BUILES, ISABEL CRISTINA
OROZCO BUILES CATALINA DEL CARMEN ALTAMIRANDA DE MEZA,
EIPOLITA CARDALES MORENO, NANCY DEL CARMEN MAYO,
LUZ NIDIA BERRIO RODRIGUEZ, LUZ MERY PEREZ
SERNA,

FILED BY
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FT.L.
2007 JUN 13  PM 3: 08

        Plaintiffs,

v.

CHIQUITA BRANDS INTERNATIONAL, INC.,
an Ohio corporation, and CHIQUITA FRESH
NORTH AMERICA LLC, a Delaware corporation,

        Defendants.

_____/

## COMPLAINT

### Introduction

1.    Plaintiffs, family members of the deceased, bring this action for damages against Defendants Chiquita Brands International, Inc., and Chiquita Fresh North America LLC ("Defendants"), as a result of Defendants' illegal activities in Colombia.

2.    Plaintiffs' deceased family members were banana workers, a teacher, a student, a child, and other innocent civilians in Colombia.  While in Colombia, the

decedents were murdered by terrorist organizations which received financial support from Defendants.

3.     Plaintiffs bring their claims under the Alien Tort Claims Act, 28 U.S.C. § 1350, and Florida law as a result of Defendants' tortuous actions.

## Jurisdiction and Venue

4.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based on the ATCA, 28 U.S.C. § 1350.

5.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).  All Plaintiffs are citizens and permanent domiciles of Colombia, and Defendants are all United States domiciles with their principal place of business and/or residence also in the United States.  Defendant Chiquita Brands International, Inc. is a New Jersey corporation and is headquartered in Ohio.  Defendant Chiquita Fresh North America LLC is a Delaware corporation, is headquartered in Ohio, and is registered to do business in Florida.  Defendants conduct substantial business in Florida, including the importation of bananas and other produce in Port Everglades, Florida, have offices in Florida, have sought relief in various courts in Florida, and have a registered agent in the State of Florida.  The amount in dispute between each Plaintiff and each Defendant exceeds $75,000.

6.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c).

2

**Plaintiffs**

7.    Plaintiff Antonio Gonzalez Carrizosa is the representative of the estate of Simon Efrain Gonzalez Ramirez.  Plaintiff Antonio Gonzalez Carrizosa is the father of Simon Efrain Gonzalez Ramirez.

8.    Plaintiff Julia Ester Durango Higita is the representative of the estate of Dennys Patricia Carvajal Durango and Luis Henry Gomez Cardona and is acting on behalf of their surviving children Yuieza Veronica Gomez Carvajal, Yeison Enrique Gomez Carvajal and Yinna Marcela Gomez Carvajal.  Plaintiff Julia Ester Durango Higita is the mother and mother in law of Dennys Patricia Carvajal Durango and Luis Henry Gomez Cardona.

9.    Plaintiff Liliana Maria Cardona is the representative of the estate of Albeiro de Jesus Ledezma and is acting on behalf of his surviving children Dana Carolina Ledezma Cardona, Darwin Alejandro Ledesma Cardona, Dione Meliza Ledezma Cardona and Crizman Yusein Ledezma Cardona.  Plaintiff Liliana Maria Cardona is the wife of Albeiro de Jesus Ledezma.

10.    Plaintiff Maria Patricia Rodriguez is the representative of the estate of Jose Manuel Gomez Madrid and is acting on behalf of his surviving children Oscar Alberto Gomez Echeverri and Solanys Gomez Rodriguez.  Plaintiff Maria Patricia Rodriguez is the wife of Jose Manuel Gomez Madrid.

11.    Plaintiff Ana Francisca Palacios Moreno is the representative of the estate of Jonny Smith Serna Palacios.  Plaintiff Ana Francisca Palacios Moreno is the mother of Jonny Smith Serna Palacios.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

12. Plaintiff Luz Marleni Durango David is the representative of the estate of Victor Julian Franco Garcia and is acting on behalf of his surviving child, Cristian Andres Franco Durango. Plaintiff Luz Marleni Durango David is the wife of Victor Julian Franco Garcia.

13. Plaintiff Rosa Zuñiga Ibargen is the representative of the estate of Angel Samuel Hinestroza Cuesta and is acting on behalf of his surviving children Sandra Milena Hinestroza Zuñiga, Lucellys Hinestroza Zuñiga and Yilmar Hinestroza Zuñiga. Plaintiff Rosa Zuñiga Ibargen is the wife of Angel Samuel Hinestroza Cuesta.

14. Plaintiff Luis Amparo Cogollo Osorio is the representative of the estate of Luis Alberto Seña Cogollo and is acting on behalf of his surviving child, Yanier Alberto Seña Montoya. Plaintiff Luis Amparo Cogollo Osorio is the mother of Luis Amparo Cogollo Osorio.

15. Plaintiff Celia Modesta Narvaez de Madrid is the representative of the estate of Jonny Luis Urango Narváez and Amauri Madrid Narváez. Plaintiff Celia Modesta Narvaez de Madrid is the mother of Jonny Luis Urango Narváez and Amauri Madrid Narváez.

16. Plaintiff Edith Montiel Ballesteros is the representative of the estate of Sergio Luis Montiel Ballesteros. Plaintiff Edith Montiel Ballesteros is the sister of Sergio Luis Montiel Ballesteros.

17. Plaintiff Maria de la Cruz Varelas Lopez is the representative of the estate of Carlos Eliecer Trejos Varelas. Plaintiff Maria de la Cruz Varelas Lopez is the mother of Carlos Eliecer Trejos Verelas.

4

18.    Plaintiff Ana Dolis Alcaraz is the representative of the estate of Victor Humberto Restrepo Rodríguez and is acting on behalf of his surviving children Claudia Maria Restrepo Alcaraz, Maria Elena Restrepo Alcaraz, Ingrid Yarley Restrepo Alcaraz and Victor Manuel Alcaraz.  Plaintiff Ana Dolis Alcaraz is the wife of Victor Humberto Restrepo Rodriguez.

19.    Plaintiffs Silvia Luz Acevedo de Builes, Juan Pablo Orozco Builes, Maria Camila Orozco Builes, and Isabel Cristina Orozco Builes are the representatives of the estate of Elizabeth Builes Acevedo.  Plaintiff Silvia Luz Acevedo de Builes is the mother of Elizabeth Builes Acevedo and Juan Pablo Orozco Builes, Maria Camila Orozco Builes, Isabel Cristina Orozco Builes are the son and daughters of Elizabeth Builes Acevedo.

20.    Plaintiff Catalina Altamiranda de Meza is the representative of the estate of David Alfonso Meza Altamiranda.  Plaintiff Catalina Altamiranda de Meza is the mother of David Alfonso Meza Altamiranda.

21.    Plaintiff Catalina Del Carmen Altamiranda de Meza is the representative of the estate of Rafael Benjamin Meza Martinez.  Plaintiff Catalina Del Carmen Altamiranda de Meza is the wife of Rafael Benjamin Meza Martinez.

22.    Plaintiff Eipolita Cardales Moreno is the representative of the estate of José de Las Nieves Moreno.  Plaintiff Eipolita Cardales Moreno is the mother of Jose de Las Nieves Moreno.

23.    Plaintiff Nancy Del Carmen Mayo is the representative of the estate of Lesly Briceth Palacios Mayo.  Plaintiff Nancy Del Carmen Mayo is the mother of Lesly Briceth Palacios Mayo.

5

24.     Plaintiff Luz Nidia Berrio Rodriguez is the representative of the estate of Jorge Alberto Hernandez Rodríguez. Plaintiff Luz Nidia Berrio Rodríguez is the sister of Jorge Alberto Hernandez Rodriguez.

25.     Plaintiff Luz Mery Pérez Serna is the representative of the estate of Jorge Narmidez Martinez and Julio Cesar Graciano Torres. Plaintiff Luz Mery Perez Serna is the mother and wife of Jorge Narmidez Martinez and Julio Cesar Graciano Torres.

## Defendants

26.     Defendant Chiquita Brands International, Inc. ("Chiquita Brands"), is a New Jersey corporation and is headquartered in Cincinnati, Ohio. Chiquita Brands conducts substantial business in Florida, including the importation of bananas and other produce in Port Everglades, Florida, has offices in Florida, has sought relief in various courts in Florida, and has a registered agent in the State of Florida.

27.     Defendant Chiquita Fresh North America LLC ("Chiquita Fresh") is a Delaware corporation and is headquartered in Cincinnati, Ohio. It is a subsidiary of Defendants Chiquita Brands International, Inc., and conducts business in Florida. Chiquita Fresh conducts substantial business in Florida, including the importation of bananas and other produce in Port Everglades, Florida, has offices in Florida, has sought relief in various courts in Florida, and has a registered agent in the State of Florida. Hereinafter, Chiquita Brands and Chiquita Fresh will be collectively referred to as "Chiquita Brands."

## Background

28.     Chiquita Brands' incorporated C.I. Bananos de Exportacion, S.A. (also known as and hereinafter referred to as "Banadex"), to conduct its business operations in

6

Colombia. Banadex produced bananas in Colombia which were ultimately imported and sold into the United States, including Florida.

29. Beginning in 1997, Chiquita Brands, through Banadex, began making payments to the United Self-Defense Forces of Colombia ("AUC"). The AUC was and is a dangerous terrorist organization that was created in order to combat other guerrilla groups. The AUC, however, has not limited its activities to this purpose. It has engaged in kidnapping, the murder of innocent civilians, and drug trafficking. The AUC has been a named terrorist organization every year by the United States since 2001.

30. Chiquita Brands, through Banadex, made over 100 payments totaling over $1.7 million to the AUC following a meeting between leaders of the AUC and Banadex.

31. The AUC instructed Banadex to make payments to it through an intermediary known as a "Convivir." Convivirs were security companies that assisted the Colombian police and military in providing security. Convivirs were created by the Colombia government in response to increased danger from guerrilla groups. However, the Convivirs operated by the AUC did not provide security for Chiquita Brands or Bandax. Instead, the AUC used the Convivir payments in furtherance of its illegal activities and Chiquita Brands and Banadex characterized the payments as "security payments."

32. The payments to the AUC were reviewed and authorized by Chiquita Brand executives. Chiquita Brand executives were aware that the AUC was violent terrorist organization as early as 2001 as reports about the AUC's terrorist designation were published in numerous media outlets.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

33. In September of 2000, an internal investigation was conducted by in-house counsel for Chiquita Brands into the payments made to the AUC. The results of the investigation were placed into a memorandum which was later discussed and reviewed at a meeting in Cincinnati, Ohio, whose attendance included a high ranking corporate officer. However, no actions were taken to stop the illegal payments.

34. For the next four years, Chiquita Brands and Banadex continued making payments to the AUC. In April of 2002, a new board of directors and audit committee took seat over Chiquita Brands, thus providing an opportunity to stop the illegal actions. However, the payments to the AUC continued.

35. On or about February 20, 2003, a high ranking officer and an employee of Chiquita Brands consulted with a national law firm to review the legality of the payments to the AUC. The law firm advised the high ranking officer and the employee that the payments were illegal, the payments must stop and Chiquita Brands should leave Colombia. However, Chiquita Brands ignored the legal advice and continued to make payments to the AUC after February 20, 2003.

36. On or about April 3, 2003, a member of the board of directors and a high ranking officer reported to the board of directors that Chiquita Brands was making illegal payments to a terrorist organization. The board agreed to disclose the illegal payments to the Department of Justice.

37. On or about April 8, 2003, a meeting was held between several high ranking officers and employees of Chiquita Brands. The high ranking officers instructed certain employees to continue making payments to the AUC despite the decision to meet with the Department of Justice.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

38. On or about April 24, 2003, a high ranking officer and a member of the board of directors met with Department of Justice officials concerning the illegal payments. The Department of Justice officials instructed Chiquita Brand's officials that the payments were illegal and must stop.

39. On or about April 30, 2003, the Chiquita Brands' officials who met with the Department of Justice officials met with members of the audit committee and outside auditors of Chiquita Brands. The Chiquita Brands' officials stated that there was no decision regarding the continuation of payments to the AUC. Thereafter, Chiquita Brands continued making payments to the AUC.

40. On September 8, 2003, Chiquita Brands' outside attorneys advised a high ranking officer and an employee that the Department of Justice advised that they could not, among other things, condone future payments to the AUC. Despite this warning, Chiquita Brands continued to make payments to the AUC.

41. On December 22, 2003, a member of Chiquita Brands' board of directors warned other board members in an email that the payments to the AUC were likely to be criminal. Despite the email, Chiquita Brands continued to make payments to the AUC.

42. As a result of the above, the United States filed criminal charges against Chiquita Brands in the United States District Court for the District of Columbia on March 13, 2007. On or about March 9, 2007, Chiquita Brands pled guilty to all charges.

### Facts Surrounding Victims' Deaths

43. Simon Efrain Gonzalez Ramirez, a student, was waiting for a bus in the Municipality of Magdalena when he was kidnapped and murdered by the AUC, financed

9

by Chiquita Brands, on May 21, 2002. He is survived by his father, Antonio Gonzalez Carrizosa.

44.     Luis Henry Gomez Cardona was the administrator of Villa Lucia Farm in Apartadó, Department of Antioquia, Colombia. Mr. Gomez and his wife, Dennys Patricia Carvajal Durango, were banana farm workers. Mr. Gomez, his wife, and 7 other banana workers were killed by the AUC, financed by Chiquita Brands, in a highly publicized massacre that occurred on the Villa Lucia Farm on April 26, 2002. Mr. Gomez and Mrs. Carvajal are survived by their mother and mother in law, Plaintiff Julia Ester Durango Higita, and their three young children.

45.     Albeiro de Jesus Ledezma was a banana worker who was also killed by the AUC, financed by Chiquita Brands, in the massacre that took place on Villa Lucia Farm in Apartadó, Department of Antioquia, Colombia on April 26, 2002. Mr. Ledezma is survived by his wife, Plaintiff Liliana Maria Cardona, and their four children.

46.     Jose Manuel Gomez Madrid was killed by AUC, financed by Chiquita Brands, in the Municipality of Apartado, Department of Antioquia, Colombia on May 12, 2004. Mr. Gomez was killed while he was working for the company on the Praga farm. He is survived by his wife, Plaintiff Maria Patricia and their three children.

47.     Jonny Smith Serna Palacios, a teacher, was killed by the AUC, financed by Chiquita Brands, on June 17, 2001. She is survived by her mother, Plaintiff Ana Francisca Palacios Moreno.

48.     Victor Julian Durango Garcia was a cabinet maker who worked in the city of Apartado. He was killed by the AUC, financed by Chiquita Brands, outside of his

workshop on June 14, 2000. He is survived by his wife, Plaintiff Luz Marleni Durango David and their child.

49.     Angel Samuel Hinestroza Cuesta was a fertilizer contractor who worked at Santa Marta Farm located close to the city of Apartado, Antioquia. He was threatened several times by members of the AUC, financed by Chiquita Brands, until they killed him while he was collecting wood on May 6, 2002. He is survived by his wife, Plaintiff Rosa Zuniga Ibargen, and their five children.

50.     Luis Alberto Seña Cogollo was threatened by members of the AUC. He was forced to leave the city of Apartado and escape to Medellin. Unable to find work, he returned to Apartado. He was killed by the AUC, financed by Chiquita Brands, when he was leaving his house in Apartado, Department of Antioquia, Colombia on October 28, 2003. He is survived by his mother, Plaintiff Luis Amparo Cogollo Osorio and his young son.

51.     Jonny Luis Urango Narvaez was murdered by the AUC, financed by Chiquita Brands, in the city of Apartado, Colombia, on November 12, 2002. He is survived by his mother, Plaintiff Celia Modesta Narvaez de Madrid.

52.     Amauri Madrid Narvaez was murdered by the AUC, financed by Chiquita Brands, in the city of Apartado, Colombia on August 18, 2000. He is survived by his mother, Plaintiff Celia Modesta Narvaez de Madrid.

53.     Sergio Luis Montiel Ballesteros was murdered by the AUC, financed by Chiquita Brands, on January 22, 2000, as the AUC falsely believed he stole plantains from the Mona Lisa farm in a zone controlled by the AUC. He is survived by his sister, Plaintiff Edith Montiel Ballesteros.

11

54.     Carlos Eliecer Trejos Varelas was a banana worker who was killed by the AUC, financed by Chiquita Brands, on September 12, 2004, while in front of his house. He was killed in the Municipality of Mutata, Colombia. He is survived by his mother, Plaintiff Maria de la Cruz Varelas Lopez.

55.     Victor Humberto Restrepo Rodriguez was killed by the AUC, financed by Chiquita Brands, in the Municipality of Apartado, Department of Antioquia, Colombia on November 17, 2002. He is survived by his wife, Plaintiff Ana Dolis Alcaraz, and their four children.

56.     Elizabeth Builes Acevedo was killed by the AUC, financed by Chiquita Brands, near the El Trebol and La Clarita Farms on January 20, 1997. She is survived by her mother, Plaintiff Silvia Luz Acevedo de Builes, by her son Plaintiff Juan Pablo Orozco Builes and by her two daughters, Plaintiffs Maria Camilia and Isabel Cristina Orozco Builes.

57.     David Alfonso Meza Altamiranda was a banana worker who was killed by the AUC, financed by Chiquita Brands, on November 4, 1999. He was killed in the municipality of Apartado, Antioquia. He is survived by his mother, Plaintiff Catalina Altamiranda de Meza.

58.     Rafael Benjamin Meza Martinez was killed by the AUC, financed by Chiquita Brands, on April 1, 1993. He is survived by his wife, Plaintiff Catalina Del Carmen Altamiranda de Meza.

59.     José de Las Nieves Moreno was a banana worker at the Praga farm located in the Municipality of Apartado, Antioquia, Colombia. He was murdered by the

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

AUC, financed by Chiquita Brands, on May 12, 2004. He is survived by his mother, Plaintiff Eipolita Cardales Moreno.

60.     Lesly Briceth Palacios Mayo was a child (8 years old) who was killed by the AUC, financed by Chiquita Brands, on December 15, 2002. She is survived by her mother, Plaintiff Nancy del Carmen Mayo.

61.     Jorge Alberto Hernandez Rodriguez was a banana worker who was killed by the AUC, financed by Chiquita Brands, on September 5, 2001. His is survived by his sister, Plaintiff Luz Nidia Berrio Rodriguez.

62.     Jorge Narmidez Martinez was a banana worker who was killed by the AUC, financed by Chiquita Brands, on February 26, 2002. He is survived by his mother, Plaintiff Luz Mery Perez Serna.

63.     Julio Cesar Graciano Torres was a banana worker who was killed by the AUC, financed by Chiquita Brands, on July 21, 2002. He is survived by his wife, Plaintiff Luz Mery Perez Serna, and their daughter.

## COUNT I – ALIEN TORT CLAIMS ACT, 28 U.S.C. § 1350, FOR PROVIDING MATERIAL SUPPORT TO A TERRORIST ORGANIZATION RESULTING IN DEATH

64.     Plaintiffs reallege and reaver paragraphs 1 through 63 as if fully set forth herein.

65.     Plaintiffs and their deceased family members are citizens of Colombia.

66.     The AUC is a designated terrorist organization by the U.S. State Department and is known for its violent activities, including, but not limited to, the murders of trade workers, drug trafficking, extortion and kidnapping.

13

67.     From 1997 to 2004, Chiquita Brands, directly and by and through is subsidiaries, agents, and employees, made approximately 100 payments to the AUC in an amount exceeding $1.7 million.

68.     At all times material hereto, Chiquita Brands knew or should have known that its relationship with the AUC would lead to the decedents' deaths.

69.     As a result of providing financial support to the AUC, Chiquita Brands violated established United States laws, international laws, treaties and norms, including, but not limited to:

a.     The Anti Terror Act, 18 U.S.C. 113B, and provisions re-enacted by,

b.     The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);

c.     The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001);

d.     The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S.;

e.     International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;

f.     International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109,1, U.N. Doc. A/RES/54/109; and,

g.     The law of nations.

70.     As a direct and proximate result of Chiquita Brands' actions, decedents were murdered.

14

71.     Plaintiffs have suffered damages, including emotional harm, lack of consortium, and financial support. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Chiquita Brands, award Plaintiffs compensatory and punitive damages, award Plaintiffs costs of suit, award Plaintiffs such other relief the Court deems just and proper, and request a trial by jury.

## COUNT II – ALIEN TORT CLAIMS ACT, 28 U.S.C. § 1350, FOR EXTRAJUDICIAL KILLING

72.     Plaintiffs reallege and reaver paragraphs 1 through 63 as if fully set forth herein.

73.     Chiquita Brands intentionally and/or recklessly caused their employees and/or agents to murder decedents. Through their employees and/or agents, Chiquita Brands knowingly aided and abetted the AUC that murdered decedents by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the AUC to murder decedents.

74.     Chiquita Brands' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, resulted in the death of decedents. Chiquita Brands is jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices. Chiquita Brands is also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices.

15

75.     Plaintiffs have suffered damages, including emotional harm, lack of consortium, and financial support. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Chiquita Brands, award Plaintiffs compensatory and punitive damages, award Plaintiffs costs of suit, award Plaintiffs such other relief the Court deems just and proper, and request a trial by jury.

## COUNT III – NEGLIGENT RETENTION AND SUPERVISION

76.     Plaintiffs reallege and reaver paragraphs 1 through 63 as if fully set forth herein.

77.     Chiquita Brands owed a duty to Plaintiffs to adequately supervise their employees and agents. Even if Chiquita Brands did not have actual knowledge of their employees' and agents' acts, the egregious and frequent nature of the acts should have given Chiquita Brands constructive knowledge. Moreover, because of the AUC's record of torture, kidnapping and murder, Chiquita Brands should have known that their employees and agents would continue to act improperly if not adequately supervised.

78.     Chiquita Brands' actions and omissions were a direct and substantial cause of the murder of decedents. Chiquita Brands failed to use due care to protect decedents from injury and harm, thereby proximately causing their injuries. Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Chiquita Brands, award Plaintiffs compensatory and punitive damages, award Plaintiffs

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

costs of suit, award Plaintiffs such other relief the Court deems just and proper, and request a trial by jury.

## COUNT IV – NEGLIGENT HIRING

79.     Plaintiffs reallege and reaver paragraphs 1 through 63 of this Complaint as if fully set forth herein.

80.     As a regular part of its operations, the Chiquita Brands hired and contracted with the AUC to oversee their operations in Colombia.

81.     Chiquita Brands failed to exercise reasonable care in hiring and contracting with the AUC.  At the time that Chiquita Brands selected, hired, and contracted with the AUC, Chiquita Brands knew or reasonably should have known that the AUC would violate Plaintiffs' rights and that, as a direct and proximate result of those violations, Plaintiffs would suffer injuries as alleged herein.

82.     Once the AUC were hired by Chiquita Brands, they were acting as joint employers, and Chiquita Brands exercised control over the operative details in Colombia.

83.     Chiquita Brands had the authority to prohibit, control, and/or regulate its operations in Colombia, so as to prevent these acts and omissions from occurring.

84.     Chiquita Brands' actions and omissions were a direct and substantial cause of the murder of decedents.  Chiquita Brands failed to use due care to protect decedents from injury and harm, thereby proximately causing their injuries.  Plaintiffs are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

17

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Chiquita Brands, award Plaintiffs compensatory and punitive damages, award Plaintiffs costs of suit, award Plaintiffs such other relief the Court deems just and proper, and request a trial by jury.

Respectfully submitted this 13th day of June, 2007.

William J. Wichmann
FL Bar No: 313270
E-Mail: wjw@conradscherer.com
CONRAD & SCHERER, LLP
Post Office Box 14723
Fort Lauderdale, FL 33302
Phone: (954) 462-5500
Fax: (954) 463-9244

18

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Antonio Gonzalez Carrizosa, et al.

CIV-ALTONAGA

## DEFENDANTS

Chiquita Brands International, Inc., and Chiquita Fresh North America, LLC.

(b) County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Conrad & Scherer, LLP       Tel-954-462-5500
William J. Wichmann
633 South Federal Highway- Fort Lauderdale, Fl 33302

MAGISTRATE JUDGE
TURNOFF

07-60821

Attorneys (If Known)

(d) Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

0:07CV 60 821-Altonaga-
Turnoff

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☑ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO

JUDGE                                    DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  06-13-07

FOR OFFICE USE ONLY

AMOUNT  350 00    RECEIPT #              IFP

540259

EXHIBIT C

1  JUDITH BROWN CHOMSKY
   LAW OFFICES OF JUDITH BROWN CHOMSKY
2  Post Office Box 29726
   Elkins Park, PA 19027
3  Telephone: (215) 782-8367
   Facsimile: (215) 782-8368
4  (Counsel of Record)

5  RICHARD HERZ, ESQ.
   MARCO SIMONS, ESQ. [S.B. #237314]
6  EARTHRIGHTS INTERNATIONAL
   1612 K Street N.W., Suite 401
7  Washington, DC 20006
   Telephone: (202) 466-5188
8  Facsimile: (202) 466-5189

9  [Counsel For Plaintiffs Continued On Next Page]

**RECEIVED**

JUL 1 9 2007

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

07- 3406 (JAG)

10            **UNITED STATES DISTRICT COURT**

11              **DISTRICT OF NEW JERSEY**

12

| | |
|---|---|
| JOHN DOE 1, individually and as representative of his deceased father JOHN DOE 2;<br>JANE DOE 1, individually and as representative of her deceased mother JANE DOE 2;<br>JOHN DOE 3, individually and as representative of his deceased brother JOHN DOE 4;<br>JANE DOE 3, individually and as representative of her deceased husband JOHN DOE 5;<br>MINOR DOES 1–4, by and through their guardian JOHN DOE 6, individually and as representative of their deceased mother JANE DOE 4;<br>JOHN DOE 7, individually and as representative of his deceased son JOHN DOE 8,<br><br>                         Plaintiffs,<br><br>        v.<br><br>CHIQUITA BRANDS INTERNATIONAL, INC., a New Jersey corporation;<br>MOE CORPORATIONS 1–10;<br>MOES 11-25,<br><br>                         Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>1.  EXTRAJUDICIAL KILLING<br>2.  CRIMES AGAINST HUMANITY<br>3.  TORTURE<br>4.  WAR CRIMES<br>5.  TERRORISM<br>6.  MATERIAL SUPPORT TO TERRORIST ORGANIZATIONS<br>7.  CRUEL, INHUMAN, OR DEGRADING TREATMENT<br>8.  VIOLATION OF THE RIGHTS TO LIFE, LIBERTY AND SECURITY OF PERSON AND PEACEFUL ASSEMBLY AND ASSOCIATION<br>9.  CONSISTENT PATTERN OF GROSS VIOLATIONS OF HUMAN RIGHTS<br>10. WRONGFUL DEATH<br>11. ASSAULT AND BATTERY<br>12. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>13. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS<br>14. NEGLIGENCE/NEGLIGENT HIRING/ NEGLIGENCE PER SE<br>15. LOSS OF CONSORTIUM<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

1   Counsel for Plaintiffs
    (continued from first page)

2

3   PAUL HOFFMAN                         ARTURO CARRILLO
    SCHONBRUN, DESIMONE, SEPLOW,        COLOMBIAN INSTITUTE OF
    HARRIS & HOFFMAN LLP                INTERNATIONAL LAW

4   723 Ocean Front Walk                5425 Connecticut Ave NW #219
    Venice, California 90210            Washington, DC 20015

5   Telephone: (310) 396-0731          Telephone: (202) 365-7260
    Facsimile: (310) 399-7040

6

7   On information and belief, Plaintiffs, by their attorneys, allege as follows:

8                                    **ADDRESSES**

9       1.      Pursuant to Local Civil Rule 10.1(a), all Plaintiffs can be contacted through their counsel,

10  EarthRights International, 1612 K Street NW #401, Washington, DC 20006.  The street and postal

11  addresses of the individual Plaintiffs cannot be made public due to the substantial risk of violent

12  reprisals against them.  The street and postal address of Defendant Chiquita Brands International, Inc.

13  (CBI), is 250 East Fifth Street, Cincinatti, Ohio 45202; their local office in New Jersey is 20 Berry Place,

14  Glen Rock, New Jersey 07452.  The street and postal addresses of Defendants Moe Corporations 1–10

15  and Moes 11–25 are presently unknown to Plaintiffs.

16                                  **INTRODUCTION**

17      2.      This case arises as a result of the actions of Defendant Chiquita Brands International, Inc.,

18  and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting

19  terrorist organizations in Colombia, in order to maintain its profitable control of Colombia's banana-

20  growing regions.  Plaintiffs are family members of trade unionists, banana workers, political organizers,

21  social activists, and others targeted and killed by terrorists, notably the paramilitary organization United

22  Self-Defense Committees of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), during the

23  1990s through 2004.  In order to operate its banana production in an environment free of labor

24  opposition and social disturbances, Chiquita funded, armed, and otherwise supported the AUC and other

25  terrorist groups during this period.  The deaths of Plaintiffs' relatives were a direct, foreseeable, and

26  intended result of Chiquita's illegal and tortious actions.  Chiquita's actions violated not only Colombian

27  law and U.S. law, but also international law prohibiting crimes against humanity, extrajudicial killing,

28

2

torture, war crimes, and other abuses.

**JURISDICTION**

3.     The Court has jurisdiction over this case under 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §1350 (Alien Tort Claims Act); 18 U.S.C. § 1964(c) (Racketeer Influenced and Corrupt Organizations Act); and 28 U.S.C. §1332 (diversity jurisdiction). Plaintiffs and Defendants are citizens of different states and the damages sought by this Complaint exceed the jurisdictional minimum for this Court.

4.     In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of the State of New Jersey or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

**PARTIES**

5.     The term "Plaintiffs" herein includes the named plaintiffs and the decedent on behalf of whom they bring this action.

6.     Plaintiff John Doe 1 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased father, John Doe 2.

7.     Plaintiff Jane Doe 1 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased mother, Jane Doe 2.

8.     Plaintiff John Doe 3 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased brother, John Doe 4.

9.     Plaintiff Jane Doe 3 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased husband, John Doe 5.

10.    Minor Does 1–4 are residents and citizens of Colombia. They are all minor children, who prosecute this action by and through their guardian John Doe 6. They bring this action individually and as representatives of their deceased mother, Jane Doe 4.

11.    Plaintiff John Doe 7 is a resident and citizen of Colombia. He bring this action individually and as representative of his deceased son, John Doe 8.

12.    Defendant Chiquita Brands International, Inc., is a United States-based corporation organized under the laws of the State of New Jersey. Its corporate headquarters are located in

CLASS ACTION COMPLAINT

3

Cincinnati, Ohio. CBI is a leading international producer, distributor, and marketer of bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas in Europe and North America. The company was founded in 1899 as the United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

13. On information and belief, at all times relevant herein, CBI wholly owned, dominated and controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia. Banadex produced bananas in the Urabá and Santa Marta regions of Colombia and, by 2003, was Chiquita's most profitable banana-producing operation. At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

14. Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued herein as Moe Corporations 1–5 and Moes 6–25, and Plaintiffs sue these Defendants by such fictitious names and capacities. Plaintiffs will amend this Complaint to allege the Moes' true names and capacities when ascertained. Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Defendants, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CBI and Banadex.

15. At all times herein material, with respect to the events at issue, CBI, Banadex, Moe Corporations 1–5 and Moes 6–25 conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope

CLASS ACTION COMPLAINT

4

of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification. Whenever reference is made in this Complaint to any conduct by a defendant, such allegations and references shall be construed to mean the conduct of each of the defendants, acting individually, jointly, and severally.

16.     At all times herein material, with respect to the events at issue, Chiquita conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC, and the terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity. The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel both in Colombia and the United States.

17.     Plaintiffs are informed and believe and based upon such information and belief allege that CBI management and other personnel in the United States and in Colombia were informed of the ongoing events complained of herein and personally participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

## STATEMENT OF FACTS

### The Colombian Conflict and Paramilitary Terrorist Organizations

18.     In the early 1980s, Colombia saw a vast expansion in trade in illegal drugs, particularly cocaine. An emerging class of drug barons began to create private armies to combat left-wing guerrilla forces, including the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarios de Colombia*, or FARC) and the National Liberation Army (*Ejercito Nacional de Liberacion*, or ELN), who were engaged in terrorist activities such as extortion, kidnappings, and assassinations. These paramilitaries acted autonomously and were dispersed, and their influence was reduced to the local scale.

19.     In 1981, the Medellín cartel created a death squad, *Muerte a Secuestradores* ("Death to Kidnappers"), that targeted guerillas for elimination and adopted brutal, terrorist tactics. As the 1980s progressed, paramilitaries maintained links with drug barons, large landowners, industrialists, and bankers who funded them, although in some cases they achieved some autonomy in their violent activities.

CLASS ACTION COMPLAINT

20. By the mid 1990s, paramilitary groups had achieved a substantial degree of independence due to their increased participation in, and benefit from, drug trafficking. The largest and most well-organized paramilitary group in Colombia was the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá,* or ACCU). The organization featured a central command that coordinated the activities of local fronts. Both mobile and stationary units existed, and fighters received a base salary plus food, a uniform, weapons, and munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade. In 1994, Castaño and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership. At all times relevant to this Complaint, Castaño remained the leader of the AUC.

21. The AUC grew rapidly in size during the late 1990s and into the twenty-first century. In 1997, it comprised roughly 4,000 combatants. By 2001, Castaño claimed to have 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present in nearly the whole of Colombia. AUC leaders have claimed that the organization comprised as many as 17,000 armed fighters and 10,000 associates at its peak before a demobilization process that began in 2004.

22. The efforts of the AUC were directed toward elimination of anyone considered close to the guerrillas or who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power. The AUC's primary method was terrorism against individuals or communities. To this end, the AUC, like the ACCU before it, routinely engaged in death threats, extrajudicial killings, massacres, torture, rape, kidnapping, forced disappearances, and looting. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians targeted by a policy of political and social cleansing, typically rural workers, trade unionists, community activists, human rights defenders, leftist politicians, judicial investigators, indigenous persons, and anyone considered socially undesirable (including suspected petty criminals). Inhabitants of small towns in contested rural areas were particularly vulnerable. AUC violence has often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of

CLASS ACTION COMPLAINT

6

such massacres and the looting and destruction that commonly accompanied them.

23.     The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out systematically. The ACCU operated throughout the banana-growing region of Uraba, as well as in other parts of Colombia, and on many occasions from at least 1994 through 2004 carried out multiple executions or massacres; the ACCU and other AUC groups were responsible for at least 150 massacres by 1997. From its founding, its activities and abuses have been carried out under the direction of a central command.

24.     The AUC and its constituent groups, including the ACCU, have, at least since 1994, been participating in an internal armed conflict in Colombia, at times engaging in direct conflict with guerrilla armies. The AUC itself has accepted that it is subject to the laws of war, with the limited exception that it believes it has the privilege to execute guerrillas *hors de combat*, and has accepted training in the laws of war from the International Committee of the Red Cross.

25.     Longstanding and pervasive ties exist between the AUC and official Colombian security forces, which include the Colombian Armed Forces and the Colombian National Police. Collusion with government forces has been a feature of Colombian paramilitaries since their inception. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in campaigns of the official armed forces against guerilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Although a 1989 government decree established criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division," in addition to the five official divisions of the Colombian Army.

26.     Government security forces have habitually tolerated the presence of paramilitaries, willfully failed to prevent or interrupt their crimes, actively conspired with them, and coordinated

CLASS ACTION COMPLAINT

7

activities with them. Documented examples include:

- Allowing paramilitaries to establish permanent bases and checkpoints without interference;

- Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;

- Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;

- Failing to intervene to stop ongoing massacres occurring over a period of days;

- Sharing intelligence, including the names of suspect guerilla collaborators;

- Sharing vehicles, including army trucks used to transport paramilitary fighters;

- Supplying weapons and munitions;

- Allowing passage through roadblocks;

- Providing support with helicopters and medical aid;

- Communicating via radio, cellular telephones, and beepers;

- Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and

- Planning and carrying out joint operations.

27. In a recurring pattern, paramilitaries have taken over villages and assaulted inhabitants while nearby security forces have either not intervened or have intervened to facilitate the violence. In October 1997, for example, members of the Army's Fourth Brigade reportedly established a perimeter around the village of El Aro, in Antioquia. While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed the pipes that fed the homes potable water. Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee. In January 2001, more than one hundred AUC fighters took over the village of Chengue, in Sucre. The AUC executed twenty-five people before setting fire to the village and forcibly disappearing ten additional villagers. Troops from the First Marine Infantry Unit positioned outside the village allegedly prevented humanitarian organizations from entering the area to aid survivors. Myriad

CLASS ACTION COMPLAINT

similar incidents have been reported.

28.    The violent and terroristic activities of the AUC and its constituent groups, including the ACCU, have at all times been well-known throughout Colombia and the world.

**Chiquita's Support of the AUC and Other Terrorists**

29.    Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century. At all relevant times, Chiquita has produced bananas in the Urabá and Santa Marta regions of Colombia.

30.    On information and belief, from the early 1990s until at least 1997, Chiquita provided material support, including money, to terrorist organizations such as the ACCU and other predecessors of the AUC.

31.    On information and belief, in the years prior to Chiquita's provision of support to the paramilitaries, these armed groups did not control the territory of the banana-producing regions of Colombia. The collaboration with Chiquita allowed the paramilitaries to consolidate as the decisive actor in the political, military, and social terrain of the banana region. In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition was suppressed.

*Payments to the AUC*

32.    From 1997 until at least February 2004, Chiquita provided material support to the AUC in Urabá and Santa Marta. By 1997, the AUC effectively controlled large swathes of territory, as well as exerting influence in institutions such as labor organizations and local governments, in these regions. On information and belief, the stability and social control provided by the AUC was to Chiquita's benefit, in allowing exportation of bananas without interruption due to conflict. The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife. The AUC also provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities and social program.

33.    Chiquita paid the AUC, directly or indirectly, nearly every month during the period

CLASS ACTION COMPLAINT

9

1997–2004, making over one hundred payments to the AUC totaling over $1.7 million. Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees. Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. Payments made to the AUC or to front organizations were recorded in Chiquita's corporate books and records as "security payments" or payments for "security" or "security services." Other payments, made to Banadex executives with the intent that they would be withdrawn as cash and handed directly to the AUC, were recorded as income contributions.

34.     At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary organization. On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"), and that designation was well-publicized in the American public media, including in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001, as well as in the Colombian media.

35.     In 2003, Chiquita consulted with attorneys from the District of Columbia office of a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC. Outside counsel advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Among other things, outside counsel advised Chiquita:

- "Must stop payments."
- "Bottom Line: CANNOT MAKE THE PAYMENT"
- "General Rule: Cannot do indirectly what you cannot do directly"
- "Concluded with: CANNOT MAKE THE PAYMENT"
- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
- "[T]he company should not make the payment."

36.     Although CBI's Board of Directors agreed to disclose its payments to the AUC to the U.S. Department of Justice on or about April 3, 2003, on April 8, 2003, CBI instructed Banadex to continue making the payments to the AUC. On April 24, 2003, CBI met with Justice Department officials, who told CBI the payments were illegal. Nonetheless, Chiquita continued to make the payments until at least February 2004.

37.     On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist. The company's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

*Other Support of the AUC*

38.     In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

39.     The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

40.     Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo. The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 millions rounds of ammunition. These arms and ammunition were then transferred to the AUC.

41.     On information and belief, Chiquita facilitated at least four other arms shipments to the AUC. In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

42.     On information and belief, Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

CLASS ACTION COMPLAINT

11

43. On information and belief, Chiquita also assisted the AUC by allowing the use of its private port facilities not only for the illegal importation of arms, but also for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC. Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly allowed use of its port and banana transportation boats for this purpose.

### Plaintiffs' Injuries

#### *John Doe 1/John Doe 2*

44. John Doe 1's father, John Doe 2, was a banana worker in Uraba and active in labor organizing. In 2001, this area was effectively controlled by the AUC.

45. In 2001, John Doe 2 was traveling by bus from his home to the banana farm. The bus was stopped by AUC paramilitaries. The paramilitaries removed John Doe 2 from the bus and executed him.

46. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 2 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of John Doe 2 by removing a labor activist who threatened the stability of Chiquita's operations.

#### *Jane Doe 1/Jane Doe 2*

47. Jane Doe 1's mother, Jane Doe 2, lived in a town in Uraba with her family. She was involved in civic and social activities of which the AUC did not approve, including advocating for marginalized groups.

48. In 1998, Jane Doe 2 told Jane Doe 1 that she was afraid she would be killed for her activities. Approximately one week later, AUC paramilitaries arrived at Jane Doe 2's house. In the presence of her family, the paramilitaries removed Jane Doe 2 from her house, and then executed her. Subsequently, the family of Jane Doe 2, including Jane Doe 1, fled their community in fear.

49. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 2 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of Jane Doe 2 by removing a social activist who threatened the stability of Chiquita's operations and the generally established social order.

CLASS ACTION COMPLAINT

12

*John Doe 3/John Doe 4*

50.    John Doe 3's brother, John Doe 4, was a banana worker at a plantation in Uraba, and a leader of a labor union committee.

51.    In 1998, John Doe 4 was involved in a protest against low wages. John Doe 3 and John Doe 4 were eating lunch at their banana plantation when AUC paramilitaries approached John Doe 4, identified him by name, and executed him.

52.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 4 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of John Doe 4 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 3/John Doe 5*

53.    Jane Doe 3's husband, John Doe 5, was a banana worker in Uraba.

54.    In 1997, John Doe 5 became a target of AUC paramilitaries because they accused him of paying ransom to the FARC for his kidnapped brother. The AUC took John Doe 5 from his banana farm and executed him. AUC paramilitaries subsequently told John Doe 5's family that they had killed him.

55.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 5 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of John Doe 5 by strengthening the AUC itself, in sending a message that payment of revenue to AUC opponents such as the FARC would be dealt with harshly.

*Minor Does 1–4/John Doe 6/Jane Doe 4*

56.    The mother of Minor Does 1–4, Jane Doe 4, was involved in civic and social activist, engaging in activities of which the AUC did not approve, in a town in Uraba, where she lived with her family.

57.    In 2004, AUC paramilitaries came to Jane Doe 4's house and executed her in the presence of her family. Subsequently, the family of Jane Doe 4, including Minor Does 1–4, fled their community in fear.

58.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 4 through its support of the AUC in Uraba. On information and belief,

CLASS ACTION COMPLAINT

Chiquita benefited from the death of Jane Doe 4 by removing a social activist who threatened the stability of Chiquita's operations and the generally established social order.

*John Doe 7/John Doe 8*

59.    John Doe 7's son, John Doe 8, was a banana worker at a plantation in Uraba.

60.    In 2000, John Doe 8 was accused by AUC paramilitaries of stealing from a banana farm. John Doe 8 was taken by an AUC paramilitary commander and executed.

61.    When John Doe 7 approached the AUC about the killing, the commander said that they had killed John Doe 8 because the AUC were guarding the farm and responsible to prevent thefts, and suggested that they had eliminated a social undesirable. The commander also threatened John Doe 7 about pursuing an investigation.

62.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 8 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of John Doe 8 by sending a message that stealing from banana farms would result in being put to death without benefit of any judicial process.

**GENERAL ALLEGATIONS**

63.    At all times, Defendants knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.

64.    The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces. Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including fourteen current members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors. Furthermore, Chiquita's payments to the AUC were facilitated by CONVIVIRs, which are licensed by and operate with the express authority of the government.

65.    The acts described herein were conducted in the course of an internal armed conflict, in

CLASS ACTION COMPLAINT

14

which the AUC and other paramilitaries were engaged in combat with guerrilla armies, and committed the abuses against Plaintiffs and decedents as part of their prosecution of this conflict. The AUC and other paramilitaries were also engaged in this conflict in partnership with the Colombian military.

66. The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack.

67. The acts and injuries to Plaintiffs and decedents described herein were part of a pattern and practice of systematic human rights violations requested, paid for, ordered, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

68. As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damages, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

69. Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions and treaties:

(a) Alien Tort Claims Act, 28 U.S.C. § 1350;

(b) Torture Victims Protection Act, 28 U.S.C. § 1350, note;

(c) Customary international law;

(d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f) International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51

CLASS ACTION COMPLAINT

15

(1984);

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i) Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;

(j) Common law of the United States of America;

(k) Statutes and common law of the State of New Jersey, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent hiring, civil conspiracy, and loss of consortium; and the

(l) Laws of Colombia.

70.     Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary Banadex. On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there. Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them. The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities. Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts. Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

71.     Legal action by Plaintiffs in Colombia would also result in serious reprisals. Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

72.     Plaintiffs were unable to bring suit in Colombia or the United States until the past year due to the poor security situation and the danger of reprisals, which Chiquita's support of the AUC contributed to.

## CLASS ACTION ALLEGATIONS

CLASS ACTION COMPLAINT

73.     Plaintiffs seek certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs allege that Chiquita supported a campaign of military and social control by the ACCU, and AUC, and/or other paramilitary groups from at least 1994 through 2004, whose goal, supported by Chiquita, was to exert total control over the land and inhabitants of the banana-growing region of Colombia.  Plaintiffs seek to represent a class consisting of all persons (including relatives and/or legal representatives of decedents) subjected to abuses by this campaign in the banana-growing region from 1994 through 2004.  Victims include, but are not limited to, individuals who were the objects of acts constituting extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced displacement; crimes against humanity; or crimes against civilians constituting war crimes.

74.     The members of the Class are so numerous that joinder of all members is impractical. The exact number and identities of all Class members is not currently known. According to reliable statistics, however, the AUC was responsible for many thousands of killings and many hundreds of massacres in Colombia between 1997 and 2004.  In 2001 alone, the AUC is believed to have committed at least 1,015 killings and over one hundred massacres; in 2003, the organization was allegedly responsible for the killing or disappearance of at least 1,300 people. In the banana-growing region of Uraba alone, human rights organizations have documented over 3,700 murders by the AUC during 1996–2004 and 60,000 forced displacements during the same period.  These figures suggest that the Class at minimum numbers in the thousands and may exceed ten thousand.

75.     There are questions of law and fact that are common to the Class, including but not limited to:

(a)     whether Defendants provided financial assistance to the AUC;

(b)     whether financial assistance provided to the AUC by Defendants substantially assisted it in perpetrating violations of Plaintiffs' fundamental human rights;

(c)     whether Defendants knew, or recklessly ignored, that the payments they made to the AUC were used to finance a campaign of terror directed at the civilian population in Colombia's banana-growing region;

(d)     whether Defendants provided support to the AUC for the purpose of suppressing labor

CLASS ACTION COMPLAINT

17

and community opposition;

 (e) whether Defendants knew, or recklessly ignored, that their business activities in Colombia, which earned them millions of dollars, resulted in the extrajudicial killing, forced disappearance, kidnapping, rape, forced displacement, property destruction, torture, or cruel, inhuman, or degrading treatment of civilians who lived in Colombia;

 (f) whether the AUC acted as an agent of Defendants in carrying out a campaign of murder and intimidation directed at union leaders, community activists, and political operatives in the areas of Colombia where Defendants had their banana-producing operations, including whether Defendants ratified such acts;

 (g) whether Defendants conspired with or aided and abetted the AUC in illegally importing weapons and ammunition from Nicaragua into Colombia for use by the AUC in its paramilitary campaigns;

 (h) whether the AUC, in committing the injuries inflicted on Plaintiffs, acted under the color of state law and in a joint venture with official Colombian security forces;

 (i) whether the actions of the AUC constitute war crimes;

 (j) whether the actions of the AUC constitute crimes against humanity;

 (k) whether Defendants' actions as set forth herein constitute violations of international, New Jersey, and/or Colombia law;

 (l) whether Defendants have been unjustly enriched by the violations set forth herein;

 (m) whether Defendants' behavior was negligent;

 (n) whether this Court has jurisdiction over the claims of the Class against Defendants;

 (o) whether this Court should order restitution or disgorgement of revenues and profits relating to the violations described herein; and

 (p) whether Defendants should be subject to awards of compensatory and/or punitive damages and the proper measure thereof.

 76. Plaintiffs' claims are typical of those of the Class in that Plaintiffs were civilians inhabiting Colombia whose fundamental human rights were violated by the AUC during the time period in which the AUC received financial and other assistance from Defendants.

CLASS ACTION COMPLAINT

77.     Plaintiffs will fairly represent the interests of the Class because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain. Plaintiffs have no interests that conflict with or are contrary to the interests of other Class members.

78.     Plaintiffs will adequately represent the class in that they are represented by counsel with extensive experience in international human rights and class action litigation.

79.     Pursuant to Fed. R. Civ. P. 23(b)(3), questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

80.     Pursuant to Fed. R. Civ. P. 23(b)(1)(B), adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications and/or would substantially impair or impede their ability to protect their interests.

81.     Statistics gathered on human rights abuses committed by the AUC during the years 1997 to 2004 indicate that the Class at minimum numbers in the thousands and may exceed ten thousand. In other cases involving claims for human rights abuses under the Alien Tort Statute and the Torture Victims Protection Act, individual plaintiffs have received multi-million-dollar damage awards. Successful actions against Defendants pursued independently by individual Class members could thus result in combined damages of hundreds of millions or billions of dollars.

82.     From January 1, 2007, through June 1, 2007, the average total market capitalization for CBI was approximately $645 million. According to CBI's 2006 annual report, its total cash and cash equivalents amount to $65 million.

83.     Upon information and belief, the amount of damages which CBI can currently afford to pay is exceeded by the claims of the Class members.

84.     Although most Class members are located in Colombia, this will not hamper the ability to pursue this case as a class action since communication with Class members can be made with the assistance of various attorneys and non-governmental organizations operating in Colombia.

**FIRST CLAIM FOR RELIEF**

(Extrajudicial Killing)

85. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

86. The deliberate killings, under color of law, of John Doe 2, Jane Doe 2, John Doe 4, John Doe 5, Jane Doe 4, and John Doe 8, were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

87. The acts described herein constitute extrajudicial killing in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

88. Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the extrajudicial killings committed against Plaintiffs.

**SECOND CLAIM FOR RELIEF**

(Crimes Against Humanity)

89. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

90. The acts described herein against Plaintiffs constitute crimes against humanity, in violation of customary international law which prohibits inhumane acts of a very serious nature such as willful killing, torture, and arbitrary arrest and detention and other inhumane acts committed as part of a widespread or systematic attack against any civilian population or persecutions on political, racial, ethnic, cultural, or religious grounds. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

CLASS ACTION COMPLAINT

91. Defendants participated in the widespread and systematic attack by persecution, by threats, murder, and other means, of persons perceived to be opponents of the AUC or of its allies, including Chiquita; of indigenous peoples; and of persons considered by Defendants and the AUC to be politically, culturally, socially, or ethnically undesirable.

92. The acts described herein constitute crimes against humanity in violation of the Alien Tort Statute, customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

93. Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

## THIRD CLAIM FOR RELIEF

### (Torture)

94. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

95. Plaintiffs and their relatives were caused by the AUC to suffer severe mental or physical pain, inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons.

96. The acts described herein against Plaintiffs and decedents constitute torture, in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

97. Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to torture Plaintiffs.

**FOURTH CLAIM FOR RELIEF**

(War Crimes)

98.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

99.     Colombia has been engaged in an ongoing civil conflict with active hostilities, including during the time of the events alleged in this Complaint. These ongoing hostilities constitute an armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, as defined in Common Article 3 of the 1949 Geneva Conventions. Defendants, through their actions conspiring with the AUC, its actions in support of the AUC, and/or its actions carried out through the AUC, are liable for war crimes perpetrated with their participation and/or ratification.

100.     Plaintiffs were civilians that took no part in the hostilities. Defendants made Plaintiffs the object of attack and threats in violation of the laws of war. The acts described herein constitute violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out of executions without previous judgment pronounced by a regularly constituted court, incidents of outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

101.     The crimes described herein are war crimes in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above, including Common Article 3 of the Geneva Conventions and Protocol II to those Conventions. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

102.     Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

**FIFTH CLAIM FOR RELIEF**

CLASS ACTION COMPLAINT

22

(Terrorism)

103.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

104.    The abuses described above were premeditated, politically-motivated acts of violence committed against noncombatant civilians for the purpose of instilling fear, targeting political opponents, and generally terrorizing a civilian population.

105.    The abuses described herein constitute terrorism in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the statutes and common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

106.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the acts of terrorism against Plaintiffs.

**SIXTH CLAIM FOR RELIEF**

(Material Support to Terrorist Organizations)

107.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

108.    At all times relevant to this Complaint, the AUC has been an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets.  The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Defendants were aware of such activities.  From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization.

109.    As detailed above, Defendants provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons.

110.    Defendants knew, or should have known, that providing such support would cause Plaintiffs' injuries, and this support did in fact proximately cause Plaintiffs' injuries by giving the AUC

CLASS ACTION COMPLAINT

23

the means to carry out acts of terrorism and violence.

111. The acts of providing assistance to the AUC described herein constitute material support to a terrorist organization in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the statutes and common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan

112. Defendants are liable to Plaintiffs for said conduct in that Defendants directed, ordered, confirmed, ratified, aided and abetted, recklessly allowed, and/or conspired to accomplish the provision of material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

### SEVENTH CLAIM FOR RELIEF

(Cruel, Inhuman, or Degrading Treatment)

113. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

114. The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

115. The acts described herein against Plaintiffs and decedents constitute cruel, inhuman, and degrading treatment or punishment, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

116. Defendants' acts alleged herein caused Plaintiffs to be placed in great fear for their lives and forced them to suffer severe physical and psychological abuse and agony.

117. Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the

CLASS ACTION COMPLAINT

24

Colombian military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

## EIGHTH CLAIM FOR RELIEF

(Violation of the Rights to Life, Liberty and Security of Person
and Peaceful Assembly and Association)

118.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

119.    The execution of the decedents as a result of their or others' opposing the activities of the AUC, Chiquita, or other interests allied with the AUC violated and deprived them of their rights to life, liberty and security of person, and their rights to peaceful assembly and association for which each defendant may be held liable.

120.    The wrongful acts described herein violated and deprived Plaintiffs of their rights to life, liberty and security of person, and to peaceful assembly and association, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

121.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the violations and deprivations of the rights to life, liberty and security of person and peaceful assembly and association.

## NINTH CLAIM FOR RELIEF

(Consistent Pattern Of Gross Violations Of Internationally Recognized Human Rights)

122.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

123.    The above-described abuses against Plaintiffs and decedent occurred within the context of numerous similar abuses and killings, comprising a consistent pattern of gross violations of human rights.

CLASS ACTION COMPLAINT

124.   The wrongful acts described herein violated and deprived Plaintiffs of their rights to life, liberty and security of person, to peaceful assembly and association, and to be free from torture, extrajudicial killing, and cruel, inhuman and degrading treatment, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

125.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the violations and deprivations of these rights.

### TENTH CLAIM FOR RELIEF

#### (Wrongful Death)

126.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

127.   As a direct result of Defendants' acts and omissions and as a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

128.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the wrongful deaths of the decedents..

129.   The acts described herein constitute wrongful death, actionable under the laws of New Jersey, the United States, and Colombia.

### ELEVENTH CLAIM FOR RELIEF

#### (Assault and Battery)

130.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

131.   Defendants' actions constituted offensive and harmful touching of Plaintiffs' persons without the consent of Plaintiffs, and/or the creation of a reasonable apprehension that such touching

CLASS ACTION COMPLAINT

1   would result.

2       132.   As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered

3   severe physical and psychological abuse and agony.

4       133.   Defendants' acts were willful, intentional, wanton, malicious, and oppressive.

5       134.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

6   requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

7   ratified, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and

8   decedents.

9       135.   The acts described herein constitute assault and battery, actionable under the laws of New

10   Jersey, the United States, and Colombia.

11                     **TWELFTH CLAIM FOR RELIEF**

12              (Intentional Infliction of Emotional Distress)

13       136.   The allegations set forth in the above paragraphs are realleged and incorporated by

14   reference as if fully set forth herein.

15       137.   The acts described herein constitute extreme and outrageous conduct in violation of all

16   normal standards of decency and were without privilege or justification.

17       138.   These outrageous acts were intentional and malicious and done for the purposes of

18   causing Plaintiffs to suffer humiliation, mental anguish, and extreme emotional and physical distress.

19       139.   As a direct and proximate result of Defendants' acts, Plaintiffs were placed in great fear

20   for their lives and were forced to suffer severe physical and psychological abuse and agony. The distress

21   suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure it.

22       140.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

23   requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

24   ratified, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress

25   of Plaintiffs and decedents.

26       141.   Defendants' outrageous conduct constitutes the intentional infliction of emotional distress

27   and is actionable under the laws of New Jersey, the United States, and Colombia.

28                      **THIRTEENTH CLAIM FOR RELIEF**

CLASS ACTION COMPLAINT

1    (Negligent Infliction of Emotional Distress)

2    142.    The allegations set forth in the above paragraphs are realleged and incorporated by

3    reference as if fully set forth herein.

4    143.    At all relevant times, Defendants owed Plaintiffs a duty to act with reasonable care,

5    and/or injury to Plaintiffs was reasonably foreseeable.

6    144.    At all relevant times, Defendants had the power, ability, authority, and duty to stop

7    engaging in the wrongful conduct herein and to intervene to prevent or prohibit such conduct.

8    145.    At all relevant times, Defendants knew, or should have known, that the conduct described

9    herein would and did proximately result in physical and emotional distress to Plaintiffs. Despite said

10   power, knowledge, and duty, Defendants breached its duty to Plaintiffs and negligently failed to act so as

11   to stop engaging in the conduct described herein and to prevent or prohibit such conduct or otherwise to

12   protect Plaintiffs.

13   146.    As a direct and legal result of Defendants' wrongful acts, Plaintiffs have suffered and will

14   continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish

15   and emotional distress. The distress suffered by Plaintiffs is severe enough that no reasonable person

16   could be expected to endure it.

17   147.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

18   requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

19   ratified, and/or conspired with the AUC in bringing about the negligent infliction of emotional distress

20   of Plaintiffs and decedents.

21   148.    Defendants' conduct constitutes the negligent infliction of emotional distress and is

22   actionable under the laws of New Jersey, the United States, and Colombia.

23   **FOURTEENTH CLAIM FOR RELIEF**

24   (Negligence/Negligent Hiring/Negligence Per Se)

25   149.    The allegations set forth in the above paragraphs are realleged and incorporated by

26   reference as if fully set forth herein.

27   150.    Despite having the duty to do so, Defendants failed to use ordinary or reasonable care in

28   order to avoid injury to Plaintiffs, including but not limited to through their negligent financial support

CLASS ACTION COMPLAINT

28

of the AUC and their participation in the transfer of arms and ammunition to the AUC. Defendants' conduct failed to protect Plaintiffs from an unreasonably great risk of harm. Defendants' negligence was a cause of injury, damage, loss, or harm to Plaintiffs and their next of kin.

151. Defendants' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

152. As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of New Jersey, the United States, and Colombia.

## FIFTEENTH CLAIM FOR RELIEF

### (Loss of Consortium)

153. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

154. At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses and parents to the Plaintiffs who are their spouses and children.

155. As a result of the acts of Defendants, those Plaintiffs who are the spouses and children of the decedents have been deprived of the decedents' society, comfort, attention, services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

156. Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

157. Defendants' conduct constitutes loss of consortium and is actionable under the laws of New Jersey, the United States, and Colombia.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

CLASS ACTION COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of $75,000, as follows:

    (a)    for compensatory damages, including general and special damages;

    (b)    for punitive damages;

    (c)    for injunctive and declaratory relief as this Court deems appropriate;

    (d)    for disgorgement of profits;

    (e)    for treble damages;

    (f)    for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

# JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.


DATED:  July 18, 2007                  Respectfully submitted,

Judith Brown Chomsky
Attorneys for Plaintiffs

CLASS ACTION COMPLAINT

# INITIAL CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, plaintiffs certify that the matter in controversy in this case is the subject of the following pending actions:

*Doe v. Chiquita Brands Int'l, Inc.*, No. 1:07-cv-01048 (D.D.C. June 7, 2007)

Plaintiffs: Jane/John Does 1–144

Defendants: Chiquita Brands International, Inc.; David Does 1–10


*Gonzalez Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-60821 (S.D. Fla. June 13, 2007)

Plaintiffs: Antonio Gonzalez Carrizosa, Julia Ester Durango Higita, Liliana Maria Cardona, Maria Patricia Rodriguez, Ana Francisca Palacios Moreno, Luz Marleni Durango David, Rosa Zuniga Ibargen, Luis Amparo Cogollo Osorio, Celia Modesta Narvaez de Madrid, Edith Montiel Ballesteros, Maria de la Cruz Varelas Lopez, Ana Dolis Alcaraz, Silvia Luz Acevedo de Builes, Juan Pablo Orozco Builes, Maria Camila Orozco Builes, Isabel Cristina Orozco Builes Catalina del Carmen Altamiranda de Meza, Eipolita Cardales Moreno, Nancy del Carmen Mayo, Luz Nidia Berrio Rodriguez, Luz Mery Perez Serna

Defendants: Chiquita Brands International, Inc., and Chiquita Fresh North America LLC

DATED:  July 18, 2007

Respectfully submitted,

Judith Brown Chomsky
Attorneys for Plaintiffs

INITIAL CERTIFICATION PURSUANT TO L. CIV. R. 11.2

1

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
……………………………………………………………..x
JUAN/JUANA DOES 1-377 Individually                              07 cv 10300 (HB)
and/or as Legal Heirs and/or Personal Representatives of        "ECF CASE"
JOSE/JOSEFINA DOES 1A-375 (said names being fictitious),

                                             Plaintiffs,

             - against -                                        **COMPLAINT**

CHIQUITA BRANDS INTERNATIONAL, INC.,
INDIVIDUALS "A THROUGH J" (whose identities
are presently unknown), MOE CORPORATIONS 1-5
and MOES 6-25 (said names being fictitious).

                                             Defendants.
……………………………………………………………...x

             Plaintiffs, by and through their attorneys, the **LAW FIRM OF**

**JONATHAN C. REITER**, complaining of the defendants, respectfully allege upon

information and belief as follows:

                              **INTRODUCTION**

             This is an action seeking damages for terrorism, war crimes, crimes

against humanity, extrajudicial killing, torture and wrongful death of plaintiffs' decedents

and/or individual living plaintiff(s) committed by defendant CHIQUITA BRANDS

INTERNATIONAL, INC. (CHIQUITA), its officers, directors, agents, servants and

employees, acting in concert with, aiding, abetting, facilitating, soliciting, directing,

orchestrating and conspiring with Colombian paramilitaries and their collaborators in

those atrocities, in violation of the Law of Nations, the laws of the United States of

America and of individual states, including but not limited to the State of Ohio, and the

laws of the Republic of Colombia.

**JURISDICTION**

1.     The Court has subject matter jurisdiction over this case under the Alien

Tort Claims Act (ATCA) 28 U.S.C. § 1350 and the Torture Victim Protection Act of

1991 (TVPA) 28 U.S.C. § 1350, note,§ 2(a) and 28 U.S.C. § 1331 (Federal Question

Jurisdiction), and 28 U.S.C. § 1332 (diversity jurisdiction).  Plaintiffs also invoke the

supplemental jurisdiction of this Court with respect to claims based upon the laws of the

State of Ohio, the Republic of Colombia and/or any other applicable jurisdiction pursuant

to 28 U.S.C. § 1367.

2.     All plaintiffs are citizens of the Republic of Colombia.

3.     All plaintiffs and plaintiff's decedents are or were aliens, being and/or

having been citizens or subjects of a foreign state.

4.     Defendant CHIQUITA is a United States corporation organized under the

laws of the State of New Jersey, having its principal place of business and corporate

headquarters at 250 East 5th Street, Cincinnati, Ohio 45202.

5.     The amount in controversy, both individually and collectively, exceeds

$75,000.

**PARTIES**

The Plaintiffs

6.     There are a total of 377 plaintiffs, of whom 370 JUAN/JUANA DOE

Plaintiffs are the legal heirs of 387 JOSE/JOSEFINA DOES who were

murdered/disappeared by Colombian paramilitaries of the "Autodefensas Unidas de

Colombia" (commonly known as and referred to hereinafter as the "AUC"), a violent,

right-wing organization in the Republic of Colombia, and their collaborators.  The decedents are given numbers corresponding to the numbers used for their heirs.  Where a JUAN DOE is heir to more than one JOSE DOE, the additional decedents are given letter designations (such as JOSE DOE 1A, 1B etc.), so that the numbers correspond to the numbers used for heirs.  In addition, plaintiffs JUAN/JUANA DOE 103, 113, 115, 343, 356 and 376 were tortured and shot by AUC paramilitaries and survived.  Accordingly claim is made for a total of 393 deaths and/or injuries.

7.      The plaintiffs who are the next of kin of the decedents either have been or will be appointed the personal representatives of the decedents if required by law.

The Defendants

8.      At all times hereinafter mentioned, CHIQUITA was and is an international producer, distributor, and marketer of bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas in Europe and North America.  The company was founded in 1899 as the United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

9.      Upon information and belief, C.I. Bananos de Exportacion, S.A., (Banadex) was a Colombian corporation or other business entity headquartered in Medellin, Colombia and was a wholly owned subsidiary of CHIQUITA.

10.      Upon information and belief and at all times relevant herein, CHIQUITA dominated and controlled Banadex.

3

11.     At all times relevant herein, CHIQUITA, by and through Banadex, produced, contracted for and traded in bananas in the Uraba and Santa Marta regions of Colombia, and elsewhere in Colombia.

12.     At all times material herein, Banadex was an agent and/or alter ego, of CHIQUITA.

13.     At all times material herein, Banadex was an agent and/or alter ego, of CHIQUITA and a co-conspirator and joint tortfeasor with CHIQUITA with whom it cooperated in a joint criminal enterprise.

14.     Defendants designated as "Individuals A through J" are those individuals referred to in that manner in the Factual Proffer filed March 19, 2007 in a criminal case entitled "United States of America v. Chiquita Brands International, Inc.", Criminal No. 07-055 in the United States District Court for the District of Columbia, which factual proffer is incorporated by reference herein and annexed hereto.

15.     Upon information and belief, defendants designated as "Individuals A through J" may include former CHIQUITA CEO Cyrus Friedheim, former CHIQUITA general counsel Robert Olsen and former CHIQUITA board member Roderick M. Hills and others whose identities are presently unknown to the plaintiffs.

16.     Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued herein as Moe Corporations 1-5 and Moes 6-25, and plaintiffs sue these Defendants by such fictitious names and capacities.  Plaintiffs will amend this Complaint to allege the Moes' true names and capacities when ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the deaths of

plaintiffs' decedents and the injuries to plaintiffs herein alleged were proximately caused by the conduct of such Defendants, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the principal tortfeasors in causing the injuries complained of, and /or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted such injuries.  Whenever and wherever reference is made in this Complaint to any conduct committed by CHIQUITA, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CHIQUITA and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CHIQUITA and Banadex.

17.     At all times herein material, with respect to the events at issue, CHIQUITA, Banadex, Individuals A through J, Moe Corporations 1-5 and Moes 6-25 conspired with each other, and/or participated in a joint criminal enterprise with each other, and /or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship.  As described herein, "agency" included agency by ratification.  Whenever reference is made in this Complaint to any conduct by a defendant, such allegations and references shall be construed to mean the conduct of each of the defendants, acting individually, jointly, and severally.

5

**VENUE**

18. Venue is proper in the Southern District of New York pursuant to 28 USC § 1391 (a) and (b) in that CHIQUITA is authorized to do business and is in fact doing business in the District and is subject to personal jurisdiction in the District.

**ALLEGATIONS OF FACT COMMON TO ALL COUNTS**

The following allegations of fact are made upon information and belief, derived from public and/or de-classified documents of the United States government, as well as documents in the public domain, statements of informants, filed Court documents in the United States and/or Colombia and other documents in the plaintiffs files.

19. The defendants and each of them tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently murdered and/or otherwise proximately caused the death of the plaintiff's decedents, and or injuries to plaintiff(s).

20. The defendants and each of them aided and abetted Colombian paramilitaries, including but not limited to the Autodefensas Unidas de Colombia ("AUC") and their collaborators, in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently murdering and/or otherwise proximately causing the death of the plaintiffs' decedents, and/or injuries to plaintiff(s).

21. The defendants and each of them conspired with the AUC in murdering and/or otherwise proximately causing the death of the plaintiffs' decedents, and/or injuries to plaintiff(s).

22.    The defendants and each of them, acted in concert with the AUC in murdering and/or otherwise proximately causing the death of the plaintiffs' decedents, and/or injuries to plaintiff(s).

23.    The defendants ordered, directed, solicited and facilitated the murders of the plaintiffs' decedents by the AUC and/or injuries to plaintiff(s).

24.    On February 10, 2000, Jose/Josefina Doe 1A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 1, who was the mother of Jose/Josefina Doe 1A, is the legal heir to Jose/Josefina Doe 1A and resides in the municipality of Pueblo Viejo-Magdalena.

25.    On February 10, 2000, Jose/Josefina Doe 1B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 1, who was the mother of Jose/Josefina Doe 1B, is the legal heir to Jose/Josefina Doe 1B and resides in the municipality of Pueblo Viejo-Magdalena.

26.    On November 6, 1997, Jose/Josefina Doe 2 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 2, who was the wife of Jose/Josefina Doe 2, is the legal heir to Jose/Josefina Doe 2 and resides in the municipality of Cienaga-Magdalena.

27.    On November 11, 2003, Jose/Josefina Doe 3 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 3, who was the

mother of Jose/Josefina Doe 3, is the legal heir to Jose/Josefina Doe 3 and resides in the municipality of Cienaga-Magdalena.

28.     On February 20, 2003, Jose/Josefina Doe 4 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 4, who was the wife of Jose/Josefina Doe 4, is the legal heir to Jose/Josefina Doe 4 and resides in the municipality of Cienaga-Magdalena.

29.     On July 12, 2000, Jose/Josefina Doe 5 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 5, who was the wife of Jose/Josefina Doe 5, is the legal heir to Jose/Josefina Doe 5 and resides in the municipality of Cienaga-Magdalena.

30.     On August 15, 2003, Jose/Josefina Doe 6 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 6, who was the mother of Jose/Josefina Doe 6, is the legal heir to Jose/Josefina Doe 6 and resides in the municipality of Cienaga-Magdalena.

31.     On February 5, 2001, Jose/Josefina Doe 7 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 7, who was the daughter of Jose/Josefina Doe 7, is the legal heir to Jose/Josefina Doe 7 and resides in the municipality of Cienaga-Magdalena.

32.     On May 1, 2001, Jose/Josefina Doe 8 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 8, who was the daughter of Jose/Josefina Doe 8, is the legal heir to Jose/Josefina Doe 8 and resides in the municipality of Cienaga-Magdalena.

33.     On March 27, 2002, Jose/Josefina Doe 9 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 9, who was the wife of Jose/Josefina Doe 9, is the legal heir to Jose/Josefina Doe 9 and resides in the municipality of Aracataca-Magdalena.

34.     On February 20, 2002, Jose/Josefina Doe 10 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 10, who was the mother of Jose/Josefina Doe 10, is the legal heir to Jose/Josefina Doe 10 and resides in the municipality of Cienaga-Magdalena.

35.     On January 23, 2003, Jose/Josefina Doe 11 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 11, who was the sister of Jose/Josefina Doe 11, is the legal heir to Jose/Josefina Doe 11 and resides in the municipality of Aracataca-Magdalena.

36.     On June 26, 2004, Jose/Josefina Doe 12 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 12, who was the daughter of

Jose/Josefina Doe 12, is the legal heir to Jose/Josefina Doe 12 and resides in the municipality of Aracataca-Magdalena.

37.    On February 10, 2004, Jose/Josefina Doe 13 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 13, who was the brother of Jose/Josefina Doe 13, is the legal heir to Jose 13 and resides in the municipality of Aracataca-Magdalena.

38.    On May 14, 2003, Jose/Josefina Doe 14 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 14, who was the son of Jose/Josefina Doe 14, is the legal heir to Jose/Josefina Doe 14 and resides in the municipality of Aracataca-Magdalena.

39.    On July 7, 1999, Jose/Josefina Doe 15 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 15, who was the husband of Jose/Josefina Doe 15, is the legal heir to Jose/Josefina Doe 15 and resides in the municipality of Fundacion-Magdalena.

40.    On April 9, 2002, Jose/Josefina Doe 16 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 16, who was the husband of Jose/Josefina Doe 16, is the legal heir to Jose/Josefina Doe 16 and resides in the municipality of Aracataca-Magdalena.

41.     On November 19, 2001, Jose/Josefina Doe 17 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 17 is the legal heir to Jose/Josefina Doe 17 and resides in the municipality of Aracataca-Magdalena.

42.     On November 19, 2001, Jose/Josefina Doe 18 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 18 is the legal heir to Jose/Josefina Doe 18 and resides in the municipality of Aracataca-Magdalena.

43.     On December 14, 2004, Jose/Josefina Doe 19 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 19, who was the mother of Jose/Josefina Doe 19, is the legal heir to Jose/Josefina Doe 19 and resides in the municipality of Aracataca-Magdalena.

44.     On June 18, 1998, Jose/Josefina Doe 20 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 20, who was the brother of Jose/Josefina Doe 20, is the legal heir to Jose/Josefina Doe 20 and resides in the municipality of Aracataca-Magdalena.

45.     On March 14, 2003, Jose/Josefina Doe 21 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 21, who was the

father of Jose/Josefina Doe 21, is the legal heir to Jose/Josefina Doe 21 and resides in the municipality of Aracataca-Magdalena.

46.     On November 19, 2002, Jose/Josefina Doe 22 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 22 is the legal heir to Jose/Josefina Doe 22 and resides in the municipality of Aracataca-Magdalena.

47.     On March 24, 2002, Jose/Josefina Doe 23 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 23, who was the mother of Jose/Josefina Doe 23, is the legal heir to Jose/Josefina Doe 23 and resides in the municipality of Aracataca-Magdalena.

48.     On February 22, 2003, Jose/Josefina Doe 24 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 24 is the legal heir to Jose/Josefina Doe 24 and resides in the municipality of Aracataca-Magdalena.

49.     On December 12, 2003, Jose/Josefina Doe 25A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 25, who was the father of Jose/Josefina Doe 25A, is the legal heir to Jose/Josefina Doe 25A and resides in the municipality of Cienaga-Magdalena.

50.     On December 12, 2003, Jose/Josefina Doe 25B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 25, who was the

father of Jose/Josefina Doe 25B, is the legal heir to Jose 25B and resides in the municipality of Cienaga-Magdalena.

51.     On May 29, 2001, Jose/Josefina Doe 26 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 26, who was the mother of Jose/Josefina Doe 26, is the legal heir to Jose/Josefina Doe 26 and resides in the municipality of Cienaga-Magdalena.

52.     On July 8, 2002, Jose/Josefina Doe 27A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27A, who was the sister of Jose/Josefina Doe 27A, is the legal heir to Juan/Juana Doe 27A and resides in the municipality of Sevilla-Zona Bananera.

53.     On July 8, 2002, Jose/Josefina Doe 27B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27A, who was the sister of Jose/Josefina Doe 27B, is the legal heir to Jose/Josefina Doe 27B and resides in the municipality of Sevilla-Zona Bananera.

54.     On July 8, 2002, Jose/Josefina Doe 27A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27B, who was the sister of Jose/Josefina Doe 27A, is the legal heir to Juan/Juana Doe 27A and resides in the municipality of Sevilla-Zona Bananera.

55.    On July 8, 2002, Jose/Josefina Doe 27B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27B, who was the sister of Jose/Josefina Doe 27B, is the legal heir to Jose/Josefina Doe 27B and resides in the municipality of Sevilla-Zona Bananera.

56.    On July 8, 2002, Jose/Josefina Doe 27C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 27A, who was the mother of Jose/Josefina Doe 27C, is the legal heir to Jose/Josefina Doe 27C and resides in the municipality of Sevilla-Zona Bananera.

57.    On May 31, 2000, Jose/Josefina Doe 28A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 28, who was the mother of Jose/Josefina Doe 28A, is the legal heir to Jose/Josefina Doe 28A and resides in the municipality of Sevilla-Zona Bananera.

58.    On May 31, 2000, Jose/Josefina Doe 28B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 28, who was the aunt of Jose/Josefina Doe 28B, is the legal heir to Jose/Josefina Doe 28B and resides in the municipality of Sevilla-Zona Bananera.

59.    On June 19, 2003, Jose/Josefina Doe 29 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 29A, who was the sister of

Jose/Josefina Doe 29, is the legal heir to Jose/Josefina Doe 29 and resides in the municipality of Sevilla-Zona Bananera.

60.     On June 19, 2003, Jose/Josefina Doe 29 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 29B, who was the sister of Jose/Josefina Doe 29, is the legal heir to Jose/Josefina Doe 29 and resides in the municipality of Sevilla-Zona Bananera.

61.     On February 14, 2007, Jose/Josefina Doe 30 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 30, who was the sister of Jose/Josefina Doe 30, is the legal heir to Jose/Josefina Doe 30 and resides in the municipality of Fundacion-Magdalena.

62.     On April 29, 2000, Jose/Josefina Doe 31 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 31, who was the son of Jose/Josefina Doe 31, is the legal heir to Jose/Josefina Doe 31 and resides in the municipality of Cienaga-Magdalena.

63.     On September 29, 1997, Jose/Josefina Doe 32 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 32A, who was the father of Jose/Josefina Doe 32, is the legal heir to Jose/Josefina Doe 32 and resides in the municipality of Sevilla-Zona Bananera.

64.     On September 29, 1997, Jose/Josefina Doe 32 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 32A, who was the father of Jose/Josefina Doe 32, is the legal heir to Jose/Josefina Doe 32 and resides in the municipality of Sevilla-Zona Bananera.

65.     On July 3, 2003, Jose/Josefina Doe 33 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 33, who was the father of Jose/Josefina Doe 33, is the legal heir to Jose/Josefina Doe 33 and resides in the municipality of Sevilla-Zona Bananera.

66.     On November 14, 2005, Jose/Josefina Doe 34 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 34, who was the father of Jose/Josefina Doe 34, is the legal heir to Jose/Josefina Doe 34 and resides in the municipality of Fundacion-Magdalena.

67.     On January 31, 2003, Jose/Josefina Doe 35 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 35, who was the mother of Jose/Josefina Doe 35, is the legal heir to Jose/Josefina Doe 35 and resides in the municipality of Sevilla-Zona Bananera.

68.     On October 30, 2004, Jose/Josefina Doe 36 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 36, who was the

sister of Jose/Josefina Doe 36, is the legal heir to Jose/Josefina Doe 36 and resides in the municipality of Aracataca-Magdalena.

69.     On April 26, 2001, Jose/Josefina Doe 37 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 37 is the legal heir to Jose/Josefina Doe 37 and resides in the municipality of Sevilla-Magdalena.

70.     On December 1, 2000, Jose/Josefina Doe 38 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 38, who was the mother of Jose/Josefina Doe 38, is the legal heir to Jose/Josefina Doe 38 and resides in the municipality of Cienaga-Magdalena.

71.     On October 3, 1997, Jose/Josefina Doe 39 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 39, who was the sister of Jose/Josefina Doe 39, is the legal heir to Jose/Josefina Doe 39 and resides in the municipality of Cienaga-Magdalena.

72.     On February 11, 2000, Jose/Josefina Doe 40 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 40, who was the wife of Jose/Josefina Doe 40, is the legal heir to Jose/Josefina Doe 40 and resides in the municipality of Cienaga-Magdalena.

73.     On June 24, 2003, Jose/Josefina Doe 41 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex

and the other Defendants. Plaintiff Juan/Juana Doe 41, who was the mother of Jose/Josefina Doe 41, is the legal heir to Jose/Josefina Doe 41 and resides in the municipality of Cienaga-Magdalena.

74.     On October 8, 2001, Jose/Josefina Doe 42 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 42, who was the wife of Jose/Josefina Doe 42, is the legal heir to Jose/Josefina Doe 42 and resides in the municipality of Cienaga-Magdalena.

75.     On October 27, 2000, Jose/Josefina Doe 43 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 43 is the legal heir to Jose/Josefina Doe 43 and resides in the municipality of Cienaga-Magdalena.

76.     On October 3, 1997, Jose/Josefina Doe 44 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 44 is the legal heir to Jose/Josefina Doe 44 and resides in the municipality of Cienaga-Magdalena.

77.     On April 2, 2005, Jose/Josefina Doe 45 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 45, who was the wife of Jose/Josefina Doe 45, is the legal heir to Jose/Josefina Doe 45 and resides in the municipality of Cienaga-Magdalena.

78.     On September 12, 2001, Jose/Josefina Doe 46 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA

and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 46 is the legal heir to Jose/Josefina Doe 46 and resides in the municipality of Sevilla-Zona Bananera.

79.    On        , Jose/Josefina Doe 47 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 47, who was the mother of Jose/Josefina Doe 47, is the legal heir to Jose/Josefina Doe 47 and resides in the municipality of Sevilla-Zona Bananera.

80.    On April 18, 2001, Jose/Josefina Doe 48 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 48 is the legal heir to Jose/Josefina Doe 48 and resides in the municipality of Guacamayal-Zona Bananera.

81.    On November 9, 2002, Jose/Josefina Doe 49 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 49, who was the mother of Jose/Josefina Doe 49, is the legal heir to Jose/Josefina Doe 49 and resides in the municipality of Sevilla-Zona Bananera.

82.    On June 19, 2003, Jose/Josefina Doe 50 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 50, who was the mother of Jose/Josefina Doe 50, is the legal heir to Jose/Josefina Doe 50 and resides in the municipality of Sevilla-Zona Bananera.

83.    On July 8, 1999, Jose/Josefina Doe 51A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA

and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 51, who was the mother of Jose/Josefina Doe 51A, is the legal heir to Jose/Josefina Doe 51A and resides in the municipality of Sevilla-Zona Bananera.

84.    On July 8, 1999, Jose/Josefina Doe 51B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 51, who was the mother of Jose/Josefina Doe 51B, is the legal heir to Jose/Josefina Doe 51B and resides in the municipality of Cienaga-Magdalena.

85.    On July 8, 1999, Jose/Josefina Doe 51C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 51, who was the wife of Jose/Josefina Doe 51C, is the legal heir to Jose/Josefina Doe 51C and resides in the municipality of Cienaga-Magdalena.

86.    On December 10, 1996, Jose/Josefina Doe 52 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 52, who was the wife of Jose/Josefina Doe 52, is the legal heir to Jose/Josefina Doe 52 and resides in the municipality of Apartado-Barrio Obrero.

87.    On September 24, 1996, Jose/Josefina Doe 53 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 53, who was the wife of Jose/Josefina Doe 53, is the legal heir to Jose/Josefina Doe 53 and resides in the municipality of Apartado-Antioquia.

88.     On July 22, 2001, Jose/Josefina Doe 54 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 54, who was the wife of Jose/Josefina Doe 54, is the legal heir to Jose/Josefina Doe 54 and resides in the municipality of Apartado-Antioquia.

89.     On August 7, 1993, Jose/Josefina Doe 55A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 55, who was the daughter of Jose/Josefina Doe 55A is the legal heir to Jose/Josefina Doe 55A and resides in the municipality of Apartado-Antioquia.

90.     On August 10, 2000, Jose/Josefina Doe 55B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 55, who was the mother of Jose/Josefina Doe 55B, is the legal heir to Jose/Josefina Doe 55B and resides in the municipality of Apartado-Antioquia.

91.     On April 26, 2002, Jose/Josefina Doe 56 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 56, who was the wife of Jose/Josefina Doe 56, is the legal heir to Jose/Josefina Doe 56 and resides in the municipality of Apartado.

92.     On July 26, 2002, Jose/Josefina Doe 57 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 57, who was the mother of

Jose/Josefina Doe 57, is the legal heir to Jose/Josefina Doe 57 and resides in the municipality of Apartado-Uraba.

93.     On November 8, 1997, Jose/Josefina Doe 58 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 58, who was the wife of Jose/Josefina Doe 58, is the legal heir to Jose/Josefina Doe 58 and resides in the municipality of Apartado-Antioquia.

94.     On July 6, 1996, Jose/Josefina Doe 59 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 59 is the legal heir to Jose/Josefina Doe 59 and resides in the municipality of Apartado-Antioquia.

95.     On July 13, 1999, Jose/Josefina Doe 60 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 60, who was the wife of Jose/Josefina Doe 60, is the legal heir to Jose/Josefina Doe 60 and resides in the municipality of Apartado.

96.     On November 18, 1996, Jose/Josefina Doe 61 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 61, who was the wife of Jose/Josefina Doe 61, is the legal heir to Jose/Josefina Doe 61 and resides in the municipality of Apartado-Uraba.

97.     On April 3, 1996, Jose/Josefina Doe 62 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex

and the other Defendants. Plaintiff Juan/Juana Doe 62, who was the partner of Jose/Josefina Doe 62, is the legal heir to Jose/Josefina Doe 62 and resides in the municipality of Apartado-Antioquia.

98.     On May 8, 2001, Jose/Josefina Doe 63 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 63, who was the sister of Jose/Josefina Doe 63, is the legal heir to Jose/Josefina Doe 63 and resides in the municipality of Apartado-Antioquia.

99.     On November 23, 2000, Jose/Josefina Doe 64 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 64, who was the wife of Jose/Josefina Doe 64, is the legal heir to Jose/Josefina Doe 64 and resides in the municipality of Apartado-Antioquia.

100.     On April 26, 2002, Jose/Josefina Doe 65 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 65, who was the wife of Jose/Josefina Doe 65, is the legal heir to Jose/Josefina Doe 65 and resides in the municipality of Apartado-Barrio Obrero.

101.     On February 27, 1997, Jose/Josefina Doe 66 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 66, who was the brother of Jose/Josefina Doe 66, is the legal heir to Jose/Josefina Doe 66 and resides in the municipality of Apartado.

102.    On October 2, 2001, Jose/Josefina Doe 67 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 67, who was the mother of Jose/Josefina Doe 67, is the legal heir to Jose/Josefina Doe 67 and resides in the municipality of Apartado.

103.    On December 16, 1999, Jose/Josefina Doe 68 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 68, who was the wife of Jose/Josefina Doe 68, is the legal heir to Jose/Josefina Doe 68 and resides in the municipality of Apartado.

104.    On April 26, 2002, Jose/Josefina Doe 69 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 69, who was the wife of Jose/Josefina Doe 69, is the legal heir to Jose/Josefina Doe 69 and resides in the municipality of Apartado-Uraba.

105.    On February 29, 1996, Jose/Josefina Doe 70 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 70, who was the partner of Jose/Josefina Doe 70 is the legal heir to Jose/Josefina Doe 70 and resides in the municipality of Apartado-Uraba.

106.    On May 10, 1998, Jose/Josefina Doe 71 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 71, who was the father of

Jose/Josefina Doe 71, is the legal heir to Jose/Josefina Doe 71 and resides in the municipality of Apartado-Uraba.

107.     On January 18, 2000, Jose/Josefina Doe 72 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 72, who was the niece of Jose/Josefina Doe 72, is the legal heir to Jose/Josefina Doe 72 and resides in the municipality of Apartado-Uraba.

108.     On August 17, 1999, Jose/Josefina Doe 73 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 73, who was the wife of Jose/Josefina Doe 73, is the legal heir to Jose/Josefina Doe 73 and resides in the municipality of Apartado-Uraba.

109.     On October 5, 2001, Jose/Josefina Doe 74 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 74, who was the husband of Jose/Josefina Doe 74, is the legal heir to Jose/Josefina Doe 74 and resides in the municipality of Barrio Las Brisas-Antioquia.

110.     On March 25, 2002, Jose/Josefina Doe 75 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 75, who was the mother of Jose/Josefina Doe 75, is the legal heir Jose/Josefina Doe 75 to and resides in the municipality of Apartado-Uraba.

111.    On April 26, 2002, Jose/Josefina Doe 76 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 76, who was the wife of Jose/Josefina Doe 76, is the legal heir to Jose/Josefina Doe 76 and resides in the municipality of Apartado.

112.    On June 26, 2004, Jose/Josefina Doe 77 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 77, who was the partner of Jose/Josefina Doe 77, is the legal heir to Jose/Josefina Doe 77 and resides in the municipality of Apartado-Barrio Obrero.

113.    On August 19, 2004, Jose/Josefina Doe 78 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 78, who was the partner of Jose/Josefina Doe 78, is the legal heir to Jose/Josefina Doe 78 and resides in the municipality of Apartado-Antioquia.

114.    On June 9, 1997, Jose/Josefina Doe 79 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 79, who was the wife of Jose/Josefina Doe 79, is the legal heir to Jose/Josefina Doe 79 and resides in the municipality of Apartado-Uraba.

115.    On July 31, 1999, Jose/Josefina Doe 80 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 80, who was the wife of Jose/Josefina

Doe 80, is the legal heir to Jose/Josefina Doe 80 and resides in the municipality of Apartado.

116.    On January 2, 1997, Jose/Josefina Doe 81 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 81, who was the wife of Jose/Josefina Doe 81, is the legal heir to Jose/Josefina Doe 81 and resides in the municipality of Apartado.

117.    On December 23, 1997, Jose/Josefina Doe 82A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 82, who was the sister of Jose/Josefina Doe 82A, is the legal heir to Jose/Josefina Doe 82A and resides in the municipality of Apartado.

118.    On December 23, 1997, Jose/Josefina Doe 82B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 82, who was the sister-in-law of Jose/Josefina Doe 82B, is the legal heir to Jose/Josefina Doe 82B and resides in the municipality of Apartado.

119.    On June 1, 1997, Jose/Josefina Doe 83 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 83, who was the wife of Jose/Josefina Doe 83, is the legal heir to Jose/Josefina Doe 83 and resides in the municipality of Apartado-Uraba.

120.     On March 9, 1997, Jose/Josefina Doe 84 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 84, who was the sister of Jose/Josefina Doe 84, is the legal heir to Jose/Josefina Doe 84 and resides in the municipality of Apartado-Uraba.

121.     On September 29, 2002, Jose/Josefina Doe 85 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 85, who was the wife of Jose/Josefina Doe 85, is the legal heir to Jose/Josefina Doe 85 and resides in the municipality of Apartado.

122.     On January 23, 1997, Jose/Josefina Doe 86 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 86, who was the partner of Jose/Josefina Doe 86, is the legal heir to Jose/Josefina Doe 86 and resides in the municipality of Apartado.

123.     On July 18, 2000, Jose/Josefina Doe 87 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 87, who was the wife of Jose/Josefina Doe 87, is the legal heir to Jose/Josefina Doe 87 and resides in the municipality of Apartado-Uraba.

124.     On July 11, 1998, Jose/Josefina Doe 88 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 88, who was the wife of Jose/Josefina

Doe 88, is the legal heir to Jose/Josefina Doe 88 and resides in the municipality of Apartado-Uraba.

125.     On December 19, 2001, Jose/Josefina Doe 89 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 89, who was the partner of Jose/Josefina Doe 89, is the legal heir to Jose/Josefina Doe 89 and resides in the municipality of Apartado.

126.     On April 12, 2002, Jose/Josefina Doe 90 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 90, who was the wife of Jose/Josefina Doe 90, is the legal heir to Jose/Josefina Doe 90 and resides in the municipality of Apartado-Antioquia.

127.     On April 15, 1997, Jose/Josefina Doe 91 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 91, who was the wife of Jose/Josefina Doe 91, is the legal heir to Jose/Josefina Doe 91 and resides in the municipality of Apartado.

128.     On December 3, 2005, Jose/Josefina Doe 92 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 92, who was the wife of Juan/Juana Doe 92, is the legal heir to Jose/Josefina Doe 92 and resides in the municipality of Apartado.

129.     On March 14, 2005, Jose/Josefina Doe 93 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 93, who was the partner of Jose/Josefina Doe 93, is the legal heir to Jose/Josefina Doe 93 and resides in the municipality of Apartado-Antioquia.

130.     On November 23, 2006, Jose/Josefina Doe 94 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 94, who was the wife of Jose/Josefina Doe 94, is the legal heir to Jose/Josefina Doe 94 and resides in the municipality of Cienaga-Magdalena.

131.     On January 24, 2004, Jose/Josefina Doe 95 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 95 is the legal heir to Jose/Josefina Doe 95 and resides in the municipality of Paraiso-Magdalena.

132.     On March 14, 2001, Jose/Josefina Doe 96 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 96, who was the mother of Jose/Josefina Doe 96, is the legal heir to Jose/Josefina Doe 96 and resides in the municipality of Cienaga-Magdalena.

133.     On March 1, 2000, Jose/Josefina Doe 97 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 97, who was the wife

of Jose/Josefina Doe 97, is the legal heir to   Jose/Josefina Doe 97 and resides in the
municipality of Cienaga-Magdalena.

134.    On August 15, 2006, Jose/Josefina Doe 98 was killed by AUC
Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA
and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 98, who was the wife
of Jose/Josefina Doe 98, is the legal heir to Jose/Josefina Doe 98 and resides in the
municipality of Cienaga-Magdalena.

135.    On January 13, 2002, Jose/Josefina Doe 99 was killed by AUC
Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA
and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 99, who was the wife
of Jose/Josefina Doe 99, is the legal heir to Jose/Josefina Doe 99 and resides in the
municipality of Cienaga-Magdalena.

136.    On April 23, 2007, Jose/Josefina Doe 100 was killed by AUC
Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA
and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 100, who was the
wife of Jose/Josefina Doe 100, is the legal heir to Jose/Josefina Doe 100 and resides in
the municipality of Cienaga-Magdalena.

137.    On January 17, 2001, Jose/Josefina Doe 101A was killed by AUC
Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA
and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 101, who was the
sister of Jose/Josefina Doe 101A, is the legal heir to Jose/Josefina Doe 101A and resides
in the municipality of Palmor-Magdalena.

138.    On January 17, 2001, Jose/Josefina Doe 101B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 101, who was the sister of Jose/Josefina Doe 101B, is the legal heir to Jose/Josefina Doe 101B and resides in the municipality of Palmor-Magdalena.

139.    On August 1, 2005, Jose/Josefina Doe 102 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 102, who was the partner of Jose/Josefina Doe 102, is the legal heir to Jose/Josefina Doe 102 and resides in the municipality of Cienaga-Magdalena.

140.    On May 12, 1996, Juan/Juana Doe 103 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Jose/Josefina Doe 103 resides in the municipality of Apartado-Antioquia.

141.    On December 7, 2005, Jose/Josefina Doe 104 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 104, who was the father of Jose/Josefina Doe 104, is the legal heir to Jorge Luis Ortega Perez and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

142.    On March 12, 2001, Jose/Josefina Doe 105 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 105, who was the

mother of Jose/Josefina Doe 105, is the legal heir to Jose/Josefina Doe 105 and resides in the municipality of El Yeso-Morroa.

143.    On November 15, 2001, Jose/Josefina Doe 106 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 106 is the legal heir to Jose/Josefina Doe 106 and resides in the municipality of Vereda-Palmarcito.

144.    On April 23, 2004, Jose/Josefina Doe 107 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 107, who was the mother of Jose/Josefina Doe 107, is the legal heir to Jose/Josefina Doe 107 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

145.    On September 3, 2004, Jose/Josefina Doe 108 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 108, who was the wife of Jose/Josefina Doe 108, is the legal heir to Jose/Josefina Doe 108 and resides in the municipality of Las Lomas de Corozal-Sucre-Sucre.

146.    On July 12, 2006, Jose/Josefina Doe 109 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 109 is the legal heir to Jose/Josefina Doe 109 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

147.    On May 24, 2004, Jose/Josefina Doe 110 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 110, who was the

sister of Jose/Josefina Doe 110, is the legal heir to Jose/Josefina Doe 110 and resides in the municipality of Corozal-Sucre-Sucre.

148.    On March 11, 2004, Jose/Josefina Doe 111 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 111, who was the sister of Jose/Josefina Doe 111, is the legal heir to Jose/Josefina Doe 111 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

149.    On January 8, 2004, Jose/Josefina Doe 112 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 112, who was the sister of Jose/Josefina Doe 112, is the legal heir to Jose/Josefina Doe 112 and resides in the municipality of Corozal-Sucre-Sucre.

150.    On July 29, 2003, Juan/Juana Doe 113 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 113 resides in the municipality of Corozal-Sucre-Sucre.

151.    On September 18, 1999, Jose/Josefina Doe 114 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 114, who was the wife of Jose/Josefina Doe 114, is the legal heir to Jose/Josefina Doe 114 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

152.    On July 29, 2003, Juan/Juana Doe 115 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with

CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 115 resides in the municipality of Morroa-Sucre.

153.    On September 3, 2003, Jose/Josefina Doe 116 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 116, who was the brother of Jose/Josefina Doe 116, is the legal heir to Jose/Josefina Doe116 and resides in the municipality of Corozal-Sucre-Sucre.

154.    On September 4, 2005, Jose/Josefina Doe 117 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 117, who was the mother of Jose/Josefina Doe 117, is the legal heir to Jose/Josefina Doe 117 and resides in the municipality of Corozal-Sucre-Sucre.

155.    On July 23, 2006, Jose/Josefina Doe 118 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 118 is the legal heir to Jose/Josefina Doe 118 and resides in the municipality of Corozal-Sucre-Sucre.

156.    On August 20, 2006, Jose/Josefina Doe 119 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 119, who was the sister of Jose/Josefina Doe 119, is the legal heir to Jose/Josefina Doe 119 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

157.    On May 14, 2004, Jose/Josefina Doe 120 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA

and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 120, who was the sister of Jose/Josefina Doe 120, is the legal heir to Jose/Josefina Doe 120 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

158.    On June 19, 2004, Jose/Josefina Doe 121 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 121, who was the father of Jose/Josefina Doe 121, is the legal heir to Jose/Josefina Doe 121 and resides in the municipality of Corozal-Sucre-Sucre.

159.    On July 29, 2003, Jose/Josefina Doe 122 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 122, who was the wife of Jose/Josefina Doe 122, is the legal heir to Jose/Josefina Doe 122 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

160.    On September 16, 2004, Jose/Josefina Doe 123 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 123, who was the wife of Jose/Josefina Doe 123, is the legal heir to Jose/Josefina Doe 123 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

161.    On April 23, 2006, Jose/Josefina Doe 124 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 124, who was the brother of Jose/Josefina Doe 124, is the legal heir to Jose/Josefina Doe 124 and resides in the municipality of Corozal-Sucre-Sucre.

162.    On October 15, 2006, Jose/Josefina Doe 125 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 125, who was the wife of Jose/Josefina Doe 125, is the legal heir to Jose/Josefina Doe 125 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

163.    On February 16, 2007, Jose/Josefina Doe 126 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 126, who was the wife of Jose/Josefina Doe 126, is the legal heir to Jose/Josefina Doe 126 and resides in the municipality of Corozal-Sucre-Sucre.

164.    On January 27, 2004, Jose/Josefina Doe 127 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 127, who was the mother of Jose/Josefina Doe 127, is the legal heir to Jose/Josefina Doe 127 and resides in the municipality of Sucre.

165.    On February 23, 2004, Jose/Josefina Doe 128 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 128, who was the brother of Jose/Josefina Doe 128, is the legal heir to Jose/Josefina Doe 128 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

166.    On May 4, 2004, Jose/Josefina Doe 129 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 129, who was the wife of

Jose/Josefina Doe 129, is the legal heir to Jose/Josefina Doe 129 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

167.    On February 2, 1998, Jose/Josefina Doe 130 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 130A, who was the wife of Jose/Josefina 130, is the legal heir to Jose/Josefina Doe 130 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

168.    On February 2, 1998, Jose/Josefina Doe 130 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 130B, who was the wife of Jose/Josefina 130, is the legal heir to Jose/Josefina Doe 130 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

169.    On December 22, 2003, Jose/Josefina Doe 131 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 131, who was the mother of Jose/Josefina Doe 131, is the legal heir to Jose/Josefina Doe 131 and resides in the municipality of Corozal-Sucre-Sucre.

170.    On June 15, 2002, Jose/Josefina Doe 132 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 132, who was the wife of Jose/Josefina Doe 132, is the legal heir to Jose/Josefina Doe 132 and resides in the municipality of Sucre.

171.    On November 4, 2002, Jose/Josefina Doe 133 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 133, who was the wife of Jose/Josefina Doe 133, is the legal heir to Jose/Josefina Doe 133 and resides in the municipality of Corozal-Sucre-Sucre.

172.    On April 29, 1997, Jose/Josefina Doe 134 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 134, who was the daughter of Jose/Josefina Doe 134, is the legal heir to Jose/Josefina Doe 134 and resides in the municipality of Corozal-Sucre-Sucre.

173.    On February 27, 1995, Jose/Josefina Doe 135 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with CHIQUITA and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 135 is the legal heir to Jose/Josefina Doe 135 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

174.    On September 4, 2005, Jose/Josefina Doe 136 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 136 is the legal heir to Jose/Josefina Doe 136 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

175.    On July 25, 2000, Jose/Josefina Doe 137 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 137, who was the mother of Jose/Josefina Doe 137, is the legal heir to Jose/Josefina Doe 137 and resides in the municipality of Sincelejo.

176.    On June 7, 1998, Jose/Josefina Doe 138 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 138 is the legal heir to Jose/Josefina Doe 138 and resides in the municipality of Sucre.

177.    On November 1, 2003, Jose/Josefina Doe 139 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 139 is the legal heir to Jose/Josefina Doe 139 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

178.    On May 6, 2005, Jose/Josefina Doe 140 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 140, who was the mother of Jose/Josesfina Doe 140, is the legal heir to Jose/Josefina Doe 140 and resides in the municipality of San Onofre-Sucre.

179.    On February 2, 1998, Jose/Josefina Doe 141 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 141, who was the wife of Jose/Josefina Doe 141, is the legal heir to Jose/Josefina Doe 141 and resides in the municipality of Ovejas-Sucre.

180.    On April 4, 1999, Jose/Josefina Doe 142 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 142, who was the daughter of Jose/Josefina Doe 142, is the legal heir to Jose/Josefina Doe 142 and resides in the municipality of Corozal-Sucre-Sucre.

181.     On May 7, 2003, Jose/Josefina Doe 143 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 143, who was the wife of Jose/Josefina Doe 143, is the legal heir to Jose/Josefina Doe 143 and resides in the municipality of Corozal-Sucre-Sucre.

182.     On March 8, 2007, Jose/Josefina Doe 144 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 144, who was the wife of Jose/Josefina Doe 144, is the legal heir to Jose/Josefina Doe 144 and resides in the municipality of Corozal-Sucre-Sucre.

183.     On July 19, 2000, Jose/Josefina Doe 145 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 145, who was the mother of Jose/Josefina Doe 145, is the legal heir to Jose/Josefina Doe 145 and resides in the municipality of Corozal-Sucre-Sucre.

184.     On November 15, 2002, Jose/Josefina Doe 146 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 146 is the legal heir to Jose/Josefina Doe 146 and resides in the municipality of San Francisco-Antioquia.

185.     On September 24, 2000, Jose/Josefina Doe 147 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 147, who was the wife of

Jose/Josefina Doe 147, is the legal heir to Jose/Josefina Doe 147 and resides in the municipality of Sucre.

186.    On February 15, 2004, Jose/Josefina Doe 148 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 148, who was the wife of Jose/Josefina Doe 148, is the legal heir to Jose/Josefina Doe 148 and resides in the municipality of Corozal-Sucre-Sucre.

187.    On July 15, 1993, Jose/Josefina Doe 149 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 149, who was the son of Jose/Josefina Doe 149, is the legal heir to Jose/Josefina Doe 149 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

188.    On January 9, 1999, Jose/Josefina Doe 150 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 150 is the legal heir to Jose/Josefina Doe 150 and resides in the municipality of Sucre.

189.    On April 15, 2001, Jose/Josefina Doe 151 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 151, who was the wife of Jose/Josefina Doe 151, is the legal heir to Jose/Josefina Doe 151 and resides in the municipality of Morroa-Sucre.

190.    On July 4, 2004, Jose/Josefina Doe 152 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and

the other Defendants. Plaintiff Juan/Juana Doe 152, who was the father of Jose/Josefina Doe 152, is the legal heir to Jose/Josefina Doe 152 and resides in the municipality of Corozal-Sucre-Sucre.

191.    On February 12, 2007, Jose/Josefina Doe 153 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 153, who was the mother of Jose/Josefina Doe 153, is the legal heir to Jose/Josefina Doe 153 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

192.    On May 3, 1997, Jose/Josefina Doe 154 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 154 is the legal heir to Jose/Josefina Doe 154 and resides in the municipality of Sucre.

193.    On July 3, 2004, Jose/Josefina Doe 155 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 155, who was the wife of Jose/Josefina Doe 155, is the legal heir to Jose/Josefina Doe 155 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

194.    On January 3, 1999, Jose/Josefina Doe 156 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 156 is the legal heir to Jose/Josefina Doe 156 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

195.    On April 16, 2005, Jose/Josefina Doe 157 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 157, who was the mother of Jose/Josefina Doe 157, is the legal heir to Jose/Josefina Doe 157 and resides in the municipality of Corozal-Sucre-Sucre.

196.    On September 13, 2002, Jose/Josefina Doe 158 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 158, who was the wife of Jose/Josefina Doe 158, is the legal heir to Jose/Josefina Doe 158 and resides in the municipality of Sucre.

197.    On January 4, 2001, Jose/Josefina Doe 159 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 159, who was the mother of Jose/Josefina Doe 159, is the legal heir to Jose/Josefina Doe 159 and resides in the municipality of Corozal-Sucre-Sucre.

198.    On August 5, 2004, Jose/Josefina Doe 160 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 160, who was the wife of Jose/Josefina Doe 160, is the legal heir to Jose/Josefina Doe 160 and resides in the municipality of Corozal-Sucre-Sucre.

199.    On July 15, 2004, Jose/Josefina Doe 161 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 161, who was the wife of Jose/Josefina Doe 161, is the legal heir to Jose/Josefina Doe 161 and resides in the municipality of Corozal-Sucre-Sucre.

200.     On February 12, 2004, Jose/Josefina Doe 162 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 162, who was the wife of Jose/Josefina Doe 162, is the legal heir to Jose/Josefina Doe 162 and resides in the municipality of Morroa-Sucre.

201.     On April 22, 1991, Jose/Josefina Doe 163 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 163, who was the wife of Jose/Josefina Doe 163, is the legal heir to Jose/Josefina Doe 163 and resides in the municipality of Corozal-Sucre-Sucre.

202.     On February 25, 2006, Jose/Josefina Doe 164 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 164 is the legal heir to Jose/Josefina Doe 164 and resides in the municipality of Corozal-Sucre-Sucre.

203.     On February 7, 2001, Jose/Josefina Doe 165 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 165, who was the wife of Jose/Josefina Doe 165, is the legal heir to Jose/Josefina Doe 165 and resides in the municipality of Sucre.

204.     On October 22, 1996, Jose/Josefina Doe 166 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 166, who was the

wife of Jose/Josefina Doe 166, is the legal heir to Jose/Josefina Doe 166 and resides in the municipality of Corozal-Sucre-Sucre.

205.    On April 16, 2005, Jose/Josefina Doe 167 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 167, who was the sister of Jose/Josefina Doe 167, is the legal heir to Jose/Josefina Doe 167 and resides in the municipality of Corozal-Sucre-Sucre.

206.    On January 10, 1999, Jose/Josefina Doe 168 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 168, who was the father of Jose/Josefina Doe 168, is the legal heir to Jose/Josefina Doe 168 and resides in the municipality of Toluviejo-Sucre.

207.    On April 23, 2004, Jose/Josefina Doe 169 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 169, who was the father of Jose/Josefina Doe 169, is the legal heir to Jose/Josefina Doe 169 and resides in the municipality of Corozal-Sucre-Sucre.

208.    On April 28, 1997, Jose/Josefina Doe 170 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 170, who was the sister of Jose/Josefina Doe 170, is the legal heir to Jose/Josefina Doe 170 and resides in the municipality of Sucre.

209.     On June 15, 2002, Jose/Josefina Doe 171 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 171, who was the wife of Jose/Josefina Doe 171, is the legal heir to Jose/Josefina Doe 171 and resides in the municipality of Ovejas-Sucre.

210.     On April 2, 2000, Jose/Josefina Doe 172 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 172, who was the wife of Jose/Josefina Doe 172, is the legal heir to Jose/Josefina Doe 172 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

211.     On March 12, 2003, Jose/Josefina Doe 173 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 173, who was the father of Jose/Josefina Doe 173, is the legal heir to Jose/Josefina Doe 173 and resides in the municipality of Corozal-Sucre-Sucre.

212.     On February 28, 2004, Jose/Josefina Doe 174 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 174, who was the father of Jose/Josefina Doe 174, is the legal heir to Jose/Josefina Doe 174 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

213.     On November 29, 2003, Jose/Josefina Doe 175 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 175, who was the wife of

Jose/Josefina Doe 175, is the legal heir to Jose/Josefina Doe 175 and resides in the municipality of Corozal-Sucre-Sucre.

214.    On April 2, 2001, Jose/Josefina Doe 176 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 176, who was the mother of Jose/Josefina Doe 176, is the legal heir to Jose/Josefina Doe 176 and resides in the municipality of Sucre.

215.    On December 21, 2003, Jose/Josefina Doe 177 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 177, who was the mother of Jose/Josefina Doe 177, is the legal heir to Jose/Josefina Doe 177 and resides in the municipality of Corozal-Sucre-Sucre.

216.    On December 7, 2001, Jose/Josefina Doe 178 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 178, who was the wife of Jose/Josefina Doe 178, is the legal heir to Jose/Josefina Doe 178 and resides in the municipality of Sucre.

217.    On November 9, 2003, Jose/Josefina Doe 179 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 179 is the legal heir to Jose/Josefina Doe 179 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

218.    On January 26, 2002, Jose/Josefina Doe 180 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 180, who was the mother of 180, is the legal heir to Jose/Josefina Doe 180 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

219.    On July 4, 2001, Jose/Josefina Doe 181 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 181, who was the mother of Jose/Josefina Doe 181, is the legal heir to Jose/Josefina Doe 181 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

220.    On March 25, 2005, Jose/Josefina Doe 182 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 182 is the legal heir to Jose/Josefina Doe 182 and resides in the municipality of Sucre.

221.    On July 29, 2003, Jose/Josefina Doe 183 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 183, who was the wife of Jose/Josefina Doe 183, is the legal heir to Jose/Josefina Doe 183 and resides in the municipality of Corozal-Sucre-Sucre.

222.    On June 16, 1993, Jose/Josefina Doe 184 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 184, who was the father of Jose/Josefina Doe 184, is the legal heir to Jose/Josefina Doe 184 and resides in the municipality of Corozal-Sucre-Sucre.

223.    On May 15, 2001, Jose/Josefina Doe 185 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 185, who was the wife of Jose/Josefina Doe 185, is the legal heir to Jose/Josefina Doe 185 and resides in the municipality of Corozal-Sucre-Sucre.

224.    On September 24, 2005, Jose/Josefina Doe 186 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 186, who was the mother of Jose/Josefina Doe 186, is the legal heir to Jose/Josefina Doe 186 and resides in the municipality of Corozal-Sucre-Sucre.

225.    On April 15, 2001, Jose/Josefina Doe 187 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 187, who was the brother of Jose/Josefina Doe 187, is the legal heir to Jose/Josefina Doe 187 and resides in the municipality of Morroa-Sucre.

226.    On November 25, 2003, Jose/Josefina Doe 188 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 188 is the legal heir to Jose/Josefina Doe 188 and resides in the municipality of Morroa-Sucre.

227.    On January 9, 1999, Jose/Josefina Doe 189A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 189 is the legal heir to Jose/Josefina Doe 189A and resides in the municipality of Morroa-Sucre.

228.    On February 11, 2004, Jose/Josefina Doe 189B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 189 is the legal heir to Jose/Josefina Doe 189B and resides in the municipality of Morroa-Sucre.

229.    On October 17, 1997, Jose/Josefina Doe 189C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 189 is the legal heir to Jose/Josefina Doe 189C and resides in the municipality of Morroa-Sucre.

230.    On August 15, 2005, Jose/Josefina Doe 190 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 190, who was the wife of Jose/Josefina Doe 190, is the legal heir to Jose/Josefina Doe 190 and resides in the municipality of Corozal-Sucre-Sucre.

231.    On November 7, 2002, Jose/Josefina Doe 191 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 191, who was the mother of Jose/Josefina Doe 191, is the legal heir to Jose/Josefina Doe 191 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

232.    On January 23, 2005, Jose/Josefina Doe 192 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 192, who was the wife of Jose/Josefina Doe 192, is the legal heir to Jose/Josefina Doe 192 and resides in the municipality of Sincelejo.

233.    On May 18, 2003, Jose/Josefina Doe 193 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 193, who was the mother of Jose/Josefina Doe 193, is the legal heir to Jose/Josefina Doe 193 and resides in the municipality of Corozal-Sucre-Sucre.

234.    On June 21, 2001, Jose/Josefina Doe 194A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 194 is the legal heir to Jose/Josefina Doe 194A and resides in the municipality of Cartagena.

235.    On June 21, 2001, Jose/Josefina Doe 194B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 194 is the legal heir to Jose/Josefina Doe 194B and resides in the municipality of Cartagena.

236.    On June 21, 2001, Jose/Josefina Doe 194C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 194 is the legal heir to Jose/Josefina Doe 194C and resides in the municipality of Cartagena.

237.    On July 24, 2005, Jose/Josefina Doe 195 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 195, who was the mother of Jose/Josefina Doe 195, is the legal heir to Jose/Josefina Doe 195 and resides in the municipality of Aracataca-Magdalena.

238.    On May 3, 1999, Jose/Josefina Doe 196 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 196, who was the sister of Jose/Josefina Doe 196, is the legal heir to Jose/Josefina Doe 196 and resides in the municipality of Tucurinca-Magdalena.

239.    On May 21, 2003, Jose/Josefina Doe 197 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 197, who was the wife of Jose/Josefina Doe 197, is the legal heir to Jose/Josefina Doe 197 and resides in the municipality of Cienaga-Magdalena.

240.    On April 4, 1999, Jose/Josefina Doe 198 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 198, who was the sister of Jose/Josefina Doe 198, is the legal heir to Jose/Josefina Doe 198 and resides in the municipality of Zona Bananera.

241.    On November 21, 2001, Jose/Josefina Doe 199 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 199, who was the wife of Jose/Josefina Doe 199, is the legal heir to Jose/Josefina Doe 199 and resides in the municipality of Aracataca-Magdalena.

242.    On February 3, 2003, Jose/Josefina Doe 200 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 200, who was the mother of

Jose/Josefina Doe 200, is the legal heir to Jose/Josefina Doe 200 and resides in the municipality of Cienaga-Magdalena.

243.     On February 16, 1998, Jose/Josefina Doe 201 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 201 is the legal heir to Jose/Josefina Doe 201 and resides in the municipality of Cienaga-Magdalena.

244.     On January 19, 2001, Jose/Josefina Doe 202 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 202 is the legal heir to Jose/Josefina Doe 202 and resides in the municipality of Cienaga-Magdalena.

245.     On January 31, 1998, Jose/Josefina Doe 203 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 203, who was the sister of Jose/Josefina Doe 203, is the legal heir to Jose/Josefina Doe 203 and resides in the municipality of Casa Loma.

246.     On August 27, 2000, Jose/Josefina Doe 204 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 204, who was the daughter of Jose/Josefina Doe 204, is the legal heir to Jose/Josefina Doe 204 and resides in the municipality of Cienaga-Magdalena.

247.     On December 23, 2004, Jose/Josefina Doe 205 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 205, who was the wife of

Jose/Josefina Doe 205, is the legal heir to Jose/Josefina Doe 205 and resides in the municipality of Cienaga-Magdalena.

248.    On May 6, 2004, Jose/Josefina Doe 206 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 206, who was the wife of Jose/Josefina Doe 206, is the legal heir to Jose/Josefina Doe 206 and resides in the municipality of Maicao.

249.    On September 18, 1997, Jose/Josefina Doe 207A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 207, who was the mother of Jose/Josefina Doe 207A, is the legal heir to Jose/Josefina Doe 207A and resides in the municipality of Aracataca-Magdalena.

250.    On September 18, 1997, Jose/Josefina Doe 207B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 207, who was the mother of Jose/Josefina Doe 207B, is the legal heir to Jose/Josefina Doe 207B and resides in the municipality of Aracataca-Magdalena.

251.    On February 21, 2003, Jose/Josefina Doe 208 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 208 is the legal heir to Jose/Josefina Doe 208 and resides in the municipality of Zona Bananera.

252.    On August 13, 1998, Jose/Josefina Doe 209 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 209, who was the mother of Jose/Josefina Doe 209, is the legal heir to Jose/Josefina Doe 209 and resides in the municipality of Guacamayal.

253.     On September 21, 1997, Jose/Josefina Doe 210 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 210, who was the mother of Jose/Josefina Doe 210, is the legal heir to Jose/Josefina Doe 210 and resides in the municipality of Guacamayal.

254.     On December 12, 2002, Jose/Josefina Doe 211 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 211, who was the brother of Jose/Josefina Doe 211, is the legal heir to Jose/Josefina Doe 211 and resides in the municipality of Sevilla-Zona Bananera.

255.     On July 10, 2003, Jose/Josefina Doe 212 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 212, who was the wife of Jose/Josefina Doe 212, is the legal heir to Jose/Josefina Doe 212 and resides in the municipality of Sevilla-Magdalena.

256.     On September 25, 2003, Jose/Josefina Doe 213 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 213, who was the father of Jose/Josefina Doe 213, is the legal heir to Jose/Josefina Doe 213 and resides in the municipality of Guacamayal-Cienaga.

257.     On May 29, 2000, Jose/Josefina Doe 214 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 214, who was the mother of Jose/Josefina Doe 214, is the legal heir to Jose/Josefina Doe 214 and resides in the municipality of Sevilla-Zona Bananera.

258.     On September 29, 1997, Jose/Josefina Doe 215 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 215, who was the sister of Jose/Josefina Doe 215, is the legal heir to Jose/Josefina Doe 215 and resides in the municipality of Sevilla-Zona Bananera.

259.     On July 7, 1997, Jose/Josefina Doe 216 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 216, who was the wife of Jose/Josefina Doe 216, is the legal heir to Jose/Josefina Doe 216 and resides in the municipality of Cienaga-Magdalena.

260.     On December 25, 1996, Jose/Josefina Doe 217 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 217, who was the wife of Jose/Josefina Doe 217, is the legal heir to Jose/Josefina Doe 217 and resides in the municipality of Cienaga-Magdalena.

261.     On January 27, 1997, Jose/Josefina Doe 218 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 218, who was the mother of

Jose/Josefina Doe 218, is the legal heir to Jose/Josefina Doe 218 and resides in the municipality of Pueblo Viejo-Magdalena.

262.    On August 1, 2003, Jose/Josefina Doe 219 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 219, who was the mother of Jose/Josefina Doe 219, is the legal heir to Jose/Josefina Doe 219 and resides in the municipality of Cienaga-Magdalena.

263.    On July 14, 2001, Jose/Josefina Doe 220 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 220, who was the mother of Jose/Josefina Doe 220, is the legal heir to Jose/Josefina Doe 220 and resides in the municipality of Cienaga-Magdalena.

264.    On January 9, 1998, Jose/Josefina Doe 221 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 221, who was the wife of Jose/Josefina Doe 221, is the legal heir to Jose/Josefina Doe 221 and resides in the municipality of Guacamayal-Cienaga.

265.    On May 20, 1997, Jose/Josefina Doe 222 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 222, who was the mother of Jose/Josefina Doe 222, is the legal heir to Jose/Josefina Doe 222 and resides in the municipality of Cienaga-Magdalena.

266.    On April 19, 2001, Jose/Josefina Doe 223 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 223, who was the wife of Jose/Josefina Doe 223, is the legal heir to Jose/Josefina Doe 223 and resides in the municipality of Guacamayal-Cienaga.

267.    On November 14, 2004, Jose/Josefina Doe 224 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 224, who was the mother of Jose/Josefina Doe 224, is the legal heir to Jose/Josefina Doe 224 and resides in the municipality of Fonseca-Guajira.

268.    On June 2, 2000, Jose/Josefina Doe 225 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 225, who was the mother of Jose/Josefina Doe 225, is the legal heir to Jose/Josefina Doe 225 and resides in the municipality of Cienaga-Magdalena.

269.    On June 13, 2003, Jose/Josefina Doe 226 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 226, who was the wife of Jose/Josefina Doe 226, is the legal heir to Jose/Josefina Doe 226 and resides in the municipality of Cienaga-Magdalena.

270.    On August 22, 1998, Jose/Josefina Doe 227A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 227, who was the wife of

Jose/Josefina Doe 227A, is the legal heir to Jose/Josefina Doe 227A and resides in the municipality of Guacamayal.

271.     On March 21, 2002, Jose/Josefina Doe 227B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 227, who was the mother of Jose/Josefina Doe 227B, is the legal heir to Jose/Josefina Doe 227B and resides in the municipality of Guacamayal.

272.     On September 18, 1997, Jose/Josefina Doe 228 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 228, who was the wife of Jose/Josefina Doe 228, is the legal heir to Jose/Josefina Doe 228 and resides in the municipality of Cienaga-Magdalena.

273.     On March 18, 2005, Jose/Josefina Doe 229 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 229, who was the wife of Jose/Josefina Doe 229, is the legal heir to Jose/Josefina Doe 229 and resides in the municipality of Cienaga-Magdalena.

274.     On March 17, 1998, Jose/Josefina Doe 230 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 230, who was the son of Jose/Josefina Doe 230, is the legal heir to Jose/Josefina Doe 230 and resides in the municipality of Cienaga-Magdalena.

275.    On October 6, 2000, Jose/Josefina Doe 231 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 231, who was the wife of Jose/Josefina Doe 231, is the legal heir to Jose/Josefina Doe 231 and resides in the municipality of Sevilla-Zona Bananera.

276.    On July 8, 2002, Jose/Josefina Doe 232A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 232, who was the mother of Jose/Josefina Doe 232A, is the legal heir to Jose/Josefina Doe 232A and resides in the municipality of Sevilla-Zona Bananera.

277.    On July 8, 2002, Jose/Josefina Doe 232B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 232, who was the mother of Jose/Josefina Doe 232B, is the legal heir to Jose/Josefina Doe 232B and resides in the municipality of Sevilla-Zona Bananera.

278.    On August 27, 2003, Jose/Josefina Doe 233 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 233, who was the mother of Jose/Josefina Doe 233, is the legal heir to Jose/Josefina Doe 233 and resides in the municipality of Cienaga-Magdalena.

279.    On May 22, 2003, Jose/Josefina Doe 234 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 234, who was the wife of

Jose/Josefina Doe 234, is the legal heir to Jose/Josefina Doe 234 and resides in the municipality of Zona Bananera.

280.    On October 30, 1997, Jose/Josefina Doe 235 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 235, who was the wife of Jose/Josefina Doe 235, is the legal heir to Jose/Josefina Doe 235 and resides in the municipality of Tucurinca-Magdalena.

281.    On November 27, 1998, Jose/Josefina Doe 236 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 236, who was the wife of Jose/Josefina Doe 236, is the legal heir to Jose/Josefina Doe 236 and resides in the municipality of Cienaga-Magdalena.

282.    On April 20, 2003, Jose/Josefina Doe 237 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 237, who was the sister of Jose/Josefina Doe 237, is the legal heir to Jose/Josefina Doe 237 and resides in the municipality of Zona Bananera.

283.    On April 14, 2005, Jose/Josefina Doe 238 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 238, who was the wife of Jose/Josefina Doe 238, is the legal heir to Jose/Josefina Doe 238 and resides in the municipality of Zona Bananera.

284.    On May 12, 1999, Jose/Josefina Doe 239 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 239, who was the sister of Jose/Josefina Doe 239, is the legal heir to Jose/Josefina Doe 239 and resides in the municipality of Cienaga-Magdalena.

285.    On October 17, 2003, Jose/Josefina Doe 240 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 240, who was the son of Jose/Josefina Doe 240, is the legal heir to Jose/Josefina Doe 240 and resides in the municipality of Aracataca-Magdalena.

286.    On May 7, 2002, Jose/Josefina Doe 241 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 241, who was the sister of Jose/Josefina Doe 241, is the legal heir to Jose/Josefina Doe 241 and resides in the municipality of Aracataca-Magdalena.

287.    On November 15, 2002, Jose/Josefina Doe 242 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 242, who was the wife of Jose/Josefina Doe 242, is the legal heir to Jose/Josefina Doe 242 and resides in the municipality of Cienaga-Magdalena.

288.    On September 15, 2006, Jose/Josefina Doe 243 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 243, who was the sister of

Jose/Josefina Doe 243, is the legal heir to Jose/Josefina Doe 243 and resides in the municipality of Fundacion-Magdalena.

289.    On May 3, 1999, Jose/Josefina Doe 244 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 244, who was the sister of Jose/Josefina Doe 244, is the legal heir to Jose/Josefina Doe 244 and resides in the municipality of Tucurinca-Magdalena.

290.    On September 20, 2004, Jose/Josefina Doe 245 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 245 is the legal heir to Jose/Josefina Doe 245 and resides in the municipality of Aracataca-Magdalena.

291.    On May 14, 2003, Jose/Josefina Doe 246 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 246, who was the sister of Jose/Josefina Doe 246, is the legal heir to Jose/Josefina Doe 246 and resides in the municipality of Fundacion-Magdalena.

292.    On August 29, 1996, Jose/Josefina Doe 247 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 247, who was the brother of Jose/Josefina Doe 247, is the legal heir to Jose/Josefina Doe 247 and resides in the municipality of Aracataca-Magdalena.

293.    On August 20, 2004, Jose/Josefina Doe 248 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 248, who was the wife of Jose/Josefina Doe 248, is the legal heir to Jose/Josefina Doe 248 and resides in the municipality of Aracataca-Magdalena.

294.    On October 22, 1996, Jose/Josefina Doe 249 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 249, who was the mother of Jose/Josefina Doe 249, is the legal heir to Jose/Josefina Doe 249 and resides in the municipality of Cienaga-Magdalena.

295.    On May 6, 1999, Jose/Josefina Doe 250 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 250, who was the sister of Jose/Josefina Doe 250, is the legal heir to Jose/Josefina Doe 250 and resides in the municipality of Riosucio-Caldas.

296.    On April 8, 2005, Jose/Josefina Doe 251 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 251, who was the sister of Jose/Josefina Doe 251, is the legal heir to Jose/Josefina Doe 251 and resides in the municipality of Apartado.

297.    On March 25, 1997, Jose/Josefina Doe 252A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 252, who was the mother of Jose/Josefina Doe 252A, is the legal heir to Jose/Josefina Doe 252A and resides in the municipality of Apartado.

298.    On April 27, 1997, Jose/Josefina Doe 252B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 252, who was the mother of Jose/Josefina Doe 252B, is the legal heir to Jose/Josefina Doe 252B and resides in the municipality of Apartado.

299.    On July 15, 1997, Jose/Josefina Doe 253 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 253, who was the wife of Jose/Josefina Doe 253, is the legal heir to Jose/Josefina Doe 253 and resides in the municipality of Puerto Libertado-Cordoba.

300.    On April 18, 1998, Jose/Josefina Doe 254 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 254, who was the wife of Jose/Josefina Doe 254, is the legal heir to Jose/Josefina Doe 254 and resides in the municipality of Cienaga.

301.    On May 13, 2007, Jose/Josefina Doe 255 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 255, who was the sister of Jose/Josefina Doe 255, is the legal heir to Jose/Josefina Doe 255 and resides in the municipality of Apartado.

302.    On January 22, 1999, Jose/Josefina Doe 256 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 256, who was the wife of

Jose/Josefina Doe 256, is the legal heir to Jose/Josefina Doe 256 and resides in the municipality of Apartado-Antioquia.

303.    On April 26, 2002, Jose/Josefina Doe 257 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 257, who was the mother of Jose/Josefina Doe 257, is the legal heir to Jose/Josefina Doe 257 and resides in the municipality of Apartado.

304.    On June 2, 1997, Jose/Josefina Doe 258 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 258, who was the wife of Jose/Josefina Doe 258, is the legal heir to Jose/Josefina Doe 258 and resides in the municipality of Cienaga-Magdalena.

305.    On July 30, 1998, Jose/Josefina Doe 259 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 259, who was the wife of Jose/Josefina Doe 259, is the legal heir to Jose/Josefina Doe 259 and resides in the municipality of Cienaga-Magdalena.

306.    On October 8, 2001, Jose/Josefina Doe 260 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 260, who was the wife of Jose/Josefina Doe 260, is the legal heir to Jose/Josefina Doe 260 and resides in the municipality of Cienaga.

307.    On May 2, 1999, Jose/Josefina Doe 261 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 261, who was the son of Jose/Josefina Doe 261, is the legal heir to Jose/Josefina Doe 261 and resides in the municipality of Cienaga.

308.    On April 30, 1996, Jose/Josefina Doe 262 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 262, who was the mother of Jose/Josefina Doe 262, is the legal heir to Jose/Josefina Doe 262 and resides in the municipality of Cienaga.

309.    On May 11, 2004, Jose/Josefina Doe 263 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 263, who was the mother of Jose/Josefina Doe 263, is the legal heir to Jose/Josefina Doe 263 and resides in the municipality of Cienaga-Magdalena.

310.    On October 13, 1998, Jose/Josefina Doe 264 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 264, who was the sister of Jose/Josefina Doe 264, is the legal heir to Jose/Josefina Doe 264 and resides in the municipality of Cienaga-Magdalena.

311.    On December 2, 2002, Jose/Josefina Doe 265 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 265, who was the sister of

Jose/Josefina Doe 265, is the legal heir to Jose/Josefina Doe 265 and resides in the municipality of Cienaga-Magdalena.

312.    On May 5, 2002, Jose/Josefina Doe 266 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 266, who was the mother of Jose/Josefina Doe 266, is the legal heir to Jose/Josefina Doe 266 and resides in the municipality of Cienaga-Magdalena.

313.    On May 28, 2002, Jose/Josefina Doe 267 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 267, who was the father of Jose/Josefina Doe 267, is the legal heir to Jose/Josefina Doe 267 and resides in the municipality of Cienaga-Magdalena.

314.    On June 22, 1997, Jose/Josefina Doe 268 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 268, who was the mother of Jose/Josefina Doe 268, is the legal heir to Jose/Josefina Doe 268 and resides in the municipality of Cienaga-Magdalena.

315.    On October 20, 2001, Jose/Josefina Doe 269 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 269, who was the mother of Jose/Josefina Doe 269, is the legal heir to Jose/Josefina Doe 269 and resides in the municipality of Cienaga-Magdalena.

316.    On January 22, 2005, Jose/Josefina Doe 270 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 270, who was the brother of Jose/Josefina Doe 270, is the legal heir to Jose/Josefina Doe 270 and resides in the municipality of Cienaga-Magdalena.

317.    On August 5, 2004, Jose/Josefina Doe 271 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 271, who was the daughter of Jose/Josefina Doe 271, is the legal heir to Jose/Josefina Doe 271 and resides in the municipality of Barrio Concepcion.

318.    On October 17, 2003, Jose/Josefina Doe 272 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 272, who was the wife of Jose/Josefina Doe 272, is the legal heir to Jose/Josefina Doe 272 and resides in the municipality of Sevilla-Zona Bananera.

319.    On October 8, 2001, Jose/Josefina Doe 273 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 273, who was the sister of Jose/Josefina Doe 273, is the legal heir to Jose/Josefina Doe 273 and resides in the municipality of Cienaga-Magdalena.

320.    On May 15, 2003, Jose/Josefina Doe 274 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 274, who was the wife of

Jose/Josefina Doe 274, is the legal heir to Jose/Josefina Doe 274 and resides in the municipality of Cienaga-Magdalena.

321.    On September 9, 2004, Jose/Josefina Doe 275 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 275, who was the uncle of Jose/Josefina Doe 275, is the legal heir to Jose/Josefina Doe 275 and resides in the municipality of Sevilla-Zona Bananera.

322.    On February 21, 1997, Jose/Josefina Doe 276 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 276, who was the sister of Jose/Josefina Doe 276, is the legal heir to Jose/Josefina Doe 276 and resides in the municipality of Santa Marta-Magdalena.

323.    On August 12, 2002, Jose/Josefina Doe 277 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 277, who was the brother of Jose/Josefina Doe 277, is the legal heir to Jose/Josefina Doe 277 and resides in the municipality of Cienaga-Magdalena.

324.    On June 4, 2003, Jose/Josefina Doe 278 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 278, who was the father of Jose/Josefina Doe 278, is the legal heir to Jose/Josefina Doe 278 and resides in the municipality of Fonseca-Guajira.

325.    On January 1, 1997, Jose/Josefina Doe 279 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 279, who was the brother of Jose/Josefina Doe 279, is the legal heir to Jose/Josefina Doe 279 and resides in the municipality of Sevilla-Cienaga.

326.    On September 18, 1997, Jose/Josefina Doe 280 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 280, who was the husband of Jose/Josefina Doe 280, is the legal heir to Jose/Josefina Doe 280 and resides in the municipality of Sevilla-Zona Bananera.

327.    On August 16, 2006, Jose/Josefina Doe 281 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 281, who was the sister of Jose/Josefina Doe 281, is the legal heir to Jose/Josefina Doe 281 and resides in the municipality of Cienaga-Magdalena.

328.    On October 14, 2003, Jose/Josefina Doe 282 was killed or went missing by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 282, who was the wife of Jose/Josefina Doe 282, is the legal heir to Jose/Josefina Doe 282 and resides in the municipality of Cienaga-Magdalena.

329.    On September 20, 1998, Jose/Josefina Doe 283 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 283 is the legal heir to Jose/Josefina Doe 283 and resides in the municipality of Cienaga-Magdalena.

330.     On July 11, 2001, Jose/Josefina Doe 284 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 284 is the legal heir to Jose/Josefina Doe 284 and resides in the municipality of Pueblo Viejo-Magdalena.

331.     On January 15, 2005, Jose/Josefina Doe 285 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 285 is the legal heir to Jose/Josefina Doe 285 and resides in the municipality of Cienaga-Magdalena.

332.     On May 20, 2003, Jose/Josefina Doe 286 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 286, who was the mother of Jose/Josefina Doe 286, is the legal heir to Jose/Josefina Doe 286 and resides in the municipality of Pivijay-Magdalena.

333.     On April 11, 1997, Jose/Josefina Doe 287 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 287, who was the brother of Jose/Josefina Doe 287, is the legal heir to Jose/Josefina Doe 287 and resides in the municipality of Apartado.

334.     On April 21, 1999, Jose/Josefina Doe 288 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 288 is the legal heir to Jose/Josefina Doe 288 and resides in the municipality of Apartado-Antioquia.

335.    On August 27, 2000, Jose/Josefina Doe 289 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 289, who was the mother of Jose/Josefina Doe 289, is the legal heir to Jose/Josefina Doe 289 and resides in the municipality of Cienaga-Magdalena.

336.    On September 30, 2004, Jose/Josefina Doe 290 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 290, who was the aunt of Jose/Josefina Doe 290, is the legal heir to Jose/Josefina Doe 290 and resides in the municipality of Cienaga-Magdalena.

337.    On December 3, 2004, Jose/Josefina Doe 291 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 291, who was the wife of Jose/Josefina Doe 291, is the legal heir to Jose/Josefina Doe 291 and resides in the municipality of Cienaga-Magdalena.

338.    On June 16, 2004, Jose/Josefina Doe 292 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 292, who was the wife of Jose/Josefina Doe 292, is the legal heir to Jose/Josefina Doe 292 and resides in the municipality of Cienaga-Magdalena.

339.    On April 22, 1998, Jose/Josefina Doe 293 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 293, who was the mother of Jose/Josefina Doe 293, is the legal heir to Jose/Josefina Doe 293 and resides in the municipality of Apartado-Antioquia.

340.    On April 16, 2002, Jose/Josefina Doe 294 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 294, who was the wife of Jose/Josefina Doe 294, is the legal heir to Jose/Josefina Doe 294 and resides in the municipality of Apartado.

341.    On October 16, 2004, Jose/Josefina Doe 295 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 295, who was the mother of Jose/Josefina Doe 295, is the legal heir to Jose/Josefina Doe 295 and resides in the municipality of Supia-Caldes.

342.    On May 18, 2002, Jose/Josefina Doe 296 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 296, who was the wife of Jose/Josefina Doe 296, is the legal heir to Jose/Josefina Doe 296 and resides in the municipality of Apartado-Antioquia.

343.    On November 6, 1997, Jose/Josefina Doe 297 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 297, who was the mother of

Jose/Josefina Doe 297, is the legal heir to Jose/Josefina Doe 297 and resides in the municipality of Apartado.

344.     On October 21, 1996, Jose/Josefina Doe 298 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 298, who was the father of Jose/Josefina Doe 298, is the legal heir to Jose/Josefina Doe 298 and resides in the municipality of Apartado-Antioquia.

345.     On March 9, 2000, Jose/Josefina Doe 299 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 299, who was the mother of Jose/Josefina Doe 299, is the legal heir to Jose/Josefina Doe 299 and resides in the municipality of Apartado-Antioquia.

346.     On January 7, 1999, Jose/Josefina Doe 300 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 300, who was the wife of Jose/Josefina Doe 300, is the legal heir to Jose/Josefina Doe 300 and resides in the municipality of Apartado-Antioquia.

347.     On February 19, 2003, Jose/Josefina Doe 301 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 301, who was the mother of Jose/Josefina Doe 301, is the legal heir to Jose/Josefina Doe 301 and resides in the municipality of Cienaga-Magdalena.

348.    On October 1, 1996, Jose/Josefina Doe 302A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 302, who was the daughter of Jose/Josefina Doe 302A, is the legal heir to Jose/Josefina Doe 302A and resides in the municipality of Turbo-Antioquia.

349.    On October 1, 1996, Jose/Josefina Doe 302B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 302, who was the daughter of Jose/Josefina Doe 302B, is the legal heir to Jose/Josefina Doe 302B and resides in the municipality of Turbo-Antioquia.

350.    On July 5, 2001, Jose/Josefina Doe 303 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 303, who was the mother of Jose/Josefina Doe 303, is the legal heir to Jose/Josefina Doe 303 and resides in the municipality of Apartado.

351.    On July 16, 2004, Jose/Josefina Doe 304 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 304, who was the mother of Jose/Josefina Doe 304, is the legal heir to Jose/Josefina Doe 304 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

352.    On August 1, 2005, Jose/Josefina Doe 305 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 305, who was the mother of

Jose/Josefina Doe 305, is the legal heir to Jose/Josefina Doe 305 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

353.    On June 14, 2004, Jose/Josefina Doe 306 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 306, who was the mother of Jose/Josefina Doe 306, is the legal heir to Jose/Josefina Doe 306 and resides in the municipality of Sucre.

354.    On October 4, 2007, Jose/Josefina Doe 307 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 307, who was the wife of Jose/Josefina Doe 307, is the legal heir to Jose/Josefina Doe 307 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

355.    On December 29, 2001, Jose/Josefina Doe 308 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 308, who was the wife of Jose/Josefina Doe 308, is the legal heir to Jose/Josefina Doe 308 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

356.    On August 5, 2004, Jose/Josefina Doe 309 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 309, who was the sister of Jose/Josefina Doe 309, is the legal heir to Jose/Josefina Doe 309 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

357.     On February 13, 2005, Jose/Josefina Doe 310 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 310, who was the father of Jose/Josefina Doe 310, is the legal heir to Jose/Josefina Doe 310 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

358.     On June 24, 2007, Jose/Josefina Doe 311 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 311, who was the mother of Jose/Josefina Doe 311, is the legal heir to Jose/Josefina Doe 311 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

359.     On May 4, 1997, Jose/Josefina Doe 312 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 312, who was the mother of Jose/Josefina Doe 312, is the legal heir to Jose/Josefina Doe 312 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

360.     On February 12, 2007, Jose/Josefina Doe 313 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 313, who was the wife of Jose/Josefina Doe 313, is the legal heir to Jose/Josefina Doe 313 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

361.     On May 18, 2003, Jose/Josefina Doe 314 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 314, who was the mother of

Jose/Josefina Doe 314, is the legal heir to Jose/Josefina Doe 314 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

362.    On October 19, 2002, Jose/Josefina Doe 315 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 315, who was the mother of Jose/Josefina Doe 315, is the legal heir to Jose/Josefina Doe 315 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

363.    On November 4, 2006, Jose/Josefina Doe 316 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 316, who was the mother of Jose/Josefina Doe 316, is the legal heir to Jose/Josefina Doe 316 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

364.    On July 3, 2000, Jose/Josefina Doe 317 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 317, who was the wife of Jose/Josefina Doe 317, is the legal heir to Jose/Josefina Doe 317 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

365.    On December 31, 1999, Jose/Josefina Doe 318 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 318, who was the wife of Jose/Josefina Doe 318, is the legal heir to Jose/Josefina Doe 318 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

366.     On November 4, 2005, Jose/Josefina Doe 319 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 319, who was the wife of Jose/Josefina Doe 319, is the legal heir to Jose/Josefina Doe 319 and resides in the municipality of Monteria-Cordoba.

367.     On August 13, 2007, Jose/Josefina Doe 320 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 320 is the legal heir to Jose/Josefina Doe 320 and resides in the municipality of Sucre.

368.     On January 10, 1999, Jose/Josefina Doe 321A was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juan Doe 321 is the legal heir to Jose/Josefina Doe 321A and resides in the municipality of Toluviejo-Sucre.

369.     On August 25, 2000, Jose/Josefina Doe 321B was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 321 is the legal heir to Jose/Josefina Doe 321B and resides in the municipality of Toluviejo-Sucre.

370.     On August 25, 2000 Jose/Josefina Doe 321C was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 321 is the legal heir to Jose/Josefina Doe 321C and resides in the municipality of Toluviejo-Sucre.

371.     On May 9, 2000, Jose/Josefina Doe 322 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and

the other Defendants. Plaintiff Juan/Juana Doe 322 is the legal heir to Jose/Josefina Doe 322 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

372.     On August 22, 1997, Jose/Josefina Doe 323 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 323, who was the wife of Jose/Josefina Doe 323, is the legal heir to Jose/Josefina Doe 323 and resides in the municipality of Ovejas-Sucre.

373.     On August 9, 2004, Jose/Josefina Doe 324 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 324, who was the daughter of Jose/Josefina Doe 324, is the legal heir to Jose/Josefina Doe 324 and resides in the municipality of Monteria-Cordoba.

374.     On January 15, 2007, Jose/Josefina Doe 325 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 325, who was the wife of Jose/Josefina Doe 325, is the legal heir to Jose/Josefina Doe 325 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

375.     On April 21, 2006, Jose/Josefina Doe 326 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 326 is the legal heir to Jose/Josefina Doe 326 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

376.     On February 28, 1999, Jose/Josefina Doe 327 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 327, who was the wife of Jose/Josefina Doe 327, is the legal heir to Jose/Josefina Doe 327 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

377.    On December 19, 2003, Jose/Josefina Doe 328 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 328, who was the mother of Jose/Josefina Doe 328, is the legal heir to Jose/Josefina Doe 328 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

378.    On September 17, 1993, Jose/Josefina Doe 329 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 329, who was the wife of Jose/Josefina Doe 329, is the legal heir to Jose/Josefina Doe 329 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

379.    On November 1, 1996, Jose/Josefina Doe 330 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 330, who was the wife of Jose/Josefina Doe 330, is the legal heir to Jose/Josefina Doe 330 and resides in the municipality of Ovejas-Sucre.

380.    On August 23, 2000, Jose/Josefina Doe 331 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 331 is the legal heir to Jose/Josefina Doe 331 and resides in the municipality of Toluviejo-Sucre.

381.    On November 16, 2005, Jose/Josefina Doe 332 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 332 is the legal heir to Jose/Josefina Doe 332 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

382.    On February 1, 1995, Jose/Josefina Doe 333 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 333 is the legal heir to Jose/Josefina Doe 333 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

383.    On June 3, 1994, Jose/Josefina Doe 334 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 334, who was the wife of Jose/Josefina Doe 334, is the legal heir to Jose/Josefina Doe 334 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

384.    On January 24, 2006, Jose/Josefina Doe 335 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 335, who was the wife of Jose/Josefina Doe 335, is the legal heir to Jose/Josefina Doe 335 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

385.    On November 12, 2001, Jose/Josefina Doe 336 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 336 is the legal heir to Jose/Josefina Doe 336 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

386.     On November 20, 2005, Jose/Josefina Doe 337 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 337, who was the wife of Jose/Josefina Doe 337, is the legal heir to Jose/Josefina Doe 337 and resides in the municipality of Sincelejo-Sucre.

387.     On February 27, 1997, Jose/Josefina Doe 338 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 338, who was the daughter of Jose/Josefina Doe 338, is the legal heir to Jose/Josefina Doe 338 and resides in the municipality of Ovejas-Sucre.

388.     On July 3, 2000, Jose/Josefina Doe 339 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 339, who was the brother of Jose/Josefina Doe 339, is the legal heir to Jose/Josefina Doe 339 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

389.     On October 13, 2002, Jose/Josefina Doe 340 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana 340, who was the sister of Jose/Josefina Doe 340, is the legal heir to Jose/Josefina Doe 340 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

390.     On September 18, 1999, Jose/Josefina Doe 341 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 341, who was the mother of

Jose/Josefina Doe 341, is the legal heir to Jose/Josefina Doe 341 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

391.    On September 24, 2000, Jose/Josefina Doe 342 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 342, who was the father of Jose/Josefina Doe 342, is the legal heir to Jose/Josefina Doe 342 and resides in the municipality of El Coley-Sucre.

392.    On September 18, 2006, Juan/Juana Doe 343 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 343 resides in the municipality of Corozal-Sucre-Sucre-Sucre.

393.    On November 9, 2003, Jose/Josefina Doe 344 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 344, who was the mother of Jose/Josefina Doe 344, is the legal heir to Jose/Josefina Doe 344 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

394.    On September 7, 2005, Jose/Josefina Doe 345 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 345, who was the wife of Jose/Josefina Doe 345, is the legal heir to Jose/Josefina Doe 345 and resides in the municipality of Ovejas-Sucre.

395.    On July 4, 2001, Jose/Josefina Doe 346 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and

the other Defendants. Plaintiff Juan/Juana Doe 346, who was the father of Jose/Josefina Doe 346, is the legal heir to Jose/Josefina Doe 346 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

396.    On November 29, 2003, Jose/Josefina Doe 347 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 347, who was the wife of Jose/Josefina Doe 347, is the legal heir to Jose/Josefina Doe 347 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

397.    On August 3, 1999, Jose/Josefina Doe 348 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 348, who was the mother of Jose/Josefina Doe 348, is the legal heir to Jose/Josefina Doe 348 and resides in the municipality of San Onofre-Sucre.

398.    On October 7, 2002, Jose/Josefina Doe 349 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 349, who was the wife of Jose/Josefina Doe 349, is the legal heir to Jose/Josefina Doe 349 and resides in the municipality of San Pedro-Sucre.

399.    On October 3, 2002, Jose/Josefina Doe 350 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 350, who was the sister of Jose/Josefina Doe 350, is the legal heir to Jose/Josefina Doe 350 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

400.    On May 4, 1997, Jose/Josefina Doe 351 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 351, who was the mother of Jose/Josefina Doe 351, is the legal heir to Jose/Josefina Doe 351 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

401.    On July 28, 1994, Jose/Josefina Doe 352 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 352 is the legal heir to Jose/Josefina Doe 352 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

402.    On June 18, 2004, Jose/Josefina Doe 353 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 353, who was the mother of Jose/Josefina Doe 353, is the legal heir to Jose/Josefina Doe 353 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

403.    On December 29, 2000, Jose/Josefina Doe 354 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 354, who was the brother-in-law of Jose/Josefina Doe 354, is the legal heir to Jose/Josefina Doe 354 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

404.    On September 17, 1998, Jose/Josefina Doe 355 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 355, who was the wife of

Jose/Josefina Doe 355, is the legal heir to Jose/Josefina Doe 355 and resides in the municipality of San Jose de Pileta-Sucre.

405.    On May 26, 1999, Juan/Juana Doe 356 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 356 resides in the municipality of Corozal-Sucre-Sucre-Sucre.

406.    On April 25, 1992, Jose/Josefina Doe 357 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 357, who was the wife of Jose/Josefina Doe 357, is the legal heir to Jose/Josefina Doe 357 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

407.    On January 8, 2002, Jose/Josefina Doe 358 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 358, who was the sister of Jose/Josefina Doe 358, is the legal heir to Jose/Josefina Doe 358 and resides in the municipality of Ovejas-Sucre.

408.    On April 16, 2005, Jose/Josefina Doe 359 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 359, who was the father of Jose/Josefina Doe 359, is the legal heir to Jose/Josefina Doe 359 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

409.    On August 20, 2001, Jose/Josefina Doe 360 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or

Banadex and the other Defendants. Plaintiff Juan/Juana Doe 360, who was the father of Jose/Josefina Doe 360, is the legal heir to Jose/Josefina Doe 360 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

410.    On August 10, 2004, Jose/Josefina Doe 361 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 361, who was the mother of Jose/Josefina Doe 361, is the legal heir to Jose/Josefina Doe 361 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

411.    On November 7, 2002, Jose/Josefina Doe 362 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 362, who was the wife of Jose/Josefina Doe 362, is the legal heir to Jose/Josefina Doe 362 and resides in the municipality of Sincelejo-Sucre.

412.    On May 25, 2000, Jose/Josefina Doe 363 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 363 is the legal heir to Jose/Josefina Doe 363 and resides in the municipality of Sincelejo-Sucre.

413.    On June 8, 1995, Jose/Josefina Doe 364 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 364, who was the wife of Jose/Josefina Doe 364, is the legal heir to Jose/Josefina Doe 364 and resides in the municipality of San Juan de Betulia-Sucre.

414.    On February 15, 1997, Jose/Josefina Doe 365 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 365, who was the wife of Jose/Josefina Doe 365, is the legal heir to Jose/Josefina Doe 365 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

415.    On February 15, 1997, Jose/Josefina Doe 366 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 366, who was the wife of Jose/Josefina Doe 366, is the legal heir to Jose/Josefina Doe 366 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

416.    On October 27, 2006, Jose/Josefina Doe 367 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 367, who was the mother of Jose/Josefina Doe 367, is the legal heir to Jose/Josefina Doe 367 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

417.    On August 17, 1990, Jose/Josefina Doe 368 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 368 is the legal heir to Jose/Josefina Doe 368 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

418.    On November 9, 2003, Jose/Josefina Doe 369 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 369, who was the mother of

Jose/Josefina Doe 369, is the legal heir to Jose/Josefina Doe 369 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

419.    On August 27, 2000, Jose/Josefina Doe 370 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 370, who was the brother of Jose/Josefina Doe 370, is the legal heir to Jose/Josefina Doe 370 and resides in the municipality of San Juan de Betulia-Sucre.

420.    On May 29, 1995, Jose/Josefina Doe 371was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 371, who was the mother of Jose/Josefina Doe 371, is the legal heir to Jose/Josefina Doe 371 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

421.    On April 26, 2001, Jose/Josefina Doe 372 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 372, who was the son of Jose/Josefina Doe 372, is the legal heir to Jose/Josefina Doe 372 and resides in the municipality of Apartado-Antioquia.

422.    On March 31, 2000, Jose/Josefina Doe 373 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 373, who was the wife of Jose/Josefina Doe 373, is the legal heir to Jose/Josefina Doe 373 and resides in the municipality of Corozal-Sucre-Sucre-Sucre.

423.    On May 1, 1998, Jose/Josefina Doe 374 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants. Plaintiff Juan/Juana Doe 374, who was the wife of Jose/Josefina Doe 374, is the legal heir to Jose/Josefina Doe 374 and resides in the municipality of Apartado-Antioquia.

424.    On March 16, 1997, Jose/Josefina Doe 375 was killed by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 375, who was the sister-in-law of Jose/Josefina Doe 375, is the legal heir to Jose/Josefina Doe 375 and resides in the municipality of Apartado-Antioquia.

425.    On September 20, 2002, Juan/Juana Doe 376 was shot and severely injured by AUC Paramilitaries, aided, abetted, solicited, facilitated and in conspiracy with Chiquita and/or Banadex and the other Defendants.  Plaintiff Juan/Juana Doe 377 is the spouse of Plaintiff Juan/Juana 376.  Plaintiff Juan/Juana Doe 377 claims loss of services of Plaintiff Juan/Juana Doe 376.  They reside in the municipality of Santaurio-Antioquia.

<u>The Colombian Conflict/Civil War</u>

426.    Heretofore and at the time of the occurrences herein, there existed a state of armed conflict and civil war in Colombia.

427.    At the time of the occurrences herein, there were three main sets of actors in Colombia's longstanding conflict: leftist guerrilla groups, right-wing paramilitary groups, and government security forces.

428.    The most significant leftist guerilla group was, and is, the Revolutionary Armed Forces of Colombia (FARC).

429.    In 2004, the FARC was estimated to have about 18,000 members in almost 70 fronts, organized in regional "blocs," plus mobile columns and urban militias. The group controlled and/or or operated freely in 40 to 60 percent of the country, usually sparsely populated areas, rural zones, jungles and plains, and rarely in significant population centers.

430.    While it received limited assistance from the Soviet bloc during the Cold War, the FARC financed itself through kidnapping for ransom, extortion, and involvement in Colombia's drug trade.

431.    The FARC grew rapidly during the 1990s, and dealt the Colombian military several humiliating defeats in 1996-1998.

<u>The AUC</u>

432.    The Autodefensas Unidas de Colombia ("AUC') is a right wing paramilitary organization in Colombia.

433.    Heretofore and at the time of the occurrences herein, The AUC's operations, included terrorism, massacres, extra-judicial killings, murders, disappearances forced displacements, threats and intimidation.

434.    The AUC financed itself from a variety of sources, including but not limited to the drug trade, and by monetary payments from American corporations such as CHIQUITA, as more fully set forth below.

435.    The AUC was founded by Carlos Castano Gil, and is the successor to the "ACCU", the Peasant Self-Defense Group of Cordoba and Uraba.

94

436.     In 1994, Castano and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castano's leadership.

437.     In 1997, the AUC comprised roughly 4,000 combatants. By 2001, Castano claimed to have 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present in nearly the whole of Colombia. AUC leaders have claimed that the organization comprised as many as 17,000 armed fighters and 10,000 associates at its peak before a demobilization process that began in 2004.

438.     Carlos Castano was allegedly murdered in April 2004. Subsquently, the most publicly recognized leader of the AUC was Salvatore Mancuso. A former Córdoba rancher, Mancuso became the "Maximum Comandante" of the AUC and chief negotiator in Santa Fe de Ralito.

439.     Run by AUC military leader Salvatore Mancuso, the Northern Bloc of the AUC incorporated Carlos Castaño's original ACCU, controlling municipalities in a swath of territory stretching from the Panamanian to the Venezuelan borders. Mancuso's deputy in the Caribbean coast was Rodrigo Tovar Pupo, more commonly known as Jorge 40, whom authorities believe controlled much of Colombia's Caribbean drug routes. Vicente Castaño, Carlos and Fidel's brother, is a third powerful player - and he is widely believed to have played a role in Carlos' death. The Northern Bloc demobilized in March of 2006. Vicente Castaño is a fugitive from justice.

440.     Led by José Alfredo "El Alemán" Berrío, the Elmer Cardenas Bloc of

the AUC was originally part of the ACCU, which through a wave of brutality and massacres gained control of the strategic Urabá region near the Colombian-Panamanian border during the 1990s. Substantial evidence suggests that Berrío and the Élmer Cárdenas Bloc are very strong in drug trafficking.

441.    Other blocs of the AUC existed and/or continue to exist including, but not limited to, the Catatumbo Bloc, the Madgdalena Medio Bloc, the Central Bolivar Bloc, the Mineros Bloc, the Calima Bloc, and others.

442.    The activities of the AUC were directed toward elimination of anyone considered close to the guerillas or who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power.

443.    The AUC's primary method was terrorism against individuals or communities.  To this end, the AUC routinely engaged in death threats, extrajudicial killings, massacres, torture, rape, kidnapping, forced disappearances, and looting.  The AUC periodically engaged in direct combat with armed guerilla forces, but the vast majority of its victims were civilians targeted by a policy of political and social cleansing,- typically rural workers, trade unionists, community activists, human rights defenders, leftist politicians, judicial investigators and inhabitants of small towns in contested rural areas.

444.    AUC violence has often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

445.    The AUC and its constituent groups, including the ACCU, have, at least since 1994, been participating in an internal armed conflict in Colombia, at times

engaging in direct conflict with guerilla armies.  The AUC itself has accepted that it is subject to the laws of war, with the limited exception that it believes it has the privilege to execute guerillas hors de combat, and has accepted training in the laws of war from the International Committee of the Red Cross.

Ties Between the AUC and the Colombian Government

446.    The Colombian security forces tolerated and collaborated with the AUC in committing massacres, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation, including but not limited to the deaths and injuries of the plaintiff sued for herein.

447.    The Colombian security forces regarded the AUC as de facto allies in the civil war against leftist guerillas.

448.    High officials in the Colombian government collaborated with and directed the operations of the AUC including massacres, extra-judicial killings, murders, disappearances forced displacements, threats and intimidation.

449.    High officials in the Colombian civilian government and the Colombian military, collaborated with and orchestrated massacres, extra-judicial killings, murders, disappearances forced displacements, threats and intimidation against persons including the plaintiffs' decedents. To date, Colombian authorities have charged at least 14 members of Colombia's Congress, seven former lawmakers, the head of the secret police, mayors and former governors with illegally collaborating with paramilitaries.  According to testimony of Salvatore Mancuso, two current ministers in the present Uribe government, Vice President Francisco Santos, and Defense Minister Juan Manuel Santos, met and collaborated with paramilitaries.

97

450.    Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett, and General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, aided and abetted the AUC in the commission of various massacres, extrajudicial killings and other atrocities against civilians, including the plaintiffs, and or gave tacit support to and acquiescence in their activities.

451.    General Montoya was linked to Diego Murillo, the former leader of an AUC affiliated paramilitary group in Medellin.

452.    The presence in the military of high ranking staff officers known to have close ties to the AUC and other paramilitaries was widely regarded within the army as tolerance for the paramilitaries.

453.    In July 1997, approximately 200 AUC paramilitaries from the Uraba region murdered at least 30 civilians in Mapiripan, Colombia with the active assistance of the Columbian military. The paramilitaries arrived by chartered plane at San Jose Del Guaviare airport and were not subjected to identification or cargo checks by airport police. During their 5 day stay in the town, the commander of a nearby military base, Major Hernan Orozco, then acting commander of the Joaquin Paris Battalion and Brig. General. Jaime Humerto Uscategui, Commander of the parent unit 7th Brigade, and other officials, including the Mayor, knowingly failed to respond to the massacre, indicating their complicity.

454.    AUC paramilitaries provided assistance to the military during large scale operations against guerilla strongholds.

455.    The AUC carried out selective assassinations, and massacres of suspected leftist sympathizers.

456.    The political goal of the AUC was to drive the FARC out of Uraba, Santa Marta and other regions of Colombia.

457.    The AUC was the de facto government of Uraba, Santa Marta and other regions of Colombia.

458.    In 2001, a ship unloaded 3400 AK47 rifles and 4 million rounds of ammunition in a Banadex controlled dock in Colombia destined for the AUC.

459.    According to Mario Iguaran, Colombia's attorney general, there was a criminal relationship between CHIQUITA and the AUC in which CHIQUITA supplied money and arms to the AUC in return for the bloody pacification of Uraba.

460.    The Colombian state was a participant in illegal payments by CHIQUITA to the AUC through a program known as Convivir, a network of private security cooperatives licensed by the government to patrol rural areas and gather intelligence under the direction of military commanders.

461.    The Colombian government authorized the formation of Convivirs in November 1995 to aid the military in counterinsurgency operations by empowering civilians to gather information about guerilla activities in rural areas and pass it on to local commanders.  The official name of these organizations was Rural Cooperatives of Vigilance and Security.

462.    Colombian president Alvaro Uribe was one of the program's key sponsors while governor of Uraba in the mid 1990s, which support has contined while he has been president.

463.    CHIQUITA channeled AUC payments through intermediaries from various convivir groups in Uraba; the fact that the company chanelled illegal payments through the ledgers of the state-backed security network indicates that the AUC, the convivir, the Colombian government and CHIQUITA were acting in concert.

464.    The Convivir were and are directly linked to some of the most brutal massacres in the Uraba region, including the deaths of the plaintiffs' decedents.

465.    The Colombian government, through ministry of defense officials authorized illegal arms sales to convivirs with links to the AUC and other paramilitaries , including a wide range of weapons legally restricted for exclusive use by the armed forces, including submachine guns, 9mm pistols, mini-Uzis, rifles and munitions.

466.    The Ministry of Defense was providing a legal cover for the paramiltiaries.

467.    According to the United States Drug Enforcement Agency (DEA), Carlos Castaño was connected to some of the world's richest drug dealers.  Castano has openly admitted that drug trafficking finances 70 percent of his operation.  He often boasts of his strategy, "quitarle agua al pez", or draining the sea to catch the fish (killing the innocent to catch the guerillas). When asked why he slaughters peasants, women and children, he replies, "Well, I can't wait for the guerillas to put on their uniforms before I kill them. When we take out [a sympathizer] we save many who would've been killed in the future."  Robin Kirk, author of "War with Colombia and International Law," claims

that the death squads make their massacres as brutal and gruesome as possible to make sure their message is understood.

468.    On a Friday in July 2000, in the village of El Salado, some 300 paramilitaries arrived and went straight to the makeshift basketball court which doubles as the main square there, announced themselves as members of the AUC, and with a list of names began "summoning people for judgment." A table and chairs were seized from a house, and after the death squad leader had made himself comfortable, the basketball court was turned into a court of execution. The paramilitary troops ordered up liquor and music, and then embarked on a rampage of torture, rape and killing.  By the time they left, they had killed at least 36 people whom they accused of collaborating with the enemy. The victims ranged from a six-year-old girl to an elderly woman.  As music blared, some of the victims were shot after being tortured; others were stabbed or beaten to death, and several more were strangled.  Yet during the three days of killing, military and police units just a few miles away made no effort to stop the slaughter. At one point the paramilitaries had a helicopter flown in to rescue a fighter who had been injured trying to drag some victims from their home. Instead of fighting back, the armed forces set up a roadblock on the road to the village shortly after the rampage began and prevented human rights and relief groups from entering and rescuing residents," (NYT News Service, July 2000).

469.    According to the 2000 State Department report on Human Rights, "High-ranking government security forces committed serious abuses, including extra judicial killings, but were rarely brought to justice."

470.    The US Army School of the Americas (SOA), now renamed the

Western Hemisphere Institute for Security Cooperation (WHISC), has an extensively documented history of training some of the hemisphere's worst human rights abusers. It acquired its nickname the "School of Assassins" for obvious reasons. SOA graduates are currently involved in the dirty war now being waged in Colombia with US support. The school is now drawing more of its students from Colombia than from any other country, over 10,000 to so far.

471.     In 2000, Human Rights Watch released a report linking SOA graduates to the formation and operation of Colombian paramilitary death squads. These groups are notorious for horrific atrocities including rape, torture, chainsaw massacres, other types of terrifying massacres, and assassinations. Among those graduates cited for involvement with paramilitary groups were: Maj. David Hernandez Rojas, cited for the 1999 murder of peace commissioner Alex Lopera, and who was working with the ACCU; Maj. Jesus Maria Clavijo and Maj. Alvaro Cortes Morillo, linked in 1999 to paramilitary groups through cell phone and beeper communications as well as regular meetings on military bases; Gen. Carlos Ospina Ovalle, former commander of the Fourth Brigade cited with "extensive evidence of pervasive ties" to paramilitary groups involved in human rights atrocities in 1999; Brigadier General Jaime Alban, who commands the Third Brigade of the Colombian military, the brigade responsible for setting up a paramilitary death squad known as the "Calima Front" in 1999.  A 2001 Human Rights Watch report states that "the Calima Front and the Third Brigade are the same thing. The Third Brigade provided the Calima Front with weapons and intelligence."  The report also notes that, "Half of Colombia's eighteen brigade-level army units have documented links to paramilitary activity.

472.    Longstanding and pervasive ties exist between the AUC and official

Colombian security forces, which include the Colombian Armed Forces and the

Colombian National Police.  Collusion with government forces has been a feature of

Colombian paramilitaries since their inception.  In the 1980's, paramilitaries were

partially organized and armed by the Colombian military and participated in campaigns

of the official armed forces against guerilla insurgents.  Paramilitary forces included

active-duty and retired army and police personnel among their members.  Although a

1989 government decree established criminal penalties for providing assistance to

paramilitaries, the continued existence of military/paramilitary ties has been documented

by Colombian non-governmental organizations, international human rights groups, the

U.S. State Department, the Office of the U.N. High Commissioner for Human Rights,

and the Colombian Attorney General 's office.  Cooperation with paramilitaries has been

demonstrated in half of Colombia's eighteen brigade –level Army units, spread across all

of the Army's regional divisions.  Such cooperation is so pervasive that the paramilitaries

are referred to by many in Colombian as the "Sixth Division," in addition to the five

official divisions of the Colombian Army.

473.    Government securities forces have habitually tolerated the presence of

paramilitaries and have willfully failed to prevent or interrupt their crimes, actively

conspired with them and coordinated activities with them.  Documented examples

include: Allowing paramilitaries to establish permanent bases and checkpoints without

interference; Failing to carry out arrest warrants for paramilitary leaders, who move about

the country freely; withdrawing security forces from villages deemed sympathetic to

guerillas, leaving them vulnerable to attack by paramilitaries; failing to intervene to stop

ongoing massacres occurring over a period of days; sharing intelligence, including the names of suspect guerilla collaborators; sharing vehicles, including army trucks used to transport paramilitary fighters; supplying weapons and munitions; allowing passage through roadblocks; providing support with helicopters and medical aid; communicating via radio, cellular telephones, and beepers; sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and planning and carrying out joint operations.

474.    In a recurring pattern, paramilitaries have taken over villages and assaulted inhabitants while nearby security forces have either failed to intervene or have intervened to facilitate the violence.  In October 1997, for example, members of the Army's Fourth Brigade reportedly established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.  In January 2001, more than one hundred AUC fighters took over the village of Chengue, in Sucre.  The AUC executed twenty-five people before setting fire to the village and forcibly disappearing ten additional villagers. Troops from the First Marine Infantry Unit positioned outside the village allegedly prevented humanitarian organizations from entering the area to aid survivors.

475.    According to testimony of Salvatore Mancuso given on May15-17, 2007, paramilitarism was State Policy in the Republic of Colombia.

CHIQUITA's Ties to the AUC and its Conspiracy and Aiding and Abetting of the
Murders/Disappearances/Tortures of Plaintiffs' Decedents and/or Plaintiff(s)

476.     Plaintiffs hereby incorporate by reference and specifically allege all of the allegations of the Factual Proffer filed March 19, 2007 in a criminal case entitled "United States of America v. Chiquita Brands International, Inc.," Criminal No. 07-055 in the United States District Court for the District of Columbia, as follows:

477.     Defendant CHIQUITA BRANDS INTERNATIONAL, INC. ("CHIQUITA"), was a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio.  Defendant CHIQUITA engaged in the business of producing, marketing, and distributing bananas and other fresh produce.  Defendant CHIQUITA was one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America, including within the District of Columbia.  Defendant CHIQUITA reported over $2.6 billion in revenue for calendar year 2003.  Defendant CHIQUITA had operations throughout the world, including the Republic of Colombia.

478.     C.I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as "Banadex"), was defendant CHIQUITA's wholly-owned Colombian subsidiary.  Banadex produced bananas in the Urabá and Santa Marta regions of Columbia.  By 2003, Banadex was defendant CHIQUITA's most profitable banana-producing operation.  In June 2004, defendant CHIQUITA sold Banadex.

479.     The United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), was a violent, right-wing organization in the Republic of Colombia.  The AUC was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retalitate against

left-wing guerillas fighting the Colombian government.  The AUC's activities varied

from assassinating suspected guerilla supporters to engaging guerrilla combat units.  The

AUC also engaged in other illegal activities, including the kidnapping and murder of

civilians.

480.    Pursuant to Title 8, United States Code, Section 1189, the Secretary of

State of the United States had the authority to designate a foreign organization as a

Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity

threatening the national security of the United States.

481.    The Secretary of State of the United States designated the AUC as an

FTO, initially on September 10, 2001, and again on September 10, 2003.  As a result of

the FTO designation, since September 10, 2001, it has been a crime for any United States

person, among other things, to knowingly provide material support and resources,

including currency and monetary instruments, to the AUC.

482.    The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et

seq.,* conferred upon the President of the United States the authority to deal with threats

to the national security, foreign policy and economy of the United States.  On September

23, 2001, pursuant to this authority, President George W. Bush issued Executive Order

13224.  This Executive Order prohibited, among other things, any United States person

from engaging in transactions with any foreign organization or individual determined by

the Secretary of State of the United States, in consultation with the Secretary of the

Treasury of the United States and the Attorney General of the United States, to have

committed, or posed a significant risk of committing, acts of terrorism that threaten the

security of United States nationals or the national security, foreign policy or economy of

the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

483.    The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201, *et seq.,* implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Colombia, was the entity empowered to authorize transactions with an SDGT. Such authorization, if granted, would have been in the form of a license.

484.    Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having first obtained a license or other authorization from OFAC.

485.    Individual A was a high-ranking officer of defendant CHIQUITA.

486.    Individual B was a member of the Board of Directors of defendant CHIQUITA ("Board").

487.    Individual C was a high-ranking officer of defendant CHIQUITA.

488.    Individual D was a high-ranking officer of defendant CHIQUITA.

489.    Individual E was a high-ranking officer of defendant CHIQUITA.

490.    Individual F was a high-ranking officer of Banadex.

491.    Individual G was an employee of Banadex.

492.    Individual H was an employee of defendant CHIQUITA.

493.    Individual I was an employee of defendant CHIQUITA.

494.    Individual J was a high-ranking officer of defendant CHIQUITA.

495.    For over six years – from in or about 1997 through on or about February 4, 2004 – defendant CHIQUITA, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-producing operations: Urabá and Santa Marta. Defendant CHIQUITA paid the AUC, directly or indirectly, nearly every month.  From in or about 1997 through on or about February 4, 2004, defendant CHIQUITA made over 100 payments to the AUC totaling over $1.7 million.

496.    Defendant CHIQUITA had previously paid money to other terrorist organizations operating in Colombia, namely to the following violent, left-wing terrorist organizations:  Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as "the FARC"); and the National Liberation Army – an English translation of the Spanish name of the group "Ejército de Liberación Nacional" (commonly known as and referred to hereinafter as "the ELN").  Defendant CHIQUITA made these earlier payments from in or about 1989 through in or about 1997, when the FARC and the ELN controlled areas where defendant CHIQUITA had its banana-producing operations.   The FARC and the ELN were designated as FTOs in October 1997.

497.    Defendant CHIQUITA began paying the AUC in Urabá following a meeting in or about 1997 between the then-leader of the AUC, Carlos Castaño, and Banadex's then-General Manager.  At the meeting Castaño informed the General Manager that the AUC was about to drive the FARC out of Urabá.  Castaño also instructed the General Manager that defendant CHIQUITA's subsidiary had to make payments to an intermediary known as a "convivir." Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property.  Convivirs were private security companies licensed by the Colombian government to assist the local police and military in providing security.  The AUC, however, used certain convivirs as fronts to collect money from businesses for use to support its illegal activities.

498.    Defendant CHIQUITA's payments to the AUC were reviewed and approved by senior executives of the corporation, to include high-ranking officers, directors, and employees.  No later than in or about September 2000, defendant CHIQUITA's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.  An in-house attorney for defendant CHIQUITA conducted an internal investigation into the payments and provided Individual C with a memorandum detailing that investigation.  The results of that internal investigation were discussed at a meeting of the then-Audit Committee of the then-Board of Directors in defendant CHIQUITA's Cincinnati headquarters in or about September 2000.  Individual C, among others, attended this meeting.

499.    For several years defendant CHIQUITA paid the AUC by check through various convivirs in both the Urabá and Santa Marta regions of Colombia.  The checks

were nearly always made out to the convivirs and were drawn from the Colombian bank accounts of defendant CHIQUITA's subsidiary. No convivir ever provided defendant CHIQUITA or Banadex with any actual security services or actual security equipment in exchange for the payments, for example, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant CHIQUITA recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

500.    In or about April, 2002, defendant CHIQUITA seated a new Board of Directors and Audit Committee following defendant CHIQUITA's emergence from bankruptcy.

501.    Beginning in or about June, 2002, defendant CHIQUITA began paying the AUC in the Santa Marta region of Colombia directly and in cash according to new procedures established by senior executives of defendant CHIQUITA. In or about March, 2002, Individual C and others established new procedures regarding defendant CHIQUITA's direct cash payments to the AUC. According to these new procedures: Individual F received a check that was made out to him personally and drawn from one of the Colombian bank accounts of defendant CHIQUITA's subsidiary. Individual F then endorsed the check. Either Individual F or Individual G cashed the check, and Individual G hand-delivered the cash directly to AUC personnel in Santa Marta.

502.    Banadex treated these direct cash payments to the AUC as payments to Individual F, recorded the withholding of the corresponding Colombian tax liability, reported the payments to Individual F as such to Colombian tax authorities, and paid Individual F's corresponding Colombian tax liability. This treatment of the payments

made it appear that Individual F was being paid more money and thus increased the risk that Individual F would be a target for kidnapping or other physical harm if this became known.

503.    Individual F also maintained a private ledger of the payments, which did not reflect the ultimate and intended recipient of the payments.  The private ledger only reflected the transfer of funds from Individual F to Individual G and not the direct cash payments to the AUC.

504.    On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in defendant CHIQUITA's Cincinnati headquarters, Individual C described the procedures referenced in Paragraph 25 [of the Factual Proffer].  Individual A, Individual B, and Individual E, among others, attended this meeting.

505.    The United States government designated the AUC as a FTO on September 10, 2001, and that designation was well-publicized in the American public media.  The AUC's designation was first reported in the national press (for example, in the Wall Street Journal and the New York Times) on September 11, 2001.  It was later reported in the local press in Cincinnati where defendant CHIQUITA's headquarters were located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001.  The AUC's designation was even more widely reported in the public media in Colombia, where defendant CHIQUITA had its substantial banana-producing operations.

506.    Defendant CHIQUITA had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that defendant CHIQUITA paid money to

receive.  On or about September 30, 2002, Individual H, from a computer within

defendant CHIQUITA's Cincinnati headquarters, accessed this service's "Colombia –

Update page," which contained the following reporting on the AUC:

> "US terrorist designation.
>
> International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations.  This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

507.    From on or about September 10, 2001, through on or about February 4,

2004, defendant CHIQUITA made 50 payments to the AUC totaling over $825,000.

Defendant CHIQUITA never applied for nor obtained any license from the Department

of the Treasury's Office of Foreign Assets Control with respect to any of its payments to

the AUC.

508.    On or about September 12, 2001, Individual G paid the AUC in Urabá and

Santa Marta by check in an amount equivalent to $31,847.[1]

509.    On or about November 14, 2001, Individual F and Individual G paid the

AUC in Urabá and Santa Marta by check in the amount equivalent to $56,292.

510.    On or about December 12, 2001, Individual F and Individual G paid the

AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

511.    On or about February 4, 2002, Individual F and Individual G paid the

AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

---

[1]     With respect to all statements in this Factual Proffer relating to payments by check, the "on or about" dates refer to the dates on which such checks cleared the bank, not the dates on which the checks were issued or delivered.

512.    On or about March 7, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

513.    On or about March 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

514.    On or about April 16, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,675.

515.    On or about May 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $10,888.

516.    On or about May 31, 2002, Individual F and Individual G paid the AUC Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

517.    In or about June 2002, Individual F and Individual G began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 25.

518.    On or about June 11, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670 and $6,269, respectively.

519.    On or about June 14, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $31,131.

520.    On or about July 2, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $11,585.

521.    On or about July 9, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

522.    On or about August 6, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

523.    On or about August 15, 202, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,841.

524.    On or about September 2, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

525.    On or about October 7, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

526.    On or about October 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $40,419.

527.    On or about November 8, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

528.    On or about November 29, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

529.    On or about December 9, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,424.

530.    On or about January 21, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

531.    On or about January 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $22,336.

532.    On or about February 11, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

533.    On or about February 20, 2003, Individual I stated to Individual C that Individual I had discovered that the AUC had been designated by the United States government as a Foreign Terrorist Organization.  Shortly thereafter, Individual C and Individual I spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about defendant CHIQUITA's ongoing payments to the AUC.

534.    Beginning on or about February 21, 2003, outside counsel advised defendant CHIQUITA, through Individual C and Individual I, that the payments were illegal under United States law and that defendant CHIQUITA should immediately stop paying the AUC directly or indirectly.  Among other things, outside counsel, in words and in substance, advised defendant CHIQUITA:

"Must stop payments."
(notes, dated February 21, 2003)

"Bottom Line:  CANNOT MAKE THE PAYMENT"
"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
"General Rule:  Cannot do indirectly what you cannot do directly"
"Concluded with: CANNOT MAKE THE PAYMENT"
(memo, dated February 26, 2003)

"You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  CHIQUITA should leave Colombia."
(notes, dated March 10, 2003)

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
(memo, dated March 11, 2003)

[T]he company should not make the payment."
(memo, dated March 27, 2003)

535.    On or about February 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $17,434.

536.    On or about March 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $19,437.

537.    On or about April 3, 2003, Individual B and Individual C first reported to the full Board of Directors of defendant CHIQUITA that defendant CHIQUITA was making payments to a designated Foreign Terrorist Organization.  A member of defendant CHIQUITA's Board of Directors objected to the payments and recommended that defendant CHIQUITA consider taking immediate corrective action, to include withdrawing from Colombia.  The Board agreed to disclose promptly to the Department of Justice the fact that defendant CHIQUITA had been making payments to the AUC.

538.    On or before April 4, 2003, according to outside counsel's notes concerning a conversation about defendant CHIQUITA's payments to the AUC, Individual C said: "His and [Individual B's] opinion is just let them sue us, come after us. This is also [Individual A's] opinion."

539.    On or about April 8, 2003, Individual C and Individual D met at defendant CHIQUITA's headquarters in Cincinnati with Individual F, Individual G, Individual H, and Individual I.  According to the contemporaneous account of this meeting, Individual C and Individual D instructed Individual F and Individual G to "continue making payments" to the AUC.

540.    On or about April 24, 2003, Individual B and Individual C, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant CHIQUITA had been making payments to the AUC for years, and represented that the payments had been made under threat of violence.  Department of Justice officials told Individual B and Individual C that defendant CHIQUITA's payments to the

116

AUC were illegal and could not continue.  Department of Justice officials acknowledged that the issue of continued payments was complicated.

541.    On or about April 30, 2003, Individual B and Individual C told members of the Audit Committee of the Board of Directors and the outside auditors of defendant CHIQUITA about the meeting with Department of Justice officials on April 24, 2003. Individual B and Individual C said that the conclusion of the April 24th meeting was that there would be "no liability for past conduct" and that there had been [n]o conclusion on continuing the payments."

542.    On or about May 5, 2003, according to the contemporaneous account of this conversation, Individual I instructed Individual F and Individual J to "continue making payments" to the AUC.

543.    On or about May 12, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

544.    On or about May 21, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,235.

545.    On or about June 4, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

546.    On or about June 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

547.    On or about July 14, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,139.

548.     On or about July 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,136.

549.     On or about August 8, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

550.     On or about August 25, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $12,850.

551.     On or about September 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

552.     On or about September 8, 2003, outside counsel advised defendant CHIQUITA in writing, through Individual C and Individual I, that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

553.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $18,249.

554.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent $9,439.

555.     On or about October 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,511.

556.     On or about November 5, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

557.     On or about December 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,337.

558.    On or about December 2, 2003, Individual F and Individual G paid the AUC in Urabá by check in the amount equivalent to $30,193.

559.    On or about December 4, 2003, Individual B and Individual C provided the Board of Directors additional details concerning defendant CHIQUITA's payments to the AUC that had not previously been disclosed to the Board.  A member of defendant CHIQUITA's Board of Directors responded to this additional information by stating: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

560.    On or before December 4, 2003, defendant CHIQUITA created and maintained corporate books and records that did not identify the ultimate and intended recipient of the payments to the AUC in Urabá in calendar year 2003 as follows:

| Reporting Period | Description of recipient | Description of payment |
|---|---|---|
| 1st Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security service." |
| 2nd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |
| 3rd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |

561.    On or about December 16, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $24,584.

562.    On or about December 22, 2003, Individual B sent an email to other Board members on the subject of defendant CHIQUITA's ongoing payments to the AUC, stating, among other things: "This is not a management investigation.  This is an audit

committee investigation.  It is an audit committee investigation because we appear to [be] committing a felony."

563.    On or about January 9, 2004, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

564.    On or about January 13, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,958.

565.    On or about February 4, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $4,795.

566.    According to defendant CHIQUITA's records, from September 10, 2001, through in or about January 2004, defendant CHIQUITA earned more than $49.4 million in profits from its Colombian banana-producing operations.

567.    The foregoing allegations contained in the factual proffer, were formally admitted in writing by Fernando Aguirre, Chairman of the Board of Directors, President and Chief Executive Officer of CHIQUITA BRANDS INTERNATIONAL, INC., on or about March 12, 2007.

568.    That heretofore and at the time of the occurrences herein, the defendants had entered into a conspiracy with the AUC to effectuate a variety of purposes that were of mutual benefit to CHIQUITA and the AUC.

569.    The joint purposes and mutual benefits of the conspiracy between CHIQUITA and the AUC included the political, military and economic control of the Republic of Colombia and specifically of the banana growing regions; the destruction and expulsion of guerilla groups such as the FARC and the ELN; the establishment of the AUC and CHIQUITA as the *de facto* power and authority over the banana growing

regions and their inhabitants; the wrongful and illegal seizure and/or acquisition of banana growing land from the peasants by the commission of various overt acts, including threats, intimidation, murders, massacres, disappearances and other atrocities; the elimination and/or domination of labor union organizers perceived by CHIQUITA to be hostile to their economic interests, accomplished by threats, intimidation, murders, massacres, disappearances and other atrocities; the acquisition and maintenance of monopolistic control over commerce in bananas by CHIQUITA and the destruction of all competition in the cultivation, distribution and marketing of bananas, accomplished by threats, intimidation, murders, massacres, disappearances and other atrocities.

570. That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively cooperated in a variety of overt acts, including but not limited to the illegal payment of money as detailed in the "Factual Proffer".

571. That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively cooperated in a variety of overt acts, including but not limited to the production, transportation, distribution and sale of illegal drugs.

572. That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively conspired to acquire, transport and distribute illegal weapons and ammunition to be used in the commission of threats, intimidation, murders, massacres, disappearances and other atrocities.

573. That pursuant to the conspiracy between CHIQUITA and the AUC, the co-conspirators actively conspired to acquire, transport and distribute vehicles and other war materiel for the purpose of committing threats, intimidation, murders, massacres, disappearances and other atrocities.

574.     CHIQUITA, by and through its agents, servants and employees, including but not limited to Individuals A through J, and other agents servants and employees including but not limited to James Reilly, Willie Gonzalez, Jose Anarbona and Giovanny Hurtado Torres ordered, directed and orchestrated weapons smuggling, threats, intimidation, murders, massacres, disappearances and other atrocities.

575.     As more fully alleged in detail above, Chiquita paid the AUC, directly or indirectly, nearly every month during the period 1997-2004, making over one hundred payments to the AUC totaling over 1.7 million.  Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high ranking officers, directors, and employees.  Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castano. Payments made to the AUC or to front organizations were recorded in Chiquita's corporate books and records as "security payments" or payments for "security" or "security services." Other payments, made to Banadex executives with the intent that they would be withdrawn as cash and handed directly to the AUC, were recorded as income contributions.

576.     At all relevant times, CHIQUITA knew that the AUC was a violent, terrorist paramilitary organization.  On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"), and that designation was well-publicized in the American public media, including in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001, as well as in the Colombian media.

577. On March 19, 2007, CHIQUITA pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist. The company's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

578. In 2001, CHIQUITA facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

579. The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatamalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47's and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

580. CHIQUITA, through Banadex, operated a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo. The arms ship docked at the CHIQUITA port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 million rounds of ammunition. These arms and ammunition were then transferred to the AUC.

581. On information and belief, CHIQUITA facilitated at least four other arms shipments to the AUC. In an interview with the Colombian newspaper El Tiempo, AUC leader Carlos Castano subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

582.    On information and belief, CHIQUITA was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

583.    On information and belief, CHIQUITA also assisted the AUC by allowing the use of its private port facilities not only for the illegal importation of arms, but also for the illegal exportation of large amounts of illegal drugs, especially cocaine.  The drug trade was a major source of income for the AUC.  CHIQUITA intentionally and knowingly allowed use of its port and banana transportation boats for this purpose. CHIQUITA also transported illegal drugs in trucks and other vehicles acquired, owned and operated by it for the use in its conspiracy with the AUC.

### AS AND FOR A FIRST CAUSE OF ACTION
### ENGAGING IN TERRORISM AND/OR PROVIDING
### MATERIAL SUPPORT TO A TERRORIST ORGANIZATION

584.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

585.    The AUC was and is a global terrorist organization, having been so designated by the U.S. State Department, as hereinabove alleged.

586.    That heretofore and at the time of the occurrences herein, the AUC was engaged in terrorism in violation of the law of nations and of individual countries and states in that *inter alia* it engaged in violent acts, or acts dangerous to human life that were intended to intimidate or coerce a civilian population, and/or to influence the policy of a government by intimidation or coercion; and/or to affect the conduct of a government by mass destruction, assassination, kidnapping or hostage taking, as defined by 31 CFR § 594.311 and Chapter 113B of Part I of Title 18 of the United States Code;

engaged in criminal acts intended and/or calculated to create a state of terror in the minds

of particular persons or a group of persons or the general public as defined in the League

of Nations Convention (1937)  and the General Assembly Resolution 51/210 (1999)

wherein such acts are strongly condemned; and/or engaged in crimes against a civilian

population intended to cause death or serious bodily harm to civilians or non-combatants

with the purpose of intimidating a population in violation of  UN Resolution May 17,

2005 and UN General Assembly Resolution 49/60 of December 9, 1994 adopting the

Declaration of Measures to Eliminate International Terrorism and all other citations

therein condemning terrorism which are hereby incorporated by reference; and  UN

General Assembly Resolution 42/159 (adopted December 7, 1987) and other

international laws and *jus cogens* as set forth herein and elsewhere.

  587. That terrorism is a violation of the law of nations.

  588. That conspiring with and aiding, abetting, facilitating, soliciting and

giving material aid to a terrorist organization is a violation of the law of nations.

  589. That heretofore and at the time of the occurrences herein, the AUC was

engaged in committing violent activities, including, but not limited to mass murders,

individual murders, forced disappearances, drug trafficking, extortion and kidnapping,

including but not limited to the murders of the plaintiffs' decedents and others.

  590. As heretofore alleged, from 1997 to 2004, CHIQUITA, directly and by

and through its subsidiaries, agents, and employees, made approximately 100 payments

to the AUC in an amount exceeding $1.7 million as hereinabove alleged.

  591. CHIQUITA directly and indirectly provided guns, ammunition, trucks and

other war material to the AUC, as hereinabove alleged.

592.    That as heretofore alleged, CHIQUITA was involved in a conspiracy with the AUC and committed the overt acts hereinabove alleged that proximately caused the deaths of plaintiffs' decedents.

593.    At all times material hereto, CHIQUITA knew or should have known that its providing money, guns, ammunition, war material and other forms of aid to the AUC would facilitate, aid and abet the commission of mass murders, individual murders, forced disappearances, kidnapping and other crimes, including the murders of the plaintiffs decedents.

594.    As a result of providing financial support to the AUC, defendant CHIQUITA violated the law of nations, established United States laws, international laws, treaties and norms, including, but not limited to those sections previously set forth including but not limited to:

The Declaration on Measures to Eliminate International Terrorism and citations therein incorporated by reference adopted by the United Nations General Assembly on December 9, 1994 (GA Res. 49/60);
The Anti Terror Act, 18 U.S.CC. 113B;
The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);
The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001);
The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S.;
International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;
International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997);
United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);
(Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948);
International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. (A/6316 (1966);
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. doc. A/39/51 (1984);

Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);
Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;
Convention on Combating Bribery of Foreign Public Officials in International Businesss Transactions, 37 I.L.M. 1 (Dec. 18, 1997);
and other *jus cogens*.

595.    The murders of the plaintiffs' decedents and/or injuries to plaintiff(s) were a direct and proximate result of CHIQUITA's conspiring with and providing aid to a terrorist organization as hereinabove alleged.

596.    The abuses described above were premeditated, politically-motivated acts of violence committed against noncombatant civilians for the purpose of instilling fear, targeting political opponents, and generally terrorizing a civilian population.

597.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the acts of terrorism against Plaintiffs.

598.    The murderous acts of terrorism against the plaintiffs were financed by the defendants' illegal payments of money hereinabove alleged.

599.    The murderous acts of terrorism against the plaintiffs were aided, abetted and facilitated by the illegal payments of money hereinabove alleged.

600.    The murderous acts of terrorism against the plaintiffs and the illegal payments of money hereinabove alleged as well as defendants furnishing arms to the AUC were overt acts committed in pursuance of the conspiracy hereinabove alleged.

601.    The defendants, their agents servants and employees including but not limited to James Reilly, Willie Gonzalez, Jose Anarbona and Giovanny Hurtado Torres,

participated in the coordination of joint and conspiratorial activities between CHIQUITA

and the AUC, including identifying to the AUC who was to be killed, tortured and/or

otherwise terrorized and intimidated and otherwise participated in the distribution of

money, arms and ammunition, vehicles, war material, drugs and drug-making chemicals

as hereinabove alleged.

  602. That the defendants, their agents servants and employees (a) knowingly

and substantially assisted the AUC and their collaborators to commit acts that violate

clearly established international law norms, and (b) facilitated the commission of

international law violations by providing the AUC and their collaborators with the tools,

instrumentalities, or services to commit those violations with actual or constructive

knowledge that those tools, instrumentalities, or services would be (or only could be)

used in connection with that purpose.

  603. That by reason of the wrongful conduct of the defendants, including aid to

a terrorist organization as hereinabove alleged and the consequent crimes committed

thereby, as hereinabove alleged, plaintiff's decedents suffered conscious pain, suffering

and death, and the plaintiffs have suffered pecuniary and economic damages, loss of

support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services

and other injuries, and accordingly, the plaintiffs claim all damages allowed by law,

including compensatory and punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**WAR CRIMES**

  604. Plaintiffs repeat and reallege all of the previous allegations of the

complaint with the same force and effect as if fully set forth again at length.

605.    Heretofore, and at the time of the murders of plaintiffs' decedents and/or injuries to plaintiffs, and prior thereto, there existed a state of civil war and armed conflict in Colombia and specifically in the regions where plaintiffs resided.

606.    The murders of plaintiff's decedents and/or injuries to plaintiff(s) were committed in the course of a civil war and armed conflict.

607.    The plaintiffs' decedents and/or plaintiffs were non-combatants in the civil war and armed conflict.

608.    The defendants conspired with, aided, abetted, directed, solicited and facilitated the AUC in the orchestration of hostilities, armed conflict, and acts of murder, torture, terrorism, coercion and intimidation, including but not limited to the murders of plaintiffs' decedents and/or injuries to plaintiff(s)

609.    The murders of plaintiffs' decedents constituted war crimes, in violation of the law of nations and laws of the United States, including but not limited to:

The Anti Terror Act, 18 U.S.CC. 113B; and
The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);
The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001);
The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S.;
International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;
International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997);
United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);
(Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948);
International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. (A/6316 (1966);
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. doc. A/39/51 (1984);

Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);
Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;
Convention on Combating Bribery of Foreign Public Officials in International Businesss Transactions, 37 I.L.M. 1 (Dec. 18, 1997);
and other *jus cogens*.

610.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

611.    That by reason of the murderous war crimes herein alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered personal injuries, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
## CRIMES AGAINST HUMANITY

612.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

613.    Heretofore, and at the time of the murders of plaintiff's decedents and/or attempted murders/personal injuries, and prior thereto, the AUC, in pursuance of the

aforedescribed conspiracy with defendant CHIQUITA, and acting in concert with, aided, abetted, facilitated, and solicited by defendant CHIQUITA, engaged in a widespread and systematic attack on and persecution of large segments of the civilian populations of the banana growing regions of Colombia, including but not limited to the areas where plaintiffs resided, and including plaintiffs' decedents.

614.    The AUC's widespread and systematic attack on and persecution of large segments of the civilian population of the banana growing regions was carried out by mass murders/massacres, individual murders, disappearances, torture, threats, detention, coercion and intimidation.

615.    The AUC's acts of mass murder/massacre, individual murders, disappearances, torture, threats, and intimidation was designed, planned, orchestrated and executed for the primary purpose of exercising political and economic control over the subject areas as heretofore alleged.

616.    The murders of plaintiffs' decedents and/or attempted murders/personal injuries constituted crimes against humanity, in violation of the law of nations and laws of the United States, including but not limited to:

The Anti Terror Act, 18 U.S.CC. 113B; and
The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996);
The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001);
The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, Dec. 9, 1948, 78 U.N.T.S. 277;
International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52-164, 1, U.N. Doc A/RES/52/164;
International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997);
United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);
(Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948);

International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. (A/6316 (1966);
Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. doc. A/39/51 (1984), 1465 U.N.T.S. 85;
Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);
Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;
Convention on Combating Bribery of Foreign Public Officials in International Businesss Transactions, 37 I.L.M. 1 (Dec. 18, 1997);
and other *jus cogens*.

617.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

618.    That by reason of the murderous crimes against humanity herein alleged, plaintiffs' decedents and/or plaintiff(s) suffered personal injuries, conscious pain, suffering and death, and the plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
## GENOCIDE

619.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

620.    That the defendants, their agents servants and employees committed the following acts with the intent to destroy, in whole or in part, the national, ethnical, political or cultural group of which the plaintiff's decedents were a part of: killing members of the group; causing serious bodily or mental harm to members of the group; deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; imposing measures to prevent births within the group; and forcibly transferring children of the group to another group.

621.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms including the deliberate and systematic destruction of a national, ethnical, political or cultural group (genocide) and (b) facilitated the commission of international law violations including the deliberate and systematic destruction of a national, ethnical, political or cultural group (genocide) by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

622.    That by reason of the deliberate and systematic destruction of a national, ethnical, political or cultural group (genocide), as herein alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered personal injuries, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and

accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
## EXTRAJUDICIAL KILLING/TORTURE IN VIOLATION OF TVPA

623.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

624.    The murders of the plaintiffs' decedents and/or attempted murders of plaintiff(s) were extra-judicial killings/torture in violation of the TVPA.

625.    The deliberate killings and/or attempted murders, under color of law, of plaintiffs' decedents and/or plaintiff(s) were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples

626.    The murders of plaintiffs' decedents and/or attempted murders of plaintiff(s) were committed under color of law, in that the AUC's commission of these atrocities was done with the knowledge, acquiescence and complicity of the official security forces of the Republic of Colombia as heretofore alleged; that the AUC was acting as a *de facto* government and/or agency of government of the banana growing regions with the knowledge, acquiescence and complicity of large segments of the Colombian government, including ranking members of the executive and legislative branches as well as the security forces; and payments were made by CHIQUITA utilizing officially sanctioned Convivirs, as hereinabove alleged.

627.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of

international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

628.    Plaintiffs have no alternative remedy to the within action.  Legal action by Plaintiffs in Colombia would be futile.  In June 2004, CHIQUITA sold its Colombian subsidiary Banadex.  On information and belief, CHIQUITA no longer owns any production operation in Colombia and is not subject to service there.

629.    Legal action by Plaintiffs in Colombia could also result in serious reprisals.  Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence. This has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International.  *See*, *e.g.* The Ties that Bind: Colombia and Military-Paramilitary Links, Human Rights Watch (February, 2000).

630.    Further, various non-governmental organizations in Colombia, such as Justicia y Paz, have sought the assistance and protection of the Colombian government. No action was taken, and these complaints were futile because of the lack of an independent or functioning legal system within Colombia.  The justice system in Colombia has utterly failed to bring the perpetrators of violence to justice under the laws of Colombia.  Finally, even if there were remedies available Plaintiffs in Colombia, such remedies are inadequate and would not afford the compete relief available to Plaintiffs by this Complaint.

631.    Plaintiffs were unable to bring suit in the United States until the present

due to the poor security situation and the danger of reprisals, which CHIQUITA's support

of the AUC contributed to, as well as the criminal secreting of evidence by CHIQUITA

and the conspiratorial and secretive nature of the acts and omissions of the defendants

only brought to light by the above referenced criminal proceedings instituted by the

United States.  This suit is brought within one year from the termination of said criminal

proceeding and within all applicable statutes of limitation.

632.    That by reason of the extrajudicial killing of the plaintiffs' decedents and

that plaintiffs' decedents suffered conscious pain, suffering and death, and the plaintiffs

have suffered pecuniary and economic damages, loss of support, loss of nurture care and

guidance, grief, anguish, loss of society, loss of services and other injuries, and

accordingly, the plaintiffs claim all damages allowed by law, including compensatory and

punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
### WRONGFUL DEATH AND SURVIVAL ACTIONS
### UNDER THE LAW OF OHIO

633.    Plaintiffs repeat and reallege all of the previous allegations of the

complaint with the same force and effect as if fully set forth again at length.

634.    By reason of the extrajudicial killing and wrongful death of the plaintiff's

decedents as hereinabove alleged, and the negligence of the defendants in failing to

exercise proper supervision; in negligently hiring, supervising and retaining its agents,

servants and employees; in negligently violating their duties as directors and officers of

CHIQUITA; in negligently contracting, agreeing, acting in concert with and conspiring

with persons whom defendants knew or should have known were violent and had the

intention, means and propensity to commit crimes, perpetrate murders, disappearances, kidnappings, torture and other atrocities, and in otherwise being negligent, the defendants are liable to the plaintiff for wrongful death damages under laws of the State of Ohio, including R.C. § 2125.01, 2125.02 et seq. and for the conscious pain and suffering of the decedent pursuant to R.C. § 2305.21 et seq. pertaining to survival of actions.

635.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted a the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

636.    That by reason of the extrajudicial killing and wrongful death of the plaintiffs' decedents as hereinabove alleged, plaintiff's decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### BATTERY

637.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

638.    Defendants murdered, tortured and/or attempted to murder plaintiffs' decedents and/or plaintiff(s), constituting common law battery.

639.    That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

640.    That by reason of the foregoing, plaintiffs' decedents suffered conscious pain, suffering and death, and the plaintiffs have suffered personal injuries, pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## AS AND FOR A EIGHTH CAUSE OF ACTION
## NEGLIGENCE

641.    Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

642.    Defendants were negligent in failing to exercise proper supervision; in negligently hiring its agents, servants and employees; in negligently violating their duties as directors and officers of CHIQUITA; in negligently contracting, agreeing, acting in concert with and conspiring with persons whom defendants knew or should have known were violent and had the intention, means and propensity to commit crimes, perpetrate murders, disappearances, kidnappings, torture and other atrocities, in acting and in otherwise being negligent and failing to exercise reasonable care.

643.     That the defendants, their agents servants and employees (a) knowingly and substantially assisted the AUC and their collaborators to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the AUC and their collaborators with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose.

644.     That defendants' negligence was a proximate cause of injury and or/death of plaintiff(s) and /or plaintiffs' decedents.

645.     Defendants acted willfully, wantonly, maliciously and with a reckless disregard and depraved indifference to human life in the commission of the acts and omissions hereinabove alleged in all counts of the complaint.

## AS AND FOR AN NINTH CAUSE OF ACTION
## LOSS OF SERVICES, SOCIETY AND CONSORTIUM

646.     Plaintiffs repeat and reallege all of the previous allegations of the complaint with the same force and effect as if fully set forth again at length.

647.     All plaintiffs who are the spouses, children, siblings, parents and/or relations of persons injured or killed, as heretofore alleged, claim damages for loss of services, society and consortium.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action.

**WHEREFORE**, plaintiffs demand judgment against the defendants on each and all Causes of Action in the complaint on behalf of each and all plaintiff(s) against each and all defendant(s) for compensatory damages in the sum of $10 million for each individual plaintiff and/or decedent, totaling $3,930,000,000.00 (THREE BILLION NINE HUNDRED THIRTY MILLION DOLLARS) in compensatory damages, and punitive damages in the sum of $10 million for each individual plaintiff and/or decedent, totaling $3,930,000,000.00 (THREE BILLION NINE HUNDRED THIRTY MILLION DOLLARS) in punitive damages, making in all the sum of $7,860,000,000.00 (SEVEN BILLION EIGHT HUNDRED SIXTY MILLION DOLLARS), along with interest, costs and disbursements.

**LAW FIRM OF JONATHAN C. REITER**

By: _____

JONATHAN C. REITER (7522)
Attorneys for Plaintiffs
350 Fifth Avenue, Suite 2811
New York, New York 10118
212-736-0979

EXHIBIT E

2007 DEC 27 P 3: 01

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

RECEIVED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE CHIQUITA BRANDS INTERNATIONAL, | : |  |
| INC. ALIEN TORT STATUTE AND | : | MDL Docket No. 1916 |
| SHAREHOLDERS DERIVATIVE LITIGATION | : |  |
|  | : |  |

### NOTICE OF ACTION RELATED TO
### *IN RE CHIQUITA BRANDS INTERNATIONAL, INC.*
### *ALIEN TORT STATUTE AND SHAREHOLDERS DERIVATIVE LITIGATION*

Pursuant to Rule 7.5(e) of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation ("the Panel"), Chiquita Brands International, Inc. and Chiquita Fresh

North America LLC (collectively, "Chiquita") hereby provide this notice informing the Panel of

a potential "tag-along action" to *In re Chiquita Brands International, Inc. Alien Tort Statute and*

*Shareholders Derivative Litigation*, MDL No. 1916, which is scheduled for argument before the

Panel on January 30, 2008:

> *Henry Taylor v. Fernando Aguirre, Morten Arntzen, Jeffrey D.*
> *Benjamin, Robert W. Fisher, Cyrus F. Friedheim, Jr., Clare M.*
> *Hasler, Roderick M. Hills, Durk I. Jager, Jaime Serra, Steven P.*
> *Stanbrook, and Chiquita Brands International, Inc.*; United States
> District Court for the District of New Jersey, Trenton Division;
> No. 3:07-cv-06002-FLW-JJH (D.N.J.); Judge Freda L. Wolfson.

This action was filed on December 17, 2007, after the Panel filed Chiquita's

motion to transfer on November 28, 2007. Chiquita was served with this complaint on

December 24, 2007. A copy of the complaint is attached as Exhibit A.


Respectfully submitted,


Eric H. Holder, Jr.
John E. Hall
James M. Garland
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

Jonathan M. Sperling
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
Facsimile: (212) 841-1010

COVINGTON & BURLING LLP

*Attorneys for Defendants*
  *Chiquita Brands International, Inc. &*
  *Chiquita Fresh North America LLC*

Dated:          December 27, 2007

# EXHIBIT A

RECEIVED
CLERK'S OFFICE

2001 DEC 27 P 3: 01

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph L. DePalma
Katrina Blumenkrants
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858

*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### *DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| HENRY TAYLOR, Derivatively on Behalf of Nominal Defendant CHIQUITA BRANDS INTERNATIONAL, INC., | ) Case No.<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| FERNANDO AGUIRRE, MORTEN ARNTZEN, JEFFREY D. BENJAMIN, ROBERT W. FISHER, CYRUS F. FREIDHEIM, JR., CLARE M. HASLER, RODERICK M. HILLS, DURK I. JAGER, JAIME SERRA, and STEVEN P. STANBROOK, | ) **VERIFIED SHAREHOLDER**<br>) **DERIVATIVE COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants, | )<br>) |
| and | ) **JURY TRIAL DEMANDED** |
| CHIQUITA BRANDS INTERNATIONAL, INC., | )<br>)<br>) |
| Nominal Defendant. | )<br>) |

Plaintiff Henry Taylor ("Plaintiff"), residing at 3394 Bridle Run Trial, Marietta, GA 30064, by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge

165286 v1

1

with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Chiquita Brands International, Inc. ("Chiquita" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its former executive officers seeking to remedy defendants' breaches of fiduciary duties.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that complete diversity of citizenship exists between Plaintiff on the one hand and Defendants on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4.     Plaintiff Henry Taylor is, and was at all relevant times, a shareholder of nominal defendant Chiquita.  Plaintiff is a citizen of the State of Georgia.

165286 v1

2

5.      Nominal defendant Chiquita is a New Jersey corporation with its principal place of business located at 250 East Fifth Street, Cincinnati, Ohio 45202. According to its public filings, Chiquita, together with its subsidiaries, operates as a leading international marketer and distributor of bananas and other fresh produce sold under the "Chiquita" and other brand names in approximately 80 countries, and packaged salads sold under the "Fresh Express" brand name primarily in the United States. Chiquita also distributes and markets fresh-cut fruit and other branded, value-added fruit-based products. The Company produces approximately 30% of the bananas it markets on its own farms, and purchases the remainder of the bananas, all of the lettuce and substantially all of the other fresh produce from third-party suppliers throughout the world. During the calendar year 2003, Chiquita reported over $2.6 billion in revenue. At all relevant times herein until it was sold by the Company in June 2004, Chiquita also owned and operated C.I. Bananos de Exportacion S.A. ("Banadex"), a foreign subsidiary located in Colombia, South America. Chiquita is a citizen of the State of New Jersey and the State of Ohio.

6.      Defendant Fernando Aguirre ("Aguirre") has served as the Company's President, Chief Executive Officer and Chairperson of the Board since January 2004. Upon information and belief, Aguirre is a citizen of the State of Ohio.

7.      Defendant Morten Arntzen ("Arntzen") has served as a director of the Company and as a member of the Audit Committee of the Board (the "Audit Committee") since 2002. Upon information and belief, Arntzen is a citizen of the State of New York.

8.      Defendant Robert W. Fisher ("Fisher") has served as a director of the Company since March 2002. Fisher also served as the Company's Acting Chief Operating Officer from March 2002 to August 2002 and as a member of Chiquita's Executive Committee from 2003 to 2004. Upon information and belief, Fisher is a citizen of the State of California.

165286 v1

3

9. Defendant Clare M. Hasler ("Hasler") has served as a director of the Company since October 2005. Upon information and belief, Hasler is a citizen of the State of California.

10. Defendant Durk I. Jager ("Jager") has served as a director of the Company since December 2002. Upon information and belief, Jager is a citizen of the State of Ohio.

11. Defendant Jaime Serra ("Serra") has served as a director of the Company since January 2003. Upon information and belief, Serra is a citizen of Mexico.

12. Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of the Company and as a member of the Audit Committee since December 2002. Upon information and belief, Stanbrook is a citizen of the State of Wisconsin.

13. Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of the Company and as a member of the Audit Committee from March 2002 until his resignation on February 6, 2007. Upon information and belief, Benjamin is a citizen of the State of New York.

14. Defendant Roderick M. Hills ("Hills") served as a director of the Company and as a member of the Audit Committee until his retirement on May 24, 2007, including as Chairman of the Audit Committee from early 2002 to February 2004. Upon information and belief, Hills is a citizen of Washington, D.C.

15. Defendant Cyrus F. Freidheim, Jr. ("Freidheim") served as the Company's non-executive Chairman of the Board from January 10, 2004 to his retirement in May 2004, as Chief Executive Officer and as the Chairperson of the Board from March 2002 to January 2004 and as President from May 2002 to January 10, 2004. Upon information and belief, Friedheim is a citizen of the State of Illinois.

16. Collectively, defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook are referred to herein as the "Director Defendants."

165286 v1

4

17.     Collectively, defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra, Stanbrook, Benjamin, Hills and Freidheim are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

20.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

>       a.      exercise good faith in ensuring that the affairs of the Company
>               were conducted in an efficient, business-like manner so as to make

it possible to provide the highest quality performance of its business;

b.   exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.   exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.   exercise good faith in ensuring  that the Company's financial statements were prepared in accordance with GAAP; and

e.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

21.   The Individual Defendants, particularly the executive officers and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, the Individual Defendants were required to:

( 1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

( 2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)   transactions are executed in accordance with management's general or specific authorization; and

165286 v1

6

      (b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## SUBSTANTIVE ALLEGATIONS

22.     According to its public filings, Chiquita, together with its subsidiaries, operates as a leading international marketer and distributor of bananas and other fresh produce sold under the "Chiquita" and other brand names in approximately 80 countries, and packaged salads sold under the "Fresh Express" brand name primarily in the United States. Chiquita also distributes and markets fresh-cut fruit and other branded, value-added fruit-based products. The Company produces approximately 30% of the bananas it markets on its own farms, and purchases the remainder of the bananas, all of the lettuce and substantially all of the other fresh produce from third-party suppliers throughout the world.

23.     Banadex, Chiquita's wholly-owned subsidiary, produced bananas in the Urabá and Santa Marta regions of Colombia and by 2003 was the Company's most profitable banana production outlet. Chiquita subsequently sold Banadex in June 2004.

24.     However, before the sale of Banadex, Chiquita, with the approval and at the direction of its Board, made illegal payments to gain "protection" for Banadex from the terrorist Colombian paramilitary group Autodefensas Unidas de Colombia, translated as the United Self-Defense Forces of Colombia (the "AUC").

25.     Between 1989 and 1997, Chiquita made payments to certain violent left-wing terrorist groups operating in Colombia, Fuerzas Armadas Revolucionarias de Colombia, translated as the Revolutionary Armed Forces of Colombia (the "FARC") and the Ejército de Liberación Nacional, translated as the National Liberation Army (the "ELN"). In October 1997,

the FARC and the ELN were designated by the Secretary of State of the United States as Foreign Terrorist Organizations ("FTO") pursuant to Title 8, United States Code, Section 1189.

26.    In or about 1997, the then-General Manager of Banadex met with the then-leader of AUC, Carlos Castaño. Castaño advised that the FARC was about to be ousted from Urabá by the AUC and that Banadex had to make payments to a "convivir," a private security company generally licensed by the Colombian government to assist local police and military in security but used by the AUC as fronts to collect monies from local businesses. Though it was not explicitly stated, Castaño's clear message was that if Banadex did not make payments to the convivir, physical harm to the subsidiary's personnel and property could result.

27.    Chiquita complied with Castaño's demands. From 1997 through February 4, 2004, Chiquita made at least 100 cash payments to AUC using convivirs in the Santa Marta and Urabá regions of Colombia, through checks drawn on Banadex's accounts. Chiquita accounted for these payments as "security payments," payments for "security" or "security services" in its corporate financial records, despite the fact that no actual security services were provided by AUC.

28.    On September 10, 2001 and again on September 10, 2003, the United States Secretary of State designated AUC as an FTO. As a result of this designation, after September 10, 2001, the knowing provision of material support and resources, including currency and monetary instruments, to the AUC was a federal crime.

29.    Additionally, on September 23, 2001, pursuant to the authority granted to him by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, President George W. Bush issued Executive Order 13224. Executive Order 13224, among other things, prohibited any United States person from engaging in transactions with any foreign organization or

165286 v1

8

individual determined by the United States Secretary of State, in consultation with the United

States Secretary of the Treasury and the United States Attorney General, to have committed, or

posed a significant risk of committing, acts of terrorism that threaten the security of United

States nationals or the national security, foreign policy or economy of the United States, labeled

a "Specially-Designated Global Terrorist" ("SDGT").  The prohibition included making any

contribution of funds to or for the benefit of an SDGT without first obtaining a license or similar

authorization from the United States Government.

30.     The United States Secretary of State, in consultation with the United States

Secretary of the Treasury and the United States Attorney General, designated the AUC as an

SDGT on October 31, 2001.

31.     However, despite the Individual Defendants' knowledge that funding AUC was a

federal crime, the Individual Defendants continued to authorize payments to the convivir after

September 10, 2001, with the knowledge that such payments were directly funding the AUC.

32.     Specifically, in or about June 2002, after Chiquita emerged from bankruptcy and

seated a new Board in April 2002, Chiquita continued its payments to AUC.  Senior executives

at Chiquita even developed a new system to make continued cash payments to AUC whereby

checks drawn on Banadex's Colombian accounts were cashed by Chiquita executives and funds

were hand delivered to AUC personnel in Santa Marta.

33.     Moreover, the Board, which included the Individual Defendants, had direct

knowledge of the illegal payments to AUC and, indeed, allowed such payments to continue until

at least February 4, 2004 despite such knowledge.

34.     On March 13, 2007, based upon Chiquita's illegal payments to AUC, the United

States Government charged Chiquita with the federal crime of Engaging in Transactions with a

165286 v1

9

Specifically Designated Global Terrorist. Chiquita pled guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204 that same day. A copy of the plea agreement between the United States Department of Justice and Chiquita (the "Plea Agreement") is attached hereto as Exhibit A. Pursuant to the terms of the Plea Agreement, Chiquita admitted as true all of the facts contained in a Factual Proffer prepared by the United States (the "Factual Proffer"), which is attached hereto as Exhibit B and incorporated by reference herein.

35.     The Factual Proffer, and the subsequent Sentencing Memorandum filed by the United States Department of Justice in connection with the September 17, 2007 sentencing hearing (the "Sentencing Memorandum," attached hereto as Exhibit C and incorporated by reference herein), details not only the knowledge that the Board had of the illegal payments, but also the willful disregard by the Board of advice from Chiquita's counsel beginning on February 21, 2003 that the payments were improper, violated federal law and must stop immediately.

36.     Specifically, the Sentencing Memorandum states that payments continued to flow from Chiquita to the AUC, with the knowledge and approval of the Individual Defendants, even after the following occurred:

-     the new cash payment procedures for Chiquita's payments to AUC were reviewed at a meeting of the Audit Committee on April 23, 2002;

-     senior officers at Chiquita had knowledge, as early as September 2002, that the AUC had been designated as an FTO;

-     beginning on February 21, 2003, Chiquita's outside counsel repeatedly advised the Company to discontinue payment to AUC, as the payments were illegal, which advice outside counsel detailed in contemporaneous notes and memoranda;

-     on April 24, 2003, officials at the United States Department of Justice advised the Company that the payments to AUC were illegal and could not continue;

165286 v1

10

- in a memorandum dated September 8, 2003 and sent to Chiquita's senior officers, Chiquita's outside counsel summarized the Company's contacts with the United States Department of Justice since April 2003 and noted that "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments;

- on December 22, 2003, a member of the Board noted in an internal email, in reference to the payments to AUC that "we appear [to] be committing a felony;"

37.     Moreover, the Sentencing Memorandum details that Chiquita's "payments to the AUC *were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees*. No later than September 2000, defendant Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño." (Emphasis added).

38.     Chiquita's payments to AUC continued until defendant Aguirre, one month after becoming the Company's Chief Executive Officer in January 2004, finally decided that the Company's funding of the terrorist organization had to come to an end. On January 24, 2004, Chiquita issued its last check to AUC, which cleared on February 4, 2004. In total, from 1997 through February 4, 2004, Chiquita's payments to AUC totaled over $1.7 million, including 50 payments totaling over $825,000 from September 10, 2001 through February 4, 2004.

39.     Pursuant to the Plea Agreement, Chiquita agreed to plead guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204, pay a criminal fine of $25 million in five annual payments of $5 million (plus post-judgment interest) commencing upon the entry of judgment and serve a five-year term of corporate probation. In addition to the general conditions of probation, Chiquita also agreed to implement and maintain an effective compliance and ethics

program and refrain from committing any federal, state or local crimes during the probationary period.

40.     In addition to criminal liability, Chiquita also faces additional civil liability for its illegal funding of terrorist activity.  Three separate civil actions, unrelated to the instant action, have been brought on behalf of victims of AUC's violent terrorist activities, including family members of those killed and tortured by AUC members, under the Alien Tort Claims Act and other federal statutes against Chiquita for, among other things, the Company's sponsorship of terrorism.  The lawsuits seek billions of dollars in damages from Chiquita.

41.     The Colombian government also may take independent action against the Company.  A criminal investigation remains ongoing, and Columbia may seek to extradite certain Chiquita executives to stand trial in that country.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

42.     In a misguided effort to protect the Company's interests in Colombia, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by knowingly permitting and approving illegal payments by Chiquita to an identified terrorist organization, despite knowledge that such actions were illegal.  The Individual Defendants' unlawful misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.

43.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, their actions were patently illegal and exposed the Company to substantial criminal and civil liability.

44.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Chiquita has sustained significant damages, including, but not limited to, the

165286 v1

costs incurred in the Company's defense of the DOJ Action and the criminal penalty the Company has agreed to pay as part of its plea bargain.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

45.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

46.     Plaintiff is an owner of Chiquita common stock and was an owner of Chiquita common stock at all times relevant hereto.

47.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

48.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Chiquita Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

49.     The Board currently consists of eight directors: defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook, and director Howard W. Barker, Jr. Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action because, as members of the Board during the relevant period, they were knowing participants in the criminal conspiracy and are therefore substantially likely to be held liable for the misconduct complained of herein. As alleged in detail herein (*see, supra*, ¶¶ 24, 31-38), these directors knowingly directed and approved the Company's illegal conduct, which resulted in the Company's guilty plea and criminal fine. Accordingly, Aguirre, Arntzen, Fisher, Hasler, Jager,

165286 v1

13

Serra and Stanbrook are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants.

50. Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. The actions of the Board were patently illegal and exposed the Company to substantial civil and criminal liability. As the Board knowingly entered into a criminal conspiracy and directed the Company to engage in criminal conduct, their actions cannot be afforded the protections of the business judgment rule. Accordingly, demand is excused.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

51. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

52. The Individual Defendants owed and owe Chiquita fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Chiquita the highest obligation of good faith and loyalty.

53. The Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty and good faith, as alleged herein.

54. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chiquita has sustained significant damages, as alleged herein.

55. Plaintiff, on behalf of Chiquita, has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

    A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

B. Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.


Dated: December 17, 2007

**LITE DEPALMA GREENBERG & RIVAS, LLC**

By:  /s/ Joseph J. DePalma
Joseph L. DePalma
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Eric L. Zagar
Alison K. Clark
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*


165286 v1

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is not related to the following actions:

*Hawaii Annuity Trust Fund v. Hills, et al.*, Docket No. 2007-C379, filed October 30, 2007 in New Jersey state court, Bergen County, Chancery Division;

*City of Philadelphia Public Employees Retirement System v. Aguirre et al.*, Civil Action No. 1:07-cv-00851-SJD, filed October 12, 2007 in the United States District Court for the Southern District of Ohio (Hon. Susan J. Dlott presiding)

*Sheet Metal Workers Local #218(S) Pension Fund v. Hills et al.*, Civil Action No. 1:07-cv-01957-PLF, filed October 31, 2007 in the United States District Court for the District of Columbia (Hon. Paul L. Friedman presiding)

Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 17, 2007        **LITE DEPALMA GREENBERG & RIVAS, LLC**

By:    /s/ Joseph J. DePalma
        Joseph J. DePalma
        Katrina Blumenkrants
        Two Gateway Center, 12th Floor
        Newark, New Jersey 07102
        (973) 623-3000

        Attorneys for Plaintiff

165286 v1

## VERIFICATION

I, Henry Taylor, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.

DATE: _Dec 5, 2007_

_____
HENRY TAYLOR

EXHIBIT F

COHN LIFLAND PEARLMAN
   HERRMANN & KNOPF LLP
PETER S. PEARLMAN
BARRY A. KNOPF
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

|  |  |
|---|---|
| ————————————————— x | |
| HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC., | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY |
| Plaintiff, | DOCKET NO.  C-379-07 |
| vs. | |
| RODERICK M. HILLS, FERNANDO AGUIRRE, MORTEN ARNTZEN, HOWARD W. BARKER, JR., ROBERT W. FISHER, CLARE M. HASLER, DURK I. JAGER, JAIME SERRA, STEVEN P. STANBROOK, CARL H. LINDNER, KEITH E. LINDNER, CYRUS F. FREIDHEIM, JR., WILLIAM W. VERITY, JEFFREY D. BENJAMIN, ROBERT W. OLSON, STEVEN G. WARSHAW, JEFFERY M. ZALLA, ROHIT MANOCHA, GREGORY C. THOMAS, JAMES B. RILEY, WARREN J. LIGAN, | SUMMONS |
| ————————————————— x | |

[Caption continued on following page.]

```
_____ x
ROBERT F. KISTINGER, OLIVER W.    :
WADDELL, FRED J. RUNK, WILLIAM A. :
TSACALIS, JOHN W. BRAUKMAN III and :
ERNST & YOUNG LLP,                :
                                  :
                  Defendants,     :
                                  :
        -and-                     :
                                  :
CHIQUITA BRANDS INTERNATIONAL,    :
INC., a New Jersey corporation,   :
                                  :
                  Nominal Defendant. :
                                  :
_____ x
```

## FROM THE STATE OF NEW JERSEY
## TO THE DEFENDANT(S) NAMED ABOVE:

### CHIQUITA BRANDS INTERNATIONAL, INC..
#### c/o Corporation Trust Company
#### 820 Bear Tavern Road
#### West Trenton, NJ 08628

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The Complaint attached to this Summons states the basis for this lawsuit. If you dispute this Complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this Summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, CN-971, Trenton, New Jersey 08625. A $135.00 filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

s/Donald F. Phelan
CLERK OF THE SUPERIOR COURT

DATED: November 2, 2007

NAME OF DEFENDANT TO BE SERVED:
**CHIQUITA BRANDS INTERNATIONAL INC.**

ADDRESS OF DEFENDANT TO BE SERVED:    c/o Corporation Trust Co.
820 Bear Tavern Road
West Trenton, NJ  08628

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Boulevard,
First Floor
Atlantic City, NJ 08401
LAWYER REFERRAL
(609)345-3444
LEGAL SERVICES
(609)348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Case Processing Section
Room 119
Justice Center, 10 Main Street
Hackensack, NJ 07601-0769
LAWYER REFERRAL
(201)488-0044
LEGAL SERVICES
(201)487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Floor, Courts Facility
49 Rancocas Road
Mt. Holly, NJ 08060
LAWYER REFERRAL
(609)261-4862
LEGAL SERVICES
(609)261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
1st Floor, Hall of Records
101 S. Fifth Street
Camden, NJ 08103
LAWYER REFERRAL
(609)964-4520
LEGAL SERVICES
(609)964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
9 N. Main Street
Box DN-209
Cape May Court House, NJ 08210
LAWYER REFERRAL
(609)463-0313
LEGAL SERVICES
(609)465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Broad and Fayette Streets
P.O. Box 615
Bridgeton, NJ 08302
LAWYER REFERRAL
(609)692-6207
LEGAL SERVICES
(609)451-0003

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
237 Hall of Records
465 Dr. Martin Luther King, Jr.
Blvd.
Newark, NJ 07102
LAWYER REFERRAL
(973)622-6207
LEGAL SERVICES
(973)624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attention: Intake
First Floor, Court House
1 North Broad Street, P.O. Box 129
Woodbury, NJ 08096
LAWYER REFERRAL
(609)848-4589
LEGAL SERVICES
(609)848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House - 1st Floor
583 Newark Avenue
Jersey City, NJ 07306
LAWYER REFERRAL
(201)798-2727
LEGAL SERVICES
(201)792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08862
LAWYER REFERRAL
(908)735-2611
LEGAL SERVICES
(908)782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650
LAWYER REFERRAL
(609)585-6200
LEGAL SERVICES
(609)695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court
Administration Building
Third Floor
1 Kennedy Sq., P.O. Box 2633
New Brunswick, NJ 08903-2633
LAWYER REFERRAL
(732)828-0053
LEGAL SERVICES
(732)249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
71 Monument Park
P.O. Box 1262
Court House, East Wing
Freehold, NJ 07728-1262
LAWYER REFERRAL
(732)431-5544
LEGAL SERVICES
(732)866-0020

**MORRIS COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
30 Schuyler Pl., P.O. Box 910
Morristown, NJ 07960-0910
LAWYER REFERRAL
(973)267-5882
LEGAL SERVICES
(973)285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
Court House, Room 119
118 Washington Street
Toms River, NJ 08754
LAWYER REFERRAL
(732)240-3666
LEGAL SERVICES
(732)341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505
LAWYER REFERRAL
(973)278-9223
LEGAL SERVICES
(973)345-7171

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
92 Market Street, P.O. Box 18
Salem, NJ 08079
LAWYER REFERRAL
(609)678-8363
LEGAL SERVICES
(609)451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
New Court House, 3rd Floor
P.O. Box 3000
Somerville, NJ 08876
LAWYER REFERRAL
(908)685-2323
LEGAL SERVICES
(908)231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860
LAWYER REFERRAL
(973)267-5882
LEGAL SERVICES
(973)383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Floor, Court House
2 Broad Street
Elizabeth, NJ 07207-6073
LAWYER REFERRAL
(908)353-4715
LEGAL SERVICES
(908)354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 475-2010

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
BARRY A. KNOPF
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

**SUPERIOR COURT BERGEN COUNTY**
**FILED**

**OCT 3 0 2007**

**DEPUTY CLERK**

---

|  |  |
|---|---|
| HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RODERICK M. HILLS, FERNANDO AGUIRRE, MORTEN ARNTZEN, HOWARD W. BARKER, JR., ROBERT W. FISHER, CLARE M. HASLER, DURK I. JAGER, JAIME SERRA, STEVEN P. STANBROOK, CARL H. LINDNER, KEITH E. LINDNER, CYRUS F. FREIDHEIM, JR., WILLIAM W. VERITY, JEFFREY D. BENJAMIN, ROBERT W. OLSON, STEVEN G. WARSHAW, JEFFERY M. ZALLA, ROHIT MANOCHA, GREGORY C. THOMAS, JAMES B. RILEY, WARREN J. LIGAN, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY <br><br> DOCKET NO. C - 379 - 07 <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, ABUSE OF CONTROL AND *ULTRA VIRES* CONDUCT AND DEMAND FOR JURY TRIAL ON ALL ISSUES SO TRIABLE |

---

[Caption continued on following page.]

```
                                          x
_____       :
ROBERT F. KISTINGER, OLIVER W.            :
WADDELL, FRED J. RUNK, WILLIAM A.         :
TSACALIS, JOHN W. BRAUKMAN III and        :
ERNST & YOUNG LLP,                        :
                                          :
                        Defendants,       :
                                          :
        -and-                             :
                                          :
CHIQUITA BRANDS INTERNATIONAL,            :
INC., a New Jersey corporation,           :
                                          :
                 Nominal Defendant.       :
                                          :
_____       :
                                          x
```

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2007 by Coughlin Stoia Geller Rudman & Robbins LLP. Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

> Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. . . . Funding a terrorist organization can never be treated as a cost of doing business . . . . American businesses must take note that payments to terrorists are of a whole different category. They are crimes.

U.S. Department of Justice Release, March 19, 2007

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action on behalf of Chiquita Brands International, Inc.

("Chiquita" or the "Company") against the entire current Chiquita Board of Directors (the "Board"),

several of Chiquita's present or former officers and directors (collectively the "Chiquita

Defendants")[1] and Chiquita's auditor, Ernst & Young LLP ("E&Y"), for intentional, reckless and/or

negligent breaches of their fiduciary duties of care, control, compliance and candor, and/or aiding

and abetting such breaches of fiduciary duty, involving illegal, improper and/or *ultra vires* conduct,

including causing Chiquita to violate the laws of the United States, Colombia and international

business conduct codes. This conduct includes paying, or permitting to be paid, improper and/or

illegal bribes – payments to a known right-wing/fascist terrorist organization known as United Self-

Defense Forces of Colombia (the "Autodefensas Unidas de Colombia" (commonly known as and

referred to herein as the "AUC")), and to left-wing terrorist organizations known as The

Revolutionary Armed Forces of Colombia ("FARC") and the National Liberation Army ("ELN") –

and illegally providing or facilitating the provision of arms and other weapons to the AUC. This

conduct was possible because E&Y, Chiquita's long-time (and current) outside auditor, and Robert

W. Olson, the Company's long-time in-house General Counsel, acquiesced in the making or

concealment of the improper or illegal payments and their mischaracterization in Chiquita's

---

[1]      When the term "Chiquita Defendants" is used herein, and its context so requires, it refers to the Chiquita officers and directors in office during the time period the allegation refers to.

accounting books and records, and because E&Y repeatedly certified Chiquita's false and misleading financial statements distributed to its shareholders, while misrepresenting that they had been properly audited – all without either of them requiring disclosure of these illegal acts, thus furthering the false and misleading statements and breaches of fiduciary duty of the Chiquita Defendants. As a result of this improper and illegal – indeed, criminal – conduct, Chiquita was forced to plead guilty to federal felony charges, pay a huge fine, was placed on corporate criminal probation, was sued civilly by the victims of the AUC's murderous rampage in Colombia and suffered huge losses due to the destruction of Chiquita's business operations in Colombia – once its largest source of bananas and profits.

2.     Chiquita is a publicly owned company, with operations throughout the world, including, until recently, Colombia, where its Banadex subsidiary produced bananas in the Urabá and Santa Marta regions. Chiquita is the second largest banana producer in the world. To exploit their positions of power, prestige and profit with Chiquita, the Chiquita Defendants have represented in annual reports to shareholders and otherwise that under their stewardship Chiquita was an ethical, law abiding corporation which was improving its operations due to the skills of its top managers, while conducting Chiquita's businesses in accordance with applicable rules and laws under their oversight. These corporate fiduciaries assured Chiquita's public shareholders that *"[w]e communicate in an open, honest . . . manner" and "[w]e conduct business ethically and lawfully." They said that "[t]welve top operating and administrative managers of our worldwide businesses have been meeting about every two months . . . specifically to discuss our Corporate Responsibility . . . performance," and that Chiquita had a Corporate Responsibility Officer and a "Corporate Responsibility Steering Committee" that included "five directors" that "met monthly since October 1998" to oversee Chiquita's "ethical and legal behavior and compliance."* As a result,

these top managers and directors of Chiquita enjoyed – and exploited – their prestigious and lucrative Chiquita positions, benefiting from the considerable perquisites and financial benefits their positions with one of the world's largest corporations provided.

3.      Chiquita is the present-day successor to the notorious United Fruit Company ("United Fruit"), which had a long, dark history of improper and illegal conduct. In Central and South America it cooperated with authoritarian governments to suppress – even kill – its employees during labor protests, paid bribes, the exposure of which led to the suicide of the Company's Chairman and CEO and the enactment of the U.S. Foreign Corrupt Practices Act, fomented a coup against an unfriendly government, was implicated in illegally using child labor and in serious environmental abuses and also violated the U.S. antitrust laws. As the Company itself has admitted:

> [I]ts predecessor companies, including the United Fruit Company, also made a number of mistakes – including the use of improper government influence, antagonism toward organized labor, and disregard for the environment.

As a result of this checkered past, it was especially important that the insider fiduciaries who were managing and overseeing Chiquita on behalf of its stockholder owners take appropriate steps to operate Chiquita in a lawful and ethical manner – not only to safeguard the value of its assets and operations, but to protect the improved reputation the Company had come to enjoy in the 1990s. In fact, the Chiquita Defendants specifically addressed this important issue, telling the owners of the Company that Chiquita's prior unsavory behavior

> clearly would not live up to the Core Values we hold today or to the expectations of our stakeholders.
>
> *Today, we are a different Company.* But we acknowledge our complex past as a way to begin an honest dialogue about our present and our future. It is humbling to consider the impacts – both positive and negative – that a corporation can have. At the same time, it is uplifting to note the distance a company can travel.

4.      However, the true facts were quite different than these corporate fiduciaries represented to the owners of Chiquita, *i.e.*, Chiquita's shareholders, on whose behalf they were

managing and overseeing the business. In fact, Chiquita's officers and directors were encouraging and/or permitting Chiquita's executives to resort to improper and/or illegal *ultra vires* activities to boost Chiquita's reported results, including bribes and other improper payments and conduct to retain the ability to operate in Colombia, Chiquita's single largest source of bananas *and* profits – thus making their stewardship of Chiquita appear more successful and providing those executives with large salaries and bonus compensation justified by that apparent success.

5.    From 1997 through 2004, the Chiquita Defendants caused Chiquita to make over 100 bribery payments to the AUC in Colombia, totaling over $1.7 million, on top of other bribery payments to the FARC and ELN, which payments were actively concealed by them from the owners of Chiquita, *i.e.*, its shareholders, and from government officials in the U.S. and Colombia. Chiquita had been making similar payments to the leftist FARC and ELN guerrillas since 1989. With the help of E&Y, they caused these payments to be falsely accounted for in Chiquita's financial records and statements as "security payments." Because of the illegal conduct of the defendants, following a March 2007 indictment, Chiquita was forced to plead guilty to a criminal violation of the U.S. Global Terrorism Sanctions Act and pay a $25 million non-tax-deductible fine – *the largest criminal penalty ever imposed under that Act*. Chiquita was also sentenced to five years criminal probation during which the Company has to meet stringent conditions or face revocation of its probation and additional criminal sanctions. *The fine was so large that Chiquita has to pay it over five years with interest, thus materially increasing the actual amount to be paid and the damage to the Company.*

6.    The AUC, often described as a "death squad," was designated as a "Foreign Terrorist Organization" by the U.S. Department of State. *Forbes* describes the AUC as "responsible for some of the worst massacres in Colombia's civil conflict and for a sizable percentage of the country's cocaine exports." With 15,000 to 20,000 armed troops, the AUC has used kidnapping, torture,

disappearance, rape, murder, beatings, extortion and drug trafficking among its techniques. The paramilitary offensive began with the July 1997 killings of at least 30 civilians in Mapiripán, a coca-growing region in southeastern Colombia. Some 200 AUC paramilitaries were flown in from Urabá to carry out the slaughter. Paramilitary killings rose dramatically while the sustaining payments from Chiquita continued. One of many massacres committed by the AUC took place in 2001, while the AUC was receiving funds from Chiquita. One morning, the AUC paramilitaries entered the rural town of Chengue and killed 24 men by smashing their skulls with stones and a sledgehammer. The AUC gained a reputation for the shocking brutality of its crimes. The slaughter left a trail of mangled corpses across the country, from the banana farms of Urabá to the coca fields of Putumayo. An overwhelming majority of the victims were civilians.

7.    This right-wing terrorist organization earns money by terrorizing workers, murdering those who seek to organize struggles for higher wages or improved conditions and threatening others that the same will happen to them if they do not submit and/or behave. Many of the victims of the AUC were human rights workers and trade unionists. Indeed, over the past six years, more than 800 union officials and organizers have been assassinated in Colombia – and more than 4,000 since 1986. Chiquita's insiders, in effect, used the right-wing paramilitaries as hit-men against their own rebellious employees and those who urged their employees to take steps to improve their working conditions. In the state of Antioquia, Chiquita's business boomed as the AUC took over banana-growing lands and was blamed for the killings of human rights workers and trade unionists. As the U.S. criminal complaint stated, *"by 2003, Banadex [Chiquita's Colombian subsidiary] was defendant Chiquita's most profitable banana-producing operation."*

8.    During one year, the AUC was accused of carrying out 16 massacres, 362 assassinations and 180 kidnappings, all of these crimes financed in part by Chiquita's funds. In

addition to the payments to the AUC, Chiquita's executives facilitated the shipment of 3,000 Israeli rifles and millions of rounds of ammunition to the right-wing paramilitaries in 2001. The weapons were brought into Colombia through the port facility operated by Banadex and stored on the Company's docks before being distributed to the death squads. Colombia's attorney general has opened an investigation into this and requested information from the U.S. Department of Justice ("DOJ"). Colombia may seek the extradition of eight Chiquita officials on charges that the Company used one of its own ships to smuggle weapons to the same paramilitary group.

9.      This is not a case of low-level, rogue employees in a far off subsidiary making improper payments which were concealed from – and thus not discovered by – senior executives or the directors of the Company, or its auditors. These payments were known to the top corporate officers and Board of Directors, to Chiquita's in-house General Counsel and to Chiquita's outside auditors and lawyers who all were aware the payments were being made and falsely misaccounted for in Chiquita's records to conceal their true nature. The Chiquita Defendants engaged in this wrongful *ultra vires* behavior because Chiquita's Colombian banana-producing operations were quite profitable and these corporate officers and directors were desperate to convince Chiquita's shareholders (and investors) that their management and stewardship of Chiquita was successful and they were making progress toward sustained profitable growth, despite the Company's persistent financial problems due to excessive debt levels and operational disruptions in its Latin American operations. The improper bribery payments served the improper purpose of the Chiquita Defendants, who retained the long-term hostility to workers' rights that has given the Company a black eye for decades. The AUC, a right-wing/fascist group engaged in terrorism, *was killing thousands of pro-labor social activists and labor advocates in Colombia*, which the Chiquita Defendants knew would help them pressure workers in the Company's Colombian operations to

accept lower wages and less desirable, *i.e.*, cheaper, working conditions. In addition, by continuing the profitable Colombian banana operations via the improper payments and other activities, the Chiquita Defendants inflated their compensation in the form of salaries, bonuses and perks, thus personally profiting from their breaches of duty, which damaged the Company.

10.    The bribery payments to the AUC were made for over seven years, continuing after the payments were disclosed to the DOJ and even after Chiquita publicly disclosed them in mid-2004 – even though the Chiquita Defendants indicated, directly or indirectly, expressly or implicitly – but falsely – to the DOJ and the shareholders of Chiquita that the payments had stopped. The defendants also permitted these bribery payments to continue even after the Chiquita Defendants received specific advice from Chiquita's outside counsel, Kirkland & Ellis, that the payments *were illegal and had to stop*! In stating that the payments were illegal and that Chiquita must immediately stop paying the AUC, this outside counsel's documents indicate it told the Chiquita Defendants:

- "Must stop payments."

- "Bottom Line:  CANNOT MAKE THE PAYMENT"

- "Concluded with: 'CANNOT MAKE THE PAYMENT'"

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

- "[T]he company should not make the payment."

11.    These illegal and/or improper actions had the desired effect, *i.e.*, increasing Chiquita's apparent success and operating profits in the short term. Given the fact that most of the Chiquita Defendants had limited tenures in their positions at Chiquita, this was their real concern, not Chiquita's long-term profitability or reputation and goodwill, *i.e.*, the long-term interests of the actual owners of Chiquita, *i.e.*, its public shareholders. These defendants' improper and/or unlawful

actions have had an inevitable damaging impact on Chiquita, its long-term future and the interests of its shareholder community.

12.     Despite actual knowledge of the bribery payments and knowledge of or reckless disregard for the arms shipments/transactions and the obvious dangers of this improper, *ultra vires* and/or illegal conduct, Chiquita's directors permitted such conduct, including the falsification of Chiquita's books and records in violation of the Securities Exchange Act of 1934 ("1934 Act"), to disguise and conceal the improper/illegal payments. Incredibly, they did this even though Chiquita was the subject of a Securities and Exchange Commission ("SEC") Consent Decree entered in October 2001, arising out of improper payments made by Chiquita's Banadex subsidiary in Colombia, which involved the falsification of Chiquita's books and records in violation of the 1934 Act to disguise and conceal these illegal payments, requiring Chiquita to "cease and desist" from such falsification. They did not take the steps they knew were necessary and required to remedy the dangerous conditions created by that conduct – even after the conduct became known to the DOJ. Those defendants who joined the Company as this course of conduct and conspiracy was ongoing joined in that conduct and conspiracy, allowing the conduct to continue while taking steps to conceal it and cover it up – both from Chiquita shareholders and government officials. The Chiquita Defendants' false statements, reckless or intentional misconduct and abuse of this corporation have already cost it millions of dollars in wasted compensation expense for the Chiquita Defendants, as well as fines and expenses, and exposed it to potentially hundreds of millions of dollars in civil suit damages and costs, while badly damaging Chiquita's corporate image and reputation. Chiquita's stock has plunged from over $30 per share to as low as $12.50 per share, costing its shareholder community over $750 million in lost market capitalization.

13.     When the DOJ discovered that the Chiquita Defendants were continuing to make the illegal payments – continuing a long course of improper conduct – the DOJ threatened Chiquita and the Chiquita Defendants with criminal prosecution.  The Chiquita Defendants caused Chiquita to agree to plead guilty.  On March 19, 2007, the DOJ issued a release entitled "Chiquita Brands International Pleads Guilty to Making Payments to a Designated Terrorist Organization, Agrees to Pay $25 Million Fine," which stated:

> Chiquita pleaded guilty pursuant to a written plea agreement.  Under the terms of the plea agreement, Chiquita's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation. . . .

> The plea agreement arises from payments that Chiquita had made for years to the violent, right-wing terrorist organization United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC").  The AUC had been designated by the U.S. government as a Foreign Terrorist Organization ("FTO") on Sept. 10, 2001, and as a Specially-Designated Global Terrorist ("SDGT") on Oct. 31, 2001.  *These designations made it a federal crime for Chiquita, as a U.S. corporation, to provide money to the AUC.* . . .

> *"Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. . . .*

> *"Funding a terrorist organization can never be treated as a cost of doing business . . . .  American businesses must take note that payments to terrorists are of a whole different category.  They are crimes."*

*          *          *

**Chiquita's Payments to the AUC**

*          *          *

*Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.  Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees.*

For several years Chiquita paid the AUC by check through various intermediaries.  *Chiquita recorded these payments in its corporate books and*

- 9 -

*records as "security payments" or payments for "security" or "security services." Chiquita never received any actual security services in exchange for the payments.*

Beginning in June 2002, Chiquita began paying the AUC in Santa Marta directly and in cash according to new procedures established by senior executives of Chiquita. *The newly-implemented procedures concealed the fact that Chiquita was making direct cash payments to the AUC. A senior Chiquita officer had described these new procedures to Chiquita's Audit Committee on April 23, 2002.*

\*      \*      \*

Department of Justice officials told the Chiquita representatives that the payments were illegal and could not continue. . . .

*Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004.*

14.     On April 17, 2007, *The Miami Herald* published an exposé entitled "Payoffs to Colombian Terrorists Scrutinized," which stated:

*In Colombia, Chiquita paid both left-wing and right-wing groups, according to the case files in federal court in the District of Colombia. The court documents do not specify how much money went to the leftist rebels, but say $1.7 million went to the AUC beginning in 1997 . . . .*

\*      \*      \*

*Colombian authorities are pursuing their own investigations into Chiquita's protection payments, and have threatened to seek the extradition of Chiquita executives from the United States. . . .*

*"I do not regard this as a relationship between a blackmailer and his victim,"* Attorney General Mario Iguaran told journalists. *"What I can see is a criminal relationship."*

15.     As a result of this scandal and its criminal guilty plea, Chiquita has been sued on behalf of scores of Colombians killed by the terrorists the Chiquita Defendants caused Chiquita to fund, seeking tens of millions of dollars in damages. For instance, the families of certain individuals killed by the AUC filed a class-action lawsuit against Chiquita in this district, alleging violations of the Alien Tort Claims Act and international law. Other similar suits are pending. EarthRights

International, a non-profit human rights NGO representing the plaintiffs in one of these suits, has stated:

> *Chiquita's payments to these paramilitary groups, including the United Self-Defense Committees of Colombia (Autodefensorias Unidas de Colombia, or AUC) and its predecessors, were reviewed and approved by senior executives of the corporation, and resulted in the targeted killings of hundreds or thousands of individuals, including trade unionists, banana workers, and political organizers. . . .*
>
> *"To promote its business operations, Chiquita funneled money and guns to a terrorist group that murdered thousands of people and shipped untold amounts of cocaine to the United States," said Marco Simons, ERI's Legal Director. "Now, the victims are demanding some measure of accountability from Chiquita for its egregious behavior."*

16.    One civil complaint on behalf of victims of the AUC, filed in New Jersey, also detailed extensive links between Chiquita and the AUC that defendants had long concealed:

> 38.    *In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.*
>
> 39.    The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.
>
> 40.    Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo. The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 millions rounds of ammunition. These arms and ammunition were then transferred to the AUC.
>
> 41.    . . . *Chiquita facilitated at least four other arms shipments to the AUC. In an interview with the Colombian newspaper El Tiempo, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."*
>
> 42.    . . . *Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.*

17.    Not only did the Chiquita Defendants engage in illegal and/or improper conduct for their own economic benefit while in control of Chiquita, but when the DOJ threatened a criminal prosecution against them and Chiquita, the Chiquita Defendants further abused their control of Chiquita and continued to protect themselves and aggrandize their own interests at the expense – and to the damage – of Chiquita. The Chiquita Defendants did this by causing Chiquita to plead guilty and pay a huge fine *in return for a promise from the government not to prosecute the Chiquita executives involved in the illegal conduct – even though the government's Sentencing Memorandum specifically identified 10 present and former officers of Chiquita as being actively involved in the illegal payments. This action protected those executives and the Chiquita Defendants, while amaging the Company*. When Chiquita's guilty plea was first presented to the federal district court, the Judge questioned why the individuals involved had not been indicted. However, on September 17, 2007, it became clear that Chiquita's senior officers and directors had offered Chiquita up as a sacrificial lamb – and they would be spared legal and financial responsibility for their illegal conduct which had damaged Chiquita:

> A US federal court Monday ordered the Chiquita banana company to pay 25 million dollars in fines for paying millions of dollars in protection money to Colombian paramilitary groups between 1997 and 2004.
>
> *Judge Royce Lamberth accepted an agreement between the company and the US government in March that spared company executives.*
>
> *"I order that the corporation pays a fine of 25 million dollars,"* he said.
>
> \*    \*    \*
>
> *In accepting the fines, the prosecution agreed not to name or prosecute the executives involved in ordering the payments.*

By orchestrating events to protect the guilty executives whose active misconduct had caused Chiquita to be exposed criminally, Chiquita's directors protected themselves, and by sparing those individuals any criminal exposure and paying them off with large severance payments or continued

lucrative employment to buy their silence as to the directors' complicity in the criminal conduct (a further waste of corporate assets), all the then-current directors of Chiquita abused their control of Chiquita and further breached their fiduciary duties to Chiquita.

18.    By 2002, Chiquita's insiders knew that they would have to sell off Chiquita's Colombian banana operations due to the longstanding illegal and improper conduct they had caused or permitted there. They knew this sale would deprive Chiquita of millions of dollars in revenues from what had been one of its most profitable operations, which could hurt Chiquita's operating results and reflect very badly on the Chiquita Defendants' management and stewardship of Chiquita. Thus, to try to make up for these lost revenues and profits they knew Chiquita would soon encounter, in 2003, the Chiquita Defendants, in haste and without adequate research, investigation, evaluation or due diligence, acquired a German fruit distribution business known as Atlanta A.G. ("Atlanta"), paying a greatly excessive price. Because of the price the Chiquita Defendants caused Chiquita to pay for Atlanta in this hastily arranged acquisition, almost $43 million in goodwill went onto Chiquita's balance sheet. The Chiquita Defendants presented Atlanta as a very favorable acquisition – a "virtually cashless transaction" which would increase in revenues by over $1 billion a year. And, according to them, the Atlanta acquisition was a huge success. Chiquita's 2003 Annual Report stated:

> *We acquired Atlanta, exited its underperforming businesses and cut its costs. In fact, we're ahead of schedule on improving Atlanta's profitability.*

However, in truth, the reckless Atlanta acquisition was a disaster that badly damaged the Company. Almost immediately upon the acquisition of Atlanta, because of severe problems in its business, Chiquita began to write off the value of Atlanta, with charges and write-downs, which ultimately exceeded $43 million, that wiped out 100% of the goodwill recorded in connection with the Atlanta acquisition – all in less than three years.

19.    In 2004, due to the severe problems created in its Colombian operations due to the improper and illegal activities there, and hoping to reduce the likelihood of extradition of Chiquita insiders to Colombia for their criminal conduct, the Chiquita Defendants sold Chiquita's Colombian banana-producing operations in a "fire sale." This deprived Chiquita of a major source of supply of bananas necessary to conduct its business – requiring Chiquita to secure a supply of bananas by purchasing them from another source at premium, *i.e.*, unprofitable, prices. Even though those Colombian operations had been one of Chiquita's most profitable operations, *the "fire sale" of what was once a very valuable asset produced a $9 million loss when the cost of the long-term banana purchase contract is factored in.*

20.    Defendant E&Y has been Chiquita's outside auditor for many years. Because of the size of Chiquita and its worldwide operations, Chiquita was a prize client – an extremely lucrative account – especially for E&Y's small Cincinnati, Ohio office, which has few large public company clients. As a result, the Cincinnati office of E&Y, which was in charge of E&Y's audits of Chiquita, was extremely eager to please the Chiquita Defendants and hold onto that huge account. Thus, even when E&Y learned of Chiquita's illegal bribery payments and other likely illegal acts in Colombia, E&Y did not make or require disclosure of them, but permitted them to be misaccounted for in Chiquita's books and records and repeatedly certified Chiquita's false and misleading financial statements, falsely representing that it had audited them in accordance with Generally Accepted Auditing Standards ("GAAS") and that they were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP"), indicating that Chiquita's internal financial and accounting and disclosure controls were effective when, in fact, they were deficient and were being circumvented by the insiders.

21.    As detailed elsewhere herein, an overwhelming majority of the current members of the Chiquita Board are hopelessly conflicted as well as potentially personally liable and as such have not and cannot comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Chiquita or vigorously prosecute them, as this would require them to sue themselves, several of Chiquita's current executives and several former Board members and executives (who they have improperly caused Chiquita to release or agree to indemnify) who would provide inculpatory testimony as to their involvement, knowledge and malfeasance if they were sued.[2]  In fact, so as to protect themselves, the directors not only engineered the plea deal costing the Company millions while letting the responsible executives off the hook, they allowed several executives to stay in their lucrative positions of corporate trust, even though they unquestionably engaged in conduct that damaged the Company!  For example:

(a)    Aguirre, the Chairman and CEO, who lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, has failed to fire or discipline the Chiquita officers responsible for the bribery payments, and permitted and participated in causing Chiquita to plead guilty to protect the other Chiquita Defendants and in causing the fire sale of the Colombian operations, remains in his dominant and controlling position.

---

[2]    In September 2007, the Chiquita Board announced that Howard W. Barker, Jr. had been added to the Chiquita Board as a director.  Barker has never been elected by the Chiquita shareholders.  He was hand-picked by CEO/Chairman Fernando Aguirre ("Aguirre") and the other Board members – all defendants herein – only after they were comfortable that he would not take any action adverse to them.  Because they hand picked him and because Barker spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits, sympathy toward firms like E&Y, he will never sue them, and could not, in any event, since he is only one Board member and is controlled and dominated by the other Board members, defendants herein.

(b)    The Chiquita Board members have continued to permit the employment of other individuals who were actively involved in the criminal conduct, such as defendants Zalla and Kistinger, in fiduciary positions of trust and confidence at the Company.

(c)    Certain board members have made very public and resolute pronouncements condoning their own and other Company insiders' past transgressions, stating categorically there was no impropriety in making the payments to the AUC and other groups, no impropriety in continuing to make the payments even after the DOJ and Chiquita's own lawyers said they were illegal, and no impropriety in covering them up.

(d)    Members of the Audit Committee of the Chiquita Board continued approving the filing of misleading reports with the SEC that concealed the "security payments" well after the Audit Committee had been repeatedly apprised the payments were not legal.

(e)    During February - March 2007, members of the Compensation Committee of the Chiquita Board privately approved pay raises for themselves and Chiquita's senior executives complicit in the misconduct alleged herein, even as Chiquita's demise was playing out publicly.

(f)    Members of the Compensation Committee of the Chiquita Board also approved payoff packages to certain departing Chiquita executives such as Olson whose misconduct cost Chiquita tens of millions of dollars – instead of demanding contribution from them for the harm they had caused Chiquita.

22.    The current directors will not objectively consider – let alone bring or vigorously prosecute – claims against themselves or the officers of Chiquita who were actively involved in the criminal misconduct.  Because the current Board is disabled from protecting or enforcing the Company's rights in this regard, Hawaii Annuity Trust Fund for Operating Engineers, an

institutional shareholder of Chiquita, brings these claims in the place and stead of the Chiquita Board of Directors to protect the Company and restore shareholder value.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction over the causes of action asserted herein because this case is an equitable cause not given by statute to other trial courts.

24.    This Court has jurisdiction over Chiquita and the Chiquita Defendants. Chiquita has been incorporated in and a citizen of the State of New Jersey since March 30, 1899. Chiquita's origins as a New Jersey corporation can be traced back to 1870, at which time Captain Lorenzo Dow Baker purchased 160 bunches of bananas while in Jamaica, to be sold eleven days later for profit in New Jersey. Beyond its incorporation here, Chiquita has offices located at 401 Madeline Avenue, Garfield, Bergen County, New Jersey and directs significant marketing toward, makes substantial sales in and relies heavily upon sales revenue derived from the State of New Jersey. Each Chiquita director is subject to personal jurisdiction in the State of New Jersey by virtue of being a director of New Jersey corporation. This action is not removable because it arises under state law and seeks only equitable relief. In addition, defendants Chiquita and E&Y are citizens of the State of New Jersey and thus the action cannot be removed even if diversity were present. As this action seeks predominantly equitable relief, and as shareholder derivative actions are creatures of equity, it is properly brought to the Chancery Division.

25.    Venue is proper in this Court because the conduct at issue arose in and had an effect in this County, Chiquita and E&Y do business here and service can be made in this County.

## PARTIES AND OTHER ENTITIES

**Plaintiff**

26.    Plaintiff Hawaii Annuity Trust Fund for Operating Engineers was at relevant times a stockholder of Chiquita. Plaintiff currently owns approximately 1,790 shares of Chiquita common

stock. Plaintiff brings this action derivatively in the right and for the benefit of Chiquita. Plaintiff will fairly and adequately represent the interests of Chiquita and its shareholders in enforcing the rights of Chiquita.

**Nominal Defendant**

27.   (a)   Nominal defendant Chiquita Brands International, Inc. ("Chiquita") is, and has been since the 1800s, a New Jersey corporation. Chiquita engages in the growing, distribution and sale of bananas. Chiquita is the world's second largest banana producer, with annual revenues of approximately $4.5 billion and about 25,000 employees. Through the late 90s, Chiquita was the world's single largest banana producer, controlling one-third of the world's banana trade. By late 2001, due to excessive debt levels, Chiquita would enter into a "pre-arranged" or "pre-packaged" reorganization proceeding from which Chiquita emerged in the Spring of 2002. Dole is now the largest banana producer. The pre-reorganization equity holders of Chiquita continued to be equity holders after the reorganization. The reorganization plan explicitly preserved Chiquita's pre-reorganization causes of action as to all persons and entities not released via the reorganization plan. The improper and illegal conduct and conspiracy alleged herein began before the Chiquita bankruptcy, continued during the Chiquita bankruptcy proceeding while being concealed from the bankruptcy court, and continued after the reorganization of Chiquita. None of the defendants in this action were released by the reorganization plan.

(b)   Chiquita is the successor to the notorious United Fruit, which had a long, dark history of improper and illegal conduct. In Central and South America it cooperated with authoritarian governments to suppress – even kill – its employees during labor protests. It paid bribes, the exposure of which led to the suicide of the Company's Chairman and CEO and the enactment of the U.S. Foreign Corrupt Practices Act, and fomented a coup against an unfriendly

government. It was implicated in illegally using child labor and in serious environmental abuses and it also violated the U.S. antitrust laws. As the Company itself has admitted:

> [I]ts predecessor companies, including the United Fruit Company, also made a number of mistakes – including the use of improper government influence, antagonism toward organized labor, and disregard for the environment.

(c)     United Fruit's control over Central American governments earlier this century gave rise to the term "banana republic." United Fruit became notorious in Latin America as a U.S. Army-backed opponent to agrarian reform and agricultural workers' unions. In 1928, several thousand workers on Colombia's banana plantations began a strike demanding written contracts, eight-hour days, six-day weeks and the elimination of food coupons. According to the United Fruit Historical Society, the strike turned into "the largest labor movement ever witnessed in the country." The strike received national attention and support. When the army fired on strikers during a demonstration in the city of Cienaga, killing up to 2,000 workers, it created unrest that contributed to the downfall of the Conservative Party.

(d)     Through much of the 20th century, the operations of United Fruit in Central America, Colombia and elsewhere in Latin America were highly questionable – as in the organization of the CIA-backed coup in Guatemala that overthrew the reformist government of Jacobo Arbenz in 1954. United Fruit was infamous for using a combination of its financial clout, congressional influence and a refusal to negotiate with striking workers to establish and maintain a colony of "banana republics" in Latin America. United Fruit/Chiquita has owned banana exporting companies in Honduras since 1899, and the U.S. Army has come to call frequently since then, first in 1903, then 1907, then 1912, 1919, and 1924. United Fruit/Chiquita workers have gone on strike more than 40 times during the 89 years the Company has operated in Honduras. Juan Pablo Wainwright, the leader of the 1903 banana workers' strike in Honduras, was assassinated in Guatemala. In 1954, massive strikes for wage increases paralyzed all banana operations and peaked

with 25,0000 striking workers (around 15% of all the country's labor force).  United Fruit fired 10,000 workers.  In 1975, "Bananagate" struck.  A federal grand jury accused United Fruit of bribing Honduran President Osvaldo Lopez Arellano.  Later investigations revealed repeated bribes carried out by the Company.  More recently, in 1992, workers went on strike to demand housing, health care and schools for their families, and an increase in salaries by 10%.

       (e)     In May 1998, *The Cincinnati Enquirer* published a series of articles that exposed Chiquita's still-questionable business practices.  The articles, written by Mike Gallagher and Cameron McWhirter, reported cases in which the Company used tactics including bribery, abusive corporate control in Honduras and Colombia, the use of harmful pesticides and repressive actions against workers to bolster profits.  The writers found cases of worker and union suppression on Chiquita-controlled farms, though the "employee pamphlet" assured workers that they have the right to unionize.  In one case, the Company used the Honduran military to "evict residents of a farm village."  The soldiers forced the farmers out at gunpoint, and the village was bulldozed.  The investigation also found that Chiquita was aerially spraying workers, despite its pact with the Rainforest Alliance since November 2000, which forbids aerial spraying.  Furthermore, in defiance of the "Better Banana" pact to abide by pesticide safety standards, Chiquita subsidiaries have used pesticides in Central America that are banned in the U.S., Canada and the European Union, such as Bitertanol sold as Baycor, Chlorpyrifos, sold as Lorsban, Carboturan, sold as Furadan, and five other dangerous pesticides and fungicides.  Chiquita's insiders did not take this criticism kindly.  They caused Chiquita to sue the newspaper, claiming that reporter Gallagher obtained voice-mail tapes illegally.  *The Cincinnati Enquirer* later published an apology across the top of its front page and said it had agreed to pay Chiquita more than $10 million to avoid being sued for the series of articles

that exposed the fruit company's criminal practices. The facts found in the investigations were never challenged, however.

(f)    In October 2001, the SEC issued a "cease-and-desist order against Chiquita Brands International, Inc., in which the SEC found that Chiquita violated the books and records – Section 13(b)(2)(A) – and internal accounting controls – Section 13(b)(2)(B) – provisions of the Securities Exchange Act of 1934 in connection with a payment to foreign customs officials by a wholly-owned foreign subsidiary of Chiquita." *SEC v. Chiquita Brands International, Inc.*, Civ. Action No. 1:01CV02079, Litigation Release No. 17169; Accounting and Auditing Enforcement Release No. 1464 (D.D.C. October 3, 2001). Chiquita consented to the entry of an order that requires Chiquita to cease and desist from violating those provisions. The SEC also filed a settled complaint in federal court seeking entry of a consent order requiring Chiquita to pay a $100,000 civil penalty. Chiquita settled the action without admitting or denying the Commission's allegations.

(g)    The order found that Chiquita violated the books and records and internal control provisions as a result of the conduct of its Colombian subsidiary, Banadex. According to the order, employees of Banadex authorized the payment of the equivalent of $30,000 to local customs officials to secure renewal of a license at Banadex's Turbo, Colombia port facility. The subsidiary's books and records incorrectly identified the two installment payments, which were made in 1996 and 1997.

(h)    Sections 13(b)(2)(A) and 13(b)(2)(B) of the 1934 Act, the "books and records" and "internal controls" provisions of the Foreign Corrupt Practices Act, require reporting companies to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect their transactions and disposition of assets, and to devise and maintain a reasonable

system of internal accounting controls. Such companies are also responsible for ensuring that their wholly-owned foreign subsidiaries comply with §§13(b)(2)(A) and 13(b)(2)(B).

(i)    Based on the foregoing, the SEC concluded that Banadex employees made inaccurate entries in the documents recording the transaction and in Banadex's general ledger to conceal the payment to customs officials. These inaccurate entries by Banadex constituted a violation by Chiquita of §13(b)(2)(A) by failing to maintain books and records which accurately reflected Banadex's transactions and dispositions of assets. The SEC further found that Chiquita violated §13(b)(2)(B) by failing to maintain a system of internal accounting controls to ensure that Banadex's books and records accurately and fairly reflected the disposition of Banadex's assets. Accordingly, the SEC, pursuant to §21C of the 1934 Act, required that Chiquita cease and desist from committing or causing any violation, and committing or causing any future violation, of §§13(b)(2)(A) and 13(b)(2)(B) of the 1934 Act.

**The Individual Defendants**

28.    The defendants named below include the entire Chiquita Board of Directors as of the filing of this Complaint.

29.    Defendant Fernando Aguirre ("Aguirre") has served as Chairman of Chiquita since May 2004 and as its Chief Executive Officer ("CEO") and President since January 2004. Aguirre received a compensation package for fiscal 2006 valued at over $3 million. On April 15, 2007 – after the Company entered into the plea agreement and suffered the Colombia and Atlanta losses – Aguirre's employment agreement was renewed and his base salary was increased more than 13% to $900,000 year with a target bonus of 130% of that annual base salary. Aguirre also received a restricted stock award of shares worth $1.2 million and an additional restricted stock grant with a targeted value of $1.6 million. His long-term incentive payment for the 2007-2009 performance period under the Chiquita Stock and Incentive Plan was set at $1.6 million. According to the

Company's 2007 proxy statement, "[i]n setting 2006 base salary and annual bonus targets, the Compensation Committee considered market data derived from a *peer group* of 22 companies that the committee had identified . . . *as being similarly situated to Chiquita in terms of one or more of the following: revenue, net income, asset size, market capitalization or industry*." But none of those companies is facing the litany of regulatory and legal actions that Chiquita is currently exposed to or the losses Chiquita has suffered on the Atlanta acquisition or Colombian disposition. Moreover, Aguirre's salary of $796,000 in 2006 was higher than the median CEO salary for small cap companies, even though Chiquita underperformed the S&P 500 by 34% in 2006. Aguirre resides in and is a citizen of Ohio.

30.    Defendant Morten Arntzen ("Arntzen") has served as a director of Chiquita since 2002. Arntzen received $111,000 in directors' fees in fiscal 2006. However, employing the same "peer group" established to increase Aguirre's base salary, on February 17, 2007, despite the Board's complicity in the wrongdoing, the Board increased the cash component of their own pay by more than 60%, from $30,000 to $50,000 per year, and increased the stock component of their compensation by 100%, from an annual grant worth $25,000 to an annual grant worth $50,000, resulting in a combined directors' fee of $130,000 per year. Arntzen served with defendant Hills on Chiquita's Audit Committee that approved the payments to the AUC, the fraudulent accounting for those payments in Chiquita's books and records and the concealment of those payments in Chiquita's financial reports filed with the SEC. *The Wall Street Journal* reported in August 2007 that Arntzen said "*the AUC payments weren't secretive; they were disclosed to Ernst & Young and to company directors on the audit committee.*" "'*When I joined the board, I knew the company was making payments to paramilitary groups in Colombia,*'" Arntzen told *The Wall Street Journal*. Arntzen resides in and is a citizen of Connecticut.

- 23 -

31.     Defendant Robert W. Fisher ("Fisher") has served as director of Chiquita since 2002. Fisher, the former President of Dole Foods, served as Chiquita's Acting Chief Operating Officer from March 2002 to August 2002. He is an insider. He received over $101,000 in directors' fees in fiscal 2006. Due to the increases in directors' fees, Fisher now receives an annual fee of $130,000 per annum and other perks. Fisher resides in and is a citizen of California.

32.     Defendant Clare M. Hasler ("Hasler") has served as a director of Chiquita since 2005. Including the value of her stock grant, Hasler received a directors fee of over $270,000 during fiscal 2006. Hasler receives a fee of $130,000 per annum and other perks. Hasler resides in and is a citizen of California.

33.     Defendant Durk I. Jager ("Jager") has served as a director of Chiquita since 2002. Jager receives a fee of $130,000 per annum and other perks. Jager is a former CEO of Proctor & Gamble. Jager resides in and is a citizen of Ohio.

34.     Defendant Jaime Serra ("Serra") has served as a director of Chiquita since 2003. Serra received a directors' fee of over $101,000 for fiscal 2006 and now receives a fee of $130,000 per annum and other perks. Serra resides in and is a citizen of Mexico.

35.     Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of Chiquita since 2002. Stanbrook received a directors fee of over $111,000 for fiscal 2006 and now receives a directors' fee of $130,000 per annum and other perks. Stanbrook resides in and is a citizen of Wisconsin.

36.     Defendant Carl H. Lindner ("C. Lindner") served as Chairman and CEO of Chiquita from 1984 until May 22, 2002 and August 13, 2001, respectively, having originally joined the Board in 1976. Through his insurance company, American Financial Group ("AFG"), Lindner controlled

nearly 40% of Chiquita's stock until after the pre-packaged bankruptcy in 2003, when his equity interest was reduced to less than 10%. C. Lindner resides in and is a citizen of Ohio.

37.     Defendant Keith E. Lindner ("K. Lindner"), C. Lindner's son, served as Vice Chairman of Chiquita from 1997 until 2001. K. Lindner served as Chiquita's President and Chief Operating Officer from 1989 to 1997 and served in various executive capacities since 1984. K. Lindner was also Co-President and a director of AFG and AFC. K. Lindner resides in and is a citizen of Ohio and Florida.

38.     Defendant Roderick M. Hills ("Hills") served as a director of Chiquita from March 2002 until he resigned effective May 2007. Hills learned about the payments to the AUC (which had been ongoing since 1998) when he joined the Board. According to notes later produced by the Company's outside counsel, in reaction to their warnings that the payments had to stop, Hill's adamant position was that the payments continue – with Hills rebuking: *"just let them sue us, come after us."* Even after the DOJ learned of the bribery payments to a violent Colombian group that the U.S. branded as terrorists, and Hills was told by the DOJ the payments were illegal, Hills refused to curtail the payments and permitted approximately $145,000 worth of payments to be made. On December 22, 2003, Hills emailed fellow directors: *"we appear to [be] committing a felony."* Since 1977, Hills has served on the boards of many scandal-plagued companies, including Federal-Mogul Corp., Waste Management Inc. and Oak Industries Inc. Hills learned about the payments to the AUC in April 2002, a month after he joined the Board. Arntzen, a director who served with Hills on Chiquita's Audit Committee, has stated "the *AUC payments weren't secretive; they were disclosed to Ernst & Young and to company directors on the audit committee.*" "'When I joined the board, I knew the company was making payments to paramilitary groups in Colombia,'" Arntzen has said. Hills resides in and is a citizen of Washington, D.C.

- 25 -

39.    Defendant Howard ("Skip") W. Barker, Jr. ("Barker") has served as a director of Chiquita since September 21, 2007, when a seventh board seat was created by the existing Board and Barker was picked by defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook to fill that seat. ***Barker has never stood for election to the Chiquita Board*** and thus has never been elected by the Chiquita shareholders. He was hand-picked by Aguirre and the other Board members – all defendants herein – only after they were comfortable that he would not take any action adverse to them. Because they hand-picked him and because Barker spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits and sympathy toward firms like E&Y. Barker will never sue them, and could not, in any event, since he is only one Board member and is controlled and dominated by the other Board members, defendants herein. Barker is a resident and citizen of Connecticut and Florida.

40.    Defendant Cyrus F. Freidheim, Jr. ("Freidheim") served as Chairman and CEO of Chiquita from 2002 to 2004. Freidheim resides in and is a citizen of Illinois.

41.    Defendant Robert W. Olson ("Olson") served as Senior Vice President and General Counsel of Chiquita from before 1997 until he left in August 2006. Olson approved the illegal payments from early on and helped devise the scheme to conceal and miss-account for them. He provided legal counsel and advice to many of the Chiquita Defendants and Chiquita throughout the relevant time period and approved many of the false and misleading statements to Chiquita's shareholders. When Kirkland & Ellis told Chiquita, Chiquita "should STOP PAYMENTS IMMEDIATELY," Olson (and Hills) argued against stopping the payments and was involved in continuing to conceal the payments from the DOJ. Even when the DOJ told Olson in no uncertain terms on April 23, 2003 that the payments were illegal, he and Hills caused or permitted Chiquita to

make more payments totaling more than $145,000 through February 2004. Olson resides in and is a citizen of Ohio.

42.     Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of Chiquita from March 2002 until 2007. Benjamin was a member of Chiquita's Audit Committee during his Board membership. Benjamin resides in and is a citizen of New York.

43.     Defendant William W. Verity ("Verity") served as a director of Chiquita from 1994 until March 2002. Verity served on the Board's Compensation and Audit Committees from 1998-2002 and stayed on as a director of Chiquita throughout the bankruptcy proceedings. Verity resides in and is a citizen of South Carolina.

44.     Defendant Steven G. Warshaw ("Warshaw") served as a director of Chiquita from 1997 until March 2002. Warshaw also served as Chiquita's President and Chief Operating Officer from 1997-2001, as Chief Financial Officer from 1994-1998 and as Executive Vice President and Chief Administrative Officer from 1990-1997, having served in various executive capacities at Chiquita since 1986 when the Lindners took control. Warshaw is a resident and citizen of Ohio.

45.     Defendant Jeffery M. Zalla ("Zalla") has served in various Chiquita executive positions since 1990. He has served as Senior Vice President and Chief Financial Officer of Chiquita since May 2005. From April 2005 to June 2005, Zalla served as Vice President, Finance for the Chiquita Fresh Group-North America. He served as Vice President, Treasurer, and Corporate Responsibility Officer from April 2003 to April 2005, as Corporate Responsibility Officer and Vice President, Corporate Communications from September 2001 to April 2003 and as Vice President and Corporate Responsibility Officer from October 2000 to September 2001. Zalla is a resident and citizen of Kentucky.

46.     Defendant Rohit Manocha ("Manocha") was a Thomas Weisel partner who served as a director of Chiquita between January 2001 and March 2002 when Chiquita emerged from bankruptcy. Manocha is a resident and citizen of New York.

47.     Defendant Gregory C. Thomas ("Thomas") served as a director of Chiquita from 2000 through March 2002. Previously, from 1990-1996, he had served as Executive Vice President and Chief Financial Officer of Citicasters Inc., an affiliate of AFG, until its sale by AFG in 1996. Thomas is a resident and citizen of Ohio.

48.     Defendant James B. Riley ("Riley") served as Senior Vice President and Chief Financial Officer of Chiquita from 2001 until August 2004. Riley is a resident and citizen of Ohio.

49.     Defendant Warren J. Ligan ("Ligan") served as Chief Financial Officer of Chiquita from 1998 until 2000, having previously served in various executive capacities since 1993. Ligan is a resident and citizen of California.

50.     Defendant Robert F. Kistinger ("Kistinger") has served as President and Chief Operating Officer of the Company's Chiquita Fresh Group since March 2000, having previously served as President and Chief Operating Officer of the Company's Chiquita Banana Group from 1997 until 2000, as Senior Executive Vice President of the Chiquita Banana Group from 1994 to 1997, as President of Chiquita Banana Group-North America from 1996 to 1997, and in various other executive capacities since 1980. Kistinger is a resident and citizen of Ohio

51.     Defendant Oliver W. Waddell ("Waddell") served as a director of Chiquita from 1994 to March 2002 and served on the Audit and Compensation Committees. Waddell is a resident and citizen of Ohio.

52.     Defendant Fred J. Runk ("Runk") served as a director of Chiquita from 1984 until March 2002, having previously served as Vice President of Chiquita from 1984 to 1996 and Chief

Financial Officer from 1984 to 1994. Runk also served as a Senior Vice President and Treasurer of AFG and AFC. Runk is a resident and citizen of Ohio.

53.    Defendant William A. Tsacalis ("Tsacalis") was Vice President, Controller and Chief Accounting Officer of Chiquita and currently serves at Vice President, Finance and Treasurer. Tsacalis is a resident and citizen of Ohio.

54.    Defendant John W. Braukman III ("Braukman") is Senior Vice President of New Business Development and served as Senior Vice President and Chief Financial Officer of Chiquita until June 2005 when he was replaced by Zalla. Braukman is a resident and citizen of Connecticut.

55.    Non-party Ronald F. Walker ("Walker") served as a director of Chiquita from 1984-1998 and as its President and Chief Operating Officer from 1984-1989. As of 1997, Walker had also served as Vice Chairman of Great American Insurance Company, an AFG subsidiary, for more than five years. He was President and Chief Operating Officer of AFC from 1984 until April 1995. Walker was fired in connection with the bribery charges that eventually led to the 2001 Foreign Corrupt Practices Act charges being lodged against Chiquita. Walker passed away on May 15, 1997.

56.    Non-party Jean H. Sisco ("Sisco") served as a director of Chiquita from 1976 to April 2000 and served on the Audit and Compensation Committees. Sisco passed away in April 2000.

**Ernst & Young**

57.    Defendant E&Y has served as Chiquita's outside auditor for over a decade. E&Y has offices in, does business in and can be found in New Jersey and is a citizen of the State of New Jersey. E&Y received millions of dollars in auditing and other professional fees from Chiquita during the relevant period. E&Y became Chiquita's outside auditor prior to 1997. Because of the size of Chiquita and its worldwide operations, Chiquita was a prize client – an extremely lucrative account – especially for E&Y's Cincinnati, Ohio office, which had few large public company clients.

- 29 -

As a result, the Cincinnati office of E&Y, which was in charge of E&Y's audits of Chiquita, was extremely eager to please the Chiquita Defendants and hold onto that huge account. Thus, even when E&Y learned of Chiquita's illegal bribery payments and other illegal acts in Colombia, E&Y did not make or require disclosure of them, permitted them to be miss-accounted for in Chiquita's books and records and repeatedly certified Chiquita's false and misleading financial statements, falsely reporting that it had audited them in accordance with GAAS and that they were fairly presented in accordance with GAAP. E&Y committed accounting malpractice and breached its contract for professional services with Chiquita.

**Kirkland & Ellis, LLP**

58.    Non-party Kirkland & Ellis, LLP ("K&E") served as one of Chiquita's outside counsel during the relevant period. K&E has partners admitted in, represents clients in and can be found in New Jersey. K&E received millions of dollars in legal and other professional fees from Chiquita during the relevant period. From 2002 on, K&E had actual knowledge of the improper or illegal bribery payments but did not force the Chiquita Defendants to cease making them or to make disclosure of them to the owners of Chiquita, *i.e.*, its shareholders.

### TERRORISM ACT

59.    Pursuant to Title 8, U.S.C. §1189, the Secretary of State of the United States has the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

60.    The AUC was a violent, right-wing organization in the Republic of Colombia. The AUC was formed in or about April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. The AUC's activities varied from assassinating suspected guerilla supporters to

engaging guerrilla combat units. The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

61.    The Secretary of State of the United States designated the AUC as an FTO initially on September 10, 2001, and again on September 10, 2003. As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, knowingly to provide material support and resources, including currency and monetary instruments, to the AUC.

62.    The International Emergency Economic Powers Act, 50 U.S.C. §1701, *et seq.*, conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States. On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224. This Executive Order prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

63.    The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. §594.201, *et seq.*, implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control

("OFAC"), located in the District of Colombia, was the entity empowered to authorize transactions with a SDGT. Such authorization, if granted, would have been in the form of a license.

64.    Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having first obtained a license or other authorization from the OFAC.

## DEFENDANTS' FIDUCIARY DUTIES

65.    By reason of their positions as officers, directors and/or fiduciaries of Chiquita and because of their ability to control the business and corporate affairs of Chiquita, the Chiquita Defendants owed Chiquita and its shareholders fiduciary obligations of care, candor, compliance, fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Chiquita in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Chiquita and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

66.    Each director and officer of the Company owes to Chiquita the fiduciary duty to comply with the laws of the United States and the other countries Chiquita does business in and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Chiquita Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, and defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections and to not advance their

own personal, financial or economic interests over and at the expense of the Company's public shareholders.

67.    The Chiquita Defendants, because of their positions of control and authority as directors or officers of Chiquita, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Chiquita, each of the Chiquita Defendants had access to all non-public information about the financial condition, operations and future business prospects of Chiquita, including, without limitation, the illegal and improper activities which the Chiquita Defendants caused Chiquita to engage in.

68.    To discharge their duties, the officers and directors of Chiquita were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Chiquita. By virtue of such duties, the officers and directors of Chiquita were required, among other things, to:

(a)    Manage, conduct, supervise and direct the business and internal affairs of Chiquita in accordance with the laws and regulations of the United States and every country in which Chiquita conducts business, and pursuant to the charter and bylaws of Chiquita;

(b)    Neither violate nor knowingly permit any officer, director or employee of Chiquita to violate applicable laws, rules and regulations;

(c)    Remain informed as to the status of Chiquita's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Chiquita and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Chiquita's operations would comply with all applicable anti-bribery and corruption laws, Chiquita's financial statements and information filed with U.S. financial regulators and disseminated to the public and to Chiquita shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)     Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Chiquita by the officers and employees of Chiquita and any other reports or other information required by law from Chiquita and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Chiquita and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.     During all times relevant hereto, each of the Chiquita Defendants occupied positions with Chiquita or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning Chiquita, its operations, finances and financial condition. Because of these positions and such access, each of the Chiquita Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from Chiquita's shareholders. The Chiquita Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to disclose material information regarding Chiquita and to take any and all

actions necessary to ensure that the officers and directors of Chiquita do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

## FACTUAL ALLEGATIONS

### The Chiquita Defendants' False and Misleading Reports to the Owners of Chiquita

70.    In an effort to present themselves as competent, honest stewards and managers of Chiquita's business, the Chiquita Defendants have repeatedly misrepresented how they were overseeing, managing and operating Chiquita in a lawful and ethical manner and that Chiquita had in place internal accounting and financial and other controls to assure its accounting procedures were proper and it was in compliance with anti-corruption and anti-bribery laws and had effective training programs for its executives and managers in this regard, and, as a result, it was in compliance with laws and conventions. These representations were false and misleading. Under their stewardship, the Chiquita Defendants have caused Chiquita to engage in a pattern and practice of making illegal and improper bribery payments and engaging in other illegal activities in Colombia and making false and misleading statements to conceal and cover them up, violating U.S. and foreign law. Defendants' misconduct also involved repeatedly misleading Chiquita's shareholders to entrench and enrich themselves by boosting Chiquita's apparent short-term results and to justify paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage Chiquita in the longer term.

71.    For many years in their Annual Reports and other communications with shareholders, Chiquita's directors have stressed their successful management and oversight of Chiquita, its ethical behavior and compliance with laws. These representations were false and misleading and made with reckless disregard for the truth by the directors issuing them. The Annual Reports to Chiquita shareholders set forth below were each false and misleading for failing to disclose the existence and

nature of the Colombian payments, the falsification of Chiquita's financial statements, the circumvention of, and/or material weakness in, Chiquita's internal financial and accounting and disclosure controls, Chiquita's other improper activities in Colombia, the Chiquita Defendants' *ultra vires* conduct, Chiquita's unethical conduct and that the primary reason for Chiquita's apparent progress in its business and objectives and its better performance was the improper, unethical and *ultra vires* conduct which could not continue indefinitely.

72.    The statements in Chiquita's Annual Reports specified below were known to be false by the then directors and officers of Chiquita when those statements were made. Chiquita operates in a competitive environment. To justify the continuation of their lucrative and prestigious executive and directoral positions, the Chiquita Defendants wanted to make it appear that Chiquita was succeeding under their stewardship and doing so by operating in an ethical manner, in compliance with the laws applicable to it. The repeated positive and reassuring statements about Chiquita's controls, procedures and practices to comply with laws, rules and conventions, Chiquita's actual compliance with them, and Chiquita's dedication to high ethical standards were false. In fact, Chiquita's top officers and directors were permitting the circumventing of those preventative procedures and controls by permitting the payment of bribes and other improper payments and illegal arms shipments, *i.e.*, unethical, *ultra vires* and illegal activities. Chiquita's financial statements, published by, and the responsibility of, its directors, were also false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make provision for the monetary fines, penalties and damages that would inevitably result from those payments.

73.    In Chiquita's 1997 Annual Report to Shareholders, the "Executive Message," signed by C. Lindner, K. Lindner and Warshaw, stated:

We firmly believe in the strength of the Chiquita brand and remain committed to achieving the Company's full earnings potential.

*    *    *

We continue to make measurable progress toward objectives which further the realization of Chiquita's earnings capacity.

Elsewhere, the 1997 Annual Report stated:

> **Chiquita's corporate values balance good citizenship and social responsibility with profitable business growth. . . . The Company has a strong commitment to ethical, social . . . standards . . . .**

*    *    *

Consumers worldwide are concerned about . . . social issues. They expect companies to fulfill their responsibilities of global citizenship. . . . **Chiquita welcomes the interest in ethical standards and pledges to continue improving . . . social conditions where the Company operates.**

74.    The 1997 Annual Report contained the following:

**Statement of Management Responsibility**

The financial information presented in this Annual Report is the responsibility of Chiquita Brands International, Inc. management, which believes that it presents fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The Company's system of internal accounting controls, which is supported by formal financial and administrative policies, is designed to provide reasonable assurance that the financial records are reliable for preparation of financial statements and that assets are safeguarded against losses from unauthorized use or disposition. Management reviews, modifies and improves these systems and controls as changes occur in business conditions and operations. The Company's worldwide internal audit function reviews the adequacy and effectiveness of controls and compliance with policies.

The Audit Committee of the Board of Directors reviews the Company's financial statements, accounting policies and internal controls. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors to discuss these matters.

75.    With respect to the risks associated with Chiquita's Central and South American operations, the 1997 Annual Report stated:

Chiquita's earnings are heavily dependent upon products grown and purchased in Central and South America. These activities, a significant factor in the economies of the countries where Chiquita produces bananas and related products, are subject to the risks that are inherent in operating in such foreign countries, including government regulation, currency restrictions and other restraints, risk of expropriation and burdensome taxes.

76.    Chiquita's 1998 Annual Report stated:

Chiquita is a responsible corporate citizen to a broad community of our customers, consumers, employees and neighbors.

77.    The "Executive Message" in the 1998 Annual Report signed by C. Lindner, K. Lindner and Warshaw stated:

Chiquita Brand International's 1998 operating results reflect continued progress . . . .

*        *        *

Higher banana farm productivity has contributed significantly to recent cost improvements.

78.    Chiquita's 1998 and 1999 Annual Reports contained the same "Statement of Management Responsibility" and the same statement regarding the risks of its Central American operations as those in its 1997 Annual Report.

79.    Chiquita's 2000 Annual Report to Shareholders contained the same "Statement of Management Responsibility" and same statement regarding the risks of Chiquita's Central American operations as the 1997 Annual Report, which statements were false and misleading for the same reasons.

80.    During 2000, Chiquita published a "Corporate Responsibility Report." It stated in a letter signed by Warshaw:

**A New Spirit of Openness: Letter from Steve Warshaw**

To some, this Report may seem like it was along time coming.

- 38 -

The Chiquita of today emerged, over the course of 100 years, from companies holding various names, including the United Fruit Company and United Brands. . . .

But along the way, the United Fruit Company became known as "the octopus," an organization reputed to have such broad reach and influence that it could hold sway over governments and the lives of its employees. This reputation was born of many things, including allegations of the Company's participation in labor rights suppression in Colombia in 1928 and involvement in a government overthrow in Guatemala in 1954, as well as its involvement in a bribery scandal in Honduras in 1975. And in the years since, some would argue that the Company has been closed and defensive in addressing concerns about its standards and practices. In the eyes of many, all of this casts a shadow, even today, over the Company.

*Times have changed. And so has our Company.*

Our stakeholders expect more of us. We expect more of ourselves. Our understanding of our role in society, and what it means to be a responsible corporate citizen, is quite different than it was not long ago.

*Three years ago, in the wake of particularly damaging media coverage, we embarked on a disciplined path toward Corporate Responsibility.* . . . This was not to be a public relations exercise, *but a management discipline* – a way to align ourselves around a set of Core Values, to build a sense of common purpose across our different units, and to get the best out of our people.

*    *    *

We have learned that building trust demands a new spirit of openness and honesty within the Company, and that earning the trust of our many stakeholders is vital to our success.

*    *    *

*Of course there is compelling moral value to this work. But it also makes smart business sense.* . . .

81.    Elsewhere the 2000 Corporate Responsibility Report stated:

—    **Our Core Values and Code of Conduct** – These standards are the cornerstones of our commitment to Corporate Responsibility. Our Core Values guide our strategic business decisions and help us balance the needs of our stakeholders, and our Code of Conduct translates these Values into everyday behaviors.

*    *    *

*INTEGRITY*

We live by our Core Values

*We communicate in an open, honest and straightforward manner*

*We conduct business ethically and lawfully*

82.     In the 2000 Corporate Responsibility Report, the Chiquita Defendants told the owners

of the Company that they had in place a series of controls, committees and procedures that ensured

compliance with these core values:

**Creating Governance:  Support and Accountability**

Governance Structure

Chiquita's commitment to Corporate Responsibility begins at the top of the organization and is supported by a governance structure designed to provide guidance, resources, and accountability *for the responsible conduct of employees in their everyday jobs.*

Audit Committee

In 2000, we expanded the role of the Audit Committee of the Company's Board of Directors to include oversight of whether the Company has the right people, policies and programs in place to properly manage Corporate Responsibility.  The Audit Committee has three members, all of whom are outside directors.  The Company's Corporate Responsibility Officer has open access to Audit Committee members and reports to them periodically as part of regularly scheduled Committee meetings.

Senior Management Group for Corporate Responsibility

The effective achievement of our standards is the responsibility of our senior management.  Twelve top operating and administrative managers of our worldwide businesses have been meeting about every two months since October 1998 specifically to discuss our Corporate Responsibility strategy and performance. These senior managers are responsible for providing vision and effective leadership for Corporate Responsibility, modeling our Core Values in their personal behavior, and holding the organization accountable for achieving credible progress toward our objectives.

Corporate Responsibility Officer

In May 2000, Chiquita appointed a full-time Vice President and Corporate Responsibility Officer. The role of the Corporate Responsibility Officer is to oversee the design, implementation, management, and improvement of Corporate Responsibility practices throughout the Company. He is also responsible for the

development of measurement, verification, accountability, communication, and reporting systems. *He serves as an internal resource for best practices in Corporate Responsibility, communicates with stakeholders about the Company's performance, and tracks emerging issues of importance to the Company and its stakeholders. He reports to the President and Chief Executive Officer.*

Jeff Zalla is a ten-year Chiquita employee and has led our Corporate Responsibility Steering Committee since its inception in 1998.

Corporate Responsibility Steering Committee

The Senior Management group is currently supported by a Corporate Responsibility Steering Committee, which includes the Corporate Responsibility Officer, the Vice President of Human Resources, *five directors* and managers from representative Chiquita business units, and one rotating member of Senior Management. This group has met monthly since October 1998 and has contributed enormously to the design and implementation of our Corporate Responsibility efforts. The Steering Committee has worked to ensure that our strategies and objectives are appropriate and that our tools for assessment and planning are effective for all business units. It has also engaged other corporate functions such as Legal, Human Resources and our environmental group in efforts to integrate Corporate Responsibility into our everyday management practices.

\*       \*       \*

Our Code of Conduct

Our Code of Conduct translates our Core Values into everyday behaviors. *For decades, Chiquita has had a Code of Conduct that dealt with ethical and legal behavior and compliance with Company policies. . . . Our Code of Conduct now embodies standards in the areas* of food safety, labor standards, employee health and safety, community involvement, environmental protection, *ethical behavior, and legal compliance.*

83.    Chiquita's 2001 Annual Report stated:

We made considerable progress on corporate responsibility, breaking new ground with our first Corporate Responsibility Report (www.chiquita.com), which earned praise for its honesty, transparency and measurement against rigorous third-party environmental and social standards. *As a Company, we will continue to be guided by Chiquita's Core Values of integrity, respect, opportunity and responsibility in our dealings with shareholders, employees, customers, suppliers and the communities in which we do business.*

For 2001, Chiquita reported $155 million earnings . . . (EBITDA) . . . [and] an improvement of 7% over the previous year. . . .

. . . We are confident that . . . our industry-leading production capabilities in Latin America, and the Chiquita brand, which is among the best-known and most respected brands in the world, provide us a strong platform for growth.

84.    Chiquita's 2001 Annual Report contained the same "Statement of Management Responsibility" and same statement regarding the risks of its Central and South American operations as the 1997 Annual Report, which statements were false and misleading for the same reasons. Chiquita's 2001 Corporate Responsibility Report contained essentially the same statements as the 2000 Corporate Responsibility Report, which were false and misleading for the same reasons.

85.    Chiquita's 2002 Annual Report contained a letter from Chairman Freidheim stating:

Net sales for 2002 on a combined basis totaled $2.0 billion, up six percent from 2001.

*        *        *

**Here's what we're doing to improve corporate responsibility**.  In 2002, Chiquita again demonstrated its commitment to high . . . social standards. . . . *Our corporate responsibility reports also continue to earn recognition for their honesty, transparency and clear performance measurement*.  Our first report was ranked best in the world among food companies by SustainAbility and the United Nations Environmental Program, and our second report shared the first-ever award for outstanding sustainability reporting from a coalition of more than 80 environmental and investment groups.  I encourage you to review our corporate responsibility reports at www.chiquita.com.

*We are committed to managing Chiquita to the highest standards of integrity and propriety in all our affairs, from our farms to our boardroom.  Our achievements are a great source of price among our employees.*

*We have confidence in Chiquita's turnaround.*

86.    Elsewhere the 2002 Annual Report stated:

**Why Are You Continuing to Invest in Corporate Responsibility?**

. . . [I]n 1998, Chiquita took on corporate responsibility as a major priority following years of criticism from nongovernmental organizations and the media. *Management decided to turn around the company's reputation.*

*        *        *

- 42 -

> *In delivering on our corporate responsibility goals, we have gone from being a target of criticism to a focal point of praise.* We could not buy that kind of turnaround in corporate reputation. We can only earn it, by committing to high standards and living up to them. . . . [W]e continue to invest in corporate responsibility because it is the right thing to do.

*      *      *

> Integrity
>
> - *We live by our Core Values.*
>
> - *We communicate in an open, honest and straightforward manner.*
>
> - *We conduct business ethically and lawfully.*

87.     Chiquita's 2002 Annual Report contained the same "Statement of Management Responsibility" and same statement regarding the risks of the Company's Central and South American operations as the 1997 Annual Report, which were false and misleading for the same reasons.

88.     Chiquita's 2003 Annual Report contained a letter from Aguirre and Freidheim, which stated:

> *We also accomplished new milestones in corporate responsibility* . . . .

*      *      *

> *2003 was an excellent year for Chiquita* . . . . *The turnaround of Chiquita is well underway.* . . .

> Revenue in 2003 was $2.6 billion . . . . Approximately 80 percent of the $1 billion increase in 2003 revenue from 2002 was due to our acquisition in March of Atlanta AG, a German fresh produce distributor. Operating income for 2003 rose to $140 million . . . .

*      *      *

> *We are very pleased with Chiquita's achievements in 2003* . . . .

89.     Elsewhere, the 2003 Annual Report stated in a Q/A session:

> A.     As I explained earlier, I believe in decisions made on the basis of values and principles. *I am impressed by Chiquita's Core Values and the*

- 43 -

*company's accomplishments in corporate responsibility.* Chiquita's high standards of . . . social performance enhance the company's reputation and ultimately its brand. There are a growing number of investors who seek companies with track records in corporate responsibility. Chiquita should benefit from this trend. I will continue to support our corporate responsibility program, because it is the right thing to do and it is good for Chiquita and our stakeholders.

90.    Elsewhere, the 2003 Annual Report stated:

OUR COMMITMENT TO ACHIEVE HIGH STANDARDS OF ENVIRONMENTAL, SOCIAL AND ETHICAL PERFORMANCE IS ROOTED IN OUR CORE VALUES – INTEGRITY, RESPECT, OPPORTUNITY AND RESPONSIBILITY – WHICH, ALONG WITH OUR CODE OF CONDUCT, GUIDE OUR LONG-TERM STRATEGIES AND EVERYDAY ACTIONS.

91.    Chiquita's 2003 Annual Report contained the same "Statement of Management Responsibility" and same statement regarding the risks of the Company's Central and South American operations as the 1997 Annual Report, which were false and misleading for the same reasons.

92.    The 2003 Annual Report also stated:

In January 2004, the Company confirmed it is having discussions regarding the potential sale of its banana-producing and port operations in Colombia to Invesmar Ltd., the holding company of C.I. Banacol S.A., a Colombian-based producer and exporter of bananas.

93.    Chiquita's 2003 Annual Report also stated:

The Company has international operations in many foreign countries, including those in Central and South America, the Philippines and La Côte d'Ivoire. The Company must continually evaluate the risks in these countries, including Colombia, where an unstable environment has made it increasingly difficult to do business. The Company's activities are subject to risks inherent in operating in these countries, including government regulation, currency restrictions and other restraints, burdensome taxes, risks of expropriation, threats to employees, political instability and terrorist activities, including extortion, and risks of action by U.S. and foreign governmental entities in relation to the Company. *Should such circumstances occur, the Company might need to curtail, cease or alter its activities in a particular region or country. Chiquita's ability to deal with these issues may be affected by applicable U.S. laws. The Company is currently dealing with one such issue, which it has brought to the attention of the appropriate U.S. authorities who are reviewing the matter. Management currently believes that the matter can be*

> *resolved in a manner that is not material to the Company, although there can be*
> *no assurance in this regard.*

No disclosure was made of the illegal bribery payments or arms-providing activities relating to the

AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with

regard to legal violations in the United States and Colombia and the viability and value of Chiquita's

Colombian operations.

94.     On May 10, 2004, the Chiquita Defendants caused Chiquita to issue a release stating:

DEPARTMENT OF JUSTICE INVESTIGATION

In April 2003, the company's management and audit committee, in consultation with the board of directors, voluntarily disclosed to the U.S. Department of Justice that the company's banana producing subsidiary in Colombia has been forced to make "protection" payments to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The company's *sole reason* for submitting to these payment demands has been to protect its employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Justice Department was made because the company's management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the Justice Department's guidance. Following the voluntary disclosure, the Justice Department undertook an investigation. The company has cooperated with that investigation.

Recently, the Department advised that, as part of the investigation, it will be evaluating the role and conduct of the company and some of its officers. The company cannot predict the outcome of the investigation or its possible effect on the company or its Colombian subsidiary.

95.     Chiquita's 2004 Annual Report discussed the now-disclosed Colombia payments and

the DOJ investigation, stating:

FACING A NEW CHALLENGE IN COLOMBIA

In May 2004, Chiquita announced that the company's management and audit committee, in consultation with the board of directors, had voluntarily disclosed to the U.S. Department of Justice more than a year earlier that the company's banana producing subsidiary in Colombia had been forced to make protection payments to certain groups in that country. The company's sole reason for submitting to these

payment demands was to protect employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Department of Justice was made because management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the department's guidance. Following the voluntary disclosure, the Department of Justice undertook an investigation, with which the company has cooperated. To date, this investigation has not concluded and the company cannot predict its outcome. Chiquita sold its Colombian banana-producing and port operations to a local producer and exporter of bananas in June 2004.

*        *        *

The Company is currently dealing with one such issue involving protection payments that its Colombian banana producing subsidiary (sold in June 2004) had been forced to make to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The Company's management and its audit committee, in consultation with the board of directors, voluntarily disclosed this issue to the U.S. Department of Justice in April 2003 and requested its guidance. In late March 2004, the Department of Justice advised that, as part of its investigation, it would be evaluating the role and conduct of the Company and some of its officers in the matter. The Company intends to continue its cooperation with this investigation, but it cannot predict the outcome or any possible adverse effect on the Company, which could include the imposition of fines.

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations. The stated "sole" reason for the payments was false, as the payments were being made because the AUC's activities were helping the Chiquita Defendants control labor conditions in Colombia and to boost the Chiquita Defendants' bonuses.

96.    Chiquita's 2004 Annual Report contained the following "Statement of Management Responsibility," signed by Aguirre, Braukman and Tsacalis:

The financial statements and related financial information presented in the Annual Report are the responsibility of Chiquita Brands International Inc. management, which believes that they present fairly the Company's consolidated

financial position and results of operations in accordance with generally accepted accounting principles.

The Company's management is responsible for establishing and maintaining adequate internal controls. The Company has a system of formal accounting controls, which includes internal control over financial reporting and is supported by internal financial and administrative policies. This system is designed to provide reasonable assurance that the Company's financial records can be relied on for preparation of its financial statements and that its assets are safeguarded against loss from unauthorized use or disposition.

The Company also has a system of disclosure controls and procedures designed to ensure that material information relating to the Company and its consolidated subsidiaries is made known to the Company representatives who prepare and are responsible for the Company's financial statements and periodic reports filed with the Securities and Exchange Commission ("SEC"). The effectiveness of these disclosure controls and procedures is reviewed quarterly by management, including the Company's Chief Executive Officer and Chief Financial Officer. Management modifies and improves these disclosure controls and procedures as a result of the quarterly reviews or as changes occur in business conditions, operations or reporting requirements.

The Company's worldwide internal audit function, which reports to the Audit Committee, reviews the adequacy and effectiveness of controls and compliance with the Company's policies.

The Audit Committee of the Board of Directors consists solely of directors who are considered independent under applicable New York Stock Exchange rules. One member of the Audit Committee, Roderick M. Hills, has been determined by the Board of Directors to be an "audit committee financial expert" as defined by SEC rules The Audit Committee reviews the Company's financial statements and periodic reports filed with the SEC, as well as the Company's internal control over financial reporting including its accounting policies. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors, both together and separately, to discuss these matters.

The Audit Committee engages Ernst & Young, an independent registered accounting firm, to audit the Company's financial statements and its internal control over financial reporting and express opinions thereon. The scope of the audits is set by Ernst & Young, following review and discussion with the Audit Committee. Ernst & Young has full and free access to all Company records and personnel in conducting its audits. Representatives of Ernst & Young meet regularly with the Audit Committee, with and without members of management present, to discuss their audit work and any other matters they believe should be brought to the attention of the Committee. Ernst & Young has issued an opinion on the Company's financial statements. This report appears on page 33. Ernst & Young has also issued an audit

- 47 -

report on management's assessment of the Company's internal control over financial reporting. This report appears on page 34.

## MANAGEMENT'S ASSESSMENT OF THE COMPANY'S INTERNAL CONTROL OVER FINANCIAL REPORTING

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. ***Based on management's assessment, management believes that, as of December 31, 2004, the Company's internal control over financial reporting was effective based on the criteria in Internal Control-Integrated Framework.***

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

97.    Chiquita's 2005 Annual Report contained the following "Statement of Management Responsibility," signed by Aguirre and Zalla:

The financial statements and related financial information presented in this Annual Report are the responsibility of Chiquita Brands International Inc. management, which believes that they present fairly the company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The company's management is responsible for establishing and maintaining adequate internal controls. The company has a system of internal accounting controls, which includes internal control over financial reporting and is supported by formal financial and administrative policies. This system is designed to provide reasonable assurance that the company's financial records can be relied on for preparation of its financial statements and that its assets are safeguarded against loss from unauthorized use or disposition.

The company also has a system of disclosure controls and procedures designed to ensure that material information relating to the company and its consolidated subsidiaries is made known to the company representatives who prepare and are responsible for the company's financial statements and periodic reports filed with the Securities and Exchange Commission ("SEC"). The effectiveness of these disclosure controls and procedures is reviewed quarterly by management, including the company's Chief Executive Officer and Chief Financial Officer. Management

modifies and improves these disclosure controls and procedures as a result of the quarterly reviews or as changes occur in business conditions, operations or reporting requirements.

The company's worldwide internal audit function, which reports to the Audit Committee, reviews the adequacy and effectiveness of controls and compliance with the company's policies.

Chiquita has published its Core Values and Code of Conduct which establish the company's high standards for corporate responsibility. The company maintains a hotline, administered by an independent company, that employees can use to confidentially and anonymously communicate suspected violations of the company's Core Values or Code of Conduct, including concerns regarding accounting, internal accounting control or auditing matters. All reported accounting, internal accounting control or auditing matters are forwarded directly to the Chairman of the Audit Committee of the Board of Directors.

The Audit Committee of the Board of Directors consists solely of directors who are considered independent under applicable New York Stock Exchange rules. One member of the Audit Committee, Roderick M. Hills, has been determined by the Board of Directors to be an "audit committee financial expert" as defined by SEC rules. The Audit Committee reviews the company's financial statements and periodic reports filed with the SEC, as well as the company's internal control over financial reporting including its accounting policies. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors, both together and separately, to discuss these matters.

The Audit Committee engages Ernst & Young, an independent registered public accounting firm, to audit the company's financial statements and its internal control over financial reporting and express opinions thereon. The scope of the audits is set by Ernst & Young, following review and discussion with the Audit Committee. Ernst & Young has full and free access to all company records and personnel in conducting its audits. Representatives of Ernst & Young meet regularly with the Audit Committee, with and without members of management present, to discuss their audit work and any other matters they believe should be brought to the attention of the Committee. Ernst & Young has issued an opinion on the company's financial statements. This report appears on page 42. Ernst & Young has also issued an audit report on management's assessment of the company's internal control over financial reporting. This report appears on page 43.

## MANAGEMENT'S ASSESSMENT OF THE COMPANY'S INTERNAL CONTROL OVER FINANCIAL REPORTING

The company's management assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2005. Based on management's assessment, management believes that, as of December 31, 2005, the company's internal control over financial reporting was effective based on the

criteria in *Internal Control-Integrated Framework*, as set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

98.    Chiquita's 2005 Annual Report discussed the Colombian situation and the DOJ investigation:

> In April 2003, the company's management and audit committee, in consultation with the board of directors, voluntarily disclosed to the U.S. Department of Justice, Criminal Division (the "Justice Department"), that its former banana producing subsidiary in Colombia, which was sold in June 2004, had been forced to make "protection" payments to certain groups in that country which had been designated under United States law as foreign terrorist organizations. The company's sole reason for allowing its subsidiary to submit to these payment demands had been to protect its employees from the risks to their safety if the payments were not made. The voluntary disclosure to the Justice Department was made because the company's management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the Justice Department's guidance. Following the voluntary disclosure, the Justice Department undertook an investigation, including consideration by a grand jury. The company has cooperated with that investigation. In March 2004, the Justice Department advised that, as part of its criminal investigation, it will be evaluating the role and conduct of the company and some of its officers in the matter. In September-October 2005, the company was advised that the investigation is continuing and that the conduct of the company and some of its officers and directors remains within the scope of the investigation. The company intends to continue its cooperation with this investigation, but it cannot predict its outcome or any possible adverse effect on the company (including the materiality thereof), which could include the imposition of fines and/or penalties.

99.    Chiquita's 2005 Annual Report contained a section entitled "Corporate Responsibility," which stated:

> Our Core Values – Integrity, Respect, Opportunity and Responsibility – guide our daily decisions, and our Code of Conduct clearly defines our standards for corporate responsibility  In addition to strict legal compliance, we define corporate responsibility to include social responsibilities, such as respect for the environment

and the communities where we do business, the health and safety of our workers, labor rights and food safety. We see a clear link between our Core Values and our company's vision, mission and sustainable growth strategy.

No disclosure was made of the continuing illegal bribery payments or arms-providing activities relating to the AUC or Chiquita's other illicit and/or illegal activities or the tremendous risks they posed with regard to legal violations in the United States and Colombia and the viability and value of Chiquita's Colombian operations.

100.    Chiquita's 1997-2005 financial statements as published by the Chiquita Defendants and distributed to the owners of the business, *i.e.*, Chiquita's shareholders, were false and misleading in failing to disclose the Chiquita Defendants' improper, wasteful and *ultra vires* payments (and the continuation thereof after the DOJ found out about them), as well as the huge contingent liabilities those payments exposed Chiquita to, including large criminal or civil penalties and the diminution of the value of Chiquita's Colombian operations.

**Improper/Illegal Payments**

101.    From around 1989 through 1997, Chiquita had improperly paid bribes to two violent, left-wing terrorist organizations in Colombia, *i.e.*, the FARC and ELN. After having previously made improper and *ultra vires* bribery payments to the ELN and FARC for several years, from 1997 through February 2004, Chiquita, through its Colombian subsidiary, Banadex, made improper or illegal and *ultra vires* payments to a violent, right-wing terrorist organization in Colombia, the AUC. The AUC was formed around April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. Defendants caused or permitted Chiquita to make payments to the AUC, directly or indirectly, nearly every month from 1997 through February 2004, making over 100 payments totaling over $1.7 million. Thus, the Chiquita Defendants caused Chiquita to pay money to

- 51 -

Colombian terrorist organizations for approximately 15 years, all of which payments were *ultra vires*, improper or illegal under U.S. or Colombian law.

102.    Starting in 1997, Chiquita made payments to two different components of the AUC in the Urabá and Santa Marta regions, where Chiquita had its Colombian operations. Chiquita made these payments through Banadex. Chiquita's payments to the FARC and the ELN had been in those same regions.

103.    Initially, Chiquita made the payments to the AUC through an intermediary known as a "*convivir*."[3]  Later, Chiquita began paying the AUC in Urabá by check through a *convivir*. Chiquita routinized the payments. Sometime in 1998 or 1999, Chiquita began making payments to the AUC in the Santa Marta region.

104.    For several years Chiquita paid the AUC by check through various *convivirs* in both the Urabá and Santa Marta regions. The checks were nearly always made out to the *convivirs* and were drawn from the Colombian bank accounts of Chiquita's subsidiary. No *convivir* ever provided Chiquita or Banadex with any actual security services or actual security equipment in exchange for the payments, such as security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendants caused or permitted Chiquita to improperly record these payments in its corporate books and records as "security payments," payments for "security," or "security services," so as to conceal the improper and/or illegal nature of the payments. From the outset, officers of Chiquita and Banadex recognized that these payments were illicit and improper. That is why they continued to misaccount for them.

---

[3]    "*Convivirs*" were private security companies licensed by the Colombian government to assist the local police and military in providing security. Notwithstanding their intended purpose and apparent legal authority under Colombian law, the AUC used certain *convivirs* as fronts to collect money from businesses to support its illegal activities.

105.    Chiquita's payments to the AUC were reviewed and approved by high-ranking officers and directors. They knew that the Company was paying the AUC and that the AUC was a violent, paramilitary organization. An in-house attorney for Chiquita conducted a review of the payments in August 2000 and prepared a memorandum detailing that review. The memorandum recognized that the *convivir* was merely a front for the AUC and described the AUC as a "*widely-known, illegal vigilante organization*."

106.    The in-house attorney presented the results of his review to the Audit Committee of the Board, which operated as the agent of the full Board in September 2000. There was no instruction to stop the payments or to report the payments to United States or Colombian authorities. Notwithstanding the knowledge of senior officers and directors that the Company was making regular payments to a violent, paramilitary organization, Chiquita continued to make payments to the AUC.

107.    On September 10, 2001, the AUC was designated as an FTO by the United States Department of State, making Chiquita's payments to the AUC illegal under the material support statute, 18 U.S.C. §2339B. On October 31, 2001, the AUC was designated as a Specially-Designated Global Terrorist by the United States Department of the Treasury's OFAC, making the payments illegal under the International Emergency Economic Powers Act, 50 U.S.C. §1705(b), and the underlying Global Terrorism Sanctions Regulations, 31 C.F.R. §594.204.

108.    After at least 2000, Chiquita's payments to the AUC were reported to the Audit Committee of the Board of Directors, the agent of the full Board, on a quarterly basis. Throughout the duration of the payments to the AUC, Chiquita recorded them in its books and records as "security payments" or payments for "security services" to a specifically named *convivir*, even after it was known to senior officers and directors that no *convivir* was providing Chiquita or Banadex

with any security services in Colombia and the *convivirs* were simply fronts for the terrorist organization.

109.    In late March 2002, senior officers of Chiquita established new procedures for paying the AUC in Santa Marta directly in cash and keeping a private ledger of these cash payments.[4] The procedures involved paying a senior officer of Banadex additional "income" from the Banadex general manager's fund. That money, in turn, was provided to an employee of Banadex, who delivered the cash directly to the AUC in Santa Marta. The senior Banadex officer reported this additional "income" on his Colombian tax return, and Banadex increased the payments to him to cover this additional personal tax liability. On April 23, 2002, these new procedures were reviewed at a meeting of the Audit Committee of the Board of Directors, the agent of the full Board, in Chiquita's Cincinnati headquarters. The procedures were implemented beginning in June 2002.

110.    Chiquita's corporate books and records never reflected that the ultimate and intended recipient of these funds was the AUC. With respect to the payments to the AUC in Urabá, the books and records only identified payments to various *convivirs*. With respect to the payments to the AUC in Santa Marta, the private ledger only identified the transfer of funds from the senior Banadex officer to the Banadex employee.

111.    The Chiquita Defendants caused Chiquita to continue to pay the AUC even after the payments were brought directly to the attention of its senior executives and Board members during a Board meeting held in September 2000. Chiquita continued to pay the AUC after the United States designated the AUC as an FTO on September 10, 2001, and as a Specially-Designated Global

---

[4]    Chiquita changed its method of payment to the AUC in Santa Marta several times. Initially, Chiquita paid the AUC through a *convivir* located in Santa Marta. Later, Chiquita made combined payments to a *convivir* in Urabá, with the payments shared between the AUC components in Urabá and Santa Marta. Eventually, the AUC in Santa Marta received direct cash payments.

Terrorist on October 30, 2001. Chiquita continued to pay the AUC after gaining direct knowledge of the AUC's designation as an FTO.

112.    The Chiquita Defendants caused Chiquita to continue to pay the AUC even after its outside counsel emphatically and repeatedly advised them, beginning in late February 2003, to stop the payments. They caused Chiquita to continue to pay the AUC after DOJ officials admonished them on April 24, 2003, that the payments were illegal and could not continue. They caused Chiquita to continue to pay the AUC after the same outside counsel advised them on September 8, 2003, that the DOJ had given no assurances that the Company would not be prosecuted for making the payments. They caused Chiquita to continue to pay the AUC even after one of its directors acknowledged in an internal email, on December 22, 2003, that *we appear [to] be committing a felony*."

113.    Outside counsel's advice to the Chiquita Defendants was memorialized in a series of contemporaneous memoranda and notes. Among other things, outside counsel advised the Chiquita Defendants:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: 'CANNOT MAKE THE PAYMENT'"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

114.    In April 2003, according to outside counsel's contemporaneous notes concerning a conversation about Chiquita's payments to the AUC, a senior officer of Chiquita said as to the DOJ: *"His and [a director's] opinion is just let them sue us, come after us. This is also [a senior officer's] opinion."* Four days later, senior officers of Chiquita instructed their subordinates to *"continue making payments"* to the AUC.

115.    In April 2003, the DOJ learned of the payments to the AUC. The DOJ officials told the Chiquita Defendants that Chiquita's payments to the AUC were illegal and could not continue. The DOJ also cautioned them, as Chiquita's outside counsel had warned them earlier, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." The DOJ *never* authorized the Chiquita Defendants to continue under any circumstances the Company's payments to the AUC. Chiquita's outside counsel later stated in writing that the DOJ never gave Chiquita any assurance that the Company would not be prosecuted for making the payments.

116.    In May 2003, an employee of Chiquita was instructed to "continue making payments" to the AUC. Chiquita thereafter continued its regular payments to the AUC. In a memorandum dated September 8, 2003, outside counsel noted that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

117.    Senior officers and directors of Chiquita were well aware that the Company was continuing to pay a designated FTO and that the Company was subject to criminal prosecution for its continuing conduct. On December 22, 2003, a director of Chiquita sent an email to other

directors regarding the Company's ongoing payments to the AUC, in which he said, among other things, "*we appear to [be] committing a felony*." A week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that "*Chiquita is knowingly violating the law*."

118.    When the DOJ learned of the continuing payments, it threatened the Chiquita Defendants and Chiquita with criminal prosecution. To protect themselves from possible criminal prosecution, on March 19, 2007, the Chiquita Defendants caused Chiquita to sign a written plea agreement with the United States in which Chiquita was required to admit its guilt. The plea agreement provides for an agreed-upon sentence of a criminal fine of $25 million *and* corporate probation of five years. The plea agreement provided that Chiquita must pay the criminal fine in five annual installments. Chiquita was required to post the first payment of $5 million upon entry of judgment. Chiquita is required to pay an additional $5 million, plus post-judgment interest, each year for the subsequent four years. The DOJ stated: "Defendant Chiquita has pled guilty to a very serious charge. In support of its guilty plea, the Company has admitted the truth of the facts sets [sic] forth in the Factual Proffer." It also emphasized that "Chiquita . . . admitted as part of its guilty plea *that it continued to engage in the same criminal conduct after its voluntary disclosure*." The government's Sentencing Memorandum also clearly states: "It was particularly important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager."

119.    When the DOJ threatened the Chiquita Defendants and Chiquita with criminal prosecution, the Chiquita Defendants abused their continuing control of Chiquita by causing it to plead guilty and pay a huge fine in return for a promise from the government not to prosecute the Chiquita executives involved in the illegal conduct, thus damaging the Company to protect

themselves and their allies and friends. In order to assure that the DOJ did not prosecute any of the Chiquita directors criminally, the directors have continued to employ key wrongdoers in important corporate positions, have paid off other employees with generous severance packages and "confidentiality" agreements and promises not to pursue them civilly for their involvement in the activities which resulted in the criminal plea of Chiquita.

120.    The plea agreement provided for a five-year term of corporate probation. In addition to the general conditions of probation, the plea agreement provides for the following specific additional conditions of probation: (1) Chiquita must pay the sums set forth in the agreement; (2) Chiquita "shall implement and maintain an effective compliance and ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States Sentencing Guidelines, including, but not limited to, (a) maintaining a permanent compliance and ethics office and a permanent educational and training program relating to federal laws governing payments to, transactions involving, and other dealings with individuals, entities, or countries designated by the United States as Foreign Terrorist Organizations, Specially-Designated Global Terrorists, Specially-Designated Narcotics Traffickers, and/or Countries Supporting International Terrorism, and/or any other such federally-designated individuals, entities, or countries, (b) ensuring that a specific individual remains assigned with overall responsibility for the compliance and ethics program, and (c) ensuring that that specific individual reports directly to the Chief Executive Officer and to the Board of Directors of Chiquita . . . , no less frequently than on an annual basis on the effectiveness of the compliance and ethics program; and (3) pursuant to 18 U.S.C. § 3563(a)(l), [Chiquita] shall not commit any federal, state or local crimes during the term of probation."

121.    On March 19, 2007, the DOJ issued a release entitled "Chiquita Brands International

Pleads Guilty to Making Payments to a Designated Terrorist Organization, Agrees to Pay $25

Million Fine," which stated:

> Under the terms of the plea agreement, Chiquita's sentence will include a $25 million
> criminal fine, the requirement to implement and maintain an effective compliance
> and ethics program, and five years' probation. . . .
>
> The plea agreement arises from payments that Chiquita had made for years to
> the violent, right-wing terrorist organization United Self-Defense Forces of Colombia
> [AUC] . . . .
>
> *            *            *
>
> *"Funding a terrorist organization can never be treated as a cost of doing
> business," stated U.S. Attorney Taylor. "American businesses must take note that
> payments to terrorists are of a whole different category. They are crimes."*
>
> *            *            *
>
> ### CHIQUITA'S PAYMENTS TO THE AUC
>
> . . . [T]he investigation leading to this prosecution developed evidence that
> for over six years – from sometime in 1997 through Feb. 4, 2004 – Chiquita paid
> money to the AUC in two regions of the Republic of Colombia . . . .  In total,
> Chiquita made over 100 payments to the AUC amounting to over $1.7 million.
>
> *. . . Chiquita's payments to the AUC were reviewed and approved by senior
> executives of the corporation, including high-ranking officers, directors and
> employees.*
>
> For several years Chiquita paid the AUC by check through various
> intermediaries. *Chiquita recorded these payments in its corporate books and
> records as "security payments" or payments for "security" or "security services."
> Chiquita never received any actual security services in exchange for the payments.*
>
> Beginning in June 2002, Chiquita began paying the AUC in Santa Marta
> directly and in cash according to new procedures established by senior executives of
> Chiquita. *The newly-implemented procedures concealed the fact that Chiquita was
> making direct cash payments to the AUC. A senior Chiquita officer had described
> these new procedures to Chiquita's Audit Committee on April 23, 2002.*
>
> *            *            *

Beginning on Feb. 21, 2003, outside counsel emphatically advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Outside counsel advised Chiquita:

"Must stop payments."

"Bottom Line: CANNOT MAKE THE PAYMENT"

"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"

"General Rule: Cannot do indirectly what you cannot do directly"

Concluded with: "CANNOT MAKE THE PAYMENT"

"You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

"[T]he company should not make the payment."

\*       \*       \*

Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004. From April 24, 2003 (the date of Chiquita's initial disclosure to the Justice Department) through February 4, 2004, Chiquita made 20 payments to the AUC totaling over $300,000.

122.   Mario Iguarán, Colombia's Attorney General, has said he will seek the extradition of eight Chiquita officials connected to the case. His office is also seeking information about charges that in 2001 a ship unloaded some 3,400 AK-47 rifles and 4 million rounds of ammunition in a Banadex-controlled dock in Colombia destined for the AUC. These charges were first detailed in a 2003 report from the Organization of the American States. ***This was a criminal relationship," said Iguarán in a recent report published in the Washington Post. "Money and arms and, in exchange, the bloody pacification of Urabá.***"

123.   On March 17, 2007, *CNN.com* reported:

Colombian President Alvaro Uribe said Saturday he favored the extradition to his country of executives of U.S. banana producer Chiquita after the company's admission that it paid Colombian right-wing death squads more than $1.7 million.

*"That would be normal. Extradition should be from here to there and from there to here,"* Uribe said.

Colombia's attorney general said he would ask the U.S. Department of Justice for full disclosure about the case and would investigate possible links to another case from 2001. In that case, weapons and ammunition were smuggled into Colombia through a port facility operated by Chiquita's Colombian subsidiary, Banadex.

124.    U.S. prosecutors were blunt. *"I regarded this as a murder investigation"* from the start, said Roscoe Howard Jr., former U.S. Attorney for Washington D.C., who helped lead the Chiquita prosecution before he left his position in 2004. *"Even though Chiquita didn't murder anyone, that's what the money was used for – to buy weapons."*

125.    During 2007, Chiquita has been sued in a number of class actions brought on behalf of scores of Colombians killed by the terrorists Chiquita funded – seeking tens of millions of dollars in damages. Some of the families of individuals killed by the right-wing AUC filed a class-action lawsuit against Chiquita in this district, alleging violations of the Alien Tort Claims Act ("ATCA") and international law. EarthRights International, a non-profit human rights group representing plaintiffs in a New Jersey action, described that suit as follows:

Today, Colombian families represented by EarthRights International (ERI), together with the Colombian Institute of International Law (CIIL), Judith Brown Chomsky, and Schonbrun DeSimone Seplow Harris & Hoffman LLP (SDSHH), filed a federal class-action lawsuit charging Chiquita Brands International, Inc., the multi-national produce company, with funding and arming known terrorist organizations in Colombia in order to maintain its profitable control of Colombia's banana growing regions starting in the mid-1990s. *Chiquita's payments to these paramilitary groups, including the United Self-Defense Committees of Colombia (Autodefensorias Unidas de Colombia, or AUC) and its predecessors, were reviewed and approved by senior executives of the corporation, and resulted in the targeted killings of hundreds or thousands of individuals, including trade unionists, banana workers, and political organizers.* The case is brought on behalf of relatives of the deceased . . . .

> *"To promote its business operations, Chiquita funneled money and guns to a terrorist group that murdered thousands of people and shipped untold amounts of cocaine to the United States," said Marco Simons, ERI's Legal Director. "Now, the victims are demanding some measure of accountability from Chiquita for its egregious behavior."*

126.    The complaint filed by EarthRights detailed the links between Chiquita and the AUC that defendants had long concealed:

> 33.    Chiquita paid the AUC, directly or indirectly, nearly every month during the period 1997-2004, making over one hundred payments to the AUC totaling over $1.7 million. Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees.

*    *    *

> 38.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

> 39.    The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

> 40.    Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo. The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 millions rounds of ammunition. These arms and ammunition were then transferred to the AUC.

> 41.    . . . Chiquita facilitated at least four other arms shipments to the AUC. In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

> 42.    . . . On information and belief, Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

**Purchase of Atlanta/Sale of Colombian Operations**

127.    In 2004, due to the problems created in its Colombia operations due to the illegal activities the Chiquita Defendants had caused Chiquita to engage in there, and hoping to avoid extradition of Chiquita insiders to Colombia for their criminal conduct, the Chiquita Defendants caused Chiquita to sell Chiquita's Colombian banana-producing operations.    Due to these circumstances, this was, in essence, a "fire sale" – even though those Colombian operations had been Chiquita's most profitable operations.    Chiquita earned some $50 million in profits from its Colombian banana-producing operations from September 10, 2001 through January 2004.    Worse, the forced sale of the Colombian operations deprived Chiquita of a huge source of supply of bananas necessary to conduct its business – requiring that Chiquita, while selling the Colombian banana operations also secured a supply of bananas by purchasing them from another source at premium, *i.e.*, unprofitable, prices.    The sale of this valuable asset produced a $9 million loss when the long-term banana purchase contract is factored in.

128.    While Chiquita's Colombian banana operation had, at one time, been a very profitable part of Chiquita's business, the Chiquita Defendants' illegal and improper acts largely destroy the value of the asset.    The Chiquita Defendants had to sell that operation at a large loss. The Company reported:

> In June 2004, the Company sold its banana-producing and port operations in Colombia . . . .
>
> In connection with the sale, Chiquita entered into eight-year agreements to purchase bananas . . . from affiliates of the buyer . . . at above-market prices. This resulted in a liability of $33 million at the sale date, which represents the estimated net present value of the above-market premium to be paid for the purchase of bananas over the term of the contract. . . .
>
> *             *             *
>
> The Company recognized a before-tax loss of $9 million and an after-tax loss of $4 million on the transaction . . . .

- 63 -

129.    By 2002, Chiquita's insiders knew that they would have to cause Chiquita to sell off its Colombian banana operations due to the longstanding illegal conduct they had caused or permitted there, in part to try to avoid the extradition of several Chiquita insiders to Colombia for their criminal conduct. This sale – which they knew would take place under distress circumstances – would deprive Chiquita of millions of dollars in revenues from what had been its most profitable operations, which would reflect very badly on the Chiquita Defendants' management and stewardship of Chiquita. Thus, to try to make up for the lost revenues and profits Chiquita would soon suffer, the Chiquita Defendants in haste, and without adequate research, investigation, evaluation or due diligence, acquired a German fruit distribution business, known as Atlanta A.G., at a grossly excessive price. Because of the excessive price the Chiquita Defendants caused Chiquita to pay for Atlanta in this hastily arranged acquisition, almost $43 million dollars in goodwill went onto Chiquita's balance sheet. According to Chiquita's 2002 Annual Report:

> *By exchanging loans for Atlanta's underlying equity interests, we were able to acquire ownership in a virtually cashless transaction that closed in March 2003.* To boost Atlanta's profitability and maximize the value of our investment, *we hired as president Peter Jung, who brings extensive restructuring, food industry and consumer products expertise. We have already begun streamlining Atlanta's distribution network, selling certain assets and reducing its debt. The acquisition of Atlanta increased Chiquita's debt by approximately $65 million and will increase our consolidated revenues on an annualized basis by almost $1.1 billion.*

130.    According to the Chiquita Defendants, the Atlanta acquisition was a huge success. Chiquita's 2003 Annual Report stated:

> The improvement in 2003 operating income was due to Chiquita's success in cost-cutting, the benefit of a stronger euro, asset sales, increased banana and other fresh fruit sales, and *improvements at Atlanta.*

> The progress on our commitments was significant. . . . *We acquired Atlanta, exited its underperforming businesses and cut its costs. In fact, we're ahead of schedule on improving Atlanta's profitability.*

131.    According to the Chiquita Defendants, the success of Atlanta continued in 2004.

According to Chiquita's 2004 Annual Report:

Financial highlights for 2004 include the following

- Net sales for 2004 were $3.1 billion compared to $2.6 billion for 2003. *Approximately 60% of the increase was due to the acquisition of Atlanta AG ("Atlanta"), a German distributor of fresh fruits and vegetables, which was completed in March 2003.*

132.    According to Chiquita's 2003 Annual Report:

Critical Accounting Policies and Estimates

The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements. The additional discussion below addresses major judgments used in

- *reviewing the carrying values of intangibles*

\*      \*      \*

Review of Carrying Values of Intangibles

\*      \*      \*

Goodwill – Substantially all of the Company's $43 million of goodwill relates to its acquisition of Atlanta during 2003. . . . [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

133.    According to Chiquita's 2004 Annual Report:

Critical Accounting Policies and Estimates

The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements. The additional discussion below addresses major judgments used in

- *reviewing the carrying values of intangibles.*

\*      \*      \*

Goodwill

Substantially all of the Company's $46 million of goodwill relates to its acquisition of Atlanta during 2003. . . . [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

134.    However, in truth, the hastily reckless Atlanta acquisition was a complete disaster, and one that has badly damaged the Company. Almost immediately upon the acquisition of Atlanta, because of problems in its business, Chiquita began to write off the value (goodwill) of Atlanta, and by 2006, those charge-offs and write-downs wiped out all – 100% – of the goodwill recorded in connection with the Atlanta acquisition in less than three years.

## FUTILITY OF DEMAND ALLEGATIONS

135.    Plaintiff brings this action derivatively in the right and for the benefit of Chiquita to redress injuries suffered and to be suffered by Chiquita as a direct result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by the Chiquita Defendants. Chiquita is named as a nominal party solely in a derivative capacity.

136.    In bringing this action, plaintiff has satisfied all statutory procedural requirements of applicable law. First, plaintiff has standing to bring this action as it is a shareholder and/or beneficial owner of Chiquita and was a shareholder and/or beneficial owner of Chiquita at relevant times. Second, plaintiff will fairly and adequately represent the interests of Chiquita in enforcing its rights, as detailed herein. Third, this action is not being used by plaintiff to gain any personal advantage, nor does plaintiff maintain any personal agenda other than to correct the wrong that has been done to the Company. To this end, plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions. To the extent court permission is required to continue this action, such permission is hereby sought.

137.    As of the filing of this Complaint, the Chiquita Board consists of defendants Aguirre, Arntzen, Fisher, Jager, Stanbrook, Serra, Barker and Hasler. These defendants are referred to as the "Director Defendants."

138.    The defendants described herein at ¶¶29-54 (except Barker) were all directors and/or senior ranking officers at Chiquita, acquiesced in and/or were complicit in making the protection payments to the AUC between 1998 and 2004 and, as demonstrated below, each of the Director Defendants (including Barker) cannot and would not conduct a meaningful investigation and/or prosecution of those parties for that misconduct, as to do so would undermine their own credibility, require them to take inconsistent positions with those they have taken in the past, and/or to expose themselves and their comrades to a substantial likelihood of criminal and/or civil liability, both here and in Colombia, because of their egregious misconduct:[5]

(a)    *Aguirre.* In a written statement issued in March 2007, immediately following Chiquita's entry into the plea agreement, Aguirre stated publicly that the Company viewed the plea agreement "as a reasoned solution to the dilemma the company faced several years ago." The Company "voluntarily disclosed the payments to the Justice Department in 2003," he stated, adding the payments were made "to protect the lives of its employees." "The payments made by the company were always motivated by our good faith concern for the safety of our employees," Aguirre said in a statement published March 22, 2007, in the *Chicago Tribune.* Aguirre made these statements knowing that the so-called "good faith" payments had continued for more than a year

---

[5]    In March 2007, upon disclosure of the terms of Chiquita's plea agreement, and admissions by Chiquita that it paid Colombian right-wing death squads more than $1.7 million, Colombian President Alvaro Uribe stated he wanted the responsible Chiquita executives extradited to his country to face charges: "That would be normal. Extradition should be from here to there and from there to here," Uribe said. Colombian Attorney General Mario Iguarán said he would ask the U.S. DOJ for full disclosure about the case and would investigate possible links to *another case from 2001.* In that case, weapons and ammunition were smuggled into Colombia through a port facility operated by Chiquita's Colombian subsidiary, Banadex. Colombian authorities outlawed right-wing paramilitary forces in 1989. The U.S. State Department added the AUC to its list of foreign terrorist groups in September 2001. In November 2001, Israeli arms dealers illegally shipped 3,400 AK-47 assault rifles and 4 million rounds of ammunition into Colombia for the AUC *through a port facility operated by Chiquita subsidiary Banadex.*

after the Company secretly "disclosed" the relationship to the Justice Department in 2003, at a time that Chiquita's outside lawyers were insisting that the Company terminate the arrangement. Astoundingly, Chiquita made at least nineteen more payments after the Justice Department told the Company that "payments to the AUC were illegal and could not continue." Any reconsideration of his position by Aguirre *now* could not be occasioned by anything he did not know *then* and a decision to prosecute those responsible at the Company would be wholly inconsistent with and contradictory to Aguirre's actions and statements during his entire tenure as President, CEO and Chairman of Chiquita since 2004, where he has adamantly and continually maintained the payments were proper and has taken no action to remove the executives and/or directors who oversaw and acquiesced in their payment. Aguirre, despite having lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, failing to fire or discipline the Chiquita officers responsible for the bribery payments, and permitting and participating in causing Chiquita to plead guilty to protect the other Chiquita Defendants and in causing the fire sale of the Colombian operations, remains in his dominant and controlling position.

(b)    ***Arntzen and Stanbrook.*** Arntzen served with Hills on Chiquita's Audit Committee between 2002 and 2007 and Stanbrook served with Hills on the Audit Committee between 2003 and 2005. The Audit Committee was aware of the nature of the protection payments throughout this period. Members of the Audit Committee also knew that Chiquita's outside lawyers deemed the payments illegal and wanted them stopped. Members of the Audit Committee acquiesced in the payments to terrorists, the false accounting for the payments and the decision not to properly report the payments to the SEC between 2002 and 2004. Arntzen has publicly stated the AUC payments were not secretive, but instead were disclosed to E&Y and to Company directors on the Audit Committee. "'When I joined the board, I knew the company was making payments to

paramilitary groups in Colombia,'" Arntzen told *The Wall Street Journal* in August 2007, five months *after* Chiquita's plea agreement was entered and less than one month before the DOJ would announce it had decided not to prosecute individual Chiquita executives: "'If you didn't do it, your people were going to get killed.'" In an interview with *TradeWinds* in March 2007, Arntzen stated: (i) the Chiquita Board and management "handled the Colombian disclosures properly," (ii) that he and fellow Board members had "'turned ourselves in to the Justice Department'" and "'gave them all the evidence they needed to convict us,'" (iii) that the "'*directors did what we were supposed to do,*'" and (iv) that "'You don't always know who you're paying or which side they're on. All you know is that the people are scary and they're armed to the teeth and that if you don't pay them, your people are going to die.'" Any reconsideration of their positions by Arntzen or Stanbrook *now* could not be occasioned by anything they did not know *then* and a decision to prosecute those responsible at the Company would be wholly inconsistent with and contradictory to Arntzen's and Stanbrooks' actions and statements throughout this ordeal, where they have ardently maintained the payments were proper and have taken no action to remove the executives and/or directors who oversaw and acquiesced in them.

(c)    *Fischer, Jager, and Serra.*  On April 3, 2003, Hills and Olson reported the history of the AUC payments to the full Chiquita Board, of which current Chiquita directors Fisher, Jager and Serra were then members. Thereafter, Chiquita continued making payments to the AUC, including ten additional payments that were made between May and September totaling about $134,000, *after the DOJ told Hills and Olson the payments were illegal on August 23, 2003.*  On December 22, 2003, Hills emailed fellow directors concerning the DOJ's concerns that the Company was not being as cooperative as he felt it should be, telling them: "We cannot delegate this issue to management . . . . We appear to [be] committing a felony." Nonetheless, the payments continued –

with the Board's knowledge – through February 2004. Even as Chiquita began turning over documents relating to the payments to the Justice Department, it kept making payments. Shortly after 8 a.m. on March 24, 2004, agents of the Federal Bureau of Investigation armed with subpoenas paid a surprise visit to Chiquita's Cincinnati headquarters. Later that day, FBI agents in Fort Lauderdale, Florida, descended on a Company Board meeting and delivered subpoenas. Despite the fact that the Company was forced to pay a $25 million fine, is a felon, is serving five years probation and is exposed to hundreds of millions of dollars in potential liability in the civil suits Chiquita has been named as a defendant in, none of the implicated executives have been discharged and no recovery has been sought from any of the implicated Chiquita executives or directors.

(d)    ***Stanbrook, Fisher, Hasler, Serra.***    As members of the Chiquita Compensation Committee, defendants Stanbrook, Fisher, Hasler and Serra are charged with: (i) evaluating the performance, and reviewing and approving all compensation, of Chiquita's executive officers; (ii) making recommendations to the Board with respect to incentive compensation and equity-based plans; (iii) overseeing the Company's leadership and organization development, including succession planning; and (iv) administering Chiquita's Stock and Incentive Plan. Turning these principles on their heads, these defendants decided to *increase* executive pay following the Company's March 2007 plea agreement, despite Chiquita's losses and massive exposure to criminal and civil liability. Despite the fact that Chiquita suffered through a miserable 2006 and its stock price dropped 25%, the Compensation Committee decided to raise Aguirre's cash salary to $900,000 a year, a 13% increase, and to grant him a new award of $1.2 million in restricted stock, an LTIP award opportunity for the 2007-2009 performance period of $1.6 million, and an additional restricted stock grant with a targeted value of $1.6 million. Despite Chiquita's being run out of the banana business due to misconduct by its executives, and Aguirre's and others' refusal to hold them

- 70 -

accountable, Chiquita's Compensation Committee justified this compensation increase stating Aguirre was "helping to transform it from a seller of commodity bananas to a more diversified – and more profitable – seller of fruit-based products." They also almost doubled their own annual directors' fees. However, by this decision shareholders are being penalized twice: as the firm's equity owners, they pay the ultimate price for the misconduct, and then they must pay bonuses on top of handsome salaries for the cleanup efforts. Additionally, on August 3, 2006, the Compensation Committee accepted Olson's resignation and entered into an agreement with him providing for one year's annual base salary and target bonus, aggregating $622,500, paid between March 1, 2007 and August 24, 2007; $138,333 representing the pro rata portion of his 2006 target bonus; $7,434 in company-paid COBRA health insurance premiums through August 2007; $10,000 in reimbursement of legal fees related to the agreement; the acceleration of the vesting of 59,639 shares of restricted stock previously issued to him; and payment of up to 12 months of office space and services for Olson and maintenance of existing director and officer liability insurance covering him. In exchange, Olson entered into a "retirement" agreement containing a confidentiality agreement of unlimited duration, among other provisions.

(e)     ***Arntzen and Stanbrook.*** As members of the Chiquita Audit Committee between 2002 and 2004, Arntzen and Stanbrook were charged with selecting and assessing the performance of Chiquita's outside auditors and approving their fees and independence; assessing and approving the annual audit results of the Company; establishing and enforcing Chiquita's financial and accounting policies and its annual and quarterly financial statements; reviewing the adequacy and effectiveness of Chiquita's internal accounting controls and the internal audit function; overseeing the Company's programs for compliance with laws, regulations and Company policies; considering any requests for waivers from the Code of Conduct for executive officers and directors

(any such waivers being subject to Board approval); and, in connection with all of the foregoing, meeting with the independent auditors, internal auditors and Chiquita's financial management. As such, these Audit Committee defendants had direct oversight and participation in the decision to falsely account for the terrorist payments and to misreport them to the SEC. These Audit Committee defendants also repeatedly facilitated the Company's non-compliance with laws, regulations and Company policies by refusing to exercise their authority under the Audit Committee charter to remove the offending officers and directors from their posts.

(f)    *Serra* could not independently and disinterestly consider a presuit demand to bring the claims alleged herein as Serra's livelihood and career prospects would be compromised if he actively investigated or made the decision to prosecute these claims. Serra is a Mexican economist and a foreign trade specialist with vast ties to the Latin America fruit and vegetable trade import/export business. Serra is Chairman of SAI Consulting and Principal of NAFTA Fund. His professional practice includes the design of investment strategies in Mexico for foreign companies and advice to Mexican companies interested in becoming regional players in North America.

(g)    *Barker* could not independently and disinterestedly consider a presuit demand to bring the claims alleged herein, as Barker is beholden to the other Board members who appointed him. Moreover, Barker has attempted to market himself as a consultant and expert based on his former status as a major partner at KPMG, and diligently investigating and prosecuting the claims alleged herein would threaten those interests – something Barker will not do. Barker has never been elected by the Chiquita shareholders. He was hand-picked by Aguirre and the other Board members – all defendants herein – only after they were comfortable that he would not take any action adverse to them. Because they hand-picked him and because Barker spent his entire career as a "Big Six" accountant, he had an ingrained hostility toward shareholder suits and sympathy toward firms like

E&Y – he will never sue them, and could not, in any event, since he is only one Board member and is controlled and dominated by the other Board members, defendants herein.

139.    The Chiquita Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, as detailed herein, and thus, plaintiff's demand upon the Company to take the action requested herein is excused. For the following reasons and those detailed elsewhere in this Complaint, Chiquita's Board and its management are also antagonistic to this lawsuit and thus, plaintiff has not made a pre-filing demand on the Chiquita Board to initiate this action:

(a)    The factual allegations contained herein detail a widespread, continuous, global pattern and practice of misconduct that spans more than six years. Each of the Chiquita Defendants had the ability to cause Chiquita to disclose the existence of the illegal protection payment scheme during that six-year period and failed to do so.

(b)    The misconduct alleged herein is so egregious that it created a substantial fear of personal criminal or civil liability on the part of several current members of the Chiquita Board in light of the successful DOJ prosecution resulting in a $25 million fine and the pending civil suits. As a result, the Chiquita Board is incapable of exercising valid business judgment as of the filing of this suit, as to investigate and/or prosecute these claims would expose, or increase the exposure of, each Board member to criminal and/or civil liability for the misconduct alleged herein.

(c)    In addition, the misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure – it had to be the result of a deliberate policy of the Board or willful or reckless disregard for what has been going on with said illegal or improper payments. According to the government's Sentencing Memorandum, Chiquita's top officers and directors knew that for over six years – from sometime in

1997 through February 4, 2004 – Chiquita, through its wholly-owned Colombian subsidiary, Banadex, paid money to the AUC, a violent, right-wing terrorist organization in the Republic of Colombia. According to the government's Sentencing Memorandum:

### A.    The Gravity of the Core Conduct

This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years – from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.

Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquita's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.

The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.

### B.    Defendant Chiquita's Motivations

Defendant Chiquita's motivations for paying the AUC are irrelevant to the illegality of its conduct or to the harm that the Company's conduct has caused to victims of AUC violence.  As one federal appeals court has noted, "Terrorist organizations use funds for illegal activities regardless of the intent of the donor[.]" *Boim v. Quranic Literacy Inst. & Holy Land Found, for Relief and Dev.*, 291 F.3d 1000, 1027 (7lh Cir. 2002) (discussing breadth of criminal liability under the material support statute, 18 U.S.C. § 2339B). Nevertheless, defendant Chiquita's motivations for paying the AUC are relevant to an understanding of the felony charge against the Company.

Preliminarily, it is important to note what defendant Chiquita is not accused of.  Defendant Chiquita is not accused of supporting the goals or ideologies of the terrorist organizations that the Company funded.  The record reflects that defendant Chiquita did not seek out the AUC to start making these payments. Rather, the AUC, through its leader Carlos Castaño, instructed that defendant Chiquita's subsidiary would have to start making the payments once the AUC moved into the Company's banana-producing region.

Defendant Chiquita, however, did not make one or two payments while deciding on a course of action to take in the face of the AUC's demand (and implied threat) in 1997. Defendant Chiquita decided to accede to the AUC's demand and make routine payments for fully six years. Although defendant Chiquita would later claim that it was the victim of AUC extortion, the Company did not report the "extortion" to any United States or Colombian authorities for several years.

Defendant Chiquita, as a large multinational corporation, had choices to make about where in the world to operate and under what conditions. The Company chose to enter and exit markets and to buy and sell farms based on its business judgment. Defendant Chiquita chose to remain in Colombia and make payments to the AUC that it deemed necessary to operate in the Urabá and Santa Marta regions of Colombia.

Defendant Chiquita's reason for being in Colombia was, of course, to produce bananas profitably. And there is no question that defendant Chiquita profited from its Colombian operations during the period that the Company paid the AUC. According to defendant Chiquita's records, from September 10, 2001 (the date of the AUC's designation as a Foreign Terrorist Organization), through January 2004, the Company earned approximately $49.4 million in profits from its Colombian banana-producing operations. Indeed, by 2003 the Company's Colombian operations were its most profitable.

Whatever motivated defendant Chiquita at the start, the Company made a business decision to remain in Colombia and pay the AUC for over six years. Officers of defendant Chiquita and Banadex referred to the payments as an unsavory "cost of doing business" at their inception in 1997. When the internal investigation into the payments was presented to the Board in September 2000, the Board treated them as a routine business matter – a tolerable expense to be kept low. When the AUC in Santa Marta demanded direct, cash payments in 2002, senior officers of defendant Chiquita obliged. These senior executives also came up with a procedure to record these monthly payments in the Company's books and records that failed to reflect the ultimate and intended recipient of the payments.

By late February 2003, when defendant Chiquita's outside counsel advised the Company to stop the payments immediately in light of the AUC's designation as an FTO and the attendant risk of criminal liability, the payments had already been reviewed and approved at the highest levels of the Company for years. The fact of the AUC demand in 1997 and any perceived risk to the Company's employees from doing business in Colombia were not new topics. The payments had been discussed repeatedly in defendant Chiquita's Cincinnati headquarters. The Company had long since made the business judgment to remain in Colombia, to keep paying the AUC, to record the payments in the Company's books and records without identifying the AUC, and not to report the payments to the pertinent United States and Colombian authorities.

The new information in late February 2003 was not the claimed extortion, but rather outside counsel's advice about the risk of criminal liability to the Company for making the payments. Defendant Chiquita chose to reject that advice and to continue to pay the AUC. The Company chose to continue the payments even after being advised by the Department of Justice that the payments were illegal and could not continue.

Defendant Chiquita has claimed that it made the payments to protect its employees. Undoubtedly some officers, directors, and employees of defendant Chiquita with knowledge of the payments firmly believed (and still believe) that the Company's sole motivation for making the payments was to protect its Colombian employees. As mentioned, the Company's motivation is legally irrelevant and of no comfort to the victims of the AUC's violence. But even this purported rationale for the payments begs serious questions. If defendant Chiquita was solely motivated to protect its Colombian employees from the AUC,

•       How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

•       How did the payments protect the communities in which those employees lived?

•       How did the payments protect the families, friends, and associates of the Company's employees?

•       What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

•       Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

•       Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

•       Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?

C.      **Defendant Chiquita's Alternatives**

The Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law. Defendant Chiquita is a sophisticated multinational corporation with access to the highest quality business and legal advice. There were a number of points at which the Company could have conformed its conduct to the requirements of the law. US failure to do so until late in the evolution of this matter is one of the reasons that the Company appears before the Court having pled guilty to a very serious criminal charge.

Defendant Chiquita was not without any alternative to paying the AUC. While there may have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option that the Company could have considered when faced with the AUC's demand in 1997. As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments. The officer stated, "[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia." In late February and March 2003, defendant Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia. When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia. Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." Indeed, within one month of joining defendant Chiquita as its new CEO, Fernando Aguirre told senior officers that "if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

Defendant Chiquita may well have had other alternatives – other than the course that it pursued. In the end, the issue is not what defendant Chiquita could have done, but rather what it chose to do– and that was to continue paying terrorists for over six years.

140.    The Chiquita Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the government should not have prosecuted Chiquita. According to Chiquita's response to the government's Sentencing Memorandum:

When Chiquita learned in 2003 (and not earlier as the government implies) that the U.S. government had designated the AUC as a foreign terrorist organization, thereby making the payments illegal under U.S. law, Chiquita voluntarily disclosed its intolerable dilemma to the Department of Justice and sought its guidance – guidance that, despite the government's acknowledgement of the "complicated" nature of the life-and-death situation facing Chiquita, was never provided. *For the government now to attempt to hide behind the simplistic position that "[t]he Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law"* (Sentencing Mem. at 16) *is a hollow, post hoc rationalization that ignores reality. That is especially true in an area that the government has itself indicated is vital to the country's interest – national security. The government's position that companies like Chiquita should comply with the law without the government's input or help does much to undermine the government's goal of encouraging self-reporting and full cooperation.*

. . . Chiquita agrees that the government faced a very substantial risk of losing this case if it had proceeded to trial. Indeed, it is Chiquita's position that, in light of

the Company's voluntary disclosure of the payments and its complete cooperation with the government's subsequent investigation, *the government should have foregone prosecution in this matter altogether*.

141.    As detailed elsewhere herein, an overwhelming majority of the current members of the Chiquita Board are hopelessly conflicted as well as potentially personally liable and as such have not and cannot comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Chiquita, as this would require them to sue themselves, several of Chiquita's current executives and several former Board members and executives (who they have improperly caused Chiquita to release or agree to indemnify) who would provide damning inculpatory testimony as to the current Board's involvement, knowledge and malfeasance if they were sued. In fact, so as to protect themselves, the directors not only engineered a plea deal costing the Company millions while letting the responsible executives off the hook, but have allowed several executives to stay in their lucrative positions of corporate trust, even though they unquestionably engaged in criminal conduct that damaged the Company! For example:

(a)    Aguirre, the Chairman and CEO, who lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, has failed to fire or discipline the Chiquita officers responsible for the bribery payments, and permitted and participated in causing Chiquita to plead guilty to protect the other Chiquita Defendants and causing the fire sale of the Colombian operations, remains in his dominant and controlling position.

(b)    The current directors will not pursue legal action against the officers and directors involved in the wrongdoing as this will create further evidence of those officers' and directors' active illegal conduct in violation of Colombian law, increasing the likelihood of their extradition to Colombia. Extradition would put tremendous pressure on the Chiquita officers and directors to implicate the current directors, and further expose and detail their complicity in the criminal conduct.

(c)    The current directors will not objectively consider – let alone bring or vigorously prosecute – claims against the directors and officers of Chiquita who were actively involved in the criminal misconduct, because they have continued to permit the employment of several of these individuals, such as defendants Zalla and Kistinger, in fiduciary positions of trust and confidence at the Company, and chose to send others like Olson off with a king's ransom rather than demanding contribution from them for their transgressions against Chiquita. Each of these decisions would be called into question, and evidence of their conduct revealed, if the current directors investigated the allegations herein.

142.    A majority of the current Board approved the Atlanta acquisition and the Colombia disposition which damaged the Company. A majority of the current Board increased their own compensation and that of the officers still at the Company involved in the wrongdoing, notwithstanding their responsibility for this scandal.

143.    Vigorously investigating the wrongdoing alleged herein or suing to remedy it would require the Chiquita Board to denounce entrenched positions. Defendants could also have to reveal evidence of their culpability and criminality. Prosecution of the allegations contained herein in light of the Chiquita Board's prior claims of "innocence" would undermine each Board member's defense and exponentially increase each Board member's exposure to potential civil and/or criminal liability.

144.    The members of Chiquita's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

145.    The members of Chiquita's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

146.    The members of Chiquita's Audit Committee during the relevant period were defendants Verity, Waddell, Hills (Chair), Arntzen, Benjamin, Stanbrook, Fisher and Jager, who were charged with (i) reviewing the effectiveness of the Company's financial reporting and internal control policies and procedures for the identification, assessment and reporting of risk; (ii) monitoring the role and effectiveness of the internal audit function; (iii) considering and approving recommendations to the Board on the appointment of the outside auditors; (iv) keeping the relationship with the outside auditors under review, including the terms of their engagement and fees, their independence and their expertise, resources and qualifications; (v) monitoring the integrity of the Company's financial statements; and (vi) reviewing significant financial reporting issues and judgments. The Audit Committee specifically received presentations during the relevant period addressing the Company's purported "compliance processes." By virtue of the fact that each member of the Audit Committee was charged with ensuring that Chiquita complied with its anti-bribery compliance processes and applicable law and with ensuring that Chiquita's accounting and reporting practices reflected all potential liability, defendants Arntzen, Stanbrook, Fisher and Jager are personally implicated by the allegations contained herein.

147.    Defendants Aguirre and Fisher are so-called "inside directors" as they are (or were during the relevant period) executives of Chiquita. These defendants are dependent upon the other defendants for continuation of their livelihood. These inside directors were well compensated for their services during the relevant period.

148.   The Chiquita Board delegated to the Compensation Committee, consisting of defendants Verity, Waddell, Benjamin (Chair), Arntzen, Jager, Stanbrook, Fisher, Hasler and Serra during the relevant period, its authority to set executive pay for the Chairman and executive directors. By virtue of the fact that each member of the Compensation Committee was charged with ensuring that Chiquita's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, defendants Arntzen, Jager, Stanbrook, Fisher, Hasler and Serra are personally implicated by the allegations contained herein.

149.   The Chiquita Board's non-executive directors are also rewarded handsomely. By virtue of the fact that each member of the Non-Executive Directors' Fees Committee was charged with ensuring that Chiquita's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, these defendants are personally implicated in the allegations contained herein.

150.   Members of the Chiquita Board as a whole had direct knowledge of the illegal malfeasance, had the background to understand the illegality of the conduct and had close alliances with and allegiances to the inside directors and other culpable parties who engaged in the illegal activities complained of herein who they are dependent upon for continuation of their lucrative and prestigious positions as directors.

151.   In order to bring this action for breaching their fiduciary duties, the members of the Chiquita Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

152.     Chiquita's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Chiquita. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Chiquita against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Chiquita, there would be no directors' and officers' insurance protection and thus, this is a further reason why the directors will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

153.     For the foregoing reasons, there is a reasonable doubt that:  (i) the directors are disinterested and independent; or (ii) their conduct, which is at issue here, was otherwise the product of valid business judgment.

### FIRST CAUSE OF ACTION

### (Derivative Claim for Breach of Fiduciary Duties Against the Chiquita Defendants)

154.     Plaintiff hereby incorporates ¶¶1-152.

155.     The Chiquita Defendants are fiduciaries of Chiquita and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently.  This cause of action is asserted based upon these defendants' acts in violation of applicable law, which acts constitute a breach of fiduciary duty.

156.    The Chiquita Defendants, in their roles as executives and/or directors of the Company, made false and misleading statement in Annual Reports and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of herein.    The bribery payments were *ultra vires* and a waste of corporate assets even if they were not illegal under U.S. or other law when made.

157.    The Chiquita Defendants are responsible for the gross mismanagement of Chiquita, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:

(a)    They caused Chiquita to engage in *ultra vires* acts and to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

(b)    They violated their duties of compliance by causing Chiquita to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties by engaging in *ultra vires* and illegal conduct.

(c)    They violated their duty of candor by lying to Chiquita's public shareholders.

(d)    They violated an SEC consent decree, causing Chiquita to commit criminal acts.

(e)    They abused their control of Chiquita for their own personal gain, aggrandizement and protection.

(f)    They exposed the Company and its shareholders to massive fines and penalties and civil suits, expenses and liabilities.

(g)    They subjected Chiquita to adverse publicity and loss of goodwill.

158.    As a result of the Chiquita Defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, Chiquita has suffered considerable damage.

159.    All the Chiquita Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

160.    The Chiquita Defendants abused the control vested in them by virtue of their high-level positions at the Company.

161.    By reason of the foregoing, these Chiquita Defendants have breached their fiduciary obligations of care, candor, compliance and control to Chiquita and its shareholders.

162.    Chiquita and its shareholders have been injured by reason of these defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and a representative of Chiquita, seeks damages and other relief for the Company.

### SECOND CAUSE OF ACTION

**(Derivative Claim for Waste of Corporate Assets**
**Against the Chiquita Defendants)**

163.    Plaintiff hereby incorporates ¶¶1-152.

164.    As a direct result of the wrongdoing alleged herein, the Chiquita Defendants have unreasonably and unnecessarily caused Chiquita to wrongfully expend and waste billions of dollars of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

165.    Additionally, the Chiquita Defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

166.    As a direct and proximate result of the Chiquita Defendants' waste of corporate assets as alleged herein, Chiquita has sustained damages.

### THIRD CAUSE OF ACTION

#### (Derivative Claim for Conspiracy and Aiding and Abetting Breaches of Fiduciary Duties Against the Chiquita Defendants and E&Y)

167.    Plaintiff hereby incorporates ¶¶1-152.

168.    By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, the Chiquita Defendants and E&Y have each encouraged, facilitated and advanced the Chiquita Defendants' breaches of their fiduciary duties and waste of corporate assets. In so doing, the Chiquita Defendants and E&Y have each aided and abetted, conspired and schemed with the other Chiquita Defendants to breach their fiduciary duties, waste Chiquita's corporate assets and engage in the *ultra vires* and illegal conduct.

### FOURTH CAUSE OF ACTION

#### (Professional Negligence and Accounting Malpractice Against Defendant E&Y)

169.    Plaintiff hereby incorporates ¶¶1-152.

170.    E&Y issued unqualified audit opinions on the fiscal 1998-2004 consolidated financial statement reports to Chiquita's Board of Directors and shareholders. Those reports stated that the Company's financial statements were presented in accordance with GAAP based on the results of the E&Y audit which was performed in accordance with GAAS. These statements were false. In fact, E&Y's audit reports were false and misleading due to, among other things, E&Y's failure to conduct its audits in accordance with GAAS and the fact that Chiquita's financial statements were not prepared in conformity with GAAP, causing E&Y's reports to be in violation of GAAS and SEC rules.

171.    GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of individual audit engagements. Statements on Auditing Standards are recognized by the AICPA as the interpretation of GAAS.

172.    The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and cash flows in conformity with GAAP. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states his audit has been in accordance with GAAS. These standards require him to state whether, in his opinion, the financial statements are presented in accordance with GAAP and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period. AU §110.01.

173.    GAAS as approved and adopted by the membership of the AICPA, are comprised of ten general standards. These standards to a great extent are interrelated and interdependent. The independent auditor is responsible for compliance with GAAS in an audit engagement. The ten general standards are as follows:

- **General Standards**

1. The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2. In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3. Due professional care is to be exercised in the performance of the audit and the preparation of the report.

- **Standards of Fieldwork**

1. The work is to be adequately planned and assistants, if any, are to be properly supervised.

2. A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

3. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

- **Standards of Reporting**

1. The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4. The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

174. As indicated below, E&Y's audit of Chiquita's 1998-2004 financial statements repeatedly violated each and every one of the general standards.

175. E&Y is one of the largest international firms of certified public accountants and a member of the AICPA. E&Y has been engaged by Chiquita to provide auditing and accounting services (as well as tax and consulting services) since at least 1992. E&Y was the auditor of Chiquita's financial statements for 1998-2004. In addition, E&Y performed timely reviews of several of the quarterly financial statements of Chiquita throughout this period. E&Y audited Chiquita's financial statements and issued its audit opinion stating that the financial statements were fairly presented in accordance with GAAP and that E&Y had audited those financial statements in accordance with GAAS. ***Both of those statements were false***. E&Y was aware of facts that undeniably precluded E&Y from making either of those statements at the time they were made.

Chiquita's financial statements and E&Y's opinion on them were then used by Chiquita with E&Y's consent to publicly disseminate its financial results in the filing of its annual Forms 10-K with the SEC.

176.    E&Y willingly and knowingly violated its public watchdog role and the requirement to comply with GAAS as Chiquita's independent accountants in order to assist its client in maintaining its ruse with respect to the illegal "protection" payments. E&Y issued an unqualified opinion stating that the financial statements of Chiquita were fairly presented in accordance with GAAP when E&Y was aware of facts and circumstances evidenced in its own working papers that undermined such unqualified opinion and rendered it false and misleading.

177.    E&Y chose to disregard its professional responsibility to require Chiquita to adjust its financial statements or alternatively for E&Y to qualify its opinion regarding the fairness of presentation of those financial statements in accordance with GAAP. E&Y, one of the largest international accounting firms, literally looked the other way when Chiquita repeatedly violated GAAP and issued false financial statements for the purpose of allowing Chiquita's securities to continue to trade, attracting additional investor funds.

178.    Chiquita was a major client of E&Y. E&Y billed Chiquita $1.6 million, $1.9 million, $2.9 million and $3.9 million in 2001, 2002, 2003 and 2004, respectively.

179.    E&Y was a primary participant in this scheme because it failed to comply with GAAS and the securities laws as follows:

(a)    In the course of performing its audit services, E&Y obtained evidential matter revealing the adverse facts detailed above about Chiquita's business and finances, but improperly failed to require Chiquita to adjust its financial statements or make disclosure of such facts. As a result of its investigations and audit work, E&Y knew that the reports and financial statements

described herein were materially misleading or it recklessly disregarded facts that showed that all such statements were materially misleading.

(b)    E&Y knew or recklessly disregarded facts that indicated that it should have: (i) qualified its opinion on Chiquita's financial statements; *or* (ii) required Chiquita to adjust its financial statements; *or* (iii) refused to give an opinion in light of the materially adverse effects of the undisclosed facts about the matters alleged herein.  The failure to make such qualification, correction, modification or withdrawal was a violation of GAAS, including the Fourth Standard of Reporting.

(c)    E&Y failed to require Chiquita to disclose material adverse facts and allowed the Company to make material misrepresentations to its shareholders and to the investing public.

(d)    E&Y violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in performance of the examination and the preparation of the audit report.

(e)    E&Y violated GAAS Standard of Field Work No. 2 that requires the auditor to make a proper study of existing internal controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  E&Y, knowing that the Company's internal controls were insufficient, failed to expand its auditing procedures.  In fact, E&Y did exactly the opposite, it contracted the scope of its audit in a manner designed to enable it to give the "clean" audit opinion its client so desperately sought.

(f)    E&Y violated GAAS Standard of Field Work No. 3 that requires sufficient competent evidential matter be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion to be issued on the subject financial

statements. As described above, E&Y failed to obtain sufficient competent evidential matter as to the amounts of Chiquita's revenues, expenses and earnings.

(g)    E&Y violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. E&Y's opinion inappropriately represented that Chiquita's financial statements complied with GAAP, when E&Y knew or recklessly disregarded that they did not for the reasons herein alleged.

(h)    E&Y violated GAAS Standard of Reporting No. 4 that requires, when an opinion on the financial statements as a whole cannot be expressed, that the reasons be stated. E&Y should have either stated that no opinion could be issued by it on Chiquita's financial statements or issued an adverse opinion stating that the financial statements were not fairly presented.

(i)    E&Y violated Standard of Field Work No. 1 and the standards set forth in AU §§310, 320 and 327 by, among other things, failing to adequately plan its audit and properly supervise the work of its assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

(j)    E&Y violated AU §316.13 in that it failed to perform its examination with an attitude of professional skepticism and, in connection with the year-end audits, ignored numerous "red flags" that would reasonably have led to the discovery of the fraud.

(k)    E&Y violated AU §316.20, which requires that additional procedures should be performed when evaluation at the financial statement level indicates significant risk.

180.    As a result of the foregoing, E&Y's certification of Chiquita's 1998-2004 financial statements falsely represented that the statements were audited pursuant to GAAS and that Chiquita's financial statements were presented in conformity with GAAP. E&Y knew that such

certification was false and misleading because, as detailed in this cause of action: (i) E&Y knew or was reckless in not knowing that the Company's financial statements violated GAAP; and (ii) E&Y knew it had not complied with GAAS.

181.    As a result of the services rendered to Chiquita, E&Y's personnel were present at Chiquita's corporate headquarters and examined or participated in reviews, investigations and audit procedures regarding Chiquita's financial condition, business operations and financial, accounting and management-control systems. In the course of performing such services, E&Y had unlimited access to substantial evidential matter revealing the adverse facts about Chiquita's business and finances, but improperly failed to require adjustment for or disclosure of such facts.

182.    Defendant E&Y: (a) knew or was reckless in not knowing of the material, adverse, non-public information about Chiquita's financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about Chiquita.

183.    In performing auditing and accounting services on behalf of Chiquita and engaging in the wrongful acts alleged herein, defendant E&Y knew or should have known that its client would, and did, transmit false and misleading financial information to the investing public. However, defendant E&Y failed to discharge its duties in adherence to GAAP and GAAS to detect errors and irregularities, including the misappropriation of assets.

184.    In performing the auditing and accounting services to Chiquita in the manner alleged herein, defendant E&Y owed a duty to Chiquita and its shareholders to use such skill, care and diligence as other members of its profession commonly exercised. Defendant E&Y, however, breached such duty by committing the wrongful acts and conduct alleged herein.

185.    Chiquita relied to its detriment on defendant E&Y and was damaged thereby.

186.    As a direct, foreseeable and proximate result of defendant E&Y's breach of said duty owed to Chiquita, Chiquita was damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon.

B.    Directing Chiquita to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Articles and take such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    an amendment to the Company's Articles limiting the number of executive directors on the Chiquita Board to one;

(ii)    a proposal to strengthen the Chiquita Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    establishing an effective anti-bribery or corruption exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

(iv)    a provision to permit the shareholders of Chiquita to nominate at least three candidates for election to the Chiquita Board;

(v)     appropriately test and then strengthen the internal audit and control functions;

(vi)    reform executive compensation;

(vii)   require full compliance with Sarbanes-Oxley; and

(viii)  permit shareholders to question all executive directors of Chiquita at the Annual Meeting of Shareholders and establish a more transparent process for receiving and evaluating shareholder proposals.

C.     Voiding all indemnity agreements with, and recapturing all severance or departure payments to, any officer or director found to have been actively involved in the wrongdoing.

D.     Terminating the employment of Zalla and Kistinger and any other current member of Chiquita's management found to have been actively involved in the wrongdoing.

E.     Recapturing all directors' fees and other compensation or reimbursement paid to any of the Chiquita directors named as defendants.

F.     Discharging E&Y as Chiquita's accountants.

G.     Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby.

H.     Awarding punitive damages.

I.     Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

J.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury with respect to all issues so triable.

DATED:  October 29, 2007

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
BARRY A. KNOPF

_____
PETER S. PEARLMAN

Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Local Counsel

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt CHIQUITA State Court_Hawaii.doc

**VERIFICATION**

I, Mary K. Blasy, hereby declare as follows:

1.       I am an associate of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP,

counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and know the

contents thereof. I am informed and believe the matters therein are true and on that ground allege

that the matters stated therein are true.

2.       I make this Verification because plaintiff is absent from the County of San Diego

where I maintain my office.

Executed this 26th day of October, 2007, at San Diego, California

_____
MARY K. BLASY

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
BARRY A. KNOPF
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

---

| | |
|---|---|
| HAWAII ANNUITY TRUST FUND FOR OPERATING ENGINEERS, Derivatively on Behalf of CHIQUITA BRANDS INTERNATIONAL, INC., | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY |
| Plaintiff, | DOCKET NO. |
| vs. | |
| RODERICK M. HILLS, FERNANDO AGUIRRE, MORTEN ARNTZEN, HOWARD W. BARKER, JR., ROBERT W. FISHER, CLARE M. HASLER, DURK I. JAGER, JAIME SERRA, STEVEN P. STANBROOK, CARL H. LINDNER, KEITH E. LINDNER, CYRUS F. FREIDHEIM, JR., WILLIAM W. VERITY, JEFFREY D. BENJAMIN, ROBERT W. OLSON, STEVEN G. WARSHAW, JEFFERY M. ZALLA, ROHIT MANOCHA, GREGORY C. THOMAS, JAMES B. RILEY, WARREN J. LIGAN, | CERTIFICATION PURSUANT TO R. 4:5-1 |

[Caption continued on following page.]

```
——————————————————————————  x
ROBERT F. KISTINGER, OLIVER W.          :
WADDELL, FRED J. RUNK, WILLIAM A.       :
TSACALIS, JOHN W. BRAUKMAN III and      :
ERNST & YOUNG LLP,                      :
                                        :
                    Defendants,         :
                                        :
      -and-                             :
                                        :
CHIQUITA BRANDS INTERNATIONAL,          :
INC., a New Jersey corporation,         :
                                        :
                    Nominal Defendant.  :
                                        :
——————————————————————————  x
```

I certify that, to my knowledge, no other civil action or arbitration proceeding regarding

the subject matter of this action is pending or contemplated, and I am not aware of any parties

who should be joined in this action.

PETER S. PEARLMAN

Dated: October 29, 2007

EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| CITY OF PHILADELPHIA PUBLIC EMPLOYEES RETIREMENT SYSTEM derivatively on behalf of CHIQUITA BRANDS INTERNATIONAL, INC.<br><br>Plaintiff,<br><br>v.<br><br>FERNANDO AGUIRRE, MORTEN ARNTZEN, JEFFREY D. BENJAMIN, ROBERT W. FISHER, CYRUS F. FREIDHEIM, JR., CLARE M. HASLER, RODERICK M. HILLS, DURK I. JAGER, JAIME SERRA, and STEVEN P. STANBROOK,<br><br>Defendants,<br><br>-and-<br><br>CHIQUITA BRANDS INTERNATIONAL, INC.,<br><br>Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CASE NO: <u>1:07-cv-851</u><br>JUDGE <u>Dlott</u><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHARHOLDER'S DERIVATIVE COMPLAINT

For its Verified Shareholders' Derivative Complaint, plaintiff alleges the following upon personal knowledge as to itself, and upon information and belief as to all other allegations, based upon its attorneys' investigation of information pertinent to the claims herein alleged:

## NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought pursuant to Federal Rule of Civil Procedure 23.1 on behalf of nominal defendant Chiquita Brands International, Inc. ("Chiquita" or the "Company"), against the current members of the Company's Board of Directors, certain former Directors, and certain former officers and employees of Chiquita.   Plaintiff seeks injunctive and other relief against defendants for repeated breaches of fiduciary duties owed to

Chiquita arising out of the Company's repeated and systematic violations of federal law prohibiting transactions with recognized global terrorist organizations. These breaches of fiduciary duty, along with the resultant violations of federal law, have substantially injured the Company.

2.     As current or past directors and/or officers of Chiquita, each of the Director Defendants (as defined herein) owe and have owed Chiquita and its shareholders the fiduciary duties of loyalty and due care in the management and administration of the Company's affairs. The Director Defendants' conduct, as more fully described herein, involves a conscious disregard for their obligations as directors and officers of the Company. Among other things, the Director Defendants failed to (a) ensure that the Company abstained from committing willful and knowing illegal acts, (b) remain informed as to Chiquita's operations in Colombia after being told by Company lawyers that illegal payments were being made by the Company through its Colombian subsidiary, (c) take reasonable steps to ensure that the illegal practice had stopped, and (d) properly report the violations to the appropriate law enforcement officials.

3.     Chiquita is a publicly traded, multinational corporation headquartered in Cincinnati, Ohio and incorporated in New Jersey. Chiquita is in the business of producing, distributing, and marketing bananas and other produce throughout North America and Europe. The Company wholly-owned and operated, at all relevant times herein, *C.I. Bananos de Exportacion S.A.* ("Banadex"), a foreign subsidiary in Colombia, South America. Banadex produced bananas in the Uraba and Santa Marta regions of Columbia. By 2003, Banadex was Chiquita's most profitable banana business. Chiquita sold Banadex in June 2004.

4.     As detailed herein, the Defendants knowingly approved a course of sustained and systematic payments to terrorists located in Columbia, South America. Between 1989 and 1997,

Chiquita paid money to the violent, left-wing terrorist organizations *Fuerzas Armadas Revolucionarios de Columbia* ("FARC") and *Ejercito Nacional de Liberacion* ("ELN"). From 1997 through February 4, 2004, the Company also made at least 100 cash payments to the *Autodefensas Unidas de Colombia* ("AUC"), a violent paramilitary organization operating in Columbia. The United States Secretary of State designated the AUC as a Foreign Terrorist Organization ("FTO") on September 10, 2001, and again on September 10, 2003. Since September 10, 2001, it has been a federal crime for Chiquita to knowingly provide material support and resources, including currency and monetary instruments, to the AUC.

5.      Pursuant to Executive Order 13224, on October 31, 2001, President Bush also designated the AUC as a "Specially-Designated Global Terrorist" ("SDGT"). Accordingly, since at least that date, it has been a federal crime for Chiquita to have willfully engaged in transactions with the AUC, without first receiving a license from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). At all relevant times, Chiquita failed to obtain such a license.

6.      As detailed herein, current and former directors and/or officers of the Company allowed it to continue to pay the AUC even after the Director Defendants knew that Chiquita was violating the law and could face substantial monetary fines and criminal liability in connection with its misconduct.

7.      Jonathan Malis, the United States Department of Justice ("DOJ") Trial Attorney in the Counterterrorism Section who helped prosecute Chiquita, called Chiquita's conduct "morally repugnant" in a news report published in the *McClatchy Newspapers* on September 17, 2007. As quoted in that news report, Malis stated that "[t]he charges that Chiquita provided material support to a terrorist organization uncovered a grim underworld of corporate protection

money given to Colombian armed groups accused of massive kidnappings, killings and displacement of innocent civilians."

8.     On March 13, 2007, the Government charged Chiquita with the federal crime of Engaging in Transactions with a Specifically Designated Global Terrorist, namely the AUC. On that same day, Chiquita pled guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204. A copy of the agreement between Chiquita and the Department of Justice (the "Plea Agreement") is attached hereto as Exhibit A, and incorporated herein by reference. As part of the Plea Agreement, the Company was required to, and did, admit to facts contained in a Factual Proffer prepared by the government (the "Factual Proffer"), which is attached hereto as Exhibit B and incorporated herein by reference.

9.     Chiquita admitted as true all of the facts contained in the Factual Proffer. As part of the Plea Agreement, Chiquita also agreed to pay $25 million in five (5) annual installments through the year 2011 in equal payments of $5 million dollars, plus post-judgment interest. The Company also agreed to a five-year term of probation and is required to implement and maintain an effective compliance system to ensure that the wrongdoing it engaged in does not occur again. The Company also agreed to cooperate with any ongoing investigation against individuals involved in these transactions and to create a permanent office of corporate compliance and ethics.

10.     On September 11, 2007, the DOJ filed a Sentencing Memorandum in connection with the Company's appearance at a sentencing hearing held on September 17, 2007 (the "Sentencing Memorandum"). The Sentencing Memorandum, attached hereto as Exhibit C and incorporated herein by reference, contains a stunning indictment of Chiquita's conduct and the

conduct of the Director Defendants.  Among other things, the Sentencing Memorandum states

that Chiquita paid the AUC *even after*:

> "[T]he payments were brought directly to the attention of its senior executives
> during a Board meeting held in September 2000 . . . .
>
> [T]he United States designated the AUC as Foreign Terrorist Organization on
> September 10, 2001, and as a Specially-Designated Global Terrorist on October
> 30, 2001 . . . .
>
> [G]aining direct knowledge of the AUC's designation as a Foreign Terrorist
> Organization in September 2002 . . . .
>
> [I]ts outside counsel emphatically and repeatedly advised the Company, beginning
> in late February 2003, to stop the payments . . . .
>
> Department of Justice officials admonished the Company, on April 24, 2003, that
> the payments were illegal and could not continue . . . .
>
> [T]he same outside counsel advised the Company, on September 8, 2003, that the
> Department of Justice had given no assurances that the Company would not be
> prosecuted for making the payments . . . .
>
> [O]ne of its directors acknowledged in an internal email, on December 22, 2003,
> that 'we appear [to] be committing a felony.'"

11.    The wrongdoing detailed in the Government's case, to which Chiquita has pled

guilty, was not misconduct perpetrated at the bottom levels of the Company hidden from the

view of senior managers and directors.   On the contrary, according to the Sentencing

Memorandum, "Chiquita's payments to the AUC were reviewed and approved by senior

executives of the corporation, *including high-ranking officers, directors, and employees . . . . .*

*[i]t was particularly important to make clear that the conduct that led to the Company's guilty*

*plea was not the act of a rogue employee or mid-level manager.*"   (Emphasis added).   The

systematic, continuous, and conscious decisions taken by the Director Defendants to make

payments to a murderous terrorist organization constitutes, beyond question, a serious and

substantial violation of the Director Defendants' fiduciary duties of loyalty and good faith to the Company's shareholders.

12.     The seriousness of the offense to which Chiquita pled guilty cannot be underestimated. According to the Sentencing Memorandum, the DOJ believes that "Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquita's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million. The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. *Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.*" (Emphasis added).

13.     On September 17, 2007, the Court accepted the Company's Plea Agreement with the Government. The Company's troubles and the damage the Director Defendants have caused the Company, however, are just beginning. During the summer, the victims of killings and torture perpetrated by the AUC and paid for by Chiquita, brought three separate lawsuits (unrelated to this Action) under the Alien Tort Claims Act and other federal statutes to recover against the Company for among other things sponsoring terrorism. The lawsuits were all brought on behalf of the family members of trade unionists, banana workers, political organizers, social activists, and others who were killed and tortured by the AUC.

14.     According to the allegations made in a class action complaint brought in the United States District Court for the District of New Jersey captioned *Does v. Chiquita Brands International*, Case No. 07-cv-3406, the AUC murdered over 3,700 people in the banana-

growing region of Urabá alone between 1996 and 2004 during the time the Company admittedly paid the AUC. The complaint further alleges that Chiquita facilitated the transfer of weapons to the AUC and the transfer of illegal drugs from the AUC to overseas markets. A similar allegation appears in the class action complaint filed in the Federal District Court of Washington, D.C. captioned *Does v. Chiquita Brands International, Inc.*, Case No 1:07-cv-01048-PLF. That complaint, citing a 2003 report of the Organization of American States and testimony of the Columbian chief federal prosecutor's office, alleges that in November 2001, a Banadex ship smuggled 3,000 AK-47 assault rifles and more than 2.5 million bullets into Columbia for the AUC's use. All of the lawsuits seek hundreds of millions of dollars from Chiquita including treble damages.

15.    Moreover, the government of Columbia may take independent action against Chiquita and some of the Director Defendants. According to a press report in the *Associated Press* dated September 18, 2007, a criminal investigation is ongoing in Columbia against Chiquita and certain senior executives. According to the *Associated Press*, Columbia might seek to extradite the executives to stand trial in Columbia.

16.    In addition, private organizations in Columbia have apparently mobilized against Chiquita. As reported by the *Associated Press*, an organization called the National Victims' Movement, the largest Columbian representative of the victims of paramilitary violence, are seeking to have the Columbian Trade and Commerce Ministry withdraw all commercial licenses granted to Chiquita and its subsidiaries to prevent the Company from ever doing business in Columbia again.

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1332(a) because this action is an action for, *inter alia,* damages in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship.

18.    This action is not a collusive one to confer jurisdiction on a Court of the United States that it would not otherwise have.

19.    Venue is proper in this District because Chiquita is incorporated in this District.

**THE PARTIES**

20.    Plaintiff is the City of Philadelphia Public Employee Retirement System.  Plaintiff currently holds 19,261 shares of Chiquita common stock, and it has continuously owned shares in Chiquita at all times relevant to this action.  Plaintiff brings this action derivatively in the right and for the benefit of Chiquita.  Plaintiff will fairly and adequately represent the interests of Chiquita and its shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of Pennsylvania.

21.    Nominal defendant Chiquita is a leading international marketer and distributor of high-quality fresh and value-added food products from bananas and other fruits to nutritious blends of convenient green salads.  The Company is a publicly traded, multinational corporation headquartered in Cincinnati, Ohio and incorporated in the state of New Jersey.  Chiquita is a citizen of Ohio and New Jersey.

22.    Defendant Fernando Aguirre ("Aguirre") has served as the Chairperson of Chiquita's Board of Directors, President, and CEO since January 2004.  As such, Aquirre had specific knowledge of the underlying misconduct described herein but made the decision not to

take any action against the individuals responsible for such misconduct including the other individual defendants named herein.  Aquirre is a citizen of Ohio.

23.    Defendant Morten Arntzen ("Arntzen") has been a member of Chiquita's Board of Directors since March 2002 and has served on the Audit Committee since 2002.  As a member of Chiquita's Audit Committee during the Company's repeated violations of federal law against SDGT Transactions, Arntzen was directly responsible for overseeing the review of Company financial statements, accounting policies, and internal controls and providing oversight of the Company's Corporate Responsibility program.  Arntzen is a Citizen of New York.

24.    Defendant Robert W. Fisher ("Fisher") has been a member of Chiquita's Board of Director since March 2002.  Fisher served as Chiquita's Acting Chief Operating Officer from March 2002 to August 2002 and as a member of the Company's Executive Committee since 2003 (when the Company engaged in repeated SDGT Transactions in violation of federal law) up to 2004.  Fisher is a citizen of California.

25.    Defendant Clare M. Hasler ("Hasler") has been a member of Chiquita's Board of Directors since October 2005.  As such, Hasler had specific knowledge of the underlying misconduct described herein but made the decision not to take any action against the individuals responsible for such misconduct including the other individual defendants.  Hasler is a citizen of California.

26.    Defendant Durk I. Jager ("Jager") has been a member of Chiquita's Board of Directors since December 2002.  From December 2002 to February 2004, Jager served as a director while the Company violated federal law by engaging in SDGT Transactions.  Jager is a citizen of Ohio.

27.    Defendant Jaime Serra ("Serra") has been a member of Chiquita's Board of Directors since January 2003.  From January 2003 to February 2004, Serra served as a director while the Company violated federal law by engaging in SDGT Transactions.  Serra is a citizen of Mexico.

28.    Defendant Steven P. Stanbrook ("Stanbrook") has been a member of Chiquita's Board of Directors and has served on the Audit Committee since December 2002.  As a member of Chiquita's Audit Committee during the Company's repeated violations of federal law against SDGT Transactions, Stanbrook was directly responsible for overseeing the review of Company financial statements, accounting policies, and internal controls and providing oversight of the Company's Corporate Responsibility program.  Stanbrook is a citizen of Wisconsin.

29.    Defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra, and Stanbrook are hereinafter collectively referred to as the Current Director Defendants.

30.    Defendant Jeffrey D. Benjamin ("Benjamin") was a member of Chiquita's Board of Directors and served on the Audit Committee from March 2002 until he resigned on February 6, 2007.  From early 2002 until February 2004, he served alongside Roderick M. Hills ("Hills") on the Audit Committee.  As a member of Chiquita's Audit Committee, Benjamin was directly responsible for overseeing the review of Company financial statements, accounting policies, and internal controls and providing oversight of the Company's Corporate Responsibility program. Benjamin is a citizen of New York.

31.    Defendant Hills was a member of Chiquita's Board of Directors and Chairman of its Audit Committee from early 2002 until May 24, 2007 when he retired from the Board.  Hills was Chairperson of the Audit Committee from early 2002 until February 2004.  Soon after the Company announced that it had pled guilty to engaging in SDGT Transactions and that it agreed

to pay $25 million in fines, Hills announced his retirement from the Board of Directors. As Chairman of the Company's Audit Committee, Hills was directly responsible for reviewing the Company's financial statements, accounting policies, and internal controls and for providing oversight of the Company's Corporate Responsibility program. Hills is a citizen of Washington, D.C.

32.     Defendant Cyrus F. Freidheim, Jr. ("Friedheim") served as the Company's CEO and the Chairperson of Chiquita's Board of Directors from March 2002 until January 10, 2004 when he became non-executive Chairman of the Board upon the election of Aguirre as President and CEO on that date. He also served as President from May 2002 until January 10, 2004. Friedheim retired as Chairman in May 2004. Friedheim is a citizen of Illinois.

33.     Defendants Benjamin, Hills, and Friedheim shall hereinafter be referred to as the Prior Director Defendants.

34.     The Current Board Defendants and the Prior Board Defendants shall hereinafter be referred to collectively as the "Director Defendants."

35.     Due to their positions as current or former officers and/or directors of Chiquita and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations of loyalty and due care. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally, rather than to further their personal interests or other interests. Each director and officer of Chiquita owes a fiduciary duty to the Company and its shareholders to exercise good faith and diligence in the administration of the affairs of the Company.

36.    To discharge their duties, the Director Defendants are required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the Director Defendants were and are required to, among other things:

a.    Manage, conduct, supervise, and direct the business affairs of Chiquita in accordance with all applicable laws (including federal and state laws, government rules and regulations and the charter and bylaws of Chiquita);

b.    Neither violate nor knowingly permit any officer, director or employee of Chiquita to violate applicable laws, rules, and regulations;

c.    Remain informed as to the status of Chiquita's operations, including foreign operations and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d.    Establish and maintain systematic and accurate records and reports of the business and affairs of Chiquita and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records; and

e.    Maintain and implement an adequate, functioning system of internal controls, such that Chiquita's affairs and operations would be conducted in accordance with all applicable laws, rules, and regulations.

37.    The Director Defendants, in light of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and indirectly, exercise control over the criminal acts described herein.  That conduct involves knowing, willful, and

repeated criminal violations and obligations as officers and directors of Chiquita. Furthermore, Chiquita's Board effectively ratified the illegal conduct of Chiquita's officers, employees, and Defendant Hills by consciously failing to take any legal action on behalf of the Company against them and by permitting Hills to remain on the Board and retire his service from the Company

38.    Each Defendant herein is sued individually as a conspirator, aider, and abettor, as well as in his or her capacity as a present or past officer and/or director of Chiquita, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, schemes, procedures, or transactions described of herein.

## THE DIRECTOR DEFENDANTS' FIDUCIARY DUTIES
## TO CHIQUITA AND ITS SHAREHOLDERS

39.    According to the Factual Proffer , beginning in 1989 through 1997, Chiquita made payments to left-wing terrorists organizations, namely the FARC and the ELN, in areas of Colombia, South America, where Chiquita, through Banadex, maintained banana-producing operations.  The Factual Proffer states that in October of 1997, both FARC and ELN were designated as FTOs.

40.    According to the Factual Proffer, in 1997 following a meeting between Banadex's then-General Manager and the leader of AUC, Carlos Castaño, Chiquita – through Banadex – began making payments to AUC in exchange for what the Company has described as "security services." Chiquita admitted in the Factual Proffer that Castaño told Banadex at the meeting that the AUC was about to drive the FARC out of the banana producing region of Columbia where Chiquita was doing business.

41.    Castaño told Banadex to begin making payments to the AUC through associated private security companies called "convivirs." According to the Factual Proffer, Chiquita paid the AUC in checks drawn on the Columbian subsidiary of Chiquita listing convivirs as the

payee(s).  The Factual Proffer states that the Company never received any security services from the convivirs.  According to the Factual Proffer, Chiquita recorded the payments on its corporate books and records as "security payments" or payments for "security" or "security services."  According to the Sentencing Memorandum, the amounts Chiquita was required to pay depended on its output of bananas.  The Sentencing Memorandum states "Chiquita's payments to the AUC were reported to the Audit Committee of the Board of Directors *on a quarterly basis*." (Emphasis added).

42.     According to the Sentencing Memorandum, Chiquita and Banadex knew the payments were "illicit" from the beginning.  According to the Sentencing Memorandum, "in early 1997, according to a contemporaneous, written account, one officer of defendant Chiquita remarked about the payments: 'Cost of doing business in Colombia - maybe the question is not why are we [Chiquita] doing this but rather why we [Chiquita] are in Colombia and do we [Chiquita] want to ship bananas from Colombia.'"  The Sentencing Memorandum also states that "in June 1997, a senior officer of Banadex approved a convivir payment with the written comment: 'No alternative.  But next year needs to be less.'"

43.     According to the Factual Proffer, in September 2000, members of Chiquita's Board of Directors became aware of the payments to the AUC and that the AUC was a "violent, paramilitary organization led by Carlos Castaño."  According to the Factual Proffer, Chiquita's in-house counsel prepared a memorandum detailing an investigation of the payments.  The Sentencing Memorandum states that the internal memorandum "made clear that the convivir was merely a front for the AUC and described the AUC as a 'widely-known, illegal vigilante organization.'"

44.    Chiquita's in-house counsel presented the results of the investigation and the memorandum to the Audit Committee of Chiquita's Board during a meeting held in Cincinnati, Ohio in September 2000.    As the Sentencing Memorandum recounts, "[a]ccording to contemporaneous notes of the meeting, defendant Chiquita's ongoing payments to the AUC were described as 'not a voluntary decision (extortion)' and Carlos Castaño was named as the 'convivir leader.'    According to the notes, one director responded to the presentation by asking: 'Can we reduce [the] amount per box?'"    Nonetheless, the payments continued without anyone at the Company notifying the authorities.

45.    As discussed above, approximately one year later, on September 10, 2001, the United States Department of State designated AUC as a SDGT.    This designation made it illegal to knowingly provide financial support to the organization without first receiving a license from the United States Department of the Treasury.    According to the Factual Proffer, Chiquita knew about the SDGT designation.    Chiquita admitted in the Factual Proffer that news reports of the designation were widely published in the press on or about October 6, 2001, including in Cincinnati newspapers and in a proprietary database to which Chiquita subscribed.    That database, according to the Factual Proffer, in a posting accessed by a Chiquita employee on September 30, 2002, stated, among other things, that the State Department had designated the AUC as a terrorist organization "barring US companies from contact with the personnel accused of AUC connections."    Despite this designation and the press coverage it received, Chiquita continued making payments to AUC through the remainder of 2001 and beyond.

46.    According to the Sentencing Memorandum, in late March of 2002, as the Company was emerging from Chapter 11 Bankruptcy, the AUC began to demand cash payments.    The Sentencing Memorandum states that by June 2002, senior Chiquita officers

established new procedures and began keeping a "private ledger of these cash payments." The Sentencing Memorandum states that the Audit Committee reviewed the procedures at a meeting on April 23, 2003.

47.    According to the Factual Proffer, in February 2003, an undisclosed high-ranking officer of the Company spoke to outside counsel regarding the payments.  Outside counsel advised the Company, through this undisclosed officer, that the payments were illegal under United Sates law and that Chiquita should immediately stop paying AUC directly or indirectly. The Factual Proffer and the Sentencing Memorandum cites the following communications from counsel regarding the illegality of the payments:

- "Must stop payments."  (Notes, dated February 21, 2003).

- "Bottom Line: CANNOT MAKE THE PAYMENT"; Advised NOT TO MAKE THE ALTERNATIVE PAYMENT through CONVIVIR;" "General Rule: cannot do indirectly what you cannot do directly;" "Concluded with: CANNOT MAKE THE PAYMENT" (Memo, dated February 26, 2003).

- "You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  Chiquita should leave Colombia."  (Notes, dated March 10, 2003).

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization" (Memo, dated March 11, 2003)

48.    According to the Factual Proffer and the Sentencing Memorandum, on or about April 3, 2003, an unnamed director reported to the entire Board that Chiquita was making payments to a foreign terrorist organization.  One of the directors objected to the payments and suggested that they be disclosed to the DOJ.

49.    The next day on April 4, 2003, according to the Sentencing Memorandum, the Company's outside counsel's contemporaneous notes cite a "senior officer of defendant Chiquita" who purportedly said: "'His and [a director's] opinion is just let them sue us, come

16

after us. This is also [a senior officer's] opinion.'" Consistent with that instruction, as the Sentencing Memorandum states, "[f]our days later, senior officers of defendant Chiquita instructed their subordinates to 'continue making payments' to the AUC."

50.     As the Factual Proffer states, on April 24, 2003, an undisclosed director and officer met with the DOJ and disclosed the payments. According to the Factual Proffer and the Sentencing Memorandum, the DOJ told the Chiquita senior officers who were present that "the payments were illegal and could not continue." According to the Sentencing Memorandum, the DOJ also stated at the meeting, "as [Chiquita's] outside counsel had warned earlier, that the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Columbia." An article appearing in *The New York Times* on August 16, 2007, named defendant Hills as a participant in that meeting.

51.     Despite these warnings from the DOJ, according to the Factual Proffer and the Sentencing Memorandum, a Chiquita employee told others at Chiquita to "continue making payments." The Sentencing Memorandum states that Chiquita made a cash payment to the AUC within a week and the payments continued.

52.     The DOJ continued to have contact with senior Chiquita officers through September 2003. According to the Sentencing Memorandum, "[i]n a memorandum dated September 8, 2003, outside counsel summarized defendant Chiquita's various contacts with the Department of Justice from April 2003 through September 2003."

53.     According to the memorandum cited in the Sentencing Memorandum, "[o]utside counsel noted that: '[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future

payments.'"  The Sentencing Memorandum states that "[s]enior officers of defendant Chiquita received copies of this memorandum."

54.     The Sentencing Memorandum concludes, "[s]enior officers and directors of defendant Chiquita were well aware that the Company was continuing to pay a federally-designated Foreign Terrorist Organization and that the Company was subject to criminal prosecution for its continuing conduct."

55.     According to the Factual Proffer, on December 4, 2003, the full Board received more information about the payments to the AUC.  According to the Factual Proffer and the Sentencing Memorandum, one of the Director Defendants responded by stating:  "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

56.     The Factual Proffer recounts that on December 22, 2003, one of the Director Defendants sent an email to the entire Board stating that "[t]his is not a management investigation.  This is an audit committee investigation.  It is an audit committee investigation because we appear to [be] committing a felony."  According to the Sentencing Memorandum, "a week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that 'Chiquita is knowingly violating the law.'"

57.     Despite their actual knowledge of the wrongdoing, the Director Defendants continued to authorize the payments to the AUC.  According the Factual Proffer and the Sentencing Memorandum, these payments continued until a check cleared on February 4, 2004, which as the Sentencing Memorandum states, was issued no January 29, 2004.  The payments were discontinued, according to the Sentencing Memorandum, after Aguirre became CEO of the Company.  Nonetheless, Aguirre did nothing to remediate Chiquita's past conduct.  Neither Aguirre nor any other member of the Board (including defendant Hasler who became a Board

18

member in October 2005) took any action to discipline any Chiquita officer and/or director for any misconduct related to the Company's payments to the terrorist organizations.

58.     The facts pled herein and contained in the Factual Proffer and the Sentencing Memorandum establish that top members of Chiquita's management and Board knowingly caused the Company to violate federal law.  All told, the Company made 50 payments to AUC following its designation as a specially designated global terrorist organization totaling in excess of $825,000.

## DERIVATIVE ALLEGATIONS

59.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

60.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of the breaches of fiduciary duty by the Director Defendants.

61.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights, and they have retained counsel experienced in litigating these types of actions.

62.     Plaintiff is an owner of Chiquita shares and was an owner of Chiquita stock during all times relevant to the Director Defendants' wrongful conduct as alleged herein.

## DEMAND IS EXCUSED

63.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

64.     Chiquita is incorporated in New Jersey and New Jersey corporation law therefore governs the issue of whether plaintiff was required to make a demand on the Company's Board

of Directors to institute this case before filing this Complaint.  Making a demand is considered futile under New Jersey law if the plaintiff has pled with particularity facts creating a reasonable doubt that a majority of the current Board of the Company are: (1) disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

65.    Such demand would be a futile and useless act here because the facts alleged herein raise more than a reasonable doubt that the Board's decision to pay a terrorist organization was a product of a valid exercise of business judgment.

66.    As described above, in the Sentencing Memorandum and the Factual Proffer, a majority of the Board made the decision to continue paying the AUC even with knowledge that doing so constituted a federal crime.  As the Government stated in the Sentencing Memorandum, "Chiquita is a sophisticated multinational corporation with access to the highest quality business and legal advice.  There were a number of points at which the Company could have conformed its conduct to the requirements of the law.  *Its failure to do so until late in the evolution of this matter is one of the reasons that the Company appears before the Court having pled guilty to a very serious criminal charge*."  (Emphasis added.)

67.    The Sentencing Memorandum, along with the facts pled herein, establish that the Board decided to do business in Columbia and viewed making illegal payments to terrorists as a price of doing business.  According to the Sentencing Memorandum, "Chiquita was not without any alternative to paying the AUC.  While there may have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option that the Company could have considered when faced with the AUC's demand in 1997.  As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments.  The officer stated,

'[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia.' In late February and March 2003, defendant Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia. When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia. Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that 'the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option - to withdraw from Colombia.'"

68.    The Director Defendants cannot claim that they made a business judgment to pay the AUC to protect its own employees. The Government turned this assertion aside in its Sentencing Memorandum stating, among other things: "[i]f defendant Chiquita was solely motivated to protect its Colombian employees from the AUC,

- How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

- How did the payments protect the communities in which those employees lived?

- How did the payments protect the families, friends, and associates of the Company's employees?

- What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

- Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

- Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

- Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?"

21

69.    Demand is also excused as futile because the facts pled herein raise a reasonable doubt that a majority of the Board is independent and disinterested. To the extent that the facts pled herein challenge the Director Defendants' failure to act, the Current Directors face a substantial likelihood of liability for deliberately and consciously failing to comply with their fiduciary duties of loyalty, good faith and supervision after being presented with numerous glaring red flags of misconduct in connection with Chiquita's illegal payments to a terrorist organization. As detailed in the Factual Proffer, the Sentencing Memorandum and herein, the Director Defendant repeatedly ignored legal advice of its own counsel and the admonitions of the DOJ to stop paying the AUC. In the face of these evident warnings, the Director Defendants, conscious of the known risks, made the decision to continue operating in Columbia and paying the AUC. Such knowing conduct raises a substantial likelihood of liability that a majority of the Board violated their fiduciary duties of good faith and loyalty to Chiquita and its shareholders.

### BREACH OF FIDUCIARY DUTIES

70.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

71.    Each of the Director Defendants, because of their positions as directors and/or officers of Chiquita Brands, owed fiduciary duties of loyalty to the Company and its shareholders in connection with the management and operations of the Company's business and operations.

72.    To properly discharge these duties, the Director Defendants were required to, among other things:

a.    manage, conduct, supervise, and direct the business affairs of Chiquita in accordance with best practices, and applicable state and federal laws, rules, and regulations;

b.     neither violate nor permit any officer, director, agent, or employee of Chiquita to violate applicable state and federal laws, rules, or regulations; and

c.     remain informed as to the status of Chiquita's business practices, and operations and, including foreign operations and upon receipt of notice of information of imprudent or unsound practices or operations, make a reasonable inquiry in connection therewith, and take steps to correct such practices or operations.

73.     As alleged in detail herein, the Director Defendants willfully and knowingly made decisions that caused the Company to engage in conduct that violated federal law.

74.     Moreover, each of the Director Defendants had a duty to Chiquita and its shareholders to establish and maintain adequate internal controls to ensure that the Company was operated in a prudent and lawful manner. The Director Defendants had an affirmative obligation to install an internal control system to discover wrongdoing, which they had every reason to know or believe existed. Additionally, where such red flags exist, the Director Defendants have an obligation to take affirmative steps to address such issues.

75.     As detailed herein, the Director Defendants abdicated their responsibility to establish and maintain adequate internal controls at Chiquita, having made no good faith effort to fulfill their fiduciary duties in the face of evident red flag warnings of misconduct. The Director Defendants did nothing about the payments they knew were going to the AUC. Rather, they instituted a corporate culture that encouraged unlawful and irresponsible activity resulting in the Company pleading guilty to a federal crime.

76.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Chiquita engaged in unlawful activities causing damage to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Authorizing the maintenance of this action as a derivative action, with plaintiff as derivative plaintiff;

B.     Declaring that the Director Defendants have violated their fiduciary duties to the Company;

C.     Awarding against all of the Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Director Defendants' breaches of fiduciary duties;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims asserted herein.


Dated:  October 12, 2007

STRAUSS & TROY

Richard S. Wayne (0022390)
William K. Flynn (0029536)
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio 45202-4018
Telephone:   (513) 621-2120
Facsimile:    (513) 629-9426
E-Mail: (*rswayne@strausstroy.com*)
E-Mail: (*wkflynn@strausstroy.com*)

**COHEN, PLACITELLA & ROTH P.C.**
Stewart L. Cohen
Harry M. Roth
Jonathan A. Saidel
Two Commerce Square, Suite 2900
2001 Market Street
Philadelphia, PA 19103
Telephone:   (215) 567-3500
Facsimile:   (215) 567-6019

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 N. Market Street, Suite 980
Wilmington, DE 19801
Telephone:  (302) 295-5310
Facsimile:  (302) 654-7530

*Attorneys for Plaintiff*

1381197_1.DOC

25

## VERIFICATION

Romulo L. Diaz, Jr., on behalf of the City of Philadelphia Public Employees

Retirement System ("the City Fund"), verifies that he has reviewed the foregoing

Verified Shareholder's Derivative Complaint, and that the allegations as to the Fund and

its own actions are true and correct and the other allegations upon information and belief

are true and correct.


Dated: _October 10, 2007_                                  _____

                                                          Romulo L. Diaz, Jr., Esquire
                                                          City of Philadelphia Solicitor

℞JS 44  (Rev. 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a)  PLAINTIFFS

City of Philadelphia Public Employees Retirement System, derivatively on behalf of Chiquita Brands International, Inc.

### DEFENDANTS

Fernando Aguirre, Morten Arntzen, Jeffrey D. Benjamin, Robert W. Fisher, Cyrus F. Freidheim, Jr., Clare M. Hasler, Roderick M. Hills,

**(b)**  County of Residence of First Listed Plaintiff    Philadelphia Co., PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Richard S. Wayne, William K. Flynn, Strauss & Troy, 150 E. Fourth Street, Cincinnati, Ohio 45202  (513) 629-9426

Attorneys (If Known)

### II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV.  NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Med. Malpractice | ☐ 625 Drug Related Seizure |     28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |    Liability    ☐ 365 Personal Injury - |    of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
|    & Enforcement of Judgment |    Slander    ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent |    Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |    Liability    Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|    Student Loans | ☐ 340 Marine    **PERSONAL PROPERTY** |    Safety/Health | | ☐ 490 Cable/Sat TV |
|    (Excl. Veterans) | ☐ 345 Marine Product    ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment |    Liability    ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |    Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    Property Damage |    Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract |    Product Liability    ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) |    12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury |    & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting    ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment    Sentence | ☐ 791 Empl. Ret. Inc. |    or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/    **Habeas Corpus:** |    Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land |    Accommodations    ☐ 530 General | |    26 USC 7609 |    Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare    ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | | |    Under Equal Access |
| |    Employment    ☐ 550 Civil Rights | | |    to Justice |
| | ☐ 446 Amer. w/Disabilities -    ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| |    Other | | |    State Statutes |
| | ☐ 440 Other Civil Rights | | | |

### V. ORIGIN    (Place an "X" in One Box Only)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to District
Judge from
Magistrate
Judgment

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U S C . Section 1332 (a)

Brief description of cause:
Shareholder derivative action for violations of federal law prohibiting transactions with terrorist organizat

### VII. REQUESTED IN
COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☑ Yes  ☐ No

### VIII. RELATED CASE(S)
IF ANY

(See instructions:)    JUDGE                              DOCKET NUMBER

DATE
10/12/2007

SIGNATURE OF ATTORNEY OF RECORD
Richard S. Wayne by William K. Flynn

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

Fri Oct 12 14:56:42 2007

UNITED STATES DISTRICT COURT

CINCINNATI, OH

Receipt No.    100 435888
Cashier        wg1

Check Number: 8718

DO Code    Div No
4661         1

| Sub Acct | Type | Tender | Amount |
|----------|------|--------|--------|
| 1:510000 | N    | 2      | 190.00 |
| 2:086900 | N    | 2      | 60.00  |
| 3:086400 | N    | 2      | 100.00 |

Total Amount        $      350.00

STRAUSS AND TROY

FILING FEE FOR 1:07-CV-851

EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHEET METAL WORKERS LOCAL #218(S) )<br>PENSION FUND, 2855 Via Verde,<br>Springfield, IL 62703<br><br>Derivatively on Behalf of CHIQUITA<br>BRANDS INTERNATIONAL, INC.,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>RODERICK M. HILLS, FERNANDO<br>AGUIRRE, MORTEN ARNTZEN, ROBERT<br>W. FISHER, STEVEN P. STANBROOK,<br>CARL H. LINDNER, KEITH E. LINDNER,<br>WILLIAM W. VERITY, JEFFREY D.<br>BENJAMIN, ROBERT W. OLSON, STEVEN<br>G. WARSHAW, JEFFERY M. ZALLA,<br>JAMES B. RILEY, WARREN J. LIGAN,<br>ROBERT F. KISTINGER, OLIVER W.<br>WADDELL, WILLIAM A. TSACALIS and<br>JOHN W. BRAUKMAN III,<br><br>　　　　　　　　　　Defendants,<br><br>　　-and-<br><br>CHIQUITA BRANDS INTERNATIONAL,<br>INC., a New Jersey corporation,<br><br>　　　　　　　　　Nominal Defendant. | Case No.<br><br><br><br>DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY,
CORPORATE WASTE, AND *ULTRA VIRES* CONDUCT

## OVERVIEW

1.    This is a stockholder derivative action on behalf of Chiquita Brands International, Inc.

("Chiquita" or the "Company") against certain of its officers and directors for intentional, reckless or

negligent breaches of their fiduciary duties and corporate waste.  The wrongful conduct involves illegal,

improper or *ultra vires* conduct, including causing Chiquita to violate the laws of the United States and

Colombia and international business conduct codes.  This conduct includes paying, or permitting to be

paid, improper and/or illegal bribes and other payments to known terrorist organizations such as United

Self-Defense Forces of Colombia (the "AUC"), The Revolutionary Armed Forces of Colombia

("FARC"), and the National Liberation Army ("ELN") and illegally providing or facilitating the

provision of weapons to the AUC.  Chiquita's outside auditor and Robert W. Olson, the Company's in-

house General Counsel, acquiesced in the making and concealment of the improper or illegal payments

and their mischaracterization in Chiquita's books and records.  As a result of this illegal conduct,

Chiquita was forced to plead guilty to federal felony charges, pay a large fine, be placed on corporate

criminal probation, be sued civilly by the victims of the AUC, and to suffer losses due to the destruction

of Chiquita's business operations in Colombia – once its largest source of bananas and profits.

2.    Chiquita is a publicly owned company operating throughout the world, including, until

recently, Colombia, where its Banadex subsidiary produced bananas in the Urabá and Santa Marta

regions.  Chiquita is the world's second largest banana producer.  Defendants have misrepresented to

shareholders that under their stewardship Chiquita was an ethical, law-abiding corporation that was

improving its operations due to the skills of its top managers.  As a result, these top managers and

directors benefited from their lucrative Chiquita positions.

3.    Chiquita is the successor to the United Fruit Company, which had a long history of

illegal conduct.  In Central and South America it cooperated with authoritarian governments to suppress

and kill its employees during labor protests and pay bribes, the exposure of which led to the suicide of

the Company's Chairman and CEO and the enactment of the U.S. Foreign Corrupt Practices Act.

- 1 -

United Fruit's control over Central American governments gave rise to the term "banana republic." As a result of this past, it was important that the insider fiduciaries operate Chiquita in a lawful and ethical manner. Defendants told the shareholders Chiquita's prior behavior

> clearly would not live up to the Core Values we hold today or to the expectations of our stakeholders. Today, we are a different Company. But we acknowledge our complex past as a way to begin an honest dialogue about our present and our future. It is humbling to consider the impacts – both positive and negative – that a corporation can have. At the same time, it is uplifting to note the distance a company can travel.

4.      The true facts were much different than these corporate fiduciaries represented to Chiquita's shareholders. In fact, Chiquita's officers and directors were encouraging and/or permitting Chiquita's executives to resort to improper and/or illegal *ultra vires* activities to boost Chiquita's reported results, including bribes and other improper payments to retain the ability to operate in Colombia. This was done to make their stewardship of Chiquita appear more successful and provide the executives with large salaries and bonus compensation.

5.      From 1997 through 2004, Defendants caused Chiquita to make over 100 bribery payments to the AUC, totaling over $1.7 million, and other bribery payments to the FARC and ELN, which payments were actively concealed from the shareholders and government officials in the U.S. and Colombia. They caused these payments to be falsely accounted for in Chiquita's financial records and statements as "security payments." Because of the illegal conduct of the Defendants, following a March 2007 indictment, Chiquita was forced to plead guilty to a criminal violation of the U.S. Global Terrorism Sanctions Act and pay a $25 million non-tax-deductible fine – the largest criminal penalty ever imposed under that Act. Chiquita also was sentenced to five years criminal probation during which the Company has to meet stringent conditions or face revocation of its probation and additional criminal sanctions. Chiquita has to pay the fine over five years with interest, thus materially increasing the actual amount to be paid and the damage to the Company.

6.      The AUC was designated a "Foreign Terrorist Organization" by the U.S. Department of State. With 15,000 to 20,000 armed troops, the AUC has used kidnapping, torture, rape, murder,

extortion and drug trafficking among its techniques. Paramilitary killings rose dramatically while the sustaining payments from Chiquita continued. One of many massacres committed by the AUC took place in 2001, while the AUC was receiving funds from Chiquita. One morning, the AUC paramilitaries entered the rural town of Chengue and killed 24 men by smashing their skulls. Over 4,000 people were killed in the Uraba banana-growing region of Columbia during the period Chiquita funded the AUC. Chiquita's money helped the AUC buy weapons and ammunition to carry out its terrorist operations.

7.    Chiquita's insiders used the AUC against its own rebellious employees and those who urged them to improve their working conditions. In Antioquia, Chiquita's business boomed as the AUC took over banana-growing lands and was blamed for killing human rights workers and trade unionists. In one year, the AUC was accused of 16 massacres, 362 assassinations and 180 kidnappings, all financed in part by Chiquita. Chiquita has been sued on behalf of many Colombians killed by the terrorists, seeking millions of dollars in damages from Chiquita. Chiquita's executives also facilitated the shipment of 3,000 Israeli rifles and millions of rounds of ammunition to the paramilitaries in 2001. The weapons were brought through the port facility operated by Banadex and stored on the Company's docks before being distributed to the paramilitaries. Colombia's attorney general has opened an investigation into this and requested information from the U.S. Department of Justice ("DOJ"). Colombia may seek the extradition of eight Chiquita officials on charges the Company used one of its ships to smuggle weapons to the paramilitary group.

8.    These payments were known to Chiquita's top corporate officers and directors, Chiquita's in-house General Counsel, and Chiquita's outside auditors and lawyers, who all were aware the payments were being falsely accounted for in Chiquita's records to conceal the truth. Defendants engaged in this wrongful *ultra vires* behavior because Chiquita's Colombian banana-producing operations were highly profitable and these officers and directors were motivated to convince Chiquita's shareholders their management and stewardship of Chiquita was successful. The AUC was

- 3 -

killing thousands of pro-labor advocates in Colombia, which Defendants knew would help them pressure workers in the Company's Colombian operations to accept lower wages and less desirable working conditions. In addition, by continuing the profitable Colombian banana operations via the improper payments and other activities, Defendants inflated their compensation, thus personally profiting from their breaches of duty, which damaged the Company.

9.      The bribery payments to the AUC were made for over seven years, continuing after the payments were disclosed to the DOJ and even after Chiquita publicly disclosed them in mid-2004. Defendants falsely indicated to the DOJ and shareholders that the payments had stopped. Defendants also permitted these bribery payments to continue even after they received specific advice from Chiquita's outside counsel that the payments were illegal and had to stop and that "Chiquita should leave Columbia."

10.     These illegal and/or improper actions had the desired effect, *i.e.*, increasing Chiquita's apparent success and operating profits in the short term. The Defendants' improper and/or unlawful actions have had a damaging impact on Chiquita and its shareholders.

11.     Despite knowledge of the bribery payments and knowledge or reckless disregard of the arms shipments, Chiquita's directors permitted such conduct, including the falsification of Chiquita's books and records in violation of the Securities Exchange Act of 1934 ("1934 Act") to conceal the payments. They did this even though Chiquita was the subject of a Securities and Exchange Commission ("SEC") Consent Decree entered in October 2001. That Decree arose out of improper payments by Chiquita's Banadex subsidiary in Colombia and the falsification of Chiquita's books and records in violation of the 1934 Act to conceal payments, and required Chiquita to "cease and desist" from such falsification. The directors failed to remedy the wrongful conduct even after it became known to the DOJ. Defendants' false statements and reckless or intentional misconduct have already cost Chiquita millions of dollars in wasted compensation for the Defendants, fines and expenses, and expose it to hundreds of millions of dollars in civil suit damages and costs, while damaging Chiquita's

corporate reputation. Chiquita's stock has fallen from over $30 per share to as low as $12.50 per share, costing shareholders over $750 million in lost market capitalization.

12.    When the DOJ discovered Defendants were continuing to make the illegal payments, it threatened Chiquita and Defendants with criminal prosecution. Defendants continued to act in their own self-interest at the expense of Chiquita by causing Chiquita to plead guilty and pay a large fine in return for the government's promise not to prosecute the executives involved – even though the government's Sentencing Memorandum specifically identified 10 present and former Chiquita officers as being actively involved in the illegal payments. On September 17, 2007, the federal court's order made clear Chiquita's senior officers and directors had offered Chiquita's guilty plea so they would be spared personally. By sparing the executives criminal exposure and by paying them large severance payments or allowing them continued lucrative employment in exchange for their silence, all the then-current directors of Chiquita further breached their fiduciary duties to Chiquita.

13.    By 2002, Chiquita's insiders knew they would have to sell off Chiquita's Colombian banana operations due to the illegal and improper conduct they had caused or permitted there. They knew this sale would deprive Chiquita of millions of dollars in revenues from what had been one of its most profitable operations. To try to make up for these lost revenues and profits, in 2003, the Defendants hastily and without adequate due diligence acquired a German fruit distribution business known as Atlanta A.G. ("Atlanta") for an excessive price. As a result, almost $43 million in goodwill went onto Chiquita's balance sheet. Defendants presented Atlanta as a favorable acquisition that would increase revenues by over $1 billion a year. In truth, the Atlanta acquisition badly damaged the Company. Almost immediately upon the acquisition of Atlanta, because of severe problems in its business, Chiquita began to write off the value of Atlanta, which ultimately wiped out 100% of the goodwill recorded for the Atlanta acquisition in less than three years.

14.    In 2004, due to the problems in its Colombian operations from the improper activities there, and hoping to reduce the likelihood of extradition of Chiquita insiders to Colombia for their

criminal conduct, Defendants sold Chiquita's Colombian banana-producing operations in a "fire sale." This deprived Chiquita of a major source of bananas necessary to conduct its business, requiring Chiquita to secure another source at premium, unprofitable, prices. The "fire sale" produced a $9 million loss when the cost of the long-term banana purchase contract is factored in.

15.    The current directors will not objectively consider, bring, or vigorously prosecute claims against themselves or the officers who were actively involved in the misconduct. Because the current Board is disabled from protecting or enforcing the Company's rights, Sheet Metal Workers Local #218(S) Pension Fund, an institutional shareholder of Chiquita, brings these claims in the place of the Chiquita Board of Directors to protect the Company and restore shareholder value.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiff and Defendants are citizens of, and domiciled in, different states. All of Plaintiff's trustees are residents and citizens of Illinois and none reside in or are citizens of the same states as Defendants. This action does not seek to confer jurisdiction that the court would otherwise lack.

17.    Chiquita does substantial business in Washington, D.C., including directing significant marketing toward, making substantial sales in, and relying heavily upon sales revenue derived from the District of Columbia. Defendant Hills, who was the "financial expert" of the Audit Committee and a key defendant, resides in and is a citizen of the District of Columbia. A substantial part of the wrongdoing occurred in and/or had an effect in Washington, D.C. The DOJ and SEC have investigated Chiquita here in Washington, D.C. for important aspects of the conduct complained of herein. The Company is subject to a Consent Decree in this district in *Securities & Exchange Commission v. Chiquita Brands Int'l, Inc.*, No. 01-CV-2079 (D.D.C. *judgment entered* Oct. 25, 2001), and the Company's compliance with that decree is relevant to this action. The Company recently settled the DOJ enforcement action brought in this district in *United States v. Chiquita Brands Int'l, Inc.*, No. 07-

CV-0055 (D.D.C. *judgment entered* Sept. 24, 2007), which is highly relevant to the underlying claims in this action. The allegations in this case are substantially related to the claims being prosecuted in *Jane/John Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 07-CV-01048 (D.D.C. *filed* June 7, 2007), where the Company faces significant liability for injuries perpetrated by the AUC in Columbia.

## PARTIES

18.      Plaintiff Sheet Metal Workers Local #218(S) Pension Fund was at relevant times a shareholder of Chiquita. Plaintiff currently owns approximately 3,400 shares of Chiquita common stock. Plaintiff brings this action derivatively for the benefit of Chiquita. Plaintiff will fairly and adequately represent the interests of Chiquita and its shareholders in enforcing the rights of Chiquita.

19.      Nominal defendant Chiquita Brands International, Inc. ("Chiquita") is a New Jersey corporation headquartered in Ohio. Chiquita engages in the growing, distribution and sale of bananas. Chiquita is the world's second largest banana producer, with annual revenues of approximately $4.5 billion and about 25,000 employees. Through the late 1990s, Chiquita was the world's largest banana producer, controlling one-third of the world's banana trade. By late 2001, Chiquita entered into a reorganization proceeding from which it emerged in the Spring of 2002. The pre-reorganization equity holders of Chiquita continued to be such after the reorganization. The reorganization plan explicitly preserved Chiquita's pre-reorganization causes of action as to all persons and entities not released via the plan. The wrongful conduct alleged herein began before the bankruptcy, continued during the proceeding while concealed from the bankruptcy court, and continued after the reorganization. No Defendant herein was released by the reorganization plan. In October 2001, the SEC issued a cease-and-desist order against Chiquita, in which the SEC found Chiquita violated the books and records and internal accounting controls provisions of the 1934 Act in connection with a payment to foreign customs officials by a wholly-owned foreign subsidiary of Chiquita. *SEC v. Chiquita Brands International, Inc.*, Civ. Action No. 01-CV-2079 (D.D.C. *judgment entered* Oct. 25, 2001). Chiquita consented to the entry of an order that requires Chiquita to cease and desist from violating those

- 7 -

provisions. The SEC also filed a settled complaint in federal court seeking entry of a consent order requiring Chiquita to pay a $100,000 civil penalty. Chiquita settled the action without admitting or denying the Commission's allegations. The order found Chiquita violated the books and records and internal control provisions as a result of the conduct of its Colombian subsidiary, Banadex. According to the order, employees of Banadex authorized the payment of the equivalent of $30,000 to local customs officials to secure renewal of a license at Banadex's Turbo, Colombia port facility. The subsidiary's books and records incorrectly identified the two installment payments, made in 1996 and 1997. The SEC concluded Banadex employees made inaccurate entries in the records of the transaction and in Banadex's general ledger to conceal the payment to customs officials. These inaccurate entries constituted a violation by Chiquita of §13(b)(2)(A) by failing to maintain books and records which accurately reflected Banadex's transactions and dispositions of assets. The SEC further found that Chiquita violated §13(b)(2)(B) by failing to maintain a system of internal accounting controls to ensure that Banadex's books and records accurately and fairly reflected the disposition of Banadex's assets. Accordingly, the SEC, pursuant to §21C of the 1934 Act, required that Chiquita cease and desist from committing or causing any violation, and committing or causing any future violation, of §§13(b)(2)(A) and 13(b)(2)(B) of the 1934 Act.

20.     Defendant Fernando Aguirre ("Aguirre") has served as Chairman of Chiquita since May 2004 and as Chief Executive Officer ("CEO") and President since January 2004. Aguirre received a compensation package for fiscal 2006 valued at over $3 million. On April 15, 2007, after the Company entered into the plea agreement and suffered the Colombia and Atlanta losses, Aguirre's employment agreement was renewed and his base salary increased more than 13% to $900,000 per year with a target bonus of 130% of that annual base salary. Aguirre also received a restricted stock award worth $1.2 million and an additional restricted stock grant with a targeted value of $1.6 million, despite his complicity in the wrongdoing alleged herein. His long-term incentive payment for the 2007-2009 performance period was set at $1.6 million. Aguirre resides in and is a citizen of Ohio.

21.    Defendant Morten Arntzen ("Arntzen") has served as a director of Chiquita since 2002. Arntzen received $111,000 in directors' fees in fiscal 2006. Despite the Board's complicity in the wrongdoing, the Board increased the cash component of their pay by more than 60%, from $30,000 to $50,000 per year, and increased the stock component of their compensation by 100%, from an annual grant worth $25,000 to an annual grant worth $50,000, resulting in a combined directors' fee of $130,000 per year. Arntzen served with Defendant Hills on the Audit Committee that approved the payments to the AUC, the fraudulent accounting for those payments in Chiquita's books and records and the concealment of those payments in Chiquita's reports filed with the SEC. *The Wall Street Journal* reported in August 2007 that Arntzen said "the AUC payments weren't secretive; they were disclosed to Ernst & Young and to company directors on the audit committee." Arntzen told *The Wall Street Journal*: "When I joined the board, I knew the company was making payments to paramilitary groups in Colombia." Arntzen resides in and is a citizen of Connecticut.

22.    Defendant Robert W. Fisher ("Fisher") has served as a director of Chiquita since 2002 and as Acting Chief Operating Officer from March to August of 2002. He received over $101,000 in directors' fees in fiscal 2006. Due to the increases in directors' fees, Fisher now receives an annual fee of $130,000 per annum and other perquisites. Fisher resides in and is a citizen of California.

23.    Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of Chiquita since 2002 and as a member of the Audit Committee between 2003 and 2005. Stanbrook received a directors fee of over $111,000 for fiscal 2006 and now receives a directors' fee of $130,000 per annum and other perks. Stanbrook resides in and is a citizen of Wisconsin.

24.    Defendant Carl H. Lindner ("C. Lindner") served as Chairman and CEO of Chiquita from 1984 until May 22, 2002 and August 13, 2001, respectively, having originally joined the Board in 1976. Through his insurance company, American Financial Group ("AFG"), Lindner controlled nearly 40% of Chiquita's stock until after AFG's bankruptcy in 2003, when his equity interest was reduced to less than 10%. C. Lindner resides in and is a citizen of Ohio.

25.    Defendant Keith E. Lindner ("K. Lindner"), C. Lindner's son, served as Vice Chairman of Chiquita from 1997 until 2001. He served as Chiquita's President and Chief Operating Officer from 1989 to 1997 and in various executive capacities since 1984. K. Lindner was also Co-President and a director of AFG and AFC. K. Lindner resides in and is a citizen of Ohio and Florida.

26.    Defendant Roderick M. Hills ("Hills") served as a director of Chiquita from March 2002 until he resigned in May 2007 and a member of the Audit Committee. Hills learned about the payments to the AUC in April 2002, a month after he joined the Board. According to notes later produced by the Company's outside counsel, in reaction to counsel's warnings that the payments had to stop, Hills' urged continuation of the payments, stating "just let them sue us, come after us." Even after the DOJ learned of the payments and told Hills the payments were illegal, Hills refused to curtail them and permitted approximately $145,000 to be paid. On December 22, 2003, Hills emailed fellow directors: "we appear to [be] committing a felony." Hills resides in and is a citizen of Washington, D.C.

27.    Defendant Robert W. Olson ("Olson") served as Senior Vice President and General Counsel of Chiquita from before 1997 until he retired in August 2006. Olson approved the illegal payments and helped devise the scheme to conceal and falsely account for them. He provided legal counsel and advice to many of the Defendants and Chiquita throughout this period and approved many false and misleading statements to shareholders. When Kirkland & Ellis told Chiquita it "should STOP PAYMENTS IMMEDIATELY," Olson (and Hills) argued against doing so and was involved in continuing to conceal the payments from the DOJ. Even when the DOJ told Olson on April 23, 2003 the payments were illegal, he and Hills caused or permitted Chiquita to make more payments of over $145,000 through February 2004. Olson resides in and is a citizen of Ohio.

28.    Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of Chiquita from March 2002 until 2007. Benjamin was a member of Chiquita's Audit Committee during his Board membership. Benjamin resides in and is a citizen of New York.

29.     Defendant William W. Verity ("Verity") served as a director of Chiquita from 1994 until March 2002.  Verity served on the Board's Compensation and Audit Committees from 1998-2002. Verity resides in and is a citizen of South Carolina.

30.     Defendant Steven G. Warshaw ("Warshaw") served as a director of Chiquita from 1997 until March 2002.  Warshaw also served as Chiquita's President and Chief Operating Officer from 1997-2001, as Chief Financial Officer from 1994-1998 and as Executive Vice President and Chief Administrative Officer from 1990-1997, having served in various executive capacities at Chiquita since 1986 when the Lindners took control.  Warshaw is a resident and citizen of Ohio.

31.     Defendant Jeffery M. Zalla ("Zalla") has served as Senior Vice President and Chief Financial Officer since May 2005.  From April to June, 2005, he served as Vice President, Finance for Chiquita Fresh Group-North America.  He served as Vice President, Treasurer, and Corporate Responsibility Officer from April 2003 to April 2005, Corporate Responsibility Officer and Vice President, Corporate Communications from September 2001 to April 2003 and Vice President and Corporate Responsibility Officer from October 2000 to September 2001.  Zalla is a resident and citizen of Kentucky.

32.     Defendant James B. Riley ("Riley") served as Senior Vice President and Chief Financial Officer of Chiquita from 2001 until August 2004.  Riley is a resident and citizen of Ohio.

33.     Defendant Warren J. Ligan ("Ligan") served as Chief Financial Officer of Chiquita from 1998 until 2000, having previously served in various executive capacities since 1993.  Ligan is a resident and citizen of California.

34.     Defendant Robert F. Kistinger ("Kistinger") has served as President and Chief Operating Officer of the Company's Chiquita Fresh Group since March 2000, having previously served as President and Chief Operating Officer of the Company's Chiquita Banana Group from 1997 until 2000, as Senior Executive Vice President of the Chiquita Banana Group from 1994 to 1997, as President of

- 11 -

Chiquita Banana Group-North America from 1996 to 1997, and in various other executive capacities since 1980. Kistinger is a resident and citizen of Ohio

35.    Defendant Oliver W. Waddell ("Waddell") served as a director of Chiquita from 1994 to March 2002 and served on the Audit and Compensation Committees. Waddell is a resident and citizen of Ohio.

36.    Defendant William A. Tsacalis ("Tsacalis") was Vice President, Controller and Chief Accounting Officer of Chiquita and currently serves at Vice President, Finance and Treasurer. Tsacalis is a resident and citizen of Ohio.

37.    Defendant John W. Braukman III ("Braukman") is Senior Vice President of New Business Development and served as Senior Vice President and Chief Financial Officer of Chiquita until June 2005 when he was replaced by Zalla. Braukman is a resident and citizen of Connecticut.

## DEFENDANTS' FIDUCIARY DUTIES

38.    By reason of their positions as officers and directors of Chiquita and because of their ability to control corporate affairs of Chiquita, Defendants owed Chiquita and its shareholders fiduciary obligations of care, candor, compliance, trust, and loyalty, and were required to manage Chiquita in a fair, just, honest and equitable manner and to act in furtherance of the best interests of Chiquita and its shareholders and not in furtherance of their personal interest or benefit.

39.    Each director and officer of the Company owes to Chiquita the fiduciary duty to comply with the laws of the United States and the other countries Chiquita does business in and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. Each owes an obligation of good faith and fair dealing. As officers and directors of a publicly held company, Defendants had a duty to disseminate accurate and truthful information about the Company and an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections and to not advance their own personal or financial interests over and at the expense of the Company's public shareholders.

- 12 -

40.    Defendants, because of their positions of control and authority as directors or officers of Chiquita, were able to and did control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their positions with Chiquita, each Defendant had access to all non-public information about the financial condition, operations and future business prospects of Chiquita, including, without limitation, the illegal and improper activities in which the Defendants caused Chiquita to engage.

41.    To discharge their duties, the officers and directors of Chiquita were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Chiquita.

42.    During all relevant times, each Defendant occupied positions with Chiquita that made him privy to confidential and proprietary information concerning Chiquita.  Because of these positions and such access, each Defendant knew the true facts specified herein had not been disclosed to and were concealed from Chiquita's shareholders.  Defendants, as fiduciaries entrusted with non-public information, were obligated to disclose material information regarding Chiquita and to take any and all actions necessary to ensure the officers and directors of Chiquita did not abuse their positions of trust, loyalty and fidelity in a manner that caused the Company to violate the law.

## FACTUAL ALLEGATIONS

43.    In an effort to present themselves as competent, honest stewards and managers of Chiquita, Defendants repeatedly misrepresented they were overseeing and managing Chiquita in a lawful and ethical manner and Chiquita had internal accounting and other controls to assure its accounting was proper and it was in compliance with anti-corruption and anti-bribery laws.  Defendants also misrepresented Chiquita had effective training programs for its executives and managers in this regard.  Defendants have caused Chiquita to engage in a pattern and practice of making illegal and improper bribery payments and engaging in other illegal activities in Colombia and making false and misleading statements to conceal them, violating U.S. and foreign law.  Defendants also repeatedly

misled Chiquita's shareholders to entrench and enrich themselves by boosting Chiquita's apparent short-term results and paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage Chiquita.

44.     For many years in their Annual Reports and other communications with shareholders, Chiquita's directors stressed their successful management and oversight of Chiquita, its ethical behavior and compliance with laws.  These representations were false and misleading and made with reckless disregard for the truth by the directors.  The Annual Reports were false and misleading for failing to disclose the existence and nature of the Colombian payments, the falsification of financial statements, the circumvention of or material weakness in Chiquita's accounting controls, Chiquita's other improper activities in Colombia, the fact that Chiquita's funds were being used to support terrorism, the Defendants' *ultra vires* conduct, and the primary reason for Chiquita's apparent progress was the improper and *ultra vires* conduct.

45.     The statements in Chiquita's Annual Reports specified below were known by Defendants to be false when those statements were made.  To justify continuation of their lucrative positions, Defendants wanted to make it appear Chiquita was succeeding and in an ethical, lawful manner.  The repeated positive and reassuring statements about Chiquita's controls and procedures to comply with laws, rules and conventions, Chiquita's actual compliance with them, and Chiquita's dedication to high ethical standards were false.  In fact, Chiquita's top officers and directors were permitting circumvention of those procedures and controls by permitting the payment of bribes and illegal arms shipments.  Chiquita's financial statements also were false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make provision for the monetary fines, penalties and damages that would inevitably result from those payments.

46.     In Chiquita's 1997 Annual Report to Shareholders, the "Executive Message" signed by C. Lindner, K. Lindner and Warshaw, stated: "We continue to make measurable progress toward objectives which further the realization of Chiquita's earnings capacity." Elsewhere, the Report stated:

- 14 -

"Chiquita's corporate values balance good citizenship and social responsibility with profitable business growth. . . . The Company has a strong commitment to ethical, social . . . standards . . . . Consumers worldwide are concerned about . . . social issues. They expect companies to fulfill their responsibilities of global citizenship. . . . Chiquita welcomes the interest in ethical standards and pledges to continue improving . . . social conditions where the Company operates."

47.    The 1997 Annual Report contained the following:

**Statement of Management Responsibility**

The financial information presented in this Annual Report is the responsibility of Chiquita Brands International, Inc. management, which believes that it presents fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

The Company's system of internal accounting controls, which is supported by formal financial and administrative policies, is designed to provide reasonable assurance that the financial records are reliable for preparation of financial statements and that assets are safeguarded against losses from unauthorized use or disposition. Management reviews, modifies and improves these systems and controls as changes occur in business conditions and operations. The Company's worldwide internal audit function reviews the adequacy and effectiveness of controls and compliance with policies.

The Audit Committee of the Board of Directors reviews the Company's financial statements, accounting policies and internal controls. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors to discuss these matters.

48.    Chiquita's 1998 Annual Report stated:

Chiquita is a responsible corporate citizen to a broad community of our customers, consumers, employees and neighbors.

49.    The "Executive Message" in the 1998 Annual Report signed by C. Lindner, K. Lindner and Warshaw stated: "Chiquita Brand International's 1998 operating results reflect continued progress . . . ."

50.    Chiquita's 1998 and 1999 Annual Reports contained the same "Statement of Management Responsibility" as in its 1997 Annual Report, which statements were false and misleading for the same reasons.

51.    Chiquita's 2000 Annual Report to Shareholders contained the same "Statement of Management Responsibility" as in its 1997 Annual Report, which statements were false and misleading for the same reasons.

52.    During 2000, Chiquita published a "Corporate Responsibility Report." It stated in a letter signed by Warshaw:

**A New Spirit of Openness:  Letter from Steve Warshaw**

To some, this Report may seem like it was along time coming.

The Chiquita of today emerged, over the course of 100 years, from companies holding various names, including the United Fruit Company and United Brands. . . .

But along the way, the United Fruit Company became known as "the octopus," an organization reputed to have such broad reach and influence that it could hold sway over governments and the lives of its employees.  This reputation was born of many things, including allegations of the Company's participation in labor rights suppression in Colombia in 1928 and involvement in a government overthrow in Guatemala in 1954, as well as its involvement in a bribery scandal in Honduras in 1975.  And in the years since, some would argue that the Company has been closed and defensive in addressing concerns about its standards and practices.  In the eyes of many, all of this casts a shadow, even today, over the Company.

Times have changed.  And so has our Company.

Our stakeholders expect more of us.  We expect more of ourselves.  Our understanding of our role in society, and what it means to be a responsible corporate citizen, is quite different than it was not long ago.

Three years ago, in the wake of particularly damaging media coverage, we embarked on a disciplined path toward Corporate Responsibility. . . . This was not to be a public relations exercise, but a management discipline – a way to align ourselves around a set of Core Values, to build a sense of common purpose across our different units, and to get the best out of our people. . . . We have learned that building trust demands a new spirit of openness and honesty within the Company, and that earning the trust of our many stakeholders is vital to our success. . . . Of course there is compelling moral value to this work.  But it also makes smart business sense. . . .

53.    Elsewhere the 2000 Corporate Responsibility Report stated:

**Our Core Values and Code of Conduct** – These standards are the cornerstones of our commitment to Corporate Responsibility.  Our Core Values guide our strategic business decisions and help us balance the needs of our stakeholders, and our Code of Conduct translates these Values into everyday behaviors. . . .

*INTEGRITY*

We live by our Core Values

We communicate in an open, honest and straightforward manner

We conduct business ethically and lawfully

54.    In the 2000 Corporate Responsibility Report, Defendants told the shareholders they had

a series of controls, committees and procedures that ensured compliance with these core values:

**Creating Governance:  Support and Accountability**

Governance Structure

Chiquita's commitment to Corporate Responsibility begins at the top of the organization and is supported by a governance structure designed to provide guidance, resources, and accountability for the responsible conduct of employees in their everyday jobs.

Audit Committee

In 2000, we expanded the role of the Audit Committee of the Company's Board of Directors to include oversight of whether the Company has the right people, policies and programs in place to properly manage Corporate Responsibility.  The Audit Committee has three members, all of whom are outside directors.  The Company's Corporate Responsibility Officer has open access to Audit Committee members and reports to them periodically as part of regularly scheduled Committee meetings.

Senior Management Group for Corporate Responsibility

The effective achievement of our standards is the responsibility of our senior management.  Twelve top operating and administrative managers of our worldwide businesses have been meeting about every two months since October 1998 specifically to discuss our Corporate Responsibility strategy and performance.  These senior managers are responsible for providing vision and effective leadership for Corporate Responsibility, modeling our Core Values in their personal behavior, and holding the organization accountable for achieving credible progress toward our objectives.

Corporate Responsibility Officer

In May 2000, Chiquita appointed a full-time Vice President and Corporate Responsibility Officer.  The role of the Corporate Responsibility Officer is to oversee the design, implementation, management, and improvement of Corporate Responsibility practices throughout the Company.  He is also responsible for the development of measurement, verification, accountability, communication, and reporting systems.  He serves as an internal resource for best practices in Corporate Responsibility, communicates with stakeholders about the Company's performance, and tracks emerging issues of importance to the Company and its stakeholders.  He reports to the President and Chief Executive Officer.

- 17 -

Jeff Zalla is a ten-year Chiquita employee and has led our Corporate Responsibility Steering Committee since its inception in 1998.

Corporate Responsibility Steering Committee

The Senior Management group is currently supported by a Corporate Responsibility Steering Committee, which includes the Corporate Responsibility Officer, the Vice President of Human Resources, five directors and managers from representative Chiquita business units, and one rotating member of Senior Management. This group has met monthly since October 1998 and has contributed enormously to the design and implementation of our Corporate Responsibility efforts. The Steering Committee has worked to ensure that our strategies and objectives are appropriate and that our tools for assessment and planning are effective for all business units. It has also engaged other corporate functions such as Legal, Human Resources and our environmental group in efforts to integrate Corporate Responsibility into our everyday management practices. . . .

Our Code of Conduct

Our Code of Conduct translates our Core Values into everyday behaviors. For decades, Chiquita has had a Code of Conduct that dealt with ethical and legal behavior and compliance with Company policies. . . . Our Code of Conduct now embodies standards in the areas of food safety, labor standards, employee health and safety, community involvement, environmental protection, ethical behavior, and legal compliance.

55.    Chiquita's 2001 Annual Report stated:

We made considerable progress on corporate responsibility, breaking new ground with our first Corporate Responsibility Report (www.chiquita.com), which earned praise for its honesty, transparency and measurement against rigorous third-party environmental and social standards. As a Company, we will continue to be guided by Chiquita's Core Values of integrity, respect, opportunity and responsibility in our dealings with shareholders, employees, customers, suppliers and the communities in which we do business.

For 2001, Chiquita reported $155 million earnings . . . (EBITDA) . . . [and] an improvement of 7% over the previous year. . . .

We are confident that . . . our industry-leading production capabilities in Latin America, and the Chiquita brand, which is among the best-known and most respected brands in the world, provide us a strong platform for growth.

56.    Chiquita's 2001 Annual Report contained the same "Statement of Management Responsibility" as in the 1997 Annual Report, which statements were false and misleading for the same reasons. Chiquita's 2001 Corporate Responsibility Report contained similar statements as in the 2000 Corporate Responsibility Report, which were false and misleading for the same reasons.

- 18 -

57.    Chiquita's 2002 Annual Report stated:

**Here's what we're doing to improve corporate responsibility**.  In 2002, Chiquita again demonstrated its commitment to high . . . social standards. . . .  Our corporate responsibility reports also continue to earn recognition for their honesty, transparency and clear performance measurement.  Our first report was ranked best in the world among food companies by SustainAbility and the United Nations Environmental Program, and our second report shared the first-ever award for outstanding sustainability reporting from a coalition of more than 80 environmental and investment groups.  I encourage you to review our corporate responsibility reports at www.chiquita.com.

We are committed to managing Chiquita to the highest standards of integrity and propriety in all our affairs, from our farms to our boardroom.  Our achievements are a great source of price among our employees.

We have confidence in Chiquita's turnaround.

58.    Elsewhere the 2002 Annual Report stated:

**Why Are You Continuing to Invest in Corporate Responsibility?**

[I]n 1998, Chiquita took on corporate responsibility as a major priority following years of criticism from nongovernmental organizations and the media.  Management decided to turn around the company's reputation. . . .  In delivering on our corporate responsibility goals, we have gone from being a target of criticism to a focal point of praise.  We could not buy that kind of turnaround in corporate reputation.  We can only earn it, by committing to high standards and living up to them. . . .  [W]e continue to invest in corporate responsibility because it is the right thing to do. . . .

Integrity

* We live by our Core Values.

* We communicate in an open, honest and straightforward manner.

* We conduct business ethically and lawfully.

59.    Chiquita's 2002 Annual Report contained the same "Statement of Management Responsibility" as in the 1997 Annual Report, which was false and misleading for the same reasons.

60.    Chiquita's 2003 Annual Report stated:

We also accomplished new milestones in corporate responsibility . . . .  2003 was an excellent year for Chiquita . . . .  The turnaround of Chiquita is well underway. . . .  Approximately 80 percent of the $1 billion increase in 2003 revenue from 2002 was due to our acquisition in March of Atlanta AG, a German fresh produce distributor.  Operating income for 2003 rose to $140 million . . . .  We are very pleased with Chiquita's achievements in 2003 . . . .

- 19 -

61.    Elsewhere, the 2003 Annual Report stated in a Q/A session:

A.    As I explained earlier, I believe in decisions made on the basis of values and principles. I am impressed by Chiquita's Core Values and the company's accomplishments in corporate responsibility. Chiquita's high standards of . . . social performance enhance the company's reputation and ultimately its brand. There are a growing number of investors who seek companies with track records in corporate responsibility. Chiquita should benefit from this trend. I will continue to support our corporate responsibility program, because it is the right thing to do and it is good for Chiquita and our stakeholders.

62.    Elsewhere, the 2003 Annual Report stated:

OUR COMMITMENT TO ACHIEVE HIGH STANDARDS OF ENVIRONMENTAL, SOCIAL AND ETHICAL PERFORMANCE IS ROOTED IN OUR CORE VALUES – INTEGRITY, RESPECT, OPPORTUNITY AND RESPONSIBILITY – WHICH, ALONG WITH OUR CODE OF CONDUCT, GUIDE OUR LONG-TERM STRATEGIES AND EVERYDAY ACTIONS.

63.    Chiquita's 2003 Annual Report contained the same "Statement of Management Responsibility" as in the 1997 Annual Report, which was false and misleading for the same reasons.

64.    Chiquita's 2003 Annual Report also stated:

The Company has international operations in many foreign countries, including those in Central and South America. . . . The Company must continually evaluate the risks in these countries, including Colombia, where an unstable environment has made it increasingly difficult to do business. The Company's activities are subject to risks inherent in operating in these countries, including government regulation, currency restrictions and other restraints, burdensome taxes, risks of expropriation, threats to employees, political instability and terrorist activities, including extortion, and risks of action by U.S. and foreign governmental entities in relation to the Company. Should such circumstances occur, the Company might need to curtail, cease or alter its activities in a particular region or country. Chiquita's ability to deal with these issues may be affected by applicable U.S. laws. The Company is currently dealing with one such issue, which it has brought to the attention of the appropriate U.S. authorities who are reviewing the matter. Management currently believes that the matter can be resolved in a manner that is not material to the Company, although there can be no assurance in this regard.

No disclosure was made of the bribery payments or arms-provisions relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

65.    On May 10, 2004, Defendants caused Chiquita to issue a release stating:

DEPARTMENT OF JUSTICE INVESTIGATION

In April 2003, the company's management and audit committee, in consultation with the board of directors, voluntarily disclosed to the U.S. Department of Justice that the company's banana producing subsidiary in Colombia has been forced to make "protection" payments to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The company's sole reason for submitting to these payment demands has been to protect its employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Justice Department was made because the company's management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the Justice Department's guidance. Following the voluntary disclosure, the Justice Department undertook an investigation. The company has cooperated with that investigation.

Recently, the Department advised that, as part of the investigation, it will be evaluating the role and conduct of the company and some of its officers. The company cannot predict the outcome of the investigation or its possible effect on the company or its Colombian subsidiary.

66.     Chiquita's 2004 Annual Report discussed the now-disclosed Colombia payments and the

DOJ investigation, stating:

FACING A NEW CHALLENGE IN COLOMBIA

In May 2004, Chiquita announced that the company's management and audit committee, in consultation with the board of directors, had voluntarily disclosed to the U.S. Department of Justice more than a year earlier that the company's banana producing subsidiary in Colombia had been forced to make protection payments to certain groups in that country. The company's sole reason for submitting to these payment demands was to protect employees from the risks to their safety if the payments were not made.

The voluntary disclosure to the Department of Justice was made because management became aware that these groups had been designated as foreign terrorist organizations under a U.S. statute that makes it a crime to support such an organization. The company requested the department's guidance. Following the voluntary disclosure, the Department of Justice undertook an investigation, with which the company has cooperated. To date, this investigation has not concluded and the company cannot predict its outcome. Chiquita sold its Colombian banana-producing and port operations to a local producer and exporter of bananas in June 2004. . . .

The Company is currently dealing with one such issue involving protection payments that its Colombian banana producing subsidiary (sold in June 2004) had been forced to make to certain groups in that country which have been designated under United States law as foreign terrorist organizations. The Company's management and its audit committee, in consultation with the board of directors, voluntarily disclosed this

issue to the U.S. Department of Justice in April 2003 and requested its guidance. In late March 2004, the Department of Justice advised that, as part of its investigation, it would be evaluating the role and conduct of the Company and some of its officers in the matter. The Company intends to continue its cooperation with this investigation, but it cannot predict the outcome or any possible adverse effect on the Company, which could include the imposition of fines.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations. The stated "sole" reason for the payments was false; they were made because the AUC helped Defendants control labor conditions in Colombia, continue the Company's large profits from its Columbian operations (its most profitable operations), and boost their bonuses. Chiquita earned nearly $50 million in profit from its Columbian operations between September 10, 2001, when the AUC was designated a terrorist group, and February 2004.

67.    Chiquita's 2004 Annual Report contained the following "Statement of Management Responsibility," signed by Aguirre, Braukman and Tsacalis:

> The financial statements and related financial information presented in the Annual Report are the responsibility of Chiquita Brands International Inc. management, which believes that they present fairly the Company's consolidated financial position and results of operations in accordance with generally accepted accounting principles.

> The Company's management is responsible for establishing and maintaining adequate internal controls. The Company has a system of formal accounting controls, which includes internal control over financial reporting and is supported by internal financial and administrative policies. This system is designed to provide reasonable assurance that the Company's financial records can be relied on for preparation of its financial statements and that its assets are safeguarded against loss from unauthorized use or disposition.

> The Company also has a system of disclosure controls and procedures designed to ensure that material information relating to the Company and its consolidated subsidiaries is made known to the Company representatives who prepare and are responsible for the Company's financial statements and periodic reports filed with the Securities and Exchange Commission ("SEC"). The effectiveness of these disclosure controls and procedures is reviewed quarterly by management, including the Company's Chief Executive Officer and Chief Financial Officer. Management modifies and improves these disclosure controls and procedures as a result of the quarterly reviews or as changes occur in business conditions, operations or reporting requirements.

The Company's worldwide internal audit function, which reports to the Audit Committee, reviews the adequacy and effectiveness of controls and compliance with the Company's policies.

The Audit Committee of the Board of Directors consists solely of directors who are considered independent under applicable New York Stock Exchange rules. One member of the Audit Committee, Roderick M. Hills, has been determined by the Board of Directors to be an "audit committee financial expert" as defined by SEC rules The Audit Committee reviews the Company's financial statements and periodic reports filed with the SEC, as well as the Company's internal control over financial reporting including its accounting policies. In performing its reviews, the Committee meets periodically with the independent auditors, management and internal auditors, both together and separately, to discuss these matters.

The Audit Committee engages Ernst & Young, an independent registered accounting firm, to audit the Company's financial statements and its internal control over financial reporting and express opinions thereon. The scope of the audits is set by Ernst & Young, following review and discussion with the Audit Committee. Ernst & Young has full and free access to all Company records and personnel in conducting its audits. Representatives of Ernst & Young meet regularly with the Audit Committee, with and without members of management present, to discuss their audit work and any other matters they believe should be brought to the attention of the Committee. Ernst & Young has issued an opinion on the Company's financial statements. . . . Ernst & Young has also issued an audit report on management's assessment of the Company's internal control over financial reporting. . . .

### MANAGEMENT'S ASSESSMENT OF THE COMPANY'S INTERNAL CONTROL OVER FINANCIAL REPORTING

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on management's assessment, management believes that, as of December 31, 2004, the Company's internal control over financial reporting was effective based on the criteria in Internal Control-Integrated Framework.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

68.    Chiquita's 2005 Annual Report contained the same "Statement of Management Responsibility" (signed by Aguirre and Zalla in the 2005 Report) as in the 2004 Annual Report, except that the section entitled "Management's Assessment of the Company's Internal Control Over Financial Reporting was revised as follows:

- 23 -

> The company's management assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2005. Based on management's assessment, management believes that, as of December 31, 2005, the company's internal control over financial reporting was effective based on the criteria in *Internal Control-Integrated Framework*, as set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In addition, a new paragraph was added in the 2005 Report:

> Chiquita has published its Core Values and Code of Conduct which establish the company's high standards for corporate responsibility. The company maintains a hotline, administered by an independent company, that employees can use to confidentially and anonymously communicate suspected violations of the company's Core Values or Code of Conduct, including concerns regarding accounting, internal accounting control or auditing matters. All reported accounting, internal accounting control or auditing matters are forwarded directly to the Chairman of the Audit Committee of the Board of Directors.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

69.    Chiquita's 2005 Annual Report discussed Colombia and the DOJ investigation, repeating, almost verbatim, the Company's May 10, 2004 release. The discussion in the 2005 Report added:

> In September-October 2005, the company was advised that the investigation is continuing and that the conduct of the company and some of its officers and directors remains within the scope of the investigation. The company intends to continue its cooperation with this investigation, but it cannot predict its outcome or any possible adverse effect on the company (including the materiality thereof), which could include the imposition of fines and/or penalties.

70.    Chiquita's 2005 Annual Report contained a "Corporate Responsibility" section:

> Our Core Values – Integrity, Respect, Opportunity and Responsibility – guide our daily decisions, and our Code of Conduct clearly defines our standards for corporate responsibility. In addition to strict legal compliance, we define corporate responsibility to include social responsibilities, such as respect for the environment and the communities where we do business, the health and safety of our workers, labor rights and food safety. We see a clear link between our Core Values and our company's vision, mission and sustainable growth strategy.

No disclosure was made of the continuing bribery payments or arms-providing activities relating to the AUC or Chiquita's other improper or illegal activities or the risks they posed with regard to legal violations in the U.S. and Colombia and the viability and value of Chiquita's Colombian operations.

71.    Chiquita's 1997-2005 financial statements distributed to the shareholders were false and misleading in failing to disclose Defendants' improper, wasteful and *ultra vires* payments (and the continuation thereof after the DOJ found out about them), as well as the contingent liabilities those payments exposed Chiquita to, including large criminal or civil penalties and the diminution of value of Chiquita's Colombian operations.

72.    From 1997 through February 2004, Chiquita made improper or illegal and *ultra vires* payments to a terrorist organization in Colombia, the AUC. The AUC was formed around April 1997 to organize loosely affiliated paramilitary groups that emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. Defendants caused or permitted Chiquita to make payments to the AUC nearly every month from 1997 through February 2004, making over 100 payments totaling over $1.7 million. Defendants caused Chiquita to pay Colombian terrorist organizations for approximately 15 years, which payments were *ultra vires*, improper or illegal.

73.    Defendants caused or permitted Chiquita to improperly record these payments in its corporate books and records as "security payments," payments for "security," or "security services" to conceal the true nature of the payments. Neither Chiquita nor Banadex ever received any security services or security equipment for the payments. From the outset, Chiquita and Banadex officers recognized these payments were illicit and improper, which is why they falsely accounted for them.

74.    Chiquita's payments to the AUC were reviewed and approved by high-ranking officers and directors. They knew the Company was paying the AUC and the AUC was a violent, paramilitary organization. In-house counsel for Chiquita conducted a review of the payments in August 2000 and prepared a memorandum detailing that review. The memorandum recognized that the party being paid was a front for the AUC and described the AUC as a "widely-known, illegal vigilante organization."

75.     The in-house attorney presented the results of his review to the Audit Committee in September 2000. There was no instruction to stop the payments or to report the payments to U.S. or Colombian authorities. Notwithstanding the knowledge of senior officers and directors that the Company was making regular payments to the AUC, Chiquita continued to make the payments.

76.     On September 10, 2001, the AUC was designated as a Foreign Terrorist Organization by the U.S. Department of State, making Chiquita's payments to the AUC illegal under the material support statute, 18 U.S.C. §2339B. On October 31, 2001, the AUC was designated as a Specially-Designated Global Terrorist by the U.S. Department of the Treasury, making the payments illegal under the International Emergency Economic Powers Act, 50 U.S.C. §1705(b), and the underlying Global Terrorism Sanctions Regulations, 31 C.F.R. §594.204.

77.     After at least 2000, Chiquita's payments to the AUC were reported to the Audit Committee, the agent of the full Board, on a quarterly basis. Chiquita recorded them in its books and records as "security payments" or payments for "security services" after it was known to senior officers and directors that no security services were being provided to Chiquita or Banadex and the party being paid was a front for the AUC. In late March 2002, senior officers of Chiquita established new procedures for paying the AUC in Santa Marta directly in cash and keeping a private ledger of these cash payments. The procedures involved paying a senior officer of Banadex additional "income" from the Banadex general manager's fund. That money, in turn, was provided to an employee of Banadex, who delivered the cash directly to the AUC in Santa Marta. The senior Banadex officer reported this additional "income" on his Colombian tax return, and Banadex increased the payments to him to cover this additional personal tax liability. On April 23, 2002, these new procedures were reviewed at a meeting of the Audit Committee in Chiquita's Cincinnati headquarters. Chiquita's books and records never reflected that the ultimate and intended recipient of the payments was the AUC.

78.     Defendants caused Chiquita to continue to pay the AUC even after the payments were brought to the attention of its senior executives and Board members during a Board meeting held in

- 26 -

September 2000. Chiquita continued to pay the AUC after the U.S. designated the AUC as a FTO on

September 10, 2001 and a Specially-Designated Global Terrorist on October 30, 2001. Chiquita

continued to pay the AUC after gaining knowledge of the AUC's designation as an FTO. Defendants

caused Chiquita to continue to pay the AUC after outside counsel repeatedly advised them, beginning

in late February 2003, to stop the payments and leave Columbia. They caused Chiquita to continue to

pay the AUC after DOJ officials told them on April 24, 2003 that the payments were illegal and could

not continue. They caused Chiquita to continue to pay the AUC after outside counsel advised them on

September 8, 2003 that the DOJ had given no assurances the Company would not be prosecuted for

making the payments. They caused Chiquita to continue to pay the AUC after one of its directors

acknowledged in an internal email on December 22, 2003 that "we appear [to] be committing a

felony."

79.    Outside counsel's advice to Defendants was memorialized in contemporaneous

memoranda and notes. Among other things, outside counsel advised Defendants:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: 'CANNOT MAKE THE PAYMENT'"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out
  through repetition. Buz [business] decision to stay in harm's way. Chiquita
  should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given
  the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

80.    In April 2003, according to outside counsel's notes concerning a conversation about the payments to the AUC, a senior officer of Chiquita said as to the DOJ: "His and [a director's] opinion is just let them sue us, come after us. This is also [a senior officer's] opinion." Four days later, Chiquita senior officers instructed their subordinates to "continue making payments" to the AUC.

81.    In April 2003, the DOJ learned of the payments to the AUC. DOJ officials told Defendants that Chiquita's payments to the AUC were illegal and could not continue. The DOJ also cautioned them, as Chiquita's outside counsel had warned them earlier, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." Chiquita's outside counsel later stated in writing that the DOJ never gave Chiquita any assurance that the Company would not be prosecuted for making the payments.

82.    In May 2003, a Chiquita employee was instructed to "continue making payments" to the AUC. Chiquita thereafter continued its payments to the AUC. In a memorandum dated September 8, 2003, outside counsel noted that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

83.    Senior officers and directors of Chiquita were aware the Company was continuing to pay a designated FTO and the Company was subject to criminal prosecution for its conduct. On December 22, 2003, a director of Chiquita sent an email to other directors regarding the Company's ongoing payments to the AUC, in which he said, among other things, "we appear to [be] committing a felony." A week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that "Chiquita is knowingly violating the law."

84.    When the DOJ learned of the continuing payments, it threatened Defendants and Chiquita with criminal prosecution. To protect themselves from possible criminal prosecution, on March 19, 2007, Defendants caused Chiquita to sign a written plea agreement with the United States in which Chiquita was required to admit its guilt. The plea agreement provides for a criminal fine of

- 28 -

$25 million and corporate probation of five years. The plea agreement provided that Chiquita may pay the fine in five annual installments. Chiquita was required to post the first payment of $5 million upon entry of judgment. Chiquita is required to pay an additional $5 million, plus post-judgment interest, each year for the subsequent four years. DOJ stated: "Defendant Chiquita has pled guilty to a very serious charge. In support of its guilty plea, the Company has admitted the truth of the facts sets [sic] forth in the Factual Proffer." It emphasized that "Chiquita . . . admitted as part of its guilty plea that it continued to engage in the same criminal conduct after its voluntary disclosure." DOJ's Sentencing Memorandum states: "It was particularly important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager."

85.     When the DOJ threatened the Defendants and Chiquita with criminal prosecution, the Defendants abused their continuing control of Chiquita by causing it to plead guilty and pay a huge fine in return for a promise from the government not to prosecute the Chiquita executives involved in the illegal conduct, thus damaging the Company to protect themselves. In order to assure that the DOJ did not prosecute any of the Chiquita directors criminally, the directors have continued to employ key wrongdoers in important corporate positions, have paid off other employees with generous severance packages and "confidentiality" agreements and promises not to pursue them civilly for their involvement in the activities which resulted in the criminal plea of Chiquita.

86.     The plea agreement provided for a five-year term of corporate probation. In addition to the general conditions of probation, the agreement provides the following additional conditions: (1) Chiquita must pay the sums set forth in the agreement; (2) Chiquita "shall implement and maintain an effective compliance and ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States Sentencing Guidelines, including, but not limited to, (a) maintaining a permanent compliance and ethics office and a permanent educational and training program relating to federal laws governing payments to, transactions involving, and other dealings with individuals, entities, or countries designated by the United States as Foreign Terrorist Organizations, Specially-Designated Global

- 29 -

Terrorists, Specially-Designated Narcotics Traffickers, and/or Countries Supporting International

Terrorism, and/or any other such federally-designated individuals, entities, or countries, (b) ensuring

that a specific individual remains assigned with overall responsibility for the compliance and ethics

program, and (c) ensuring that that specific individual reports directly to the Chief Executive Officer

and to the Board of Directors of Chiquita . . . , no less frequently than on an annual basis on the

effectiveness of the compliance and ethics program; and (3) pursuant to 18 U.S.C. § 3563(a)(l),

[Chiquita] shall not commit any federal, state or local crimes during the term of probation."

     87.     On March 19, 2007, DOJ issued a release entitled "Chiquita Brands International Pleads

Guilty to Making Payments to a Designated Terrorist Organization, Agrees to Pay $25 Million Fine":

> Under the terms of the plea agreement, Chiquita's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation. . . . The plea agreement arises from payments that Chiquita had made for years to the violent, right-wing terrorist organization United Self-Defense Forces of Colombia [AUC] . . . . Funding a terrorist organization can never be treated as a cost of doing business," stated U.S. Attorney Taylor. "American businesses must take note that payments to terrorists are of a whole different category. They are crimes. . . .

### CHIQUITA'S PAYMENTS TO THE AUC

> [T]he investigation leading to this prosecution developed evidence that for over six years – from sometime in 1997 through Feb. 4, 2004 – Chiquita paid money to the AUC in two regions of the Republic of Colombia . . . . In total, Chiquita made over 100 payments to the AUC amounting to over $1.7 million. . . . Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees.

> For several years Chiquita paid the AUC by check through various intermediaries. Chiquita recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services." Chiquita never received any actual security services in exchange for the payments.

> Beginning in June 2002, Chiquita began paying the AUC in Santa Marta directly and in cash according to new procedures established by senior executives of Chiquita. The newly-implemented procedures concealed the fact that Chiquita was making direct cash payments to the AUC. A senior Chiquita officer had described these new procedures to Chiquita's Audit Committee on April 23, 2002. . . .

Beginning on Feb. 21, 2003, outside counsel emphatically advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Outside counsel advised Chiquita:

"Must stop payments."

"Bottom Line: CANNOT MAKE THE PAYMENT"

"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"

"General Rule: Cannot do indirectly what you cannot do directly"

Concluded with: "CANNOT MAKE THE PAYMENT"

"You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

"[T]he company should not make the payment." . . . .

Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004. From April 24, 2003 (the date of Chiquita's initial disclosure to the Justice Department) through February 4, 2004, Chiquita made 20 payments to the AUC totaling over $300,000.

88.     Mario Iguarán, Colombia's Attorney General, has said he will seek extradition of eight Chiquita officials connected to the case. He also is seeking information about charges that in 2001 a ship unloaded some 3,400 AK-47 rifles and 4 million rounds of ammunition in a Banadex-controlled dock in Colombia destined for the AUC. These charges were detailed in a 2003 report of the Organization of American States. "This was a criminal relationship," said Iguarán in a report published in the Washington Post. "Money and arms and, in exchange, the bloody pacification of Urabá."

89.     Roscoe Howard Jr., former U.S. Attorney for Washington D.C., who helped lead the Chiquita prosecution before he left his position in 2004, stated: "I regarded this as a murder investigation" from the start. He also stated: "Even though Chiquita didn't murder anyone, that's what the money was used for – to buy weapons."

90.    In 2004, due to the problems created in its Colombia operations due to the illegal activities the Defendants had caused Chiquita to engage in there, and hoping to avoid extradition of Chiquita insiders to Colombia for their criminal conduct, the Defendants caused Chiquita to sell Chiquita's Colombian banana-producing operations. Due to these circumstances, this was a "fire sale," even though those Colombian operations had been Chiquita's most profitable operations. Chiquita earned some $50 million in profits from its Colombian banana-producing operations from September 10, 2001 through January 2004. The forced sale of the Colombian operations deprived Chiquita of a huge source of supply of bananas necessary to conduct its business – requiring that Chiquita, while selling the Colombian banana operations also secured a supply of bananas by purchasing them from another source at premium, unprofitable, prices. The sale of this valuable asset produced a $9 million loss when the long-term banana purchase contract is factored in.

91.    While Chiquita's Colombian banana operation had been a very profitable part of Chiquita's business, the Defendants' illegal and improper acts largely destroyed the value of the asset. The Defendants had to sell that operation at a large loss. The Company reported:

> In June 2004, the Company sold its banana-producing and port operations in Colombia. . . . In connection with the sale, Chiquita entered into eight-year agreements to purchase bananas . . . from affiliates of the buyer . . . at above-market prices. This resulted in a liability of $33 million at the sale date, which represents the estimated net present value of the above-market premium to be paid for the purchase of bananas over the term of the contract. . . . The Company recognized a before-tax loss of $9 million and an after-tax loss of $4 million on the transaction . . . .

92.    By 2002, Chiquita's insiders knew that they would have to cause Chiquita to sell off its Colombian banana operations due to the longstanding illegal conduct they had caused or permitted there, in part to try to avoid the extradition of several Chiquita insiders to Colombia for their criminal conduct. This sale – which they knew would take place under distress circumstances – deprived Chiquita of millions of dollars in revenues from what had been its most profitable operations, which reflected badly on Defendants' management and stewardship of Chiquita. Thus, to try to make up for the lost revenues and profits Chiquita would soon suffer, the Defendants in haste, and without adequate

research, investigation, evaluation or due diligence, acquired a German fruit distribution business,

known as Atlanta A.G., at an excessive price. Because of the excessive price the Defendants caused

Chiquita to pay for Atlanta, almost $43 million dollars in goodwill went onto Chiquita's balance sheet.

According to Chiquita's 2002 Annual Report:

> By exchanging loans for Atlanta's underlying equity interests, we were able to acquire ownership in a virtually cashless transaction that closed in March 2003. To boost Atlanta's profitability and maximize the value of our investment, we hired as president Peter Jung, who brings extensive restructuring, food industry and consumer products expertise. We have already begun streamlining Atlanta's distribution network, selling certain assets and reducing its debt. The acquisition of Atlanta increased Chiquita's debt by approximately $65 million and will increase our consolidated revenues on an annualized basis by almost $1.1 billion.

93.    According to Defendants, the Atlanta acquisition was a substantial success. Chiquita's

2003 Annual Report stated:

> The improvement in 2003 operating income was due to Chiquita's success in cost-cutting, the benefit of a stronger euro, asset sales, increased banana and other fresh fruit sales, and improvements at Atlanta. The progress on our commitments was significant. . . . We acquired Atlanta, exited its underperforming businesses and cut its costs. In fact, we're ahead of schedule on improving Atlanta's profitability.

94.    According to Defendants, the success of Atlanta continued in 2004. According to

Chiquita's 2004 Annual Report:

> Financial highlights for 2004 include the following

> - Net sales for 2004 were $3.1 billion compared to $2.6 billion for 2003. Approximately 60% of the increase was due to the acquisition of Atlanta AG ("Atlanta"), a German distributor of fresh fruits and vegetables, which was completed in March 2003.

95.    Chiquita's 2003 Annual Report stated:

> Critical Accounting Policies and Estimates

> The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements. The additional discussion below addresses major judgments used in

> - reviewing the carrying values of intangibles . . . .

> Review of Carrying Values of Intangibles . . . .

Goodwill – Substantially all of the Company's $43 million of goodwill relates to its acquisition of Atlanta during 2003. . . . [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

96.     Chiquita's 2004 Annual Report stated:

Critical Accounting Policies and Estimates

The Company's significant accounting policies are summarized in Note 1 to the Consolidated Financial Statements. The additional discussion below addresses major judgments used in

•     reviewing the carrying values of intangibles . . . .

Goodwill

Substantially all of the Company's $46 million of goodwill relates to its acquisition of Atlanta during 2003. . . . [T]here was no indication of impairment and, as such, no write-down of the goodwill carrying value was required.

97.     In truth, the Atlanta acquisition was a failure, badly damaging the Company. Almost immediately upon the acquisition of Atlanta, because of problems in its business, Chiquita began to write off the value (goodwill) of Atlanta, and by 2006, those charge-offs and write-downs wiped out all of the goodwill recorded in connection with the Atlanta acquisition in less than three years.

## FUTILITY OF DEMAND ALLEGATIONS

98.     Plaintiff brings this action derivatively in the right and for the benefit of Chiquita to redress injuries suffered and to be suffered by Chiquita as a result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by Defendants. Chiquita is named as a nominal party solely in a derivative capacity.

99.     In bringing this action, plaintiff has satisfied all statutory procedural requirements. Plaintiff has standing to bring this action as it is a shareholder of Chiquita and was such at all relevant times. Plaintiff will fairly and adequately represent Chiquita's interests in enforcing its rights. Plaintiff is not using this action to gain any personal advantage, nor does Plaintiff have any agenda other than to correct the wrong that has been done to the Company. To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

100.    Defendants all were directors and/or senior ranking officers of Chiquita, acquiesced in and/or were complicit in making the protection payments to the AUC between 1998 and 2004. They, as well as the non-party outside directors, cannot and would not conduct a meaningful investigation and/or prosecution of Defendants for their misconduct, as to do so would undermine their own credibility, require them to take inconsistent positions with those they have taken, and/or expose themselves and their colleagues to significant criminal and/or civil exposure, both here and in Colombia:

(a)    *Aguirre.* In a written statement issued in March 2007, immediately following Chiquita's entry into the plea agreement, Aguirre stated publicly that the Company viewed the plea agreement "as a reasoned solution to the dilemma the company faced several years ago." The Company "voluntarily disclosed the payments to the Justice Department in 2003," he stated, adding the payments were made "to protect the lives of its employees." "The payments made by the company were always motivated by our good faith concern for the safety of our employees," Aguirre told the *Chicago Tribune* on March 22, 2007. Aguirre made these statements knowing the so-called "good faith" payments had continued for more than a year after the Company secretly "disclosed" the relationship to the Justice Department in 2003, at a time that Chiquita's outside lawyers were insisting the Company terminate the arrangement. Chiquita made at least 19 more payments after the DOJ told the Company that "payments to the AUC were illegal and could not continue." A decision to prosecute those responsible at the Company would be inconsistent with and contradictory to Aguirre's actions and statements during his tenure as President, CEO and Chairman of Chiquita since 2004, where he has maintained the payments were proper and has taken no action to remove the executives and/or directors who oversaw and acquiesced in their payment. Aguirre remains in his dominant and controlling position, despite having lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, failing to fire or discipline the responsible Chiquita officers, and permitting and participating in causing Chiquita to plead guilty to protect the other Defendants and in causing the fire sale of the Colombian operations.

(b)    *Arntzen and Stanbrook.* Arntzen served with Hills on Chiquita's Audit Committee between 2002 and 2007 and Stanbrook served with Hills on the Audit Committee between 2003 and 2005. The Audit Committee was aware of the nature of the protection payments throughout this period. The Audit Committee also knew Chiquita's outside lawyers deemed the payments illegal and wanted them stopped. The Audit Committee acquiesced in the payments to terrorists, the false accounting for the payments and the decision not to properly report the payments to the SEC between 2002 and 2004. Arntzen publicly stated "When I joined the board, I knew the company was making payments to paramilitary groups in Colombia." Arntzen told *The Wall Street Journal* in August 2007, five months after Chiquita's plea agreement was entered and less than one month before the DOJ announced it had decided not to prosecute individual Chiquita executives: "If you didn't do it, your people were going to get killed." In an interview with *TradeWinds* in March 2007, Arntzen stated: (i) the Chiquita Board and management "handled the Colombian disclosures properly," (ii) he and fellow Board members had "turned ourselves in to the Justice Department" and "gave them all the evidence they needed to convict us," (iii) the "directors did what we were supposed to do," and (iv) "You don't always know who you're paying or which side they're on. All you know is that the people are scary and they're armed to the teeth and that if you don't pay them, your people are going to die." As members of the Audit Committee, Arntzen and Stanbrook were charged with selecting and assessing the performance of Chiquita's outside auditors and approving their fees and independence; assessing and approving the annual Company audit results; establishing and enforcing Chiquita's financial and accounting policies and financial statements; reviewing the adequacy and effectiveness of Chiquita's internal accounting controls and the internal audit function; overseeing the Company's legal and Company policy compliance; considering requests for waivers from the Code of Conduct for executive officers and directors (any such waivers being subject to Board approval); and, in connection with all of the foregoing, meeting with the independent auditors, internal auditors and Chiquita's financial management. As such, these Audit Committee Defendants had direct oversight and participation in the

decision to falsely account for the terrorist payments and to misreport them to the SEC. These Audit Committee Defendants also repeatedly facilitated the Company's non-compliance with laws, regulations and Company policies by refusing to exercise their authority under the Audit Committee charter to remove the offending officers and directors. A decision to prosecute those responsible at the Company would be inconsistent with Arntzen's and Stanbrooks' actions and statements throughout this period, where they have maintained the payments were proper and have taken no action to remove the executives and/or directors who oversaw and acquiesced in them.

(c)     *Fisher*. On April 3, 2003, Hills and Olson reported the history of the AUC payments to the full Chiquita Board, of which current Chiquita directors Fisher and non-parties Durk I. Jager and Jaime Serra were then members. Thereafter, Chiquita continued making payments to the AUC, including ten additional payments that were made between May and September totaling about $134,000, after the DOJ told Hills and Olson the payments were illegal on August 23, 2003. On December 22, 2003, Hills emailed fellow directors concerning the DOJ's concerns that the Company was not being as cooperative as he felt it should be, telling them: "We cannot delegate this issue to management . . . . We appear to [be] committing a felony." Nonetheless, the payments continued, with the Board's knowledge, through February 2004. Even as Chiquita began turning over documents relating to the payments to the Justice Department, it kept making payments. Shortly after 8 a.m. on March 24, 2004, agents of the Federal Bureau of Investigation with subpoenas paid a surprise visit to Chiquita's Cincinnati headquarters. Later that day, FBI agents in Fort Lauderdale, Florida, entered a Company Board meeting and delivered subpoenas. Despite the fact that the Company was forced to pay a $25 million fine, is a felon, is serving five years probation and is exposed to hundreds of millions of dollars in potential liability in the civil suits, none of the implicated executives have been discharged and no recovery has been sought from any of the implicated Chiquita executives or directors.

(d)     *Stanbrook and Fisher*. As members of the Chiquita Compensation Committee, Defendants Stanbrook and Fisher and non-party directors Clare M. Hasler and Jaime Serra are charged

- 37 -

with: (i) evaluating the performance, and reviewing and approving all compensation, of Chiquita's executive officers; (ii) making recommendations to the Board with respect to incentive compensation and equity-based plans; (iii) overseeing the Company's leadership and organization development, including succession planning; and (iv) administering Chiquita's Stock and Incentive Plan. Contrary to their responsibilities, these directors increased executive pay following the Company's March 2007 plea agreement, despite Chiquita's losses and exposure to criminal and civil liability. Despite the fact that Chiquita suffered a poor 2006 and its stock price dropped 25%, the Compensation Committee raised Aguirre's cash salary to $900,000 a year, a 13% increase, and granted him a new award of $1.2 million in restricted stock, an LTIP award opportunity for the 2007-2009 performance period of $1.6 million, and an additional restricted stock grant with a targeted value of $1.6 million. Despite Chiquita's loss of the banana business due to misconduct by its executives and Aguirre's and others' refusal to hold them accountable, Chiquita's Compensation Committee justified this compensation increase by stating Aguirre was "helping to transform it from a seller of commodity bananas to a more diversified – and more profitable – seller of fruit-based products." They also almost doubled their own annual directors' fees. By this decision, shareholders are being penalized twice: as the firm's equity owners, they pay the ultimate price for the misconduct, and they also must pay bonuses on top of high salaries to deal with the aftermath. Additionally, on August 3, 2006, the Compensation Committee accepted Olson's resignation and entered into an agreement with him providing for one year's annual base salary and target bonus, aggregating $622,500, paid between March 1, 2007 and August 24, 2007; $138,333 representing the pro rata portion of his 2006 target bonus; $7,434 in company-paid COBRA health insurance premiums through August 2007; $10,000 in reimbursement of legal fees related to the agreement; the acceleration of the vesting of 59,639 shares of restricted stock previously issued to him; and payment of up to 12 months of office space and services for Olson and maintenance of existing director and officer liability insurance covering him. In exchange, Olson entered into a "retirement" agreement containing a confidentiality agreement of unlimited duration.

- 38 -

(e)    Non-party director Serra could not independently and disinterestedly consider a pre-suit demand to bring the claims alleged herein as Serra's livelihood and career prospects would be compromised if he actively investigated or made the decision to prosecute these claims. Serra is a Mexican economist and a foreign trade specialist with vast ties to the Latin America fruit and vegetable trade import/export business. Serra is Chairman of SAI Consulting and Principal of NAFTA Fund. His professional practice includes the design of investment strategies in Mexico for foreign companies and advice to Mexican companies interested in becoming regional players in North America.

(f)    Non-party director Howard W. Barker, Jr. could not independently and disinterestedly consider a pre-suit demand to bring the claims alleged herein, as Barker is beholden to the other Board members who appointed him. Barker has never been elected by the Chiquita shareholders. He was selected by Aguirre and the other Board members only after they were comfortable he would not take any action adverse to them. Moreover, Barker has attempted to market himself as a consultant and expert based on his former status as a major partner at KPMG, and diligently investigating and prosecuting the claims alleged herein would threaten those interests.

101.    The Chiquita Board cannot exercise independent objective judgment in deciding whether to bring this action or vigorously prosecute it. Therefore, Plaintiff's demand upon it to take the action requested herein is excused. Chiquita's Board and its management also are antagonistic to this lawsuit:

(a)    The allegations herein detail a widespread and continuous pattern and practice of misconduct spanning more than six years. Each Defendant had the ability to cause Chiquita to disclose the existence of the illegal protection payment scheme during that six-year period and failed to do so.

(b)    The misconduct alleged herein created a substantial fear of personal criminal or civil liability for several current members of Chiquita's Board in light of the successful DOJ prosecution resulting in a $25 million fine and the pending civil suits. As a result, the Chiquita Board is incapable of exercising valid business judgment, as investigation and/or prosecution of these claims would expose, or increase the exposure of, each Board member to criminal and/or civil liability.

- 39 -

(c)    The misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure. It had to be the result of a deliberate Board policy or willful or reckless disregard with respect to the illegal or improper payments. According to the government's Sentencing Memorandum, Chiquita's top officers and directors knew that for over six years – from sometime in 1997 through February 4, 2004 – Chiquita, through its wholly-owned Colombian subsidiary, Banadex, paid money to the AUC, a violent terrorist organization in the Republic of Colombia. According to DOJ's Sentencing Memorandum:

A.    **The Gravity of the Core Conduct**

This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years – from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.

Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquila's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.

The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.

B.    **Defendant Chiquita's Motivations**

Defendant Chiquita's motivations for paying the AUC are irrelevant to the illegality of its conduct or to the harm that the Company's conduct has caused to victims of AUC violence. As one federal appeals court has noted, "Terrorist organizations use funds for illegal activities regardless of the intent of the donor[.]" *Boim v. Quranic Literacy Inst. & Holy Land Found, for Relief and Dev.*, 291 F.3d 1000, 1027 (7lh Cir. 2002) (discussing breadth of criminal liability under the material support statute, 18 U.S.C. § 2339B). Nevertheless, defendant Chiquita's motivations for paying the AUC are relevant to an understanding of the felony charge against the Company.

Preliminarily, it is important to note what defendant Chiquita is not accused of. Defendant Chiquita is not accused of supporting the goals or ideologies of the terrorist organizations that the Company funded. The record reflects that defendant Chiquita did not seek out the AUC to start making these payments. Rather, the AUC, through its leader Carlos Castaño, instructed that defendant Chiquita's subsidiary would have to

start making the payments once the AUC moved into the Company's banana-producing region.

Defendant Chiquita, however, did not make one or two payments while deciding on a course of action to take in the face of the AUC's demand (and implied threat) in 1997. Defendant Chiquita decided to accede to the AUC's demand and make routine payments for fully six years. Although defendant Chiquita would later claim that it was the victim of AUC extortion, the Company did not report the "extortion" to any United States or Colombian authorities for several years.

Defendant Chiquita, as a large multinational corporation, had choices to make about where in the world to operate and under what conditions. The Company chose to enter and exit markets and to buy and sell farms based on its business judgment. Defendant Chiquita chose to remain in Colombia and make payments to the AUC that it deemed necessary to operate in the Urabá and Santa Marta regions of Colombia.

Defendant Chiquita's reason for being in Colombia was, of course, to produce bananas profitably. And there is no question that defendant Chiquita profited from its Colombian operations during the period that the Company paid the AUC. According to defendant Chiquita's records, from September 10, 2001 (the date of the AUC's designation as a Foreign Terrorist Organization), through January 2004, the Company earned approximately $49.4 million in profits from its Colombian banana-producing operations. Indeed, by 2003 the Company's Colombian operations were its most profitable.

Whatever motivated defendant Chiquita at the start, the Company made a business decision to remain in Colombia and pay the AUC for over six years. Officers of defendant Chiquita and Banadex referred to the payments as an unsavory "cost of doing business" at their inception in 1997. When the internal investigation into the payments was presented to the Board in September 2000, the Board treated them as a routine business matter – a tolerable expense to be kept low. When the AUC in Santa Marta demanded direct, cash payments in 2002, senior officers of defendant Chiquita obliged. These senior executives also came up with a procedure to record these monthly payments in the Company's books and records that failed to reflect the ultimate and intended recipient of the payments.

By late February 2003, when defendant Chiquita's outside counsel advised the Company to stop the payments immediately in light of the AUC's designation as an FTO and the attendant risk of criminal liability, the payments had already been reviewed and approved at the highest levels of the Company for years. The fact of the AUC demand in 1997 and any perceived risk to the Company's employees from doing business in Colombia were not new topics. The payments had been discussed repeatedly in defendant Chiquita's Cincinnati headquarters. The Company had long since made the business judgment to remain in Colombia, to keep paying the AUC, to record the payments in the Company's books and records without identifying the AUC, and not to report the payments to the pertinent United States and Colombian authorities.

The new information in late February 2003 was not the claimed extortion, but rather outside counsel's advice about the risk of criminal liability to the Company for making the payments. Defendant Chiquita chose to reject that advice and to continue to

- 41 -

pay the AUC. The Company chose to continue the payments even after being advised by the Department of Justice that the payments were illegal and could not continue.

Defendant Chiquita has claimed that it made the payments to protect its employees. Undoubtedly some officers, directors, and employees of defendant Chiquita with knowledge of the payments firmly believed (and still believe) that the Company's sole motivation for making the payments was to protect its Colombian employees. As mentioned, the Company's motivation is legally irrelevant and of no comfort to the victims of the AUC's violence. But even this purported rationale for the payments begs serious questions. If defendant Chiquita was solely motivated to protect its Colombian employees from the AUC,

•       How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

•       How did the payments protect the communities in which those employees lived?

•       How did the payments protect the families, friends, and associates of the Company's employees?

•       What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

•       Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

•       Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

•       Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?

C.     **Defendant Chiquita's Alternatives**

The Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law. Defendant Chiquita is a sophisticated multinational corporation with access to the highest quality business and legal advice. There were a number of points at which the Company could have conformed its conduct to the requirements of the law. US failure to do so until late in the evolution of this matter is one of the reasons that the Company appears before the Court having pled guilty to a very serious criminal charge.

Defendant Chiquita was not without any alternative to paying the AUC. While there may have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option that the Company could have considered when faced with the AUC's demand in 1997. As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments. The officer stated, "[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia." In late February and March 2003, defendant

Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia. When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia. Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." Indeed, within one month of joining defendant Chiquita as its new CEO, Fernando Aguirre told senior officers that "if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

Defendant Chiquita may well have had other alternatives – other than the course that it pursued. In the end, the issue is not what defendant Chiquita could have done, but rather what it chose to do– and that was to continue paying terrorists for over six years.

102.    The Chiquita Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the government should not have prosecuted Chiquita. According to Chiquita's response to the government's Sentencing Memorandum:

When Chiquita learned in 2003 (and not earlier as the government implies) that the U.S. government had designated the AUC as a foreign terrorist organization, thereby making the payments illegal under U.S. law, Chiquita voluntarily disclosed its intolerable dilemma to the Department of Justice and sought its guidance – guidance that, despite the government's acknowledgement of the "complicated" nature of the life-and-death situation facing Chiquita, was never provided. For the government now to attempt to hide behind the simplistic position that "[t]he Department of Justice is not in the business of providing outside parties with advice about how best to comply with the law" (Sentencing Mem. at 16) is a hollow, post hoc rationalization that ignores reality. That is especially true in an area that the government has itself indicated is vital to the country's interest – national security. The government's position that companies like Chiquita should comply with the law without the government's input or help does much to undermine the government's goal of encouraging self-reporting and full cooperation. . . . Chiquita agrees that the government faced a very substantial risk of losing this case if it had proceeded to trial. Indeed, it is Chiquita's position that, in light of the Company's voluntary disclosure of the payments and its complete cooperation with the government's subsequent investigation, the government should have foregone prosecution in this matter altogether.

103.    A majority of the current Board members are conflicted as well as potentially personally liable and as such have not complied and cannot comply with their fiduciary duties to investigate these claims or bring these claims on behalf of Chiquita, as this would require them to sue themselves, several of Chiquita's current executives and several former Board members and executives (who they have

improperly caused Chiquita to release or agree to indemnify) who would provide inculpatory testimony as to the current Board's involvement, knowledge and malfeasance if they were sued. To protect themselves, the directors negotiated a plea deal costing the Company millions while letting the responsible executives off the hook, but have allowed several executives to stay in their lucrative positions even though they engaged in criminal conduct that damaged the Company. For example:

(a)     Aguirre, the Chairman and CEO, who lied to Chiquita's shareholders about the nature of and reasons for the bribery payments, has failed to fire or discipline the officers responsible for the bribery payments. He permitted and participated in causing Chiquita to plead guilty to protect the other Defendants. He caused the fire sale of the Colombian operations. Yet, he remains in his dominant and controlling position.

(b)     The current directors will not pursue legal action against the officers and directors involved in the wrongdoing as this will create further evidence of those officers' and directors' active illegal conduct in violation of Colombian law, increasing the likelihood of their extradition to Colombia. Extradition would put tremendous pressure on the Chiquita officers and directors to implicate the current directors, and further expose and detail their complicity in the criminal conduct.

(c)     The current directors will not objectively consider, bring, or vigorously prosecute claims against the directors and officers of Chiquita who were actively involved in the criminal misconduct because they have continued to permit the employment of several of them in fiduciary positions at the Company, and chose to release others with lucrative severance payments rather than demand contribution from them for their transgressions against Chiquita. Each of these decisions would be called into question, and evidence of their conduct revealed, if the current directors investigated the allegations herein.

104.    A majority of the current Board approved the Atlanta acquisition and the Colombia disposition, which damaged the Company. A majority of the current Board increased their own

compensation and that of the officers still at the Company involved in the wrongdoing, notwithstanding their responsibility for this wrongdoing.

105.    Prosecution of the allegations contained herein in light of the Chiquita Board's prior claims of innocence would undermine each Board member's defense and increase each Board member's exposure to potential civil and/or criminal liability.

106.    The members of Chiquita's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their colleagues in the top ranks of the corporation for the violations of law complained of herein.

107.    The members of Chiquita's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

108.    Chiquita's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds. Due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies contain provisions which eliminate coverage for any action brought directly by Chiquita against these Defendants, known as the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Chiquita, there would be no directors' and officers' insurance protection and thus, this is a further reason why the directors will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

## FIRST CAUSE OF ACTION

### (Derivative Claim for Breach of Fiduciary Duties)

109.    Plaintiff hereby incorporates the preceding paragraphs.

110.    Defendants are fiduciaries of Chiquita and its shareholders and owe them the duty to conduct the Company business loyally, faithfully, diligently and prudently.  This cause of action is asserted based upon Defendants' acts in violation of law, which constitute breaches of fiduciary duty.

111.    Defendants, in their roles as executives and/or directors of the Company, made false and misleading statements in Annual Reports and participated in the wrongful acts alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of herein.  The bribery payments were *ultra vires* and a waste of corporate assets even if they were not illegal under U.S. or other law when made.

112.    Defendants are responsible for the gross mismanagement of Chiquita and for abdicating their corporate responsibilities in at least the following ways:

(a)    They caused Chiquita to engage in *ultra vires* acts and to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

(b)    They violated their duties of compliance by causing Chiquita to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties by engaging in *ultra vires* and illegal conduct.

(c)    They violated their duty of candor by lying to Chiquita's public shareholders.

(d)    They violated an SEC consent decree, causing Chiquita to commit criminal acts.

(e)    They abused their control of Chiquita for their own personal gain, aggrandizement and protection.

(f)    They exposed the Company and its shareholders to substantial fines, penalties, expenses and liabilities.

(g)    They subjected Chiquita to adverse publicity and loss of goodwill.

- 46 -

113.    As a result of Defendants' wrongful conduct, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, Chiquita has suffered damage.

114.    Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

115.    Defendants abused the control vested in them by their high-level Company positions.

116.    By reason of the foregoing, Defendants have breached their fiduciary obligations of care, candor, compliance and control to Chiquita and its shareholders.

117.    Chiquita and its shareholders have been injured by reason of Defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and a representative of Chiquita, seeks damages and other relief for the Company.

## SECOND CAUSE OF ACTION

### (Derivative Claim for Waste of Corporate Assets)

118.    Plaintiff hereby incorporates the preceding paragraphs.

119.    As a direct result of the wrongdoing alleged herein, Defendants have wrongfully caused Chiquita to waste billions of dollars of corporate assets and have subjected the Company to additional liability of millions of dollars, to the detriment of the Company.

120.    Defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

121.    As a direct and proximate result of Defendants' waste of corporate assets as alleged herein, Chiquita has sustained damages.

## THIRD CAUSE OF ACTION

### (Derivative Claim for Conspiracy and Aiding and Abetting Breaches of Fiduciary Duties)

122.    Plaintiff hereby incorporates the preceding paragraphs.

123.    By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, Defendants have encouraged, facilitated and advanced their breaches of fiduciary duties and waste of corporate assets.  In so doing, Defendants have each aided and abetted, conspired and schemed with the other Defendants to breach their fiduciary duties, waste Chiquita's corporate assets and engage in the *ultra vires* and illegal conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion to ensure Defendants do not participate therein or benefit thereby.

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon.

C.    Directing Chiquita to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' Articles and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    an amendment to the Company's Articles limiting the number of executive directors on the Chiquita Board to one;

(ii)    a proposal to strengthen the Chiquita Board's supervision of operations and develop and implement procedures for greater shareholder input into Board policies and guidelines;

(iii)    establishing an effective anti-bribery or corruption exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

(iv)    a provision to permit the shareholders of Chiquita to nominate at least three candidates for election to the Chiquita Board;

(v)    appropriately test and strengthen the internal audit and control functions;

(vi)    reform executive compensation;

(vii)    require full compliance with Sarbanes-Oxley; and

(viii)    permit shareholders to question all executive directors of Chiquita at the Annual Meeting of Shareholders and establish a more transparent process for receiving and evaluating shareholder proposals.

D.    Voiding all indemnity agreements with, and recapturing all severance or departure payments to, any officer or director found to have been actively involved in the wrongdoing.

E.    Terminating the employment of Zalla and Kistinger and any other current member of Chiquita's management found to have been actively involved in the wrongdoing.

F.    Recapturing all directors' fees and other compensation or reimbursement paid to any of the Chiquita directors named as Defendants.

G.    Discharging Ernst & Young as Chiquita's accountants.

H.    Awarding punitive damages.

I.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

J.    Granting such other and further relief as this Court may deem just and proper.

# JURY DEMAND

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.


DATED: October 31, 2007

JONATHAN W. CUNEO (939389)
MICHAEL G. LENETT (425592)
CUNEO GILBERT & LaDUCA LLP

_____
JONATHAN W. CUNEO

507 C. Street, N.E.
Washington, D.C. 20002
Telephone: 202/789-3960
202/789-1813 (fax)

WILLIAM K. CAVANAGH
CAVANAGH & O'HARA
407 East Adams Street
Springfield, Illinois 62701
Telephone: 217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff

**VERIFICATION**

I, Jonathan W. Cuneo, hereby declare and verify, under penalty of perjury, as follows:

1.       I am a partner of the law firm of Cuneo Gilbert & LaDuca LLP, counsel for Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground verify that the foregoing Complaint is true and correct.

2.       I make this Verification because Plaintiff is absent from the District of Columbia where I maintain my office.

Executed this _____ day of October, 2007, at Washington, D.C.

_____
JONATHAN W. CUNEO

EXHIBIT I

**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph L. DePalma
Katrina Blumenkrants
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858

*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### *DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| HENRY TAYLOR, Derivatively on Behalf of Nominal Defendant CHIQUITA BRANDS INTERNATIONAL, INC., ) ) ) ) | Case No. |
| Plaintiff, ) ) | |
| v. ) ) | |
| FERNANDO AGUIRRE, MORTEN ARNTZEN, JEFFREY D. BENJAMIN, ROBERT W. FISHER, CYRUS F. FREIDHEIM, JR., CLARE M. HASLER, RODERICK M. HILLS, DURK I. JAGER, JAIME SERRA, and STEVEN P. STANBROOK, ) ) ) ) ) ) ) ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, ) ) | |
| and ) | **JURY TRIAL DEMANDED** |
| CHIQUITA BRANDS INTERNATIONAL, INC., ) ) ) | |
| Nominal Defendant. ) | |

Plaintiff Henry Taylor ("Plaintiff"), residing at 3394 Bridle Run Trial, Marietta, GA

30064, by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint

(the "Complaint") against the defendants named herein, and alleges upon personal knowledge

165286 v1

1

with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.       This is a shareholder's derivative action brought for the benefit of nominal defendant Chiquita Brands International, Inc. ("Chiquita" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its former executive officers seeking to remedy defendants' breaches of fiduciary duties.

## JURISDICTION AND VENUE

2.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that complete diversity of citizenship exists between Plaintiff on the one hand and Defendants on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.       Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4.       Plaintiff Henry Taylor is, and was at all relevant times, a shareholder of nominal defendant Chiquita. Plaintiff is a citizen of the State of Georgia.

165286 v1

2

5. Nominal defendant Chiquita is a New Jersey corporation with its principal place of business located at 250 East Fifth Street, Cincinnati, Ohio 45202. According to its public filings, Chiquita, together with its subsidiaries, operates as a leading international marketer and distributor of bananas and other fresh produce sold under the "Chiquita" and other brand names in approximately 80 countries, and packaged salads sold under the "Fresh Express" brand name primarily in the United States. Chiquita also distributes and markets fresh-cut fruit and other branded, value-added fruit-based products. The Company produces approximately 30% of the bananas it markets on its own farms, and purchases the remainder of the bananas, all of the lettuce and substantially all of the other fresh produce from third-party suppliers throughout the world. During the calendar year 2003, Chiquita reported over $2.6 billion in revenue. At all relevant times herein until it was sold by the Company in June 2004, Chiquita also owned and operated C.I. Bananos de Exportacion S.A. ("Banadex"), a foreign subsidiary located in Colombia, South America. Chiquita is a citizen of the State of New Jersey and the State of Ohio.

6. Defendant Fernando Aguirre ("Aguirre") has served as the Company's President, Chief Executive Officer and Chairperson of the Board since January 2004. Upon information and belief, Aguirre is a citizen of the State of Ohio.

7. Defendant Morten Arntzen ("Arntzen") has served as a director of the Company and as a member of the Audit Committee of the Board (the "Audit Committee") since 2002. Upon information and belief, Arntzen is a citizen of the State of New York.

8. Defendant Robert W. Fisher ("Fisher") has served as a director of the Company since March 2002. Fisher also served as the Company's Acting Chief Operating Officer from March 2002 to August 2002 and as a member of Chiquita's Executive Committee from 2003 to 2004. Upon information and belief, Fisher is a citizen of the State of California.

165286 v1

3

9.      Defendant Clare M. Hasler ("Hasler") has served as a director of the Company since October 2005. Upon information and belief, Hasler is a citizen of the State of California.

10.     Defendant Durk I. Jager ("Jager") has served as a director of the Company since December 2002. Upon information and belief, Jager is a citizen of the State of Ohio.

11.     Defendant Jaime Serra ("Serra") has served as a director of the Company since January 2003. Upon information and belief, Serra is a citizen of Mexico.

12.     Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of the Company and as a member of the Audit Committee since December 2002. Upon information and belief, Stanbrook is a citizen of the State of Wisconsin.

13.     Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of the Company and as a member of the Audit Committee from March 2002 until his resignation on February 6, 2007. Upon information and belief, Benjamin is a citizen of the State of New York.

14.     Defendant Roderick M. Hills ("Hills") served as a director of the Company and as a member of the Audit Committee until his retirement on May 24, 2007, including as Chairman of the Audit Committee from early 2002 to February 2004. Upon information and belief, Hills is a citizen of Washington, D.C.

15.     Defendant Cyrus F. Freidheim, Jr. ("Freidheim") served as the Company's non-executive Chairman of the Board from January 10, 2004 to his retirement in May 2004, as Chief Executive Officer and as the Chairperson of the Board from March 2002 to January 2004 and as President from May 2002 to January 10, 2004. Upon information and belief, Friedheim is a citizen of the State of Illinois.

16.     Collectively, defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook are referred to herein as the "Director Defendants."

165286 v1

4

17. Collectively, defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra, Stanbrook, Benjamin, Hills and Freidheim are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

20. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a. exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make

165286 v1

5

it possible to provide the highest quality performance of its business;

b. exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c. exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d. exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e. refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

21. The Individual Defendants, particularly the executive officers and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a) transactions are executed in accordance with management's general or specific authorization; and

165286 v1

6

      (b)      transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## **SUBSTANTIVE ALLEGATIONS**

22.     According to its public filings, Chiquita, together with its subsidiaries, operates as a leading international marketer and distributor of bananas and other fresh produce sold under the "Chiquita" and other brand names in approximately 80 countries, and packaged salads sold under the "Fresh Express" brand name primarily in the United States. Chiquita also distributes and markets fresh-cut fruit and other branded, value-added fruit-based products. The Company produces approximately 30% of the bananas it markets on its own farms, and purchases the remainder of the bananas, all of the lettuce and substantially all of the other fresh produce from third-party suppliers throughout the world.

23.     Banadex, Chiquita's wholly-owned subsidiary, produced bananas in the Urabá and Santa Marta regions of Colombia and by 2003 was the Company's most profitable banana production outlet. Chiquita subsequently sold Banadex in June 2004.

24.     However, before the sale of Banadex, Chiquita, with the approval and at the direction of its Board, made illegal payments to gain "protection" for Banadex from the terrorist Colombian paramilitary group Autodefensas Unidas de Colombia, translated as the United Self-Defense Forces of Colombia (the "AUC").

25.     Between 1989 and 1997, Chiquita made payments to certain violent left-wing terrorist groups operating in Colombia, Fuerzas Armadas Revolucionarias de Colombia, translated as the Revolutionary Armed Forces of Colombia (the "FARC") and the Ejército de Liberación Nacional, translated as the National Liberation Army (the "ELN"). In October 1997,

165286 v1

7

the FARC and the ELN were designated by the Secretary of State of the United States as Foreign Terrorist Organizations ("FTO") pursuant to Title 8, United States Code, Section 1189.

26.    In or about 1997, the then-General Manager of Banadex met with the then-leader of AUC, Carlos Castaño. Castaño advised that the FARC was about to be ousted from Urabá by the AUC and that Banadex had to make payments to a "convivir," a private security company generally licensed by the Colombian government to assist local police and military in security but used by the AUC as fronts to collect monies from local businesses. Though it was not explicitly stated, Castaño's clear message was that if Banadex did not make payments to the convivir, physical harm to the subsidiary's personnel and property could result.

27.    Chiquita complied with Castaño's demands. From 1997 through February 4, 2004, Chiquita made at least 100 cash payments to AUC using convivirs in the Santa Marta and Urabá regions of Colombia, through checks drawn on Banadex's accounts. Chiquita accounted for these payments as "security payments," payments for "security" or "security services" in its corporate financial records, despite the fact that no actual security services were provided by AUC.

28.    On September 10, 2001 and again on September 10, 2003, the United States Secretary of State designated AUC as an FTO. As a result of this designation, after September 10, 2001, the knowing provision of material support and resources, including currency and monetary instruments, to the AUC was a federal crime.

29.    Additionally, on September 23, 2001, pursuant to the authority granted to him by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, President George W. Bush issued Executive Order 13224. Executive Order 13224, among other things, prohibited any United States person from engaging in transactions with any foreign organization or

165286 v1

8

individual determined by the United States Secretary of State, in consultation with the United States Secretary of the Treasury and the United States Attorney General, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States, labeled a "Specially-Designated Global Terrorist" ("SDGT"). The prohibition included making any contribution of funds to or for the benefit of an SDGT without first obtaining a license or similar authorization from the United States Government.

30.     The United States Secretary of State, in consultation with the United States Secretary of the Treasury and the United States Attorney General, designated the AUC as an SDGT on October 31, 2001.

31.     However, despite the Individual Defendants' knowledge that funding AUC was a federal crime, the Individual Defendants continued to authorize payments to the convivir after September 10, 2001, with the knowledge that such payments were directly funding the AUC.

32.     Specifically, in or about June 2002, after Chiquita emerged from bankruptcy and seated a new Board in April 2002, Chiquita continued its payments to AUC. Senior executives at Chiquita even developed a new system to make continued cash payments to AUC whereby checks drawn on Banadex's Colombian accounts were cashed by Chiquita executives and funds were hand delivered to AUC personnel in Santa Marta.

33.     Moreover, the Board, which included the Individual Defendants, had direct knowledge of the illegal payments to AUC and, indeed, allowed such payments to continue until at least February 4, 2004 despite such knowledge.

34.     On March 13, 2007, based upon Chiquita's illegal payments to AUC, the United States Government charged Chiquita with the federal crime of Engaging in Transactions with a

165286 v1

Specifically Designated Global Terrorist. Chiquita pled guilty to one count of knowingly

Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50

U.S.C. § 1705(b) and 31 C.F.R. § 594.204 that same day. A copy of the plea agreement between

the United States Department of Justice and Chiquita (the "Plea Agreement") is attached hereto

as Exhibit A. Pursuant to the terms of the Plea Agreement, Chiquita admitted as true all of the

facts contained in a Factual Proffer prepared by the United States (the "Factual Proffer"), which

is attached hereto as Exhibit B and incorporated by reference herein.

35. The Factual Proffer, and the subsequent Sentencing Memorandum filed by the

United States Department of Justice in connection with the September 17, 2007 sentencing

hearing (the "Sentencing Memorandum," attached hereto as Exhibit C and incorporated by

reference herein), details not only the knowledge that the Board had of the illegal payments, but

also the willful disregard by the Board of advice from Chiquita's counsel beginning on February

21, 2003 that the payments were improper, violated federal law and must stop immediately.

36. Specifically, the Sentencing Memorandum states that payments continued to flow

from Chiquita to the AUC, with the knowledge and approval of the Individual Defendants, even

after the following occurred:

- the new cash payment procedures for Chiquita's payments to AUC were reviewed at a meeting of the Audit Committee on April 23, 2002;

- senior officers at Chiquita had knowledge, as early as September 2002, that the AUC had been designated as an FTO;

- beginning on February 21, 2003, Chiquita's outside counsel repeatedly advised the Company to discontinue payment to AUC, as the payments were illegal, which advice outside counsel detailed in contemporaneous notes and memoranda;

- on April 24, 2003, officials at the United States Department of Justice advised the Company that the payments to AUC were illegal and could not continue;

- in a memorandum dated September 8, 2003 and sent to Chiquita's senior officers, Chiquita's outside counsel summarized the Company's contacts with the United States Department of Justice since April 2003 and noted that "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments;

- on December 22, 2003, a member of the Board noted in an internal email, in reference to the payments to AUC that "we appear [to] be committing a felony;"

37.     Moreover, the Sentencing Memorandum details that Chiquita's "payments to the AUC *were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees*. No later than September 2000, defendant Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño." (Emphasis added).

38.     Chiquita's payments to AUC continued until defendant Aguirre, one month after becoming the Company's Chief Executive Officer in January 2004, finally decided that the Company's funding of the terrorist organization had to come to an end. On January 24, 2004, Chiquita issued its last check to AUC, which cleared on February 4, 2004. In total, from 1997 through February 4, 2004, Chiquita's payments to AUC totaled over $1.7 million, including 50 payments totaling over $825,000 from September 10, 2001 through February 4, 2004.

39.     Pursuant to the Plea Agreement, Chiquita agreed to plead guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204, pay a criminal fine of $25 million in five annual payments of $5 million (plus post-judgment interest) commencing upon the entry of judgment and serve a five-year term of corporate probation. In addition to the general conditions of probation, Chiquita also agreed to implement and maintain an effective compliance and ethics

165286 v1

program and refrain from committing any federal, state or local crimes during the probationary period.

40.    In addition to criminal liability, Chiquita also faces additional civil liability for its illegal funding of terrorist activity.  Three separate civil actions, unrelated to the instant action, have been brought on behalf of victims of AUC's violent terrorist activities, including family members of those killed and tortured by AUC members, under the Alien Tort Claims Act and other federal statutes against Chiquita for, among other things, the Company's sponsorship of terrorism.  The lawsuits seek billions of dollars in damages from Chiquita.

41.    The Colombian government also may take independent action against the Company.  A criminal investigation remains ongoing, and Columbia may seek to extradite certain Chiquita executives to stand trial in that country.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

42.    In a misguided effort to protect the Company's interests in Colombia, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by knowingly permitting and approving illegal payments by Chiquita to an identified terrorist organization, despite knowledge that such actions were illegal.  The Individual Defendants' unlawful misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.

43.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, their actions were patently illegal and exposed the Company to substantial criminal and civil liability.

44.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Chiquita has sustained significant damages, including, but not limited to, the

165286 v1

12

costs incurred in the Company's defense of the DOJ Action and the criminal penalty the Company has agreed to pay as part of its plea bargain.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

45. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

46. Plaintiff is an owner of Chiquita common stock and was an owner of Chiquita common stock at all times relevant hereto.

47. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

48. As a result of the facts set forth herein, Plaintiff has not made any demand on the Chiquita Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

49. The Board currently consists of eight directors: defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook, and director Howard W. Barker, Jr. Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action because, as members of the Board during the relevant period, they were knowing participants in the criminal conspiracy and are therefore substantially likely to be held liable for the misconduct complained of herein. As alleged in detail herein (*see, supra*, ¶¶ 24, 31-38), these directors knowingly directed and approved the Company's illegal conduct, which resulted in the Company's guilty plea and criminal fine. Accordingly, Aguirre, Arntzen, Fisher, Hasler, Jager,

165286 v1

13

Serra and Stanbrook are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants.

50.     Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  The actions of the Board were patently illegal and exposed the Company to substantial civil and criminal liability.  As the Board knowingly entered into a criminal conspiracy and directed the Company to engage in criminal conduct, their actions cannot be afforded the protections of the business judgment rule.  Accordingly, demand is excused.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

51.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

52.     The Individual Defendants owed and owe Chiquita fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Chiquita the highest obligation of good faith and loyalty.

53.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty and good faith, as alleged herein.

54.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chiquita has sustained significant damages, as alleged herein.

55.     Plaintiff, on behalf of Chiquita, has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

165286 v1

14

B.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: December 17, 2007          **LITE DEPALMA GREENBERG & RIVAS, LLC**

By:   /s/ Joseph J. DePalma
Joseph L. DePalma
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Eric L. Zagar
Alison K. Clark
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

165286 v1

15

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is not related to the following actions:

*Hawaii Annuity Trust Fund v. Hills, et al.*, Docket No. 2007-C379, filed October 30, 2007 in New Jersey state court, Bergen County, Chancery Division;

*City of Philadelphia Public Employees Retirement System v. Aguirre et al.*, Civil Action No. 1:07-cv-00851-SJD, filed October 12, 2007 in the United States District Court for the Southern District of Ohio (Hon. Susan J. Dlott presiding)

*Sheet Metal Workers Local #218(S) Pension Fund v. Hills et al.*, Civil Action No. 1:07-cv-01957-PLF, filed October 31, 2007 in the United States District Court for the District of Columbia (Hon. Paul L. Friedman presiding)

Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 17, 2007      **LITE DEPALMA GREENBERG & RIVAS, LLC**

By:    /s/ Joseph J. DePalma
       Joseph J. DePalma
       Katrina Blumenkrants
       Two Gateway Center, 12th Floor
       Newark, New Jersey 07102
       (973) 623-3000

       Attorneys for Plaintiff

165286 v1

**VERIFICATION**

I, Henry Taylor, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: _Dec 5, 2007_

_____
HENRY TAYLOR

EXHIBIT J



## HON. ROBERT P. CONTILLO, J.S.C.
## SUPERIOR COURT OF NEW JERSEY

BERGEN COUNTY JUSTICE CENTER
10 MAIN STREET, HACKENSACK, NJ 07601
PHONE -- (201) 527-2615  FAX   (201) 371-1117

### FACSIMILE TRANSMITTAL SHEET

| TO | FROM: |
|----|-------|
| Andrew Berry – 973-624 7070 | Hon. Robert P. Contillo, J.S.C. |
| | DATE: |
| | 1/9/2008 |
| | TOTAL NO. OF PAGES INCLUDING COVER:    8 |

RE: Hawaii v. Hills

Docket No. C-379-07

**FILED**

JAN - 9 2008

**Robert P. Contillo, J.S.C.**

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: BERGEN COUNTY

| | |
|---|---|
| HAWAII ANNUITY TRUST FUND | Docket No. C-379-07 |
| *Plaintiff(s)*, | **CIVIL ACTION** |
| vs. | ***ORDER*** |
| HILLS et al. | |
| *Defendant(s)*. | |

It having been brought to the Court's attention that its prior issued decision on the above-captioned matter contained a discrete clerical error, and it appearing to the Court that the correction will not affect the substance of its decision,

**IT IS** on this **9th** day of January, 2008,

**ORDERED**, that the letter decision accompanying this Order shall hereby replace the Court's letter decision of January 7, 2008.

**ORDERED**, that a copy of this Order and annexed rider shall be served upon all parties within 7 days of receipt.

_____
Hon. Robert P. Contillo, J.S.C.

# SUPERIOR COURT OF NEW JERSEY

**FILED**

JAN - 9 2008



ROBERT P. CONTILLO
JUDGE, GENERAL EQUITY

**Robert P. Contillo, J.S.C.**
BERGEN COUNTY JUSTICE CENTER
HACKENSACK, NJ 07601
201-527-2615

January 9, 2008

**VIA FACSIMILE**

Andrew Berry, Esq.
McCarter & English LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

> Re:   Hawaii Annuity Trust Fund, et als. v. Roderick M. Hills, et als.
>        Docket No. C-379-07
>
>        : Decision

Counsel:

## Statement of the Case

The issue before the Court is whether to grant a stay of a shareholder derivative suit, based on either the principle of comity or the presence of an alternative dispute resolution agreement. The Court entertained oral argument on December 21, 2007. For the reasons set forth below, the Court hereby dismisses without prejudice the claims asserted against all defendants save Ernst & Young, LLP ("E & Y") and stays, pending alternative dispute proceedings, the action on the claims against E & Y.

Between 2001 and 2004, Chiquita Brands International ("Chiquita") illegally paid a Columbian terrorist organization, the Autodefensas Unidas de Colombia ("AUC"), for "security." (Betz Cert. Ex. A.) Chiquita pled guilty to one count of engaging in transactions with a Specially Designated Global Terrorist and paid a twenty-five million dollar fine. During this time, E & Y provided financial audit services to Chiquita, pursuant to contracts requiring mediation and arbitration of their disputes. On October 12, 2007, "City of Philadelphia Public Employees Retirement System," a large shareholder of Chiquita Brands International ("Chiquita"), filed a derivative complaint on

1

behalf of Chiquita, in a district court of Ohio, against officers and directors of Chiquita, alleging breaches of fiduciary duty.

On October 30, 2007, "Hawaii Annuity Trust Fund for Operating Engineers," another shareholder, filed a complaint in this Court against a greater number officers and directors (including every named defendant from the Ohio action) and also against E & Y. (Betz Cert. Ex. B.) This complaint additionally alleged breaches of fiduciary duty and corporate waste against the director-officer defendants. Against E & Y the plaintiff alleged "aiding and abetting" liability and also professional negligence.

One day later, another plaintiff, "Sheet Metal Workers Local #218(S) Pension Fund," filed an action in a district court in Washington D.C., again, against many of the same defendants and on behalf of Chiquita, alleging breaches of fiduciary duty, corporate waste, and the "aiding and abetting" liability of certain officers and directors. (Betz Cert. Ex. C.) As the attorneys for Chiquita demonstrated to the Court, there are substantial and extensive substantive and stylistic similarities between the pleadings in each case. (Betz. Cert. Ex. D.)

On November 26, 2007, attorneys for Chiquita filed a motion before the Judicial Panel on Multidistrict Litigation, to transfer these actions before one judge, for consolidated pretrial proceedings. Chiquita moved before this Court to stay its proceedings pending the outcome of the Ohio action. E & Y moved to stay this proceeding to allow the parties to mediate and possibly arbitrate. The director and officer defendants joined in Chiquita's motion. Chiquita and E & Y each joined in the other's motion.

The defendants advance two main arguments for granting a stay of these proceedings. First they argue that the Court should stay this action under the principle of comity articulated in <u>American Home Products Corp. v. Adriatic Insurance Co.</u>, 286 <u>N.J. Super.</u> 24 (App. Div. 1995). Second, they argue that the Court should stay the action pursuant to the Federal Arbitration Act's stay provisions.

## DECISION

### 1) Chiquita's Motion to Stay Action in Favor of a Pending Federal Action in Ohio

"The fact that an action pending in another state involves the same parties and the same or substantially similar claims does not bar prosecution of a subsequent action here in New Jersey. However, the New Jersey action may, as a matter of sound discretion, be stayed by our courts until the prior action has been adjudicated." Am. Home Products Corp. v. Adriatic Ins. Co., 286 N.J. Super. 24, 33 (App. Div. 1995). The Court applies the following analysis to determine whether principles of comity mandate a stay (or a dismissal):

> [T]he defendant should be required to establish (1) that there is a first-filed action in another state, (2) that both cases involve substantially the same parties, the same claims, and the same legal issues, and (3) that plaintiff will have the opportunity for adequate relief in the prior jurisdiction. When a defendant establishes these requisites, it has shown a clear entitlement to comity-stay relief and the judge should grant the stay unless plaintiff demonstrates "special equities."

Ibid.

Here, there is in another state a first-filed action that involves substantially the same parties, claims and legal issues. The Ohio action encompasses claims against officers and directors for breach of fiduciary duty, as does this action; the addition of a claim for corporate waste does little to distinguish the two. Likewise, the parties are substantially the same: All of the defendants from the Ohio action are named in this action, and the plaintiff is an identically situated institutional shareholder of Chiquita. The most serious difference is the addition of E & Y as a defendant, which, as I will discuss below, will not affect the Court's comity analysis.

The plaintiff, by joining in the Ohio action, will have a fair opportunity to present its claims against the directors and officers. Even though the plaintiff cannot name E & Y in federal court (because of the requirement of absolute diversity), this Court is persuaded that there will be no prejudice to the plaintiff's rights. No party at oral argument was concerned that the directors and officers might attempt to defend against

3

the claims by citing the advice of E & Y. But even if they do, there is no reason why the district court cannot adjudicate the issue, even though the result will not bind E & Y.

Therefore, it is the plaintiff's burden to show that some special equity requires the Court to allow the action to proceed. Factors that the Court may consider when assessing special equities are: 1) whether granting the stay would thwart the public policy of New Jersey; 2) how well-advanced toward trial the action is, as compared to the first-filed action; 3) how convenient and fair the forum is to the parties that will be involved in the litigation; and 4) what relative connections the dispute has to the forum. Id. at 38-39.

In American Home Products, the lower court found special equities where insurance companies were challenging their obligation to pay for the cleanup of waste sites in New Jersey and 1) the covered company headquarters were in Madison, New Jersey; 2) ten out of thirty-seven waste sites were in New Jersey, while only one was in the first-filed forum; 3) six defendant insurers were headquartered in New Jersey; 4) the remediation costs were ten times higher in New Jersey than in the first-filed jurisdiction; 5) New Jersey law was likely to be applied to the controversy; 6) and the case was two years into discovery. Id. at 39-40. The only similarity the current case has with American Home Products is that New Jersey law will likely be applied. As is clear from the record, every other factor militates against allowing the action to proceed in this forum.

Chiquita's headquarters are in Cincinnati, Ohio, Chiquita owns no property in New Jersey, and only 5 out of 25,000 Chiquita employees work in New Jersey. (Howland Cert. ¶¶ 3-5.) There are no allegations that witnesses or litigants will have an easier time litigating in New Jersey than in a federal forum. Neither action is far along in the discovery process. And there is no public policy of New Jersey that will be thwarted if the Court declines to adjudicate the dispute at this time.

New Jersey's interest in discouraging corporate fiduciaries from breaching their duties to each other and New Jersey's interest in interpreting its own law (Chiquita being a New Jersey corporation) will be adequately protected in the federal forum. The Appellate Division has said the following:

> We do not distrust the proceedings of the courts of our sister states as we once did. **It has become necessary and commonplace in a national economy for courts to interpret and enforce the laws of other**

4

> jurisdictions. In these circumstances, there is ordinarily no reason to entertain subsequent local litigation paralleling an already instituted action in another state. And this is so whether the later New Jersey action is brought by plaintiff or defendant in the earlier case . . . .

Cogen Techs. v. Boyce Eng'g, 241 N.J. Super. 268, 272-73 (App. Div. 1990), cert. denied, 122 N.J. 358 (1990) (emphasis added).

And there is no reason that has been brought to the Court's attention why this analysis should be any different in the state-versus-federal context.

Finally, while the parties have petitioned the Court for a stay of the proceedings, their own legal authority and general principles of judicial economy support a dismissal without prejudice under these facts. "The general rule favors stays or **dismissals** in comity-stay situations, in the absence of special equities." Am. Home Prods., supra, 286 N.J. Super. at 36 (emphasis added). A comity dismissal, since it does not adjudicate the merits, should be without prejudice. Exxon Research v. Industrial Risk, 341 N.J. Super. 489, 518-20 (App. Div. 2001). In this case, in the federal forum, the parties will likely receive a full adjudication of the merits of all claims against the directors and officers. There is therefore no reason for this Court to continue to administer the case as to these parties. In the unlikely event that the parties are not able to receive a full adjudication in the federal case, there will be no prejudice to their re-filing at a later date.

## 2) Ernst & Young's Motion to Stay Pending Mediation/Arbitration

The claims against E & Y cannot proceed in the federal forum, because the lack of diversity will defeat the court's subject matter jurisdiction. Nevertheless, this Court has the authority, and must exercise the authority, to stay the claims against Ernst & Young, until the parties engage the alternative dispute proceedings that they contracted for.

The Federal Arbitration Act, 9 U.S.C. § 3, mandates a stay of proceedings where the court finds an issue is referable to arbitration. A dispute is referable to arbitration if the parties have a valid agreement to arbitrate, as interpreted under general principles of state contract law. Circuit City Stores v. Najd, 294 F.3d 1104 (9th Cir. 2002). Under both federal and state statutory law, a stay, and not a dismissal, is the appropriate judicial response where the Court finds a dispute referable to arbitration. Wein v. Morris, 388 N.J. Super. 640, 653-54 (App. Div. 2006), cert. granted, 190 N.J. 254 (2007); Lloyd v. Hovensa, LLC, 369 F.3d 263, 269 (3d Cir. 2003).

Here, the dispute is referable to arbitration. E & Y has provided the Court with alternative dispute agreements spanning the time in question, and each provides for mediation and arbitration. There is no evidence, nor are there allegations, that the signatories to the contract acted improperly under state law when they contracted for mediation and arbitration. All allegations of wrongdoing go toward alleged breaches of fiduciary duty—not the engaging of E & Y to provide audit services. Without such particularized facts specific to the arbitration clause, the Court need not go further in its analysis. Cf. Suntera Corp. v. Ernst & Young, LLP, 2003 WL 23497720, *7 (Md. Cir. Ct. Jan 30, 2004).

Furthermore, the prerequisite of mediation does not stop the Court from staying this proceeding. Courts have stayed or dismissed proceedings with near identical arbitration provisions containing mediation prerequisites. E.g. Degroff v. Mascotech Forming Techs., 179 F. Supp.2d 896, 913 (N.D. Ind. 2001). Here, plaintiff has moved in a timely manner to compel the agreed upon arbitration procedure, which includes mediation. A stay is the appropriate judicial response.

Two Orders accompany this decision.



ROBERT P. CONTILLO, J.S.C.

EXHIBIT K

# Department of Justice

**FOR IMMEDIATE RELEASE**                                                                                    **NSD**
**MONDAY, MARCH 19, 2007**                                                                  **(202) 514-2008**
**WWW.USDOJ.GOV**                                                                            **TDD (202) 514-1888**

## Chiquita Brands International Pleads Guilty to
## Making Payments to a Designated Terrorist Organization
## And Agrees to Pay $25 Million Fine

WASHINGTON — Chiquita Brands International Inc. ("Chiquita"), a multinational corporation incorporated in New Jersey and headquartered in Cincinnati, Ohio, pleaded guilty today before the Honorable Royce C. Lamberth of the U.S. District Court for the District of Columbia to one count of engaging in transactions with a specially-designated global terrorist, announced Assistant Attorney General Kenneth L. Wainstein National Security Division; U.S. Attorney Jeffrey A. Taylor; Wendy Wysong, Deputy Assistant Secretary, U.S. Department of Commerce ("Commerce"); and William Reid, Special Agent in Charge, U.S. Immigration and Customs Enforcement (ICE), Washington, D.C. Office of Investigations.

Chiquita pleaded guilty pursuant to a written plea agreement. Under the terms of the plea agreement, Chiquita's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation. Chiquita also has agreed to cooperate in this ongoing investigation. Sentencing will occur on June 1, 2007.

The plea agreement arises from payments that Chiquita had made for years to the violent, right-wing terrorist organization United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"). The AUC had been designated by the U.S. government as a Foreign Terrorist Organization ("FTO") on Sept. 10, 2001, and as a Specially-Designated Global Terrorist ("SDGT") on Oct. 31, 2001. These designations made it a federal crime for Chiquita, as a U.S. corporation, to provide money to the AUC. In April 2003, Chiquita made a voluntary self-disclosure to the government of its payments to the AUC, giving rise to this investigation.

"Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. For several years, the AUC terrorist group found one in the payments they demanded from Chiquita Brands International. Thanks to Chiquita's cooperation and this prosecution, that funding stream is now dry and corporations are on notice that they cannot make protection payments to terrorists," said Assistant Attorney General Wainstein.

"Funding a terrorist organization can never be treated as a cost of doing business," stated U.S. Attorney Taylor. "American businesses must take note that payments to terrorists are of a whole different category. They are crimes. But like adjustments that American businesses made to the passage of the Foreign Corrupt Practices Act decades ago, American businesses, as good corporate citizens, will find ways to conform their conduct to the requirements of the law and still remain competitive."

"This case clearly demonstrates the commitment of the Commerce Department and its Bureau of Industry and Security to the Administration's fight against terrorist financing," said Commerce Deputy Assistant Secretary Wysong.

"The message to industry from this guilty plea today is that the U.S. Government will bring its full power to bear in the investigation of those who conduct business with designated terrorist organizations, even when those acts occur outside of the United States," said ICE Special Agent in Charge Reid.

### Chiquita's Payments to the AUC

Following the company's disclosure, the investigation leading to this prosecution developed evidence that for over six years – from sometime in 1997 through Feb. 4, 2004 – Chiquita paid money to the AUC in two regions of the Republic of Colombia where Chiquita had banana-producing operations: Urabá and Santa Marta. Chiquita made these payments through its wholly-owned Colombian subsidiary known as "Banadex." By 2003, Banadex was Chiquita's most profitable operation. Chiquita, through Banadex, paid the AUC nearly every month. In total, Chiquita made over 100 payments to the AUC amounting to over $1.7 million.

Case 1:07-cv-01957-PLF    Document 7-14    Filed 01/25/2008    Page 3 of 4

Chiquita began paying the AUC following a meeting in 1997 between the then-leader of the AUC, Carlos Castaño, and a senior executive of Banadex. Castaño implied that failure to make the payments could result in physical harm to Banadex personnel and property. No later than September 2000, Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees.

For several years Chiquita paid the AUC by check through various intermediaries. Chiquita recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services." Chiquita never received any actual security services in exchange for the payments.

Beginning in June 2002, Chiquita began paying the AUC in Santa Marta directly and in cash according to new procedures established by senior executives of Chiquita. The newly-implemented procedures concealed the fact that Chiquita was making direct cash payments to the AUC. A senior Chiquita officer had described these new procedures to Chiquita's Audit Committee on April 23, 2002.

## Chiquita Continued to Pay the AUC After the AUC Was Designated as an FTO

The U.S. government designated the AUC as an FTO on Sept. 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was even more widely reported in the public media in Colombia, where Chiquita had its substantial banana-producing operations. Chiquita also had specific information about the AUC's designation as an FTO through an Internet-based, password-protected subscription service that Chiquita paid money to receive. Nevertheless, from Sept. 10, 2001 through Feb. 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.

## Chiquita Continued To Pay the AUC Against the Advice of Outside Counsel

On Feb. 20, 2003, a Chiquita employee told a senior Chiquita officer that he had discovered that the AUC had been designated by the U.S. government as an FTO. Shortly thereafter, these Chiquita officials spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC. Beginning on Feb. 21, 2003, outside counsel emphatically advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Outside counsel advised Chiquita:

"Must stop payments."

"Bottom Line: CANNOT MAKE THE PAYMENT"

"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"

"General Rule: Cannot do indirectly what you cannot do directly"

Concluded with: "CANNOT MAKE THE PAYMENT"

"You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

"[T]he company should not make the payment."

On April 3, 2003, a senior Chiquita officer and a member of Chiquita's Board of Directors first reported to the full Board that Chiquita was making payments to a designated FTO. A Board member objected to the payments and recommended that Chiquita consider taking immediate corrective action, including withdrawing from Colombia. The Board did not follow that recommendation, but instead agreed to disclose promptly to the Department of Justice the fact that Chiquita had been making payments to the AUC. Meanwhile, Banadex personnel were instructed to continue making the payments.

## Chiquita Disclosed the Payments to the Department of Justice, but Continued to Make Them

On April 24, 2003, a senior Chiquita officer and a Chiquita Board member, along with outside counsel, disclosed to officials of the U.S. Department of Justice that Chiquita had been making payments to the AUC for years, and represented

Case 1:07-cv-01957-PLF   Document 7-14   Filed 01/25/2008   Page 4 of 4

that the payments had been made under threat of violence. Department of Justice officials told the Chiquita representatives that the payments were illegal and could not continue. Department of Justice officials acknowledged that the issue of continued payments was complicated. On Sept. 8, 2003, outside counsel advised Chiquita in writing that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

Notwithstanding the persistent advice of its outside counsel, the Department of Justice's statement that the payments were illegal and could not continue, and Board involvement in the matter, Chiquita continued to pay the AUC throughout 2003 and early 2004. From April 24, 2003 (the date of Chiquita's initial disclosure to the Justice Department) through February 4, 2004, Chiquita made 20 payments to the AUC totaling over $300,000. Chiquita sold Banadex to a Colombian buyer in June 2004.

Chiquita has already provided the government with voluminous corporate records and made numerous company witnesses available for questioning in connection with this matter. As part of the plea agreement, Chiquita has committed to cooperate fully with the ongoing investigation.

The plea agreement is the result of a joint investigation by the Department of Commerce and ICE. In announcing today's plea agreement, Assistant Attorney General Wainstein, U.S. Attorney Taylor, Deputy Assistant Secretary Wysong, and Special Agent in Charge Reid commended the concerted efforts of Commerce Special Agent Christopher Tafe and ICE Special Agent Theodore Schmitz. They praised Oliver John-Baptiste of the Litigation Support Unit, Paralegal Specialist Amber Wetzel, Assistant U.S. Attorneys Jonathan M. Malis and Denise Cheung, and Department of Justice Trial Attorney Stephen Ponticiello, who are prosecuting the case. They also recognized the efforts of former Assistant U.S. Attorney John A. Beasley and Linda Otani McKinney, Assistant U.S. Attorney Jeanne M. Hauch, and Department of Justice Trial Attorney Michael D. Taxay, all of whom worked on this matter at earlier stages.

###

07-161

EXHIBIT L





PRINTER-FRIENDLY FORMAT
SPONSORED BY

**November 15, 2007**

# Victims of Colombian Conflict Sue Chiquita Brands

**By THE ASSOCIATED PRESS**

Victims of Colombia's civil conflict sued the banana importer Chiquita Brands International yesterday, accusing it of making payments to a paramilitary group responsible for thousands of killings.

The lawsuit, filed in Federal District Court in Manhattan, accused Chiquita of complicity in hundreds of deaths because of its financial support of the United Self-Defense Forces of Colombia, also known by its Spanish initials, A.U.C.

The plaintiffs include relatives of 387 people thought to have been killed by the group, which was responsible for some of the worst massacres in Colombia's long-running conflict and was designated a terrorist group by the United States government in 2001.

The families are seeking $7.86 billion in damages from Chiquita, which they accuse of abetting atrocities including terrorism, war crimes and crimes against humanity.

A spokesman said Chiquita, which is based in Cincinnati, would fight the civil lawsuit, one of several filed recently by Colombian citizens and human rights groups.

Chiquita has acknowledged that its former subsidiary, Banadex, had paid $1.7 million to the A.U.C. from 1997 to 2004. The company has also admitted that the payments were illegal; it pleaded guilty this year to violating counterterrorism laws and agreed to pay a $25 million fine.

But Chiquita has repeatedly insisted that it had no choice but to pay protection money to groups that had threatened to turn death squads loose on its banana plantations and employees.

"We reiterate that Chiquita and its employees were victims and that the actions taken by the company were always motivated to protect the lives of our employees and their families," a Chiquita spokesman, Michael Mitchell, said.

The New York lawyer who filed the lawsuit on behalf of the families, Jonathan Reiter, said Chiquita's support of the A.U.C. went beyond mere "protection payments" and included the shipment of thousands of rifles.

Chiquita sold its Colombian subsidiary in 2004, but it continues to buy Colombian bananas from independent suppliers.

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

-

EXHIBIT M

# Coughlin Stoia Geller Rudman & Robbins LLP

**Coughlin Stoia Geller Rudman & Robbins LLP** ("Coughlin Stoia") is a 190-lawyer firm with offices in San Diego, San Francisco, Los Angeles, New York, Boca Raton, Washington, D.C. and Philadelphia (*www.csgrr.com*). Coughlin Stoia is actively engaged in complex litigation, emphasizing securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions. Coughlin Stoia's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys who have successfully prosecuted thousands of class-action lawsuits. As a result, Coughlin Stoia attorneys have been responsible for recoveries of more than $45 billion.

This successful track record stems from our experienced attorneys, including many who left partnerships at other firms or came to Coughlin Stoia from federal, state and local law enforcement and regulatory agencies, including dozens of former prosecutors and SEC attorneys. Coughlin Stoia also includes more than 25 former federal and state judicial clerks.

Coughlin Stoia currently represents more institutional investors, including public and multi-employer pension funds – domestic and international financial institutions – in securities and corporate litigation than any other firm in the United States.

Coughlin Stoia is committed to practicing law with the highest level of integrity and in an ethical and professional manner. We are a diverse firm with lawyers and staff from all walks of life. Our lawyers and other employees are hired and promoted based on the quality of their work and their ability to enhance our team and treat others with respect and dignity. Evaluations are never influenced by one's background, gender, race, religion or ethnicity.

We also strive to be good corporate citizens and to work with a sense of global responsibility. Contributing to our communities and our environment is important to us. We raised hundreds of thousands of dollars in aid for the victims of Hurricane Katrina and we often take cases on a *pro bono* basis. We are committed to the rights of workers and to the extent possible, we contract with union vendors. We care about civil rights, workers' rights and treatment, workplace safety and environmental protection. Indeed, while we have built a reputation as the finest securities and consumer class action law firm in the nation, our lawyers have also worked tirelessly in less high-profile, but no less important, cases involving human rights.

## Practice Areas

### Securities Fraud

As recent corporate scandals demonstrate clearly, it has become all too common for companies and their executives – and often with the help of their advisors, such as bankers, lawyers and accountants – to manipulate the market price of their securities by misleading the public about the company's financial condition or prospects for the future. This misleading information has the effect of artificially inflating the price of the company's securities above their true value. When the underlying truth is eventually revealed, the prices of these securities plummet, harming those innocent investors who relied upon the company's misrepresentations.

Coughlin Stoia is the leader in the fight to provide investors with relief from corporate securities fraud. We utilize a wide range of federal and state laws to provide investors with remedies, either by

bringing a class action on behalf of all affected investors or, where appropriate, by bringing individual cases.

The Firm's reputation for excellence has been repeatedly noted by courts and has resulted in the appointment of Coughlin Stoia attorneys to lead roles in hundreds of complex class-action securities and other cases. In the securities area alone, the Firm's attorneys have been responsible for a number of outstanding recoveries on behalf of investors. Currently, Coughlin Stoia attorneys are lead or named counsel in approximately 500 securities class action or large institutional-investor cases. Some current and past cases include:

- ***In re Enron Corp. Sec. Litig.***, Case No. H-01-3624 (S.D. Tex.). Coughlin Stoia attorneys are sole lead counsel representing the interests of Enron investors in this class action alleging securities fraud violation against numerous defendants, including many of Wall Street's biggest banks and law firms. To date, Coughlin Stoia attorneys and lead plaintiff The Regents of the University of California have obtained settlements in excess of $7.3 billion for the benefit of investors, the largest aggregate settlement in securities litigation history.

- ***In re WorldCom Sec. Litig. (Alaska Electrical Pension Fund v. CitiGroup, Inc.)***, Case No. 03-CV-8269 (DLC) (S.D.N.Y.). Coughlin Stoia attorneys represented more than 50 private and public institutions that opted out of the class-action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998-2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Coughlin Stoia attorneys recovered more than $650 million for its clients on the May 2000 and May 2001 bond offerings (the primary offerings at issue), substantially more than they would have recovered in the class.

- ***In re Cardinal Health, Inc. Sec. Litig.***, Case No. C2-04-00575 (ALM) (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Coughlin Stoia obtained a recovery of $600 million that was preliminarily approved in July 2007. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, the California Ironworkers Field Trust Fund and PACE Industry Union-Management Pension Fund, Coughlin Stoia aggressively pursued class claims and won notable courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth largest settlement in the history of securities fraud litigation and is the largest ever recovery in a securities fraud action in the Sixth Circuit.

- ***AOL Time Warner Cases I & II***, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles County). Coughlin Stoia represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, about a dozen Australian public and private funds, insurance companies, and numerous additional institutional investors, domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger

with internet high flier America Online.  Coughlin Stoia attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue.  After almost four years of litigation involving extensive discovery, Coughlin Stoia secured combined settlements for its opt-out clients totaling over $618 million just weeks before The Regents' case pending in California state court was scheduled to go to trial.  The Regents' gross recovery of $244 million is the largest individual opt-out securities recovery in history.

- *In re HealthSouth Corp. Sec. Litig.*, Case No. CV-03-BE-1500-S (N.D. Ala.).  As court-appointed co-lead counsel, Coughlin Stoia attorneys obtained a landmark settlement of $445 million from HealthSouth and certain of its former directors and officers and certain other parties for the benefit of stockholder plaintiffs.  A product of hard-fought litigation, the settlement represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the Private Securities Litigation Reform Act of 1995.  For nearly a decade, HealthSouth, its investment bankers and its auditor perpetrated one of the largest and most pervasive frauds in the history of United States healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions.  Coughlin Stoia attorneys continue to prosecute complex civil actions vigorously against remaining defendants, including former HealthSouth CEO Richard Scrushy as well as UBS AG and Ernst & Young LLP for their participation in this massive scheme to defraud HealthSouth's investors.  In January 2007, Coughlin Stoia attorneys defeated the remaining defendants' motions to dismiss, and the case has now proceeded to full discovery where Coughlin Stoia attorneys are aggressively marshaling the evidence required to win further large recoveries for the victims of this immense fraud.

- *In re Qwest Commc'ns  Int'l, Inc. Sec. Litig.*, Case No. 01-CV-1451-REB-CBS (D. Colo.).  Coughlin Stoia attorneys are currently serving as lead counsel for the class of investors that purchased Qwest securities.  In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice.  After five years of litigation, lead plaintiffs entered into a proposed partial settlement with Qwest and certain individual defendants that guarantees a $400 million recovery for the class and further provides for a mechanism that will allow the vast majority of class members to share in an additional $250 million recovered by the SEC.  The district court approved the settlement in late 2006.  Non-settling defendants such as Joseph P. Nacchio and Robert S. Woodruff have appealed the final approval of the settlement.  Coughlin Stoia will continue to prosecute the class' claims against Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO respectively of Qwest during large portions of the class period.

- *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.).  Coughlin Stoia attorneys served as lead counsel for a class of investors that purchased AT&T common stock.  The case charged defendants AT&T Corporation and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, the largest IPO in American history.  After two weeks of trial, and on the eve of scheduled testimony by

Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million. In granting approval of the settlement, the Court stated the following about the Coughlin Stoia attorneys handing the case:

> Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

- ***Brody v. Hellman*** (U.S. West Dividend Litigation), Case No. 00-CV-4142 (Dist. Ct. for the City and Cty. of Denver, Colo.). Coughlin Stoia attorneys were court-appointed counsel for the class of former stockholders of U.S. West, Inc. who sought to recover a dividend declared by U.S. West before its merger with Qwest. The merger closed before the record and payment dates for the dividend, which Qwest did not pay following the merger. The case was aggressively litigated, and the plaintiffs survived a motion to dismiss, two motions for summary judgment, and successfully certified the class over vigorous opposition from defendants. In certifying the class, the Court commented, "Defendants do not contest that Plaintiffs' attorneys are extremely well qualified to represent the putative class. This litigation has been ongoing for years; in that time Plaintiffs' counsel has proven that they are more than adequate in ability, determination, and resources to represent the putative class." The case settled for $50 million on the day before trial was scheduled to commence. At the August 30, 2005 final approval hearing relating to the settlement, the Court noted that the case "was litigated by extremely talented lawyers on both sides" and that the settlement was "a great result." In describing the risk taken by Coughlin Stoia and its co-counsel, the Court noted, "There wasn't any other lawyer[] in the United States that took the gamble that these people did. Not one other firm anywhere said I'm willing to take that on. I'll go five years. I'll pay out the expenses. I'll put my time and effort on the line." In discussing the difficulties facing Coughlin Stoia in this case, the Court said, "There wasn't any issue that wasn't fought. It took a great deal of skill to get to the point of trial." In concluding, the Court remarked that the class was "fortunate they had some lawyers that had the guts to come forward and do it."

Coughlin Stoia's Securities Department includes dozens of former federal and state prosecutors and trial attorneys. The Firm's securities practice is also strengthened by the existence of a strong Appellate Department, whose collective work has established numerous legal precedents. The Securities Department also utilizes an extensive group of in-house economic and damage analysts, investigators and forensic accountants to aid in the prosecution of complex securities issues.

While obtaining monetary recoveries for our clients is our primary focus, Coughlin Stoia attorneys have also been at the forefront of securities fraud ***prevention***. The Firm's prevention efforts are focused on creating important changes in corporate governance, either as part of the global

settlements of derivative and class cases or through court orders.  Recent cases in which such changes were made include:

- ***Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Hanover Compressor Co.***, Case No. H-02-0410 (S.D. Tex.).   Groundbreaking corporate governance changes obtained include: direct shareholder nomination of two directors; mandatory rotation of the outside audit firm; two-thirds of the board required to be independent*;* audit and other key committees to be filled only by independent directors;  and creation and appointment of lead independent director with authority to set up board meetings.

- ***In re Sprint Corp. S'holder Litig.***, Case No. 00-CV-230077 (Cir. Ct. Jackson County, Mo.).   In connection with the settlement of a derivative action involving Sprint Corporation, the company adopted over 60 new corporate governance provisions which, among other things, established a truly independent board of directors and narrowly defines "independence" to eliminate cronyism between the board and top executives; required outside board directors to meet at least twice a year without management present; created an independent director who will hold the authority to set the agenda, a power previously reserved for the CEO; and imposed new rules to prevent directors and officers from vesting their stock on an accelerated basis.

- ***Teachers' Ret. Sys. of La. v. Occidental Petroleum Corp.***, Case No. BC185009 (Cal. Super. Ct., Los Angeles County).   As part of the settlement, corporate governance changes were made to the composition of the company's board of directors, the company's nominating committee, compensation committee and audit committee.

- ***Barry v. E*Trade Group, Inc.***, Case No. CIV419804 (Cal. Super. Ct., San Mateo County).   In connection with settlement of derivative suit, excessive compensation of the company's CEO was eliminated (reduced salary from $800,000 to zero; bonuses reduced and to be repaid if company restates earnings; reduction of stock option grant; and elimination of future stock option grants) and important governance enhancements were obtained, including the appointment of a new unaffiliated outside director as chair of board's compensation committee.

Through these efforts, Coughlin Stoia has been able to create substantial shareholder guarantees to prevent future securities fraud.  The Firm works closely with noted corporate governance consultant Robert Monks and his firm, LENS Governance Advisors, to shape corporate governance remedies for the benefit of investors.

## Corporate Takeover Litigation

Coughlin Stoia is at the forefront of representing the rights of the public shareholders of companies whose management has agreed to a corporate buyout, merger or other corporate transaction.  Directors and officers of public companies owe shareholders the highest fiduciary duties under the law.  Because corporate takeover transactions are often riddled with conflicts of interest, the duties owed to shareholders are all too often breached, resulting in transactions that are either financially unfair to shareholders, procedurally unfair to shareholders, or both.  Among the cases in which

Coughlin Stoia attorneys have successfully represented shareholders in corporate takeover litigation are:

- ***Charter Township of Clinton Police and Fire Ret. Sys. v. OSI Res. Partners, Inc.***, Case No. 06-010348 (Hillsborough County Cir. Ct., Fla.). On behalf of a large institutional investor, Coughlin Stoia's attorneys sued to block a deal under which two private equity firms teamed up with the founders and executives of the Outback Steakhouse ("OSI") chain to take the company private. As a result of the litigation, OSI was forced to make major modifications to the corporate merger agreement and to disclose a host of additional financial and other information about the negotiations to shareholders. This, in turn, led to a concern by the private equity buyers that the shareholders, armed with more information, would vote against the transaction. Thus, the consideration was increased by over $60 million. The OSI shareholders approved the transaction, which was improved both procedurally and financially by the litigation.

- ***In re HCA Inc. S'holder Litig.***, Case No. 06-1816 III (Davidson County Ch. Ct., Tenn.). Coughlin Stoia represented Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust, on behalf of itself and HCA's shareholders, in this action challenging the inadequate process by which defendants agreed to sell HCA (the $33 billion sale was the largest management-led buyout in history at the time it was announced). On the eve of a preliminary injunction hearing challenging the sale of HCA, defendants capitulated to Coughlin Stoia's client's demands and agreed to various provisions that helped ensure a fair merger process for HCA's public shareholders. Specifically, Coughlin Stoia was instrumental in achieving the following substantial benefits on behalf of the class: (i) a material expansion of appraisal rights for those HCA shareholders who opted for appraisal rather than accepting the $51 per share offered in the transaction; (ii) a $280 million (or almost 60%) reduction in the termination fee that that would have been payable to the buyout group in the event that a competing bid for HCA emerged, thus making competing bids more feasible; (iii) disclosure of additional material information to shareholders, thus aiding them in deciding whether to approve or reject the transaction, and whether to seek appraisal as an alternative thereto; and (iv) a provision creating "majority of the minority" protection for the company's public shareholders which would permit the litigation to proceed unless the transaction obtained the approval of a majority of those shareholders unaffiliated with the First family (HCA's controlling shareholders).

- ***Wetzel v. Karol*** (ElkCorp Derivative), Case No. CC-06-18562-B (Dallas County Ct. at Law, Tex.). Coughlin Stoia's attorneys challenged defendants' modifications to ElkCorp's shareholder rights plan (the "poison pill") as a deal-protection device to "lock up" the proposed buyout of the company by Carlyle and prevent the company shareholders from tendering their shares into the tender offer that had been made by Building Materials Corporation of America ("BMCA"). The Court granted Coughlin Stoia's request for a temporary restraining order which prohibited defendants from issuing any rights certificates pursuant to the poison pill and also prohibited the payment of a termination fee of $29 million by the company to Carlyle.

- ***In re Prime Hospitality, Inc. S'holders Litig.***, Case No. 652-N, 2005 Del. Ch. LEXIS 61 (Del. Ch. Ct. May 4, 2005). On behalf of a large institutional investor, Coughlin Stoia's attorneys successfully objected to an inadequate settlement in this action. After the Court refused to approve the settlement and granted the institutional investor's motion to intervene, Coughlin Stoia successfully renegotiated a $25 million settlement for Prime Hospitality's shareholders.

- ***In re Cablevision Sys. Corp. S'holders Litig.***, Case No. 06-016807 (N.Y. Super. Ct., County of Nassau). Coughlin Stoia represented a large institutional investor as one of the court-appointed lead counsel in a lawsuit seeking to block the attempted buyout of Cablevision by its majority shareholders. The litigation resulted in an increase of more than $2.2 billion in cash consideration being offered to Cablevision's public stockholders, and provided additional protections, including $300 million of personal guarantees from the controlling shareholders for any liabilities payable as a result of a breach of the merger agreement.

- ***Phillips v. Reckson Assoc. Realty Corp.***, Case No. 06-12871 (N.Y. Super. Ct., County of Nassau). Coughlin Stoia served as lead counsel in an action involving the takeover of Reckson Associates Corporation by SL Green Realty Corporation pursuant to which SL Green was to acquire Reckson and then sell a large portion of Reckson's real estate properties back to former members of Reckson's management team. Following briefing on a motion for a preliminary injunction, defendants agreed, among other things, that if the former members of Reckson's management sell their interests in certain of those properties at a profit within three years, Reckson's stockholders would receive an agreed-upon percentage of any such profit. In addition, in the event that Reckson's former management is given the right and approval to develop a certain parcel of land, they are required to pay Reckson's former shareholders an additional $20 million in cash. Moreover, as part of the settlement, Reckson's former shareholders received Reckson's interests in contingent profit-sharing participations in connection with the sale of certain Long Island industrial properties. Also, as a result of the litigation, defendants were required to make additional disclosures about the terms and conditions of the deal between SL Green and Reckson management. Those disclosures resulted in shareholders demanding and receiving a $25 million dividend.

## Options Backdating Litigation

As has been widely reported in the media, the stock options backdating scandal suddenly engulfed hundreds of publicly traded companies throughout the country. Coughlin Stoia is at the forefront of investigating and, where necessary, pursuing options backdating derivative and securities cases in this new and developing area. Coughlin Stoia's lawyers are presently prosecuting the enormous and high-profile *UnitedHealth Group* securities class action in Minnesota, where the California Public Employees' Retirement System is the court-appointed sole lead plaintiff. Coughlin Stoia's lawyers are also serving as lead counsel in several large derivative actions such as *The Home Depot, Inc.*, *Vitesse Semiconductor*, *Family Dollar Stores, Inc.* and *KLA-Tencor Corp.*

**Insurance**

Fraud in the insurance industry by executives, agents, brokers, lenders and others is one of the most costly crimes in America. Driving up everyone's insurance prices, some experts estimate the annual cost of this rising tide of white collar crime to be $120 billion nationally. Coughlin Stoia stands at the forefront in protecting the rights of consumers and state and federal entities against insurance fraud and unfair business practices in the insurance industry.

Coughlin Stoia attorneys were the first to expose the illegal and improper bid-rigging and kickback scandal between insurance companies and their brokers. The Firm is currently one of the lead firms representing businesses, individuals, school districts, counties and the State of California in numerous actions in state and federal courts nationwide.

Our attorneys prosecute claims relating to the fraudulent and improper sale and servicing of insurance policies to recoup losses for victimized policy owners. For example, Coughlin Stoia attorneys have represented and continue to represent policy owners against insurance companies who made misrepresentations at the point of sale concerning how the policy will perform, the amount of money the policy will cost, and whether premiums will "vanish." Claims also include allegations that purchasers were misled concerning the financing of a new policy, falling victim to a "replacement" or "churning" sales scheme where they were convinced to use loans, partial surrenders or withdrawals of cash values from an existing permanent life insurance policy to purchase a new policy.

Coughlin Stoia attorneys have long been at the forefront of race discrimination litigation against life insurance companies for their practice of intentionally charging African-Americans and other minorities more for life insurance than similarly situated Caucasians. Our attorneys have recovered over $400 million for African-Americans and other minority class members as redress for the civil rights abuses they were subjected to, including landmark recoveries in *McNeil v. Am. Gen. Life & Accident Ins. Co.*, *Thompson v. Metro. Life Ins. Co.* and *Williams v. United Ins. Co. of Am*.

Coughlin Stoia attorneys have also battled the automobile insurance companies that insist on placing low quality "imitation" parts on their customer's cars. The insurance group is also actively litigating against those insurers who overcharge their customers for their insurance coverage.

**Antitrust**

Coughlin Stoia's antitrust practice focuses on representing businesses and individuals who have been the victims of price-fixing, unlawful monopolization, tying and other anticompetitive conduct. The Firm has taken a leading role in many of the largest federal and state price-fixing, monopolization and tying cases throughout the United States.

- ***The Apple iPod iTunes Antitrust Litig.***, Case No. C-05-00037-JW (N.D. Cal.). Coughlin Stoia is one of two firms appointed lead counsel for the proposed iPod direct-purchaser class – a class of several million people. Plaintiffs assert that Apple illegally tied the purchase of digital music and video files from its iTunes Store to the purchase of an iPod by making it impossible to play music and video purchased on iTunes using other portable players, and unlawfully monopolized the market for portable digital music players. This conduct locked Apple's competitors out of the market and allowed

Apple to inflate the price at which iPods were sold.  The trial court denied Apple's motion to dismiss and discovery continues.

- ***In re Digital Music Antitrust Litig.***, MDL No. 1780 (S.D.N.Y.).  Coughlin Stoia attorneys are co-lead counsel in an action against the major music labels (Sony-BMG, EMI, Universal and Warner Music Group) in a case involving music that can be downloaded digitally from the Internet.  In this case, plaintiffs allege that defendants restrained the development of digital downloads and agreed to fix the distribution price of digital downloads at supracompetitive prices.  Plaintiffs also allege that as a result of defendants' restraint of the development of digital downloads, and the market and price for downloads, defendants were able to maintain the prices of their CDs at supracompetitive levels.  Defendants' motion to dismiss is being briefed.

- ***In re Late Fee and Over-Limit Fee Litig.***, Case No. C-07-00634-SBA (N.D. Cal.). Coughlin Stoia attorneys are lead counsel in an action against the major credit card issuers (Citibank, Bank of America, JPMorgan/Chase, Wells Fargo and Washington Mutual), challenging the pricing of late fees and over-limit fees on substantive due process grounds.  In addition, plaintiffs allege that defendants have agreed to set the prices of late fees at supracompetitive levels.  Defendants' motion to dismiss is being briefed.

- ***In re NASDAQ Market-Makers Antitrust Litig.***, MDL No. 1023 (S.D.N.Y.).  Coughlin Stoia attorneys served as co-lead counsel in this case, in which investors alleged that NASDAQ market-makers set and maintained artificially wide spreads pursuant to an industry-wide conspiracy.  After three and one half years of intense litigation, the case settled for a total of $1.027 billion, the largest ever antitrust settlement. The Court commended counsel for its work, saying:

  > Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful, and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

  *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

  One of the most significant events in the case – Judge Sweet's decision to certify the class – resulted from efforts by Coughlin Stoia lawyers, including oral argument by Leonard B. Simon, Of Counsel to Coughlin Stoia.

- ***In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.***, MDL No. 1720 (E.D.N.Y.).  Coughlin Stoia attorneys are co-lead counsel in the world's largest antitrust action (in terms of dollar value of commerce).  In this case, a class of merchants allege Visa, MasterCard and their member banks, including Bank of America, Citibank, JPMorgan Chase, Capital One, Wells Fargo and HSBC among others, have conspired to fix the price of the interchange rate on credit cards and signature debit cards.  In addition, plaintiffs allege that the defendants have set and enforced rules against merchants that restrain competition in the payment card industry,

including the no-surcharge rule and the no-minimum-purchase rule.  The motions to dismiss are *sub judice* and discovery continues.

Other cases include:

- ***Hall v. NCAA*** (Restricted Earnings Coach Antitrust Litigation), Case No. 94-2392-KHV (D. Kan.).  Coughlin Stoia attorneys served as lead counsel and lead trial counsel for one of three classes of coaches who alleged that the National Collegiate Athletic Association illegally fixed their compensation by instituting the "restricted earnings coach" rule.  On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- ***Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*** (Carbon Fiber Antitrust Litigation), Case No. CV-99-7796 (C.D. Cal.).  Coughlin Stoia attorneys were co-lead counsel (with one other firm) in this consolidated class action, in which a class of purchasers alleged that the major producers of carbon fiber fixed its price from 1993 to 1999.  The case settled for $675 million.

- ***In re DRAM Antitrust Litig.***, MDL No. 1486 (N.D. Cal.).  Coughlin Stoia attorneys served on the executive committee in this multi-district class action, in which a class of purchasers of dynamic, random access memory chips, known as DRAM, alleged that the leading manufacturers of semiconductor products fixed the price of DRAM from the fall of 2001 through at least the end of June 2002.  The case settled for more than $300 million.

- ***In re Disposable Contact Lens Antitrust Litig.***, MDL No. 1030 (M.D. Fla.).  Coughlin Stoia attorneys served as co-lead counsel for a class of contact lens wearers alleging that the principal manufacturers of disposable contact lenses conspired with the leadership of the American Optometric Association and other eye care practitioners to boycott alternative channels of contact lens distribution, including pharmacies and mail order suppliers.  The case settled for $89 million five weeks into a jury trial.

- ***Microsoft I-V Cases***, J.C.C.P. No. 4106 (Cal. Super. Ct., San Francisco County).  Coughlin Stoia attorneys served on the executive committee in these consolidated cases, in which California indirect purchasers challenged Microsoft's illegal exercise of monopoly power in the operating system, word processing and spreadsheet markets.  In a settlement approved by the Court, class counsel obtained an unprecedented $1.1 billion worth of relief for the business and consumer class members who purchased the Microsoft products.

- ***In re Currency Conversion Antitrust Litig.***, MDL No. 1409 (S.D.N.Y.).  Coughlin Stoia attorneys have recovered $336 million for credit and debit cardholders in this multi-district litigation, in which Coughlin Stoia serves as co-lead counsel.  Plaintiffs allege that VISA and MasterCard, and certain leading member banks of Visa and MasterCard, conspired to fix and maintain the foreign currency conversion fee charged to United States cardholders, and failed to disclose adequately the fee in violation of federal law. The trial court has preliminary approved a $336 million settlement.  The proposed $336 million settlement awaits final approval.

- ***In re Carbon Black Antitrust Litig.***, MDL No. 1543 (D. Mass.). Coughlin Stoia attorneys recovered $20 million for the class in this multi-district litigation price-fixing class action, in which Coughlin Stoia serves as co-lead counsel. Plaintiffs purchased carbon black from major producers that allegedly unlawfully conspired to fix the price of carbon black, which is used in the manufacture of tires, rubber and plastic products, inks and other products, from 1999 through the present. The proposed settlement $20 million awaits final approval.

## Consumer Fraud

Coughlin Stoia's attorneys represent plaintiffs nationwide in a variety of important, complex consumer class actions. Coughlin Stoia attorneys have taken a leading role in many of the largest federal and state consumer fraud, human rights, environmental, public health and tobacco-related cases throughout the United States. Coughlin Stoia is also actively involved in numerous cases relating to the financial services industry, pursuing claims on behalf of individuals victimized by abusive mortgage lending practices, including violations of the Real Estate Settlement Procedures Act, market timing violations in connection with the sale of variable annuities and deceptive consumer credit lending practices in violation of the Truth-In-Lending Act.

Current consumer cases include:

- ***Florida Emergency Room Physicians HMO Litigation***. Coughlin Stoia attorneys represent emergency care physicians suing four HMOs over improper payments. The cases, pending in state court in Florida, have been litigated all the way up to the Florida Supreme Court, which upheld a lower appellate court's ruling in favor of the physicians.

- ***Home Loan Lenders Overcharging Consumers***. Coughlin Stoia attorneys represent customers of Wells Fargo, Washington Mutual and Countrywide, alleging that these banks have improperly overcharged home-loan customers hundreds of dollars for work that costs only a few dollars per loan.

- ***Cellphone Termination Fee Cases***. Coughlin Stoia attorneys are co-lead counsel in a lawsuit against the six major wireless telephone service providers in California. The plaintiffs allege that the early termination fee provisions in defendants' contracts are illegal penalties under California law, designed to unfairly tether consumers to long-term contracts and prevent customers from changing their wireless service providers. Classes have been certified against Nextel, Sprint and Verizon.

Prior consumer cases include:

- ***Tenet Healthcare Cases***. Coughlin Stoia attorneys were co-lead counsel in a class action alleging a fraudulent scheme of corporate misconduct, resulting in the overcharging of uninsured patients by the Tenet chain of hospitals. The Firm's attorneys represented uninsured patients of Tenet hospitals nationwide who were overcharged by Tenet's admittedly "aggressive pricing strategy" which resulted in price gouging of the uninsured. The case was settled with Tenet changing its practices and making refunds to patients.

- ***Kehoe v. Fidelity Fed.***, Case No. 03-80593-CIV (S.D. Fla.).  After years of litigation that included appeals to the United States Supreme Court, Coughlin Stoia attorneys successfully negotiated a $50 million all cash settlement in this cutting-edge case involving consumer privacy rights.  The published decision in *Kehoe*, one of the first opinions construing the Federal Drivers Privacy Protection Act, was a victory for Coughlin Stoia's clients and has been cited over 50 times by other courts since its publication in 2005.

- ***Schwartz v. Visa Int'l***, Case No. 822404-4 (Cal. Super. Ct., Alameda County).  After years of litigation and a six month trial, Coughlin Stoia attorneys won one of the largest consumer-protection verdicts ever awarded in the United States.  Coughlin Stoia attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders.  The Court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest.  In addition, the Court ordered full disclosure of the hidden fee.

- ***In re Lifescan, Inc. Consumer Litig.***, Case No. CV-98-20321-JF (N.D. Cal.).  Coughlin Stoia attorneys were responsible for achieving a $45 million all cash settlement with Johnson & Johnson and its wholly owned subsidiary, Lifescan, Inc., over claims that Lifescan deceptively marketed and sold a defective blood-glucose monitoring system for diabetics.  The Lifescan settlement was noted by the District Court for the Northern District of California as providing "exceptional results" for members of the class.

**Human Rights, Labor Practices and Public Policy**

Coughlin Stoia attorneys have a long tradition of representing the victims of unfair labor practices and violations of human rights.  These include:

- ***Does I v. The Gap, Inc.***, Case No. 01 0031 (D. N. Mariana Islands).  In this groundbreaking case, Coughlin Stoia attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top United States retailers such as The Gap, Target and J.C. Penney.  In the first action of its kind, Coughlin Stoia attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan.  This case was a companion to two other actions: ***Does I v. Advance Textile Corp.***, Case No. 99 0002 (D. N. Mariana Islands), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and ***UNITE v. The Gap, Inc.***, Case No. 300474 (Cal. Super. Ct., San Francisco County), which alleged violations of California's Unfair Practices Law by the United States retailers.  These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones.  The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts at bringing about the precedent-setting settlement of the actions.

- ***Kasky v. Nike, Inc.***, 27 Cal. 4th 939 (2002). The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising. The Court rejected defense contentions that any misconduct was protected by the First Amendment, finding the heightened constitutional protection afforded to noncommercial speech inappropriate in such a circumstance.

- ***World War II-Era Slave Labor***. Against steep odds, the Firm's lawyers took up the claims of people forced to work as slave labor for Japanese corporations during the Second World War. Their human rights case ran into trouble when the Ninth Circuit agreed with the Bush administration that any claims against Japanese corporations and their subsidiaries were preempted by the federal government's foreign-affairs power. *See Deutsch v. Turner,* 324 F.3d 692 (9th Cir. 2003). The case nonetheless demonstrates the lawyers' dedication to prosecuting human-rights violations against the challenge of formidable political opposition.

- ***The Cintas Litigation***. Brought against one of the nation's largest commercial laundries for violations of the Fair Labor Standards Act for misclassifying truck drivers as salesmen to avoid payment of overtime.

- ***Taco Bell workers***. Coughlin Stoia attorneys represented over 2,300 Taco Bell workers who were denied thousands of hours of overtime pay because, among other reasons, they were improperly classified as overtime-exempt employees.

Shareholder derivative litigation brought by Coughlin Stoia attorneys at times also involves stopping anti-union activities, including:

- ***Southern Pacific/Overnite***. A shareholder action stemming from several hundred million dollars in loss of value in the company due to systematic violations by Overnite of United States labor laws.

- ***Massey Energy***. A shareholder action against an anti-union employer for flagrant violations of environmental laws resulting in multi-million dollar penalties.

- ***Crown Petroleum***. A shareholder action against a Texas-based oil company for self-dealing and breach of fiduciary duty while also involved in a union lockout.

## Environment and Public Health

Coughlin Stoia attorneys have also represented plaintiffs in class actions related to environmental law. The Firm's attorneys represented, on a *pro bono* basis, the Sierra Club and the National Economic Development and Law Center as *amici curiae* in a federal suit designed to uphold the federal and state use of project labor agreements ("PLAs"). The suit represented a legal challenge to President Bush's Executive Order 13202, which prohibits the use of project labor agreements on construction projects receiving federal funds. Our *amici* brief in the matter outlined and stressed the significant environmental and socio-economic benefits associated with the use of PLAs on large-scale construction projects.

Attorneys with Coughlin Stoia have been involved in several other significant environmental cases, including:

- **Public Citizen v. U.S. D.O.T.**  Coughlin Stoia attorneys represented a coalition of labor, environmental, industry and public health organizations including Public Citizen, The International Brotherhood of Teamsters, California AFL-CIO and California Trucking Industry in a challenge to a decision by the Bush Administration to lift a congressionally-imposed "moratorium" on cross-border trucking from Mexico on the basis that such trucks do not conform to emission controls under the Clean Air Act, and further, that the Administration did not first complete a comprehensive environmental impact analysis as required by the National Environmental Policy Act.  The suit was dismissed by the Supreme Court, the Court holding that because the D.O.T. lacked discretion to prevent cross-border trucking, an environmental assessment was not required.

- **Sierra Club v. AK Steel**.  Brought on behalf of the Sierra Club for massive emissions of air and water pollution by a steel mill, including homes of workers living in the adjacent communities, in violation of the Federal Clean Air Act, Resource Conservation Recovery Act and the Clean Water Act.

- **MTBE Litigation**.  Brought on behalf of various water districts for befouling public drinking water with MTBE, a gasoline additive linked to cancer.

- **Exxon Valdez**.  Brought on behalf of fisherman and Alaska residents for billions of dollars in damages resulting from the greatest oil spill in United States history.

- **Avilla Beach**.  A citizens' suit against UNOCAL for leakage from the oil company pipeline so severe it literally destroyed the town of Avilla Beach, California.

Federal laws such as the Clean Water Act, the Clean Air Act, the Resource Conservation and Recovery Act and state laws such as California Proposition 65 exist to protect the environment and the public from abuses by corporate and government organizations.  Companies can be found liable for negligence, trespass or intentional environmental damage, be forced to pay for reparations and to come into compliance with existing laws.  Prominent cases litigated by Coughlin Stoia attorneys include representing more than 4,000 individuals suing for personal injury and property damage related to the Stringfellow Dump Site in Southern California, participation in the Exxon Valdez oil spill litigation and the toxic spill arising from a Southern Pacific train derailment near Dunsmuir, California.

**The Fight Against Big Tobacco**

Coughlin Stoia attorneys have led the fight against Big Tobacco since 1991.  As an example, Coughlin Stoia attorneys filed the case that helped get rid of Joe Camel representing various public and private plaintiffs, including the State of Arkansas, the general public in California, the cities of San Francisco, Los Angeles and Birmingham, 14 counties in California and the working men and women of this country in the Union Pension and Welfare Fund cases that have been filed in 40 states.  In 1992, Coughlin Stoia attorneys filed the first case in the country that alleged a conspiracy by the Big Tobacco companies.

**Pro Bono**

Coughlin Stoia attorneys have been recognized for their long history of *pro bono* work and demonstrated commitment to providing services for the poor and disenfranchised. In 1999, for example, the Firm's lawyers were honored as finalists for the San Diego Volunteer Lawyer Program's 1999 Pro Bono Law Firm of the Year Award, based on a disability-rights case, *Badua v. City of San Diego*. Linda Kilb, of the Disability Rights Education and Defense Fund, lauded the lawyers', "talent, effort, and commitment" in a case that the local ACLU described as one of the year's most important.

In 2003, the Firm's lawyers earned a nomination for the California State Bar President's *Pro Bono* Law Firm of the Year award. The State Bar President commended them for "dedication to the provision of *pro bono* legal services to the poor" and for "extending legal services to underserved communities." Carl Poirot of the San Diego Volunteer Lawyer Program praised the lawyers for "extraordinary efforts" representing people "who clearly do not have the financial resources or wherewithal to retain legal counsel."

More recently, one of the Firm's lawyers undertook the representation of an impoverished Somali family seeking political asylum. A mother and her children belonged to an ethnic minority subject to systematic persecution and genocidal violence in Somalia. They sought desperately to escape that violence, and also to preserve the children from the genital mutilation forced on Somali girls. Christie Suriel took the case after an initial application for political asylum had been denied – and she vigorously represented the family, which was granted political asylum in May of 2006.

The Firm's lawyers worked as cooperating attorneys with the ACLU in *Sanchez v. County of San Diego,* a class action filed on behalf of welfare applicants subject to the County's "Project 100%" program, under which investigators from the San Diego D.A.'s office, Public Assistance Fraud Division, lacking any suspicion of fraud or wrongdoing, enter and search the home of every person who applies for welfare benefits. The D.A.'s Fraud Division agents would arrive unannounced at applicants' homes and ask to walk through them, inspecting the contents of bedroom closets, dresser drawers and bathroom medicine cabinets. They also initiated "collateral contacts" with neighbors and employers, identifying themselves as Public Assistance Fraud Investigators and asking questions about the applicant – never explaining they had no reason to suspect wrongdoing.

The Firm's lawyers obtained real relief. The County admitted that under controlling regulations it could not make food stamps hinge on the Project 100% "home visits." The district court ruled that the D.A.'s program of unconsented "collateral contacts" violated state regulations – putting an end to the practice of law-enforcement officers interviewing applicants' neighbors and employers without first obtaining the applicants' written consent. With respect to CalWORKs aid to needy families, however, the district court sustained the D.A.'s "home visits" and "walk throughs," rejecting arguments that it violates the Fourth Amendment for law-enforcement officers to inspect the contents of welfare applicants' bedroom closets and bathroom medicine cabinets absent any reason to suspect wrongdoing or ineligibility.

A divided panel of the Ninth Circuit affirmed that ruling over the vigorous dissent of Judge Raymond C. Fisher, who blasted the majority for "suggesting that welfare applicants may be treated the same as convicted criminals." *Sanchez v. County of San Diego,* 464 F.3d 916, 932 (9th Cir. 2006). A petition for *en banc* rehearing was denied with eight judges publicly dissenting from what Judge Harry Pregerson termed "an assault on our country's poor." *Sanchez v. County of San Diego,* 483 F.3d 965,

966 (9th Cir. 2007).  The decision was noted and sharply criticized in the pages of the *Harvard Law Review* and *The New York Times*, and the Firm now is working with a former acting Solicitor General of the United States to obtain review by the United States Supreme Court.

Not all of the Firm's *pro bono* work has focused on rights of impoverished citizens.  As noted above, the Firm's lawyers also have represented groups such as the Sierra Club and the National Economic Development and Law Center as *amici curiae* before the United States Supreme Court.  And senior appellate partner Eric Alan Isaacson has filed *amicus curiae* briefs on behalf of religious organizations and clergy supporting civil rights, opposing government support for discrimination on the basis of personal religious viewpoint, and generally upholding the American traditions of religious freedom and church-state separation.

## JUDICIAL COMMENDATIONS

Coughlin Stoia attorneys have been commended by countless judges all over the country for the quality of their representation in class-action lawsuits.

In October 2007, a $600 million settlement for shareholders in the securities fraud class action against Ohio's biggest drug distributor, Cardinal Health, Inc., was approved – the largest settlement in the Sixth Circuit.  Judge Marbley commented:

> The quality of representation in this case was superb. Lead Counsel, Coughlin Stoia Geller Rudman & Robbins LLP, are nationally recognized leaders in complex securities class actions.  The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action.  Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.

*In Re: Cardinal Health Inc. Sec. Litig.*, No. C2-04-575, 2007 U.S. Dist. LEXIS 95127, at *49 (S.D. Ohio Dec. 31, 2007).

When Judge Harmon appointed Coughlin Stoia attorneys as lead counsel for Enron securities purchasers, she commented, "In reviewing the extensive briefing submitted regarding the Lead Plaintiff/Lead Counsel selection, the Court has found that the submissions of [Coughlin Stoia attorneys] stand out in the breadth and depth of its research and insight."  *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 458 (S.D. Tex. 2002).

Later, in a preliminary class certification order discussing the issues of Enron, Judge Harmon had this to say about the Firm:

> The firm is comprised of probably the most prominent securities class action attorneys in the country. It is not surprising that Defendants have not argued that counsel is not adequate.  Counsel's conduct in zealously and efficiently prosecuting this litigation with commitment of substantial resources to that goal evidences those qualities . . . . Since the beginning they have propelled the *Newby* litigation forward. They have established the website by which attorneys serve and communicate with each other, established the central depository for discovery materials, negotiated an agreed, organized, nonduplicative, and pared-down discovery schedule, and negotiated complex settlements with a number of defendants.

*In re Enron Corp. Sec. Litig.*, No. H-01-3624, 2006 U.S. Dist. LEXIS 43146, at *77 (S.D. Tex. June 5, 2006).

In *Stanley v. Safeskin Corp.*, Case No. 99 CV 454-BTM (S.D. Cal. May 25, 2004), where Coughlin Stoia attorneys obtained $55 million for the class of investors, Judge Moskowitz stated:

> I said this once before, and I'll say it again. I thought the way that your firm handled this case was outstanding. This was not an easy case. It was a complicated case, and every step of the way, I thought they did a very professional job.

In April 2005, in granting final approval of a $100 million settlement obtained after two weeks of trial in *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.), Judge Garret E. Brown, Jr. stated the following about the Coughlin Stoia attorneys prosecuting the case:

> Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

In a December 2006 hearing on the $50 million consumer privacy class action settlement in *Kehoe v. Fidelity Fed.*, Case No. 03-80593-CIV (S.D. Fla.), United States District Court Judge Daniel T.K. Hurley said the following:

> First, I thank counsel. As I said repeatedly on both sides we have been very, very fortunate. We have had fine lawyers on both sides. The issues in the case are significant issues. We are talking about issues dealing with consumer protection and privacy -- something that is increasingly important today in our society. [I] want you to know I thought long and hard about this. I am absolutely satisfied that the settlement is a fair and reasonable settlement. [I] thank the lawyers on both sides for the extraordinary effort that has been brought to bear here.

In July 2007, the Honorable Richard Owen of the Southern District of New York approved the $129 million settlement of the *In re Doral Fin. Corp. Sec. Litig.*, MDL No. 1706 (S.D.N.Y.) finding in his Order that:

> The services provided by Lead Counsel [Coughlin Stoia] were efficient and highly successful, resulting in an outstanding recovery for the Class without the substantial expense, risk and delay of continued litigation. Such efficiency and effectiveness supports the requested fee percentage.
>
> [] Cases brought under the federal securities laws are notably difficult and notoriously uncertain. . . . Despite the novelty and difficulty of the issues raised, Lead Plaintiffs' counsel secured an excellent result for the Class.
>
> . . . Based upon Lead Plaintiff's counsel's diligent efforts on behalf of the Class, as well as their skill and reputations, Lead Plaintiff's counsel were able to negotiate a very favorable result for the Class. . . . The ability of [Coughlin Stoia] to obtain such a

favorable partial settlement for the Class in the face of such formidable opposition confirms the superior quality of their representation.

## NOTABLE CLIENTS

### Public Fund Clients

- Alaska Permanent Fund Corporation.

- Alaska State Pension Investment Board.

- California Public Employees' Retirement System.

- California State Teachers' Retirement System.

- Teachers' Retirement System of the State of Illinois.

- Illinois Municipal Retirement Fund.

- Illinois State Board of Investment.

- Los Angeles County Employees Retirement Association.

- Maine State Retirement System.

- The Maryland-National Capital Park & Planning Commission Employees' Retirement System.

- Milwaukee Employees' Retirement System.

- Minnesota State Board of Investment.

- New Hampshire Retirement System.

- New Mexico Public Funds (New Mexico Educational Retirement Board, New Mexico Public Employees Retirement Association, and New Mexico State Investment Council).

- Ohio Public Funds (Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, Ohio Police and Fire Pension Fund, Ohio State Highway Patrol Retirement System, and Ohio Bureau of Workers' Compensation).

- The Regents of the University of California.

- State Universities Retirement System of Illinois.

- State of Wisconsin Investment Board.

- Tennessee Consolidated Retirement System.

- Washington State Investment Board.

- Wayne County Employees' Retirement System.

- West Virginia Investment Management Board.

## Multi-Employer Clients

- Alaska Electrical Pension Fund.

- Alaska Hotel & Restaurant Employees Pension Trust Fund.

- Alaska Ironworkers Pension Trust.

- Alaska Laborers Employers Retirement Fund.

- Carpenters Pension Fund of West Virginia.

- Carpenters Health & Welfare Fund of Philadelphia & Vicinity.

- Carpenters Pension Fund of Baltimore, Maryland.

- Carpenters Pension Fund of Illinois.

- Southwest Carpenters Pension Trust.

- Central States, Southeast and Southwest Areas Pension Fund.

- Southern Nevada Carpenters Annuity Fund.

- Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund.

- Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds.

- 1199 SEIU Greater New York Pension Fund.

- Massachusetts State Carpenters Pension and Annuity Funds.

- Massachusetts State Guaranteed Fund.

- New England Health Care Employees Pension Fund.

- PACE Industry Union-Management Pension Fund.

- SEIU Staff Fund.

- Southern California Lathing Industry Pension Fund.

- United Brotherhood of Carpenters Pension Fund.

## Additional Institutional Investors

- Bank of Ireland Asset Management.

- Northwestern Mutual Life Insurance Company.

- Standard Life Investments.

## PROMINENT CASES AND PRECEDENT-SETTING DECISIONS

### Prominent Cases

- ***In re Enron Corp. Sec. Litig.***, Case No. H-01-3624 (S.D. Tex.).  In appointing Coughlin Stoia lawyers as sole lead counsel to represent the interests of Enron investors, the Court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers.  Ever since, Coughlin Stoia attorneys and lead plaintiff The Regents of the University of California have aggressively pursued numerous defendants, including many of Wall Street's biggest banks and law firms.  Coughlin Stoia attorneys and The Regents have thus far obtained settlements in excess of $7.3 billion for the benefit of investors.  Coughlin Stoia continues to press substantial and sizable claims against numerous defendants, including Enron's senior-most officers and several large international banks, with every intention of winning further large recoveries at trial for the victims of this corporate catastrophe.

- ***In re NASDAQ Market-Makers Antitrust Litig.***, MDL No. 1023 (S.D.N.Y.).  Coughlin Stoia attorneys served as court-appointed co-lead counsel for a class of investors.  The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry wide conspiracy in one of the largest and most important antitrust cases in recent history.  After three and one half years of intense litigation, the case was settled for a total of $1.027 billion, the largest antitrust settlement ever.  An excerpt from the Court's Opinion reads:

  Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful and well regarded law firms in the country.  It is difficult to conceive of better representation than the parties to this action achieved.

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D. N.Y. 1998).

- ***In re Dynegy Inc. Sec. Litig.***, Case No. H-02-1571 (S.D. Tex.).  As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Coughlin Stoia attorneys obtained a combined settlement of $474 million from Dynegy Inc., Citigroup, Inc. and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha.  Given Dynegy's limited ability to pay, Coughlin Stoia attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company.  Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Coughlin Stoia and The Regents believe will result in benefits to all of Dynegy's stockholders.

- ***In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.***, MDL No. 834 (D. Ariz.).  Coughlin Stoia attorneys served as the court-appointed co-lead counsel for a class of persons who purchased debentures and/or stock in American Continental Corp., the parent company of the now infamous Lincoln Savings & Loan.  The suit charged Charles Keating, other insiders, three major accounting firms, three major law firms, Drexel Burnham, Michael Milken and others with racketeering and violations of securities laws.  Recoveries totaled $240 million on $288 million in losses.  A jury also rendered verdicts of more than $1 billion against Keating and others.

- **In re 3Com, Inc. Sec. Litig.**, Case No. C-97-21083-JW (N.D. Cal.). A hard-fought class action alleging violations of the federal securities laws in which Coughlin Stoia attorneys served as lead counsel for the class and obtained a recovery totaling $259 million.

- **Mangini v. R.J. Reynolds Tobacco Co.**, Case No. 939359 (Cal. Super. Ct., San Francisco County). In this case, R.J. Reynolds admitted, "the *Mangini* action, and the way that it was vigorously litigated, was an early, significant and unique driver of the overall legal and social controversy regarding underage smoking that led to the decision to phase out the Joe Camel Campaign."

- **Cordova v. Liggett Group, Inc.**, Case No. 651824 (Cal. Super. Ct., San Diego County), and **People v. Philip Morris, Inc.**, Case No. 980864 (Cal. Super. Ct., San Francisco County). Coughlin Stoia attorneys, as lead counsel in both these actions, played a key role in these cases which were settled with the Attorneys General global agreement with the tobacco industry, bringing $26 billion to the State of California as a whole and $12.5 billion to the cities and counties within California.

- **Does I v. The Gap, Inc.**, Case No. 01 0031 (D. N. Mariana Islands). In this ground-breaking case, Coughlin Stoia attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top United States retailers such as The Gap, Target and J.C. Penney. In the first action of its kind, Coughlin Stoia attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan. This case was a companion to two other actions: **Does I v. Advance Textile Corp.**, Case No. 99 0002 (D. N. Mariana Islands) – which alleged overtime violations by the garment factories under the Fair Labor Standards Act, and **UNITE v. The Gap, Inc.**, Case No. 300474 (Cal. Super. Ct., San Francisco County), which alleged violations of California's Unfair Practices Law by the United States retailers. These actions resulted in a settlement of approximately $20 million that included a comprehensive Monitoring Program to address past violations by the factories and prevent future ones. The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts at bringing about the precedent-setting settlement of the actions.

- **In re Exxon Valdez**, Case No. A89 095 Civ. (D. Alaska), and **In re Exxon Valdez Oil Spill Litig.**, Case No. 3 AN 89 2533 (Alaska Super. Ct., 3d Jud. Dist.). Coughlin Stoia attorneys served on the Plaintiffs' Coordinating Committee and Plaintiffs' Law Committee in the massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. A jury verdict of $5 billion was obtained and is currently on appeal.

- **In re Wash. Pub. Power Supply Sys. Sec. Litig.**, MDL No. 551 (D. Ariz.). A massive litigation in which Coughlin Stoia attorneys served as co-lead counsel for a class that obtained recoveries totaling $775 million after several months of trial.

- **Hall v. NCAA** (Restricted Earnings Coach Antitrust Litigation), Case No. 94-2392-KHV (D. Kan.). Coughlin Stoia attorneys were lead counsel and lead trial counsel for one of three classes of coaches in consolidated price fixing actions against the National Collegiate Athletic Association. On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- **Newman v. Stringfellow** (Stringfellow Dump Site Litigation), Case No. 165994 MF (Cal. Super. Ct., Riverside County). Coughlin Stoia attorneys represented more than 4,000 individuals suing

for personal injury and property damage arising from their claims that contact with the Stringfellow Dump Site may have caused them toxic poisoning. Recovery totaled approximately $109 million.

- ***In re Prison Realty Sec. Litig.***, Case No. 3:99-0452 (M.D. Tenn.). Coughlin Stoia attorneys served as lead counsel for the class, obtaining a $105 million recovery.

- ***In re Honeywell Int'l, Inc. Sec. Litig.***, Case No. 00-cv-03605 (DRD) (D.N.J.). Coughlin Stoia attorneys served as lead counsel for a class of investors that purchased Honeywell's common stock. The case charged defendants Honeywell and its top officers with violations of the federal securities laws, alleging defendants made false public statements concerning Honeywell's merger with Allied Signal, Inc., and also alleging that defendants falsified Honeywell's financial statements. After extensive discovery, Coughlin Stoia attorneys obtained a $100 million settlement for the class.

- ***In re AT&T Corp. Sec. Litig.***, MDL No. 1399 (D.N.J.). Coughlin Stoia attorneys served as lead counsel for a class of investors that purchased AT&T common stock. The case charged defendants AT&T Corporation and its former Chairman and Chief Executive Officer, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, the largest IPO in American history. After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million.

- ***In re Reliance Acceptance Group, Inc. Sec. Litig.***, MDL No. 1304 (D. Del.). Coughlin Stoia attorneys served as co-lead counsel and obtained a recovery of $39 million.

- ***Schwartz v. Visa Int'l.***, Case No. 822404-4 (Cal. Super. Ct., Alameda County). After years of litigation and a six month trial, Coughlin Stoia attorneys won one of the largest consumer protection verdicts ever awarded in the United States. Coughlin Stoia attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders. The Court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest. In addition, the Court ordered full disclosure of the hidden fee.

- ***Thompson v. Metro. Life Ins. Co.***, Case No. 00-cv-5071 (HB) (S.D.N.Y.). Coughlin Stoia attorneys served as lead counsel and obtained $145 million for the class in a settlement involving racial discrimination claims in the sale of life insurance.

- ***In re Prudential Ins. Co. of Am. Sales Practices Litig.***, MDL No. 1061 (D.N.J.). In one of the first cases of its kind, Coughlin Stoia attorneys obtained a settlement of over $1.2 billion for deceptive sales practices in connection with the sale of life insurance involving the "vanishing premium" sales scheme.

- ***In re Cardinal Health, Inc. Sec. Litig.***, Case No. C2-04-00575(ALM) (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Coughlin Stoia obtained a recovery of $600 million that was preliminarily approved in July 2007. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, the California Ironworkers Field Trust Fund and PACE Industry Union-Management Pension Fund, Coughlin Stoia aggressively pursued claims of securities fraud and won notable court room victories, including a decision on defendants' motion to dismiss. *In re Cardinal Health Inc., Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the

$600 million settlement was the tenth largest settlement in the history of securities fraud litigation and is the largest ever recovery in a securities fraud action in the Sixth Circuit.

# Precedent-Setting Decisions

**Investor and Shareholder Rights**

• ***In re Daou Sys. Inc. Sec. Litig.***, 411 F.3d 1006 (9th Cir. 2005).  The Ninth Circuit sustained investors' allegations of accounting fraud and ruled that loss causation was adequately alleged by pleading that the value of the stock they purchased declined when the issuer's true financial condition was revealed.

• ***Barrie v. Intervoice-Brite, Inc.***, 409 F.3d 653 (5th Cir. 2005).  The Fifth Circuit held that where corporate officers made public statements together, an investor's allegations of the false statements meets the heightened pleading requirements for federal securities claims, and that the corporate officer who stood by silently while false statements were made – failing to correct them – may be liable along with the officer who actually made them.

• ***Ill. Mun. Ret. Fund v. Citigroup, Inc.***, 391 F.3d 844 (7th Cir. 2004).  The Seventh Circuit upheld a district court's decision that the Illinois Municipal Retirement Fund was entitled to litigate its claims under the Securities Act of 1933 against WorldCom's underwriters before a state court rather than before the federal forum sought by the defendants.

• ***City of Monroe Employees Ret. Sys. v. Bridgestone Corp.***, 387 F.3d 468 (6th Cir. 2005).  The Sixth Circuit held that a statement regarding objective data supposedly supporting a corporation's belief that its tires were safe was actionable, where jurors could have found a reasonable basis to believe the corporation was aware of undisclosed facts seriously undermining the statement's accuracy.

• ***Nursing Home Pension Fund, Local 144 v. Oracle Corp.***, 380 F.3d 1226 (9th Cir. 2004).  The Ninth Circuit ruled that defendants' fraudulent intent could be inferred from allegations concerning their false representations, insider stock sales and improper accounting methods.

• ***Southland Sec. Corp. v. INSpire Ins. Solutions Inc.***, 365 F.3d 353 (5th Cir. 2004).  The Fifth Circuit sustained allegations that an issuer's CEO made fraudulent statements in connection with a contract announcement.

• ***No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.***, 320 F.3d 920 (9th Cir. 2003).  *America West* is a landmark Ninth Circuit decision holding that investors pleaded with particularity facts raising a strong inference of corporate defendants' fraudulent intent under heightened pleading standards of the Private Securities Litigation Reform Act of 1995.

• ***Pirraglia v. Novell, Inc.***, 339 F.3d 1182 (10th Cir. 2003).  In *Pirraglia*, the Tenth Circuit upheld investors' accounting-fraud claims, concluding that their complaint presented with particularity facts raising a strong inference of the defendants' fraudulent intent, and that absence of insider trading by individual defendants did not mean they lacked a motive to commit fraud.

- ***In re Cavanaugh***, 306 F.3d 726 (9th Cir. 2002).  In *Cavanaugh*, the Ninth Circuit disallowed judicial auctions to select lead plaintiffs in securities class actions, and protected lead plaintiffs' right to select the lead counsel they desire to represent them.

- ***Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.***, 238 F.3d 363 (5th Cir. 2001).  In *Lone Star Ladies*, the Fifth Circuit upheld investors' claims that securities-offering documents were incomplete and misleading, reversing a district court Order that had applied inappropriate pleading standards to dismiss the case.

- ***Bryant v. Dupree***, 252 F.3d 1161 (11th Cir. 2001).  The Eleventh Circuit held that investors were entitled to amend their securities-fraud complaint to reflect further developments in the case, reversing a contrary district court Order.

- ***In re WorldCom Sec. Litig. (Cal. Pub. Employees' Ret. Sys. v. Caboto-Gruppo Intesa, BCI)***, Case No. 05-6979-CV, 2007 U.S. App. LEXIS 17797 (2d Cir. July 26, 2007).  The Second Circuit held that the filing of a class-action complaint tolls the limitations period for all members of the class, including those who choose to opt out of the class action and file their own individual actions without waiting to see whether the district court certifies a class – reversing the decision below and effectively overruling multiple district-court rulings that *American Pipe* tolling did not apply under these circumstances.

- ***In re Merck & Co., Inc., Sec., Derivative & ERISA Litig.***, Case No. 06-2911, 2007 U.S. App. LEXIS 17000 (3d Cir. July 18, 2007).  In a shareholder derivative suit appeal, the Third Circuit held that the general rule that discovery may not be used to supplement demand-futility allegations does to apply where the defendants enter a voluntary stipulation to produce materials relevant to demand futility without providing for any limitation as to their use.

- ***In re Qwest Commc'ns Int'l***, 450 F.3d 1179 (10th Cir. 2006).  In a case of first impression, the Tenth Circuit held that a corporation's deliberate release of purportedly privileged materials to governmental agencies was not a "selective waiver" of the privileges such that the corporation could refuse to produce the same materials to non-governmental plaintiffs in private securities fraud litigation.

- ***DeJulius v. New England Health Care Employees Pension Fund***, 429 F.3d 935 (10th Cir. 2005).  The Tenth Circuit held that the multi-faceted notice of a $50 million settlement in a securities fraud class action had been the best notice practicable under the circumstances, and thus satisfied both constitutional due process and Rule 23 of the Federal Rules of Civil Procedure.

- ***In re Guidant S'holders Derivative Litig.***, 841 N.E.2d 571 (Ind. 2006).  Answering a certified question from a federal court, the Supreme Court of Indiana issued a unanimous decision holding that a pre-suit demand in a derivative action is unnecessary if the demand would be a futile gesture. The court adopted a "demand futility" standard and rejected the defendants' call for a "universal demand" standard that might have immediately ended the case.

- ***Crandon Capital Partners v. Shelk***, 157 P.3d 176 (Or. 2007).  The Supreme Court of Oregon ruled that a shareholder plaintiff in a derivative action may still seek attorney fees even if the defendants took actions to moot the underlying claims.  Coughlin Stoia attorneys convinced Oregon's

highest court to take the case, and reverse, despite the contrary position articulated by both the trial court and the Oregon Court of Appeals.

- ***Denver Area Meat Cutters and Employers Pension Plan v. Clayton***, 209 S.W.3d 584 (Tenn. Ct. App. 2006).  The Tennessee Court of Appeals rejected an objector's challenge to a class action settlement arising out of Warren Buffet's 2003 acquisition of Tennessee-based Clayton Homes. In their effort to secure relief for Clayton Homes stockholders, Coughlin Stoia attorneys obtained a temporary injunction of the Buffet acquisition for six weeks in 2003 while the matter was litigated in the courts.  The temporary halt to Buffet's acquisition received national press attention.

ADDITIONALLY, IN THE CONTEXT OF SHAREHOLDER DERIVATIVE ACTIONS, Coughlin Stoia attorneys have been at the forefront of protecting shareholders' investments by causing important changes in corporate governance as part of the global settlement of such cases.  Three cases in which such changes were made include:

- ***Teachers' Ret. Sys. of La. v. Occidental Petroleum Corp.***, Case No. BC185009 (Cal. Super. Ct., Los Angeles County).  As part of the settlement, corporate governance changes were made to the composition of the company's board of directors, the company's nominating committee, compensation committee and audit committee.

- ***In re Sprint Corp. S'holder Litig.***, Case No. 00-CV-230077 (Circuit Ct. Jackson County, Mo.). In connection with the settlement of a derivative action involving Sprint Corporation, the company adopted over 60 new corporate governance provisions, which, among other things, established a truly independent board of directors and narrowly defined "independence" to eliminate cronyism between the board and top executives; required outside board directors to meet at least twice a year without management present; created an independent director who will hold the authority to set the agenda, a power previously reserved for the CEO; and imposed new rules to prevent directors and officers from vesting their stock on an accelerated basis.

- ***Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Hanover Compressor Co.***, Case No. H-02-0410 (S.D. Tex.).  Groundbreaking corporate governance changes obtained include: direct shareholder nomination of two directors; mandatory rotation of the outside audit firm; two-thirds of the board required to be independent; audit and other key committees to be filled only by independent directors; and creation and appointment of lead independent director with authority to set up board meetings.

**Insurance**

- ***Harris v. Los Angeles Super. Ct.***, Case No. B195121, 2007 WL 2325580 (Cal. App. 2d Aug. 16, 2007).  In a significant wage and hour case, the California Court of Appeal ruled that a class of claims adjusters employed by a large insurance company was not exempt from California's overtime regulations and, therefore, was entitled to overtime pay under California law.  The Court rejected the insurer's invitation to adopt non-binding federal law that was less protective to workers.

- ***Lebrilla v. Farmers Group, Inc.***, 119 Cal. App. 4th 1070 (2004).  Reversing the trial court, the California Court of Appeal ordered class certification of a suit against Farmers, one of the largest automobile insurers in California and ruled that Farmers' standard automobile policy requires it to

provide parts that are as good as those made by vehicle's manufacturer.  The case involved Farmers' practice of using inferior imitation parts when repairing insureds' vehicles.

- ***Dehoyos v. Allstate Corp.***, 345 F.3d 290 (5th Cir. 2003).  The Fifth Circuit Court of Appeals held that claims under federal civil rights statutes involving the sale of racially discriminatory insurance policies based upon the use of credit scoring did not interfere with state insurance statutes or regulatory goals and were not preempted under the McCarran-Ferguson Act.  Specifically, the Appellate Court affirmed the district court's ruling that the McCarran-Ferguson Act does not preempt civil-rights claims under the Civil Rights Act of 1866 and the Fair Housing Act for racially discriminatory business practices in the sale of automobile and homeowners insurance.  The United States Supreme Court denied defendants' petition for certiorari and plaintiffs can now proceed with their challenge of defendants' allegedly discriminatory credit scoring system used in pricing of automobile and homeowners insurance policies.

- ***In re Monumental Life Ins. Co.*** 365 F.3d 408 (5th Cir. 2004).  The Fifth Circuit Court of Appeals reversed a district court's denial of class certification in a case filed by African-Americans seeking to remedy racially discriminatory insurance practices.  The Fifth Circuit held that a monetary relief claim is viable in a Rule 23(b)(2) class if it flows directly from liability to the class as a whole and is capable of classwide "computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."

- ***Moore v. Liberty Nat'l Life Ins. Co.***, 267 F.3d 1209 (11th Cir. 2001).  The Eleventh Circuit affirmed the district court's denial of the defendant's motion for judgment on the pleadings, rejecting contentions that insurance policyholders' claims of racial discrimination were barred by Alabama's common law doctrine of repose.  The Eleventh Circuit also rejected the insurer's argument that the McCarran-Ferguson Act mandated preemption of plaintiffs' federal civil rights claims under 42 U.S.C. §§1981 and 1982.

- ***Mass. Mut. Life Ins. Co. v. Super. Ct.***, 97 Cal. App. 4th 1282 (2002).  The California Court of Appeal affirmed a trial court's Order certifying a class in an action by purchasers of so-called "vanishing premium" life-insurance policies who claimed violations of California's consumer-protection statutes.  The Court held that common issues predominate where plaintiffs allege a uniform failure to disclose material information about policy dividend rates.

## Consumer Protection

- ***Branick v. Downey Sav. & Loan Ass'n***, 39 Cal. 4th 235 (2006).  Coughlin Stoia attorneys were part of a team of lawyers that briefed this case at the Supreme Court of California.  The Court issued a unanimous decision holding that new plaintiffs may be substituted, if necessary, to preserve actions pending when Proposition 64 was passed by California voters in 2004.  Proposition 64 amended California's Unfair Competition Law and was aggressively cited by defense lawyers in an effort to dismiss cases after the initiative was adopted.

- ***Kasky v. Nike, Inc.***, 27 Cal. 4th 939 (2002).  The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising.  The Court rejected defense contentions that such misconduct was protected by the First Amendment.

- **McKell v. Washington Mut. Inc.**, 142 Cal. App. 4th 1457 (2006).  The California Court of Appeal reversed the trial court, holding that plaintiff's theories attacking a variety of allegedly inflated mortgage related fees were actionable.

- **Kruse v. Wells Fargo Home Mortgage, Inc.**, 383 F.3d 49 (2d Cir. 2004) and **Santiago v. GMAC Mortgage Group, Inc.**, 417 F.3d 384 (3d Cir. 2005).  In two groundbreaking federal appellate decisions, the Second and Third Circuits each ruled that the Real Estate Settlement Practices Act prohibits marking up home loan-related fees and charges.

- **West Corp. v. Super. Ct.**, 116 Cal. App. 4th 1167 (2004).  The California Court of Appeal upheld the trial court's finding that jurisdiction in California was appropriate over the out-of-state corporate defendant whose telemarketing was aimed at California residents.  Exercise of jurisdiction was found to be in keeping with considerations of fair play and substantial justice.

- **Ritt v. Billy Blanks Enters.**, 870 N.E.2d 212 (Ohio Ct. App. 2007).  In the Ohio analog to the *West* case, the Ohio Court of Appeals approved certification of a class of Ohio residents seeking relief under Ohio's consumer protection laws for the same telemarketing fraud.

- **Lavie v. Procter & Gamble Co.**, 105 Cal. App. 4th 496 (2003).  The California Court of Appeal issued an extensive opinion elaborating, for the first time in California law, the meaning of the "reasonable consumer" standard.  The Court announced a balanced approach that has enabled actions under California's leading consumer protection statutes when necessary to protect the public from acts of unfair business competition.

- **Spielholz v. Superior Court**, 86 Cal. App. 4th 1366 (2001).  The California Court of Appeal held that false advertising claims against a wireless communications provider are not preempted by the Federal Communications Act of 1934.

- **Sanford v. MemberWorks, Inc.**, 483 F.3d 956 (9th Cir. 2007).  In a telemarketing-fraud case, where the plaintiff consumer insisted she had never entered the contractual arrangement that defendants said bound her to arbitrate individual claims to the exclusion of pursuing class claims, Ninth Circuit reversed an order compelling arbitration – allowing the plaintiff to litigate on behalf of a class.

- **Benson v. Kwikset Corp.**, 152 Cal. App. 4th 1254 (2007).  In the first published decision to apply California's "Made in the USA" statute, the California Court of Appeal ruled that the statute had been violated and that judgment should be re-entered against Kwikset provided the plaintiff can satisfy Proposition 64's amendments to the Unfair Competition Law.

- **Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n**, 148 P.3d 1179 (Haw. 2006).  The Supreme Court of Hawaii ruled that claims of unfair competition were not subject to arbitration and that claims of tortious interference with prospective economic advantage were adequately alleged.

## Antitrust

- **Law v. NCAA**, 134 F.3d 1010 (10th Cir. 1998).  The Tenth Circuit upheld summary judgment on liability for plaintiffs in college coaches' antitrust action against the National Collegiate Athletic Association on the issue of antitrust liability under §1 of the Sherman Antitrust Act, 15 U.S.C. §1 (plaintiffs subsequently prevailed on a damages trial).  It also upheld the district court's Order

permanently enjoining the NCAA from enforcing the "restricted earnings coach" rule, through which NCAA member institutions limited the salary of certain coaches to $12,000 during the academic year.

- ***In re NASDAQ Market-Makers Antitrust Litig.***, 172 F.R.D. 119 (S.D.N.Y. 1997).  In a case where plaintiffs alleged that approximately 30 NASDAQ market-makers engaged in a conspiracy to restrain or eliminate price competition, the district court certified a class of millions of investors – including institutional investors to be represented by five public pension funds.

- ***In re Disposable Contact Lens Antitrust Litig.***, 170 F.R.D. 524 (M.D. Fla. 1996).  Plaintiff contact lens purchasers alleged that defendant manufacturers conspired on a nationwide basis to eliminate competition and maintain artificially inflated prices for replacement contact lenses.  The district court denied defendant manufacturers' motion to dismiss plaintiffs' Clayton Act claims and granted their motion for class certification, finding that plaintiffs' vertical–conspiracy evidence was general to the class and provided a colorable method of proving impact on the class at trial.

- ***In re Currency Conversion Fee Antitrust Litig.***, 265 F. Supp. 2d 385 (S.D.N.Y. 2003).  In a case consolidating more than 20 putative class actions, plaintiff credit card holders alleged that two credit-card networks, Visa and MasterCard, and their member banks, conspired to fix the foreign-currency conversion fees they charged.  The district court found that plaintiffs pleaded facts sufficient to permit the inference of an antitrust conspiracy, denying defendants' motion to dismiss the antitrust allegations.

# THE FIRM'S PARTNERS

**RAMZI ABADOU** graduated from Pitzer College in 1994 and received his Master of Arts degree from Columbia University in 1997. Between 1997 and 1999, Mr. Abadou served as an Adjunct Political Science and Labor History Professor at Foothill College in Los Altos Hills, California.

Mr. Abadou graduated from Boston College Law School in 2002 and clerked for the Major Frauds and Economic Crimes Section for the United States Attorney's Office in San Diego. Mr. Abadou prosecutes securities fraud class actions and handles all aspects of the Firm's lead plaintiff practice. In this role, Mr. Abadou has helped enable many of the Firm's institutional clients serve as lead plaintiffs in precedent-setting cases, such as: *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298 (S.D. Ohio 2005); *Frank v. Dana Corp.*, 236 F.R.D. 349 (N.D. Ohio 2006); *In re NorthWestern Corp. Sec. Litig.*, 299 F. Supp. 2d 997 (D.S.D. 2003); *In re UnitedHealth Group, Inc. Sec. Litig.*, No. 06-1691-JMR (FLN) (D. Minn. 2006); *In re Unumprovident Corp. Sec. Litig.*, No. 1:03-CV-049 (E.D. Tenn. 2003); *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.*, No. 1:04CV00416 (M.D.N.C. 2004); *In re Alstom SA Sec. Litig.*, No. 03-CV-6595 (S.D.N.Y. 2003); *In re Abercrombie & Fitch Co. Sec. Litig.*, No. 2:05-CV-0819 (S.D. Ohio 2005); and *Borochoff v. GlaxoSmithKline PLC*, 246 F.R.D. 201 (S.D.N.Y. 2007).

Mr. Abadou was a featured panelist at the American Bar Association's 11th Annual National Institute on Class Actions in October 2007.  Mr. Abadou is admitted to the California Bar and is licensed to practice in all California state courts, as well as the U.S. District Courts for the Southern, Northern, and Central Districts of California.

**X. JAY ALVAREZ** graduated from the University of California, Berkeley, with a Bachelor of Arts degree in Political Science in 1984. He earned his Juris Doctor degree from the University of California, Berkeley, Boalt Hall, in 1987 and entered private practice in San Diego, California that same year.

Mr. Alvarez served as an Assistant United States Attorney for the Southern District of California from 1991-2003.  As an Assistant United States Attorney, Mr. Alvarez obtained extensive trial experience, including the prosecution of bank fraud, money laundering, and complex narcotics conspiracy cases. During his tenure as an Assistant United States Attorney, Mr. Alvarez also briefed and argued numerous appeals before the Ninth Circuit Court of Appeals.

At Coughlin Stoia, Mr. Alvarez's practice areas include securities fraud litigation and other complex litigation.

**LAURA ANDRACCHIO** focuses primarily on litigation under the federal securities laws. She has litigated dozens of cases against public companies in federal and state courts throughout the country, and has contributed to hundreds of millions of dollars in recoveries for injured investors. Most recently, Ms. Andracchio led the litigation team in *Brody v. Hellman*, a case against Qwest and former directors of U.S. West seeking an unpaid dividend, recovering $50 million.  In late 2004, she was a lead member of the trial team in *In re AT&T Corp. Sec. Litig.*, which settled for $100 million after two weeks of trial in district court in New Jersey. Prior to trial, Ms. Andracchio was responsible for managing and litigating the case, which was pending for four years.  She was also the lead litigator in *In re P-Com, Inc. Sec. Litig.*, which resulted in a $16 million recovery for the plaintiff class.

Ms. Andracchio is a member of the State Bars of California and Pennsylvania, and the federal district courts for the Northern, Central, and Southern Districts of California and the Western District of Pennsylvania.  She received

her Bachelor of Arts degree from Bucknell University in 1986 and her Juris Doctor degree with honors from Duquesne University School of Law in 1989. While at Duquesne, Ms. Andracchio was elected to the Order of Barristers and represented the Law School in the National Samuel J. Polsky Appellate Moot Court competition, in which she placed as a finalist, and in the regional Gourley Cup Trial Moot Court competition.

**A. RICK ATWOOD, JR**. prosecutes securities class actions, merger-related class actions, and shareholder derivative suits at both the trial and appellate levels.

Mr. Atwood was born in Nashville, Tennessee in 1965. In 1987, he received a Bachelor of Arts degree, with honors, in Political Science from the University of Tennessee at Knoxville. In 1988, he received a Bachelor of Arts degree, with great distinction, in Philosophy from the Katholieke Universiteit Leuven in Leuven, Belgium. He received his Juris Doctor degree in 1991 from Vanderbilt University Law School, where he served as Authorities Editor on the *Vanderbilt Journal of Transnational Law*. He was admitted to the California Bar in 1991 and is licensed to practice before the United States District Courts for the Southern, Central, and Northern Districts of California.

Mr. Atwood has successfully represented shareholders in federal and state courts in numerous jurisdictions, including Alabama, California, Colorado, Delaware, Georgia, Hawaii, Illinois, Iowa, Kentucky, Maryland, Missouri, Nevada, New York, New Jersey, North Carolina, Oregon, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Washington, D.C. Significant opinions include *Crandon Capital Partners v. Shelk*, 342 Ore. 555 (2007) (reversing dismissal of action); *Ind. State Dist. Council of Laborers and HOD Carriers Pension Fund v. Renal Care Group, Inc.*, No. 3:05-0451, 2005 U.S. Dist. LEXIS 24210 (M.D. Tenn. Aug. 18, 2005) (successfully obtaining remand of case improperly removed

to federal court under the Class Action Fairness Act); *Pipefitters Locals 522 & 633 Pension Trust Fund v. Salem Commc'ns Corp.*, No. CV 05-2730-RGK (MCx), 2005 U.S. Dist. LEXIS 14202 (C.D. Cal. June 28, 2005) (successfully obtaining remand of case improperly removed to federal court under the Securities Litigation Uniform Standards Act of 1998); *In re Prime Hospitality, Inc. S'holders Litig.*, No. 652-N, 2005 Del. Ch. LEXIS 61 (Del. Ch. May 4, 2005) (successfully objecting to unfair settlement and thereafter obtaining $25 million recovery for shareholders); *Pate v. Elloway*, No. 01-03-00187-CV, 2003 Tex. App. LEXIS 9681 (Tex. App. Houston 1st Dist. Nov. 13, 2003) (upholding grant of class certification and denial of motion to dismiss).

**RANDI D. BANDMAN** is a senior partner at Coughlin Stoia whose responsibilities include coordination of the Firm's Institutional Investor Department and managing the Manhattan and Los Angeles offices. Ms. Bandman received her Juris Doctor degree from the University of Southern California and her Bachelor of Arts degree in English from the University of California at Los Angeles.

Ms. Bandman has represented hundreds of institutional investors in several of the largest and most successful shareholder actions ever prosecuted, both as private and class actions, and involving such companies as WorldCom, AOL Time Warner, Vivendi, Unocal and Boeing.

Using her extensive experience, Ms. Bandman lectures and advises public and multi-employer pension funds, fund managers, banks, hedge funds and insurance companies, both domestically and internationally, on their options for seeking redress for losses due to fraud sustained in their portfolios. These clients include various States and Municipalities, as well as trades such as Teamsters, the Entertainment Industry, Sheet Metal, Construction, Air Conditioning, Food and Hospitality, Nursing and Plumbers.

Ms. Bandman has served as a lecturer to attorneys and insurance professionals for continuing education, as well as a panelist for the Practicing Law Institute.

**RANDALL J. BARON** was born in Albuquerque, New Mexico in 1964. Mr. Baron received his Bachelor of Arts degree from University of Colorado at Boulder in 1987 and his Juris Doctor degree, *cum laude*, from University of San Diego School of Law in 1990. He was a member of the *San Diego Law Review* from 1988-1989. Mr. Baron was admitted to the California Bar in 1990 and the Colorado Bar in 1993. Since 1997, Mr. Baron is licensed to practice in Colorado State Court as well as the United States District Court for the Southern, Northern and Central Districts of California, as well as the District of Colorado.

Formerly, Mr. Baron served as a Deputy District Attorney in Los Angeles County. From 1990-1994, he was a trial deputy in numerous offices throughout Los Angeles County, where he tried over 70 felony cases. Mr. Baron was part of the Special Investigation Division of the Los Angeles District Attorneys office, where he investigated and prosecuted public corruption cases. He concentrates his practice in securities litigation and actions for breach of fiduciary duty.

**JONATHAN E. BEHAR** was born in Los Angeles in 1968. In 1991, Mr. Behar received his Bachelor of Arts degree in English Literature from the University of California at Santa Barbara, with high honors, and his Juris Doctor degree from the University of San Diego School of Law in 1994. He is admitted to the State Bar of California (1994) and the Southern and Central Districts of California (1998 and 2000, respectively).

As a partner at Coughlin Stoia, Mr. Behar currently practices in the areas of securities, environmental and consumer litigation. Mr. Behar was actively involved in the prosecution of two of California's seminal tobacco cases,

*Mangini v. R.J. Reynolds Tobacco Company*, the "Joe Camel" case, as well as *Cordova v. Liggett Group, Inc., et al.*, which alleged a 40-year conspiracy by the United States tobacco manufacturers.

**TIMOTHY G. BLOOD** graduated *cum laude* and with honors in Economics from Hobart College in 1987 and the National Law Center of George Washington University in 1990. He was elected to Phi Beta Kappa, Omicron Delta Epsilon (Economics), and the Moot Court Board (first year honors).

Mr. Blood focuses on consumer fraud and unfair competition litigation with a concentration in actions brought by policyholders against life and property and casualty insurers for deceptive sales practices, racial discrimination and systematic failures in claims adjustment. Mr. Blood has tried a number of class actions, including the precedent-setting case, *Lebrilla v. Farmers Group, Inc.* Mr. Blood also has been involved in a number of cases that have resulted in significant settlements, including *Lebrilla, McNeil v. Am. Gen. Life & Accident Ins. Co.* ($234 million), *Lee v. USLife Corp.* ($148 million), *Garst v. Franklin Life Ins. Co.* ($90.1 million), *In re Gen. Am. Sales Practices Litig.* ($67 million), *Williams v. United Ins. Co. of Am.* ($51.4 million); and *Sternberg v. Apple Computer, Inc.* ($50 million).

Mr. Blood is responsible for several precedent-setting appellate decisions, including *McKell v. Washington Mutual*, 142 Cal. App. 4th 1457 (2006) and *Lebrilla v. Farmers Group, Inc.*, 119 Cal. App. 4th 1070 (2004). Mr. Blood was a finalist for 2007 Consumer Attorney of the Year for the state of California. He is a frequent lecturer on class action procedure and consumer fraud issues and is a member of the Board of Governors of the Consumer Attorneys of California.

Mr. Blood is admitted to practice in California and in the United States Court of Appeals for

the Fifth, Sixth, Eighth, Ninth and Eleventh Circuits, and the United States District Courts for the Southern, Central, Eastern and Northern Districts of California. He is also admitted to the United States District Court for the Eastern District of Arkansas. He is a member of the San Diego County and American Bar Associations, the State Bar of California, the American Association for Justice, the Consumer Attorneys of California, and the Consumer Attorneys of San Diego.

**ANNE L. BOX** graduated from the University of Tulsa with a Bachelor of Science degree in Economics in 1985 and received a Juris Doctor degree in 1988. While in law school, she was the Articles Editor for the *Energy Law Journal* and won the Scribes Award for her article *Mississippi's Ratable-Take Rule Preempted: Transcontinental Gas Pipeline Corp. v. State Oil and Gas Bd.*, 7 Energy L.J. 361 (1986). From 1988-1991, she was an Associate Attorney in the Energy Section of Jenkins & Gilchrist, P.C. in Dallas, Texas. In 1991, she became an Assistant District Attorney in Tarrant County, Texas where she tried over 80 felony cases to verdict. Ms. Box was elevated to Chief Prosecutor in 1998, and along with supervising felony attorneys, her responsibilities included running the day-to-day operations of a felony district court. Ms. Box was admitted to the State Bar of Texas in 1989 and the State Bar of California in 2003. Her practice at Coughlin Stoia focuses on securities fraud.

**DOUGLAS R. BRITTON** was born in Los Angeles, California, in 1968. Mr. Britton received his Bachelor of Business Administration degree from Washburn University in Topeka, Kansas in 1991 and his Juris Doctor degree, *cum laude*, from Pepperdine University Law School in 1996. Mr. Britton was admitted to the Nevada Bar in 1996 and to the California Bar in 1997 and is admitted to practice in all of the state courts in California, as well as the United States District Courts for the Northern, Southern, Eastern, and Central Districts of California. Mr. Britton has been litigating

securities class action lawsuits since his admission to the Bar in 1996.

**ANDREW J. BROWN** was born in Northern California in 1966. He received his Bachelor of Arts degree from the University of Chicago in 1988 and received his Juris Doctor degree from the University of California, Hastings College of Law in 1992. Upon passing the Bar, Mr. Brown worked as a trial lawyer for the San Diego County Public Defender's Office. In 1997, he opened his own firm in San Diego, representing consumers and insureds in lawsuits against major insurance companies. His current practice focuses on representing consumers and shareholders in class action litigation against companies nationwide.

As a partner of Coughlin Stoia, Mr. Brown continues to change the way corporate America does business. He prosecutes complex securities fraud and shareholder derivative actions, resulting in multi-million dollar recoveries to shareholders and precedent-setting changes in corporate practices. Examples include: *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858 (E.D. Tenn 2005); *Does I v. The Gap, Inc.*, Case No. 010031 (D. N. Mariana Islands); *Arlia v. Blankenship*, 234 F. Supp. 2d 606 (S.D. W.Va. 2002); and *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581 (N.D. Ohio 2004).

Mr. Brown is admitted to the state Bar of California and admitted to practice before the United States District Courts for all Districts in California.

**JOY ANN BULL** received her Juris Doctor degree, *magna cum laude*, from the University of San Diego in 1988. She was a member of the University of San Diego National Trial Competition Team and the *San Diego Law Review*. Ms. Bull focuses on the litigation of complex securities and consumer class actions.

For nine years, Ms. Bull has concentrated her practice in negotiating and documenting

complex settlement agreements and obtaining the required court approval of the settlements and payment of attorneys' fees. These settlements include: *In re Dole S'holders Litig.*, Case No. BC281949 (Cal. Super. Ct., Los Angeles County) ($172 million recovery plus injunctive relief); *Lindmark v. Am. Express*, Case No. 00-8658-JFW(CWx) (C.D. Cal.) ($38 million cash payment plus injunctive relief); *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030 (M.D. Fla.) ($89 million); *In re LifeScan, Inc. Consumer Litig.*, Case No. C-98-20321-JF(EAI) (N.D. Cal.) ($45 million cash recovery); *In re Bergen Brunswig Corp. Sec. Litig.*, Case No. SACV-99-1305-AHS(ANx) (C.D. Cal.) ($27.9 million cash recovery); *Hall v. NCAA*, Case No. 94-2392-KHV (D. Kan.) (more than $70 million cash recovery); *In re Glen Ivy Resorts, Inc.*, Case No. SD92-16083MG (Banker. Ct. C.D. Cal.) ($31 million cash recovery); and *In re Advanced Micro Devices Sec. Litig.*, Case No. C-93-20662-RPA(PVT) (N.D. Cal.) ($34 million cash recovery).

**CHRISTOPHER M. BURKE** earned his Juris Doctor degree from the University of Wisconsin in 1993 and his Ph.D. in 1996. His practice areas include antitrust and consumer protection. He has been part of the trial teams that successfully prosecuted the *In re Disposable Contact Lens Antitrust Litig.* ($89 million) and *Schwartz v. Visa* ($800 million).

Prior, he was an Assistant Attorney General at the Wisconsin Department of Justice. He has lectured on law-related topics including constitutional law, law and politics and civil rights at the State University of New York at Buffalo and at the University of Wisconsin. His book, *The Appearance of Equality: The Supreme Court and Racial Gerrymandering* (Greenwood, 1999), examines conflicts over voting rights and political representation within the competing rhetoric of communitarian and liberal strategies of justification.

**SPENCER A. BURKHOLZ** received his Bachelor of Arts degree in Economics, *cum laude*, from Clark University in 1985, where he was elected to Phi Beta Kappa, and received his Juris Doctor degree from the University of Virginia School of Law in 1989. Mr. Burkholz specializes in securities class actions and has been one of the senior lawyers on some of the most high-profile cases in the nation in the past decade.

Mr. Burkholz was one of the lead attorneys representing over 60 public and private institutional investors that filed and settled individual actions in the *WorldCom* securities litigation. He is also one of the senior lawyers representing The Regents of the University of California on behalf of all investors in the *Enron* securities class action where investors have recovered over $7 billion. Mr. Burkholz was also responsible for significant settlements in the *Qwest* and *Cisco* securities class actions.

Mr. Burkholz is a member of the California Bar and has been admitted to practice in numerous federal courts throughout the country.

**MICHELLE CICCARELLI** represents shareholders, workers, and consumers in a broad range of complex class-action litigations for securities fraud, fraudulent business practices, human rights abuses, labor and employment violations, as well as derivative litigation for breaches of fiduciary duties by corporate officers and directors. She is the Editor of Coughlin Stoia's *Corporate Governance Bulletin* and *Taking Action - Fighting Corporate Corruption*, and the author of *Improving Corporate Governance Through Litigation Settlements*, Corporate Governance Review, 2003.

She participated in the successful prosecution of several important actions, including *Does I v. The Gap, Inc.* Case No. 01-0031 (D.N. Mariana Islands), in which she was one of the lead litigators, spending several months on

Saipan working with clients, investigating claims, and obtaining discovery. The case was successfully concluded with a $20 million settlement, including a precedent-setting Monitoring Program to monitor labor and human rights practices in Saipan garment factories. She was also a member of the *WorldCom* litigation team, which recovered over $650 million for various institutional investors, and the *Enron* litigation team, which recovered a $7.3 billion partial recovery for the investor class – the largest securities opt-out and class-action securities recoveries in history.

She is a frequent lecturer on securities fraud, corporate governance, and other issues of import to institutional investors, including lecturing at Cornell University Law School (Joint JD/MBA Program 2003) and the University of Kentucky College of Law (Randall-Park Colloquium 2006).

Formerly, she practiced in Kentucky in the area of labor and employment law. She was the co-editor of the *Kentucky Employment Law Letter* (1998) and co-author of *Wage and Hour Update* (Lorman 1998). She was also a regular lecturer for the Kentucky Cabinet for Economic Development.

She was a law clerk to the Honorable Sara Walter Combs, Chief Judge, Kentucky Court of Appeals (1994-1995) after obtaining her Juris Doctor degree from the University of Kentucky in 1993. She is a member of the California and Kentucky Bars, and is admitted to practice before the United States District Courts for both jurisdictions as well as the Sixth Circuit Court of Appeals.

As a law student, she trained lawyers and law students to represent immigrants, *pro bono*, in deportation proceedings at the Federal Penitentiary in Lexington, Kentucky (1992-93) and participated in a summer program in Miami assisting Haitian refugees seeking asylum status (1992). She also served as an intern to former Congressman Joe Kennedy in his Charlestown, Massachusetts office (1992).

**CHRIS COLLINS** earned his Bachelor of Arts degree in History from Sonoma State University in 1988 and his Juris Doctor degree from Thomas Jefferson School of Law. His practice areas include antitrust and consumer protection. Mr. Collins first joined the firm in 1994 and was a part of the trial teams that successfully prosecuted the tobacco industry. Mr. Collins left the firm and served as a Deputy District Attorney for the Imperial County where he was in charge of the Domestic Violence Unit. Mr. Collins is currently counsel on the California Energy Manipulation antitrust litigation, the Memberworks upsell litigation, as well as a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations.

Mr. Collins is a member of the American Bar Association, the Federal Bar Association, the California Bar Association, and the Consumer Attorneys of California and San Diego.

**PATRICK J. COUGHLIN** is the Firm's Chief Trial Counsel, and has been lead counsel for several major securities matters, including one of the largest class action securities cases to go to trial, *In re Apple Computer Sec. Litig.*, Case No. C-84-20148(A)-JW (N.D. Cal.). Mr. Coughlin has argued in the United States Supreme Court on behalf of shareholders, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), in which an important decision was issued by the high court concerning loss causation in securities cases. Although the Court overruled established Ninth Circuit precedent, the decision is widely regarded as a favorable one for investors alleging fraud.

Formerly, Mr. Coughlin was an Assistant United States Attorney in the District of Columbia and the Southern District of California, handling complex white collar fraud matters. During this time, Mr. Coughlin

helped try one of the largest criminal RICO cases ever prosecuted by the United States, *United States v. Brown,* Case No. 86-3056-SWR, as well as an infamous oil fraud scheme resulting in a complex murder-for-hire trial, *United States v. Boeckman,* Case No. 87-0676-K.

Mr. Coughlin's recent trials involving securities violations include cases against Wells Fargo and California Amplifier. Cases that settled on the eve of trial include cases against Alcatel and America West. Mr. Coughlin now heads up the prosecution of the high profile *HealthSouth* and *Enron* cases. Mr. Coughlin has also handled and resolved a number of large securities cases involving such companies as 3Com, Boeing, IDB Communications Group, Unocal, Sybase, Connor, Media Vision, ADAC, Sunrise Medical, Valence, Sierra Tucson and Merisel. Throughout his career, Mr. Coughlin has tried more than 50 jury and non-jury trials. Mr. Coughlin tried one of the largest private RICO trials against the major tobacco companies on behalf of hundreds of thousands of Ohio Taft-Hartley health and welfare fund participants. Mr. Coughlin also helped end the Joe Camel ad campaign, a cartoon ad campaign that targeted children and secured a $12.5 billion recovery for the Cities and Counties of California in the landmark 1998 state settlement with the tobacco companies.

**JOSEPH D. DALEY** received his undergraduate degree from Jacksonville University and his Juris Doctor degree from the University of San Diego School of Law. Mr. Daley is a member of the Firm's Appellate Practice Group, where his practice concentrates on federal appeals. Published precedents include: *In re Merck & Co., Inc.*, 493 F.3d 393 (3d Cir. 2007); *In re Qwest Commc'ns Int'l*, 450 F.3d 1179 (10th Cir. 2006); *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935 (10th Cir. 2005); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004).

Mr. Daley edited the award-winning *Federal Bar Association Newsletter* (San Diego chapter) in the Year 2000, and served as the Year 2000 Chair of San Diego's Co-operative Federal Appellate Committees ("COFACS"). Mr. Daley co-authored *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and Its Import for Securities-Fraud Litigation*, 37 Loy. U. Chi. L.J. 1 (2005), and *The Nonretroactivity of the Private Securities Litigation Reform Act of 1995*, 25 Sec. Regulation L.J. 60 (1997), reprinted in 3 Sec. Reform Act Litig. Rep. 258 (1997) and 25 RICO L. Rep. 819 (1997).

While attending law school, Mr. Daley was a member of the USD Appellate Moot Court Board (1995-1996) and received several awards for written and oral advocacy, including: Order of the Barristers, Roger J. Traynor Constitutional Law Moot Court Competition (Best Advocate Award); Philip C. Jessup International Law Moot Court Competition (United States National Champions, First Place Regional Team); USD Alumni Torts Moot Court Competition (First Place Overall and Best Brief); the USD Jessup International Law Moot Court Competition (First Place Overall and Best Brief); and the American Jurisprudence Award in Professional Responsibility.

Mr. Daley was admitted to the California Bar in 1996. He is admitted to practice before the United States District Courts for the Northern, Southern, Eastern and Central Districts of California, as well as before the Supreme Court of the United States, and the United States Court of Appeals for the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and District of Columbia Circuits.

**PATRICK W. DANIELS** is a founding partner of the Firm and the global director of business development. He received his Bachelor of Arts degree from the University of California, Berkeley, *cum laude,* and his Juris Doctor degree from the University of San Diego School of Law.

Working closely with the Chairman of the Firm, Patrick Coughlin, Mr. Daniels oversees the Firm's client outreach and business development programs. He advises hundreds of public and multi-employer pension funds, fund managers, insurance companies and banks around the world on issues related to corporate fraud in the U.S. securities markets and "best practices" in the corporate governance of publicly traded companies. He has represented dozens of institutional investors in some of the largest and most significant shareholder actions in the United States, including Enron, WorldCom, AOL Time Warner, HealthSouth, Royal Dutch Shell and BP, to name just a few.

Mr. Daniels leads the Firm's cooperative efforts and joint ventures with outside independent advisors to provide advice and counsel to major investors in the United States markets. As part of these joint ventures, Mr. Daniels works very closely with political and financial leaders throughout the world to advise national and state government pension funds, central banks and fund managers in the United States, Australia, the United Kingdom, the Netherlands, and in other countries within the European Union.

In the area of advancing international standards on human rights, Mr. Daniels was a lead counsel in an international coalition of attorneys and human rights groups that won a historic settlement with major United States clothing retailers and manufacturers, including The Gap, Ralph Lauren, Donna Karan and Calvin Klein, on behalf of a class of over 50,000 predominantly female Chinese garment workers on the island of Saipan in an action seeking to hold the Saipan garment industry responsible for creating a system of indentured servitude and forced labor in the island's garment factories. The coalition obtained an unprecedented agreement for supervision of working conditions in the Saipan factories by an independent NGO, as well as a substantial multi-million dollar compensation award for the workers.

Mr. Daniels is based in the Firm's headquarters in San Diego and is also a managing partner of the Firm's Manhattan office.

**STUART A. DAVIDSON** is admitted to practice law in the state courts of Florida, as well as the United States District Courts for the Southern, Middle, and Northern Districts of Florida and the Northern District of Texas, the Eighth, Tenth and Eleventh Circuit Courts of Appeals, and the United States Supreme Court.

Mr. Davidson earned his Bachelor of Arts degree in Political Science from the State University of New York at Geneseo. He then earned his Juris Doctor degree, *summa cum laude*, from Nova Southeastern University Shepard Broad Law Center, where he graduated in the top 3% of his class. At Nova Law, he was an Associate Editor of the Nova Law Review, and was the recipient of Book Awards (highest grade) in Trial Advocacy, Criminal Pretrial Practice, and International Law.

Before joining the Firm in 2004, Mr. Davidson was an associate with the law firm of Geller Rudman, PLLC in Boca Raton, Florida, where he also concentrated his practice on the prosecution of class actions. At Geller Rudman, Mr. Davidson handled numerous cases on behalf of shareholders of public corporations whose shares were to be acquired through leveraged buyouts, mergers, tender offers, and other "change of control" transactions, as well as derivative lawsuits filed against corporate boards, seeking to impose corporate governance reforms aimed at protecting shareholders and eliminating corporate waste and abuse. Mr. Davidson also represented consumers in numerous cases in which allegations of consumer fraud and deceptive trade practices were alleged.

Prior to joining Geller Rudman, Mr. Davidson was an associate at a private law firm in Boca Raton, Florida, where he gained substantial experience in all aspects of securities litigation, including, among other things, SEC and NASD enforcement proceedings, securities regulatory proceedings by state and self-regulatory organizations, federal criminal securities fraud prosecutions, federal securities appellate litigation, and NASD customer arbitration proceedings, as well as acting as counsel for court-appointed receivers in complex federal securities and franchise litigation proceedings. In addition, Mr. Davidson is an experienced trial lawyer, having been a former lead assistant public defender in the Felony Division of the Broward County, Florida Public Defender's Office. During his tenure at the Public Defender's Office, Mr. Davidson tried over 30 jury trials, conducted hundreds of depositions, handled numerous evidentiary hearings, engaged in extensive motion practice, and defended individuals charged with major crimes ranging from third-degree felonies to life and capital felonies.

A substantial portion of Mr. Davidson's time is currently devoted to the representation of investors in class actions involving mergers and acquisitions and in prosecuting derivative lawsuits on behalf of public corporations. Mr. Davidson is also actively involved in prosecuting a number of consumer fraud cases throughout the nation. Mr. Davidson recently served as class counsel in *Kehoe v. Fidelity Federal Bank & Trust*, a consumer class action alleging privacy violations filed in the Southern District of Florida, which was settled for $50 million. In addition, Mr. Davidson currently serves as court-appointed co-lead counsel in *In re Pet Food Products Liability Litigation*, a multidistrict consumer class action pending in the District of New Jersey, where Mr. Davidson represents thousands of aggrieved pet owners nationwide against some of the nation's largest pet food manufacturers, distributors and retailers.

**MICHAEL J. DOWD** graduated from Fordham University, *magna cum laude*, with a Bachelor of Arts degree in History and Latin in 1981. While at Fordham, he was elected to Phi Beta Kappa. He earned his Juris Doctor degree from the University of Michigan School of Law in 1984 and entered private practice in New York that same year. He was admitted to practice in New York in 1985 and in California in 1988.

Mr. Dowd served as an Assistant United States Attorney in the Southern District of California from 1987-1991 and again from 1994-1998. As an Assistant United States Attorney, Mr. Dowd obtained extensive trial experience, including the prosecution of bank fraud, bribery, money laundering and narcotics cases. He is a recipient of the Director's Award for Superior Performance as an Assistant United States Attorney. Mr. Dowd has been responsible for prosecuting complex securities cases and obtaining recoveries for investors, including cases involving AOL Time Warner, WorldCom, Qwest, Vesta, U.S. West, Safeskin and Bergen Brunswig. Mr. Dowd was the lead lawyer for the Coughlin Stoia trial team in *In re AT&T Corp. Sec. Litig.*, which was tried in the District of New Jersey, and settled after two weeks of trial for $100 million. Mr. Dowd also participated in the Firm's tobacco cases.

**TRAVIS E. DOWNS III** received his Bachelor of Arts degree in History, *cum laude*, from Whitworth College in 1985, and received his Juris Doctor degree from University of Washington School of Law in 1990. Mr. Downs concentrates his practice in securities class actions and Shareholders' derivative actions.

Mr. Downs is responsible for the prosecution and recovery of significant settlements in the following cases: *In re Informix Corp. Sec. Litig.*, Case No. C-97-1289-CRB (N.D. Cal.) ($137.5 million recovery); *In re MP3.com, Inc. Sec. Litig.*, Case No. 00-CV-1873-K(NLS) (S.D. Cal.) ($36 million recovery); *In re Conner Peripherals, Inc. Sec. Litig.*, Case No. C-95-2244-

MHP (N.D. Cal.) ($26 million recovery); *In re Silicon Graphics, Inc. II Sec. Litig.*, Case No. 97-4362-SI (N.D. Cal.) ($20.3 million recovery); *In re J.D. Edwards Sec. Litig.*, Case No. 99-N-1744 (D. Colo.) ($15 million recovery); *In re Sony Corp. Sec. Litig.*, Case No. CV-96-1326-JGD(JGx) (C.D. Cal.) ($12.5 million recovery); *In re Veterinary Ctrs. of Am., Inc. Sec. Litig.*, Case No. 97-4244-CBM(MCx) (C.D. Cal.) ($6.75 million recovery); *In re JDN Realty Corp. Derivative Litig.*, Case No. 00-CV-1853 (N.D. Ga.) (obtained extensive corporate governance enhancements); *In re Hollywood Entm't Corp. Sec. Litig.*, Case No. 95-1926-MA (D. Or.) ($15 million recovery); *In re Legato Sys., Inc. Derivative Litig.*, Case No. 413050 (Cal. Super. Ct., San Mateo County) (obtained extensive corporate governance enhancements); and *In re Flagstar Cos., Inc. Derivative Litig.*, Case No. 736748-7 (Cal. Super. Ct., Alameda County) (obtained extensive corporate governance enhancements).

Mr. Downs is a member of the Bar of the State of California and is also admitted to practice before the United States District Courts for the Central, Northern and Southern Districts of California. He is also a member of the American Bar Association and the San Diego County Bar Association. Mr. Downs lectures and participates in professional education programs.

**WILLIAM J. DOYLE II** earned his Bachelor of Arts degree in 1993 from the University of San Diego, majoring in Business Economics. Mr. Doyle earned his Juris Doctor degree in 1997 from California Western School of Law. Previously, Mr. Doyle was a civil litigator with the firm of Wingert Grebing Brubaker & Ryan, LLP in San Diego.

Mr. Doyle's practice focuses on securities fraud, antitrust, and financial services class actions. Mr. Doyle is admitted to practice before the United States Court of Appeal for the First Circuit, the United States District Courts for the Southern, Central, and Northern Districts of California, the United States District Court for the District of Colorado and all California State courts. He is a member of the American Bar Association, the State Bar of California, the Association of Trial Lawyers of America, and the Association of Business Trial Lawyers.

**DANIEL DROSMAN** is a partner with Coughlin Stoia. He is a former federal prosecutor with extensive litigation experience before trial and appellate courts. His practice focuses on securities fraud litigation and other complex civil litigation. Mr. Drosman is admitted to practice in New York and California and before federal courts throughout those states.

Mr. Drosman is a native San Diegan who received his Bachelor of Arts degree in Political Science from Reed College in 1990, with honors, and was a member of Phi Beta Kappa. He received his Juris Doctor degree from Harvard Law School in 1993. Following graduation from law school, Mr. Drosman served for three years as an Assistant District Attorney for the Manhattan District Attorney's Office. While there, Mr. Drosman served in both the appellate section, where he briefed and argued over 25 cases to the New York appellate courts, and in the trial section, where he prosecuted a wide variety of street crime.

From 1996-1997, Mr. Drosman was an associate in the New York office of Weil Gotshal & Manges, where he concentrated his practice in civil litigation and white-collar criminal defense.

In 1997, Mr. Drosman returned to San Diego and became an Assistant United States Attorney in the Southern District of California. In the Southern District, Mr. Drosman tried cases before the United States District Court and briefed and argued numerous appeals before the Ninth Circuit Court of Appeals. He was a member of the border crimes unit, where he was assigned to investigate and prosecute violations of the federal narcotics and immigration laws and official corruption

cases.  During his tenure as an Assistant United States Attorney, Mr. Drosman received the Department of Justice Special Achievement Award in recognition of sustained superior performance of duty.

Mr. Drosman's practice involves representing defrauded investors in securities class actions, an area in which he has co-authored a law journal article.

**AMBER L. ECK** graduated from Pepperdine University *magna cum laude* with a Bachelor of Arts degree in 1990.  Upon graduation, she worked for two years at a Los Angeles legal newspaper, the *Metropolitan News-Enterprise*. Ms. Eck then attended Boston University School of Law, where she received her Juris Doctor degree, *magna cum laude*, in 1995.  At Boston University, Ms. Eck was a member of the Giles Sutherland Rich Intellectual Property Moot Court Team which received honors for Best Brief in the Northeast Region.   In addition, she served as Case and Note Editor for the *Boston University International Law Journal* and Chapter Justice for Phi Alpha Delta.

Ms. Eck has prosecuted securities class actions and shareholder derivative suits for the past ten years.  Ms. Eck received the Wiley W. Manuel Pro Bono Service Award in 1999 and the Distinguished Service Award in 2002 from the County of San Diego for *pro bono* service. Ms. Eck is a member of the California (1995) and Nevada (1996) Bars, and is admitted to practice before the United States District Courts for all districts in both jurisdictions.  She served on the Board of Directors for the Barristers Club of San Diego (1996-1997) and is a member of the American Inns of Court, Enright Chapter.

**THOMAS E. EGLER** was born in Pittsburgh, Pennsylvania in 1967.  Mr. Egler received his Bachelor of Arts degree from Northwestern University in 1989.  Mr. Egler received his Juris Doctor degree in 1995 from Catholic University

of America, Columbus School of Law, where he served as Associate Editor for *Catholic University Law Review* from 1994-1995.  From 1995-1997, Mr. Egler was a law clerk to the Honorable Donald E. Ziegler, Chief Judge, United States District Court, Western District of Pennsylvania.

Mr. Egler was admitted to the California Bar in 1995 and the Pennsylvania Bar in 1996.  He is admitted to practice before the United States District Courts for the Western District of Pennsylvania, the Northern, Southern and Central Districts of California and the United States Court of Appeals for the Third and Eleventh Circuits.

**PAUL J. GELLER** received his Bachelor of Science degree in Psychology from the University of Florida, where he was a member of the University Honors Program.  Mr. Geller then earned his Juris Doctor degree, with Highest Honors, from Emory University School of Law. At Emory, Mr. Geller was an Editor of the *Law Review*, was inducted into the Order of the Coif legal honor society, and was awarded multiple American Jurisprudence Book Awards for earning the highest grade in the school in a dozen courses.

After spending several years representing blue chip companies in class action lawsuits at one of the largest corporate defense firms in the world, Mr. Geller became a founding partner and head of the Boca Raton offices of the national class action boutiques Cauley Geller Bowman & Rudman, LLP and Geller Rudman, PLLC.  In July 2004, through a merger of the firms, Mr. Geller opened the Boca Raton, Florida office of Coughlin Stoia.

In May 2005, Mr. Geller was selected by *The National Law Journal* as one of the nation's top "40 Under 40" – an honor bestowed upon 40 of the country's top lawyers under the age of 40.  The *NLJ* had previously compiled its "40 Under 40" list in July 2002; Mr. Geller is the only lawyer in the country that was selected

for inclusion both in 2002 and again in 2005. In July 2006, as well as July 2003, Mr. Geller was featured in *Florida Trend* magazine as one of Florida's "Legal Elite."   Mr. Geller has also been featured in the *South Florida Business Journal* as one of Florida's top lawyers, and was named one of the nation's top 500 lawyers by Lawdragon in August 2006.  In June 2007, Mr. Geller was selected by *Law & Politics* as one of Florida's top lawyers.

Mr. Geller is rated AV by Martindale-Hubbell (the highest rating available) and has served as lead or co-lead counsel in a majority of the securities class actions that have been filed in the southeastern United States in the past several years, including cases against Teco Energy ($17 million settlement), Hamilton Bancorp ($8.5 million settlement), Prison Realty Trust (co-lead derivative counsel; total combined settlement of over $120 million); and Intermedia Corp. ($38 million settlement). Mr. Geller recently served as one of the court-appointed lead counsel in cases involving the alleged manipulation of the asset value of some of the nation's largest mutual funds, including *Hicks v. Morgan Stanley & Co.*; *Abrams v. Van Kampen Funds, Inc.*; and *In re Eaton Vance Sec. Litig.*   ($51.5 million aggregate settlements).

Mr. Geller is also heavily involved in corporate governance litigation.  For example, Mr. Geller recently represented a shareholder of Applica Inc. who was concerned with allegedly reckless acquisitions made by the company.  Mr. Geller and his partners secured a settlement that required Applica to establish a new independent Acquisitions Committee charged with conducting due diligence and approving future acquisitions, even though such a committee is not required by SEC regulations. In another corporate governance lawsuit, Mr. Geller and his co-counsel challenged the independence of certain members of a Special Committee empanelled by Oracle Corp. to look into certain stock sales made by its Chairman and CEO, Larry Ellison.    After Delaware

Chancery Court Vice Chancellor Leo E. Strine issued an Order agreeing that the Special Committee was "fraught with conflicts," *The Wall Street Journal* called the decision "one of the most far-reaching ever on corporate governance."

Mr. Geller has also successfully represented consumers in class action litigation. He recently settled *Kehoe v. Fidelity Fed.,* a consumer class action alleging privacy violations filed in the Southern District of Florida, for $50 million. He was personal counsel to the lead plaintiff in *Stoddard v. Advanta*, a case that challenged the adequacies of interest rate disclosures by one of the nation's largest credit card companies ($11 million settlement), and was personal counsel to one of the lead plaintiffs in the American Family Publishers sweepstakes litigation, which alleged that the defendant misled consumers into thinking they would win a lottery if they purchased magazine subscriptions ($38 million settlement).

Mr. Geller is currently representing Emergency Room physicians in Florida who are suing four of the nation's largest HMOs for improper payment calculations.  The four related cases have been through numerous appeals.  After Mr. Geller's most recent appellate victory in the case, he was presented an award by the America Law Media's *Daily Business Review* and named one of the 2006 "Florida's Most Effective Lawyers."

During the past few years, several of Mr. Geller's cases have received regional and national press coverage.    Mr. Geller has appeared on CNN Headline News, CNN Moneyline with Lou Dobbs, ABC, NBC and FOX network news programs.    Mr. Geller is regularly quoted in the financial press, including *The New York Times*, *The Wall Street Journal*, *The Washington Post* and *BusinessWeek*.

Mr. Geller has been or is a member of the Association of Trial Lawyers of America, the

Practicing Law Institute, the American Bar Association, the Palm Beach County Bar Association (former Member of Bar Grievance Committee) and the South Palm Beach County Bar Association (former Co-Chair of Pro Bono Committee).

**DAVID J. GEORGE** earned his Bachelor of Arts degree in Political Science from the University of Rhode Island, *summa cum laude*.  Mr. George then graduated at the top of his class at the University of Richmond School of Law. At the University of Richmond, Mr. George was a member of the *Law Review*, was the President of the McNeill Law Society/Order of the Coif, and earned numerous academic awards, including outstanding academic performance in each of his three years there and outstanding graduate.

Before joining the Firm, Mr. George, who is AV rated by Martindale-Hubbell (the highest rating available), was a partner in the Boca Raton office of Geller Rudman, PLLC.  Mr. George, a zealous advocate of shareholder rights, has been lead and/or co-lead counsel with respect to various securities class action matters, including: *In Re Cryo Cell Int'l, Inc. Sec. Litig.* ($7 million settlement); *In Re TECO Energy, Inc. Sec. Litig.* ($17.35 million settlement); *In Re Newpark Res., Inc. Sec. Litig.* ($9.24 million settlement); *In Re Mannatech, Inc. Sec. Litig.* (N.D. Tex.); *In Re Jabil Circuit Sec. Litig.* (S.D. Fla.) and *In Re Shaw Group Sec. Litig.* (E.D. La.).  Mr. George has also acted as lead counsel in numerous consumer class actions, including *Lewis v. Labor Ready, Inc.* ($11 million settlement), *Flaxman v. Geico* (S.D. Fla.) and *In Re Webloyalty, Inc. Mktg. and Sales Practices Litig.* (D. Mass.); among many others. Before joining Geller Rudman, Mr. George spent more than a decade as a commercial litigator with two of the largest corporate law firms in the United States.  During that time, Mr. George aggressively prosecuted and defended a wide array of complex commercial litigation matters, including securities class action matters, non-compete litigation, fraud claims, and real estate-based litigation matters.

Mr. George is licensed to practice law in the state courts of Florida, as well as the United States District Courts for the Southern, Middle, and Northern Districts of Florida, and the First and Fifth Circuit Courts of Appeal.  He is currently or has been a member of the American Bar Association, the Federal Bar Association, the Academy of Florida Trial Lawyers, the Palm Beach County Bar Association, and the Southern Palm Beach County Bar Association.

**JONAH H. GOLDSTEIN** is a partner with Coughlin Stoia.  Formerly, Mr. Goldstein was an Assistant United States Attorney in the United States Attorney's Office for the Southern District of California, where he obtained extensive trial experience (including a seven-defendant 11-week trial), and briefed and argued appeals before the Ninth Circuit Court of Appeals.  Mr. Goldstein has been responsible for prosecuting complex securities cases and obtaining recoveries for investors.  Mr. Goldstein was a member of the Firm's trial team in *In re AT&T Corp. Sec. Litig.*, No. 3:00-CV-5364, which was tried in the United States District Court for the District of New Jersey and settled after two weeks of trial for $100 million.

Mr. Goldstein graduated from Duke University with a Bachelor of Arts degree in Political Science in 1991.  He received his Juris Doctor degree from the University of Denver College of Law in 1995, where he was the Notes & Comments Editor of the *University of Denver Law Review*.  Following graduation from law school, Mr. Goldstein served as a law clerk for the Honorable William H. Erickson on the Colorado Supreme Court.

Mr. Goldstein is admitted to practice in Colorado (1995) and California (1997).

**BENNY C. GOODMAN III'S** practice includes securities fraud class actions and shareholder

derivative litigation. Mr. Goodman is currently working on the *WorldCom, Inc. Securities Litigation*.

Mr. Goodman earned his undergraduate degree in 1994 from Arizona State University, majoring in Management Systems. After college he worked for several years at United Parcel Service and Roadway Express. Mr. Goodman earned his Juris Doctor degree from the University of San Diego in 2000. During his third year of legal studies, Mr. Goodman attended Georgetown University as a visiting student while he worked in the Compliance and Enforcement Division of the Federal Deposit Insurance Corporation.

Mr. Goodman is a member of the California State Bar and is admitted to practice in all United States District Courts in California, as well as the Sixth and Seventh Circuit Courts of Appeal.

**JOHN K. GRANT** was born in Provo, Utah in 1961. Mr. Grant received his Bachelor of Arts degree from Brigham Young University in 1988 and his Juris Doctor degree from the University of Texas at Austin in 1990. Mr. Grant was admitted to the California Bar in 1994.

**KEVIN K. GREEN** is a partner in the Firm's Appellate Practice Group. He received his Bachelor of Arts degree in Political Economy, with honors and distinction, from the University of California at Berkeley in 1989. He took his Juris Doctor degree from Notre Dame Law School in 1995. After admission to the California Bar, he clerked for the Honorable Theodore R. Boehm, Associate Justice, Supreme Court of Indiana, where he developed his interest in appellate work. Mr. Green then returned to California to clerk for the Honorable Barry T. Moskowitz, United States District Court, Southern District of California. The latter position included two sittings by designation on the United States Court of Appeals for the Ninth Circuit.

In 1999, Mr. Green entered practice on behalf of defrauded consumers and investors, focusing from the outset on appeals. After briefing and arguing appellate matters for several years, he became a Certified Appellate Specialist, State Bar of California Board of Legal Specialization. He also advises the Firm's trial litigators on issues and strategy.

Reflecting the practice's national scope, Mr. Green has handled appeals and writs in jurisdictions across the country. The cases involve diverse subject matter and questions of first impression often resulting in published opinions. Illustrative appeals he has briefed and argued include: *Harris v. Los Angeles Super. Ct.*, Case No. B195121, 2007 WL 2325580 (Cal. App. 2d, Aug. 16, 2007); *Ritt v. Billy Blanks Enter.*, 870 N.E.2d 212 (Ohio Ct. App. 2007); *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006); *In re Guidant S'holders Derivative Litig.*, 841 N.E.2d 571 (Ind. 2006); *Denver Area Meat Cutters & Employers Pension Plan v. Clayton*, 209 S.W.3d 584 (Tenn. Ct. App. 2006); *Hyams v. Halifax PLC*, 2005 WL 3441230 (N.J. App. Div., Dec. 16, 2005); *Lebrilla v. Farmers Group, Inc.*, 119 Cal. App. 4th 1070 (2004); *West Corp. v. Super. Ct.*, 116 Cal. App. 4th 1167 (2004); and *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003). In partnership with co-counsel, he assisted in briefing *Branick v. Downey Sav. & Loan Ass'n*, 39 Cal. 4th 235 (2006), and also prepared an *amicus curiae* brief on behalf of the National Association of Shareholder and Consumer Attorneys in *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (2004).

Beyond his appellate practice, Mr. Green is active in professional activities. Since 2006, he has sat on the State Bar of California Committee on Appellate Courts. He is currently the Chair of the Civil Rules Subcommittee of the San Diego County Bar Association's Appellate Court Committee. In connection with the Firm's consumer fraud practice, Mr. Green is a member of the State Bar Antitrust and Unfair Competition Law

Section. He is also a member of the American Constitution Society, the Federal Bar Association, and the California Supreme Court Historical Society.

In the area of publication, Mr. Green is the author of *The Unfair Competition Law After Proposition 64: The California Supreme Court Speaks*, Journal of Competition (Vol. 15, No. 2, Fall/Winter 2006) (published by State Bar Antitrust and Unfair Competition Law Section). While a student, he wrote *A Vote Properly Cast? The Constitutionality of the National Voter Registration Act of 1993*, 22 Journal of Legislation 45 (1996) (published by Notre Dame Law School).

**TOR GRONBORG** was born in Portland, Oregon in 1969. Mr. Gronborg received his Bachelor of Arts degree in 1991 from the University of California at Santa Barbara and was a recipient of an AFL-CIO history scholarship. In 1992, Mr. Gronborg did graduate work in international relations and strategic studies at the University of Lancaster, United Kingdom on a Rotary International Fellowship. Mr. Gronborg received his Juris Doctor degree from Boalt Hall at the University of California at Berkeley where he was a member of the Moot Court Board.

Since 1997, Mr. Gronborg has worked on securities fraud actions and has been lead or co-lead litigation counsel in cases that have recovered more than $800 million, including: *In re Cardinal Health, Inc. Sec. Litig.* ($600 million); *In re Prison Realty Sec. Litig.* ($104 million); *In re Tele-Commc'ns, Inc. Sec. Litig.* ($33 million); and *Rasner v. Sturm*, (FirstWorld Communications) ($26.5 million). Twice, Mr. Gronborg's pleadings have been upheld by the Ninth Circuit (*Broudo v. Dura Pharms., Inc.*, 339 F.3d 933 (9th Cir. 2003); *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005)) and he has been responsible for a number of significant rulings, including: *In re Cardinal Health Inc., Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006); *In re Direct Gen. Corp. Sec. Litig.*,

Case No. 3:05-0077, 2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. 2006); and *In re Dura Pharms., Inc. Sec. Litig.*, 452 F.Supp. 2d 1005 (S.D. Cal. 2006).

Mr. Gronborg was admitted to the California Bar in 1995 and in 1997 was licensed to practice in the courts of the Ninth Circuit and the Northern, Central, and Southern Districts of California. In addition to his securities litigation practice, Mr. Gronborg has lectured on the Federal Rules of Civil Procedure and electronic discovery.

**ELLEN A. GUSIKOFF STEWART** was born in New York, New York in 1964. She received her Bachelor of Arts degree in Economics from Muhlenberg College in 1986 and her Juris Doctor degree from Case Western Reserve University in 1989. Ms. Stewart was admitted to the California Bar in 1989 and is admitted to practice before all federal courts in California, the Sixth and Ninth Circuit Courts of Appeals, and the Western District of Michigan.

Ms. Stewart currently practices in the Firm's settlement department, negotiating and documenting the Firm's complex securities, merger and consumer privacy class and derivative actions. Notably, recent settlements include: *Schwartz v. TXU Corp.*, (N.D. Tex. 2005) ($149.75 million in cash plus corporate governance reforms); *In re Doral Fin. Corp. Sec. Litig.*, (S.D.N.Y. 2007) ($129 million plus corporate governance reforms); *In re Chiron S'holder Deal Litig.*, (Cal. Super. Ct., Alameda County 2006) (significant increase in merger consideration); *In re Payment, Inc. S'holder Litig.*, (Davidson County, Tenn. 2006) (increased merger consideration and improved merger terms).

**KATHLEEN A. HERKENHOFF** received a Bachelor of Arts in English Literature from the University of California at Berkeley in 1989 and received a Juris Doctor degree from Pepperdine University School of Law in 1993. While at Pepperdine, she received American Jurisprudence Awards in Constitutional Law

and Agency-Partnership Law. After graduation from Pepperdine, Ms. Herkenhoff was an enforcement attorney with the United States Securities and Exchange Commission.

Ms. Herkenhoff is a 1993 admittee to the State Bar of California and has been admitted to practice before the United States District Courts for the Northern, Central, Eastern and Southern Districts of California. Ms. Herkenhoff has successfully prosecuted several complex securities class actions, including obtaining a $122 million settlement against Mattel, Inc. and several of its former officers and directors.

**DENNIS J. HERMAN** received his Bachelor of Science degree from Syracuse University in 1982. He is a 1992 graduate of Stanford Law School, where he received the Order of the Coif and the Urban A. Sontheimer Award for graduating second in his class. Mr. Herman concentrates his practice in securities class action litigation.

Mr. Herman served as one of the lead counsel in the successful prosecution of securities actions against Lattice Semiconductor, Inc., Stellent, Inc., and Specialty Laboratories, Inc., each of which resulted in significant, precedent-setting decisions upholding complaints on behalf of defrauded investors. Mr. Herman has also been significantly involved in the prosecution of numerous other securities fraud claims that have resulted in substantial recoveries for investors, including actions filed against VeriSign Corp. ($78 million), NorthWestern Corp. ($40 million), and Electro-Scientific Industries, Inc. ($9 million). Mr. Herman has also successfully represented the estate of a bankrupt company in lawsuits against its former officers and outside auditor seeking recovery for actions that deepened the company's insolvency before it went bankrupt.

Previously, Mr. Herman practiced for 10 years in Denver, Colorado, where he had a general commercial litigation practice and litigated many cases involving fraud and other tort claims, as well as a wide variety of cases involving contract claims, land use disputes, environmental issues, inter-governmental disputes, voting rights, and intellectual property disputes. Mr. Herman is admitted to practice in both California and Colorado, and is a member of the bar of the United States Courts of Appeals for the Fifth, Eighth and Tenth Circuits, as well as the bars of the United States District Courts for Colorado, and the Northern, Central and Southern Districts of California. Prior to attending law school, Mr. Herman was an investigative reporter and editor for a number of newspapers in California and Connecticut.

**HELEN J. HODGES** received her Bachelor of Science degree in accounting from Oklahoma State University in 1979. While attending Oklahoma State, Ms. Hodges obtained her private pilot's license and in 1980 was a member of Oklahoma State's flying team, which won top honors at the National Intercollegiate Flying Association competition. Ms. Hodges became a certified public accountant in 1982 and received her Juris Doctor degree from the University of Oklahoma in 1983, where she was the Managing Editor of the *Law Review*. She was admitted to the State Bars of Oklahoma in 1983 and California in 1987.

Ms. Hodges was a staff accountant with Arthur Andersen & Co. and served as the law clerk for the *Penn Square* cases in the Western District of Oklahoma. Ms. Hodges has been involved in numerous securities class actions, including: *Knapp v. Gomez*, Civ. No. 87-0067-H(M) (S.D. Cal.), in which a plaintiffs' verdict was returned in a Rule 10b-5 class action; *Nat'l Health Labs*, which was settled for $64 million; *Thurber v. Mattel*, which was settled for $122 million and *Dynegy*, which settled for $474 million. In the last several years, Ms. Hodges has focused on prosecution of *Enron*, where a record recovery ($7.3 billion) has been obtained for investors.

Ms. Hodges is rated AV by Martindale-Hubbell (the highest rating available) and she was selected as a Super Lawyer in Southern California Super Lawyers 2007 – San Diego Edition.

**G. PAUL HOWES**, after Marine Corps Vietnam service, received his Bachelor of Arts degree with distinction from the University of New Mexico, was elected to Phi Beta Kappa and Phi Kappa Phi, and was the tympanist for the New Mexico Symphony Orchestra.  He received his Juris Doctor degree and Masters in Public Administration from the University of Virginia. He served as a Special Assistant to the Director of the FBI, Judge William H. Webster and then as a law clerk to Judge Roger Robb, United States Circuit Court of Appeals for the District of Columbia Circuit.  He was an ABC News correspondent for the Washington Bureau and then served for 11 years as an Assistant United States Attorney for the District of Columbia, primarily prosecuting complex drug-organization homicides. Beginning in October 2001, he led the Firm's investigation of Enron's collapse, established the Firm's Houston office, and was an integral member of the trial team. Mr. Howes concentrated on the Enron action and headed the investigation of the Enron-inspired securities fraud Dynegy action and led the trial team to a $474 million settlement in March 2005.  He is a member of the New Mexico, District of Columbia and California Bars.

**LESLIE HURST** is a San Diego native.  She earned her Bachelor of Arts degree in Sociology (*cum laude*) from the University of California, San Diego, her Master of Arts degree in Sociology from the University of California, Berkeley, and her Juris Doctor degree from the University of California, Hastings College of Law.  Following graduation from Hastings in 1995 through 2003, Ms. Hurst's practice focused on insurance and consumer fraud class action litigation.

In 2003, Ms. Hurst moved to Sri Lanka and worked for CARE International as Coordinator for Strategic Planning, working with CARE Sri Lanka's project directors to develop and implement a programmatic strategy for CARE's work in the conflict-affected areas of Sri Lanka.

In 2006, Ms. Hurst joined the Firm. Her practice areas are consumer fraud and antitrust litigation.

**ERIC ALAN ISAACSON** received his Bachelor of Arts degree *summa cum laude* from Ohio University in 1982. He earned his Juris Doctor degree with high honors from Duke University School of Law in 1985 and was elected to the Order of the Coif. Mr. Isaacson served as a Note and Comment Editor for the *Duke Law Journal* and in his third year of law school became a member of the Moot Court Board. After graduation, Mr. Isaacson clerked for the Honorable J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit.

In 1986, Mr. Isaacson joined the litigation department of O'Melveny & Myers, where his practice included cases involving allegations of trademark infringement, unfair business practices and securities fraud. He served as a member of the trial team that successfully prosecuted a major trademark infringement action.

Mr. Isaacson joined the plaintiffs' bar in 1989, and has taken part in prosecuting many securities fraud class actions.  He was a member of the plaintiffs' trial team in *In re Apple Computer Sec. Litig.*, No. C 84-20198(A)-JW (N.D. Cal.). Since the early 1990s, his practice has focused primarily on appellate matters in cases that have produced dozens of published precedents.  *See, e.g., In re WorldCom Sec. Litig. (Cal. Pub. Employees' Ret. Sys. v. Caboto-Gruppo Intesa, BCI)*, Case No. 05-6967-CV, 2007 U.S. App. LEXIS 17797 (2d Cir. 2007); *Sanford v. MemberWorks, Inc.,* 483 F.3d 956 (9th Cir. 2007); *Sanchez v. County of San*

*Diego,* 464 F.3d 916 (9th Cir. 2006), *rehearing denied,* 483 F.3d 965 (9th Cir. 2007); *In re Daou Sys., Inc., Sec. Litig. (Sparling v. Daou),* 411 F.3d 1006 (9th Cir. 2005); *Ill. Mun. Ret. Fund v. CitiGroup, Inc.,* 391 F.3d 844 (7th Cir. 2004); *Deutsch v. Turner Corp.,* 324 F.3d 692 (9th Cir. 2003); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363 (5th Cir. 2001); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076 (9th Cir. 1999); *Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir. 1996); *Fecht v. Price Co.,* 70 F.3d 1078 (9th Cir. 1995); and *Mangini v. R.J. Reynolds Tobacco Co.,* 7 Cal. 4th 1057 (1994).

Mr. Isaacson's publications include: *What's Brewing in Dura v. Broudo? A Review of the Supreme Court's Opinion and Its Import for Securities-Fraud Litigation*, (co-authored with Patrick J. Coughlin and Joseph D. Daley), 37 Loyola University Chicago Law Journal 1 (2005); *Pleading Scienter Under Section 21D(b)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness and the Private Securities Litigation Reform Act of 1995* (co-authored with William S. Lerach), 33 San Diego Law Review 893 (1996); *Securities Class Actions in the United States* (co-authored with Patrick J. Coughlin), Litigation Issues in the Distribution of Securities: An International Perspective 399 (Kluwer International/International Bar Association, 1997); *Pleading Standards Under the Private Securities Litigation Reform Act of 1995: The Central District of California's* Chantal *Decision* (co-authored with Alan Schulman & Jennifer Wells), *Class Action & Derivative Suits,* Summer 1996, at 14; *Commencing Litigation Under the Private Securities Litigation Reform Act of 1995* (co-authored with Patrick J. Coughlin), Securities Litigation 1996 9-22 (Practising Law Institute 1996); *The Flag Burning Issue: A Legal Analysis and Comment,* 23 Loyola of Los Angeles Law Review 535 (1990).

Mr. Isaacson has served as a cooperating attorney with the American Civil Liberties Union of San Diego and Imperial counties. He also received awards for *pro bono* work from the California State Bar and the San Diego Volunteer Lawyer Program. He has filed *amicus curiae* briefs on behalf of a variety of organizations, including the Social Justice Committee and Board of Trustees of the First Unitarian Universalist Church of San Diego.

Since January 2004, Mr. Isaacson has served as a member of the Board of Directors – and since March 2005 as Board President – of the San Diego Foundation for Change, an organization dedicated to funding and supporting community-led efforts to promote social equality, economic justice and environmental sustainability. Its grantees have included groups as diverse as Activist San Diego, the Interfaith Committee for Worker Justice and the San Diego Audubon Society.

Mr. Isaacson has been a member of the California Bar since 1985. He is also admitted to practice before the United States Supreme Court, the United States Courts of Appeals for the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and District of Columbia Circuits, and before all federal district courts in the State of California.

**JAMES I. JACONETTE** was born in San Diego, California in 1967. Mr. Jaconette is one of three partners responsible for the day-to-day prosecution of *In re Enron Corp. Sec. Litig.* (S.D. Tex.) and *In re Dynegy Inc. Sec. Litig.* (S.D. Tex.), on behalf of lead plaintiff The Regents of the University of California, and the large classes of public investors represented in those actions. Mr. Jaconette has litigated securities class actions and corporate governance/merger & acquisition-related actions since 1995. To date, cases in which Mr. Jaconette executed a primary litigating role, including *In re Informix Corp. Sec. Litig.* (N.D. Cal.), have resulted in approximately $300 million in settlements, judgments, or common funds that benefited investors.

Mr. Jaconette attended San Diego State University, receiving his Bachelor of Arts

degree with honors and distinction in 1989 and his M.B.A. in 1992. In 1995, Mr. Jaconette received his Juris Doctor degree *cum laude* from Hastings College of the Law, University of California, San Francisco. Mr. Jaconette was the Mortar Board Vice President from 1988-1989, a member of the *Hastings Law Journal* from 1993-1994, and Associate Articles Editor for same from 1994-1995. Mr. Jaconette authored *The Fraud-on-the-Market Theory in State Law Securities Fraud Suits*, Hastings Law Journal, Volume 46, August, 1995. In 1993, Mr. Jaconette served as law clerk to the Honorable Barbara J. Gamer, and in 1994, as extern to the Honorable William H. Orrick, Jr., District Judge.

In 1995, Mr. Jaconette was admitted to the California Bar and licensed to practice before the United States District Court, Southern District of California.

**FRANK J. JANECEK, JR.** received his Bachelor of Science degree in Psychology from the University of California at Davis in 1987 and his Juris Doctor degree from Loyola Law School in 1991. He is admitted to the Bar of the State of California, the district courts for all districts California, and to the United States Court of Appeals for the Sixth, Ninth, and Eleventh Circuits. For 11 years, Mr. Janecek has practiced in the areas of consumer, Proposition 65, taxpayer, and tobacco litigation. He has participated as a panelist and a speaker in continuing legal education programs relating to California's Unfair Competition laws, public enforcement tobacco litigation, and challenging unconstitutional taxation schemes.

Mr. Janecek litigated several Proposition 65 actions, including *People ex. rel. Lungren v. Super. Ct.*, 14 Cal. 4th 294 (1996), which was jointly prosecuted with the Attorney General's office. These actions resulted in the recovery of more than $10 million in disgorgement and/or civil penalties and warnings to consumers of their exposure to cancer-causing agents and reproductive toxins. Mr. Janecek chaired several of the litigation committees in

California's tobacco litigation, which resulted in the $25.5 billion recovery for California and its local entities. Mr. Janecek also handled a constitutional challenge to the State of California's Smog Impact Fee, in the case *Ramos v. Dep't of Motor Vehicles*, Case No. 95AS00532 (Cal. Super. Ct., Sacramento County). As a result of the *Ramos* litigation, more than a million California residents received full refunds, plus interest, totaling $665 million.

Mr. Janecek is the co-author with Patrick J. Coughlin of "A Review of R.J. Reynolds' Internal Documents Produced in *Mangini v. R.J. Reynolds Tobacco Co.*, No. 939359 - The Case that Rid California and the American Landscape of 'Joe Camel'" (January 1998), which, along with more than 60,000 internal industry documents, was released to the public through Congressman Henry Waxman. He is also the author of *California's Unfair Competition Act and Its Role in the Tobacco Wars* (Fall 1997). Mr. Janecek is a member of the American Bar Association, the California Bar Association, the San Diego County Bar Association and the Consumer Attorneys of California and San Diego.

**RACHEL L. JENSEN** grew up in St. Petersburg, Florida. She received her Bachelor of Arts degree in International Affairs from Florida State University's honors program in 1997, graduating *cum laude*. She received her Juris Doctor degree from Georgetown University Law School in 2000. During law school, she served as Editor-in-Chief of the *First Annual Review of Gender and Sexuality Law*, a publication of the nascent *Georgetown Journal of Gender and the Law*. She also taught Street Law at a public high school in Washington, D.C.

Upon graduation, Ms. Jensen joined the law firm of Morrison & Foerster in San Francisco for one year before clerking for the Honorable Warren J. Ferguson on the Ninth Circuit Court of Appeals. Thereafter, she worked abroad as

a law clerk in the Office of the Prosecutor at the International Criminal Tribunal for Rwanda (ICTR) and at the International Criminal Tribunal for the Former Yugoslavia (ICTY), respectively.

Ms. Jensen's practice focuses on class action securities and consumer fraud. She is licensed to practice law in the State of California and is admitted to practice before all the federal district courts in the state.

**JEFFREY W. LAWRENCE** received his Bachelor of Arts degree, *magna cum laude*, from Tufts University in 1976. In 1979, Mr. Lawrence graduated *magna cum laude* with a Juris Doctor degree from Boston School of Law. He was a staff member of the *Boston University Law Review* from 1977-1978, and its editor from 1978-1979.

From September 1979 to September 1980, Mr. Lawrence served as a law clerk to the Honorable Walter Jay Skinner, United States District Court, District of Massachusetts. He was admitted to the Massachusetts Bar in 1979 and to the Bar of California in 1991. He is licensed to practice before the United States Court of Appeals, First and Ninth Circuits, the United States District Court, District of Massachusetts and the Northern District of California.

From 1983-1994, Mr. Lawrence was an Assistant United States Attorney, Criminal Division, where he obtained extensive trial experience in white-collar crimes, ranging from money-laundering to stock fraud.

**ARTHUR C. LEAHY** graduated with a Bachelor of Arts degree in Business from Point Loma College in 1987. In 1990, Mr. Leahy graduated *cum laude* and received a Juris Doctor degree from the University of San Diego School of Law, where he served as Managing Editor of the Law Review. While in law school, Mr. Leahy authored an article published in the *San Diego Law Review* and other articles published

in another law journal. In addition, he served as a judicial extern for the Honorable J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit. After law school, Mr. Leahy served as a judicial law clerk for the Honorable Alan C. Kay of the United States District Court for the District of Hawaii.

Mr. Leahy works on securities actions in which his clients have recovered hundreds of millions of dollars. Mr. Leahy is a member of the California Bar and has been admitted in numerous federal courts throughout the country.

**JEFFREY D. LIGHT** was born in Los Angeles, California in 1964. He received his Bachelor of Science degree from San Diego State University in 1987 and his Juris Doctor degree from the University of San Diego in 1991, *cum laude*. Mr. Light was the recipient of the American Jurisprudence Award in Constitutional Law. He served as law clerk to the Honorable Louise DeCarl Adler, United States Bankruptcy Court, and the Honorable James Meyers, Chief Judge, Southern District of California, United States Bankruptcy Court. Mr. Light was admitted to the California Bar in 1992 and is admitted to practice before all federal courts in California.

Mr. Light is also a member of the San Diego County Bar Association and is on the Attorney Fee Arbitration Panel. Mr. Light currently practices in the Firm's settlement department, negotiating, documenting and obtaining court approval of the Firm's complex securities, merger, consumer and derivative actions. These settlements include: *In re AT&T Corp. Sec. Litig.* (D.N.J. 2005) ($100 million recovery); *In re Infonet Corp. Sec. Litig.* (C.D. Cal. 2004) ($18 million recovery); and *In re Ashworth, Inc. Sec. Litig.* (S.D. Cal. 2004) ($15.25 million recovery).

**JAMES D. MCNAMARA** earned his Juris Doctor degree from the University of San Diego School of Law in 1997 and a Bachelor of Arts degree in Political Science from the University

of San Diego in 1994. Mr. McNamara was admitted to practice in California in 1997. Mr. McNamara's practice focuses primarily on consumer protection, with an emphasis on actions brought by policyholders against life, auto and other insurers for deceptive sales practices. He has also been engaged in consumer fraud and antitrust matters in the mortgage lending, telecommunications and insurance brokerage industries.

He is a member of the San Diego County Bar Association, American Bar Association, the State Bar of California, and the Association of Trial Lawyers of America.

**AZRA Z. MEHDI** earned her Bachelors of Arts in 1992 from the University of Illinois at Chicago, with high honors in English and German Literature. She was a member of the Honors College and spent a year at the University of Vienna in Austria. She received her Juris Doctor degree from DePaul University College of Law in Chicago in 1995. Upon graduation, Ms. Mehdi did an internship at the Austrian law firm of Ortner Poch & Foramitti. Ms. Mehdi focuses her practice on antitrust litigation and securities fraud litigation.

Ms. Mehdi is admitted to practice in New York (1996), California (2002), before the United States District Court for the Southern and the Eastern Districts of New York (1997), and the United States District Court for the Northern, Central and Southern Districts of California (2002). She is a member of the American Bar Association, the California Bar Association and the San Francisco Bar Association. Ms. Mehdi is fluent in German and Hindi.

**DAVID W. MITCHELL** was born in Wilmington, Delaware in 1973. He graduated from the University of Richmond in 1995 with a Bachelor of Arts degree in both Economics and History and thereafter received his Juris Doctor degree from the University of San Diego School of Law in 1998.

Prior to joining the Firm, Mr. Mitchell served as an Assistant United States Attorney in the Southern District of California. While at the United States Attorney's Office, he worked on cases involving narcotics trafficking, bank robbery, murder-for-hire, alien smuggling, and terrorism. He tried nearly 20 cases to verdict before federal criminal juries and made numerous appellate arguments before the Ninth Circuit Court of Appeals.

Mr. Mitchell's practice focuses on securities fraud and antitrust litigation. He is a member of the State Bar of California and is admitted to practice before the Southern and Central Districts of California and the Ninth Circuit Court of Appeals.

**MATTHEW MONTGOMERY** was born in Pontiac, Michigan in 1970. Mr. Montgomery received his Bachelor of Arts degree from Stanford University in 1992 and his Juris Doctor degree from the University of California, Berkeley in 1995. Mr. Montgomery was admitted to the California Bar in 1995 and is licensed to practice in the courts of the Ninth and Sixth Circuits, as well as the Northern, Central and Southern Districts of California. Mr. Montgomery practices in the Firm's securities litigation group.

**STEPHEN J. ODDO** graduated from Santa Clara University with a Bachelor of Arts degree in English with a minor in Spanish. He received his Master of Arts degree from the Medill School of Journalism at Northwestern University before receiving his Juris Doctor degree from the University of San Diego. Mr. Oddo was admitted to the California Bar in 1994. He specializes in securities class actions involving mergers and acquisitions.

**KEITH F. PARK** graduated from the University of California at Santa Barbara in 1968 and from Hastings College of Law of the University of California in 1972.

Mr. Park is responsible for the recoveries in more than 1,000 securities class actions, including actions involving: Dollar General ($162 million recovery); Mattel ($122 million recovery); Prison Realty ($105 million recovery); Honeywell (in addition to the $100 million recovery, obtained Honeywell's agreement to adopt significant corporate governance changes relating to compensation of senior executives and directors, stock trading by directors, executive officers and key employees, internal and external audit functions, and financial reporting and board independence); Sprint (in addition to $50 million recovery, obtained important governance enhancements, including creation of "Lead Independent Director" and expensing of stock options); Hanover Compressor (on top of $85 million recovery, obtained the following governance enhancements, among others: direct shareholder nomination of Board and mandatory rotation of audit firm); 3COM ($259 million recovery); Chiron ($43 million recovery); MedPartners ($56 million recovery); NME ($60.75 million recovery); and TCI ($26.5 million recovery).

He is admitted to practice in California and New York.

**STEVEN W. PEPICH** received his Bachelor of Science degree in Economics from Utah State University in 1980 and his Juris Doctor degree from De Paul University in 1983. Mr. Pepich is admitted to practice before the Courts of California and the District Court for the Southern, Central, Eastern, and Northern Districts of California. Mr. Pepich has been engaged in a wide variety of civil litigation, including consumer fraud, mass tort, royalty, civil rights, human rights, ERISA and employment law actions, as well as many securities and corporate litigations. He was part of the plaintiffs' trial team in *Mynaf v. Taco Bell Corp.*, which settled after two months of trial on terms favorable to two plaintiff classes of restaurant workers, for recovery of unpaid wages. He was also a member of the plaintiffs' trial team in *Newman v. Stringfellow* where, after a nine-month trial in Riverside, California, all claims for exposure to toxic chemicals were ultimately resolved for $109 million.

Mr. Pepich has also participated in the successful prosecution of numerous securities fraud class actions, including: *Gohler v. Wood*, Case No. 92-C-181 ($17.2 million recovery); *In re Advanced Micro Devices Sec. Litig.*, Case No. C-93-20662-RPA(PVT) ($34 million recovery); *In re Catalyst Semiconductor Sec. Litig.*, Case No. C-93-2096 ($15 million recovery); *In re Gupta Corp. Sec. Litig.,* Case No. C-94-1517 ($6 million recovery); *In re La.-Pacific Corp. Sec. Litig.*, Case No. C-95-707 ($65 million recovery); and *In re Boeing Sec. Litig.*, Case No. C-97-1715Z ($92 million recovery). Mr. Pepich is a member of the American Bar Association, the San Diego Bar Association and the Association of Business Trial Lawyers of San Diego. Mr. Pepich co-authored with William S. Lerach *Personal Liability Considerations of Officers and Directors in the Takeover Context*, CEB, Business Law Institute, April 1986, and *New Diligence Considerations in the Context of the Federal Securities Laws*, CEB Fourth Annual Securities Institute, May 1986.

**THEODORE J. PINTAR** received his Bachelor of Arts degree from the University of California at Berkeley in 1984 where he studied Political Economies of Industrial Societies. Mr. Pintar received his Juris Doctor degree from the University of Utah College of Law in 1987 where he was Note and Comment Editor of the Journal of *Contemporary Law* and the *Journal of Energy Law and Policy*. Formerly, Mr. Pintar was associated with the firm of McKenna Conner & Cuneo in Los Angeles, California, where he focused in commercial and government contracts defense litigation. Mr. Pintar is co-author of *Assuring Corporate Compliance with Federal Contract Laws and Regulations*, Corporate Criminal Liability Reporter, Vol. 2 (Spring 1988).

Mr. Pintar participated in the successful prosecution of numerous securities fraud class actions and derivative actions, including participation on the trial team in *Knapp v. Gomez*, No. 87-0067-H(M) (S.D. Cal.), which resulted in a plaintiff's verdict. Mr. Pintar also participated in the successful prosecution of numerous consumer class actions, including: (i) actions against major life insurance companies such as Manulife ($555 million settlement value) and Principal Life Insurance Company ($379 million settlement value); (ii) actions against major homeowners insurance companies such as Allstate ($50 million settlement) and Prudential Property and Casualty Co. ($7 million settlement); and (iii) an action against Columbia House ($55 million settlement value), a direct marketer of CDs and cassettes.

Most recently, Mr. Pintar was part of the litigation team in the AOL Time Warner state and federal court opt-out actions, which arose from the 2001 merger of American Online and Time Warner. These cases resulted in a global settlement of $618 million, entered into just weeks before the California state court trial was scheduled to begin.

Mr. Pintar is a member of the State Bar of California and the San Diego County Bar Association.

**WILLOW E. RADCLIFFE** earned her Bachelor of Arts degree from the University of California at Los Angeles in 1994 and her Juris Doctor degree from the Seton Hall University School of Law, *cum laude*, in 1998. Ms. Radcliffe clerked for the Honorable Maria-Elena James, Magistrate Judge for the United States District Court for the Northern District of California, prior to joining the Firm.

Ms. Radcliffe's practice at Coughlin Stoia focuses on the prosecution of securities class actions and derivative actions in state and federal court. She is a member of the California Bar, and is admitted to practice

before the United States District Court for the Northern District of California.

**JACK REISE** earned his Bachelor of Arts degree in History from Binghamton University. He graduated *cum laude* from University of Miami School of Law where he was an Associate Editor on the *University of Miami Inter-American Law Review* and was also the recipient of the American Jurisprudence Book Award in Contracts.

Since he began practicing law, Mr. Reise has been devoted to protecting the rights of those who have been harmed by corporate misconduct. Mr. Reise started his legal career representing individuals suffering the debilitating affects of asbestos exposure back in the 1950s and 1960s.

Mr. Reise has since concentrated his practice on class action litigation, including securities fraud, shareholder derivative actions, consumer protection, and unfair and deceptive insurance practices and antitrust. Prior to joining the Firm, Mr. Reise was a partner at the law firm of Cauley Geller.

A substantial portion of Mr. Reise's practice is devoted to representing shareholders in actions brought under the federal securities laws. He is currently serving as lead counsel in more than a dozen cases nationwide, including *Abrams v. Van Kampen Funds*, Case No. 01 C 7538 (N.D. Ill.) (involving a mutual fund that is charged with improperly valuating its net asset value), and *In re NewPower Holdings Sec. Litig.*, Case No. 02 Civ. 1550 (CLB) (S.D.N.Y.), which settled with several of the defendants for $26 million.

Mr. Reise has been admitted to the Florida Bar since 1995. He is also admitted to practice before the United States Courts of Appeals for the First, Fourth, and Eleventh Circuits, as well as the Southern and Middle District Courts of Florida.

**JOHN J. RICE** graduated *cum laude* from Harvard University with a Bachelor of Arts degree in History and received his Juris Doctor degree from the University of Virginia. After law school, he was a judicial law clerk to the late United States District Court Judge Judith N. Keep of the Southern District of California.

Mr. Rice brings significant trial experience to Coughlin Stoia, where he is a member of the Firm's litigation team. Prior to joining the Firm, he prosecuted a wide array of cases, ranging from complex white-collar to murder to Russian organized crime cases. Most recently, he worked as an Assistant United States Attorney in the Southern District of California, specializing in public corruption cases. He has also served stints prosecuting organized crime for the United States Attorney's Office in the Southern District of New York and was nominated to serve as Branch Chief in the Northern Mariana Islands, prosecuting public corruption and white-collar criminal cases.

Mr. Rice has been praised for his diligent efforts to combat graft, corruption and collusion among public and private officials in San Diego. In 2005, he spearheaded prosecution teams on behalf of the United States Attorney's Office that successfully convicted the acting San Diego Mayor and a well-known councilman on federal corruption charges. In May 2006, Mr. Rice again exposed and prosecuted corrupt public figures, this time unraveling an intricate plot between a former college president and a political consultant who were misappropriating public funds for campaign finance.

Mr. Rice also served as Assistant United States Attorney in the Southern District of New York and Assistant Attorney General in the Republic of Palau. He was the Branch Chief at the United States Attorney's office for the Commonwealth of the Northern Mariana Islands. Most recently, Mr. Rice was Assistant United States Attorney at the United States Attorney's office in San Diego, California.

Mr. Rice serves as an adjunct professor at the University of San Diego School of Law and Western State University School of Law. He is also an Instructor at the Department of Justice Office of Legal Education and a frequent lecturer of trial advocacy and advanced trial advocacy.

**DARREN J. ROBBINS** is a founding partner of the Firm and oversees the Firm's mergers and acquisition practice. Mr. Robbins has extensive experience in federal and state securities class action litigation, and has recovered more than $600 million for shareholders serving as lead counsel in numerous securities class actions including *In re TXU Sec. Litig.* ($150 million recovery plus significant corporate governance reforms); *In re Prison Realty Sec. Litig.* ($120 million recovery); and *In re Dollar Gen. Sec. Litig.* ($172.5 million recovery).

In January 2007, Mr. Robbins was recognized as one of the American Lawyer's Young Litigators 45 and Under for making significant strides in the securities litigation field. Similarly, Mr. Robbins received the California Lawyers Attorney of the Year Award in 2004 for his role as lead counsel in *In re Hanover Compressor Sec. Litig.*, which resulted in an $85 million recovery for shareholders and landmark corporate governance reforms.

Mr. Robbins is a frequent speaker at conferences and seminars and has lectured on a wide-range of topics related to securities litigation including: Prosecuting and Defending Shareholder Derivative Suits to Force Corporate Change in the Post-Enron World (2005); Corporate Governance Forum (2005); Securities Litigation & Enforcement Institute, Corporate Governance Litigation (2004); International Foundation of Employees Benefit Plans, How to Deal with Class Action Litigation (2004); Advanced Securities Law Workshop (2004); Practice Before the Federal

Magistrates (2004); Business Law Annual Meeting, Third-Party Liability in the Post-Enron Environment (2003); Tillinghast-Towers Perrin Seminar on Directors & Officers Liability, Rapid Growth in Securities Class Action Recoveries Post-PSLRA (2003); Directors Roundtable, Battling Over Corporate Disclosure, The Revolution in Securities Class Actions (2002); Business Ethics and Corporate Governance in the Post-Enron World (2002); CALBIOsummit, Class Action Litigation and Prevention (2002); The Opal Financial Group and COLT, Third Annual Investment Education Symposium (2001); Maximizing Returns from Class Actions (2001); and Directors Roundtable (1997). Mr. Robbins is also the co-author of "The Race to the Bottom: Bidding for Lead Counsel and its Impact on Securities Class Actions" presented by the Practicing Law Institute Securities Workshop (2001).

Mr. Robbins received his Bachelor of Science and Master of Arts degrees in Economics from the University of Southern California and his Juris Doctorate from Vanderbilt School of Law.

**HENRY ROSEN** obtained his Bachelor of Arts degree in 1984 from the University of California, after attending American College in Paris. In 1988, Mr. Rosen received his Juris Doctor degree from the University of Denver, where he was Editor-in-Chief for the *University of Denver Law Review*. Mr. Rosen served as Judicial Law Clerk to the Honorable Jim R. Carrigan, United States District Court, District of Colorado, from 1989 to 1990. He is a member of the Firm's Hiring Committee and is also a member of the Firm's Technology Committee, which focuses on applications to digitally manage documents produced during litigation and internally generate research files.

Major clients include Minebea Co., Ltd., a Japanese manufacturing company, represented in securities fraud arbitration against a United States investment bank. Mr. Rosen has significant experience prosecuting

every aspect of securities fraud class actions and has obtained hundreds of millions of dollars on behalf of defrauded investors. Prominent cases include: *In re Storagetek Sec. Litig.*, Case No. 92-B-750 (D. Colo.); *In re Access HealthNet Sec. Litig.*, Case No. SACV-96-1250-GLT(EEx) and Case No. SACV-97-191-GLT(EEx) (C.D. Cal.); *In re Valence Sec. Litig.*, Case No. C-95-20459-JW(EAI) (N.D. Cal.); *In re J.D. Edwards Sec. Litig.*, Case No. 99-N-1744 (D. Colo.); *In re Bergen Brunswig Sec. Litig.* and *Bergen Brunswig Capital Litig.*, Case No. SACV-99-1462-AHS(ANx) (C.D. Cal.); *In re Advanced Lighting Sec. Litig.*, No. 1:99CV8936 (N.D. Ohio); and *In re Safeskin Sec. Litig.*, Case No. 99cv454-BTM(LSP) (S.D. Cal.).

Mr. Rosen is admitted to the California Bar (1991) and the Colorado Bar (1988). He is a member of the State Bar of California, the American Bar Association (Litigation Section), the Association of Trial Lawyers of America, the California Trial Lawyers of America, California Trial Lawyers Association and the San Diego Trial Lawyers Association.

**DAVID A. ROSENFELD** earned his Bachelor of Science degree in Accounting from Yeshiva University's Sy Syms School of Business and his Juris Doctor degree from the Benjamin N. Cardozo School of Law.

While in law school, Mr. Rosenfeld interned in the chambers of the Honorable Frederic Block in the United State District Court for the Eastern District of New York.

Mr. Rosenfeld was responsible for initiating some of the largest and most significant securities and shareholder class action lawsuits since the passage of the Private Securities Litigation Reform Act of 1995, and developed an expertise in the area of lead plaintiff jurisprudence.

In 2003, Mr. Rosenfeld joined Samuel Rudman in opening the New York office of Geller Rudman, PLLC and assisted Mr. Rudman in

raising the Firm's profile as one of the nation's "most active" plaintiffs' firms.

At Coughlin Stoia, Mr. Rosenfeld continues to concentrate his practice on the investigation and initiation of securities and consumer fraud class actions. Mr. Rosenfeld also advises the Firm's institutional and individual investor clients on issues related to their involvement in securities class action lawsuits.

Mr. Rosenfeld is admitted to practice in the States of New York and New Jersey and in the United States District Courts for the Southern District of New York, Eastern District of New York, District of New Jersey, District of Colorado, Eastern District of Wisconsin and the Eastern and Western Districts of Arkansas.

**ROBERT M. ROTHMAN** earned his Bachelor of Arts degree in Economics from the State University of New York at Binghamton. He then earned his Juris Doctor degree, with Distinction, from Hofstra University School of Law. During law school, Mr. Rothman was a member of the law review and was awarded the Dean's Academic Scholarship for completing his first year in the top one percent of his class.

After law school, Mr. Rothman practiced commercial litigation with an international law firm. Having litigated cases involving many of the nation's largest companies, Mr. Rothman has extensive experience in the areas of consumer protection, antitrust, and investment fraud.

Mr. Rothman has served as lead counsel in many class actions alleging violations of the securities laws, including cases filed against First Bancorp ($74.25 million recovery), Interstate Bakeries ($18 million recovery), Spiegel ($17.5 million recovery), and NBTY ($16 million recovery). Mr. Rothman also actively represents shareholders in connection with going private transactions. For example, Mr. Rothman was a lead counsel in a case seeking

to block the attempted buyout of Cablevision by its majority shareholders. The litigation resulted in an increase of more than $2.2 billion in cash consideration being offered to Cablevision's public stockholders, and provided additional protections, including $300 million of personal guarantees from the controlling shareholders for any liabilities payable as a result of a breach of the merger agreement.

In addition, Mr. Rothman actively litigates consumer fraud cases. In a case alleging false advertising claims against a yellow pages directory where Mr. Rothman was the lead counsel, the defendant agreed to a settlement valued in excess of $67 million. Mr. Rothman also tries, arbitrates, and mediates cases. For example, he obtained a multi-million dollar verdict after the trial of a shareholders' derivative case.

Prior to joining Coughlin Stoia, Mr. Rothman was a partner at Geller Rudman PLLC, where he concentrated his practice on representing shareholders and consumers in class actions.

Mr. Rothman is admitted to practice before the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York. Mr. Rothman is a member of the American Bar Association's Sections of Litigation and Antitrust Law.

**SAMUEL H. RUDMAN** received his Bachelor of Arts degree in Political Science from Binghamton University in 1989 and earned his Juris Doctor degree from Brooklyn Law School in 1992. While at Brooklyn Law School, Mr. Rudman was a Dean's Merit Scholar and a member of the *Brooklyn Journal of International Law* and the Moot Court Honor Society.

Upon graduation from law school, Mr. Rudman joined the Enforcement Division of the United States Securities & Exchange Commission in its New York Regional Office as

a staff attorney. In this position, Mr. Rudman was responsible for numerous investigations and prosecutions of violations of the federal securities laws. Thereafter, Mr. Rudman joined one of the largest corporate law firms in the country, where he represented public companies in the defense of securities class actions and also handled several white-collar criminal defense matters.

Since joining the Firm, Mr. Rudman has been responsible for the investigation and initiation of securities and shareholder class actions. In addition, Mr. Rudman developed a focus in the area of lead plaintiff jurisprudence and has been responsible for numerous reported decisions in this area of securities law.

Mr. Rudman continues to focus his practice in the area of investigating and initiating securities and shareholder class actions and also devotes a considerable amount of time to representing clients in ongoing securities litigation.

**SCOTT SAHAM** was born in Detroit, Michigan in 1970. Mr. Saham received a Bachelor of Arts degree in 1992 from the University of Michigan. Mr. Saham received a Juris Doctor degree from the University of Michigan Law School in 1995.

Mr. Saham is licensed to practice law in both California and Michigan. Mr. Saham's practice areas include securities and other complex litigation. Prior to joining Coughlin Stoia, Mr. Saham served as an Assistant United States Attorney in the Southern District of California.

**STEPHANIE M. SCHRODER** earned her Bachelor of Arts degree from the University of Kentucky in 1997 and her Juris Doctor degree from the University of Kentucky, College of Law in 2000.

Ms. Schroder has significant experience prosecuting every aspect of securities fraud class actions and has obtained millions of dollars on behalf of defrauded investors. Prominent cases include: *In re AT&T*; *In re First Energy*; *In re First World*; and *In re Advanced Lighting*. Ms. Schroder also specializes in derivative litigation for breaches of fiduciary duties by corporate officers and directors.

Ms. Schroder's practice also focuses on advising institutional investors, including multi-employer pension funds, on issues related to corporate fraud in the U.S. securities markets. Ms. Schroder is a frequent lecturer on securities fraud, shareholder litigation, and options for institutional investors seeking to recover losses sustained by portfolios due to fraud.

Ms. Schroder is a member of the California and Kentucky Bars and is admitted to practice before the United States District Courts for the Southern, Central, and Northern Districts of California, and the Eastern District of Kentucky.

**EX KANO SAMS II** was born in Los Angeles, California in 1971. In 1993, Mr. Sams received his Bachelor of Arts degree in Political Science from the University of California, Los Angeles. In 1996, Mr. Sams received his Juris Doctor degree from the University of California, Los Angeles, where he was a member of the *UCLA Law Review*.

After graduating from UCLA Law School, Mr. Sams represented plaintiffs in complex and class action civil rights litigation, including employment, housing and sexual harassment discrimination. Mr. Sams was actively involved in a number of actions against the tobacco industry and participated in a trial against numerous tobacco companies. Mr. Sams also participated in California litigation against the tobacco industry which resulted in billions of dollars in recovery to cities and counties in California.

As a partner of Coughlin Stoia, Mr. Sams continues to represent plaintiffs in securities,

consumer and environmental litigation. Mr. Sams is a member of the State Bar of California and has been admitted to the United States Court of Appeals for the Ninth Circuit, the United States District Courts for Northern, Southern, Eastern, and Central Districts of California and the District of Colorado.

**CHRISTOPHER P. SEEFER** received his Bachelor of Arts degree from the University of California, Berkeley in 1984 and his Master of Business Administration degree from the University of California, Berkeley in 1990. He received his Juris Doctor degree from the Golden Gate University School of Law in 1998. Mr. Seefer concentrates his practice in securities class action litigation. Mr. Seefer was a Fraud Investigator with the Office of Thrift Supervision, Department of the Treasury (1990-1999) and a field examiner with the Office of Thrift Supervision (1986-1990).

Mr. Seefer is a member of the Bar of California, the United States District Courts for the Northern, Central, and Southern Districts of California, and the United States Court of Appeals for the Ninth Circuit.

**TRIG SMITH** received his Bachelor of Science degree and Master of Science degree from the University of Colorado, Denver, in 1995 and 1997, respectively. Mr. Smith received a Juris Doctor degree from Brooklyn Law School in 2000. While at Brooklyn Law Mr. Smith was a member of the *Brooklyn Journal of International Law*, which published his note entitled: *The S.E.C. and Foreign Private Issuers*, 26 Brook. J. Int'l L. 765 (2000). Mr. Smith is licensed to practice in both California and Colorado. Mr. Smith's practice areas include securities and other complex litigation.

**MARK SOLOMON** earned his law degrees at Trinity College, Cambridge University, England (1985), Harvard Law School (1986), and the Inns of Court School of Law, England (1987). He is admitted to the Bar of England and Wales (Barrister), Ohio and California, as well

as to various United States Federal District and Appellate Courts. Mr. Solomon regularly represents both United States - and United Kingdom - based pension funds and asset managers in class and non-class securities litigation. Mr. Solomon is a founding partner of Coughlin Stoia.

Before studying law in England, Mr. Solomon served as a British police officer. After qualifying as a barrister, he first practiced at the international firm Jones Day in Cleveland, Ohio (1987-1990), followed by practice at the Los Angeles office of New York's Stroock & Stroock & Lavan (1990-1993). At those firms, Mr. Solomon's representations included the defense of securities fraud and other white-collar crimes, antitrust, copyright, commercial and real estate litigation and reinsurance arbitration. While practicing in Los Angeles, acting for plaintiffs, Mr. Solomon took to trial and won complex commercial contract and real estate actions in the Orange County and Los Angeles Superior Courts, respectively.

Since 1993, Mr. Solomon has spearheaded the prosecution of many significant cases. He has obtained substantial recoveries and judgments for plaintiffs through settlement, summary adjudications and trial. He litigated, through trial, *In re Helionetics*, where he and his trial partner, Paul Howes, won a unanimous $15.4 million jury verdict in November 2000. He has successfully led many other cases, among them: *Schwartz v. TXU* ($150 million recovery plus significant corporate governance reforms); *In re Informix Corp. Sec. Litig.* ($142 million recovery); *Rosen v. Macromedia, Inc.* ($48 million recovery); *In re Comty. Psychiatric Ctrs. Sec. Litig.* ($42.5 million recovery); *In re Advanced Micro Devices Sec. Litig.* ($34 million recovery); *In re Tele-Commc'ns, Inc. Sec. Litig.* ($33 million recovery); *In re Home Theater Sec. Litig.* ($22.5 million judgment); *In re Diamond Multimedia Sec. Litig.* ($18 million recovery); *Hayley v. Parker* ($16.4 million recovery); *In re Gupta Corp. Sec. Litig.* ($15 million recovery); *In re Radius Sec. Litig.*; *In re SuperMac Tech.*,

*Inc. Sec. Litig.* (combined recovery of $14 million); *Markus v. The North Face* ($12.5 million recovery); *In re Brothers Gourmet Coffees, Inc. Sec. Litig.* ($9 million recovery); *Anderson v. EFTC* ($9 million recovery); *In re Flir Sys. Inc. Sec. Litig.* ($6 million recovery); *In re Nike, Inc. Sec. Litig.* ($8.9 million recovery); *Sharma v. Insignia* ($8 million recovery); and *In re Medeva Sec. Litig.* ($6.75 million recovery).

Mr. Solomon chaired the American Bar Association Directors and Officers Liability Sub-Committee and the Accountants Liability Sub-Committee between 1996 and 2001.

**JONATHAN M. STEIN** earned his Bachelor of Science degree in Business Administration from the University of Florida, where he concentrated his studies in Finance. While at Florida, he was selected to join the honor society of Omicron Delta Epsilon, recognizing outstanding achievement in Economics. Mr. Stein earned his Juris Doctor degree from Nova Southeastern University, where he was the recipient of the American Jurisprudence Book Award in Federal Civil Procedure and served as Chief Justice of the Student Honor Court.

Mr. Stein began his practice of law in Fort Lauderdale as a prosecutor in the State Attorney's Office for the Seventeenth Judicial Circuit of Florida, where he handled numerous jury trials. Before concentrating his practice in class action litigation, he also practiced as a litigator with one of Florida's largest law firms, where he concentrated on fighting insurance fraud. Prior to joining Coughlin Stoia, Mr. Stein was a partner with Geller Rudman, PLLC. Mr. Stein is involved in all aspects of class action litigation, including securities fraud, shareholder class and derivative actions, consumer fraud, products liability and antitrust.

A substantial portion of Mr. Stein's practice is dedicated to the representation of public shareholders of companies whose shares are acquired through management buyouts, leveraged buyouts, mergers, acquisitions, tender offers and other change-of-control transactions. Mr. Stein has represented clients in seeking to protect shareholders by insuring that they receive maximum compensation for their shares and also by insuring that they receive all necessary information and disclosure concerning the transactions. He has been successful in restructuring many transactions and recovering millions of dollars in additional value for shareholders.

Mr. Stein is licensed to practice law in the state courts of Florida, as well as in the United States District Courts for the Southern and Middle Districts of Florida and the District of Colorado. In addition to these courts and jurisdictions, Mr. Stein regularly works on cases with local counsel throughout the country. Mr. Stein has been or is a member of the Association of Trial Lawyers of America, the American Bar Association, the Palm Beach County Bar Association and the South Palm Beach County Bar Association.

**JOHN J. STOIA, JR.** received his Bachelor of Science degree from the University of Tulsa in 1983. While working on his degree, Mr. Stoia was elected President of the National Political Science Honor Society and graduated with highest honors. In 1986, Mr. Stoia received his Juris Doctor degree from the University of Tulsa and graduated in the top of his class. In 1987, Mr. Stoia graduated in the top of his class from the Georgetown University Law Center in Washington, D.C., receiving his Masters of Law in Securities Regulation. Thereafter, Mr. Stoia served as an enforcement attorney with the United States Securities and Exchange Commission prior to going into private practice. Mr. Stoia is one of the founding partners of Coughlin Stoia.

Mr. Stoia worked on dozens of nationwide complex securities class actions, including *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz.), which arose out of the collapse of Lincoln Savings & Loan and Charles

Keating's empire. Mr. Stoia was a member of plaintiffs' trial team, which obtained verdicts against Mr. Keating and his co-defendants in excess of $3 billion and settlements of over $240 million.

Mr. Stoia has been responsible for over $10 billion in recoveries on behalf of victims of insurance fraud due to deceptive sales practices such as "vanishing premiums," "churning," and discrimination in the sale of burial or debit insurance.

Mr. Stoia has been involved in over 40 nationwide class actions brought by policyholders against United States and Canadian life insurance companies seeking redress for deceptive sales practices during the 1980s and 1990s. Mr. Stoia was lead or co-lead counsel and actively involved in nationwide cases against, among others, Prudential ($4+ billion), New York Life ($600+ million), Transamerica Life Insurance Company ($250+ million), General American Life Insurance Company ($85+ million), Manufacturer's Life ($550+ million), Metropolitan Life ($2 billion), American General and subsidiaries ($500+ million), Allianz ($55+ million), Principal Life ($380+ million) and Pacific Life Insurance Company.

Mr. Stoia was involved in numerous cases brought against life insurance companies for racial discrimination involving the sale of debt or "industrial life" insurance policies during the 20th century. Mr. Stoia was lead counsel in *McNeil v. Am. Gen'l Life Ins. Accident Ins. Co.*, the first major settlement involving discrimination claims which resulted in a $234 million recovery for class members. Mr. Stoia resolved other race-based insurance cases, including *Brown v. United Life Ins. Co.* ($40 million), *Morris v. Life Ins. Co. of Ga.* ($55 million), and *Thompson v. Metropolitan Life* ($145 million).

Mr. Stoia brought some of the first cases against the insurance brokerage industry and

insurers relating to undisclosed kickbacks known as "contingent commissions" and illegal bid-rigging activities. He is one of the lead plaintiffs' counsel in the consolidated MDL proceedings pending in the United States District Court for the District of New Jersey (*In re Employee-Benefit Ins. Brokerage Antitrust Litig.*, Case No. 2:05-cv-1079(FSH), and *In re Insurance Brokerage Antitrust Litig.*, Case No. 2:04-cv-5184(FSH), MDL No. 1663). He is also the lead trial counsel representing the California Department of Insurance against five of the largest Employee Benefit Insurance companies (MetLife, Prudential, Hartford, Cigna and UnumProvident) for violating California Insurance Regulations for failing to disclose payments of contingent commissions to brokers in California and other improper activities. *The People of the State of California v. Universal Life Res.*, Case No. GIC838913 (Cal. Super. Ct., San Diego County). To date, four out of the five defendants have agreed to sweeping changes in their disclosure practices within California as a result of that action.

Mr. Stoia currently represents numerous large institutional investors who suffered hundreds of millions of dollars in losses as a result of the major financial scandals, including AOL/Time Warner, and is court-appointed co-lead counsel in eight nationwide class actions against sellers of deferred annuities to senior citizens.

Mr. Stoia was selected as Litigator of the Month by *The National Law Journal* (July 2000). He was also selected as a Super Lawyer in *Southern California Super Lawyers 2007 – San Diego Edition.* Mr. Stoia is also a frequent lecturer on numerous legal topics. Recent speaking engagements and lectures include: Speaker, Association of Life Insurance Counsel Panel (May 2007); Speaker, 2007 International Reinsurance Summit; Speaker, Conference on Industry Litigation 2007 (ALI-ABA); Speaker, 12th Annual ALI-ABA Conference on Life Insurance and Financial Services Industry Litigation (2007); Speaker, IBA West Blue

Ribbon Conference (2006); Speaker, ATLA Annual Convention – Insurance Law Section, Panel: Broker/Dealer Liability (2006); Speaker, ATLA Winter Convention – Securities Fraud: Rights and Remedies of Shareholders; Co-chair, ALI-ABA Program 11th Annual: Financial Services and Insurance Industry Litigation (2006); Speaker, Barreau du Quebec Class Action Seminar (2005); Speaker, ACI Consumer Finance Class Actions Conference (2005); and ALI-ABA, Practicing Law Institute and American Trial Lawyers Association seminars and conferences: Speaker, ALI-ABA Program: Life and Health Insurance Litigation (2004).

SPEAKING ENGAGEMENTS:

July 12, 2007 NYC: PLI Annual Conference on Class Action Litigation

June 6-8, 2007 Bermuda: 2007 International Reinsurance Summit

May 10-11, 2007 Chicago, IL: Insurance Industry and Financial Services Litigation

May 7, 2007 San Diego, CA: Association of Life Insurance Counsel Panel

July 27-28, 2006 New York City, NY: PLI Class Action Litigation Prosecution and Defense Strategies

May 1, 2006 Kona, Hawaii: IBA West Blue Ribbon Conference

March 30-31, 2006 Washington, DC: Co-Chair; ALI-ABA Conference on Life Insurance and Financial Services Industry Litigation

February 14, 2007 Washington, DC: The Federalist Society's Corporations, Securities & Antitrust Practice Group – Class Action Fairness Act: Two Years Later

October 21, 2005 Quebec, Canada: Barreau du Quebec Class Action Seminar

September 26, 2005 New York City, NY: ACI Consumer Finance Class Actions Conference

July 24, 2005 Toronto, Canada: ATLA Annual Convention – Insurance Law Section, Panel: Broker/Dealer Liability

March 18, 2005 New York City, NY: ALI-ABA Program: Financial Services and Insurance Industry Litigation

**SANFORD SVETCOV** is a partner with the Appellate Practice Group of Coughlin Stoia. He has briefed and argued more than 300 appeals in state and federal court, including: *Braxton v. Mun. Court*, 10 Cal. 3d 138 (1973) (First Amendment); *Procunier v. Navarette*, 434 U.S. 555 (1978) (civil rights); *Parker Plaza West Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349 (5th Cir. 1991) (real estate); *Catellus Dev. Corp. v. U.S.*, 34 F.3d 748 (9th Cir. 1994) (CERCLA); *U.S. v. Hove*, 52 F.3d 233 (9th Cir. 1995) (criminal law); *Kelly v. City of Oakland*, 198 F.3d 779 (9th Cir. 1999) (employment law, same gender sexual harassment); *U.S. v. Henke*, 222 F.3d 633 (9th Cir. 2000) (securities fraud); *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001) (civil rights); *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) (securities fraud); and *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F. 3d 1226 (9th Cir. 2004) (securities fraud).

Mr. Svetcov's professional appellate litigation experience includes securities fraud litigation, CERCLA, CEQA, commercial litigation, Clean Water Act, Civil Rights Act litigation, toxic torts, federal criminal law, California writ practice, employment law and ERISA.

Mr. Svetcov was a partner with the firm of Landels Ripley & Diamond, LLP, in San Francisco, from 1989 to 2000. His extensive legal experience includes service as: Chief, Appellate Section, United States Attorney's Office, San Francisco, 1984-1989; Attorney-in-Charge, Organized Crime Strike Force, San Francisco, 1981-1984; Chief Assistant United

States Attorney, San Francisco, 1978-1981; Deputy Attorney General, State of California, 1969-1977; Legal Officer, United States Navy, VT-25, Chase Field, Beeville, Texas, 1966-1969; and Deputy Legislative Counsel, Legislature of California, Sacramento, 1965-1966.

Mr. Svetcov is certified as a Specialist in Appellate Practice by the State Bar of California Board of Legal Specialization. He was selected by the Attorney General for the Department of Justice's John Marshall Award for Excellence in Appellate Advocacy in 1986 and is a member and past President (1998) of the American Academy of Appellate Lawyers, and a member of the California Academy of Appellate Lawyers.

In 1999, Chief Justice Rehnquist appointed Mr. Svetcov to a three-year term on the Federal Appellate Rules Advisory Committee. He is also an ex-officio member of the Ninth Circuit Rules Advisory Committee on Rules and Internal Operating Procedures. His other memberships and service commitments to the legal profession include: the California Academy of Appellate Lawyers; the Bar Association of San Francisco (Appellate Courts section); the American Bar Association (Appellate Judges Conference) Committee on Appellate Practice; and the Northern California Federal Bar Association, Board of Directors.

Mr. Svetcov earned his Bachelor of Arts degree, *cum laude*, from Brooklyn College in 1961 and his Juris Doctor degree from the University of California at Berkeley in 1964. He is a member of the Bars of the State of California, the United States Supreme Court, the Court of Appeals, Fifth, Eighth, Ninth and Eleventh Circuits, and the United States District Court, Northern District of California.

For two decades, he as been active as a teacher and lecturer at continuing legal education programs, including those of the ABA Appellate Practice Institutes (1990-2000); the Ninth Circuit Federal Bar Association Appellate

Practice Seminar, and the N.I.T.A. Appellate Advocacy Seminar and Fifth Circuit Bar Association Appellate Practice Seminars (1991-1999). He has served as an adjunct professor at Hastings College of Law and an instructor in Appellate Advocacy at the United States Attorney General's Advocacy Institute (1980-1989).

Mr. Svetcov is also active in community affairs. He has been a member of the San Francisco Jewish Community Relations Council since 1982, its president from 1991-1992, and during the years 1993-1995, he also served on the Northern California Hillel Council.

**BONNY E. SWEENEY** is a partner in the San Diego office of Coughlin Stoia, where she specializes in antitrust and unfair competition class action litigation. She is immediate past Chair of the Antitrust and Unfair Competition Law Section of the State Bar of California and has served on the Executive Committee of the Section since 2002. In 2007, Ms. Sweeney was honored by *Competition Law 360* as an "Outstanding Woman" in antitrust.

Ms. Sweeney is co-lead counsel in several multi-district antitrust class actions pending in federal courts around the country, including *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.* (E.D.N.Y.), *In re Carbon Black Antitrust Litig.* (D. Mass.), and *In re Currency Conversion Fee Antitrust Litig.* (S.D. N.Y.), and serves on the Plaintiffs' Executive Committee in *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (N.D. Cal.). In *Currency Conversion*, Bonny helped recover $336 million for class members through a proposed settlement that is awaiting approval from the federal court. In *DRAM*, the federal court recently approved settlements totaling more than $300 million.

Ms. Sweeney was one of the trial lawyers in *Law v. NCAA/Hall v. NCAA/Schreiber v. NCAA* (D. Kan.), in which the jury awarded more than $70 million to three classes of college coaches.

She has participated in the successful prosecution and settlement of numerous other antitrust and unfair competition cases, including *In re LifeScan, Inc. Consumer Litig.* (N.D. Cal.), which settled for $45 million; the Bank Privacy Cases (Cal. Super. Ct., San Francisco County), which resulted in better bank privacy policies, funding to non-profit groups advocating for privacy rights, and benefits to credit cardholders, *In re NASDAQ Market-Makers Antitrust Litig.* (S.D.N.Y.), which settled for $1.027 billion, and *In re Airline Ticket Commc'n Antitrust Litig.* (D. Minn.), which settled for more than $85 million.

In 2003, Ms. Sweeney was honored with the Wiley M. Manuel Pro Bono Services Award and the San Diego Volunteer Lawyer Program Distinguished Service Award for her work on behalf of welfare applicants in *Sanchez v. County of San Diego*. In addition to her service for the Antitrust and Unfair Competition Law Section, Ms. Sweeney contributes to legal education by speaking on antitrust topics, California's unfair competition law, and complex litigation matters. She also has published articles and testified before the California Judiciary Committee on these topics.

Ms. Sweeney graduated *summa cum laude* from Case Western Reserve University School of Law in 1988, where she served as editor of the *Law Review* and was elected to the Order of the Coif. She earned a Master of Arts degree from Cornell University in 1985, a Chinese Language Certificate from the Beijing Language Institute in 1982, and a Bachelor of Arts degree from Whittier College in 1981.

A litigator since 1988, Ms. Sweeney is admitted to practice in California and Massachusetts, and is a member of the Antitrust Section of the American Bar Association and the Antitrust and Unfair Competition Law Section of the California Bar Association.

**SUSAN GOSS TAYLOR** graduated from Pennsylvania State University in 1994 with a double major in International Politics and Russian. She earned her Juris Doctor degree from The Catholic University of America, Columbus School of Law in 1997. While in law school, she was a member of the Moot Court team and was a student attorney in the D.C. Law Students in Court Program, where she was responsible for defending juveniles and indigent adults in criminal proceedings. Ms. Taylor was admitted to the Bar in California in 1997.

Ms. Taylor has served as a Special Assistant United States Attorney for the Southern District of California, where she obtained considerable trial experience prosecuting drug smuggling and alien smuggling cases.

Ms. Taylor entered private practice in 1999, initially focusing on antitrust and consumer fraud class actions. Ms. Taylor has served as counsel on the Microsoft antitrust litigation and the DRAM antitrust litigation, as well as on a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations such as General Motors, Saturn, Mercedes-Benz USA, LLC, BMG Direct Marketing, Inc., and Ameriquest Mortgage Company. As a partner with Coughlin Stoia, Ms. Taylor has been responsible for prosecuting securities fraud class actions and has obtained recoveries for investors in litigation involving WorldCom, Qwest and AOL Time Warner.

Ms. Taylor is a member of the California Bar Association, San Diego County Bar Association, Consumer Attorneys of San Diego, Lawyer's Club, and is on the Board of Directors for the San Diego Volunteer Lawyer Program. She is also an active member of the Junior League of San Diego.

**DAVID C. WALTON** earned his Bachelor of Arts degree in Accounting from the University of Utah and his Juris Doctor degree from the

University of Southern California Law Center in 1993. He was a staff member of the *Southern California Law Review* and a member of the Hale Moot Court Honors Program.

Mr. Walton is a member of the Bar of California, a Certified Public Accountant (California 1992), a Certified Fraud Examiner, and is fluent in Spanish. Mr. Walton focuses on class actions and private actions on behalf of defrauded investors, particularly in the area of accounting fraud. He has investigated and participated in the litigation of many large accounting scandals, including Enron, WorldCom, AOL Time Warner, Krispy Kreme, Informix, HealthSouth, Dynegy, Dollar General and numerous companies implicated in stock option backdating. In 2003-2004, Mr. Walton served as a member of the California Board of Accountancy, which is responsible for regulating the accounting profession in California.

**DOUGLAS WILENS** earned his Bachelor of Science degree in Accounting from the University of Florida. He graduated with honors from the University of Florida College of Law where he received a "Book Award" for the highest grade in his class for Legal Drafting. Mr. Wilens is licensed to practice law in the state courts of Florida and New York, as well as in the Eleventh Circuit Court of Appeals and the United States District Courts for the Southern and Eastern Districts of New York and the Southern, Middle, and Northern Districts of Florida.

Prior to joining Coughlin Stoia, Mr. Wilens was an associate in the Boca Raton office of Cauley Geller where he was involved in all aspects of class litigation, including the prosecution of claims of securities fraud, claims of breach of fiduciary duty related to change-of-control transactions, and consumer protection actions. Prior to joining Cauley Geller, Mr. Wilens was an associate in the New York office of Proskauer Rose LLP, a nationally recognized firm, where he litigated complex actions on behalf of numerous professional sports leagues, including the National Basketball Association, the National Hockey League and Major League Soccer.

Mr. Wilens is or has been a member of the American Bar Association, New York City Bar Association, Broward County Bar Association, Sports Lawyers Association and the Florida Bar Section on Entertainment and Sports Law. Mr. Wilens has also served as an adjunct professor at Florida Atlantic University and Nova Southeastern University where he has taught undergraduate and graduate level Business Law classes.

**SHAWN A. WILLIAMS** earned his Bachelor of Arts degree in English from the State University of New York at Albany in 1991. He earned his Juris Doctor degree from the University of Illinois College of Law in 1995. Upon graduation from law school, he served as an Assistant District Attorney in the Manhattan District Attorney's Office (1995-2000), where he spent four years in the trial division, prosecuting all levels of street crimes, and one year conducting white-collar fraud investigations.

Mr. Williams' practice focuses on class action securities fraud matters. He is admitted to practice in all courts of the State of New York, including the United States District Courts for the Southern and Eastern Districts of New York. Mr. Williams is also admitted to practice in all courts of the State of California and the United States Court of Appeals for the Ninth Circuit.

**DEBRA J. WYMAN** was born in La Mesa, California in 1967. Ms. Wyman specializes in securities litigation and has litigated numerous cases against public companies in the state and federal courts which resulted in hundreds of millions of dollars in recoveries to investors. In late 2004, Ms. Wyman was a member of the trial team in *In re AT&T Corp. Sec. Litig.*, which was tried in the District Court in New Jersey,

and which settled after two weeks of trial for $100 million. Currently, Ms. Wyman is litigating the complicated accounting fraud matter against HealthSouth Corporation, one of the largest and long-running corporate frauds in history.

Ms. Wyman received her Bachelor of Arts degree from the University of California, Irvine in 1990 and her Juris Doctor degree from the University of San Diego School of Law in 1997. Ms. Wyman was admitted to the California Bar in 1997 and is licensed to practice before all the California State Courts, as well as all the United States District Courts in California and the Eleventh Circuit Court of Appeals. She is a member of the California Bar Association and the San Diego County Bar Association.

## OF COUNSEL

**CAMERON BAKER** joined the firm as Of Counsel in November of 2005. Since then, he has focused on securities class actions. Mr. Baker currently serves as one of the lead attorneys for the class in *Jaffe v. Household Int'l, Inc.*, Lead Case No. 02-C-5893 (N.D. Ill.).

Prior to joining the Firm, Mr. Baker was an Assistant City Attorney for the City and County of San Francisco. In this capacity, he represented San Francisco in a number of significant and intriguing cases. His first case at the City Attorney's office was the tobacco litigation brought by the city under California Business and Profession Code section 17200. After the settlement of that case, he represented the city in similar suits against the firearms industry and the energy industry. Subsequently, when PG&E declared bankruptcy, Mr. Baker represented the city in the PG&E bankruptcy trial before Judge Dennis Montali as well as related administrative hearings before the California Public Utilities Commission. As a result of this work, which was performed in coalition with other California counties, Mr. Baker received

litigation awards from the California County Counsel Association.

While at the City Attorney's office, Mr. Baker also represented the city in two personal injury trials and represented the San Francisco Unified School District in a class action case brought under the ADA.

Prior to joining the City Attorney's office, Mr. Baker was an associate at Morrison & Foerster LLP (1996-1998) and Brobeck, Phleger & Harrison LLP (1991-1996). His practice at these firms focused on intellectual property litigation, although it included various other litigation. He graduated from Boalt Hall School of Law in 1991.

**ELISABETH A. BOWMAN** practice areas include class action consumer protection and antitrust. In addition, Ms. Bowman oversees and assists in the preparation of Coughlin Stoia's litigation graphics.

Ms. Bowman assisted in the successful prosecution of the following trials: *Long v. Wells Fargo Co.; Yourish v. Ca. Amplifier; In re Helionetics, Inc. Sec. Litig.; Schwartz v. Visa; Douglas Shooker v. Gary Winnick*; and *In re AT&T Corp. Sec. Litig.*

Ms. Bowman received her Bachelor of Fine Arts degree from the University of Alaska at Anchorage in 1986. She majored in Fine Arts and Psychology. While a student at the U of A, she received a grant from the Ford Foundation to participate in the artists in residency program at the Visual Arts Center, Alaska. Ms. Bowman received her Juris Doctor degree from the University of San Diego in 1989. During the summer of 1987, she attended USD's Institute on International and Comparative Law in Oxford, England.

Ms. Bowman was in private practice as a criminal defense attorney for eight years, handling both trials and appeals in state and federal courts. Ms. Bowman is a member of

Volunteers in Parole ("VIP"), an organization based on the Big Brothers' paradigm, in which attorneys are matched with parolees from the California Youth Authority in an effort to offer positive mentoring. She also served on VIP's local and state-wide boards.

Ms. Bowman is a member of the California Bar (1990), and is admitted to the Supreme Court of the State of California, the United States District Court for the Southern District of California, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.

**BRUCE BOYENS** earned his Juris Doctor degree from the University of Kentucky College of Law, while working in various industrial jobs to support his family. He also earned a Certificate in Environmental Policy and Management from Harvard University. Mr. Boyens has served as Of Counsel to the Firm since 2001. A private practitioner in Denver, Colorado since 1990, Mr. Boyens specializes in consulting with labor unions on issues relating to labor and environmental law, labor organizing, labor education, union elections, internal union governance and alternative dispute resolutions.

In this capacity, he was a Regional Director for the International Brotherhood of Teamsters elections in 1991 and 1995. He developed and taught collective bargaining and labor law courses for the George Meany Center, the United Mine Workers of America, Transportation Workers Local 260, the Kentucky Nurses Association, among others. Previously, he was an Attorney Instructor at the University of Tennessee Legal Clinic in Knoxville, Tennessee (1977-1978) and an Assistant Professor at the West Virginia Institute of Technology in Montgomery, West Virginia (1975).

He served as a special arbitrator of securities fraud claims in Kentucky in the matter of *SEC*

*v. Prudential Sec., Inc.*, (D. D.C.) Case No. 93-2164 (1993).

He served as the Western Regional Director and Counsel for the United Mine Workers from 1983-1990, where he was the chief negotiator in over 30 major agreements for the United Mine Workers, and represented the United Mine Workers in all matters before the National Labor Relations Board. From 1973-1977, he served as General Counsel to District 17 of the United Mine Workers Association and also worked as an underground coal miner during that time.

From 1978-1982, he served as the Assistant Regional Director/Inspection and Enforcement (Kentucky, Tennessee, Alabama and Georgia) for the United States Department of the Interior, Office of Surface Mining in Knoxville, Tennessee.

He has authored several articles in the areas of labor and environmental law, including: *Development of Foreign Coal by American Companies*, The National Coal Issue, West Virginia Law Review (Spring 1985), *Export of Coal, Jobs and Capital and Its Effects on the American Coal Industry*, Ninth Annual Seminar in Mineral Law, University of Kentucky College of Law (October 1984), and the *Guide to Black Lung Benefits* (December 1972). He has served as a member of the Editorial Board of the *Journal of Mineral Law & Policy*, University of Kentucky College of Law, from 1988-1999.

He is a member of the Tennessee and West Virginia Bars.

**JAMES CAPUTO** has focused his practice on the prosecution of complex litigation involving securities fraud and corporate misfeasance, consumer actions, unfair business practices, contamination and toxic torts, and employment and labor law violations. He has successfully served as lead or co-lead counsel in numerous class and consumer action litigation matters, including, for example: *In re S3 Sec.*

*Litig.*, Case No. CV770003 (Cal. Super. Ct., Santa Clara County); *Santiago v. Kia Motors Am.*, Case No. 01CC01438 (Cal. Super. Ct., Orange County); Case No. 0988 MJJ (N.D. Cal.); *In re Fleming Co. Sec. Litig.*, Case No. 5:02-CV-178 (TJW) (E.D. Tex.); *In re Capstead Mortgage Corp. Sec. Litig.*, Case No. 3:98-CV-1716 (N.D. Tex.); *In re Valence Tech. Sec. Litig.*, Case No. C95-20459 (JW)(EAI) (N.D. Cal.); *In re THQ, Inc. Sec. Litig.*, Master File No. CV-00-01783-JFW (C.D. Cal.); and *In re ICN Pharm. Corp. Sec. Litig.,* Case No. CV-98-02433 (C.D. Cal.).

Mr. Caputo was formerly a partner at Spector Roseman & Kodroff. He was one of the trial counsels in the year-long trial of *Newman v. Stringfellow*, a toxic exposure case involving nearly 4,000 plaintiffs. That case ultimately settled for approximately $110 million. He was co-trial counsel in an employment law class action against Taco Bell, which settled for $14 million.

Mr. Caputo received a Bachelor of Science degree from the University of Pittsburgh in 1970 and a Masters degree from the University of Iowa in 1975. In 1984, he received his Juris Doctor degree, *magna cum laude*, from California Western School of Law, where he served as Editor-In-Chief of the *International Law Journal*. He also clerked for Presiding Justice Daniel J. Kremer of the California Court of Appeal from 1985-1987 and to Associate Justice Don R. Work of the California Court of Appeal from 1984-1985. He has co-authored *No Single Cause: Juvenile Delinquency and the Search for Effective Treatment* (1985) and authored Comment, *Equal Right of Access in Matters of Transboundary Pollution: Its Prospects in Industrial and Developing Countries*, 14 Cal. West. Intl. L. J. 192 (1984). Mr. Caputo has also numerous presentations to various legal and professional groups regarding complex and class action litigation.

He is admitted to practice in the State of California and the United States District Courts for the Southern, Central and Northern Districts of California as well as numerous other jurisdictions. Mr. Caputo is a member of the San Diego County and American Bar Associations, the Consumer Attorneys of California, and the Association of Trial Lawyers of America.

**L. THOMAS GALLOWAY** received a Bachelor of Arts degree in History/Latin from Florida State University and received his Juris Doctor degree from the University of Virginia Law School in 1972, where he was a member of the Editorial Board of the *University of Virginia Law Review*.

Mr. Galloway is the founding partner of Galloway & Associates, a law firm that concentrates in the representation of institutional investors – namely, public and multi-employer pension funds.

Mr. Galloway has authored several books and articles, including: *The American Response to Revolutionary Change: A Study of Diplomatic Recognition* (AEI Institute 1978); *America's Energy: Reports from the Nation* (Pantheon 1980); Contributor, *Coal Treatise* (Matthew Bender 1981); Contributor, *Mining and the Environment: A Comparative Analysis of Surface Mining in Germany, Great Britain, Australia, and the United States*, 4 Harv. Envtl. L. Rev. 261 (Spring 1980); *A Miner's Bill of Rights*, 80 W. Va. L. Rev. 397 (1978); and Contributor, *Golden Dreams, Poisoned Streams* (Mineral Policy Center Washington D.C. 1997).

Mr. Galloway represents and/or provides consulting services for the following: National Wildlife Federation, Sierra Club, Friends of the Earth, United Mine Workers of America, Trout Unlimited, National Audubon Society, Natural Resources Defense Council, German Marshal Fund, Northern Cheyenne Indian Tribe and Council of Energy Resource Tribes. He is a member of the District of Columbia and Colorado State Bars.

**BYRON S. GEORGIOU** received his Bachelor of Arts degree with Great Distinction and with

Honors in Social Thought and Institutions, from Stanford University in 1970 attending on an Alfred P. Sloan full academic scholarship. After a year co-founding and teaching 7th and 8th graders at the Mariposa School, which has thrived for 35 years as an alternative primary through middle school in rural Mendocino County, he attended Harvard Law School, graduating *magna cum laude* in 1974. He was admitted to the California Bar in 1974 and served for one year as law clerk to the Honorable Robert F. Peckham, Chief Judge of the United States District Court for the Northern District of California. He is a member of the Bar of the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California.

Mr. Georgiou served from 1975-1980 in various capacities with the California Agricultural Labor Relations Board, defending the constitutionality of the law up through the United States and California Supreme Courts, and prosecuting unfair labor practice cases enforcing the collective bargaining rights of farm workers, who had been excluded from labor protection under the National Labor Relations Act.

From 1980-1983, Mr. Georgiou served as Legal Affairs Secretary to California Governor Edmund G. Brown Jr., responsible for litigation by and against the Governor, judicial appointments, liaison with the Attorney General, Judiciary and State Bar, legal advice to the Governor and members of his Cabinet, and exercise of the Governor's powers of extradition and clemency.

From 1983-1994, he was Managing Partner and co founder of the San Diego law firm of Georgiou, Tosdal, Levine & Smith, a general civil practice, with emphasis on litigation, appearances before executive and legislative governmental bodies, and representation of labor organizations and their members, including contract negotiations and enforcement for many California public and private sector labor organizations.

In 1994, he co-founded and served as President of American Partners Capital Group, concentrating on serving the needs of institutional investors through capital formation programs in a variety of alternative asset categories.

In 1981, Mr. Georgiou was honored as Public Official of the Year by the California Trial Lawyers Association and served as Chair of the Governor's Task Force on Alcohol, Drugs and Traffic Safety, one of the nation's first vehicles for enacting tough drunk driver legislation, sponsored by the Mothers Against Drunk Driving (MADD).

Mr. Georgiou has been with the Firm since 2000 and serves as the primary liaison with a number of the Firm's principal institutional clients and has been actively involved in the historic litigations seeking recoveries for defrauded investors in *Enron, Dynegy, AOL Time Warner* and *WorldCom.*

**MITCHELL D. GRAVO** concentrates his practice in lobbying and government relations. He represents clients before the Alaska Congressional delegation, the Alaska Legislature, the Alaska State Government and the Municipality of Anchorage.

Mr. Gravo attended Ohio State University as an undergraduate before attending the University of San Diego School of Law. He came to Alaska in 1977, served briefly as an intern with the Municipality of Anchorage and then clerked a year for Superior Court Judge J. Justin Ripley. After his clerkship with Judge Ripley, he went back to the work for the Municipality of Anchorage, where he first served as the executive assistant to the Municipal Manager and then as the first lobbyist for the then Mayor of Anchorage, George M. Sullivan. Mr. Gravo has been

described as one of the "top lobbyists in the state" by Alaska's major daily newspaper, *The Anchorage Daily News*.

His legislative clients include the Anchorage Economic Development Corporation, the Anchorage Convention and Visitors Bureau, UST Public Affairs, Inc., the International Brotherhood of Electrical Workers, Alaska Seafood International, Distilled Spirits Council of America, RIM Architects, Anchorage Police Department Employees Association, Fred Meyer and the Automobile Manufacturer's Association.

**DAVID J. HOFFA** is Of Counsel to the Firm and a part of the Institutional Outreach Program. He received his Bachelor of Arts degree from Michigan State University, and his Juris Doctor degree from Michigan State University College of Law.

Working closely with the Chairman of the Firm, Patrick Coughlin, Mr. Hoffa is an integral part of the Firm's client outreach and business development programs. He advises public and multi-employer pension funds around the country on issues related to corporate fraud in the U.S. securities markets and "best practices" in the corporate governance of publicly traded companies.

Mr. Hoffa is based in the Firm's Washington D.C. office.

**NANCY M. JUDA** concentrates her practice in employee benefits law and works in the Firm's Institutional Investors Department. Ms. Juda received her Juris Doctor degree from American University in 1992 and her undergraduate degree from St. Lawrence University in 1988.

Prior to joining Coughlin Stoia, Ms. Juda was employed by the United Mine Workers of America Health & Retirement Funds, where she began her practice in the area of employee benefits law. Ms. Juda was also associated

with union-side labor law firms in Washington, D.C., where she represented the trustees of Taft-Hartley pension and welfare funds on qualification, compliance, fiduciary and transactional issues under ERISA and the Internal Revenue Code.

Using her extensive experience representing union pension funds, Ms. Juda advises Taft-Hartley fund trustees regarding their options for seeking redress for losses due to securities fraud. Ms. Juda currently advises trustees of funds providing benefits for members of unions affiliated with the Building and Construction Trades Department of the AFL-CIO, including funds sponsored by the Operative Plasterers and Cement Masons International Association of America and Canada, International Union of Painters and Allied Trades, United Union of Roofers, Waterproofers and Allied Workers and International Union of Elevator Constructors. Ms. Juda also represents workers in ERISA class actions involving breach of fiduciary duty claims against corporate plan sponsors and fiduciaries.

Ms. Juda is licensed to practice in Maryland (1992) and the District of Columbia (1995). She is a member of the National Coordinating Committee for Multi-Employer Plans, the International Foundation of Employee Benefit Plans, the Employee Benefits Committee of the American Bar Association's Section of Labor and Employment Law and the AFL-CIO Lawyers' Coordinating Committee.

Ms. Juda is the Editor of the Firm's quarterly newsletter, *Taking Action – Fighting Corporate Corruption*.

**ALBERT H. MEYERHOFF** has concentrated his practice for more than 30 years in labor, civil rights and environmental law. After graduating from Cornell Law School in 1972, he joined California Rural Legal Assistance representing farm workers and the rural poor. These efforts included the landmark case of

*CAAP v. Regents of the University of California*, challenging the use of public research funds to promote agricultural mechanization. He also litigated a host of state and federal civil rights cases involving racial discrimination in employment, voting and public education, including *Maria P. v. Riles*, invalidating a California statute excluding undocumented children from California schools. In 1981, Mr. Meyerhoff joined the Natural Resources Defense Council (NRDC), a national environmental organization, as Director of their Public Health Program. His concentration is in litigation concerning toxic substances and occupational health has and brought successful challenges to the continued use of cancer-causing pesticides (*Les v. Reilly*), the exclusion of women of "child-bearing age" from the workplace (*Love v. Thomas)*, and the California Governor's failure to comply with Proposition 65, an anti-toxics law (*AFL-CIO v. Deukmejian*). During his 17 years with NRDC, Mr. Meyerhoff testified more than 50 times before the United States Senate and House of Representatives.

Mr. Meyerhoff has authored numerous articles for scholarly and general publications, including the *Stanford Law Review*, *EPA Journal*, *Environmental Law Quarterly*, *The New York Times*, *The Washington Post* and *Los Angeles Times*. He has appeared regularly on such programs as CBS News 60 Minutes, ABC 20/20, NBC Dateline, Good Morning America, The Today Show and The NewsHour with Jim Lehrer, and has been an invited speaker at the Harvard Business School, the National Academy of Sciences, the American Academy of Sciences and the AFL-CIO.

Since 1998, Mr. Meyerhoff has been lead counsel in several labor and environmental cases, including *UNITE v. The Gap*, contesting the sale of garments manufactured under sweatshop conditions in the Commonwealth of the Mariana Islands, and *Public Citizen v. U.S. D.O.T.*, challenging cross-border trucking from Mexico to conform to NAFTA but in violation of United States environmental laws.

Mr. Meyerhoff was selected as "Trial Lawyer of the Year" by Trial Lawyers for Public Justice and for a lifetime achievement award from the ACLU.

**JACQUELINE E. MOTTEK** received her Bachelor of Science degree in Government and Politics, *cum laude*, from the University of Maryland, College Park in 1979. Ms. Mottek obtained her Juris Doctor degree in 1986 from the University of San Francisco School of Law, where she was a recipient of the American Jurisprudence Award in Constitutional Law and a member of the *University of San Francisco's Law Review*.

Ms. Mottek was associated with the law firm Brobeck Phleger & Harrison from 1987-1994. In 1994, Ms. Mottek served as sole chair in a jury trial resulting in a verdict in favor of her clients of $1 million. In 1994, Ms. Mottek became a partner with the firm Lieff Cabraser Heimann & Bernstein, concentrating her practice in plaintiffs' class actions with an emphasis on consumer fraud litigation and other complex business litigation for plaintiffs. She successfully prosecuted a certified class action on behalf of physicians who provided medical services to Blue Cross of California HMO members. She is the author of *The Impact of Classwide Arbitration on Mandatory Arbitration*, Vol. 1, No. 13, Class Action Litigation Report, (October 27, 2000).

Prior to joining Coughlin Stoia, Ms. Mottek prosecuted consumer fraud class actions. She serves as co-lead counsel in several consumer class actions, including *Tenet HealthCare Cases II*, JCCP No. 4285, pending before the Los Angeles Superior Court, and as co-lead counsel and a member of the executive committee of the *Cellphone Termination Fees Litig.*, JCCP 4332, pending before the Superior Court of Alameda County. She is also a senior litigator in *Spielholz v. LA Cellular, Inc.*, Case No. BC186787 (resulting in the published opinion *Spielholz v. Super. Ct.*, 86 Cal. App. 4th 1866 (2001), granting a petition for a writ of mandamus she drafted in a question of first

impression in California); in the matters coordinated before the federal court in the Northern District of Illinois, styled *In re Owen Fed. Bank Mortgage Servicing Litig.*, MDL No. 1604; and as counsel in *Paton v. Cingular Wireless*, Case No. CGC-04-428855, in the Superior Court of San Francisco.

**PAMELA M. PARKER** received her Bachelor of Arts degree in Political Science and French, with a concentration in International Politics, from the State University of New York at Binghamton, and was elected to Phi Beta Kappa. Ms. Parker received a Juris Doctor degree from Harvard Law School, *cum laude,* in 1982. While at Harvard, Ms. Parker was an Articles Editor of the *Civil Rights/Civil Liberties Law Review*. After graduation, she served as a law clerk to the Honorable Frank J. Battisti, Chief Judge of the United States District Court, Northern District of Ohio. Upon leaving the clerkship, Ms. Parker worked as an associate with the New York firm of Paul Weiss Rifkind Wharton & Garrison. In 1988, Ms. Parker became associated with the New York firm of Lankenau Kovner & Bickford, concentrating her practice in representation of publications, libel defense, and First Amendment law.

For 13 years, Ms. Parker's practice has included appellate matters and environmental, consumer fraud and securities fraud litigation. Ms. Parker participated in the successful prosecution of several important actions, including: *In re The Exxon Valdez*, Case No. A89-095 (D. Ala.), in which she served as a member of the trial support team, and which resulted in a $5 billion jury verdict; *Pinney v. Great Western Bank,* Case No. CV-95-2100-I(RNBx) (C.D. Cal.), in which she served as one of the principal attorneys for plaintiffs and which resulted in a settlement of $17.2 million; and *Does I v. The Gap, Inc.,* Case No. 01 0031 (D. N. Mariana Islands), in which she was the lead prosecuting attorney and which resulted in a $20 million settlement, including a precedent-setting Monitoring Program to monitor labor and human rights practices in

Saipan garment factories. In July 2003, Ms. Parker was named Trial Lawyer of the Year by the Trial Lawyers for Public Justice in recognition of her work on the case in the Northern Mariana Islands.

Ms. Parker is a member of the Appellate Practice Group of Coughlin Stoia. She has worked on a variety of appellate matters before numerous courts, including the United States Courts of Appeal for the Fifth, Sixth, Ninth, and Tenth Circuits and the appellate courts of California, Alabama, Ohio and Tennessee. She is a Lawyer Representative to the Ninth Circuit Judicial Conference.

Ms. Parker is admitted to practice in California and New York. She has been an active member of the Federal Bar Association, the San Diego County Bar Association and the Lawyers Club of San Diego, and also holds memberships with the American Bar Association and California Women Lawyers. She sits on the Board of Directors for the Legal Aid Society of San Diego.

**LEONARD B. SIMON** is admitted to practice in California, New York, and the District of Columbia.

Mr. Simon's practice has been devoted heavily to litigation in the federal courts, including both the prosecution and the defense of major class actions and other complex litigation in the securities and antitrust fields. He has also handled a substantial number of complex appellate matters, arguing cases in the United States Supreme Court, several federal Courts of Appeal, and several California appellate courts. He has also represented large, publicly traded corporations.

Mr. Simon served as plaintiffs' co-lead counsel *in In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz.) (settled for $240 million) and *In re NASDAQ Market-Makers Antitrust Litig.*, MDL No. 1023 (S.D.N.Y.) (settled for more than one billion

dollars). He is currently in a leadership position in the private Microsoft Antitrust Litigation, and in the California Utilities Antitrust Litigation. He was centrally involved in the prosecution of *In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551(D. Ariz.), the largest securities class action ever litigated.

Mr. Simon is an Adjunct Professor of Law at Duke University, the University of San Diego, and the University of Southern California Law Schools. He has lectured extensively on securities, antitrust and complex litigation in programs sponsored by the American Bar Association Section of Litigation, the Practicing Law Institute, and ALI-ABA, and at the UCLA Law School, the University of San Diego Law School, and the Stanford Business School. He is an Editor of California Federal Court Practice and has authored a law review article on the Private Securities Litigation Reform Act of 1995.

Mr. Simon received his Bachelor of Arts degree from Union College in 1970 and his Juris Doctor degree from Duke University School of Law, Order of the Coif and with distinction, in 1973. He served as law clerk to the Honorable Irving Hill, United States District Judge for the Central District of California, in 1973-1974.

**LAURA S. STEIN** received her Bachelor of Arts degree in 1992 and her Juris Doctor degree in 1995 from the University of Pennsylvania. She is a member of the bar in Pennsylvania, New Jersey and Washington D.C. Since 1995, Ms. Stein has practiced in the areas of securities class action litigation, complex litigation, and legislative law.

In a unique partnership with her mother, attorney Sandra Stein, Of Counsel to Coughlin Stoia, the Steins serve as two of the top asset recovery experts in the country. The Stein's focus on maximizing profits and minimizing losses to shareholders due to corporate fraud and breaches of fiduciary duty. They also seek to deter future violations of federal and state securities laws by reinforcing the standards of good corporate governance. They work with over 500 Institutional Investors across the nation. Some of their clients have led cases against the following companies with great success: AOL Time Warner, TYCO, Cardinal Health, AT&T, Hanover Compressor and First Bancorp to name a few.

Ms. Stein has been active in a number of organizations, including the National Association of Shareholder and Consumer Attorneys (NASCAT), National Association of State Treasurers (NAST), the AFL-CIO Lawyers Coordinating Committee, the National Coordinating Committee for Multi-Employer Plans (NCCMP), and the International Foundation for Employer Benefit Plans (IFEBP), among others.

Ms. Stein has addressed the Florida Public Pension Trustees Association, the Third District Regional Meeting of the International Brotherhood of Electrical Workers, the Ohio Building Trades, the New York Pipetrades, and the Pennsylvania Treasurers Association, among many others. She has also addressed the Pennsylvania, Nevada and Virginia AFL-CIO conventions, as well as hundreds of public and Taft-Hartley pension fund trustee boards across the country.

Ms. Stein is serving as Special Counsel to the Institute for Law and Economic Policy, a think tank devoted to areas of concern to consumers and investors. In addition, Ms. Stein also served as Counsel to the Annenberg Institute of Public Service at the University of Pennsylvania. Ms. Stein resides in Penn Valley, Pennsylvania and Beverly Hills, California with her husband, Samuel Goldfeder, an attorney and NBA sports agent, and their two young children, Michael and Sabrina.

**SANDRA STEIN** received her Bachelor of Science degree from the University of Pennsylvania and a Juris Doctor degree from Temple

University Law School.  She is a member of the bar in Pennsylvania and Washington, D.C.  Ms. Stein concentrates her practice in securities class action litigation, legislative law, and antitrust litigation.  She served as Counsel to United States Senator Arlen Specter (Pennsylvania).  Ms. Stein currently serves as Vice President to the Institute for Law and Economic Policy, a think tank which develops policy positions on selected issues involving the administration of justice within the American Legal System.  In addition, Ms. Stein serves on the Board of Advisors of the Annenberg Institute of Public Service at the University of Pennsylvania.  Ms. Stein was the recipient of the National Federation of Republican Women's "Best of America" award and has been honored by the White House, California State Senate, and California State Assembly for civic leadership.

In a unique partnership with her daughter, Laura Stein, an attorney at Coughlin Stoia, the Steins serve as two of the top asset recovery attorneys in the Firm.  The Steins focus on maximizing profits and minimizing losses to shareholders due to corporate fraud and breaches of fiduciary duty.  They also seek to deter future violations of federal and state securities laws by reinforcing the standards of good corporate governance.  They work with over 500 Institutional Investors across the nation.  Some of their clients have led cases against the following companies with great success:  AOL Time Warner, TYCO, Cardinal Health, AT&T, Hanover Compressor and First Bancorp, to name a few.

Ms. Stein has been active in a number of organizations, including the National Association of Shareholder and Consumer Attorneys (NASCAT), National Association of State Treasurers (NAST), the AFL-CIO Lawyers Coordinating Committee, the National Coordinating Committee for multi-employer Plans (NCCMP), and the International Foundation for Employer Benefit Plans (IFEBP), among others.

Ms. Stein has addressed the National Association of Auditors, Controllers and Treasurers on the subject of corporate governance and its role as a positive force in future class action securities settlements.  She has also spoken before numerous AFL-CIO conventions and dozens of public and multi-employer pension funds.

## SPECIAL COUNSEL

**SUSAN K. ALEXANDER** graduated with honors from Stanford University in 1983 and earned her Juris Doctor degree from the University of California, Los Angeles in 1986. Ms. Alexander joined the Appellate Practice Group at the Firm in 2000, focusing on federal and state appeals of securities fraud class actions. Ms. Alexander has argued on behalf of defrauded investors in the Fifth, Ninth, and Tenth Circuits. Representative results include *Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) (reversal of district court dismissal of securities fraud complaint), and *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005) (reversal of district court dismissal of securities fraud complaint).

Ms. Alexander's prior appellate work was with the California Appellate Project ("CAP"), where she prepared appeals and petitions for writs of *habeas corpus* on behalf of individuals sentenced to death, as well as supervising private attorneys in their preparation of appeals and *habeas corpus* petitions. At CAP, and subsequently in private practice, Ms. Alexander litigated and consulted on death penalty direct and collateral appeals for 10 years. Representative results include *In re Brown*, 17 Cal. 4th 873 (1998) (reversal of first degree murder conviction, special circumstance finding, and death penalty), and *Odle v. Woodford*, 238 F.3d 1084 (9th Cir. 2001) (remand of death penalty conviction for retrospective competency hearing). Ms. Alexander was previously associated with Bronson, Bronson & McKinnon, where she litigated professional malpractice and product

liability cases on behalf of attorneys, doctors, and automobile manufacturers, including defense verdicts in two jury trials.

Ms. Alexander is a member of the Bars of the State of California, the United States Supreme Court, the Court of Appeals, Fifth, Ninth, and Tenth Circuits, and the United States District Court, Northern, Central, Eastern and Southern Districts of California. Ms. Alexander is also a member of the Federal Bar Association, Appellate Division and the Appellate Practice Section of the Bar Association of San Francisco.

Ms. Alexander is married with three teenage children.

**BRUCE GAMBLE** is a member of the Firm's institutional investor client services group. He serves as liaison with the Firm's institutional investor clients in the United States and abroad, advising them on securities litigation matters. He formerly served as Of Counsel to the Firm, where he worked with the institutional investor client services group, providing a broad array of highly specialized legal and consulting services to public retirement plans. Prior to that, he was General Counsel and Chief Compliance Officer for the District of Columbia Retirement Board, where he served as Chief Legal Advisor to the Board of Trustees and staff. His experience also includes the following positions: President and CEO of the National Association of Investment Companies, representing general partners of private equity firms in the United States; Staff Director and Counsel to a Small Business Subcommittee in the United States House of Representatives, where he executed a strategy for the Subcommittee's oversight jurisdiction over federal programs that promoted business development and access to capital and credit; and Chief Legislative Advocate, and then President and In-House Counsel to the National Bankers Association in Washington, D.C., where he served as principal liaison with federal financial institutions' supervisory agencies and the United States Congress. He

also served in several senior staff positions on Capitol Hill.

Mr. Gamble received his Bachelor of Science degree in Economics from the University of Louisville, and his Juris Doctor degree from Georgetown University Law Center. He formerly served as a member of the Executive Board and co-chair of the investment section of the National Association of Public Pension Attorneys (NAPPA), a professional and educational organization whose membership consists exclusively of attorneys who represent public pension funds. He frequently participates as a speaker for various organizations serving United States and international public pension plans.

He is admitted to practice in New York, the District of Columbia, Pennsylvania, and the United States Supreme Court.

**THE HONORABLE LAWRENCE IRVING** joined the firm in 2006 as special counsel to the Firm, advising the Firm's institutional investor clients regarding securities matters, including litigation and settlements, and acting as the firm's liaison with The Regents of the University of California – the lead plaintiff in the *Enron* securities class action. Previously, Judge Irving was appointed by Judge Barbara Lynn as *Guardian ad Litem* for the investor class in the *Halliburton* securities case, to review and report to the court on the fairness of the proposed settlement.

Judge Irving received his B.S. in Business Administration and his L.L.B. from the University of Southern California. For many years, Judge Irving was a leading trial lawyer in San Diego. He was elected a Fellow in the prestigious American College of Trial Lawyers and was President of the San Diego Chapter of the American Board of Trial Advocates. He was appointed to the Federal Bench in San Diego in 1982, having received an Exceptionally Well Qualified rating by the American Bar Association. He presided over

numerous high-profile criminal and civil trials, including a five-month jury trial in the *Nucorp* securities class action.

Judge Irving resigned from the Federal Bench in 1990 because of his stance against Federal Sentencing Guidelines and Minimum Mandatory Sentencing laws. He received numerous awards for his judicial service, including awards from such diverse groups as the FBI and ACLU.

Judge Irving has mediated many high profile cases since 1991, including numerous large class action securities cases. According to the *Los Angeles Daily Journal*, Judge Irving is one of the most sought after mediators/arbitrators in California. Judge Irving successfully mediated the resolution of actions against the following companies: Lincoln Savings & Loan (D. Ariz.); Coeur d'Alene (D. Colo.); Morrison Knudsen (D. Idaho & Del.); Sensormatic (D. Fla.); ADM Archer Daniels Midland (D. Ill.); Hollywood Park, LA Gear, Occidental, Lockheed, Clothestime, Great Western Savings, Pacific Enterprises, Toyota, Venture Entertainment and Ascend (C.D. Cal.); Pioneer Mortgage, National Health Labs and Proxima (S.D. Cal.); Ross Systems, Resound, Insignia Solutions, IMP, Informix and Leasing Solutions (N.D. Cal.); Salomon Bros., Woolworth Corporation and Standard Microsystems (S.D. N.Y.); and Washington Mutual, Foodmaker, Mercer Ind., Price Costco, Gensia and Midcom Communications (D. Wash.). In addition, Judge Irving also mediated the $2.2 billion settlement in the *Enron* securities litigation with defendant J.P. Morgan (S.D. Tex.).

Judge Irving has served as chair and a member of numerous Judicial Selection Committees, including as Chair of former California Governor Pete Wilson's San Diego Superior Courts Committee, Chair of Senator Barbara Boxer's Southern California Federal Judicial and United States Attorneys Selection Committee, Chair of several San Diego United States Magistrate Judicial Selection

committees, and currently serves on President Bush's Southern California Federal Judicial and United States Attorney Selection Committee.

Judge Irving has received several awards, including the following: 1990 Trial Judge of the Year – San Diego Trial Lawyers, 1990 Annual Award of San Diego Defense Lawyers (Civil), 1990 Criminal Defense Lawyers' Club of San Diego, "Extraordinary Abilities as a Federal District Judge," 1990 San Diego Press Club – Headliner Law and Justice, 2001 Witkin Award, and 2002 San Diego Bar Association Outstanding Service Award. Judge Irving is also a member of many Professional Associations including: Fellow, American College of Trial Lawyers; Fellow, American Bar Foundation; American Board of Trial Advocates (President San Diego Chapter 1972); San Diego County Bar Association (Board of Directors 1972-1975, Vice President 1975, and Treasurer 1974).

Judge Irving will continue to serve as mediator in certain cases and will continue his *pro bono* activities on behalf of significant causes.

**RUBY MENON** received her Bachelor of Arts degree in Journalism/English and her Juris Doctor degree from Indiana University. Her practice focuses on providing a variety of legal services to individual and institutional investors, which include public pension funds both in the United States and abroad. Ms. Menon is a member of the Firm's advisory team and serves as a liaison between the Firm and its individual and institutional investor clients. She provides a broad array of highly specialized legal and consulting services to retirement plans and individual investors.

Ms. Menon was the first general counsel of the Denver Employees' Retirement Plan, providing all legal services to the members of the Retirement Board and staff. Prior to that, she was the general counsel for the Indiana Public Employees' Retirement Fund. At Indiana, one of her successful projects was to help develop the legal strategy and advocacy for the State's

Referendum lifting the long-standing prohibitions on the pension funds' investment in equity instruments.

As general counsel for two large multi-employee retirement plans, Ms. Menon developed expertise in many areas of employee benefits administration, including legislative and regulatory affairs, investments, tax, fiduciary compliance and plan administration. She provided day-to-day legal advice to the Board and staff, and was responsible for drafting all legislative initiatives involving benefit and investment structure, enabling the retirement plans to provide secure long-term benefits for state, public safety and municipal employees.

Ms. Menon also served as a Deputy Prosecuting Attorney for the Marion County Prosecutor's Office in Indianapolis, Indiana. In addition, she was an adjunct professor for the Indiana Wesleyan University in Indianapolis, Indiana, where she taught law, ethics and communication.

She is a frequent instructor for several certificate and training programs for trustees, administrators, and other key decision makers of employee benefit plans. She frequently participates as a speaker for various organizations serving United States and international public pension plans.

Ms. Menon's bar affiliations and court admissions include: District of Columbia; New York; Colorado; Indiana; and the United States Supreme Court.

## FORENSIC ACCOUNTANTS

R. STEVEN ARONICA is a Certified Public Accountant licensed in the States of New York and Georgia and is a member of the American Institute of Certified Public Accountants, the Institute of Internal Auditors and the Association of Certified Fraud Examiners. He has been employed in the practice of accounting for 25 years, including: (1) public accounting where he was responsible for providing clients with a wide range of accounting and auditing services; (2) private accounting with Drexel Burnham Lambert, Inc., where he held positions with accounting and financial reporting responsibilities as a Vice President; and (3) various positions with the United States Securities and Exchange Commission ("SEC"). Mr. Aronica has extensive experience in securities regulation and litigation. At the SEC, Mr. Aronica reviewed and analyzed financial statements and related financial disclosures contained in public filings for compliance with generally accepted accounting principles, generally accepted auditing standards, and the accounting and auditing rules, regulations and policies of the SEC. Mr. Aronica was also an Enforcement Division Branch Chief, responsible for managing a group of investigators and accountants who initiated, developed and executed numerous investigations involving financial fraud, accounting improprieties and audit failures. Mr. Aronica has been instrumental in the prosecution of numerous financial and accounting fraud civil litigation claims against companies which include Lucent Technologies, Oxford Health Plans, Computer Associates, Aetna, WorldCom, Tyco, Vivendi, AOL Time Warner, Ikon, Thomas & Betts, InaCom and Royal Ahold. In addition, Mr. Aronica helped prosecute numerous claims against each of the major United States public accounting firms.

ANDREW J. RUDOLPH is a Certified Fraud Examiner and a Certified Public Accountant licensed to practice in California. He is an active member of the American Institute of Certified Public Accountants, California's Society of Certified Public Accountants, and the Association of Certified Fraud Examiners. His 20 years of public accounting, consulting and forensic accounting experience includes financial fraud investigation, auditor malpractice, auditing of public and private companies, business litigation consulting, due

diligence investigations and taxation. Mr. Rudolph is the National Director of Coughlin Stoia's Forensic Accounting Department, which provides the Firm with in-house forensic accounting expertise in connection with securities fraud litigation against national and foreign companies. Mr. Rudolph is the Director of Forensic Accounting at the Firm and has given numerous lectures and assisted with articles on forensic investigations and financial statement fraud. Mr. Rudolph has directed hundreds of financial statement fraud investigations which were instrumental in the recovered billions of dollars for defrauded investors. Prominent cases include *Qwest*, *HealthSouth*, *WorldCom*, *Boeing*, *Honeywell*, *Vivendi*, *Aurora Foods*, *Informix* and *Platinum Software*.

**CHRISTOPHER YURCEK** is one of the Firm's senior forensic accountants and provides in-house forensic accounting and litigation expertise in connection with major securities fraud litigation. Mr. Yurcek is a Certified Public Accountant with 19 years of accounting, forensic examination and consulting experience in areas including financial statement audit, fraud investigation, auditor malpractice, turn-around consulting, business litigation, and business valuation. Mr. Yurcek is currently responsible for overseeing the firm's forensic accounting investigation in *In re Enron Corp. Sec. Litig*. Mr. Yurcek provides the firm with in-house forensic accounting expertise and directs accounting investigations in connection with well-publicized securities fraud litigation, including cases such as *Enron*, *Vesta*, *Informix*, *Mattel*, *Coca Cola Company* and *Media Vision*. Mr. Yurcek's experience included providing forensic accounting expertise to bankruptcy trustees and audit and accounting services at a national CPA firm. Mr. Yurcek speaks at professional accounting seminars on topics such as financial statement fraud and fraud prevention and has co-authored articles on these subjects. Mr. Yurcek is a member of the American Institute of Certified Public Accountants and the California Society of CPAs.